LEXSEE 2006 U.S. DIST. LEXIS 66473

**ARNOLD IRRER, ET AL, Plaintiffs, v. MILACRON, INC., Defendant.**

**Case No. 04-72898**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2006 U.S. Dist. LEXIS 66473*

**September 18, 2006, Decided**
**September 18, 2006, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by *Irrer v. Milacron, Inc., 2006 U.S. Dist. LEXIS 74907 ( E.D. Mich., Oct. 16, 2006)*

**COUNSEL:** For Milacron, Incorporated, Defendant: Sean S. Cleland, LEAD ATTORNEY, Martin, Bacon, (Mount Clemens), Mount Clemens, MI; Robert A. Miller, Lee D. Thames, Butler, Snow, LEAD ATTORNEYS, Jackson, MS; John G. Mitchell, LEAD ATTORNEY, Secrest, Wardle, (Farmington Hills), Farmington Hills, MI.

For Arnold Irrer, Donald Allen, Kent Barton, Arnold Davis, Felix Rubio, Melvard Newhouse, Samuel Florida, Eula Mae Newhouse, Ila Davis, Karen Florida, Ramona Rubio, Adelaide Ball, Sally A. Hanson, Plaintiffs: Roy A. Jacobson, Jr., Gerald L. Spence, LEAD ATTORNEYS, Spence Law Firm, Jackson, WY.

For Arnold Davis, Felix Rubio, Melvard Newhouse, Samuel Florida, Arnold Irrer, Donald Allen, Kent Barton, Plaintiffs: Gary L. Shockey, LEAD ATTORNEY, Spence Law Firm, Jackson, WY.

For Estate of Bruce Eldridge, Estate of Buford Alexander, Estate of Jerry Holt, Estate of John Ross, Estate of Roosevelt Mizell, Estate of Steve Klarich, Abraham Felix, Albert Dudley, Albert Hawkins, Allen Gates, Allen Jerke, Andrew Wendling, Arnold Grace, Arnold Irrer, Arnold Kipfer, Barbara McCraney, Beatrice Shumpert, Benigno Cortez, Berley Cavness, Bernard Kahn, Bertha Simmons, Bethany Gordon, Betty Jackson, Bob Casault, Bobby Roberts, Bobby Slaughter, Calvin Stewart, Cassandra Cambell, Ceasar Littles, Cesley Barnes, Chad Oakley, Charles Cross, Charles DeCaire, Charles Hilliker, Charles Ursery, Chris Green, Chris Wagner, Clifton Arbuckle, Clifton Bey, Clovis Davis, Craig Steele, Dale Fox, Dan Price, Daniel Anderson, Daniel Chrenka, Daniel Lesko, Daniel Rosinski, Darlene Novak, Dave Henderson, David Bodnar, David Croteau, David Terrian, David Wilson, Dawn Hagemeister, Deborah Dantzler-Harris, Dennis Boykins, Dennis Harry, Dolores Matta, Don Morey, Donald Allen, Donald Fremd, Donald Hamady, Donald Valley, Douglas Beebe, Douglas Koch, Earlene Elliott, Ed McFadden, Edward McMahon, Elaine Willingham, Elizabeth Bell, Ernest Yaklin, Evelyn Dobbins, Everett Cragg, Fred McDaniel, Garwood Reimer, Gary Hicks, Gary Stillwagon, George Colter, George Harris, George Howard, Georgia Ford, Gerald Austin, Gerald Koryciak, Gerald Moore, Gerald Mosher, Glen Byers, Gordon Gragg, Gordon Harmon, Gregory Cook, Grover Hurley, Harold Miller, Harvey Taylor, Henry Heal, Hermilo Moreno, Hertis Gant, Homer Taylor, Horace Blair, Howard Loree, Howard Stuart, Hugh Smith, Ire Gillespie, J. C. McDaniel, Jack Sweeney, James Anderson, James Cook, James Goza, James Graham, James Halford, James Hill, James Martin, James Pouillon, Janene LaPratt, Jerry Ward, Jodie Nicholson, Joe Johnson, John Govitz, John Hobson, John McCallum, John McCraney, John Shannon, John Shields, Johnny Thornton, Joseph Willey, Joyel Cole, Keith Calkins, Keith Swayze, Kenneth Franklin, Kenneth Johnstone, Kenneth Randt, Kenneth Scott, Kent Barton, Larry Binkley, Larry Brown, Larry Clear, Larry Fluty, Larry Hoffman, Lawrence Tremble, Lee Roy Wells, Leo Dolehanty, Leon Bryant, Leroy Smith, Leroy Wing, Linda Cohoon, Linda Hill, Lloyd Bentley, Lloyd Moore, Louis Koryciak, Lula Lewis, Martha Edwards, Martin Gall, Mary Randle, Mary Anna Turner, Matthew Sproul, Maud Barton, Maurice O'Suna, Maxine Rivers, Melvin Austin, Merwin Geraghty, Michael Fuller, Michael Rogers, Michael Roos, Mike Prell, Milton Whiren, Mitch Garrett, Morris Branch, Morris Massey, Myrtin Calhoun, Nathanial Wyatt, Neil Huiskens, Pat Dolan, Patricia Crim, Paul Matney, Percy Morris, Phillip Harris, Phillip

Kimble, Phyllis Radd, Ralph Niedecken, Randy Johnson, Ray Gatica, Regina King, Richard Cherry, Richard Corcoran, Richard Ferguson, Richard Pakosz, Richard Pidcock, Richard Shock, Robert Arnot, Robert Boza, Robert Holt, Robert Ladd, Robert Morris, Robert Muschiana, Robert Oginsky, Robert Williams, Rocky Spencer, Roger Bouchard, Ronald Dodge, Roy Guidry, Rufus Endicott, Russell Brown, Sandra Gamble, Sandra Garrison, Sandra Hart, Sandra Henry, Sandra Stiven, Sharlene Woodward, Shirley Knox, Stanley Lessiter, Stanley Ziecina, Stephany Stephen, Steven Baroski, Steven Smith, Teddy Morris, Terry Turner, Thomas Frye, Timothy Calhoun, Timothy Jones, Timothy Wilson, Tom Sabin, Tomm McLean, Ulysses Blake, Virgie Turner, Walter Rosinski, William Balcer, William Murphy, Willie Hopkins, Willie Jones, Willie Wiggins, Willie Woodward, Yvonne Harris, Arnold Davis, Felix Rubio, Melvard Newhouse, Samuel Florida, Dave Riopelle, Enrico Guerrieri, Richard Slater, Dennis McGowan, James Walters, Judith Oginsky, Robert Neumann, Stanley Hodges, Valerie Lyles, William Wilson, Estate of George Brown, James Popular, Jerry Taylor, Taylor Hill, Ted Sweeney, Regional Garland, Valerie Green, Harriet Betts, Eula Mae Newhouse, Ila Davis, Karen Florida, Ramona Rubio, Adelaide Ball, Sally A. Hanson, Estate of Richard Slater, Estate of David Riopelle, Estate of Enrico Guerrieri, Estate of William Slater, Plaintiffs: Neal J. Wilensky, LEAD ATTORNEY, Kaechele & Wilensky (Grand Blanc), Grand Blanc, MI.

**JUDGES:** [*1] Nancy G. Edmunds, United States District Judge.

**OPINION BY:** Nancy G. Edmunds

**OPINION**

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS GREEN AND GARLAND [70]**

This product liability case comes before the Court on Defendant's motion for summary judgment as to Plaintiffs Green and Garland [1] arguing that their product liability claims against Milacron are time-barred. Defendant's motion is GRANTED. Plaintiffs' tolling and equitable estoppel arguments are rejected.

> 1  Defendant's motion addressed another Plaintiff, Harriett Betts, but her claims were dismissed with prejudice immediately before the hearing on this matter by a stipulation and order.

**I. Facts**

This Court has diversity jurisdiction over Plaintiffs' product liability action [2] brought by 256 current or former General Motors employees claiming to have been injured by exposure to Defendant Milacron, Inc.'s metalworking fluids used in fabricating metal parts at GM's Buick plant. Plaintiffs' complaint was filed on [*2] June 21, 2004.

> 2  Although Plaintiffs assert three theories of recovery (negligence, strict liability and intentional tort), all three arise out of Defendant Milacron's alleged negligence and allege personal injury from Defendant's product.

This matter is currently before the Court on Milacron's motion for summary judgment arguing that Plaintiffs Valerie Green and Regional Garland knew or should have known of their alleged injury and possible cause of action more than three years before this suit was filed. Accordingly, Milacron argues, their claims are time-barred under the applicable statute of limitations.

**II. Standard for Summary Judgment**

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided [*3] that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex, 477 U.S. at 323*. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*. The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for [*4] trial." *Fed. R. Civ. P. 56(e)*. The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party.

*Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).*

## III. Analysis

### A. General Principles

Under Michigan law, a claim for personal injury from a product must be brought within three years of when the claim first accrues. *Mich. Comp. Laws § 600.5805(13).* The Michigan courts apply a discovery rule to product liability claims, thus affecting the date they accrue for statute of limitations purposes. *See Moll v. Abbott Lab., 444 Mich. 1, 506 N.W.2d 816, 823 (Mich. 1993); Mascarenas v. Union Carbide Corp., 196 Mich. App. 240, 492 N.W.2d 512, 514 (Mich. Ct. App. 1992)* (observing that "[t]he 'discovery rule' measures the accrual date of latent occupational diseases in products liability cases"); *Stinnett v. Tool Chem. Co., 161 Mich. App. 467, 411 N.W.2d 740, 743 (Mich. Ct. App. 1987).* [*5]

The Michigan Supreme Court adopted "the 'possible cause of action' standard for determining when the discovery rule period begins to run in *Moll.*" *Solowy v. Oakwood Hosp. Corp., 454 Mich. 214, 561 N.W.2d 843, 846 (Mich. 1997).* It reasoned that "[t]his standard advances the Court's concern regarding preservation of a plaintiff's claim when the plaintiff is unaware of an injury or its cause, yet . . . also protects the Legislature's concern for finality and encouraging a plaintiff to diligently pursue a cause of action." *Moll, 506 N.W.2d at 827.* Thus, "[o]nce a claimant is aware of an injury and its possible cause, the plaintiff is aware of a possible cause of action." *Id. at 828.* The statute of limitations begins to run at that point, giving the plaintiff three years to investigate and file his complaint. "Once a plaintiff is aware of an injury and its possible cause, the plaintiff is equipped with the necessary knowledge to preserve and diligently pursue his claim." *Solowy, 561 N.W.2d at 847.*

Additional general principles apply to Michigan's discovery rule. It "applies to the discovery of an injury, not to the discovery [*6] of a later realized consequence of the injury." *Moll, 506 N.W.2d at 825.* Moreover, a plaintiff need not know "the details of the evidence by which to establish his cause of action." *Id. at 828* (internal quotations and citation omitted).

### B. Application to Undisputed Facts as to Plaintiff Green's and Garland's Causes of Action Against Defendant Milacron, Inc.

Defendant Milacron argues that the undisputed facts presented here show that Plaintiffs Green and Garland each knew or should have known of their injury and its possible cause for more than three years before this lawsuit was filed because: (1) each had a documented lung-related condition no later than 1995 and 1996, respectively; and (2) each believed that exposure to metalworking fluids or mists was a possible cause of that condition more than three years before filing this suit.

### 1. Valerie Green

Valerie Green claims that she was exposed to metalworking fluids from 1985 through 1995. (Def.'s Ex. B, Green Fact Sheet at 2.) She last worked at GM's Buick Plant on February 10, 1995. (Green Dep. at 78.) On that last day of work, Ms. Green had pneumonia. (Green Dep. at 43.) She was told by her physician, [*7] Dr. Filos, that her pneumonia was triggered by the air in the GM plant where she worked. (Green Dep. at 44.) In 1995, she understood that, based on comments from Dr. Filos, that something at work was causing her breathing problems and that it could have been triggered by some unknown chemicals in the work environment. (Green Dep. at 45-46.)[3]

> 3  She was diagnosed with "probable hyperactive airways disease" by Dr. Filos on May 11, 1995. (Def.'s Ex. K.)

On February 10, 1995, Ms. Green submitted an application for disability benefits. (Def.'s Ex. D.) In that application, she identified one of her disabling conditions as asthma, a condition she believed was a work-related condition. (Green Dep. at 107.) Her physician, Dr. Musson, submitted a Statement of Disability on April 14, 1995, declaring that Ms. Green was totally disabled and listing shortness of breath, asthmatic type, pneumonia, and obstructive air diseases, among other things, as her present condition. (Def.'s Ex. E.)

Ms. Green subsequently applied for [*8] workers' compensation benefits. In her June 15, 1995 application, she stated that her employment had caused and significantly aggravated her breathing condition. (Def.'s Ex. F.) She also testified that, as of that date, that was her opinion. (Green Dep. at 105.) She further testified that, on June 19, 1995, another of her physicians, Dr. Musson, had told her that whatever was in the environment at her work was not good for her lungs. (Green Dep. at 108.) On that date, Dr. Musson put Ms. Green on work restrictions that included avoiding smoke, vapors, or fumes because of her lung disease. (Def.'s Ex. H, 6/19/95 work restriction note.)

In light of the above, Defendant argues that, no later than June 1995, Ms. Green knew that (1) she was injured, and (2) a possible cause was the vapors or fumes in her work environment. Thus, as of June 19, 1995, Ms. Green had discovered sufficient information about her injury and a possible cause to trigger the three-year stat-

ute of limitations on her product liability claims. This Court agrees with Defendant.

By June 1995, Plaintiff Green knew that: (1) she had lung problems, (2) she was exposed to chemical fumes and mists at the GM plant where she [*9] worked (Green Dep. at 49), and (3) her physician had told her exposure to "different elements in the air" at the GM Plant where she worked was causing her breathing problems. (Green Dep. at 44-46.) Thus, similar to the plaintiff in *Stinnett*, she knew she had a lung problem and believed that "the problem was caused by chemicals she had been exposed to at work" and yet failed to bring this action until nine years later, on June 21, 2004. *Stinnett, 411 N.W.2d at 743.* Accord, *Mascarenas, 492 N.W.2d at 515* (affirming the trial court's decision that the plaintiff's product liability claim was time-barred because "[p]laintiff himself had associated his neurological symptoms with exposure to toxic fumes as early as 1982 or 1983. . . . [and thus] knew no later than 1983 that he was suffering damages associated with defendants' products.")

### 2. Regional Garland

Mr. Garland has a long work history at General Motors, most of it marked by respiratory and sinus problems that he attributes to products used at the plant. These begin in 1966-67 when Mr. Garland was diagnosed with sinusitis and severe chronic sinus headaches and was advised by physicians [*10] to avoid contact at work with paint, primer or thinner spray and other paint fumes. (Garland Dep. at 136-40.) He also suffered a pneumothorax (collapsed lung) in 1975. Its cause was not diagnosed, but Mr. Garland told another doctor in March of 1986 that he believed it might have been caused by his workplace exposure to methylene chloride because that product's label stated that it "causes lung damage and can cause death." (Garland Dep. at 65-66, 115-18; Def.'s Ex. Q, 3/18/96 medical record of Dr. Rotblatt.)

Mr. Garland claims here that he was exposed to metalworking fluids beginning in 1984 or 1985 and ending on August 13, 1997, and that this exposure caused chronic sinusitis, reoccurring pneumonia, and in part a collapsed lung. (Def.'s Ex. O, Factual Information Sheet at 4; Garland Dep. at 75-76, 104-112.) Mr. Garland testified that, while working at the GM Plant, he saw "Milacron" on product barrels and saw Milacron representatives wearing Milacron hats. (Garland Dep. at 94-102.)

Mr. Garland also testified that he was exposed to a product called "Chemkleen 338," which he believes to be a Milacron product. There was a specific incident, in either 1984 or 1985, where his exposure [*11] to that product took his breath away and left him with a lingering cough. (Garland Dep. at 104-112.) Mr. Garland claims that he was washing cars with other workers and

then this chemical product "came in on us, and everybody just lost their breath. And I wanted to know what it was . . . ." (Garland Dep. at 108.) Mr. Garland was very upset and let others at the Plant know about it. He eventually got the label off a barrel of Chemkleen 338 because he believed that was the product being used when "we almost -- all of us guys in there, we almost suffocated. They put too much of it into the system that they were washing the cars and stuff with." (Garland Dep. at 107-108.)

In July 1986, Mr. Garland was given a work restriction related to his lungs, calling for no exposure to fumes, vapors, or smoke. [4] (Garland Dep. at 152-54; Def.'s Ex. R, 7/2/86 entry Buick Medical Treatment Record.)

> 4 In fact, Mr. Garland testified that virtually the entire time he worked at GM, he was under work restrictions precluding exposure to fumes, vapors and mists. (Garland Dep. at 159.)

[*12] In March 1987, Mr. Garland had a chest x-ray in response to complaints of chest pain and in light of his history of pneumothorax. The report indicates that his lungs were "negative for active disease" but "emphysematous configuration of the chest noted. Blunting along both lateral costo phrenic sulci most likely related to old pleural fibrosis." (Def.'s Ex. S, 3/30/87 report from B-O-C Flint Medical Department.)

About a decade later, Mr. Garland applied for worker's compensation benefits, listing three injury dates in 1996: February 1, March 13, and October 25, 1996, and claiming that he "has suffered disabling pulmonary injuries as a result of exposure to various chemicals, dusts, fumes and other pollutants in the plant." (Def.'s Ex. T, Bureau of Workers' Disability Compensation, Application for Mediation or Hearing - Form A.) [5]

> 5 Mr. Garland also claimed a March 1993 wrist injury and a 1996 hernia injury. (Def.'s Ex. T.)

Mr. Garland testified that, throughout 1994, 1995, and 1996, he had heard coworkers [*13] talk about lawsuits similar to this action, and it was his belief that the metalworking fluids he was exposed to were "dangerous stuff." (Garland Dep. at 30-35.)

> Q: Have you ever been made aware of other lawsuits involving metal working fluid exposure?
>
> A: I've heard different guys in the shop talk about stuff like that.
>
> Q: What did you hear?

A: That this is some dangerous stuff we're working here. And it was like what are we working here. And it was, I don't know, I just go to work.

(Garland Dep. at 30.)

Q: Well, tell me when you first started to have these conversations with these people.

A: I'd say '94, '95, '96, all the way through there. Because, see, I left out of the shop in '97.

Q: So sometime between '94 and '97 you would have had these conversations?

A: Yes.

(Garland Dep. at 35.)

Mr. Garland last worked at the GM Plant on August 13, 1997, when he went out on compensable sick leave. (Garland Dep. at 47-48, 158.)

Defendant argues that, based on Mr. Garland's own testimony and the dates he claimed he was disabled from lung-related injuries as a result of exposure to chemicals at the GM Plant, Mr. Garland knew or [*14] should have known, by October 25, 1996 at the latest, that (1) he was injured, and (2) a possible cause was his exposure to metalworking fluids in his work environment. Thus, as of October 25, 1996, Mr. Garland had discovered sufficient information about his injury and a possible cause to trigger the three-year statute of limitations on his product liability claims. This Court agrees with Defendant.

Despite Plaintiffs' claims to the contrary, it is not necessary for Plaintiff to "know of a definitive cause" of his injury; rather, it is "sufficient" that he is "aware of a possible cause" thus triggering his duty to diligently pursue that possible causal connection and file his product liability lawsuit within the three-year statute of limitations. *CIBOROWSKI v. PELLA WINDOW & DOOR CO., 2005 Mich. App. LEXIS 3208, No. 257091, 2005 WL 3478159 (Mich. Ct. App. Dec. 20, 2005).* Michigan courts strictly adhere "to the general rule that subsequent damages do not give rise to a new cause of action." *Moll, 506 N.W.2d at 825* (internal quote and citation omitted).

Michigan's appellate courts have likewise rejected the argument that the statute of limitations on such claims does not begin [*15] to run until the plaintiff receives a definitive diagnosis. *Kullman v. Owens-Corning Fiberglas Corp., 943 F.2d 613, 616 (6th Cir. 1991)* (citing *Stinnett, 411 N.W.2d at 742-43*). For example, in *Stinnett,* the trial court denied the defendants' mo-

tion for summary judgment on statute of limitation grounds. It held that, for an action to accrue, the plaintiff "has to be informed by a physician that there is a diagnosis of a work-related injury and not something speculative." *Stinnett, 411 N.W.2d at 472.* The Michigan Court of Appeals reversed. It reasoned that, "given plaintiff's own unequivocal deposition testimony, plaintiff knew that he had a lung problem and he believed that the problem was caused by the chemicals he had been exposed to at work." *Id. at 473* (citing cases). This was enough to trigger the statute of limitations. *Id.*

The same reasoning and result apply here. Mr. Garland knew of his respiratory problems and, like the plaintiff in *Stinnett,* believed, since at least 1984 or 1985, that these problems were caused by the chemicals in the air that he had been exposed to at work. Moreover, by 1996 [*16] he believed that the metalworking fluids he was exposed to at work were "dangerous stuff" and he had suffered pulmonary injuries as a result of exposure to chemicals in the GM plant where he worked. This was enough to start the statute of limitations running on his claims. That statute gave him three years to investigate and pursue his product liability claims and to file his lawsuit. He failed to do so, and thus those claims are time-barred.

Accordingly, unless other tolling rules apply, these Plaintiffs' product liability claims against Defendant are time-barred. The Court now addresses Plaintiffs' tolling arguments.

### 4. Plaintiffs' Tolling and Equitable Estoppel Arguments

Plaintiffs argue that tolling is required because (1) class certification issues were pending in a separate Michigan state court action filed in November 1999; (2) Defendant actively and fraudulently concealed the existence of these Plaintiffs' product liability claims and thus the three-year statute of limitations period is tolled for an additional two years under *Mich. Comp. Laws § 600.5855;* and (3) Defendant Milacron allegedly made false representations to General Motors [*17] about the safety of its products and thus the doctrine of equitable estoppel should be invoked to preclude Milacron from arguing the statute of limitations bars Plaintiffs' lawsuit. The Court considers and rejects each of these arguments.

### a. Pending Michigan State Court Action With Class Allegations

Plaintiffs first argue, without supporting authority, that the statute of limitations on their product liability claims were tolled while class certification issues were pending in a separate Michigan state action, *Gibson v. General Motors Corporation, et. al.,* Genesee County

2006 U.S. Dist. LEXIS 66473, *

Circuit Court, Case No. 99-66596-NO. Plaintiffs are mistaken.

The three-year statute of limitations period for these Plaintiffs' product liability claims expired before the November 5, 1999 filing date of the putative class action *Gibson* lawsuit in state court: Ms. Green's expired, at the latest, on June 19, 1998, and Mr. Garland's expired, at the latest, on October 25, 1999. Moreover, Plaintiffs' tolling argument ignores the fact that, while the *Gibson* action was pending, they filed a separate action against Defendant Milacron. *Irrer, et al. v. Milacron, Inc.* ("*Irrer I*"), Genesee County [*18] Circuit Court, Case No. 02-75196-NO, was filed in state court on December 10, 2002. *Irrer I* was subsequently removed to this Court and voluntarily dismissed without prejudice on June 6, 2003. (*Irrer, et. al. v. Milacron, Inc.*, United States District Court, Eastern District of Michigan, Case No. 02-75092, Docket Nos. 15-16.) Thus, for about six months, these Plaintiffs had their own separate product liability action pending against Defendant Milacron despite the fact that the *Gibson* action was still pending in state court and that court had not yet denied the *Gibson* plaintiffs' motion for class certification. Moreover, this action (*Irrer II*) was not filed until June 21, 2004, even though the motion for class certification was denied on April 23, 2004. Defendant argued at the hearing on this matter that, at the very least, the statute of limitations on Plaintiffs' claims ran during the six months that the separate *Irrer I* lawsuit was pending and for the two months between the *Gibson* court's denial of the plaintiffs' motion for class certification and the filing of the *Irrer II* lawsuit. Defendant's argument is persuasive.

Putative class members like Plaintiffs, [*19] who choose to file individual actions before there is a decision on class certification, are not entitled to the benefit of the class action tolling rule. *Fezzani v. Bear, Stearns & Co., 384 F. Supp. 2d 618, 632-33 (S.D. N.Y. 2004)* (citing decisions reaching the same conclusion). To allow tolling under these circumstances "'would create the very inefficiency'" that the rule announced in *American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974)*, was created to prevent. *Id. at 633* (quoting *In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431, 450-51 (S.D. N.Y. 2003)*). Accordingly, even if the three-year statute of limitations period on Ms. Green's and Mr. Garland's product liability claims had not expired, they would not be entitled to the benefit of the class action tolling rule for the time periods discussed above.

### b. Fraudulent Concealment

Plaintiffs next argue that under *Mich. Comp. Laws § 600.5855*, [6] the three-year statute of limitations on their product liability claims is tolled because Defendant Milacron fraudulently concealed the existence of their [*20] cause of action against it. In support, Plaintiffs proffer:

(1) an affidavit from John Truchan, health and safety representative for UAW Local 599 in early 1987, averring that during that time period Milacron representatives told the committee members that its metal working fluids were "safe enough to drink" and did not "mention that breathing the mist from metal working fluids could cause any type of breathing problems" (Pls.' Ex. 1, 1/17/05 Aff.);

(2) on May 31, 1996, an industry group known as the Independent Lubricant Manufacturers Association ("ILMA") published comments regarding the National Institute for Occupational Safety and Health's ("NIOSHA") February 23, 1996 draft "Criteria for a Recommended Standard: Occupational Exposures to Metalworking Fluids" expressing its opinion that "NIOSHA has not adequately supported its Recommended Exposure Limit ("REL") for occupational exposures to metal removal fluids -- either on a technical or a legal basis" (Pls.' Ex. 2 at 4);

(3) deposition testimony showing that Milacron employee, John Steigerwald, was an officer of ILMA and supported that industry group's positions (Pls.' Resp. at 5);

(4) Milacron's Toxicity [*21] Advisory Committee minutes from an October 23, 1980 meeting stating the "belief that the area of inhalation toxicology and its far-reaching potentially long-term effects is probably the major area in metalworking fluid occupational health to be concerned about" (Pls.' Ex. 7);

(5) an October 17, 1998 internal memo detailing a number of workers "reportedly out on sick leave due to coolant related illness ranging from breathing problems to loss of speech", observing that "all related records from May 98 to date" have been summoned", that "[t]he V8 scare has taken over V6", and there is a "need to take actions to keep it from getting out of hand" (Pls.' Ex. 8);

(6) a November 14, 2000 letter from Milacron to an Environmental Engineer at

GM's V6 Flint - Plant # 36 enclosing confidential documents concerning the OSHA MSDS for certain Milacron metalworking fluid concentrate (Pls.' Ex. 9);

(7) deposition testimony from Ann Ball, a Milacron technical services representative, that she went out to GM's V6 Plant in response to its concerns about dermatitis and respiratory issues (Ball Dep. at 35-36);

(8) Ball's November 2, 1998 Trip Report revealing that "Many V6 employees [*22] have developed a lack of trust surrounding the use of metal removal fluids (MRF's) in the workplace" because "[i]nformation surrounding concerns in the V8 plant have filtered into the V6 plant" and observing that "V6 employees are in need of awareness training so that they have a better understanding of MRF's and their safe use" and further observing, among other things, that "Caution signs found hanging out of reach in various areas through the plant . . . need updating" (Pls.' Ex. 11);

(9) a December 8, 1999 internal Milacron memo discussing a December 2, 1999 request from the GMPTG Flint Components facility "for Milacron to bring in an expert to discuss the possible health affects [sic] of metal working fluids", observing that "in a recent e-mail response from Greg Foltz, Milacron has been advised not to discuss any health and safety issues concerning our products at any GM facility", objecting that the advice is unwise and contrary to prior practice and suggesting that Milacron "conduct the meeting with guidelines" that Milacron not reference the pending lawsuit (presumably the November 1999 Michigan state action) and "will only provide information on the health and safety [*23] of metal working fluids that is publicly available" (Pls.' Ex. 12);

(10) deposition testimony from a GM worker, Robert Holt, who worked at Buick, in Plant 10, that at a 2000 meeting plant employees were told that dermatitis complaints were caused by overwashing and not Milacron's coolants and that he was led to believe these Milacron products were perfectly safe (Holt Dep. at 20);

(11) an undated section from an internal Milacron handbook entitled "Questions and Answers: Health & Safety of Metalworking Fluids" with a "Tech Response" for eye, nose, throat and/or bronchial irritation recommending that (in addition to evaluating operating conditions, ventilation, checking out concentration, filling out required forms, eliminating other causes, notifying Regulatory Affairs for a letter, citing OSHA General Duty Clause, not promising to solve the problem, and issuing closure letter) that tech "Listen to complaint -- deny ownership of the problem -- ventilation or shielding are solutions" (Pls. Ex. 20); and

(12) deposition testimony from another GM employee, Deborah Dantzler-Harris, that she had a conversation in April of 1998 with an unnamed chemical management person about [*24] the safety of chemicals used in her department and was told that "system 7 was safe" and she did not ask him to elaborate (Dantzler-Harris Dep. at 228-230).

The evidence Plaintiffs proffer does not support application of the tolling statute.

    6  Michigan's tolling statute for fraudulent concealment provides that:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

*Mich. Comp. Laws § 600.5855.*

First, Michigan courts make the common sense observation that "only actions after the alleged injury [*25]

could have concealed plaintiff's cause of action against defendant because actions taken before the alleged injury would not have been capable of concealing causes of action that did not yet exist." *Doe v. Roman Catholic Archbishop of the Archdiocese of Detroit, 264 Mich. App. 632, 692 N.W.2d 398, 404 (Mich. Ct. App. 2004)* (emphasis added). Because Ms. Green and Mr. Garland allege that they suffered work-related lung injuries in 1995 and 1996 respectively, the Court does not consider items 1 and 4 listed above.

Second, Michigan courts have further observed that "[f]raudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action. The acts relied on must be of an affirmative character and fraudulent." *Id. at 405* (internal quotes and citations omitted). "Thus, the plaintiff must show that the defendant engaged in some arrangement or contrivance of an affirmative character designed to prevent subsequent discovery." *Id.* (internal quotes and citation omitted).

Even when viewed in a light most favorable to Plaintiffs, items 2, 3, 5-12 and Plaintiffs' [*26] proffered evidence on its failure to warn claims cannot be considered affirmative acts by Milacron designed to prevent these Plaintiffs from discovering the cause of action they allege here. Similar to the plaintiff in *Doe v. Roman Catholic Archbishop of the Archdiocese of Detroit*, Plaintiffs here fail to distinguish between "plaintiff's knowledge of the evidence that could prove [his or her] claims and plaintiff's knowledge of the possible causes of action against defendant." *692 N.W.2d at 407.*

Finally, much of the evidence Plaintiffs proffer refutes the argument that they could not, with reasonable diligence, have known that they had a possible cause of action thus requiring them to investigate and file their action within three years of that date. For example, items 5, 7, and 8 acknowledge that by 1998 GM employees from both the V8 and V6 plants had health concerns about working around Milacron's metalworking fluids. In fact, a lawsuit had been filed in Michigan state court in March 1996 by a group of plaintiff employees at GM's V8 engine plant against General Motors and Cincinnati Milacron alleging respiratory injuries from exposure to metalworking fluids. [*27] *Brock v. General Motors, et. al.*, Genesee County Circuit Court, Case No. 96-46048-NO. (Def.'s Ex. V.) Moreover, as Defendant points out, Plaintiffs' complaint alleges that "metal working fluids have been the focus of extensive scientific studies over the past fifteen to twenty years." (Compl. P 6.) Defendant also submits evidence that Plaintiffs' union informed its members of the possible health risks associated with working around metalworking fluids since 1984. (Def.'s

Ex. U at M9, M10, M15.) Thus, despite Plaintiffs' arguments to the contrary, this Court concludes that Plaintiffs are not entitled to the benefit of Michigan's two-year tolling statute for fraudulent concealment.

**c. Equitable Estoppel**

Plaintiffs' final argument is that Defendant Milacron should be estopped from raising the three-year statute of limitations as a bar to this action because it allegedly made false misrepresentations to its customer, General Motors, about the safety of its metalworking products. (Pls.' Resp. at 11-12.) This Court rejects Plaintiffs' argument that the facts presented here warrant application of the doctrine of equitable estoppel to preclude Defendant from raising the statute [*28] of limitations as a bar to Plaintiffs' action.

"[T]he doctrine of equitable estoppel" is a "judicially created exception to the general rule that statutes of limitation run without interruption. It is essentially a doctrine of waiver that extends the applicable period for filing a lawsuit by precluding the defendant from raising the statute of limitations as a bar." *Cincinnati Ins. Co. v. Citizens Ins. Co., 454 Mich. 263, 562 N.W.2d 648, 651 (Mich. 1997)* (citing *Lothian v. Detroit, 414 Mich. 160, 324 N.W.2d 9 (Mich. 1982)*). Michigan courts have been "reluctant to recognize an estoppel in the absence of conduct clearly designed to induce the plaintiff to refrain from bringing action within the period fixed by statute." *Lothian, 324 N.W.2d at 18* (internal quotation and citation omitted). The doctrine is generally invoked only when "it can be fairly said that [the defendant] is responsible for deceiving the plaintiff, and inducing [plaintiff] to postpone action upon some reasonably well grounded belief that [plaintiff's] claim will be adjusted if he does not sue." *Id.* (internal quotation and citation omitted). For example, [*29] "the usual sort of conduct which may work an estoppel in the statute of limitations context" includes "an offer to compromise or settle plaintiff's claim, a representation that the limitations period was of much greater duration than it actually was, or part payment of plaintiff's claim." *Id.* There is no evidence of this sort of conduct here.

**IV. Conclusion**

For the above-stated reasons, Defendant's motion for summary judgment as to Plaintiffs Green and Garland is GRANTED.

s/ Nancy G. Edmunds

United States District Judge

Dated: September 18, 2006

LEXSEE 1995 U.S. DIST. LEXIS 22252

**CHARLES P. ROMAKER and ANA Z. CARRASQUILLO, Plaintiffs, v. CROSS-LAND MORTGAGE CORPORATION, Defendant.**

**No. 94 C 3328**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1995 U.S. Dist. LEXIS 22252*

**November 3, 1995, Decided**

**DISPOSITION:**    [*1]  Plaintiffs' motion for partial summary judgment [39-1] granted in part and denied in part. Defendant's motion for partial summary judgment [46-1] granted in part and denied in part. Plaintiffs' motion to strike [58-1] denied.

**COUNSEL:** For Plaintiffs: Daniel A. Edelman, Cathleen M. Combs, Tara L. Goodwin, EDELMAN, COMBS & LATTURNER, Chicago, Illinois.

For Plaintiffs: Charles M. Baird, Atlanta, GA.

For Defendant: Robert J. Kriss, Alan N. Salpeter, MAYER BROWN & PLATT, Chicago, Illinois.

For Defendant: James S. Jardine, John A. Adams, Stephen C. Tingey, RAY, QUINNEY & NEBEKER, Salt Lake City, Utah.

**JUDGES:** John F. Grady, United States District Judge.

**OPINION BY:** John F. Grady

**OPINION**

*MEMORANDUM OPINION*

Plaintiffs, who are husband and wife, bring this suit under the Truth-in-Lending Act ("TILA"), *15 U.S.C. § 1601 et seq.* and the Illinois Consumer Fraud Act ("IL-CFA"), *815 ILCS 505/2*, claiming that Crossland Mortgage Corporation ("Crossland") did not make correct disclosures of the total finance charge and amount financed on their residential mortgage loan and failed to adequately disclose the security interest is taking in the property. Both sides [*2] move for partial summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. For the reasons stated in this opinion,

both motions are granted in part and denied in part. Plaintiffs have also moved to strike certain evidence submitted by the defendant. That motion is denied.

*BACKGROUND*

Charles Romaker and Ana Carrasquillo wished to purchase a home at 1408 Dempster Street in Evanston, Illinois. They obtained a mortgage broker ("Long Grove") which secured financing for them through Crossland. The good faith estimate prepared by Long Grove and provided to the plaintiffs listed a document preparation fee of $ 75.00, a tax service fee of $ 65.00 and an underwriting fee of $ 200.00 which were marked as "rebated." Plaintiffs claim that they were under the impression that they were not responsible for those fees. They likewise were under the impression that they did not need to pay an appraisal fee, as that fee was not listed on their good faith estimate. At or about the time of the closing, plaintiffs were asked to provide an additional $ 250.00, because the appraisal for the rental unit located in the home had rendered the total appraisal fee higher than [*3] expected. Plaintiffs also claim that they were asked to pay the underwriting fee, the document preparation fee and the tax service fee, despite their understanding that they were not responsible for those fees. Plaintiffs claim that they pointed out this understanding at closing, and they were under the impression at closing that they were not paying those fees. There is a dispute as to whether the plaintiffs had agreed before the closing to pay the extra appraisal fee. [1] The HUD statement provided at closing reflected a $ 325.00 credit toward the closing costs paid by Long Grove. Although this amount is equal to the sum of the three "rebated" fees referred to in the good faith estimate, the credit does not specify the fees to which it is being applied. The HUD statement lists an appraisal fee of $ 250.00 paid by the plaintiffs.

1  Crossland has submitted certain affidavits and other materials from certain employees at Long Grove which tend to show that the plaintiffs did indeed agree to pay the higher appraisal fee. The plaintiffs in their depositions flatly deny that any conversation of such a nature took place. Plaintiffs have moved to strike these materials, claiming that they are inadmissible. Upon full consideration of this motion for summary judgment, it is clear that the disputed materials are not necessary to a ruling on the motion and their presence or absence from the record does not affect our decision. Striking them would be a needless gesture. The motion to strike is therefore denied.

[*4]  Crossland, as lender, provided a disclosure statement at the closing as required by TILA. The statement was generated using a computer program Crossland had obtained from Dynatek, Inc., a software supplier. Crossland first acquired this software in January 1993. Before switching all of its document preparation to the new software, Crossland used the software side by side with its old program, closing all loans on the old system, in order to verify that the program issued correct TILA statements. Several inconsistencies, or "bugs," in the software were discovered and corrected during this period. Ultimately, sometime between July and October of 1993, all of Crossland's document preparation was switched to the Dynatek program. In addition to all of the procedures designed to check the software, Crossland maintained a procedure to audit its loans which included TILA compliance. The documents from approximately ten percent of all loan closings were sent to Crossland's main office in Utah for review. The audit reports are issued by the main office approximately 60 days after the closings.

Dynatek maintains a bulletin board for its software users. From this bulletin board, users may download [*5] updates to Dynatek's software. Some of these updates affected small portions of a program, others were entire rewritten versions of a program. In March 1994, Dynatek placed an update to the software used by Crossland on its bulletin board ("Update B"). Crossland downloaded this update. Update B was supposed to affect only a small portion of the program which was unrelated to the generation of TILA disclosure statements. Crossland tested Update B, but only with respect to those portions of the program which the update purportedly affected. Crossland distributed the update to all of its branches.

Unbeknownst to Crossland, Update B contained a bug which resulted in failure to include the fields labelled "tax service fee," "underwriting fee" and "processing fee" when calculating the Amount Financed and the total Finance Charge for the TILA disclosure statement. Because the total prepaid finance charges containing these three fees were calculated entirely separately in the section of the TILA statement which itemized the amount financed, the fees appeared correctly in that portion of the statement. Although Dynatek discovered the bug and placed a corrected version of Update B on the bulletin [*6] board, no notification of the bug or the correction was given to the users who had already downloaded the faulty Update B. Crossland discovered the bug in June 1994 and immediately instructed its branches how to remedy the problem. Crossland notified the Federal Reserve Board of its use of the defective software, and obtained the corrected Update B.

The defective software had been used to generate the TILA statement for the plaintiffs' loan. Consequently, the Amount Financed did not subtract the $ 100.00 tax service fee and $ 150.00 underwriting fee as prepaid finance charges, nor were they added as part of the total Finance Charge.

Plaintiffs brought this suit, alleging that (1) Crossland violated TILA when it issued a TILA statement which understated the correct Finance Charge and overstated the Amount Financed, (2) Crossland violated TILA when it failed to disclose the full extent of its security interest, and (3) Crossland violated the ILCFA when it issued the incorrect disclosure statements. With respect to items (1) and (3), plaintiffs also claim to represent a class of persons consisting of all borrowers obtaining financing from Crossland during the period in which Crossland's [*7] TILA statements were generated by Update B.

The parties have filed cross-motions for partial summary judgment with respect to several issues: (1) whether Crossland is liable under TILA for the misstatements on the TILA disclosure documents, (2) whether the security interest disclosed in the TILA statement is improper, (3) whether Crossland is liable under the ILCFA for the misstatements in the TILA documents, and (4) whether there have been "actual damages" to the plaintiffs within the meaning of TILA.

### DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548,* (1986). A "genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Wallace v. Tilley, 41 F.3d 296, 299 (7th Cir. 1994)* (quoting [*8] *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505*

1995 U.S. Dist. LEXIS 22252, *

*(1986))*. In considering such a motion, the court must view all inferences in the light most favorable to the nonmoving party. *See Tolentino v. Friedman, 46 F.3d 645, 649 (7th Cir. 1995)*. The court will enter summary judgment against a party who does not come forward with evidence that would reasonably permit a finder of fact to find in his or her favor on a material question. *McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995)*.

## I. TILA Disclosure of "Amount Financed" and "Finance Charge"

TILA was enacted to promote the "informed use of credit" by consumers by ensuring that those seeking credit obtain "'meaningful disclosure of credit terms . . .'" *Hardison v. General Finance Corp., 738 F.2d 893, 894 (7th Cir. 1984)* (quoting *15 U.S.C. § 1601(a)*). As authorized by TILA, the Federal Reserve Board has issued Regulation Z, 12 C.F.R. § 226, et seq., which provides the standards used to measure the sufficiency of a disclosure. *15 U.S.C. § 1604(a)*. The Supreme Court has made [*9] clear that "unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive" when evaluating TILA claims. *Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565, 63 L. Ed. 2d 22, 100 S. Ct. 790 (1980)*.

Regulation Z, *§ 226.18* lists the specific disclosures required of closed-end credit transactions, such as residential mortgages. Lenders are required to specifically provide the "Amount Financed," calculated by adding together the principal of the loan (minus any downpayment) and any other amounts financed by the creditor, minus any prepaid finance charges. *12 C.F.R. § 226.18(b)*. Creditors must also provide the total "Finance Charge." *12 C.F.R. § 226.18(d)*. The Finance Charge includes any charge directly or indirectly payable by the consumer and imposed directly or indirectly by the creditor as an incident to or condition of the credit. *12 C.F.R. § 226.4(a)*. Both the tax service fee and the underwriting fee are usually fees which are required to be included as part of the finance charge. *12 C.F.R. § 226.4(b)* [*10] . A finance charge which is paid either prior to or at the closing, or which is withheld from credit funds is a prepaid finance charge, which must be subtracted from the Amount Financed. *12 C.F.R. § 226.2(a)(23)*. In loans of $ 1,000.00 or more, the statement of the total Finance Charge is considered accurate if it is stated within $ 10.00 of the exact finance charge. *12 C.F.R. § 226.18(e)* n.42. Plaintiffs claim that the bug in the software used by Crossland resulted in incorrect statements of both the Amount Financed and the Finance Charge.

### A. Rebated Fees

Crossland argues that because Long Grove paid $ 325.00 toward the closing costs as rebated fees, plaintiffs

did not actually pay the underwriting and tax service fees. Because they did not pay those fees, says Crossland, there was no mistake in the statements on the TILA disclosure form. Crossland points to a portion of the Official Staff Commentary which states that where rebates or premiums are offered to borrowers as incentives in a loan or credit sale, "these amounts may be either reflected in the Truth in Lending disclosures or disregarded in the disclosures. If the creditor [*11] chooses to reflect them in the *§ 226.18* disclosures, rather than disregard them, they may be taken into account in any manner as part of those disclosures." Official Staff Interpretations, Pt 226, Supp. I, 18(b)(2).

Plaintiffs respond that because there is no basis for allocating the $ 325.00 credit from Long Grove to the fees which were left out of the statement of the Finance Charge, Crossland's claim that plaintiff did not pay those fees is unavailing. [2] We need not resolve the question of exactly how the $ 325.00 was applied, however, because however it might re resolved, Crossland would not be entitled to judgment. While rebated fees may be accounted for in any manner under Regulation Z, they cannot be accounted for in a way likely to mislead the consumer. Both the underwriting fee and the tax service fee are clearly stated in the itemization of prepaid finance charges. A clear, rational accounting of these rebated fees would either (1) include them as part of the Amount Financed, and also include them in the total Finance Charge, indicating that the creditor financed the funds that went to those fees, or (2) exclude them in calculating both the Amount Financed and the Finance [*12] Charge. Crossland's accounting included the fees in the Amount Financed but subsequently *excluded* them from the total Finance Charge. Perhaps Crossland did not have an obligation to include those fees in the calculations. But having included them among the prepaid finance charges, Crossland was required to account for them in its disclosure statement accurately and rationally.

> 2    An appraisal fee would not be listed among the prepaid finance charges. Thus, if the $ 325.00 credit was actually a rebate of the appraisal fee, it could not be considered as accounting for the discrepancies in the Amount Financed and the Finance Charge.

### B. Bona Fide Error

Crossland claims that its faulty accounting is excused under the statute because the bug in its computer software constitutes a "bona fide error" under *§ 1640(c)* of the statute. Ordinarily, strict compliance with the disclosures and terminology of TILA is required. *Smith v. No. 2 Galesburg Crown Finance Corp., 615 F.2d 407, 416 (7th Cir. 1980)*; [*13]    *see, also, April v. Union*

1995 U.S. Dist. LEXIS 22252, *

*Mortgage Co., Inc., 709 F. Supp. 809, 811 (N.D. Ill. 1989); Lirtzman v. Spiegel, Inc., 493 F. Supp. 1029, 1034-35 (N.D. Ill. 1980); Leathers v. Peoria Toyota-Volvo, 824 F. Supp. 155, 157 (C.D. Ill. 1993).* The Seventh Circuit has made it clear that even technical mistakes with little significance should still be considered violations of the statute. *Id.* This is true even if the faulty disclosure neither damaged nor deceived the plaintiff. *Brown v. Marquette Sav. and Loan Assoc., 686 F.2d 608, 614 (7th Cir. 1982).*

*Section 1640(c)* of TILA, however, states that "a creditor or assignee may not be held liable . . . if the creditor or assignee shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." *15 U.S.C. § 1640(c).* A creditor meeting the standards in this section must show (1) that the error was unintentional, (2) that the creditor maintained reasonable procedures to avoid such errors, and (3) that the creditor consistently [*14] followed these procedures during the period of time in question. *Mirabal v. General Motors Acceptance Corp., 537 F.2d 871, 877 & n.8 (7th Cir. 1976).* The defense absolves primarily clerical-type errors that do not involve significant exercise of judgment. *See, Haynes v. Logan Furniture Mart, 503 F.2d 1161, 1167 (7th Cir. 1974); Lirtzman, 493 F. Supp. at 1034.*

The Seventh Circuit has indicated that the bona fide error defense requires more than just a procedure designed to produce the right calculation; it requires as well the maintenance of procedures aimed at avoiding and preventing errors that might slip through the compliance procedures. *Mirabal, 537 F.2d at 878.* A procedure which includes both a careful procedure to prepare TILA statements and a review of the preparation satisfies § 1640(c). *Id.; Doubet v. USA Financial Services, Inc., 714 F. Supp. 980, 983 (C.D. Ill. 1987.* The Seventh Circuit has declined to state what other procedures besides a checking-rechecking system will meet the requirements of § 1640(c). *Mirabal, 537 F.2d at 878-79.* The statute as amended in 1980, added [*15] that "clerical, calculation, computer malfunction and programming, and printing errors" are all included as bona fide errors. *15 U.S.C. § 1640(c).*

Crossland argues that this error is precisely the kind of computer malfunction that should be excused under § 1640(c). While it is true that computer "bugs" are precisely the kind of unintentional error that § 1640(c) is intended to address, that alone does not establish entitlement to the defense. Crossland also has the burden of establishing that it maintained reasonable procedures designed to catch these types of errors.

Crossland points to its testing of the software before it was distributed to the branches and to its auditing practices as being reasonable procedures meeting the standard of § 1640(c). Moreover, Crossland argues, the software itself, by calculating the Amount Financed separately from the itemized list of prepaid finance charges, contained an "internal double-check." The plaintiffs insist that only a contemporaneous double-checking of the figures by a human being will satisfy the statute. We believe the answer lies somewhere in between. *Mirabal* explicitly stated that a double-check procedure [*16] was not the *only* way to satisfy the statute. *Mirabal, 537 F.2d at 878-79.* However, courts have also concluded that merely auditing a percentage of the total disclosure statements generated, while helpful, could not alone permit a § 1640(c) defense. *Teel v. Thorp Credit Inc. of Illinois, 609 F.2d 1268, 1270 (7th Cir. 1979).*

Our determination therefore hinges on whether the initial testing of the Dynatek software and the subsequent test of Update B, when combined with the auditing practice, are sufficient to allow a bona fide error defense. Crossland urges us to find similarity between this situation and the portions of Regulation Z governing proper disclosure of the annual percentage rate. *12 C.F.R. § 226.22(a).* A footnote to this portion of the regulation states that an error in the calculation of the annual percentage rate or the finance charge shall not be considered to violate Regulation Z if "(1) the error resulted from a corresponding error in a calculation tool used in good faith by the creditor; and (2) upon discovery of the error, the creditor promptly discontinues use of that calculation tool for disclosure [*17] purposes and notifies the Board in writing of the error in the calculation tool." *12 C.F.R. § 226.22(a),* n.45d. Here, upon discovery of the bug, Crossland initiated a manual override of the defective portion of the program and notified the Federal Reserve Board in writing.

We note, however, that while footnote 45d might have absolved Crossland from its misstatement of the Finance Charge, [3] it does nothing to excuse its misstatement of the Amount Financed. Moreover, good faith use of a faulty calculation tool goes to whether the statute was violated in the first place, and does not speak at all to the question of whether Crossland is entitled to a bona fide error defense. While use of a defective calculation tool will likely establish that a violation of the statute was unintentional, it cannot obviate Crossland's burden to show that it maintained reasonable procedures that would prevent such errors from occurring.

> 3    We note that Crossland does not attempt to claim the 45d footnote defense directly by saying that it has not violated the statute. Instead, Crossland asks that we import the 45d standards of

good faith in evaluating the availability of the bona fide error defense under § 1640(c). Even if Crossland were to have argued the footnote 45d defense, it would not entitle them to summary judgment. That would require us to determine that Crossland took reasonable steps to verify the accuracy of the calculation tool before using it. Official Staff Interpretation, Pt. 226, Supp. I, 22(a)(5). We note that in this instance, it is by no means certain that the steps Crossland took when it downloaded Update B would establish this defense. We believe it would be a question of fact whether failure to test the TILA portion of the program after the new update was downloaded was reasonable.

[*18] We conclude as a matter of law that Crossland has not met its burden to show it maintained reasonable procedures within the meaning of § 1640(c). The initial testing of the Dynatek software was a sufficient procedure to obtain the correct disclosures. However, Crossland did not have sufficient safeguards in place to prevent future malfunctions and errors. A computer program that is initially well-tested is a good step towards compliance. But to qualify for the bona fide error defense, reasonable steps must be taken to ensure the continued accuracy of the program. The errors in the TILA statement most likely could have been caught had there been even the briefest recalculation of the figures on the face of the statement. It is not an unreasonable imposition, even in the computer age, to insist that where Congress places a high premium on the correctness of certain financial figures, there be some form of effective safeguard to monitor the continued accuracy of computer software.

## C. Consumer Credit Transaction

Crossland also claims that the plaintiffs' loan was not a "consumer credit transaction" within the meaning of the statute, and therefore TILA is inapplicable. We disagree. [*19] Regulation Z defines "consumer credit" as "credit offered or extended to a consumer primarily for personal, family, or household purposes." 12 C.F.R. § 226.3(a)(12). The Federal Reserve Board interpretations indicate that where owner-occupied rental property containing two units or less is the subject of the transaction, a factor test is necessary to determine whether the transaction is for business purposes. Pt. 226, Supp. I, § 226.3(a)(4). The factors to be considered are: (1) the relationship of the borrower's primary occupation to the acquisition, (2) the degree to which the acquisition will be personally managed by the borrower, (3) the ratio of income from the acquisition to the total income of the borrower, (4) the size of the transaction, and (5) the bor-

rower's statement of purpose regarding the loan. pt. 226, Supp. I § 226.3(a)(2).

In the instant case, none of the factors indicate that this is a business transaction. Crossland insists that the fact that the rental income of the property exceeds one-half of the mortgage payment should show that this was not a consumer purpose loan. [4] In truth, it shows exactly the opposite. The Federal Reserve commentary [*20] states that we should consider how much of the plaintiffs' total income will be comprised of income from the property. The fact that the mortgage payment on the property exceeds the income from the rental unit indicates that the property as a whole is not producing any net income. Moreover, Mr. Romaker is an attorney and Ms. Carrasquillo is an accountant. Neither is in the business of managing rental property. This is not an especially large loan, nor have the plaintiffs stated any business purpose for their loan on their application. That the plaintiffs personally managing the property does not show a business purpose where the property at issue is the home in which the plaintiffs live. This is a consumer credit transaction and is therefore governed by TILA.

> 4   Crossland also claims that we should use a "quantative approach" in analyzing this issue. It points to cases such as Bokros v. Associates Finance, Inc., 607 F. Supp. 869 (N.D. Ill. 1984), which have looked to the use of the proceeds of the loan to determine its primary purpose. However, Bokros and cases like it are applicable where loan proceeds are used for two distinct purposes. In Bokros, over half of the proceeds were used to buy a tractor-trailer, while the other portion was used to retire a home mortgage. The court therefore looked to the tractor-trailer transaction to determine the loan was for a business purpose, as that transaction consumed the larger share of the proceeds. Id. at 872. Here there is a single transaction -- the purchase of the building. Crossland asks that we treat the single property as two transactions, one for the rental unit and a second for the plaintiffs' unit. Given that this purchase was accomplished by a single transaction, we decline to subdivide it in this manner.

[*21] *II. TILA Disclosure of the Security Interest*

Plaintiffs also claim that the disclosure of defendant's security interest on the TILA form is inadequate. Regulation Z, section 226.18(m) requires that a creditor disclose "the fact that the creditor has or will acquire a security interest in the property purchased as part of the transaction, or in other property identified by item or type." This disclosure requirement is satisfied by a general disclosure of the category of property subjected to the security interest. Matter of Dingledine, 916 F.2d 408,

*411 (7th Cir. 1990).* In cases where the security interest is being taken in the property being purchased with the proceeds of the loan, it is generally enough to state that the security interest is being taken in the "goods or property being purchased." *Leathers, 824 F. Supp. at 158.* Where other property not purchased with the loan proceeds is subjected to a security interest by the creditor, it must be specifically identified. Pt. 226, Supp. I, § *226.18(m)(3)*. However, Regulation Z specifically excludes from the definition of the term "security interest" "incidental interests such as interests [*22] in proceeds, accessions, additions, fixtures, insurance proceeds (whether or not the creditor is a loss payee or a beneficiary), premium rebates, or interests in after-acquired property." *12 C.F.R. § 226.2(a)(25).*

The security interest on the plaintiffs' loan is granted by a document called a "1-4 Family Rider." Statement of Material Facts re: Plaintiffs' Amended Motion for Partial Summary Judgment, Appendix I. It purports to give a security interest not only in the property itself, but also in

> building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor [*23] coverings now or hereafter attached to the Property, all of which including replacements and additions thereto.

Plaintiffs' Statement of Material Facts, App. I.

Crossland claims that this additional language creates merely an incidental interest, and that therefore no disclosure is required. The security interest provisions of TILA were added primarily due to a concern that borrowers were taking out loans secured by their homes without realizing it, and disclosure of incidental interests is unnecessary to address that concern. *Anderson Bros. Ford v. Valencia, 452 U.S. 205, 223, 68 L. Ed. 2d 783, 101 S. Ct. 2266 (1980).* The Federal Reserve Board has indicated the type of thing which is considered inciden-

tal, such as assignment of rents, accessories, replacements, interests in escrow accounts and waivers of homestead or personal property rights. Pt. 226, Supp. I, § *226.2(a)(25)(3).*

The question before us therefore is whether the security interest outlined in the 1-4 Family Rider is an interest incidental to the general interest taken in the home that was purchased. Although a great many of the things named in the rider are incidental interests, we are troubled [*24] by the expansive language of the security agreement. "Goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light" is an extremely broad description that could apply to nearly anything, including personal property which an ordinary consumer would not think of as incidental to his interest in a home. [5] The language specifically refers to many household appliances which are not necessarily fixtures. Because the language includes personal property not purchased with the loan proceeds which is not incidental to the home itself, some disclosure of that interest should have been made. We are not certain that Crossland necessarily intended to acquire such a broad interest in the plaintiff's property, and, in fact, assume that it did not. However, even where the parties intend to limit language in a form security agreement, failure to either remove the overbroad language or acknowledge the full extent of the interest in the TILA statement constitutes a misdisclosure of the security [*25] interest in violation of TILA. *Teel v. Thorp Credit Inc. of Illinois, 609 F.2d 1268, 1270 (7th Cir. 1979).*

> 5   The lack of limitation upon the language could render it applicable to furniture and other personal property which consumers generally expect to be able to take with them when they move to a new residence. Indeed, the language "located in" suggests the security interest could apply to property not even belonging to the debtors.

### III. ILCFA Liability for Improper TILA Disclosures

Plaintiffs also make a claim under the Illinois Consumer Fraud Act, *815 ILCS 505/2*, asserting that the violations of TILA constitute statutory fraud. "On its face, it appears that all a plaintiff need prove to establish a violation of the Act is: (1) a deceptive act or practice, (2) intent on the defendants' part that plaintiff rely on the deception, and (3) that the deception occurred in the course of conduct involving trade or commerce. Significantly, the Act does not require actual reliance." [*26] *Siegel v. Levy Organization Dev. Co., 153 Ill. 2d 534, 607 N.E.2d 194, 198, 180 Ill. Dec. 300 (Ill. 1992).* Liability may be

established under the Act even where a defendant has not acted in bad faith. *Washington Courte v. Washington-Golf, 267 Ill. App. 3d 790, 643 N.E.2d 199, 221-22, 205 Ill. Dec. 248 (Ill. App. 1st Dist. 1994); Randels v. Best Real Estate, Inc., 243 Ill. App. 3d 801, 612 N.E.2d 984, 987, 184 Ill. Dec. 108 (Ill. App. 2d Dist. 1993).*

Crossland correctly points out, however, that to recover on an ILCFA claim, plaintiffs must prove that the alleged deception resulted in some kind of injury. *Duran v. Leslie Oldsmobile, Inc., 229 Ill. App. 3d 1032, 594 N.E.2d 1355, 1361-62, 171 Ill. Dec. 835 (Ill. App. 2d Dist. 1992).* The Illinois Supreme Court's most recent statement on causation under the ILCFA is *Martin v. Heinold Commodities, Inc., 163 Ill. 2d 33, 643 N.E.2d 734, 205 Ill. Dec. 443 (Ill. 1994).* In *Martin,* the plaintiffs showed that a commodities broker had misrepresented the nature of a certain fee to the plaintiffs, and that the plaintiffs would not have engaged in the transaction [*27] had they known the truth. *643 N.E.2d at 747.* This entitled them to recover the amount of the fee. *Id. at 748.* However, in order to recover damages for their investment losses under the ILCFA, the plaintiffs also had to show that the same misrepresentation caused the options the plaintiffs had purchased to lose money. *Id.* The court's inquiry must therefore focus on what injury has been visited upon the plaintiffs given the character of the misrepresentation. *Id.*

Because of the rebate provided by Long Grove, there is an indication that the plaintiffs may not actually have paid more than the amount listed as the finance charge in the TILA statement. Plaintiffs dispute the allocation of the rebate monies among certain of the fees, but do not dispute that the rebate itself was paid. Nor have they offered evidence that they paid more money than was indicated in the TILA statement. [6] "Although a *violation* of the Consumer Fraud Act may occur in the absence of damages, a *private cause of action* does not arise absent a showing of both a violation and the resulting damages." *Duran v. Leslie Oldsmobile, Inc., 594 N.E.2d at 1362* (emphasis in original).

   6   Plaintiffs claim that their knowledge of what the end price of the transaction would be does not obviate Crossland's burden to make an honest presentation of its itemized charges that comprise the ultimate fee. This is true in cases such as *Martin,* where a consumer pays the total price of the transaction which contains misrepresented fees. Here, however, where plaintiffs are claiming that the ultimate price of the transaction was *higher* than what the misstated finance charge indicates, they must show that they did indeed pay the higher price. Because of the rebates in this transaction, plaintiffs may not in fact have paid a higher total finance charge than what was disclosed in the TILA statement. Moreover, unlike *Martin,* plaintiffs' claim under this count is not that any of the individual fees that comprised the total finance charge were misrepresented, but that the statement of the total finance charge was inaccurate.

[*28] Moreover, the misrepresentation that plaintiffs claim occurred was the mistaken figures on the TILA disclosure, which showed $ 250.00 less in finance charges than what they claim was actually charged. They say that they were charged at least $ 250.00 extra at the closing. Dep. Charles Romaker, p. 108. However, plaintiffs at no time claim that this *disclosure statement* caused them to pay more money at the closing. In fact, the "overcharge" that they complain of resulted from an entirely separate chain of events involving whether there was any agreement between the plaintiffs and Crossland concerning an increase in the appraisal fee. See p. 2, *supra.* That a computer bug happened to create a disclosure statement misstating the finance charge was serendipitous coincidence for the plaintiffs. Thus, because plaintiffs cannot show that the misstatement on the TILA form actually caused them to pay more for their loan, they cannot recover under the ILCFA.

### IV. TILA Damages

TILA is very specific about the damages that are available. Among other things, TILA makes creditors who fail to make proper disclosures liable to the borrower for "any actual damage sustained by such [*29] person as a result of the failure." *15 U.S.C. § 1639(a)(1).* Plaintiffs move for summary judgment on the question of actual damage, arguing that they are entitled to actual damages in this case in the amount by which the finance charge they paid exceeded the amount disclosed on the TILA statement.

Crossland points to authority suggesting that a plaintiff who seeks actual damages under *§ 1640(a)(1)* must show some causation of his injury, meaning reliance on the misdisclosure which prevented him from obtaining a more favorable term elsewhere. *Hickey v. Great Western Mortgage Corp., 158 F.R.D. 603, 610-11 (N.D. Ill. 1994); see, also, Vickers v. Home Federal Savings & Loan Assoc., 62 A.D.2d 1171, 404 N.Y.S.2d 201, 202 (N.Y. Sup. Ct. 1978); Adiel v. Chase Federal Savings & Loan Assoc., 630 F. Supp. 131, 133 (S.D. Fla. 1986).* Plaintiffs argue that requiring reliance or a showing that the borrower could have obtained better terms elsewhere is unreasonable. We do not need to reach this question here, because even if we were to find that the plaintiffs need not make these showings, they have not produced any evidence [*30] that their actual payment of finance charges exceeded the amount disclosed on the TILA

statement. An understatement of the finance charge may result in an award of actual damages under § 1640(a)(1) only where the plaintiff has, in fact, paid more than the understated charge. [7]

> 7  Plaintiffs also ask that we look to the defense provided by *15 U.S.C. § 1640(b)* to conclude that finance charges paid in excess of an understatement on a TILA disclosure are a sufficient measure of actual damages. *Section 1640(b)* is a "correction of errors" defense, allowing a creditor to escape liability entirely under TILA if it notifies the borrower of the error and adjusts the accounts as necessary to ensure that a borrower does not pay more than the amount actually disclosed. *Villanueva v. Motor Town, Inc., 619 F.2d 632, 635 (7th Cir. 1980)*. Plaintiffs' argument fails. First, plaintiffs have not shown that they paid more than the amount actually disclosed. Second, where there is actual damage from a misrepresentation, it will usually exceed the amount available in restitution, because a plaintiff will also have been deprived of the ability to obtain a better deal elsewhere. We are not inclined to adopt a standard defining "actual damage" that might later be employed to reduce the remedies available to a plaintiff under the statute. Finally, to say that a defendant found liable for violating TILA could satisfy the requirement of actual damages by merely adjusting accounts would nullify the time limitation contained in the defense. The right to cure errors in an account expires either 60 days from the discovery of the error, or upon the institution of a legal action seeking recovery. *15 U.S.C. § 1640 (b)*; *Lirtzman, 493 F. Supp. at 1033*.

[*31] Plaintiffs argue that "any understatement of the finance charge constitutes 'actual damages.'" Memorandum in Support of Plaintiffs' Amended Motion for Partial Summary Judgment, p. 11. We do not believe that such a broad reading of the term is warranted. TILA provides an additional statutory remedy for plaintiffs beyond actual damages, in recognition of the fact that violations of TILA do not always result in financial loss. *Brown v. Marquette Savings and Loan Assoc., 686 F.2d 608, 614 (7th Cir. 1982)*; *see, also, 15 U.S.C. § 1640(a)(2)*; *Kedziora v. Citicorp National Services, Inc., 780 F. Supp. 516, 521-22 (N.D. Ill. 1993)*. Moreover, we believe that the numerous issues regarding damages should not be decided piecemeal. Significant questions remain regarding the appropriateness of class action relief, the availability of statutory damages, and the appropriate amounts. An ultimate determination as to actual damages is therefore premature. We deny summary judgment to both parties without prejudice regarding the existence of actual damages.

### CONCLUSION

Plaintiffs' motion to strike is denied. Plaintiffs' motion [*32] for summary judgment is granted (and defendant's motion for summary judgment is denied) with respect to liability under TILA for failure to disclose the security interest and the amount financed. Plaintiffs' motion is denied (and defendant's motion is granted) with respect to liability under the ILCFA. Both plaintiffs' and defendant's motions are denied without prejudice as to the existence of actual damages.

DATED: November 3, 1995

ENTER:

John F. Grady, United States District Judge

LEXSEE 2006 U.S. DIST. LEXIS 4908

**Guadalupe Navara vs. Long Beach Mortgage, et al.**

**05 C 864**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

*2006 U.S. Dist. LEXIS 4908*

**January 26, 2006, Decided**
**January 26, 2006, Filed**

**COUNSEL:** [*1] For Guadalupe Navara, Plaintiff: Daniel A. Edelman, Albert F Hofeld, Jr., Cathleen M. Combs, James O. Latturner, Edelman, Combs, Latturner & Goodwin, LLC, Chicago, IL.

For Long Beach Mortgage Company, Washington Mutual Bank FA, Defendants: Matthew M. Neumeier, Scott T. Schutte, Jenner & Block, LLC, Chicago, IL.

**JUDGES:** Mark Filip, Magistare Judge.

**OPINION BY:** Mark Filip

**OPINION**

**DOCKET ENTRY TEXT**

For the reasons stated below, the Defendants' motion to dismiss (D.E. 15) is respectfully denied.

.[For further details see text below.]

Docketing to mail notices.

**STATEMENT**

Plaintiff Guadalupe Navara ("Plaintiff or "Ms. Navara") filed suit against Defendants Long Beach Mortgage Company ("Long Beach"), Washington Mutual Bank, F.A. ("WAMU"), New Millennium Mortgage Corporation ("New Millennium"), and Rogelio A. Astudillo, a/k/a Roger Astudillo ("Astudillo"). Plaintiff seeks (i) to rescind a real estate mortgage and to recover damages for alleged violations of the Truth in Lending Act, *15 U.S.C. § 1601 el seq.* ("TILA"), as amended by the Home Ownership & Equity Protection Act of 1994, *15 U.S.C. §§ 1602(aa)* and *1639* ("HOEPA") [*2] and implementing federal regulation, 12 C.F.R. part 226 ("Regulation Z") (Count I), (ii) to recover damages for alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, *815 ILCS § 505/1 et seq.* (the "Consumer Fraud Act") (Count II), and (iii) to recover damages for alleged failure to comply with the TILA disclosure requirement governing security interests in personal property (Count III). (D.E. 1 (the "Complaint").)

Long Beach and WAMU are named as defendants in Count I. Long Beach, New Millennium and Astudillo are named as defendants in Count II. Long Beach is named as defendant in Count III. Long Beach and WAMU moved to dismiss the Complaint under *Federal Rule of Civil Procedure 12(b)(6)*. (D.E. 15.) For the reasons stated below, the motion is respectfully denied.

**1. Background**

The following facts are taken from the Complaint. The Court accepts the allegations as true, as precedent instructs, for present purposes. The Court takes no position on whether any of the allegations are actually well-founded.

On April 24, 2004, Plaintiff obtained a $ 50,000 mortgage loan (the [*3] "Loan") from Long Beach, which was secured by her residence. (D.E. 1 P 8.) Plaintiff alleges that she obtained the loan to refinance prior debts incurred for personal, family or household purposes. (*Id.* P 9.) The following documents are attached to the Complaint: the note (*id.* Ex. A), the mortgage (*id.* Ex. B), the HUD-1 settlement statement (*id.* Ex, C ("HUD-1 Statement")), the TILA financial disclosure statement (*id.* Ex. D ("TILA Disclosure")), the notice of right to cancel (*id.* Ex. E), the itemization of amount financed and prepaid finance charge (*id.* Ex. F), and the 1-4 family rider to the mortgage (*id.* Ex. G ("1-4 Family Rider")). (*Id.* P 10.) Plaintiff has been directed to make payments under the Loan to WAMU, who claims a right to payment under the note and mortgage. (*Id.* P 23.)

Case 1:07-cv-06543   Document 21-3   Filed 02/22/2008   Page 18 of 33

Page 2
2006 U.S. Dist. LEXIS 4908, *

Plaintiff applied for the loan through New Millennium, a mortgage broker. (*Id.* P 11.) Astodillo was the loan originator at New Millennium who took Plaintiff's loan application and presented it to Long Beach. (*Id.* P 12.) New Millennium and Astodillo received the following compensation [*4] for brokering the loan: (i) a loan origination of fee of $ 800.00, listed on line 801 of the HUD-1 Statement, (ii) a processing fee of $ 500.00, listed on line 810 of the HUD-1 Statement, and (iii) $ 8,000 to ACS, meaning Astodillo Consulting Services, listed on line 1305 of the HUD-1 Statement as a $ 26,000 payment to "ACS." (*Id.* P 13.) Plaintiff claims Astodillo returned to her $ 18,000 of the $ 26,000 payment. (*Id.*) Plaintiff alleges that the $ 8,000 was retained by New Millennium and/or Astodillo as part of the compensation for brokering the loan, but was not listed on the TILA Disclosure. (*Id.* PP 13,16 and Ex. F.)

**II. Standard of Review**

"A motion to dismiss under *Rule 12(b)(6)* challenges the sufficiency of a complaint for failure to state a claim upon which relief may be granted." *Johnson v. Rivera, 272 F.3d 519, 520-21 (7th Cir. 2001)*. In deciding a motion to dismiss, the court must assume all facts alleged in the complaint to be true, construe the allegations generously, and view the allegations in the light most favorable to plaintiffs. *See, e.g., Marshall-Mosby v. Corporate Receivables, Inc., 205 F.3d 323, 326 (7th Cir. 2000).* [*5] Dismissal for failure to state a claim is not appropriate unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Lee v. City of Chicago, 330 F.3d 456, 459 (7th Cir. 2003)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*).

**III. Discussion**

**A. Counts I and II-TILA, HRHLA, and The Consumer Fraud Act**

Count I alleges that the TILA Disclosure "grossly misstated the amount financed, finance charge and annual percentage rate, in that the compensation to New Millennium and Astodillo was not fully included in the finance charge and annual percentage rate, in violation of *15 U.S.C. § 1638* and *12 C.F.R. § 226.18*" and that "no attempt was made to comply with the advance disclosure requirements of HOEPA." (D.E. 1 PP 25-26.) Plaintiff claims that she is entitled to the remedy of rescission under TILA (*see 15 U.S.C. § 1635*) and Regulation Z (*see 12 C.F.R. § 226.23*) against Long Beach and WAMU, as well as statutory damages against Long Beach for the alleged [*6] disclosure violations.

Count II alleges violations of the Consumer Fraud Act against Defendants Long Beach, Millennium and

Astodillo. (D.E. 1 PP 32-38.) Plaintiff claims that these Defendants "knowingly" violated the Illinois High Risk Home Loan Act, *815 ILCS § 137/1 et seq.* ("HRHLA")-by omitting the payment to ACS from the finance charge, by financing broker compensation in excess of 6%, and by failing to provide special advance disclosures required by the HRHLA-and in so doing, violated the Consumer Fraud Act. (*Id.* PP 34.); *see 815 ILCS 137/135(b)* ("Any knowingly violation of this Act [HRHLA] constitutes a violation of the Consumer Fraud [Act].")). Plaintiff also claims that these Defendants violated *§ 2 of the Consumer Fraud Act, 815 ILCS 505/2*, by misrepresenting the finance charge, the amount financed and the annual percentage rate and by causing such misrepresentations. (*Id* P 35.)

Defendants WAMU and Long Beach contend that the claim against WAMU should be dismissed because WAMU was not the originator of the Loan, and thus did not make the TILA Disclosure. (D.E. 15 P 3.) [*7] They further contend that Counts I and II should be dismissed on the ground that Plaintiff's allegation that she paid an additional $ 8,000 broker fee conflicts with the HUD-1 Statement, which was attached to the Complaint and signed by Plaintiff under penalty of perjury. (*Id.* P 4.) In this regard, the Defendants further argue that Plaintiff "does not (and cannot) allege that Long Beach was aware of the undisclosed [$ 8,000 broker] fee," and thus Long Beach cannot be held liable under TILA or HRHLA. (*Id.*)

**1. WAMU Is A Necessary Party**

The Court first addresses a threshold issue-whether WAMU should even be included as a defendant with respect to Count I. WAMU argues that it is not a proper party, while Plaintiff contends that WAMU is properly joined as a necessary party under *Fed. R. Civ. P. 19*.

"The purpose of *Rule 19* [of the Federal Rules of Civil Procedure] is to permit joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources.'" *Murry v. Am.'s Mortgage Banc, Inc., 2004 U.S. Dist. LEXIS 12045, No. 03 C 5811, 2004 WL 1464584,* [*8] *5 (N.D. Ill. June 29, 2004)* (quoting *Moore v. Ashland Oil, Inc., 901 F.2d 1445, 1447 (7th Cir. 1990)*). Rule 19 furthers several interests, including the public interest in preventing multiple and repetitive lawsuits, the parties' interest in obtaining complete and effective relief in a single action, and absent parties' interest in avoiding the potential prejudicial effect of decisions rendered without their participation. *See, e.g., Acton Co., Inc. of Mass. v. Bachman Foods, Inc., 668 F.2d 76, 78 (1st Cir. 1982)*; *see also Murry, 2004 U.S. Dist. LEXIS 12045, 2004 WL 1464584 at *5* (to determine whether a party is necessary, courts consider whether if, in the putative necessary

party's absence, the party "will be prejudiced or the already existing parties will be subjected to multiple or inconsistent obligations") (internal citation omitted). To that end, *Rule 19* sets forth two situations in which it is necessary to join a party if feasible: (i) where complete relief cannot be given to the current parties without the absent party being in the case; and (ii) where the outside party's interests will be prejudiced or the current parties will be subject to a substantial [*9] risk of incurring double, multiple, or otherwise inconsistent obligations. *See Fed. R. Civ. P. 19(a)*; *accord, e.g., Hashop v. Fed. Home Loan Mortg. Corp., 171 F.R.D. 208, 211 (N.D. Ill. 1997)* (Zagel, J.) (citing *Tillman v. City of Milwaukee, 715 F.2d 354, 358 (7th Cir. 1983)*). A party need only establish one of these criteria to establish that the outside party should be joined if feasible. *Hashop, 171 F.R.D. at 211* (citing *Tillman, 715 F.2d at 358*).

In *Murry*, the plaintiff sought rescission of a mortgage loan that was serviced by the putative party and alleged that the third party/mortgage servicer claimed a right to payment on account of the loan. *2004 U.S. Dist. LEXIS 12045, 2004 WL 1464584 at *6*, The court concluded that this "is the kind of party that should be retained for *Rule 19* purposes," reasoning that, if the mortgage loan were rescinded, then the mortgage servicer would cease to have any interest in the loan, and the plaintiff might wish to recover late fees or other penalties assessed and collected by the party. *Id.* Like the plaintiff in *Murry*, Plaintiff in the instant [*10] case seeks rescission of the Loan, and she alleges that WAMU services the Loan and claims a right to payments under the Loan. (D.E. 1 PP 23, 27-31; D.E. 18 at 13; D.E. 22 at 15.) If the Loan ultimately is rescinded, WAMU's interest in the Loan will terminate, directing that WAMU should be a party here. *Accord, e.g., United States ex. rel. Hall v. Tribal Development Corp., 100 F.3d 476, 479 (7th Cir. 1996)* ("no procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable") (internal quotation marks and citation omitted); *Hashop, 171 F.R.D., at 200*. In addition, in conjunction with any such rescission, Ms. Navara may attempt to recover late fees or other penalties assessed and/or collected by WAMU, which also militates in favor of joinder. *Accord, e.g., Murry, 2004 U.S. Dist. LEXIS 12045, 2004 WL 1464584 at *6*. Accordingly, the Court finds that, at least at this stage in the litigation, WAMU is a necessary party under *Rule 19. Accord, e.g., id.; Hashop, 171 F.R.D. at 212* (holding that a mortgage [*11] servicer should be joined if feasible under *Rule 19(a)* in an action by the borrowers seeking a declaration regarding their payment obligations). To the extent it so desires, WAMU may revive this objection at a more appropriate juncture-for example, through summary judgment proceedings.

## 2. The HUD-1 Statement Does Not Fatally Undermine The Complaint

The Court turns to the issue of whether the HUD-1 Statement attached to the Complaint precludes Plaintiff from asserting that she paid an undisclosed $ 8,000 broker fee-the gravamen of Counts I and II. The HUD-1 Statement shows that of the $ 50,000.00 Loan, $ 26,000.00 was paid to "ACS" at the loan closing. (D.E. 1 Ex. C at 2; *see also id.* (reflecting that payments also were made at closing to Capital One Bank and First Premier).) The Complaint alleges that "Astudillo then paid $ 18,000 of this amount to Plaintiff and "ACS" retained $ 8,000 as additional compensation for brokering the loan. (D.E. 1 P 13.) The $ 8,000, however, is not appropriately disclosed as a broker fee. (*E.g., Id.* PP 13, 15-16.) Defendants WAMU and Long Beach claim that Ms. Navara signed the HUD-1 Statement, certifying [*12] that she "carefully reviewed the HUD-1 . . . [Statement] and to the best of [her] knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on [her] account or by [her] in this transaction" (*Id.* Ex. C at 2-3), and that therefore the case is subject to dismissal under *Rule 12(b)*. For the reasons stated below, the Court respectfully disagrees.

To be sure, at a general level, it is a "well-settled rule" that when a written instrument contradicts allegations in the complaint to which it is attached, typically the exhibit "trumps the allegations." *Northern Ind. Gun & Outdoor Shows v. City of S. Bend, 163 F.3d 449, 454 (7th Cir. 1998)* ("NIGOS") (citations omitted). But, precedent further instructs that this rule should not be applied without an appreciation for context and the nature of the plaintiff's theory of the case, such that statements in exhibits attached to a complaint should not always be seen to control over allegations made within the complaint. *See id. at 455* (teaching that the district court applied the general rule "too broadly" and reversing the lower court). "Rather than [*13] accepting every word in a unilateral writing by a defendant and attached by a plaintiff to a complaint as true, it is necessary to consider why a plaintiff attached the documents, who authored the documents, and the reliability of the documents." *Id.; accord, e.g., Gilbert v. Robb, 1997 U.S. Dist. LEXIS 9077, No. 95 C 1937, 1997 WL 361559 (N.D. Ill. 1997)* ("Plaintiff does not as a matter of law adopt everything in these documents as true merely by attaching them to his complaint") (citing *Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 675 (2d Cir. 1995)).* In *NIGOS*, for example, the Seventh Circuit distinguished between documents attached to the complaint that form the basis of the claim, and documents attached for reasons unrelated to their truth. *Id., 163 F. 3d at 455-56.*

In the case *sub judice*, Plaintiff did not attach the HUD-1 Statement to show its truth or claim that everything in it was correct. In fact, Plaintiff attached the document to the Complaint for the opposite purpose; that is, she alleges that the HUD-1 Statement is the product of misrepresentation and concealment and that the document reflects the fraud. (*E.g.*, D.E. PP 13, [*14] 34, 35.) Put differently, Plaintiff has not plead herself out of court by attaching the HUD-1 Statement to the Complaint. The fact that Ms. Navara signed the document under penalty of perjury (albeit "to the best of [her] knowledge and belief") or did not allege any facts explaining the basis or origin of the $ 26,000 payment to "ACS" is of no moment. At this early stage in the litigation, Plaintiff need only satisfy federal notice pleading requirements. The Complaint alleges that Defendants failed to make certain required disclosures in violation of TILA and related federal statutes, and misrepresented certain information in violation of the Consumer Fraud Act. Except as required by *Federal Rule of Civil Procedure 9(b)*, there is no requirement in federal suits of pleading the facts underlying a claim. *See Walker v. Thompson, 288 F.3d 1005, 1007 (7th Cir. 2002). Federal Rule of Civil Procedure 8* departs from old code-pleading practice and enables plaintiffs to dispense with the need to identify, and plead specifically to, each ingredient of their respective legal theories. *See, e.g.* [*15] , *Kirksey v. R.J. Reynolds Tobacco Co., 168 F.3d 1039, 1041 (7th Cir. 1999)* ("All that's required to state a claim in a complaint filed in a federal court is a short statement, in plain (that is, ordinary, non-legalistic) English, of the legal claim. . . . The courts keep reminding plaintiffs that they don't have to file long complaints, don't have to plead facts, don't have to plead legal theories."). Thus, dismissal under *Rule 12(b)(6)* is inappropriate.

Defendants' cases do not counsel in favor of a different result, at least at this stage of the proceedings. For example, in *Bell v. Lane, 657 F. Supp. 815 (N.D. Ill. 1987)*, the complaint alleged that the prisoner-plaintiff was deprived of due process because a corrections committee refused to call a particular correctional officer as a witness; however, the committee report attached to the complaint established that the officer actually was a witness at the hearing in question. *657 F. Supp. at 817*. As a result, *Bell* dismissed the complaint as frivolous because the exhibits attached to the complaint, which plaintiff did not allege to be suspect or otherwise defective, negated the allegations [*16] underlying the claim. Here, by contrast, Plaintiff is alleging, *inter alia*, that she was defrauded, and thus is not endorsing the veracity of the attached document (or certainly at least not endorsing the veracity of everything about the document). In this regard, although not necessary or essential to the Court's decision, the Court notes that Ms. Navara has proffered sworn affidavit testimony in which she stated that she never realized that the loan application states that she owes a debt to ACS (D.E. 22, Ex. J at 3), and further states that she never reported to anyone, including ACS and Mr. Astudillo, that she owed a debt to ACS or any company with a similar name. In any event, the allegations in the complaint, when read in context, do not dictate that, as a matter of law, the attached HUD-1 Statement necessarily defeats Plaintiff's claim. Dismissal under *Rule 12(b)(6)* is therefore inappropriate.

**3. The Complaint Sufficiently Alleges Long Beach's Knowledge**

Defendant Long Beach contends that it cannot be held liable for any TILA, HOEPA or HRHLA violations in the case *subjudice* because Plaintiff "does not (and cannot) allege that Long Beach was aware of the undisclosed [*17] [alleged $ 8,000 broker] fee." (D.E. 15 P 4,) The Court respectfully disagrees. First, the Complaint *does* allege that Long Beach acted knowingly. *See* D.E. 1 P 34 (alleging that Long Beach, among other Defendants, "knowingly violated the HRHLA by omitting the payment to ACS' from the finance charge, thereby concealing the fact that they were making a loan subject to the HRHLA, by financing broker compensation exceeding 6%, in violation of the HRHLA, and by failing to provide the special advance disclosures required by the HRHLA."); *see also id.* P 35 (alleging that Long Beach violated the Consumer Fraud Act by misrepresenting the finance charge, amount financed and annual percentage rate on the loan). Long Beach may believe that this allegation is mistaken or baseless, but the allegation certainly has been made, and a central part of Plaintiff's theory is that there was a knowing violation. Moreover, given Plaintiff's allegation of a knowing violation, and given the intertwined nature of Plaintiff's theory of liability under TILA, the HRHLA, and the Consumer Fraud Act, the Court reads Count I of the Complaint to allege a knowing violation [*18] of TILA. *Accord, e.g., Graehling v. Village of Lombard, 58 F.3d 295, 297 (7th Cir. 1995)* ("A suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim."). For the sake of clarity, Plaintiff is respectfully requested to amend her Complaint to make clear that her allegations of a knowing violation reach to the TILA count. Furthermore, the Court expresses no view about the subsidiary question also briefed by the parties-and particularly the Defendants-namely, whether TILA covers a creditor's failure to disclose certain required factual information where the failure is the result of the creditor's lack of knowledge regarding such facts, or where a borrower-plaintiff was complicit in misleading the creditor-defendant. To the extent these issues prove relevant, they can be addressed after the Plaintiff has an opportunity to develop facts in support of her allegations. *Accord, e.g., Centers v. Cen-*

tennial Mortgage, Inc., 398 F.3d 930, 933 (7th Cir. 2005) (a court should only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his [*19] claim which would entitle him to relief").

## B. Count III-Violation of TILA Claim Against Long Beach

Count III alleges that Long Beach's failure to list on the TILA Disclosure the security interest it took in Plaintiff's personal property that is not part of the real estate by means of the 1-4 Family Rider constitutes a violation of TILA (see 15 U.S.C. § 1637) and Regulation Z (see 12 C.F.R. § 226.18). (D.E. 1 PP 40-42.) Long Beach contends that Count III should be dismissed on the ground that the 1-4 Family Rider creates merely "incidental interests," and Regulation Z prohibits disclosure of such interests. (D.E. 16 at 8-9 (citing 12 C.F.R. § 226.2, Supp. 1, at 305).)

Under TILA, lenders providing secured credit are required to disclose "a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type." 15 U.S.C. § 1638(a)(9); see also 12 C.F.R. § 226.18(m) (implementing regulation). Regulation [*20] Z creates a category of interests described as "incidental interests such as interests in proceeds, accessions, additions, fixtures . . . or interests in after-acquired property" that are expressly excluded from the definition of security interests that must be disclosed under § 1638(a); in fact, such interests should not be disclosed. 12 C.F.R. § 226.2(a)(25); see also 12 C.F.R. § 226.2, Supp. 1, at 305 ("The general definition of security interest excludes . . . incidental interests [and] interests in after-acquired property. . . . These interests may not be disclosed. . . .") At issue, then, is whether the interest Long Beach took pursuant to the 1-4 Family Rider (i) necessarily constitutes an incidental interest, in which case Regulation Z prohibits disclosure of such interest and the TILA Disclosure is sufficient, or (ii) whether the interest could be a security interest, in whole or in part, in which case TILA requires disclosure of the additional security interest and the TILA Disclosure is insufficient.

The 1-4 Family Rider at issue in this case provides, in relevant part:

A. **Additional Property Subject to** [*21] **the Security Instrument.** In addition to the Property described in the Security Instrument, the following items are added to the Property description, and shall also constitute the Property covered by the Security Instrument; building materials, appliances *and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to,* those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings now or hereafter attached to the property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument.

(D.E. 1, Ex. G. (emphasis added).)

Leon v. Washington Mutual Bank, F.A., 164 F. Supp. 2d 1034 (N.D. Ill. 2001) [*22] (Alesia, J.), is on all fours here. Leon rejected a defendant's motion for judgment on the pleadings under Rule 12(c), concerning the issue of whether rider language identical to the language in the 1-4 Family Rider in the instant case necessarily created an incidental interest as opposed to a security interest. Id., 164 F. Supp. 2d at 1038. The court specifically analyzed whether or not the rider added "fixtures" to the property subject to the security instrument, which constitute mere incidental interests for purposes of TILA and Regulation Z. Id. at 1038; see also 12 C.F.R. § 226.2(a)(25). Because neither the contract, nor TILA and its accompanying regulations define the term "fixture," the Leon court looked to Illinois law to define the term. Id. The court concluded that, of the three factors Illinois courts use to determine whether an item constitutes a fixture-"(1) the actual annexation of that item to the realty; (2) application of the item to the use or purpose for which the land is appropriated; and (3) the intention to make the item a permanent accession to realty"-intent was the most important [*23] factor. Id. (citing, inter alia, A & A Market v. Pekin Ins. Co., 306 Ill. App. 3d 485, 713 N.E.2d 1199, 1202, 239 Ill. Dec. 349 (Ill. App. Ct. 1999)). The court found that the rider, "read as a whole, disregards the critical favor of intent upon which Illinois fixture law is focused." Id., 164 F. Supp. 2d at 1038. The court observed that language in the rider disregards the borrower's intent to permanently attach the building materials, appliances and goods to the realty and

therefore cannot be limited to fixtures. *Id. at 1038-39.* The court ultimately refused to grant the defendant judgment on the pleadings because it could not conclude as a matter of law that the rider was limited to fixtures, as the defendant contended. *Id.* In reaching this conclusion, *Leon* cited, *inter alia, Williams v. Gelt Fin. Corp., 237 B.R. 590, 595-96 (E.D. Pa. 1999)*, which "concluded that the rider created a security interest in the consumer's personal property that extended beyond incidental interests to the real property." *Leon, 164 F. Supp. 2d at 1039.*

As stated above, the language in the 1-4 Family Rider is identical in all relevant aspects [*24] to the *Leon* rider and the Court can not find any basis to depart from the district court's decision in that case or from the district court's (and bankruptcy court's) identical conclusion in *Williams.* Long Beach fails to cite a single case finding that language similar to that of the 1-4 Family Rider at issue necessarily creates merely incidental interests as a matter of law. To the contrary, at least one other district court in this district has reached the same result as did *leon. See Romaker, et al. v. Crossland Mortgage Corp., No. 94 C 3328, 1995 U.S. Dist. LEXIS 22252, *23-25 (N.D. Ill. Nov. 3, 1995)* (Grady, J.); *see also People's v. Sebring Capital Corp., 2002 U.S. Dist. LEXIS 4104, No. 1 C 5676, 2002 WL 406979, *3-5 (N.D. Ill. Mar. 15, 2002)* (adopting *Leon* analysis for purposes of making class certification determination).

Finally, Defendant Long Beach argues *that Leon* erred by focusing solely on whether the rider was limited to "fixtures" and failed to consider whether the rider created "accessions," "additions, or "after-acquired property," which also are included in Regulation Z's description of incidental interests (*see 12 C.F.R. 226.2* [*25] , Supp. 1 at 305). (D.E. 16 at 11.) The Court believes that such an argument is misplaced. The 1-4 Family Rider includes "goods of every nature whatsoever" that are "located" on the property "now" and "hereafter" and defines these goods as "including, but not limited to" an extensive list of specific items. Addressing virtually identical language, *Romaker* states:

> The question before us therefore is whether the security interest outlined in the 1-4 Family Rider is an interest incidental to the general interest taken in the home that was purchased. Although a great many of the things named in the rider are incidental interests, we are troubled by the expansive language of the security agreement. "Goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in con-

nection with the Property including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light" is an extremely broad description that could apply to nearly anything, including personal property which an ordinary consumer would not think of as incidental to his interest in a home. The language specifically refers [*26] to many household appliances which are not necessarily fixtures. Because the language includes personal property not purchased with the loan proceeds which is not incidental to the home itself, some disclosure of that interest should have been made. We are not certain that [the defendant] necessarily intended to acquire such a broad interest in the plaintiff's property, and, in fact, assume that it did not. However, even where the parties intend to limit language in a form security agreement, failure to either remove the overbroad language or acknowledge the full extent of the interest in the TILA statement constitutes a misdisclosure of the security interest in violation of TILA. *Teel v. Thorp Credit Inc. of Illinois, 609 F.2d 1268, 1270 (7th Cir. 1979).*

*1995 U.S. Dist. LEXIS 22252 at *24-25. Romaker* adds in an appended footnote that, "the lack of limitation upon the language could render it applicable to furniture and other personal property which consumers generally expect to be able to take with them when they move to a new residence. Indeed, the language located in' suggests the security interest could apply to property not even belonging [*27] to the debtors." *Id. at *24 n.5.* Like the rider language in *Romaker,* the language in the 1-4 Family Rider is sweeping, and it contains no language suggesting that the property covered by the security instrument is limited to "accessions, "additions," or even "after-acquired property." Accordingly, the Court sides with the unanimous weight of district court caselaw cited by the parties and denies Long Beach's motion to dismiss Count III.

### IV. Conclusion

For all of these reasons, the motion to dismiss (D.E. 15) is respectfully denied.

LEXSEE 2005 U.S. DIST. LEXIS 14135

**NORAH T. STRANG and ROBERT J. STRANG, Plaintiffs, vs. WELLS FARGO BANK, N.A., WELLS FARGO HOME MORTGAGE, INC., OLD GUARD MORTGAGE AND FINANCIAL SERVICES, INC., and CHELSEA SETTLEMENT SERVICES, INC., Defendants.**

**CIVIL ACTION NO. 04-CV-2865**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2005 U.S. Dist. LEXIS 14135*

**July 13, 2005, Decided**

**COUNSEL:** [*1] For NORAH T. STRANG, ROBERT J. STRANG, Plaintiffs: DAVID A. SCHOLL, NEW-TOWN SQUARE, PA.

For CHELSEA SETTLEMENT SERVICES, INC., Defendant: PETER J. RUSSO, CAMP HILL, PA.

For OLD GUARD MORTGAGE AND FINANCIAL SERVICES, INC., Cross Defendant: MATTHEW L. HOMSHER, DELL & ASSOCIATES, LANCASTER, PA; OLD GUARD MORTGAGE AND FINANCIAL SERVICES, INC., Pro se, LANCASTER, PA.

For WELLS FARGO HOME MORTGAGE, INC., WELLS FARGO BANK, N.A., Cross Claimants: HENRY F. REICHNER, REED SMITH LLP, PHILADELPHIA, PA.

**JUDGES:** J. CURTIS JOYNER, J.

**OPINION BY:** J. CURTIS JOYNER

**OPINION**

*MEMORANDUM AND ORDER*

**JOYNER, J.**

This case is now before the Court for resolution of the Motion for Summary Judgment of Defendants Wells Fargo Home Mortgage, Inc. and Wells Fargo Bank, N.A. ("Wells Fargo"), regarding Plaintiff's Amended Complaint. For the reasons which follow, the Motion is granted.

*Factual Background*

On June 26, 2002, Plaintiffs in this action, Norah and Robert Strang, filed a Chapter 13 bankruptcy petition in the Bankruptcy Court for the Eastern District of Pennsylvania. (Docket for case # 02-19285-BIF). At the time of their bankruptcy, the Strangs had an adjustable [*2] rate mortgage loan with Ameriquest. (Exhibit D to Defendants' Motion). During the course of their bankruptcy proceeding, the Strangs approached Tom Dodson of Affinity Mortgage to act as their broker in obtaining a loan to refinance their loan with Ameriquest. [1] (R. Strang Depo. at 25:10-23); (N. Strang Depo. at 6:19-7:6). Mr. Strang also consulted his present counsel, David A. Scholl, concerning the refinancing process. (R. Strang Depo. at 29:9-30:14, 31:10-19, 34:10-24). As the Strangs' bankruptcy counsel, Scholl also had various communications with Dodson concerning the refinancing process. (Scholl Depo. at 10:9-15, 19:12-21:24).

> 1   In September 2003, Dodson told Mr. Strang that he had left Affinity Mortgage and had joined Defendant Old Guard Mortgage. (R. Strang Depo. at 40:1-25). Mr. Strang then signed a letter stating that Mr. Dodson would continue to be the Strangs' representative. (R. Strang Depo. at 87:6-24); (Exhibit D to Defendants' Motion).

On September 11, 2003, Dodson brought a Uniform Residential [*3] Loan Application to the Strangs' home, which included a two-year adjustable interest rate mortgage in the amount of $ 184,000 with an initial interest rate of 8.49%. (Exhibit G to Defendants' Motion). Mr. Strang reviewed the application while Dodson was present. (R. Strang Depo. at 38:16-22). Mr. Strang then signed the application. (Exhibit G to Defendants' Motion). Also on September 11, 2003, the Strangs received and signed both a Good Faith Estimate approximating

closing costs of $ 5,820 and a Truth in Lending Disclosure Statement. (R. Strang Depo. at 93:2-16, 96:10-97:8); (Exhibits H and I to Defendants' Motion). Shortly thereafter, Dodson submitted the September 11, 2003 application to Wells Fargo. (Exhibit J to Defendants' Motion). Wells Fargo approved the loan as submitted, except with a lower initial interest rate and lower closing costs. (Exhibits K and L to Defendants' Motion). Specifically, Wells Fargo approved a thirty year adjustable rate mortgage in the amount of $ 184,000 with an initial interest rate of 7.875% and closing costs of $ 5,344. (*Id.*).

On November 20, 2003, Chelsea Settlement Services conducted the loan closing at the Strangs' home. (R. Strang Depo. at [*4] 45:10-22). At the closing, the Strangs received and signed the Settlement Statement, Notice of Right to Cancel, Truth in Lending Disclosure Statement, an Adjustable Rate Two Year/Six Month ARM, and a Uniform Residential Loan Application. (R. Strang Depo. at 50,51,61-63,67,69,90). The Strangs were also provided with a document titled "Hazard Insurance Requirements." (Exhibit M to Defendants' Motion). Indeed, Mr. Strang admits that he chose not to read any documents at closing before signing them. (R. Strang Depo. at 63:17-25,67:13-25). In fact, Mr. Strang admits that he did not review the documents until several months after closing. (R. Strang Depo. at 64:6-65:16,66:6-13).

On December 11, 2003, the Strangs filed a motion seeking the bankruptcy court's approval of the loan, including its interest rate and variable nature. (Exhibit P to Defendants' Motion). The Strangs' Motion also attached the Truth in Lending Disclosure Statement and Settlement Sheet, setting forth the terms of the loan. (*Id.*). On February 9, 2004, the Strangs again went to the bankruptcy court and filed a Motion of Debtors Seeking Confirmation of Their Loan and Amendment of Their Confirmed Plan. (Exhibit Q to [*5] Defendants' Motion). On March 23, 2004, the bankruptcy court held a hearing and approved the terms of the Wells Fargo loan and the Amended Plan of Reorganization. (Exhibit A to Defendants' Motion).

On March 29, 2004, six days after the hearing in bankruptcy court, the Strangs' counsel sent a letter purporting to rescind the Wells Fargo loan. (Amended Complaint, P 14). The Strangs commenced the present lawsuit on June 30, 2004. An Amended Complaint was filed on December 30, 2004. In Count I, the Strangs allege that Wells Fargo failed to provide pre-settlement disclosures concerning their variable rate mortgage, in violation of the federal Truth-in-Lending Act, *15 U.S.C. § 1601 et seq.*, ("TILA"). (Amended Complaint, PP 17-19). The Strangs argue in Count II that Wells Fargo further violated TILA by failing to disclose various costs that should have been included in the Finance Charge

listed on the Truth in Lending Disclosure Statement. (*Id.* at PP 20-22). In Count III, the Strangs allege that Wells Fargo substituted less favorable terms into the loan agreement before closing, in violation of the federal Equal Credit Opportunity Act, *15 U.S.C. § 1691* [*6] *et seq.*, ("ECOA"). (*Id.* at PP 23-24). In Count IV, the Strangs contend that Wells Fargo is derivatively liable for Defendants Old Guard Mortgage and Chelsea Settlement Services' alleged violations of the Pennsylvania Credit Services Act, *73 P.S. § 2181 et seq.*, ("CSA"). (*Id.* at PP 25-28). Finally, in Count V the Strangs allege that Wells Fargo's TILA, ECOA, and CSA violations are also per se violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, *73 P.S. § 201-1 et seq.*, ("UTPCPL"). (*Id.* at PP 29-30). On June 16, 2005, Wells Fargo filed a Motion for Summary Judgment as to all Counts contained in Plaintiff's Amended Complaint.

### Standards Governing Summary Judgment Motions

In deciding a motion for summary judgment under *Fed.R.Civ.P. 56(c)*, a court must determine "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Medical Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999)* (internal citation omitted). Indeed, *Rule 56(c)* provides that summary [*7] judgment is properly rendered:

> If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Stated more succinctly, summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-32, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. *Troy Chemical Corp. v. Teamsters Union Local No. 408, 37 F.3d 123, 125-26 (3d Cir. 1994); Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co., 989 F.2d 635, 638 (3d Cir. 1993).* An issue of material fact is said to be genuine "if the evidence is such [*8] that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).*

In *Celotex Corp. v. Catrett, supra,* the Supreme Court articulated the allocation of burdens between a moving and nonmoving party in a motion for summary judgment. Specifically, the Court in that case held that the movant had the initial burden of showing the court the absence of a genuine issue of material fact, but that this did not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. *Celotex, 477 U.S. at 323.* The Court also held that *Rule 56(e)* requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id. at 324* (quoting *Fed.R.Civ.P. 56(e)*). This does not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, [*9] *Rule 56* does not require the nonmoving party to depose its own witnesses. Rather, *Rule 56(e)* permits a summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in *Rule 56(c)*, except the pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the required showing that a genuine issue of material fact exists. *Id. See, also, Morgan v. Havir Mfg. Co., 887 F. Supp. 759 (E.D. Pa. 1994); McGrath v. City of Phila., 864 F. Supp. 466, 472-73 (E.D. Pa. 1994).*

### Discussion

### I. Count I: Variable Rate Disclosures Under TILA

The Strangs allege that Wells Fargo failed to provide pre-settlement disclosures concerning their variable rate mortgage, in violation of TILA. (Amended Complaint, PP 17-19). Specifically, Section 129 of TILA provides:

> The creditor shall disclose . . . the "finance charge" not itemized, using that term [and]. . . the finance charge expressed as an "annual percentage rate," using that term.

*15 U.S.C. § 1638(a)(3)* and *(a)(4)*. However, TILA also creates a rebuttable presumption that disclosure occurred where [*10] there is "written acknowledgment of receipt of any disclosures required under this subchapter by a person to whom such information, forms, and a statement is required to be given." *15 U.S.C. § 1635(c).* The Strangs admit that they signed a Truth in Lending Disclosure Statement which explicitly stated that they had

previously received disclosures about the variable rate feature of the loan. (R. Strang Depo. at 61-63). Although the Third Circuit Court of Appeals has not explicitly addressed this issue, other Circuits have found that a borrower's testimony that disclosures were not provided, without more, is insufficient to rebut the presumption that disclosure occurred where there is written acknowledgment of receipt. *See, e.g., McCarthy v. Option One Mortgage Corp., 362 F.3d 1008, 1011 (7th Cir. 2004)*(finding mere assertion of non-receipt insufficient to rebut written evidence that disclosures were provided); *Gaona v. Town & Country Credit, 324 F.3d 1050, 1054 (8th Cir. 2003)*(finding allegations that disclosures were not provided insufficient to rebut presumption).

In addition to legal authority stating that a borrower's [*11] testimony alone is insufficient to rebut the presumption of disclosure, the facts of this case likewise indicate that the Strangs' testimony is inadequate to rebut the presumption. Specifically, the Strangs filed a motion with the bankruptcy court explicitly seeking approval of the Wells Fargo loan, including its interest rate and variable nature. (Exhibit P to Defendants' Motion). Indeed, the Strangs' motion attached both the Truth in Lending Disclosure Statement and the Settlement Sheet setting forth the terms of the loan. (*Id.*). In fact, the Strangs filed a second motion with the bankruptcy court seeking confirmation of the terms of the Wells Fargo loan. (Exhibit Q to Defendants' Motion). At no point did the Strangs or their counsel alert the bankruptcy court that they intended to rescind the loan or that the loan should not be approved. Indeed, a bankruptcy court will not approve a loan unless the debtor proves that the specific terms of the loan are fair, reasonable, and adequate. *In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).* Just as the Strangs' repeated submission of the loan terms to the bankruptcy court bolsters the presumption of [*12] disclosure, the Strangs' attempt to rescind the loan a mere six days after receiving the bankruptcy court's approval likewise supports the presumption. Specifically, it is highly unlikely that the Strangs did not realize the variable nature of their loan throughout the bankruptcy proceedings, yet discovered the variable rate within six days of receiving the bankruptcy court's approval. Accordingly, by applying the relevant legal standards to the particular facts of this case, this Court finds no TILA violation as outlined in Count I of Plaintiffs' Amended Complaint.

### II. Count II: TILA Claims Relating to Finance Charges

The Strangs further contend that Wells Fargo violated TILA by failing to disclose various charges that should have been included in the Finance Charge listed on the Truth in Lending Disclosure Statement. (Amended Complaint, PP 20-22). Thus, the Strangs allege that the finance charge was under-disclosed. (*Id.*).

The applicable law set forth in TILA Section 107 provides:

> In connection with credit transactions not under an open end credit plan that are secured by real property or a dwelling, the disclosure of the finance charge and other disclosures affected [*13] by any finance charge (1) shall be treated as being accurate for purposes of this subchapter if the amount disclosed as the finance charge (A) does not vary from the actual finance charge by more than $ 100; or (B) is greater than the amount required to be disclosed under this subchapter.

*15 U.S.C. § 1605(f).* The Code of Federal Regulations, which expands upon and clarifies rules relating to the timing and content of disclosures under TILA, likewise explains that a TILA violation is not found where the estimated finance charge is greater than the final finance charge. *12 C.F.R. § 226.18(d)(1).* Contrary to Plaintiffs' allegations, the estimated finance charge was actually overestimated by $ 126. (Exhibit O to Defendants' Motion). Specifically, the Truth in Lending Disclosure Statement initially listed a finance charge of $ 347,473.40, whereas the final finance charge was only $ 347,347.43. (*Id.*). Because the estimated finance charge was greater than the amount required to be disclosed, no TILA violation exists regarding Count II of Plaintiffs' Amended Complaint.

Although Plaintiffs allege that the title insurance charged [*14] by Chelsea Settlement Services should have been disclosed as part of the finance charge, TILA explicitly exempts the cost of title insurance from the computation of the finance charge. *See, 15 U.S.C. § 1605(e).* Likewise, Plaintiffs' contention that the $ 35 cost of a credit report should have been included in the finance charge is directly invalidated by TILA's explicit exemption of the cost of a credit report from the computation of the finance charge. *See, 15 U.S.C. § 1605(e).* Moreover, Plaintiffs' allegation that the $ 1,038 cost of hazard insurance should have been included in the finance charge is without merit, as property insurance premiums are excluded from the finance charge if disclosure is made as to the cost of insurance and the right of the consumer to pick his or her own insurer. *See, 12 C.F.R. § 226.4(d)(2).* Here, the Truth in Lending Disclosure Statement provided "Hazard insurance is required and may be obtained through any company of your choice that is acceptable to the Lender." (Exhibit J to Defendants' Motion). Furthermore, the cost of insurance was disclosed in the settlement documents, [*15] and Plaintiffs received a document titled "Hazard Insurance

Requirements" which reiterated **"NOTICE TO BORROWERS: YOU ARE REQUIRED TO PURCHASE PROPERTY INSURANCE AS A CONDITION OF RECEIVING THE LOAN. PROPERTY INSURANCE MAY BE SECURED FROM AN INSURANCE COMPANY OR AGENT OF YOUR CHOOSING."** (Exhibits L and M to Defendants' Motion)(bold and capitalization in original).

Plaintiffs further allege that the $ 5,700 payment to the Chapter 13 Trustee contemplated a double payment to Ameriquest. Plaintiffs, however, provide no factual basis for their assertion. Specifically, the Settlement Sheet indicates that these funds were divided between Plaintiffs and their unsecured creditors as specified in Plaintiffs' confirmed Chapter 13 bankruptcy plan. (Exhibit L to Defendants' Motion). Plaintiffs' allegation that the $ 5,700 payment should have been included in the finance charge likewise fails, as the Third Circuit has limited the scope of costs included in the finance charge to those listed in either TILA or the C.F.R. *See, e.g., Smith v. Fidelity Consumer Discount Co., 898 F.2d 896, 906 (3d Cir. 1990).* Finally, Plaintiffs allege that the yield spread premium should [*16] have been included in the finance charge. However, courts in the Eastern District of Pennsylvania have held that the yield spread premium is properly excluded. *See, e.g., Stump v. WMC Mortgage Corp., 2005 U.S. Dist. LEXIS 4304 at *9-13 (E.D. Pa. 2005).* Specifically, courts have found that the yield spread premium is already incorporated into the total finance charge as a higher interest rate and therefore should not be double-counted. *Id.* Accordingly, as Plaintiff fails to provide any evidence that Wells Fargo unlawfully underestimated the finance charge, this Court finds no TILA violation concerning Count II.

### III. Count III: Substitution of Terms Under the ECOA

Plaintiffs claim that Wells Fargo "significantly changed the terms of the instant credit transaction and submitted different, less favorable terms without so advising [them], in violation of *15 U.S.C. § 1691(d)* of the ECOA." (Amended Complaint, P 24). Section 702 of the ECOA provides:

> Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies such obligations by [*17] (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons

within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained.

*15 U.S.C. § 1691(d).* Although Plaintiffs assert that sometime prior to September 11, 2003 Mr. Dodson showed them the first page of an application containing a 7.5% interest rate, this allegation alone fails to present a genuine issue of material fact. Indeed, Plaintiffs fail to provide any evidence indicating that Wells Fargo "substituted different, less favorable terms." Specifically, Plaintiffs signed a Uniform Residential Loan Application on September 11, 2003 by which they applied for a thirty year adjustable rate mortgage in the amount of $ 184,000 with an initial interest rate of 8.49%. (Exhibit F to Defendants' Motion). This was the only application submitted by Mr. Dodson to Wells Fargo. (Exhibit J to Defendants' [*18] Motion). Wells Fargo subsequently approved the adjustable rate mortgage in the amount of $ 184,000 with an initial interest rate of 7.875%. (Exhibits K and L to Defendants' Motion).

Thus, the only difference between the loan application and the loan ultimately provided was the interest rate. Importantly, the final interest rate was actually more favorable to the Strangs than the one they initially sought in the September 11th application. Accordingly, Plaintiffs fail to prove that Wells Fargo took an "adverse action" against them by lessening the initial interest rate. As Wells Fargo did not change the loan's terms to Plaintiffs' detriment, the ECOA violations alleged in Count III of Plaintiffs' Amended Complaint must fail.

**IV. Count IV: Derivative Liability**

Plaintiffs argue that Wells Fargo is derivatively liable for the activities of Old Guard Mortgage and Chelsea Settlement Services which allegedly violated the CSA. Specifically, Chapter 36 of the CSA provides:

> Any buyer or borrower injured by a violation of this act or by the credit services organization's or loan broker's breach of a contract subject to this act may bring an action for recovery of damages.

[*19] *73 P.S. § 2191.* Thus, Wells Fargo may not be held derivatively liable unless the Plaintiffs prove that Old Guard Mortgage and/or Chelsea Settlement Services are loan brokers or credit services organizations. The CSA defines a loan broker as follows:

A person who: (i) For or in expectation of a consideration fee arranges or attempts to arrange or offers to fund a loan of money, a credit card or line of credit for personal, family or household purposes. (ii) For or in expectation of a consideration fee assists or advises a borrower in obtaining or attempting to obtain a loan of money, a credit card, a line of credit or related guarantee, enhancement or collateral of any kind or nature. (iii) Acts for or on behalf of a loan broker for the purpose of soliciting borrowers. (iv) Holds himself out as a loan broker.

*73 P.S. § 2182.* The CSA further provides the following definition of a credit services organization:

A person who, with respect to the extension of credit by others, sells, provides or performs or represents that he or she can or will sell, provide or perform any of the following services in return [*20] for the payment of money or other valuable consideration: (i) Improving a buyer's credit record, history or rating. (ii) Obtaining an extension of credit for a buyer. (iii) Providing advice or assistance to a buyer with regard to either subparagraph (i) or (ii).

*Id.* Plaintiffs fail to provide any evidence indicating that Chelsea or Old Guard are loan brokers or credit services organizations as defined under the CSA. Indeed, Plaintiffs admit that Chelsea merely acted as the closing agent, handling the settlement for Wells Fargo. (R. Strang. Depo. at 45-46). Plaintiffs fail to produce any evidence showing that Chelsea provided advice or assistance to them regarding improving their credit rating or obtaining an extension of credit. Similarly, Plaintiffs are unable to supply any evidence demonstrating that Old Guard exercised any activities of a loan broker or credit services organization. Rather, Old Guard merely acted as Plaintiffs' agent. *See, Barker v. Altegra Credit Co. (In re Barker), 251 B.R. 250, 259 (Bankr. E.D. Pa. 2000)*(finding that a broker is only the agent of a debtor obtaining a loan to finance home improvements). Finally, Plaintiffs' Response provides no counter-arguments [*21] to Defendants' Motion for Summary Judgment as to the derivative liability claim. Thus, as Plaintiffs provided no evidence showing that Old Guard and Chelsea are entitles liable under the CSA, Plaintiffs' derivative liability claim against Wells Fargo must fail.

**V. Count V: Alleged UTPCPL Violation**

Plaintiffs assert that Wells Fargo's alleged TILA, ECOA, and CSA violations constitute "per se violations" of the UTPCPL. Specifically, Plaintiffs allege that Wells Fargo violated three provisions of the UTPCPL, which prohibit the following:

> . Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

> . Knowingly misrepresenting that services, replacements or repairs are needed if they are not needed;

> . Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

*73 P.S. § 201-2(4)(v),(xv)*, and *(xxi)*. Plaintiffs, however, provide no evidence directly supporting the alleged UTPCPL violations. [*22] Rather, Plaintiffs merely contend that TILA, ECOA, and CSA violations are also UTPCPL violations. (Amended Complaint, P 30). Furthermore, Plaintiffs' Response provides no counter-arguments to Defendants' Motion for Summary Judgment as to the UTPCPL claim. Accordingly, as Plaintiffs' evidence is insufficient to support their TILA, ECOA, and CSA claims, this Court likewise finds no basis for their UTPCPL claim. Thus, Summary Judgment is granted on Count V of Plaintiffs' Amended Complaint.

An order follows.

### ORDER

AND NOW, this 13th day of July, 2005, upon consideration of the Motion for Summary Judgment of Defendants Wells Fargo Home Mortgage, Inc. and Wells Fargo Bank, N.A. (Doc. No. 36), Plaintiffs' response (Doc. No. 37), and Defendants' response thereto (Doc. No. 39), it is hereby ORDERED that the Motion is GRANTED and Judgment as a matter of law is entered in favor of Defendant and against Plaintiff in no amount.

BY THE COURT:

s/

J. CURTIS JOYNER, J.

LEXSEE 1999 U.S. DIST. LEXIS 18812

**ISAAC REESE and GENNELL REESE, Plaintiffs, v. HAMMER FINANCIAL CORPORATION; JOSEPH F. HAMMER III; ONE STOP MORTGAGE, INC.; AAMES FUNDING CORPORATION, d/b/a AAMES HOME LOAN, Defendants.**

**No. 99 C 0716**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1999 U.S. Dist. LEXIS 18812*

**November 29, 1999, Decided**
**November 30, 1999, Docketed**

**DISPOSITION:** [*1] Hammer Financial and Joseph Hammer's motion to dismiss denied. Hammer Financial's motion to strike the Reeses' claim for attorney's fees in Count II granted.

**COUNSEL:** For ISAAC REESE, GENNELL REESE, plaintiffs: Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Edelman, Combs & Latturner, Chicago, IL.

For HAMMER FINCANCIAL CORPORATION, JOSEPH F HAMMER, III, defendants: Matthew John Cozzi, Field Golan & Swiger, Chicago, IL.

For HAMMER FINCANCIAL CORPORATION, JOSEPH F HAMMER, III, defendants: William James Arendt, William J. Arendt & Associates, Hinsdale, IL.

For ONE STOP MORTGAGE, INC., AAMES FUNDING CORPORATION, defendants: Edward Sidney Weil, Robert D. Nachman, Patrick Thomas Stanton, Schwartz, Cooper, Greenberg & Krauss, Chicago, IL.

**JUDGES:** GEORGE M. MAROVICH, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** GEORGE M. MAROVICH

**OPINION**

*MEMORANDUM OPINION AND ORDER*

On February 4, 1999, Plaintiffs Isaac and Gennell Reese ("the Reeses") filed a Complaint in this Court against Defendants Hammer Financial Corporation ("Hammer Financial"), Joseph Hammer III ("Joseph Hammer"), One Stop Mortgage, Inc., and Aames Funding Corporation, alleging: (1) violations of the Truth in Lending Act ("TILA"), [*2] *15 U.S.C. § 1601, et seq.* (Count I), (2) violation of the United States Bankruptcy Code (Count II), (3) violation of the Illinois Consumer Fraud Act ("ICFA"), *815 ILCS 505/2* (Count III) and (4) breach of fiduciary duty pursuant to Illinois law (Count IV). Hammer Financial and Joseph Hammer presently move to dismiss the Reeses' Complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* and strike the Reeses' claim for attorney's fees contained in Count II pursuant to *Rule 12(f)*. For the reasons stated below, the Court denies the motion to dismiss and grants the motion to strike the attorney's fees request contained in Count II.

*BACKGROUND*

The Reeses, a married couple, filed for Chapter 13 Bankruptcy in 1997. While the bankruptcy was pending, the Reeses' furnace failed, requiring the purchase of a replacement. The Reeses used Hammer Financial to arrange a loan to pay for the furnace. Hammer Financial arranged a $ 35,000 loan from One Stop, which not only covered the cost of the furnace, but also paid off most, but not all, of the Chapter 13 debt. The Reeses allege that Hammer Financial and Joseph Hammer "failed to disclose . . . that [*3] the interest rate on the loan was substantially higher than any interest that would be payable pursuant to the Chapter 13 plan." (Compl. P 15.)

On November 19, 1998, the Reeses attended a closing, signed a note and mortgage and received, among other documents, a TILA disclosure statement and a notice of right to cancel the loan transaction. The Reeses allege that the notice of right to cancel had the dates left blank and that, as a result, they did not receive effective

notice of their right to cancel. Additionally, the Reeses allege that none of the parties sought approval of this loan transaction with the Bankruptcy Court. On December 28, 1998, the Reeses, through their counsel, gave notice of recission of the loan transaction. Defendants have failed and refused to honor the Reeses' recission of the loan.

On February 4, 1999, the Reeses filed their four-count Complaint in this Court, asserting four grounds for recission of the note and mortgage they executed on November 19, 1998. Particularly, the Complaint asserts recission is appropriate because: (1) they received effective notice of the Reeses' right to rescind in violation of TILA (Count I), (2) no party secured approval from [*4] the Bankruptcy Court (Count II), (3) Defendants' acts and practices violated the Illinois Consumer Fraud Act (Count III), and (4) Defendants violated their fiduciary duty to the Reeses (Count IV). Hammer Financial and Joseph Hammer presently move to dismiss the Reeses' Complaint and to strike the Reeses' request for attorney's fees under Count II.

*MOTION TO DISMISS STANDARDS*

In reviewing a motion to dismiss pursuant to *12(b)(6) of the Federal Rules of Civil Procedure*, the Court examines the sufficiency of the complaint rather than the merits of the lawsuit. *See Triad Assoc. v. Chicago Hous. Auth., 892 F.2d 583, 586 (7th Cir. 1989)*. "The issue is not whether the plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence that supports the claims." *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*. A motion to dismiss will be granted only if the Court finds that the plaintiff can put forth no set facts that would entitle her to relief. *See Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*; *Venture Assoc. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 432 (7th Cir. 1993)*. [*5] On a motion to dismiss the Court draws all inferences and resolves all ambiguities in the plaintiff's favor and assumes that all well pleaded facts are true. *See Dimmig v. Wahl, 983 F.2d 86, 87 (7th Cir. 1993)*.

*DISCUSSION*

As noted above, the Reeses' Complaint raises four grounds for rescission of the note and mortgage they executed on November 19, 1998. The motion to dismiss filed by Joseph Hammer and Hammer Financial attacks each of these grounds which comprise separate counts of the Reeses' Complaint. The Court considers the arguments contained in the motion to dismiss in turn.

I. *Truth in Lending Claim (Count I)*

TILA establishes a right of recission for any loan transaction in which the borrower's principal dwelling is used as security. *See 15 U.S.C. § 1635(a)*. The recission period extends until "midnight of the third business day following consummation [of the loan], delivery of the notice [of the right to rescind], or delivery of all material disclosures, whichever occurs last." *12 C.F.R. § 226.23(a)(3)*. Under TILA regulations, a creditor is required to "deliver two copies of the notice of the right to rescind to [*6] each consumer entitled to rescind." *12 C.F.R. § 226.23(b)(1)*. The notice "shall be on a separate document that identifies the transaction" and shall "clearly and conspicuously" disclose the consumer's right to rescind the transaction. *Id.* If the required notice or material disclosures are not delivered, the right to rescind shall expire three years after consummation. *See 12 C.F.R. § 226.23(a)(3)*.

Count I of the Reeses' Complaint contends that the Reeses are entitled to the recission of the loan transaction and refund of broker's fees paid to Hammer Financial because the notice of the right to rescind they received contained a technical violation of the TILA regulations discussed above. In particular, the Reeses allege that the notice of right to rescind they received "had the dates left blank," [1] thereby failing to give effective notice. (Compl. P 20.)

> 1    The Reeses attached a copy of this unsigned and undated notice of right to cancel to their Complaint. (Compl., Ex. F.)

In the motion to dismiss, [*7] Hammer Financial asserts that, contrary to the Reeses' allegations, the notice of right to cancel given to and signed by the Reeses disclosed the date of the transaction as well as the date of recission. In support of this contention, a copy of a "Notice of Right to Cancel" signed by the Reeses which contains the transaction date and the cancellation date has been attached to the motion to dismiss. (*See* Defs. Mot., Ex. A.) Hammer Financial contends that this document demonstrates that the unsigned and undated notice of right to rescind which the Reeses attached to their Complaint was not the final notice given to them and that, in fact, they received a properly signed and dated notice.

In reviewing a *Rule 12(b)(6)* motion to dismiss for failure to state a claim, the Court is limited to the allegations contained in the pleadings themselves. Nevertheless, documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his or her claim. *See Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998)*. "This is a narrow exception aimed at cases interpreting, for example, a contract. [*8] " *Id.* Hammer Financial asserts that the recission notice attached to its motion fits into the narrow exception discussed in *Leven-*

*stein* in that the document is central to the Reeses' claim and referred to in their Complaint. (*See* Def. Mot. at 2 n. 2.)

This Court disagrees that it is appropriate to consider the document attached to the motion to dismiss. Indeed, the Reeses have attached to their Complaint the document "central" to their improper notice claim -- namely, an unsigned Notice of Right to Cancel which they allege violates TILA's cancellation notice requirements. Although the signed Notice of Right to Cancel attached to the motion to dismiss may be "central" to Hammer Financial's defense of the Reeses' allegations, it does not meet the narrow exception of documents considered part of the pleadings. Instead, it merely raises questions regarding the factual circumstances surrounding the delivery of the Notice of Right to Cancel to the Reeses -- questions which would be inappropriate for this Court to pursue in this motion to dismiss. [2]

> 2　Although the Court may, in its discretion, consider materials beyond the pleadings if it converts a *Rule 12(b)(6)* motion to one for summary judgment, the Court declines to do so in this case and, therefore, has not relied on the recission notice attached to the motion to dismiss.

[*9] The Court additionally rejects Hammer Financial's two other arguments attacking the Reeses' TILA claim. First, Hammer Financial contends that the Reeses' TILA claim does not state a cause of action because they have not alleged that they are prepared to or have offered to return the monies given to them by One Stop. Hammer Financial has presented no apposite authority for the proposition that the Reeses must do so, and, indeed, the contention appears to contradict the language of *§ 1635(b)* which provides that "upon the performance of the creditor's obligations [to deliver any property to the obligor upon rescission], the obligor shall tender the property to the creditor[.]" [3]

> 3　It additionally bears noting that the letter requesting recission sent to Defendants by the Reeses' counsel clearly indicates that the Reeses were prepared to return funds upon acknowledgment of the recission request. (*See* Compl., Ex. H.)

Finally, Hammer Financial asserts that the Reeses have failed to state a cause of action [*10] for violation of TILA against them because they entered into the loan with One Stop and that Hammer Financial merely engaged in a broker agreement. The Court, however, agrees with the Reeses that their request for recission of the mortgage transaction includes the request to void the broker agreement, *i.e.*, by exercising their right to rescind, they are not liable for any finance charge, including borrower-paid mortgage broker fees. (*See* Pls. Resp. at 8.)

In sum, the Court denies the motion to dismiss the Reeses' TILA claim.

II. *Failure to Procure Court Approval (Count II)*

Pursuant to *section 364 of the Bankruptcy Code*, which governs post-petition financing agreements, a debtor cannot incur post-petition debt without authorization from the bankruptcy court following notice and a hearing. *See 11 U.S.C. § 364.* In Count II of their Complaint, the Reeses allege that rescission is proper because no party to the transaction sought court authorization and, consequently, the transaction is unlawful and ineffective. (Comp. PP 32-33.)

In the motion to dismiss, Hammer Financial argues that it did not have the duty, as mortgage broker, to secure court [*11] approval prior to the execution of the loan transaction. Hammer Financial asserts that *§ 364* places the requirement of receiving authorization of post-petition credit on the Reeses, not the lender. Moreover, Hammer Financial asserts that it was not a "lender," but the mortgage broker and, as such, cannot be charged with knowledge of any necessity of bankruptcy court approval.

Regardless of whose responsibility it was to notify the bankruptcy court here, it is undisputed that the bankruptcy court did not authorize the transaction, and that such authorization was necessary. As such, the pertinent issue here is the effect of a failure of the parties in post-petition financing agreements to receive the requisite court authorization pursuant to *§ 364*. Hammer Financial has submitted no authority for the proposition that rescission is inappropriate under the present circumstances. There is authority, however, which supports the Reeses' contention that rescission is appropriate. *See, e.g., Garofalo's Finer Foods, Inc. v. First Nat'l Bank of Harvey, 186 B.R. 414, 430 (N.D. Ill. 1995); In re J.L. Graphics, Inc., 62 B.R. 750, 756 (D.N.H. Bankr. 1986); In re Bernheim, 62 B.R. 739, 743 (D.N.J. Bankr. 1986).* [*12] The Court therefore denies the motion to dismiss the Reeses' purported grounds for recission pursuant to *11 U.S.C. § 364.* [4]

> 4　Hammer Financial moves this Court to strike the Reeses' request for attorney's fees in Count II. The Reeses contend that they are entitled to recovery of attorney's fees pursuant to *11 U.S.C. § 105.* Although bankruptcy courts have the discretion to award attorney's fees pursuant to its equitable authority contained in *11 U.S.C. § 105(a)*, this Court agrees with Hammer Financial that *§ 105* does not apply in the context of this matter.

The motion to strike attorney's fees is therefore granted.

## III. *Breach of Fiduciary Duty (Count IV)*

In Count IV of their Complaint, the Reeses allege that Hammer Financial and Joseph Hammer violated their fiduciary duty as the Reeses' agents and brokers by inducing and advising plaintiffs to enter into the transaction when it was not in their financial interests to do so. (Compl. [*13] P 43.) Hammer Financial and Joseph Hammer move to dismiss the Reeses' breach of fiduciary duty claim.

In the motion to dismiss, Hammer Financial and Joseph Hammer contend that the Reeses have not plead any facts from which a fiduciary relationship arises. This Court disagrees that the Reeses have failed to allege the existence of a fiduciary duty. Indeed, a similar argument was recently rejected by a court in this district. *See DeLeon v. Beneficial Constr. Co., 55 F. Supp. 2d 819 (N.D. Ill. 1999)*. In *DeLeon*, the court stated:

> In Illinois, when one party undertakes to find financing on behalf of another, a principal and agent relationship is created. An agent owes fiduciary duties to his principal as a matter of law. . . . It is undisputed that plaintiffs engaged the defendants to conduct mortgage brokerage services and a fiduciary duty was thereby created.

*55 F. Supp. 2d at 827-28* (citing *Allabastro v. Cummins, 90 Ill. App. 3d 394, 413 N.E.2d 86, 87-88, 45 Ill. Dec. 753 (1st Dist. 1980))*.

The Reeses' fiduciary duty claim meets the *Rule 12(b)(6)* standards. The Reeses allege that: (1) by undertaking a loan for the Reeses, [*14] Hammer Financial and Joseph Hammer became the Reeses' agents and mortgage brokers (*see* Compl. P 12); (2) Hammer Financial and Joseph Hammer violated their fiduciary duty as the Reeses' agents and brokers by inducing and advising the Reeses to enter into the transaction when it was not in their financial interests to do so (*id. P 43*); and (3) they were damaged by such breaches (*id. P 45*). These allegations sufficiently set forth a breach of fiduciary duty claim.

Joseph Hammer additionally contends that the claim for breach of fiduciary duty against him, individually, should be dismissed. Illinois grants corporate officers and directors a conditional privilege that protects them from personal liability for their decisions made on behalf of the corporation. *See Stafford v. Puro, 63 F.3d 1436,*

*1442 (7th Cir. 1995)*. Still, corporate officers are liable for torts if they "participated in the conduct giving rise to that liability." *Itofca, Inc. v. Hellhake, 8 F.3d 1202, 1204 & n. 6 (7th Cir. 1993)* (quoting *Prince v. Zazove, 959 F.2d 1395, 1401 (7th Cir. 1992))*.

The Reeses have stated a valid claim against Joseph Hammer individually [*15] for breach of fiduciary duty. The Reeses allege that Joseph Hammer is the sole corporate officer of Hammer Financial and that all acts attributed to Hammer Financial were carried out by Joseph Hammer. (*See* Compl. P 5.) The Reeses additionally allege that Joseph Hammer participated in arranging the loan which spawned fiduciary obligations. (*Id.* PP 12, 43.) In short, because the Reeses allege that Joseph Hammer was a corporate officer who participated in the conduct giving rise to a breach of fiduciary duty, his motion to dismiss is denied.

## IV. *Consumer Fraud Claim (Count III)*

In Count III of their Complaint, the Reeses allege that Defendants engaged in unfair or deceptive acts and practices in violation of § 2 of ICFA. In order to state a claim under the ICFA, a plaintiff must allege: (1) a deceptive act or practice, (2) an intent by the defendant that the plaintiff rely on the deception, and (3) that the deception occurred in the course of conduct involving a trade or commerce. *See Thacker v. Menard, Inc., 105 F.3d 382, 386 (7th Cir. 1997)*. In the motion to dismiss, Hammer Financial and Joseph Hammer assert that they have not engaged in any deceptive [*16] act or practice, reiterating the arguments discussed above. This Court has rejected those arguments and finds that the Reeses have adequately plead deceptive acts or practices under ICFA. The motion to dismiss the ICFA count is therefore denied. [5]

> 5  As he did with respect to the breach of fiduciary duty claim against him individually, Joseph Hammer argues that the ICFA claim against him personally should be dismissed. ICFA clearly provides that "any person" may be sued under its provisions, including "any agent, employee, salesman, partner, officer, director, member, [or] stockholder" of a corporation that is also being sued. *815 ILCS § 505/1*, 10(a). In addition, many cases have permitted officers to be named as individual defendants under ICFA, where they were personally involved in the activities which gave rise to the cause of action. *See Garcia v. Overland Bond & Inv. Co., 282 Ill. App. 3d 486, 496, 668 N.E.2d 199, 206, 218 Ill. Dec. 36 (1st Dist. 1996); People ex rel. Hartigan v. All Am. Aluminum & Constr. Co., 171 Ill. App. 3d 27, 35, 524 N.E.2d 1067, 1072, 121 Ill. Dec. 19 (1st Dist.*

*1988).* As explained *supra* at pp. 12-13, the Reeses have sufficiently plead that Joseph Hammer participated in the alleged deceptive acts or practices giving rise to the ICFA claim. For this reason, Joseph Hammer's motion to dismiss the ICFA claim against him individually is likewise denied.

[*17] *CONCLUSION*

For the reasons stated above, Hammer Financial and Joseph Hammer's motion to dismiss is denied. Hammer Financial's motion to strike the Reeses' claim for attorney's fees in Count II is granted.

ENTER:

GEORGE M. MAROVICH

UNITED STATES DISTRICT JUDGE

DATED:

*11/29/99*