**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LONG BEACH MORTGAGE COMPANY | ) | |
| TRUTH IN LENDING ACT FAMILY RIDER | ) | |
| LITIGATION | ) | MDL 07 cv 06543 |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Centralized before Judge |
| NAVARA & STINSON, JEUNE, | ) | Wayne R. Andersen |
| SULLIVAN, & SHELTON | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT**
**OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## I.    INTRODUCTION

Plaintiffs, Guadalupe Navara, Albert Stinson, Eric Shelton, Mirlaine Jeune, and Charlene Sullivan (collectively, "plaintiffs"), on behalf of others similarly situated, respectfully submit this Memorandum of Law in support of their motion for class certification, pursuant to Fed. R. Civ. P. 23(a) and (b). Plaintiffs seek certification of Counts I and II of their consolidated class action complaint ("complaint"). The first proposed class, as set forth in ¶ 30 of the complaint, is defined as follows: (a) all natural persons (b) who signed a mortgage with Long Beach in any state excluding Massachusetts, (c) that takes a security interest in personal property by means of a one-to-four-family rider not limited to fixtures, (d) on or after Feb. 11, 2004 (one year prior to the original filing of the Navara action on Feb. 11, 2005).

The proposed class is nationwide in scope. Plaintiff notes that Long Beach has

1

stipulated to numerosity only[1], as indicated in its counsel's letter contained in <u>Exhibit A</u>.

The second proposed class, as set forth in ¶ 40 of the complaint, is defined as follows: (a) all natural persons (b) who signed a residential mortgage loan in the state of Massachusetts secured by real estate containing 1 or 2 dwelling units located in Massachusetts with Long Beach (c) that takes a security interest in personal property by means of a one-to-four-family rider not limited to rents, (d) in a transaction documented as one subject to the Truth in Lending Act ("TILA") and/or the Massachusetts Consumer Credit Cost Disclosure Act ("MCCCDA") (e) where the Truth in Lending statement does not disclose the security interest in personal property created by the Rider (f) whose loan files show that they live in the real estate (g) on or after May 19, 2002 (four years prior to the original filing of the <u>Jeune</u> (<u>Carye</u>) action on May 19, 2006).

## II.    BACKGROUND AND FACTS

On or about April 29, 2004, plaintiff Navara obtained from Long Beach a refinance mortgage loan secured by her residence at 2715 South Kostner, Chicago, IL 60623. (Complaint, ¶ 9).  Ms. Navara used the proceeds of the loan to refinance debts incurred for primarily personal, family and household purposes.  (Complaint, ¶ 10).

On or about April 12, 2006, plaintiff Stinson obtained from Long Beach two mortgage loans for the purpose of financing his prospective residence at 5402 S. Shields,

---

[1]While Long Beach admits that the same form 1-4 Family Rider plaintiffs signed was signed by borrowers in over 2,500 loans within the class period, and that the TILA Disclosure Statements provided with those same loans - like Ms. Navara's - did not disclose any security interest in personal property, Long Beach does not stipulate or admit that its form 1-4 Family Rider created a security interest in personal property not limited to fixtures that was required to have been disclosed on the TILA Statements.

Chicago, IL 60609. (Complaint, ¶ 12). Mr. Stinson used the proceeds of the loan for personal, family or household purposes. (Complaint, ¶ 13).

On or about July 12, 2005, plaintiff Shelton obtained a mortgage loan from Long Beach for the purpose of financing the purchase of a two-unit building at 6800 S. Artesian, Chicago, IL. (Complaint, ¶ 16). Mr. Shelton obtained the loan for personal, family or household purposes. (Complaint, ¶ 17).

On or about July 25, 2005, plaintiff Sullivan obtained a loan from Long Beach to refinance her residence at 190 Littlefield St., Pawtucket, RI 02861. (Complaint, ¶ 19). Ms. Sullivan obtained the loan for personal, family or household purposes. (Complaint, ¶ 20).

On or about November 1, 2005, plaintiff Jeune obtained two loans from Long Beach for the purpose of refinancing his residence at 279 W. Elm St., Brockton, MA 02301. (Complaint, ¶ 22). Mr. Jeune obtained the loan for personal, family or household purposes. (Complaint, ¶ 23).

Long Beach, which is engaged in the business of making "sub-prime" residential mortgage loans, had all plaintiffs sign a "1-4 FAMILY RIDER Assignment of Rents," the second of two riders to Long Beach's mortgage instrument. (See Exhibit B). This 1-4 Family Rider is a standard form document used by Long Beach. The version of the 1-4 Family Rider that Long Beach had plaintiffs sign creates a security interest not only in plaintiffs' real property and any "rents" but in every bit of personal property located at their addresses. In pertinent part, the 1-4 Family Rider states:

> **A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the property described in the Security Instrument, the following items are added to the Property description, and shall also constitute

the Property covered by the Security Instrument: building materials, appliances
and goods of every nature whatsoever now or hereafter located in, on, or used, or
intended to be used in connection with the Property, including, but not limited to,
those for the purposes of supplying or distributing heating, cooling, electricity,
gas, water, air and light, fire prevention and extinguishing apparatus, security and
access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks,
ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings,
storm windows, storm doors, screens, blinds, shades, curtains and curtain rods,
attached mirrors, cabinets, paneling and attached floor coverings now or hereafter
attached to the Property, all of which, including replacements and additions
thereto, shall be deemed to be and remain a part of the Property covered by the
Security Instrument [i.e., the mortgage].  All of the foregoing together with the
Property described in the Security Instrument (or the leasehold estate if the
Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and
the Security Instrument as the "Property."  (Complaint, Exhibit C).

As the Northern District of Illinois has already held, Long Beach's 1-4 Family

Rider took a security interest in all of plaintiffs' personal property.  Navara v. Long Beach

Mortgage, et al., 2006 U.S. Dist. LEXIS 4908, *19-27, (N.D. Ill., January 26, 2006) (commenting

that "the language in the 1-4 Family Rider is sweeping" and rejecting Long Beach's arguments

that (1) the 1-4 Family Rider created merely incidental interests and that (2) the interests it

created are limited to accessions, additions and after-acquired property).  Long Beach's TILA

Disclosure Statement to plaintiffs did not disclose its interest in their personal property, as

required.  (See citations below.)

TILA and implementing Federal Reserve Board Regulation Z, as well as the

MCCCDA, require that a creditor that takes a security interest in personal property must disclose

that fact on the TILA Disclosure Statement provided to the borrower.  Long Beach did not

disclose to plaintiffs, on the TILA Statement it prepared, that it was taking a security interest in

their personal property by means of the 1-4 Family Rider.  (See Exhibit C).  Long Beach's TILA

Disclosure Statement is also a standard form document.  The failure to disclose a security interest

4

in personal property on a Truth in Lending Statement violates 15 U.S.C. § 1638(a) as well as 12

C.F.R. 226.18(a).  The creditor's disclosure of any security interest taken in connection with the

creditor's extension of credit is a basic requirement of TILA.  Section 1638(a)(9) provides that,

where the credit is secured, the creditor must disclose:

> **(9)... [A] statement that security interest has been or will be taken in (A) the
> property which is purchased as part of the credit transaction, or (B) property
> not purchased as part of the credit transaction identified by item or type.**

In addition, Regulation Z, 12 C.F.R. § 226.18(m), states:

> **For each transaction the creditor shall disclose the following information as
> applicable:**
>
> **...(m) *Security interest.*  The fact that the creditor has or will acquire a
> security interest in the property purchased as part of the transaction, or in
> other property identified by item or type.**

## III.    STANDARD FOR CLASS CERTIFICATION

### A.    Plaintiffs' TILA & MCCCDA claims are susceptible to class treatment.

Class actions are essential to enforce laws protecting consumers.  As the court

stated in Eshaghi v. Hanley Dawson Cadillac Co., 214 Ill. App.3d 995, 574 N.E.2d 760, 764, 766

(1st Dist. 1991):

> **In a large and impersonal society, class actions are often the
> last barricade of consumer protection. . . . To consumerists,
> the consumer class action is an inviting procedural device to
> cope with frauds causing small damages to large groups.  The
> slight loss to the individual, when aggregated in the coffers of
> the wrongdoer, results in gains which are both handsome and
> tempting.  The alternatives to the class action  -- private suits
> or governmental actions  -- have been so often found wanting
> in controlling consumer frauds that not even the ardent critics
> of class actions seriously contend that they are truly effective.
> The consumer class action, when brought by those who have
> no other avenue of legal redress, provides restitution to the**

**injured, and deterrence of the wrongdoer.**

Congress has recognized that class actions further the underlying purposes of

TILA.  In revising 15 U.S.C. § 1640 (TILA) to expressly refer to class actions, Congress

recognized that "potential class action liability is an important encouragement to the voluntary

compliance which is so necessary to insure nationwide adherence to uniform disclosure."

Bantolina v. Aloha Motors, 419 F. Supp. 1116, 1120 (D. Haw. 1976).  Further, "[T]he possibility

of class-action exposure is essential to the prophylactic intent of the Act, and is necessary to

elevate truth-in-lending lawsuits from the ineffective nuisance category to the type of suit which

has enough sting to insure that management will strive with diligence to achieve compliance."

Bantolina, 419 F. Supp. at 1120, citing the 1972 Federal Reserve Board annual report on the

Truth in Lending Act.

Since 15 U.S.C. § 1640 was amended to provide for class actions, classes have

been certified in a substantial number of TILA actions.  See, e.g., Henry v. Cash Today, Inc., 199

F.R.D. 566 (S. D. Tex. 2000); Linfanda v. Elmhurst Dodge, 2001 WL 755189, 2001 U.S. Dist.

LEXIS 9210 (N.D. Ill. June 29, 2001); Smith v. Short Term Loans, 2001 U.S. Dist. LEXIS 1554

(N.D. Ill. Feb. 9, 2001); Marshall v. Webb Chevrolet, Inc., 2002 WL 360654 (N.D. Ill. Mar. 7,

2002); Rodrigues v. Members Mortgage Co., 226 F.R.D. 147 (Dist. Mass., 2004).

Further, TILA claims are particularly amenable to class certification and

adjudication. Typically, TILA adjudication simply requires comparison of a standard form

disclosure with the requirements of TILA and Regulation Z.  It is not necessary to prove the

consumer's actual reliance, her particular understanding or many other individual facts.

The same is true of the MCCCDA, which mirrors TILA and was closely modeled

6

after TILA  See Lynch v. Signal Fin. Co., 327 N.E. 2d 732, 734 (Mass. 1975).  In fact, the only

difference relates to the limitation periods for damages and rescission claims.  TILA provides a

one-year statute of limitations on damages claims and a three-year period on rescission claims,

while the MCCCDA provides a four-year limitations period on both types of claims.  In re

Derosiers, 212 B.R. 716, 722 (Bankr. D. Mass. 1997).  Moreover, all nonconflicting sections of

the MCCCDA should be construed in accordance with TILA.  Id.; In re Botelho, 195 B.R. 558,

565 (Bankr. D. Mass. 1996).  Accordingly, all analysis of TILA herein applies to the MCCCDA,

save the limitations differences.

   In particular, TILA classes have been certified in the Northern District of Illinois

for TILA claims identical to those presented here (and involving the identical 1-4 Family Rider

form document that Long Beach provided to plaintiffs).  See, e.g., Peoples v. Sebring Capital

Corp., 01 C 5676, 2002 U.S. Dist. LEXIS 4104, 52 Fed. R. Serv. 3d (Callaghan) 197 (N.D. Ill.,

March 13, 2002); Powell v. Advanta Nat'l Bank, 00 C 7234 and 00 C 5942, 2001 U.S. Dist.

LEXIS 14048 (N.D. Ill., Sept. 4, 2001); and Romaker v. Crossland Mortg. Corp., 94 C 3328,

1996 U.S. Dist. LEXIS 6490 (N.D. Ill., May 8, 1996).  "By definition, each class member's loan

contract includes the same standard form 1-4 Family Rider and no TILA disclosure of a security

interest in personal property.  This common fact unites the class."  Peoples v. Sebring, 2002 U.S.

Dist. LEXIS 4104 at *17.  Only one Court in the Northern District of Illinois has denied class

certification of such a claim.  Roman v. First Franklin Financial Corp., 00 C 7228, 2001 U.S.

Dist. LEXIS 3968, *7-8, (N.D. Ill., April 2, 2001) (Conlon, J.).

   Plaintiffs' class claims are no different.  In this case, plaintiffs allege that Long

Beach used a standard form document—the 1-4 Family Rider—which plaintiffs argue takes a

security interest in all of their personal property, and that Long Beach did not disclose this interest on another standard form document, its TILA disclosure statement. In Count I, plaintiffs Navara, Stinson, Shelton, and Sullivan allege that this was Long Beach's practice with respect to its loans nationwide, excluding Massachusetts, from February 11, 2004 through and including February 11, 2005. In Count II, plaintiff Jeune allege that this was Long Beach's practice in Massachusetts from May 19, 2002 through and including May 19, 2006. All of the proofs are contained on documents in the loan files within Long Beach's possession and are ascertainable by a ministerial inspection of the same or by stipulation of Long Beach. Plaintiffs have also conducted their own search of public property records to verify a class. Plaintiffs' class claims are thus highly susceptible to class treatment.

**B.      The proposed classes meet all of the requirements for class certification.**

     1.      *Rule 23(a)(1) -- Numerosity.*

Fed. R. Civ. P. 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." "When the class is large, numbers alone are dispositive . . . ." Riordan, 113 F.R.D. at 62. Where the class numbers were at least 40, joinder is generally considered impracticable. Swanson v. American Consumer Industries, 415 F.2d 1326, 1333 (7th Cir. 1969) (40 sufficient); Riordan, 113 F.R.D. 60 (10-29 sufficient); Scholes v. Stone, McGuire & Benjamin, 143 F.R.D. 181, 184 (N.D. Ill. 1992) (about 70).

At the same time, it is not necessary that the precise number of class members be known. "A class action may proceed upon estimates as to the size of the proposed class." In re Alcoholic Beverages Litigation, 95 F.R.D. 321 (E.D. N.Y. 1982); Lewis v. Gross, 663 F. Supp. 1164, 1169 (E.D. N.Y. 1986).

8

Further, in granting class certification the court may "make common sense assumptions in order to find support for numerosity." Evans v. United States Pipe & Foundry, 696 F.2d 925, 930 (11th Cir. 1983). "[T]he court may assume sufficient numerousness where reasonable to do so in absence of a contrary showing by defendant, since discovery is not essential in most cases in order to reach a class determination . . . Where the exact size of the class is unknown, but it is general knowledge or common sense that it is large, the court will take judicial notice of this fact and will assume joinder is impracticable." 2 Newberg on Class Actions (3d ed. 1992), § 7.22.A.

In this case, as stated, defendant Long Beach has admitted and stipulated to numerosity. Long Beach admits that there are over 2,500 class members for the two proposed classes combined. Specifically, Long Beach admits that, between February 11, 2004 (the filing date of this action) and February 11, 2005, it originated over 2,500 loans where the borrowers signed a mortgage instrument with Long Beach, attached to which was a 1-4 Family Rider with language identical to the one signed by plaintiffs, and where no security interest was disclosed on Long Beach's TILA Disclosure Statement provided to the borrowers. See Long Beach's counsel's letter attached as Exhibit A.

A class in excess of 2,500 would certainly make joinder impracticable. The number is also more than sufficient in light of Powell v. Advanta Nat'l Bank, 00 C 7234 and 00 C 5942, 2001 U.S. Dist. LEXIS 14048 (N.D. Ill., Sept. 4, 2001) (certifying class of 500-600 members where "[t]he 1-4 Family Rider . . . is a standard document used throughout the mortgage industry for refinancing of multi-unit properties" and "Given [defendant] Advanta's large volume of business, it may be reasonably inferred that the proposed class is sufficiently

9

numerous"); and <u>Romaker v. Crossland Mortg. Corp.</u>, 94 C 3328, 1996 U.S. Dist. LEXIS 6490,

*4 (N.D. Ill., May 8, 1996)(certifying class of "1000 borrowers whose mortgages included

defendant's standard '1-4 Family Rider' which gave defendant a security interest in personal

property that was not disclosed on the TILA statement").

       The size of the Massachusetts class in Count II is unknown, but the Court may

reasonably infer from the overall volume of defendant's business and the four-year period this

class covers that the class is sufficiently large to make joinder impracticable.

       2.    *Rule 23(a)(2) -- Commonality; and Rule 23(b)(3) -- Common Questions*
             *of Law or Fact Predominate.*

       Fed. R. Civ. P. 23(a)(2) requires that there be a question of law <u>or</u> fact that is

common across all class members.  Rule 23(b)(3) requires that the questions of law or fact that

are common to all members of the class predominate over any questions affecting only individual

members.

       The commonality requirements are normally satisfied when there is an essential

common factual link between all class members and the party opposing the class  for which the

law provides a remedy.  <u>Halverson v. Convenient Food Mart, Inc.</u>, 69 F.R.D. 331 (N.D. Ill.

1974).  Not all factual or legal questions raised in the litigation need be common so long as at

least one issue is common to all class members.  <u>Spencer v. Central States Pension Fund</u>, 778

F.Supp. 985, 989 n.2 (N.D.Ill. 1991).   Where a question of law involves "standardized conduct

of the defendants toward members of the proposed class, a common nucleus of operative facts is

typically presented, and the commonality requirement . . . is usually met." <u>Franklin v. City of</u>

<u>Chicago</u>, 102 F.R.D. 944, 949 (N.D. Ill. 1984); <u>Patrykus v. Gomilla</u>, 121 F.R.D. 357, 361

(N.D.Ill. 1988).  The authorities hold that cases dealing with the legality of standardized conduct are generally appropriate for resolution by means of a class action because the document or conduct is the focal point of the analysis.  <u>Halverson</u>, 69 F.R.D. 331; <u>Haroco v. American Nat'l Bank</u>, 121 F.R.D. 664, 669 (N.D. Ill. 1988) (improper computation of interest); <u>Kleiner v. First Nat'l Bank</u>, 97 F.R.D. 683 (N.D. Ga. 1983) (same); <u>Heastie</u>, 125 F.R.D. 669  (execution of home improvement financing documents in sequence that evaded consumers' rescission rights).

   All of the commonality requirements are readily met in this case.  In plaintiffs' Counts I & II, all class members present an identical set of legal and factual issues.  The main legal issue is simply whether Long Beach's failure to disclose, on its standard TILA Disclosure Statement, the security interest taken by the 1-4 Family Rider form document violated TILA or the MCCCDA.  A secondary legal issue—at least defendants thus far have made it an issue—is whether Long Beach's form 1-4 Family Rider created a security interest in personal property. There are no contested factual issues that relate to Counts I and II of which plaintiffs are aware. As noted above, several other cases involving the identical claim have been certified as class actions.  <u>Peoples v. Sebring Capital Corp.</u>, 01 C 5676, 2002 U.S. Dist. LEXIS 4104, 52 Fed. R. Serv. 3d (Callaghan) 197 (N.D. Ill., March 13, 2002); <u>Powell v. Advanta Nat'l Bank</u>,  00 C 7234 and 00 C 5942, 2001 U.S. Dist. LEXIS 14048 (N.D. Ill., Sept. 4, 2001); <u>Romaker v. Crossland Mortg. Corp.</u>, 94 C 3328, 1996 U.S. Dist. LEXIS 6490 (N.D. Ill., May 8, 1996).  Because these are the only major legal and factual issues, and because they are common to all class members, it is quite clear that the common questions predominate over any individual issues.

   The borrower need not show reliance or injury to obtain statutory damages under TILA.  <u>Brown v. Marquette S. & L. Ass'n</u>, 686 F.2d 608, 614 (7th Cir. 1982).  "An objective

standard is used to determine violations of the TILA, based on the representations contained in the relevant disclosure documents; it is unnecessary to inquire as to the subjective deception or misunderstanding of particular consumers." <u>Zamrippa v. Cy's Car Sales, Inc.,</u> 674 F.2d 877, 879 (11th Cir. 1982). Plaintiffs and the classes seek statutory damages only, the amount of which is set by statute, not actual damages.

       3.    *Rule 23(a)(3) -- Typicality.*

This sub-section of the rule requires that the claims of the class representative(s) be typical of the claims of putative class members. The Seventh Circuit has defined "typicality" as follows:

> **A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory. The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact.**

<u>De La Fuente v. Stokely-Van Camp, Inc.,</u> 713 F.2d 225, 232 (7th Cir. 1983) (citation omitted).

In this case, typicality is inherent in the class definitions. By definition, Long Beach subjected each member of the proposed to the same practice, i.e., taking a security interest in all personal property by means of the same, form 1-4 Family Rider and not disclosing the security interest on the TILA Disclosure Statement. Plaintiffs and the class members thus have and assert the same factual allegations and the identical legal claim.

       4.    *Rule 23(a)(4) -- Adequacy of Representation.*

This sub-section of the rule requires that the class representative(s) provide fair and adequate protection for the interests of the class. That protection involves two factors: (a)

the class representatives's attorney must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the party or parties serving as class representative(s) must not have interests antagonistic to those of the class. Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992); accord, Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975);

In this case, plaintiffs understand their obligations as class representatives, and they have retained counsel experienced in the prosecution of consumer class actions, as is indicated by Exhibit D, which sets forth counsel's qualifications. In particular, plaintiffs' counsel has successfully prosecuted numerous class actions with the same claim plaintiffs assert here. Wilson v. BNC, Inc., 04 C 4558 (N.D. Ill., 2004) (class settlement); Peoples v. Sebring Capital Corp., 01 C 5676, 2002 U.S. Dist. LEXIS 4104, 52 Fed. R. Serv. 3d (Callaghan) 197 (N.D. Ill., March 13, 2002); Powell v. Advanta Nat'l Bank, 00 C 7234 and 00 C 5942, 2001 U.S. Dist. LEXIS 14048 (N.D. Ill., Sept. 4, 2001); Romaker v. Crossland Mortg. Corp., 94 C 3328, 1996 U.S. Dist. LEXIS 6490 (N.D. Ill., May 8, 1996).

The second relevant consideration under Rule 23(a)(4) is whether the interests of the class representatives are coincident with the general interests of the class. Here, both the class representatives and the class members seek the same amounts of monetary statutory damages for the same violations of the same provisions of TILA and the MCCCDA. Given the identity of damage claims between the plaintiffs and members of the proposed classes, there is no potential for their interests to conflict. Therefore, there is no antagonism between the interests of the class representative and those of putative class members.

     5.     *Rule 23(b)(3) -- Class Action Is Superior to Other Available Methods of Resolving This Controversy.*

In this sub-section of Rule 23, efficiency is the primary focus in determining whether the class action is the "superior" method for resolving the controversy presented. Eovaldi v. First Nat'l Bank, 57 F.R.D. 545 (N.D. Ill. 1972). The Court is required to determine the best available method for resolving the controversy in keeping with judicial integrity, convenience and economy. Scholes, 143 F.R.D. at 189; Hurwitz v. R.B. Jones Corp., 76 F.R.D. 149 (W.D. Mo. 1977).

Additionally, in deciding the "best" available method, it is proper for a Court to consider the ". . . inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." Haynes v. Logan Furniture Mart, Inc., 503 F.2d 1161, 1165 (7th Cir. 1974).

In this case, there is no better method available than a class action for the adjudication of the claims that, theoretically, could be brought by each individual borrower. To date, plaintiffs have identified over 2,500 members of the proposed classes. It is more efficient for the judicial system and all would-be class members to maintain a single class action than it would be for them to bring there claims separately in individual suits.

Additionally, the vast majority of borrowers are undoubtedly unaware that their rights were or are being violated. Finally, the persons whose rights Long Beach violated are unlikely to be able, individually, to afford to pay to retain counsel to protect their rights, particularly in view of the fact that TILA sets the statutory damages for the violation complained of at a maximum of $2,000.

The special efficacy of the consumer class action has been noted by the courts and is applicable to this case:

> A class action permits a large group of claimants to have their claims
> adjudicated in a single lawsuit. This is particularly important where,
> as here, a large number of small and medium sized claimants may be
> involved. In light of the awesome costs of discovery and trial, many of
> them would not be able to secure relief if class certification were
> denied . . . .

In re Folding Carton Antitrust Litigation, 75 F.R.D. 727, 732 (N.D. Ill. 1977) (citations omitted).

Another court noted:

> Given the relatively small amount recoverable by each potential
> litigant, it is unlikely that, absent the class action mechanism, any one
> individual would pursue his claim, or even be able to retain an
> attorney willing to bring the action. As Professors Wright, Miller and
> Kane have discussed, in analyzing consumer protection class actions
> such as the instant one, 'typically the individual claims are for small
> amounts, which means that the injured parties would not be able to
> bear the significant litigation expenses involved in suing a large
> corporation on an individual basis. These financial barriers may be
> overcome by permitting the suit to be brought by one or more
> consumers on behalf of others who are similarly situated.' 7B Wright
> et al., §1778, at 59; see e.g., Phillips Petroleum Co. v. Shutts, 472 U.S.
> 797, 809 (1985) ('Class actions . . . may permit the plaintiff to pool
> claims which would be uneconomical to litigate individually.') The
> public interest in seeing that the rights of consumers are vindicated
> favors the disposition of the instant claims in a class action form.

Lake v. First Nationwide Bank, 156 F.R.D. 615, 628-629 (E.D.Pa 1994).

## IV.    CONCLUSION

For all of the reasons set forth above, the proposed classes readily meet all of the

requirements of Rules 23(a) and (b)(3). Wherefore, plaintiffs respectfully request that this Court

certify Counts I and II of the consolidated class action complaint to proceed as a class action.

Respectfully submitted,

s/ Michael J. Aschenbrener
Michael J. Aschenbrener

15

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Michael J. Aschenbrener
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)


CLAUDE LEFEBVRE
CHRISTOPHER LEFEBVRE, PC
P.O. Box 479
Pawtucket, RI 02862
(401) 728-6060
(401) 728-6534 (FAX)


Lloyd J. Brooks
THE BROOKS LAW FIRM
15008 Woodlawn Avenue
Dolton, IL 60419
(708) 841-8000
(708) 841-8080 (FAX)

## CERTIFICATE OF SERVICE

I, Michael J. Aschenbrener, hereby certify that on March 19, 2008, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. Notice was sent *via* US mail to those without access to the Court's electronic filing system.

Rogelio A. Astudillo
Astudillo Consulting Services
2304 Frontera Road
McAllen, TX 78504

Law Department
New Millennium Mortgage
1700 Park Street Suite 203
Naperville, IL 60563

Gabriel A. Crowson
Matthew M. Neumeier
Scott T. Schutte
Howrey LLP
321 North Clark Street, Suite 3400
Chicago, IL 60610

s/Michael J. Aschenbrener
Michael J. Aschenbrener

# EXHIBIT A

# JENNER&BLOCK

June 7, 2006

Jenner & Block LLP    Chicago
One IBM Plaza    Dallas
Chicago, IL 60611-7603    New York
Tel 312 222-9350    Washington, DC
www.jenner.com

Al Hofeld, Jr.
Edelman, Combs, Latturner, Goodwin, LLC
120 S. LaSalle Street
18th Floor
Chicago, Illinois 60603

Scott T. Schutte
Tel  312 923-2901
Fax  312 840-7301
sschutte@jenner.com

Re:    <u>Navara v. Long Beach Mortgage Co.</u>

Dear Al:

Following up on our telephone conversation on Tuesday afternoon, I am authorized to stipulate as follows on behalf of my client, Long Beach Mortgage Company:

> Long Beach stipulates and admits that, between February 11, 2004 and February 11, 2005, it originated more than 2,500 loans where the borrowers signed a mortgage instrument with Long Beach, attached to which was a 1-4 Family Rider with language identical to the one signed by Ms. Navara, and where no security interest was disclosed on Long Beach's TILA Disclosure Statement provided to borrowers.

Please let me know if you have any questions.

Very truly yours,

Scott T. Schutte

STS:nld

# EXHIBIT B

*PREPARED BY AND*
Return To:

LONG BEACH MORTGAGE COMPANY
P.O. BOX 201085
STOCKTON, CA 95202



Doc#: 0413529209
Eugene "Gene" Moore Fee: $84.00
Cook County Recorder of Deeds
Date: 05/14/2004 02:44 PM Pg: 1 of 21

~~Prepared By:~~

LOAN NO. 6247732-7891

61050 ——————[Space Above This Line For Recording Data]——————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated     April     29,     2004
together with all Riders to this document.
(B) "Borrower" is
GUADALUPE M NAVARA, AN UNMARRIED WOMAN

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is     LONG BEACH MORTGAGE COMPANY

Lender is a corporation
organized and existing under the laws of  the State of Delaware

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3014  1/01

VMP®  -6(IL) (0010)
Page 1 of 15                      Initials: GMN
        VMP MORTGAGE FORMS - (800)521-7291
TDIL01 (04/02/04) PC



Lender's address is    1400 S. DOUGLASS RD., SUITE 100,
                       ANAHEIM, CA 92806
Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated    April                29, 2004 .
The Note states that Borrower owes Lender
Fifty Thousand and no/100———————————————————————————————————— Dollars
(U.S. $    50,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than        June        1, 2034 .
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

Initials: GMN

VMP -6(IL) (0010)
TDIL02 (04/02/04) PC

Page 2 of 15

Form 3014    1/01

Loan No. 6247732-7891

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the County                                                      COOK              [Type of Recording Jurisdiction] of                                               [Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

Parcel ID Number: 16-27-408-007                      which currently has the address of
                                                                              [Street]
2715 S KOSTNER AVE
CHICAGO                                      [City], Illinois    60623      [Zip Code]
("Property Address"):

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
     THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
     UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
     1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(IL) (0010)                          Page 3 of 15          Initials: GMV          Form 3014  1/01
TDIL03 (04/02/04) PC                                                    Loan No. 6247732-7891

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

Initials: _____

-6(IL) (0010)

TDIL04 (04/02/04) PC

Page 4 of 15

Form 3014   1/01

Loan No. 6247732-7891

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials: GNN    Form 3014  1/01

Loan No. 6247732-7891

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: _____

Form 3014   1/01

VMP   -6(IL) (0010)
TDIL06 (04/02/04) PC

Loan No. 6247732-7891

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

-6(IL) (0010)

TDIL09 (04/02/04) PC

Page 8 of 15

Initials: GMN

Form 3014   1/01

Loan No. 6247732-7891

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

Initials: GMN

TDIL09 (04/02/04) PC

Loan No. 6247732-7891

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _____

0413529209 Page: 11 of 21

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials: SMN

TDIL11 (04/02/04) PC

Loan No. 6247732-7891

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _____

-6(IL) (0010)
TDIL12 (04/02/04) PC

Form 3014    1/01

Loan No. 6247732-7891

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

Initials: GMN

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
GUADALUPE M NAVARA                                      -Borrower

_____                        _____ (Seal)
                                                                            -Borrower

_____ (Seal)               _____ (Seal)
                                        -Borrower                                       -Borrower

_____ (Seal)               _____ (Seal)
                                        -Borrower                                       -Borrower

_____ (Seal)               _____ (Seal)
                                        -Borrower                                       -Borrower

-6(IL) (0010)                          Page 14 of 15                    Form 3014  1/01
TDIL14 (04/02/04) PC                                          Loan No. 6247732-7891

STATE OF ILLINOIS,                                        *Cook* County ss:
    I, *RAFAEL SOTO*                              , a Notary Public in and for said county and
state do hereby certify that
            *Guadalupe M. Nevarez*

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.
    Given under my hand and official seal, this *19th* day of *April* *2004*.

My Commission Expires: *1-14-08*

                                                    _____
                                                    Notary Public

OFFICIAL SEAL
RAFAEL SOTO
Notary Public - State of Illinois
My Commission Expires Jan 14, 2008

Initials: *G M N*

-6(IL) (0010)                  Page 15 of 15                Form 3014   1/01
TDIL15 (04/08/04) PC

Loan No. 6247732-7891

Loan No. 6247732-7891

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made on this  29th  day of     April     ,
    2004     , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of
Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Fixed/Adjustable Rate Note (the "Note") to :

### LONG BEACH MORTGAGE COMPANY

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

### 2715 S KOSTNER AVE
### CHICAGO, IL  60623

[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN THE BORROWER'S FIXED INTEREST
RATE AND TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S ADJUSTABLE RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

### A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of          9.300   %. The Note also provides for
a change in the initial fixed rate to an adjustable interest rate, as follows:

### 1. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
(a) Change Dates
The initial fixed interest rate will change to an adjustable interest rate on the first day of   June          ,
    2006   , and on the first day of the month every 6th month thereafter. Each date on which the adjustable
interest rate could change is called a "Change Date."

(b) The Index
Beginning with the first Change Date, the interest rate will be based on an Index. The "Index" is the average
of the London interbank offered rates for six month dollar deposits in the London market based on quotations at
five major banks ("LIBOR"), as set forth in the "Money Rates" section of *The Wall Street Journal*, or if the
Money Rates section ceases to be published or becomes unavailable for any reason, then as set forth in a
comparable publication selected by the Lender. The most recent Index figure available as of the date 45 days
before each Change Date is called the "Current Index."

(c) Calculation of Changes
Before each Change Date, the Lender will calculate my new interest rate by adding   Six and Three
Fourths                  percentage point(s) (      6.750           %) to the
Current Index. The Lender will then round the result of this addition to the nearest one-eighth of one percentage
point (0.125%). Subject to the limits stated in Section 1(d) on the following page, this rounded amount will be the
new interest rate until the next Change Date.

Fixed/Adjustable Rate Rider - Libor

Page 1 of 3

1956016 (9510)

ELECTRONIC LASER FORMS, INC. • (800)327-0545

1956016I (04/24/01) PC

Loan No. 6247732-7891

exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)        _____ (Seal)
GUADALUPE M NAVARA              -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                -Borrower                                        -Borrower

[Sign Original Only]

Fixed/Adjustable Rate Rider - Libor

-1956016 (9510)                                Page 3 of 3

19560163 (04/24/01) PC

Loan No. 6247732-7891

The Lender will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal balance as of the Change Date in full on the Maturity Date at the new interest rate in substantially equal payments. The result of this calculation will be the new monthly payment.

(d) Limits on Interest Rate Changes

The interest rate at the first Change Date will not be greater than          10.300      % or less than      9.300      %. Thereafter, the adjustable interest rate will never be increased or decreased on any single Change Date by more than                     One percentage points (      1.000      %) from the rate of interest applicable during the preceding 6 months. The adjustable interest rate will never be greater than          15.300      %, which is called the "Maximum Rate" or less than      9.300      % which is called the "Minimum Rate".

(e) Effective Date of Changes

Each new adjustable interest rate will become effective on each Change Date. The amount of each new monthly payment will be due and payable on the first monthly payment date after the Change Date until the amount of the monthly payment changes again.

(f) Notice of Changes

The Lender will deliver or mail a notice of any changes in the adjustable interest rate and the amount of the new monthly payment to the Borrower before the effective date of any change. The notice will include information required by law to be given to the Borrower and also the title and telephone number of a person who will answer any questions regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 17 of the Security Instrument provides as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 17 of the Security Instrument contained in Section B(1) above shall then cease to be in effect, and Uniform Covenant 17 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if

Fixed/Adjustable Rate Rider - Libor

𝄞 -1956016 (9510)
™

19560162 (04/24/01) PC

Page 2 of 3

Loan No. 6247732-7891

# 1-4 FAMILY RIDER
## Assignment of Rents

THIS 1-4 FAMILY RIDER is made this 29th day of April , 2004 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

**LONG BEACH MORTGAGE COMPANY**
**1400 S. DOUGLASS RD., SUITE 100**
**ANAHEIM, CA 92806**

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

**2715 S KOSTNER AVE**
**CHICAGO, IL  60623**

[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to the Property described in the Security Instrument, the following items are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, panelling and attached floor coverings now or hereafter attached to the Property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

B. USE OF PROPERTY; COMPLIANCE WITH LAW. Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

C. SUBORDINATE LIENS. Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

D. RENT LOSS INSURANCE. Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Uniform Covenant 5.

E. "BORROWER'S RIGHT TO REINSTATE" DELETED. Uniform Covenant 18 is deleted.

F. BORROWER'S OCCUPANCY. Unless Lender and Borrower otherwise agree in writing, the first sentence in Uniform Covenant 6 concerning Borrower's occupancy of the Property is deleted. All remaining covenants and agreements set forth in Uniform Covenant 6 shall remain in effect.

MULTISTATE 1 - 4 FAMILY RIDER - Fannie Mae/Freddie Mac Uniform Instrument

Form 3170 3/93

Page 1 of 2

 -57 (9304).01

VMP MORTGAGE FORMS - (800)521-7291

Initials: 

1057-1 (05/24/99) PC

Loan No. 6247732-7891

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to paragraph 21 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Uniform Covenant 7.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_Guadalupe M Navara_            _____ (Seal)
GUADALUPE M NAVARA      -Borrower                        -Borrower

_____ (Seal)           _____ (Seal)
-Borrower                                 -Borrower

# EXHIBIT C

## TRUTH-IN-LENDING DISCLOSURE STATEMENT

LENDER OR LENDER'S AGENT:

**LONG BEACH MORTGAGE COMPANY**
1400 S. DOUGLASS RD., SUITE 100
ANAHEIM, CA 92806

☐ Preliminary [X] Final
DATE: 04/29/04
LOAN NO.: 6247732-7891
Type of Loan: ADJUSTABLE RATE

BORROWERS:

**GUADALUPE M NAVARA**

ADDRESS: **2715 S KOSTNER AVE**
CITY / STATE / ZIP: **CHICAGO, IL 60623**
PROPERTY: **2715 S KOSTNER AVE**
**CHICAGO, IL  60623**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 9.811 % | $ 100,900.08 | $ 47,837.52 | $ 148,737.60 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|---|---|---|
| 360 | 413.16 | Monthly beginning 07/01/04 | | | |

DEMAND FEATURE: [X] This loan does not have a Demand Feature. ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[X] This Loan has a Variable Rate Feature  Variable Rate Disclosures have been provided to you earlier.

SECURITY:  You are giving a security interest in the property located at: **2715 S KOSTNER AVE**
**CHICAGO, IL  60623**

ASSUMPTION:  Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms
☐ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms

FILING / RECORDING FEES: $ 60.00

PROPERTY INSURANCE:  Property hazard insurance is a required condition for this loan  You may purchase this insurance from any insurance company acceptable to the Lender

☐ Hazard Insurance is available through the lender at an estimated cost of $          for          years

LATE CHARGES:  If your payment is more than 15 days late, you will be charged a late charge of 5.000 % of the overdue payment

PREPAYMENT:  If you pay off your loan early, you
☐ may [X] will not  have to pay a penalty.
☐ may [X] will not  be entitled to a refund of part of the finance charge

See your contract documents for any additional information regarding  non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.                                                                                                     e means estimate

I/We understand that this is neither a contract nor a commitment to Lend
I/We hereby acknowledge reading and receiving a complete copy of this disclosure

_Guadalupe M Navara_  4-29-04
GUADALUPE M NAVARA                        BORROWER / DATE                              BORROWER / DATE

BORROWER / DATE                              BORROWER / DATE

-765 (0112)                    VMP MORTGAGE FORMS (800)521-7291                              12/01
© 2002 CBF Systems  Inc   The contents of this form in whole or in part are prohibited under the copyright laws of the United States
TIL1 (03/01/02) LG

## DEFINITION OF TRUTH-IN-LENDING TERMS

ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate generally higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower Non-inclusive examples of such charges are: Loan origination fee, "Points" or Discount. Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on a Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable) These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

Initials GMH

LOAN NO. 6247732-7891

EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LONG BEACH MORTGAGE COMPANY | ) | |
| TRUTH IN LENDING ACT FAMILY RIDER | ) | |
| LITIGATION | ) | MDL 07 cv 06543 |
| | ) | |
| —————————————————— | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Centralized before Judge |
| NAVARA & STINSON, JEUNE, | ) | Wayne R. Andersen |
| SULLIVAN, & SHELTON | ) | |
| | ) | |

## DECLARATION OF DANIEL A. EDELMAN

Daniel A. Edelman declares under penalty of perjury, as provided for by § 1-109 of the Code of Civil Procedure/ 28 U.S.C. §1746, that the following statements are true:

1.     Edelman, Combs, Latturner & Goodwin, LLC, has 5 principals, Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Tara L. Goodwin, and Michelle R. Teggelaar and 9 associates.

2.     **Daniel A. Edelman** is a 1976 graduate of the University of Chicago Law School.  From 1976 to 1981 he was an associate at the Chicago office of Kirkland & Ellis with heavy involvement in the defense of consumer class action litigation (such as the General Motors Engine Interchange cases).  In 1981 he became an associate at Reuben & Proctor, a medium-sized firm formed by some former Kirkland & Ellis lawyers, and was made a partner there in 1982.  From the end of 1985 he has been in private practice in downtown Chicago.  Virtually all of his practice involves litigation on behalf of consumers, mostly through class actions.  He is the co-author of Rosmarin & Edelman, Consumer Class Action Manual (2d-4th editions, National Consumer Law Center 1990, 1995 and 1999); author of Payday Loans:  Big Interest Rates and Little Regulation, 11 Loy.Consumer L.Rptr. 174 (1999); author of Consumer Fraud and Insurance Claims, in Bad Faith and Extracontractual Damage Claims in Insurance Litigation, Chicago Bar Ass'n 1992; co-author of Chapter 8, "Fair Debt Collection Practices Act," Ohio Consumer Law (1995 ed.); co-author of Fair Debt Collection:  The Need for Private Enforcement, 7 Loy.Consumer L.Rptr. 89 (1995); author of An Overview of The Fair Debt Collection Practices Act, in Financial Services Litigation, Practicing Law Institute (1999); co-author of Residential Mortgage Litigation, in Financial Services Litigation, Practicing Law Institute (1996); author of Automobile Leasing:  Problems and Solutions, 7 Loy.Consumer L.Rptr. 14 (1994); author of Current Trends in Residential Mortgage Litigation, 12 Rev. of Banking & Financial Services 71 (April 24, 1996); author of Applicability of Illinois Consumer

1

Fraud Act in Favor of Out-of-State Consumers, 8 Loy.Consumer L.Rptr. 27 (1996); co-author of Illinois Consumer Law (Chicago Bar Ass'n 1996); co-author of D. Edelman and M. A. Weinberg, Attorney Liability Under the Fair Debt Collection Practices Act (Chicago Bar Ass'n 1996); author of The Fair Debt Collection Practices Act: Recent Developments, 8 Loy.Consumer L. Rptr. 303 (1996); author of Second Mortgage Frauds, Nat'l Consumer Rights Litigation Conference 67 (Oct. 19-20, 1992); and author of Compulsory Arbitration of Consumer Disputes, Nat'l Consumer Rights Litigation Conference 54, 67 (1994).  He is a member of the Illinois bar and admitted to practice in the following courts: United States Supreme Court, Seventh Circuit Court of Appeals, First Circuit Court of Appeals, Second Circuit Court of Appeals, Third Circuit Court of Appeals, Fifth Circuit Court of Appeals, Eighth Circuit Court of Appeals, Ninth Circuit Court of Appeals, Tenth Circuit Court of Appeals, Eleventh Circuit Court of Appeals, United States District Courts for the Northern and Southern Districts of Indiana, United States District Courts for the Northern, Central, and Southern Districts of Illinois, United States District Court for the District of Arizona, United States District Court for the District of Connecticut, and the Supreme Court of Illinois.  He is a member of the Northern District of Illinois trial bar.

     **3.**     **Cathleen M. Combs** is a 1976 graduate of Loyola University Law School.  She formerly supervised the Northwest office of the Legal Assistance Foundation of Chicago, where she was lead or co-counsel in class actions in the areas of unemployment compensation, prison law, social security law, and consumer law.  She joined what is now Edelman, Combs, Latturner & Goodwin, LLC in early 1991.  Decisions in which she was involved prior to joining the firm include:  Johnson v. Heckler, 607 F.Supp. 875 (N.D.Ill. 1984), and 100 F.R.D. 70 (N.D. Ill. 1983); Sanders v. Shephard, 185 Ill.App.3d 719, 541 N.E.2d 1150 (1st Dist. 1989); Maller v. Cohen, 176 Ill.App.3d 987, 531 N.E.2d 1029 (1st Dist. 1988); Wright v. Department of Labor, 166 Ill.App.3d 438, 519 N.E.2d 1054 (1st Dist. 1988); Barron v. Ward, 165 Ill.App.3d 653, 517 N.E.2d 591 (1st Dist. 1987); City of Chicago v. Leviton, 137 Ill.App.3d 126, 484 N.E.2d 438 (1st Dist. 1985); Jude v. Morrissey, 117 Ill.App.3d 782, 454 N.E.2d 24 (1st Dist. 1983).  She is a member of the Northern District of Illinois trial bar.

     **4.**     **James O. Latturner** is a 1962 graduate of the University of Chicago Law School.  Until 1969, he was an associate and then a partner at the Chicago law firm of Berchem, Schwanes & Thuma.  From 1969 to 1995 he was Deputy Director of the Legal Assistance Foundation of Chicago, where he specialized in consumer law, including acting as lead counsel in over 30 class actions.  His publications include Chapter 8 ("Defendants") in Federal Practice Manual for Legal Services Attorneys (M. Masinter, Ed., National Legal Aid and Defender Association 1989); Governmental Tort Immunity in Illinois, 55 Ill.B.J. 29 (1966); Illinois Should Explicitly Adopt the Per Se Rule for Consumer Fraud Act Violations, 2 Loy.Consumer L.Rep. 64 (1990), and Illinois Consumer Law (Chicago Bar Ass'n 1996).  He has taught in a nationwide series of 18 Federal Practice courses sponsored by the Legal Services Corporation, each lasting four days and designed for attorneys with federal litigation experience.  He has argued some 30 appeals, including two cases in the United States Supreme Court and two in the Illinois Supreme Court.  Mr. Latturner was involved in many of the significant decisions establishing the rights of Illinois consumers.  He is a member of the Northern District of Illinois trial bar.

5.    **Tara L. Goodwin** is a graduate of the University of Chicago (B.A., with general honors, 1988)and Illinois Institute of Technology, Chicago-Kent College of Law (J.D., with high honors,1991).  She has been with the firm since her graduation and has participated in many of the cases described below. **Reported Cases.**  Williams v. Chartwell Financial Services, LTD, 204 F.3d 748 (7th Cir. 2000); Hillenbrand v. Meyer Medical Group, 682 N.E.2d 101 (Ill.1st Dist. 1997), 720 N.E.2d 287 (Ill.1st Dist. 1999); Bessette v. Avco Fin. Servs., 230 F.3d 439 (1st Cir. 2000); Large v. Conseco Fin. Servicing Co., 292 F.3d 49 (1st Cir. 2002);; Carbajal v. Capital One, 219 F.R.D. 437 (N.D.Ill. 2004); Russo v. B&B Catering, 209 F.Supp.2d 857 (N.D.IL 2002); Garcia v. Village of Bensenville, 2002 U.S.Dist. LEXIS 3803 (N.D.Ill.); Romaker v. Crossland Mtg. Co., 1996 U.S.Dist. LEXIS 6490 (N.D.IL); Mount v. LaSalle Bank Lake View, 926 F.Supp. 759 (N.D.Ill 1996).  She is a member of the Northern District of Illinois trial bar.

6.    **Michelle R. Teggelaar** is a graduate of the University of Illinois (B.A., 1993) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D., with honors, 1997).  **Reported Cases:**  Johnson v. Revenue Management, Inc., 169 F.3d 1057 (7th Cir.1999); Hernandez v. Attention, LLC, 429 F. Supp. 2d 912 (N.D. Ill. 2005); Coelho v. Park Ridge Oldsmobile, Inc., 247 F. Supp. 2d 1004 (N.D. Ill. 2003); Dominguez v. Alliance Mtge., Co., 226 F. Supp. 2d 907 (N.D. Ill. 2002); Watson v. CBSK Financial Group, Inc., 197 F. Supp. 2d 1118 (N.D. Ill. 2002); Van Jackson v. Check 'N Go of Illinois, Inc. 123 F. Supp. 2d 1085 (N.D. Ill. 2000), Van Jackson v. Check 'N Go of Illinois, Inc., 123 F. Supp. 2d 1079, Van Jackson v. Check 'N Go of Illinois, Inc., 114 F. Supp. 2d 731 (N.D. Ill. 2000); Van Jackson v. Check 'N Go of Illinois, Inc., 193 F.R.D. 544 (N.D. Ill. 2000); Vines v. Sands, 188 F.R.D. 302 (N.D. Ill. 1999); Veillard v. Mednick, 24 F. Supp. 2d 863 (N.D. Ill.1998); Sledge v. Sands, 182 F.R.D. 255 (N.D. Ill. 1998), Vines v. Sands, 188 F.R.D. 203 (N.D. Ill. 1999), Livingston v. Fast Cash USA, Inc., 753 N.E.2d 572  (Ind. 2001); Binder v. Atlantic Credit and Finance, Inc., 2007 U.S. Dist. LEXIS 11483 (S.D. Ind. 2007); Carroll v. Butterfield Heath Care, Inc., 2003 WL 22462604 (N.D. Ill. 2003); Payton v. New Century Mtge., Inc., 2003 WL 22349118 (N.D. Ill. 2003); Seidat v. Allied Interstate, Inc., 2003 WL 2146825 (N.D. Ill. 2003) (Report and Recommendation); Michalowski v. Flagstar Bank, FSB, 2002 WL 112905 (N.D. Ill. 2002); Bigalke v. Creditrust Corp., 2001 WL 1098047 (N.D. Ill 2001) (Report and Recommendation); Donnelly v. Illini Cash Advance, 2000 WL 1161076 (N.D. Ill. 2000); Mitchem v. Paycheck Advance Express, 2000 WL 419992 (N.D. Ill 2000); Pinkett v. Moolah Loan Co., 1999 WL 1080596 (N.D. Ill. 1999); Farley v. Diversified Collection Serv., 1999 WL 965496 (N.D. Ill. 1999); Davis v. Commercial Check Control, 1999 WL 965496 (N.D. Ill. 1999); Sledge v. Sands, 1999 WL 261745 (N.D. Ill. 1999); Slater v. Credit Sciences, Inc., 1998 WL 341631 (N.D. Ill. 1998); Slater v. Credit Sciences, Inc., 1998 WL 299803 (N.D. Ill. 1998).

7.    Associates

a.    **Francis R. Greene** is a graduate of Johns Hopkins University (B.A., with honors, May 1984), Rutgers University (Ph.D., October 1991), and Northwestern University Law School (J.D., 2000). **Reported Cases:** Johnson v. Thomas, 342 Ill. App.3d 382,

3

794 N.E.2d 919 (1st Dist. 2003); <u>Jolly v. Shapiro & Kreisman</u>, 237 F. Supp. 2d 888 (N.D. Ill. 2002); <u>Parker v. 1-800 Bar None, a Financial Corp., Inc.</u> 2002 WL 215530 (N.D. Ill. 2002); <u>Jiang v. Allstate Ins. Co.</u> (199 F.R.D. 267); <u>Hill v. AMOCO Oil Co.</u> 2003 WL 262424, 2001 WL 293628 (N.D. Ill. 2003)**;** <u>Roquet v. Arthur Anderson LLP</u> 2002 WL 1900768 (N.D. Ill. 2002); <u>White v. Financial Credit, Corp.</u> 2001 WL 1665386 (N.D. Ill.); <u>Ransom v. Gurnee Volkswagen</u> 2001 WL 1241297 (N.D. Ill. 2001) and 2002 WL 449703 (N.D. Ill 2002); <u>Doxie v. Impac Funding Corp.</u> 2002 WL 31045387 (N.D. Ill. 2002); <u>Levin v. Kluever & Platt LLC</u> 2003 WL 22757763 and 2003 WL 22757764 (N.D. Ill. 2003); <u>Pleasant v. Risk Management Alternatives</u> 2003 WL 22175390 (N.D. Ill. 2003); <u>Jenkins v. Mercantile Mortgage</u> 231 F. Supp. 2d 737 (N.D. Ill. 2002); <u>Hobson v. Lincoln Ins. Agency, Inc.</u> 2001 WL 55528, 2001 WL 648958 (N.D. Ill. 2001), <u>Anderson v. Lincoln Ins. Agency</u> 2003 WL 291928, <u>Hobson v. Lincoln Ins. Agency</u> 2003 WL 338161 (N.D. Ill. 2003); <u>Handy v. Anchor Mortgage Corp.</u>, 464 F.3d 760 (7th Cir. 2006). He is a member of the Northern District of Illinois trial bar.

        **b.**      **Julie Clark** (neé Cobolovic) is a graduate of Northern Illinois University (B.A., 1997) and DePaul University College of Law (J.D., 2000). **Reported Cases:** <u>Qualkenbush v. Harris Trust & Savings Bank</u> 219 F. Supp.2d 935 (N.D. Ill.,2002); <u>Covington-McIntosh v. Mount Glenwood Memory Gardens</u> 2002 WL 31369747 (N.D.I ll.,2002), 2003 WL 22359626 (N.D. Ill. 2003); <u>Ballard Nursing Center, Inc.  v. GF Healthcare Products, Inc.</u>, 2007 U.S. Dist. LEXIS 84425 (N.D. Ill. Nov. 14, 2007); <u>Record-A-Hit, Inc. v. Nat'l. Fire Ins. Co.</u>, No. 1-07-0684, 2007 Ill. App. LEXIS 1194 (Ill. App. 1st Dist. Nov. 13, 2007).

        **c.**      **Heather A. Kolbus** (neé Piccirilli) is a graduate of DePaul University (B.S. *cum laude,* 1997), and Roger Williams University School of Law (J.D., 2002). **Reported Cases:** <u>Clark v. Experian Info. Solutions, Inc.</u>, 2004 U.S. Dist. LEXIS 28324 (D.S.C. Jan. 14, 2004); <u>DeFrancesco v. First Horizon Home Loan Corp.</u>, 2006 U.S. Dist. LEXIS 80718 (S.D. Ill. Nov. 2, 2006); <u>Jeppesen v. New Century Mortgage Corp.</u>, 2006 U.S. Dist. LEXIS 84035 (N.D. Ind. Nov. 17, 2006); <u>Benedia v. Super Fair Cellular, Inc.</u>, 2007 U.S. Dist. LEXIS 71911 (N.D. Ill. Sept. 26, 2007).

        **d.**      **Thomas E. Soule** is a graduate of Stanford University (B.A., 2000), and the University of Wisconsin Law School (J.D., 2003). **Reported Cases:** <u>Murray v. Sunrise Chevrolet, Inc.</u>, 441 F.Supp.2d 940 (N.D. Ill. 2006); <u>Iosello v. Leiblys, Inc.</u>, 502 F. Supp.2d 782 (N.D. Ill. 2007); <u>Claffey v. River Oaks Hyundai, Inc.</u>, 486 F. Supp.2d 776 (N.D. Ill. 2007).

        **e.**      **Cassandra P. Miller** is a graduate of the University of Wisconsin – Madison (B.A. 2001) and John Marshall Law School (J.D. *magna cum laude* 2006). **Reported Cases:** <u>Pietras v. Sentry Ins. Co.</u>, 513 F. Supp.2d 983 (N.D. Ill. 2007); <u>Hernandez v. Midland Credit Mgmt.</u>, 2007 U.S. Dist. LEXIS 16054 (N.D. Ill. Sept. 25, 2007); <u>Balogun v. Midland Credit Mgmt.</u>, 2007 U.S. Dist. LEXIS 74845 (S.D. Ind. Oct. 5, 2007).

        **f.**      **Tiffany N. Hardy** (admitted NY, DC, IL) is a graduate of

Tuskegee University (B.A. 1998) and Syracuse University College of Law (J.D.2001).

   **g.** **Zachary Jacobs** is a graduate of the University of South Dakota (B.S. 2002) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D. 2007).

   **h.** **Rupali Shah** is a graduate of the University of Chicago (B.A. 2004) and University of Illinois College of Law (J.D. 2007).

   **i.** **Michael J. Aschenbrener** is a graduate of the University of Minnesota (B.A. 2001) and the Chicago-Kent College of Law, Illinois Institute of Technology (J.D. May 2007).

  **8.** The firm also has 15 legal assistants, as well as other support staff.

  **9.** Since its inception, the firm has recovered more than $500 million for consumers.

  **10.** The types of cases handled by the firm are illustrated by the following:

  **11.** **Mortgage charges and servicing practices:**  The firm has been involved in dozens of cases, mostly class actions, complaining of illegal charges on mortgages and improper servicing practices.  These include MDL-899, In re Mortgage Escrow Deposit Litigation, and MDL-1604, In re Ocwen Federal Bank FSB Mortgage Servicing Litigation, as well as the Fairbanks mortgage servicing litigation.  Decisions in the firm's mortgage cases include: <u>Christakos v. Intercounty Title Co.</u>, 196 F.R.D. 496 (N.D.Ill. 2000); <u>Johnstone v. Bank of America, N.A.</u>, 173 F.Supp.2d 809 (N.D.Ill. 2001); <u>Leon v. Washington Mut. Bank, F.A.</u>, 164 F.Supp.2d 1034 (N.D.Ill. 2001);  <u>Williamson v. Advanta Mortg. Corp.</u>, 1999 U.S. Dist. LEXIS 16374 (N.D.Ill., Oct. 5, 1999); <u>McDonald v. Washington Mut. Bank, F.A.</u>, 2000 U.S. Dist. LEXIS 11496 (N.D.Ill., June 22, 2000); <u>Metmor Financial, Inc. v. Eighth Judicial District Court</u>, No. 23848 (Nev.Sup.Ct., Apr. 27, 1993); <u>GMAC Mtge. Corp. v. Stapleton</u>, 236 Ill.App.3d 486, 603 N.E.2d 767 (1st Dist. 1992), leave to appeal denied, 248 Ill.2d 641, 610 N.E.2d 1262 (1993); <u>Leff v. Olympic Fed. S. & L. Ass'n</u>, 1986 WL 10636 (N.D.Ill. 1986); <u>Aitken v. Fleet Mtge. Corp.</u>, 1991 U.S.Dist. LEXIS 10420 (N.D.Ill. 1991), and 1992 U.S.Dist. LEXIS 1687 (N.D.Ill., Feb. 12, 1992); <u>Poindexter v. National Mtge. Corp.</u>, 1991 U.S.Dist. LEXIS 19643 (N.D.Ill., Dec. 23, 1991), later opinion, 1995 U.S.Dist. LEXIS 5396 (N.D.Ill., April 24, 1995); <u>Sanders v. Lincoln Service Corp.</u>, 1993 U.S.Dist. LEXIS 4454 (N.D.Ill. 1993); <u>Robinson v. Empire of America Realty Credit Corp.</u>, 1991 U.S.Dist. LEXIS 2084 (N.D.Ill., Feb. 20, 1991); <u>In re Mortgage Escrow Deposit Litigation</u>, M.D.L. 899, 1994 U.S.Dist. LEXIS 12746 (N.D.Ill., Sept. 8, 1994); <u>Greenberg v. Republic Federal S. & L. Ass'n</u>, 1995 U.S.Dist. LEXIS 5866 (N.D.Ill., May 1, 1995).

  **12.** The recoveries in the escrow overcharge cases alone are over $250 million.  <u>Leff</u> was the seminal case on mortgage escrow overcharges.

13.     The escrow litigation had a substantial effect on industry practices, resulting in limitations on the amounts which mortgage companies held in escrow.

14.     **Bankruptcy:**  The firm brought a number of cases complaining that money was being systematically collected on discharged debts, in some cases through the use of invalid reaffirmation agreements, including the national class actions against Sears and General Electric.  Conley v. Sears, Roebuck, 1:97cv11149 (D.Mass); Fisher  v. Lechmere Inc., 1:97cv3065, (N.D.Ill.).  These cases were settled and resulted in recovery by nationwide classes. Cathleen Combs successfully argued the first Court of Appeals case to hold that a bankruptcy debtor induced to pay a discharged debt by means of an invalid reaffirmation agreement may sue to recover the payment.  Bessette v. Avco Financial Services, 230 F.3d 439 (1st Cir. 2000).

15.     **Automobile sales and financing practices:**  The firm has brought many cases challenging practices relating to automobile sales and financing, including:

a.     Hidden finance charges resulting from pass-on of discounts on auto purchases.  Walker v. Wallace Auto Sales, Inc., 155 F.3d 927, 1998 U.S. App. LEXIS 22663 (7th Cir. 1998).

b.     Misrepresentation of amounts disbursed for extended warranties. Taylor v. Quality Hyundai, Inc., 150 F.3d 689, 1998 U.S.App. LEXIS 16434 (7th Cir. 1998); Grimaldi v. Webb, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996); Slawson v. Currie Motors Lincoln Mercury, Inc., 1995 U.S.Dist. LEXIS 451 (N.D.Ill., Jan. 5, 1995); Cirone-Shadow v. Union Nissan, Inc., 1995 U.S.Dist. LEXIS 1379 (N.D.Ill., Feb. 3, 1995), later opinion, 1995 U.S.Dist. LEXIS 5232 (N.D.Ill., April 20, 1995) (same); Chandler v. Southwest Jeep-Eagle, Inc., 1995 U.S. Dist. LEXIS 8212 (N.D.Ill., June 8, 1995); Shields v. Lefta, Inc., 1995 U.S.Dist. LEXIS 7807 (N.D.Ill., June 5, 1995).

c.     Spot delivery.  Janikowski v. Lynch Ford, Inc., 1999 U.S. Dist. LEXIS 3524 (N.D.Ill., March 11, 1999); Diaz v. Westgate Lincoln Mercury, Inc., 1994 U.S.Dist. LEXIS 16300 (N.D.Ill. 1994);  Grimaldi v. Webb, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996).

d.     Force placed insurance.  Bermudez v. First of America Bank Champion, N.A., 860 F.Supp. 580 (N.D.Ill. 1994); Travis v. Boulevard Bank, 1994 U.S.Dist. LEXIS 14615 (N.D.Ill., Oct. 13, 1994), modified, 880 F.Supp. 1226 (N.D.Ill., 1995); Moore v. Fidelity Financial Services, Inc., 884 F. Supp. 288 (N.D.Ill. 1995).

e.     Improper obligation of cosigners.  Lee v. Nationwide Cassell, 174 Ill.2d 540, 675 N.E.2d 599 (1996); Taylor v. Trans Acceptance Corp., 267 Ill.App.3d 562, 641 N.E.2d 907 (1st Dist. 1994), leave to appeal denied, 159 Ill.2d 581, 647 N.E.2d 1017 (1995).

f.     Evasion of FTC holder rule.  Brown v. LaSalle Northwest Nat'l

Bank, 148 F.R.D. 584 (N.D.Ill. 1993), 820 F.Supp. 1078 (N.D.Ill. 1993), and 1993 U.S.Dist. LEXIS 11419 (N.D.Ill., Aug. 13, 1993).

16.    These cases also had a substantial effect on industry practices. The warranty cases, such as Grimaldi, Gibson, Slawson, Cirone-Shadow, Chandler, and Shields, resulted in the Federal Reserve Board's revision of applicable disclosure requirements, so as to prevent car dealers from representing that the charge for an extended warranty was being disbursed to a third party when that was not in fact the case.

17.    **Predatory lending practices:**  The firm has brought numerous cases challenging predatory mortgage and "payday" lending practices, mostly as class actions. Livingston v. Fast Cash USA, Inc., 753 N.E.2d 572 (Ind. Sup. Ct. 2001);  Williams v. Chartwell Fin. Servs., 204 F.3d 748 (7th Cir. 2000); Parker v. 1-800 Bar None, a Financial Corp., Inc., 01 C 4488, 2002 WL 215530 (N.D.Ill., Feb 12, 2002); Gilkey v. Central Clearing Co., 202 F.R.D. 515 (E.D.Mich. 2001);  Van Jackson v. Check 'N Go of Ill., Inc., 114 F.Supp.2d 731 (N.D.Ill. 2000), later opinion, 193 F.R.D. 544 (N.D.Ill. 2000), 123 F.Supp. 2d 1079 (N.D.Ill. 2000), later opinion, 123 F.Supp. 2d 1085 (N.D.Ill. 2000); Henry v. Cash Today, Inc., 199 F.R.D. 566 (S.D.Tex. 2000); Donnelly v. Illini Cash Advance, Inc., 00 C 94, 2000 WL 1161076, 2000 U.S. Dist. LEXIS 11906 (N.D.Ill., Aug. 14, 2000); Jones v. Kunin, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000); Davis v. Cash for Payday, 193 F.R.D. 518 (N.D.Ill. 2000); Reese v. Hammer Fin. Corp., 99 C 716, 1999 U.S. Dist. LEXIS 18812, 1999 WL 1101677 (N.D.Ill., Nov. 29, 1999); Pinkett v. Moolah Loan Co., 1999 U.S. Dist. LEXIS 17276 (N.D.Ill., Nov. 1, 1999); Gutierrez v. Devon Fin. Servs., 1999 U.S. Dist. LEXIS 18696 (N.D.Ill., Oct. 6, 1999); Vance v. National Benefit Ass'n, 99 C 2627, 1999 WL 731764, 1999 U.S. Dist. LEXIS 13846 (N.D.Ill., Aug. 26, 1999).

18.    **Other consumer credit issues:**  The firm has also brought a number of other Truth in Lending and consumer credit cases, mostly as class actions, involving such issues as:

a.    Phony nonfiling insurance.  Edwards v. Your Credit Inc., 148 F.3d 427, 1998 U.S. App. LEXIS 16818 (5th Cir. 1998); Adams v. Plaza Finance Co., 1999 U.S. App. LEXIS 1052 (7th Cir.,  January 27, 1999); Johnson v. Aronson Furniture Co., 1997 U.S. Dist. LEXIS 3979 (N.D. Ill., March 31, 1997).

b.    The McCarran Ferguson Act exemption.  Autry v. Northwest Premium Services, Inc., 144 F.3d 1037, 1998 U.S. App. LEXIS 9564  (7th Cir. 1998).

c.    Loan flipping.  Emery v. American General, 71 F.3d 1343 (7th Cir. 1995).  Emery limited the pernicious practice of "loan flipping," in which consumers are solicited for new loans and are then refinanced, with "short" credits for unearned finance charges and insurance premiums being given through use of the "Rule of 78s."

7

      **d.**      Home improvement financing practices. <u>Fidelity Financial Services, Inc. v. Hicks</u>, 214 Ill.App.3d 398, 574 N.E.2d 15 (1st Dist. 1991), leave to appeal denied, 141 Ill.2d 539, 580 N.E.2d 112; <u>Heastie v. Community Bank of Greater Peoria</u>, 690 F.Supp. 716 (N.D.Ill. 1989), later opinion, 125 F.R.D. 669 (N.D.Ill. 1990), later opinions, 727 F.Supp. 1133 (N.D.Ill. 1990), and 727 F.Supp. 1140 (N.D.Ill. 1990). <u>Heastie</u> granted certification of a class of over 6,000 in a home improvement fraud case.

      **e.**      Arbitration clauses. <u>Wrightson v. ITT Financial Services</u>, 617 So.2d 334 (Fla. 1st DCA 1993).

      **f.**      Insurance packing. <u>Elliott v. ITT Corp.</u>, 764 F.Supp. 102 (N.D.Ill. 1990), later opinion, 150 B.R. 36 (N.D.Ill. 1992).

      **19.**      **Automobile leases:** The firm has brought a number of a cases alleging illegal charges and improper disclosures on automobile leases, mainly as class actions. Decisions in these cases include <u>Lundquist v. Security Pacific Automotive Financial Services Corp.</u>, Civ. No. 5:91-754 (TGFD) (D.Conn.), <u>aff'd</u>, 993 F.2d 11 (2d Cir. 1993); <u>Kedziora v. Citicorp Nat'l Services, Inc.</u>, 780 F.Supp. 516 (N.D.Ill. 1991), later opinion, 844 F.Supp. 1289 (N.D.Ill. 1994), later opinion, 883 F.Supp. 1144 (N.D.Ill. 1995), later opinion, 1995 U.S.Dist. LEXIS 12137 (N.D.Ill., Aug. 18, 1995), later opinion, 1995 U.S.Dist. LEXIS 14054 (N.D.Ill., Sept. 25, 1995); <u>Johnson v. Steven Sims Subaru and Subaru Leasing</u>, 1993 U.S.Dist. LEXIS 8078 (N.D.Ill., June 9, 1993), and 1993 U.S.Dist. LEXIS 11694 (N.D.Ill., August 20, 1993); <u>McCarthy v. PNC Credit Corp.</u>, 1992 U.S.Dist. LEXIS 21719 (D.Conn., May 27, 1992); <u>Kinsella v. Midland Credit Mgmt., Inc.</u>, 1992 U.S.Dist. LEXIS 1405, 1992 WL 26908 (N.D.Ill. 1992); <u>Highsmith v. Chrysler Credit Corp.</u>, 18 F.3d 434 (7th Cir. 1994); <u>Black v. Mitsubishi Motors Credit of America, Inc.</u>, 1994 U.S.Dist. LEXIS 11158 (N.D.Ill., August 10, 1994); <u>Simon v. World Omni Leasing Inc.</u>, 146 F.R.D. 197 (S.D.Ala. 1992). Settlements in such cases include <u>Shepherd v. Volvo Finance North America, Inc.</u>, 1-93-CV-971 (N.D.Ga.)($8 million benefit); <u>McCarthy v. PNC Credit Corp.</u>, 291 CV 00854 PCD (D.Conn.); <u>Lynch Leasing Co. v. Moore</u>, 90 CH 876 (Circuit Court of Cook County, Illinois) (class in auto lease case was certified for litigation purposes, partial summary judgment was entered, and case was then settled); <u>Blank v. Nissan Motor Acceptance Corp.</u>, 91 L 8516 (Circuit Court of Cook County, Illinois); <u>Mortimer v. Toyota Motor Credit Co.</u>, 91 L 18043 (Circuit Court of Cook County, Illinois); <u>Duffy v. Security Pacific Automotive Financial Services, Inc.</u>, 93-729 IEG (BTM) (S.D.Cal., April 28, 1994).

      **20.**      <u>Lundquist</u> and <u>Highsmith</u> are leading cases; both held that commonly-used lease forms violated the Consumer Leasing Act. As a result of the <u>Lundquist</u> case, the Federal Reserve Board completely revamped the disclosure requirements applicable to auto leases, resulting in vastly improved disclosures to consumers.

      **21.**      **Collection practices:** The firm has brought a number of cases under the Fair Debt Collection Practices Act, both class and individual. Decisions in these cases include: <u>Jenkins v. Heintz</u>, 25 F.3d 536 (7th Cir. 1994), aff'd 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995);

Johnson v. Revenue Management Corp., 169 F.3d 1057, 1999 U.S. App. LEXIS 3142 (7th Cir. 1999); Keele v. Wexler & Wexler, 1996 U.S.Dist. LEXIS 3253 (N.D.Ill., March 18, 1996) (class), 1995 U.S.Dist. LEXIS 13215 (N.D.Ill. 1995) (merits), aff'd, 149 F.3d 589, 1998 U.S.App. LEXIS 15029 (7th Cir. 1998); Mace v. Van Ru Credit Corp., 109 F.3d 338, 1997 U.S.App. LEXIS 5000 (7th Cir., Mar. 17, 1997); Maguire v. Citicorp Retail Services, Inc., 147 F.3d 232, 1998 U.S.App. LEXIS 16112 (2d Cir. 1998); Young v. Citicorp Retail Services, Inc., 1998 U.S.App. LEXIS 20268 (2d Cir. 1998); Charles v. Lundgren & Assocs., P.C., 119 F.3d 739, 1997 U.S. App. LEXIS 16786 (9th Cir. 1997); Avila v. Rubin, 84 F.3d 222 (7th Cir. 1996), aff'g Avila v. Van Ru Credit Corp., 1995 U.S.Dist. LEXIS 461 (N.D.Ill., Jan. 10, 1995), later opinion, 1995 U.S.Dist. LEXIS 1502 (N.D.Ill., Feb. 6, 1995), later opinion, 1995 U.S.Dist. LEXIS 17117 (N.D.Ill., Nov. 14, 1995); Tolentino v. Friedman, 833 F.Supp. 697 (N.D.Ill. 1993), aff'd in part and rev'd in part, 46 F.3d 645 (7th Cir. 1995); Blakemore v. Pekay, 895 F.Supp.972 (N.D.Ill. 1995); Oglesby v. Rotche, 1993 U.S.Dist. LEXIS 15687 (N.D.Ill., Nov. 4, 1993), later opinion, 1994 U.S.Dist. LEXIS 4866 (N.D.Ill., April 15, 1994); Laws v. Cheslock, 1999 U.S.Dist. LEXIS 3416 (N.D.Ill., Mar. 8, 1999);Davis v. Commercial Check Control, Inc., 1999 U.S. Dist. LEXIS 1682 (N.D.Ill., Feb. 12, 1999); Hoffman v. Partners in Collections, Inc., 1993 U.S.Dist. LEXIS 12702 (N.D.Ill., Sept. 15, 1993); Vaughn v. CSC Credit Services, Inc., 1994 U.S.Dist. LEXIS 2172 (N.D.Ill., March 1, 1994), adopted, 1995 U.S.Dist. LEXIS 1358 (N.D.Ill., Feb. 3, 1995); Beasley v. Blatt, 1994 U.S.Dist. LEXIS 9383 (N.D.Ill., July 14, 1994); Taylor v. Fink, 1994 U.S.Dist. LEXIS 16821 (N.D.Ill., Nov. 23, 1994); Gordon v. Fink, 1995 U.S.Dist. LEXIS 1509 (N.D.Ill., Feb. 7, 1995); Brujis v. Shaw, 876 F.Supp. 198 (N.D.Ill. 1995). Settlements in such cases include Boddie v. Meyer, 93 C 2975 (N.D.Ill.); and Cramer v. First of America Bank Corporation, 93 C 3189 (N.D.Ill.).

22.    Jenkins v. Heintz is a leading decision regarding the liability of attorneys under the Fair Debt Collection Practices Act.  I argued it before the Supreme Court and Seventh Circuit.  Avila v. Rubin is a leading decision on phony "attorney letters."

23.    **Fair Credit Reporting Act:** The firm has filed numerous cases under the Fair Credit Reporting Act, primarily as class actions.  One line of cases alleges that lenders and automotive dealers, among others, improperly accessed consumers' credit information, without their consent and without having a purpose for doing so permitted by the FCRA.   Important decisions in this area include: Cole v. U.S. Capital, Inc., 389 F.3d 719 (7th Cir. 2004), Murray v. GMAC Mortgage Corp., 434 F.3d 948 (7th Cir. 2006); Perry v. First National Bank, 459 F.3d 816 (7th Cir. 2006); Murray v. Sunrise Chevrolet, Inc., 441 F. Supp.2d 940 (N.D. Ill. 2006); Murray v. GMAC Mortgage Corp., 05 C 1229, _____ F.Supp.2d _____, 2007 U.S. Dist. LEXIS 26726 (N.D.Ill. April 10, 2007); Shellman v. Countrywide Home Loans, Inc., 1:05-CV-234-TS, 2007 U.S. Dist. LEXIS 27491 (N.D.Ind.,  April 12, 2007); In re Ocean Bank, 06  C 3515, 2007 U.S. Dist. LEXIS 28973 (N.D.Ill., March 16, 2007), later opinion, 2007 U.S. Dist. LEXIS 29443 (N.D. Ill., Apr. 9, 2007); Asbury v. People's Choice Home Loan, Inc., 05 C 5483, 2007 U.S. Dist. LEXIS 17654 (N.D.Ill., March 12, 2007); Claffey v. River Oaks Hyundai, Inc., 238 F.R.D. 464 (N.D.Ill. 2006); Murray v. IndyMac Bank, FSB, 461 F.Supp.2d 645 (N.D.Ill. 2006); Kudlicki v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81103 (N.D. Ill., Nov. 2, 2006); Thomas

9

v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81358 (N.D. Ill., Oct. 24, 2006);
Pavone v. Aegis Lending Corp., 2006 U.S. Dist. LEXIS 62157 (N.D. Ill., Aug. 31, 2006); Murray
v. E*Trade Financial Corp., 2006 U.S. Dist. LEXIS 53945 (N.D. Ill., July 19, 2006); Bonner v.
Home 123 Corp., 2006 U.S. Dist. LEXIS 37922 (N.D. Ind., May 25, 2006); Murray v. Sunrise
Chevrolet , Inc., 2006 U.S. Dist. LEXIS 19626 (N.D. Ill., Mar. 30, 2006); and Murray v. Finance
America, LLC, 2006 U.S. Dist. LEXIS 7349 (N.D. Ill., Jan 5, 2006).  More than 15 such cases
have been settled on a classwide basis.

24.    **Class action procedure:**  Important decisions include Crawford v.
Equifax Payment Services, Inc., 201 F.3d 877 (7th Cir. 2000); Blair v. Equifax Check Services,
Inc., 181 F.3d 832 (7th Cir. 1999); Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir.
1997); and Gordon v. Boden, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991).

25.    **Landlord-tenant:**  The firm has brought a number of class actions against
landlords for various matters including failing to pay interest on security deposits or
commingling security deposits, breach of the warranty of habitability, improper late charges, and
various violations of the CRLTO. Reported decisions include: Wang v. Williams,343 Ill. App. 3d
495; 797 N.E.2d 179 (5th Dist. 2003); Onni v. Apartment Management and Investment Co., 344
Ill. App. 3d 1099; 801 N.E.2d 586 (2d Dist. 2003) (case challenging improper late charges,
which later settled on a class basis for $200,000); Dickson v. West Koke Mill Village P'Ship,
329 Ill.App.3d 341 (4th Dist. 2002).  Illustrative cases include: Hale v. East Lake Management &
Developmental Corp., et al., 00 CH 16139, in the Cook County Circuit Court, Judge Madden
granted class certification for tenants who had not been paid their security deposit interest after
the end of each twelve month rental period.  The East Lake case later settled on a classwide basis
for over $400,000.

26.    Some of the other reported decisions in our cases include:  Elder v.
Coronet Ins. Co., 201 Ill.App.3d 733, 558 N.E.2d 1312 (1st Dist. 1990); Smith v. Keycorp Mtge.,
Inc., 151 Bankr. 870 (N.D.Ill. 1992); Gordon v. Boden, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st
Dist. 1991), leave to appeal denied, 144 Ill.2d 633, 591 N.E.2d 21, cert. denied, U.S. (1992);
Armstrong v. Edelson, 718 F.Supp. 1372 (N.D.Ill. 1989); Newman v. 1st 1440 Investment, Inc.,
1993 U.S.Dist. LEXIS 354 (N.D.Ill. 1993); Mountain States Tel. & Tel. Co. v. District Court,
778 P.2d 667 (Colo. 1989); Disher v. Fulgoni, 124 Ill.App.3d 257, 464 N.E.2d 639, 643 (1st
Dist. 1984); Harman v. Lyphomed, Inc., 122 F.R.D. 522 (N.D.Ill. 1988); Haslam v. Lefta, Inc.,
1992 U.S.Dist. LEXIS 3623 (N.D.Ill., March 25, 1994); Source One Mortgage Services Corp. v.
Jones, 1994 U.S.Dist. LEXIS 333 (N.D.Ill., Jan. 13, 1994).

27.    Gordon v. Boden is the first decision approving "fluid recovery" in an
Illinois class action.  Elder v. Coronet Insurance held that an insurance company's reliance on lie
detectors to process claims was an unfair and deceptive trade practice.

s/Daniel A. Edelman
Daniel A. Edelman

Edelman, Combs, Latturner & Goodwin, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

T:\430\pleading\MODEL Declaration of DAE w_o p 28-35_pleading.WPD