# Exhibit 1,
# Part 1

## Page 1

1    IN THE UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ILLINOIS
3            EASTERN DIVISION
4  GUADALUPE NAVARA,            )
5          Plaintiff,          )
6    vs.                       ) No. 05 C 0864
7  LONG BEACH MORTGAGE COMPANY;    )
8  WASHINGTON MUTUAL BANK, FA; NEW  )
9  MILLENIUM MORTGAGE CORPORATION;  )
10 ROGELIO A. ASTUDILLO, a/k/a    )
11 ROGER ASTUDILLO,              )
12         Defendants.          )
13        The videotaped deposition of GUADALUPE
14 NAVARA, called for examination, taken pursuant to
15 the Federal Rules of Civil Procedure of the United
16 States District Courts pertaining to the taking of
17 depositions, taken before LISA O'BRIEN ZURAWSKI, CSR
18 No. 84-3822, a Notary Public within and for the
19 County of DuPage, State of Illinois, and a Certified
20 Shorthand Reporter of said state, at Suite 4000,
21 330 North Wabash Avenue, Chicago, Illinois, on the
22 27th day of June, A.D. 2006, at 1:13 p.m.
23
24

## Page 2

1  PRESENT:
2
3      EDELMAN, COMBS, LATTURNER & GOODWIN, LLC,
4      (120 South LaSalle Street, 18th Floor,
5      Chicago, Illinois 60603,
6      312-739-4200), by:
7      MR. AL HOFELD, JUNIOR,
8          appeared on behalf of the Plaintiff;
9
10     JENNER & BLOCK,
11     (One IBM Plaza,
12     330 North Wabash Avenue, Suite 4000,
13     Chicago, Illinois 60611,
14     312-222-9350), by:
15     MR. SCOTT T. SCHUTTE,
16     MS. BETHANY BIESENTHAL,
17         appeared on behalf of the Defendants.
18
19 ALSO PRESENT:
20     MS. CARINA JULIAN, Interpreter;
21     MR. NOAH CARNEY, Videographer.
22
23 REPORTED BY: LISA O'BRIEN ZURAWSKI C.S.R.
24        CERTIFICATE NO. 84-3822.

## Page 3

1        THE VIDEOGRAPHER:  We are going on the video
2  record at 1:14 p.m.  My name is Noah Carney.  I am a
3  legal videographer in association with Esquire
4  Deposition Services.  The court reporter today is
5  Lisa O'Brien also of Esquire Deposition Services.
6  Here begins the videotaped deposition of Guadalupe
7  Navara taking place at One IBM Plaza, Chicago,
8  Illinois.  Today's date is June 27, 2006.  This
9  deposition is being taken in the matter of Guadalupe
10 Navara versus Long Beach Mortgage Company, et al.
11        Will Counsel please state their names for
12 the record.
13     MR. HOFELD:  Al Hofeld, Junior for the
14 Plaintiff.
15     MR. SCHUTTE:  Scott Schutte for Defendant Long
16 Beach Mortgage Company and Deutsche Bank National
17 Trust Company.
18     THE VIDEOGRAPHER:  Will the reporter now swear
19 in the witness, please?
20        CARINA JULIAN,
21 was thereupon sworn to interpret the proceedings of
22 the deposition from English into Spanish and from
23 Spanish into English.

## Page 4

1        GUADALUPE NAVARA,
2  called as a witness herein, having been first duly
3  sworn through and interpreter, was examined and
4  testified through an interpreter as follows:
5        EXAMINATION
6  BY MR. SCHUTTE:
7     Q.   Good afternoon, Ms. Navara.  Could you
8  please state and spell your name for the record?
9     A.   My name is Guadalupe Navara.
10     THE WITNESS:  Navara.
11     THE INTERPRETER:  Navara, I'm sorry.
12 BY THE WITNESS:
13     A.   Do you want to spell it?
14 BY MR. SCHUTTE:
15     Q.   Yes, please.
16     A.   G-u-a-d-a-l-u-p-e.  Navara, N-a-v-a-r-a.
17     Q.   Ms. Navara, have you ever been through a
18 deposition before?
19     A.   No.
20     Q.   Let me explain briefly what will happen
21 today.  I will ask you a series of questions.  Your
22 attorney Mr. Hofeld may object from time to time.
23 Unless Mr. Hofeld or I instruct you not to answer,
24 you should answer all of my questions.

1 (Pages 1 to 4)

GUADALUPE NAVARA, JUNE 27, 2006

Page 5

1      There is a court reporter here who will
2  take down everything everyone says. There is also a
3  videotape being made of today's deposition.
4      A.  Okay.
5      Q.  And because the court reporter needs to
6  take down everything in writing, it's important that
7  you answer all the questions out loud.
8      Is that a yes?
9      A.  Yes.
10     Q.  Thank you.
11     Ms. Navara, are you taking any medication
12  that would impact your ability to testify today?
13     A.  No.
14     Q.  Okay. I plan to take a break every hour
15  or so, but if you need to take a break more often
16  than that, please let me know, and we would be happy
17  to do that.
18     A.  Okay.
19     Q.  And finally, sometimes I speak rather
20  quickly, and there is some background noise. We
21  also have the issue of the interpreter. So if at
22  any point today you don't understand what I am
23  asking or you don't hear what I am asking, please
24  ask me to repeat or rephrase my question. I would

Page 6

1  be happy to do that.
2      A.  Okay.
3      Q.  If you answer the question, I will assume
4  you understand it.
5      A.  Yes.
6      Q.  Okay. What is your date of birth,
7  Ms. Navara?
8      A.  December 12, 1942.
9      Q.  Where were you born?
10     A.  Mexico.
11     Q.  Okay. Are you currently a U.S. citizen?
12     A.  Yes.
13     Q.  Okay. When did you become a U.S.
14  citizen?
15     A.  I don't remember. February of 2002, I
16  believe. I am not sure.
17     Q.  Okay. Now, we have arranged to have an
18  interpreter for the deposition today, but it seems
19  as if you understand some of my questions in
20  English.
21     Is it your preference that we proceed
22  with an interpreter?
23     A.  Yes, I would rather. Yes.
24     Q.  Okay. In that case, what we should try

Page 7

1  to do then is to make sure that the interpreter
2  finishes interpreting my question into Spanish
3  before you answer it.
4      A.  Okay.
5      Q.  Have you ever been a plaintiff in a
6  lawsuit before?
7      A.  Me, if I have to sit somewhere?
8      Q.  Yes.
9      A.  Yes.
10     Q.  Okay. On how many occasions?
11     A.  Let me see. Twice.
12     Q.  Okay. Let's start with the more recent
13  of the two. When did that lawsuit start?
14     A.  About which one, the two?
15     Q.  Yes. If there were two -- let's start
16  with the first one, okay. The first of the two,
17  when was that lawsuit started?
18     A.  In the '90s.
19     Q.  Okay. And what was that lawsuit about?
20     A.  About carpal tunnel at my work.
21     Q.  And who -- who is it that you sued? Was
22  it your employer?
23     A.  Yes.
24     Q.  Who was your employer at that time?

Page 8

1      A.  Insco Optical. I believe they are closed
2  now.
3      Q.  And how did that lawsuit end?
4      A.  It went through.
5      Q.  To trial?
6      A.  Yes -- no, no. They settled.
7      THE WITNESS: Out of court.
8  BY MR. SCHUTTE:
9      Q.  All right. And do you remember when that
10  lawsuit settled?
11     A.  In '96, because it lasted six years.
12     Q.  In that lawsuit -- well, strike that.
13     You understand that in this lawsuit, at
14  least with respect to part of the lawsuit, you are
15  suing on behalf of class of persons?
16     A.  Yes.
17     Q.  Okay. In that lawsuit with the carpal
18  tunnel, was that also a class action?
19     A.  No.
20     Q.  Tell me about the other lawsuit.
21     A.  Now, if this one was the second one, the
22  first one was in the summer of '86. '86, yes.
23     Q.  Okay. What did that lawsuit involve?
24     A.  Well, a problem with the back.

2 (Pages 5 to 8)

GUADALUPE NAVARA, JUNE 27, 2006

Page 9

1    Q.    With your back?
2    A.    Yes. I had an accident at work.
3    Q.    Who did you sue?
4    A.    Turner Manufacturing.
5    Q.    And what was the outcome of that lawsuit?
6    A.    They settled for $5,000, I believe.
7    Q.    Okay. Were those the only two lawsuits
8    that you can recall in which you were the one who
9    started the lawsuit?
10   A.    Yes. Yes.
11   Q.    Okay. Have you ever been sued by
12   someone?
13   A.    No.
14   Q.    Have you ever been a defendant in a
15   foreclosure action?
16   A.    Yes.
17   Q.    Okay. On how many occasions?
18   A.    One -- no, twice. Twice.
19   Q.    Okay. When did those foreclosure
20   lawsuits take place?
21   A.    About a house in 2000.
22   Q.    Do you remember who it was that sued you
23   in that foreclosure action?
24   A.    First National Acceptance.

Page 10

1    Q.    Do you recall the outcome of that
2    lawsuit?
3    A.    I make the payoff. I pay them off.
4    Q.    What was the other foreclosure lawsuit
5    that was filed against you?
6    A.    Another one? In 2003. Yes, 2003. 2003
7    to 2004.
8    Q.    Was that also with First National
9    Acceptance?
10   A.    Yes.
11   Q.    What was the result of that lawsuit?
12   A.    That case is still pending. It's still
13   in court.
14   Q.    How many loans -- was that a home loan
15   with First National Acceptance?
16   A.    Yes.
17   Q.    And that case is still pending?
18   A.    Yes, from 2000, 2003; the same.
19   Q.    The loan that is at issue in the case
20   that's still pending, what --
21   A.    Now, that's for make the payment for that
22   one, for the 2003.
23   Q.    Okay. Let me just make sure I understand
24   that. There's one foreclosure action that's still

Page 11

1    ongoing?
2    A.    No. No.
3    Q.    Okay.
4    A.    They say -- yes.
5    Q.    All right. Let me make sure -- maybe I
6    understand this, and see if you agree with me, what
7    I am about to say.
8         First National Acceptance started a
9    foreclosure action against you, and that was
10   resolved when they modified the payment schedule?
11   THE WITNESS: Yes.
12   BY THE WITNESS:
13   A.    I didn't pay them everything that they
14   said that I owed to them with this loan.
15   BY MR. SCHUTTE:
16   Q.    Okay. But that was the second
17   foreclosure.
18        Okay. The first time you changed the
19   loan documents, and then the second time, you paid
20   it off?
21   THE WITNESS: From 2000.
22   THE INTERPRETER: I'm sorry, Counsel. If you
23   can please instruct the deponent just to wait until
24   I finish translating. Otherwise, it will be very

Page 12

1    confusing.
2    BY MR. SCHUTTE:
3    Q.    Okay. If you could -- this is what I was
4    raising before. And I know it's hard because you
5    can understand some of my English. But to make
6    things more simple, if you could wait until the
7    translator finishes translating before you answer,
8    it will be much easier for everyone, especially the
9    translator.
10        All right. Who represented you,
11   Ms. Navara, in those foreclosure actions as your
12   attorney?
13   A.    The first one?
14   Q.    Yes.
15   A.    Contillas And Associates (Phonetic).
16   Q.    Do you know how to spell that?
17   A.    No.
18   Q.    Okay. Who represented you in the second
19   foreclosure?
20   A.    Oh, wait. Now, you are saying who
21   represented me?
22   Q.    As your attorney.
23   A.    Oh, that's the wrong -- it's Albeski And
24   Associates (Phonetic).

3 (Pages 9 to 12)

GUADALUPE NAVARA, JUNE 27, 2006

Page 13

1    THE WITNESS:  That's who represented me.
2  BY THE WITNESS:
3    A.   They represented me.
4  BY MR. SCHUTTE:
5    Q.   In the second foreclosure?
6    A.   No, the first one.  The first one.
7    Q.   Okay.  And Consella And Associates
8  represented you in the second one?
9    THE WITNESS:  No, Contillas And Associates is
10  the ones that foreclosed the house.
11  BY THE WITNESS:
12    A.   No.
13    MR. SCHUTTE:  I see.
14  BY THE WITNESS:
15    A.   Contillas And Associates are the ones
16  that foreclosed the house.
17  BY MR. SCHUTTE:
18    Q.   So Albeski And Associates --
19    THE WITNESS:  Contillas.
20  BY THE WITNESS:
21    A.   Contillas.
22  BY MR. SCHUTTE:
23    Q.   Okay.  Thank you.  Albeski And Associates
24  who represented you on both times?

Page 14

1    A.   Yes.
2    Q.   Okay.  Do you remember, Ms. Navara, who
3  represented you in your carpal tunnel suit?
4    A.   Albeski And Associates.
5    Q.   And who represented you in your lawsuit
6  about your back?
7    A.   James D. Goodman.
8    Q.   At Albeski And Associates, was there one
9  attorney in particular you dealt with?
10    A.   With him.
11    Q.   Do you remember what his first name was?
12    A.   Sidney.
13    Q.   Sidney Albeski?
14    A.   Yes.
15    Q.   And do you remember how to spell Albeski?
16    A.   No.
17    Q.   Okay.
18    MR. SCHUTTE:  Can we mark this as Exhibit 1?
19    (WHEREUPON, a certain document was
20    marked Navara Deposition Exhibit
21    No. 1, for identification, as of
22    6/27/06.)
23  BY MR. SCHUTTE:
24    Q.   Ms. Navara, I am handing you a document

Page 15

1  that we have marked as Exhibit 1.
2    A.   Uh-huh.  Yes.
3    Q.   I will represent to you that it is an
4  affidavit that your attorneys have filed on your
5  behalf in this lawsuit.
6    A.   Yes.
7    Q.   I am going to ask you a few questions
8  about this document.  Before I do that, though, take
9  some time -- if you want to take some time to look
10  over it, please do that.
11    A.   Yes, I am going to take a little time.
12    MR. HOFELD:  Take your time, Ms. Navara, and
13  read it carefully.
14    THE WITNESS:  Yes.
15    (WHEREUPON, discussion was had off
16    the record.)
17    MR. SCHUTTE:  We can stay on the record while
18  she is reviewing this.
19    (WHEREUPON, discussion was had off
20    the record.)
21    THE WITNESS:  Yes, the papers.
22  BY MR. SCHUTTE:
23    Q.   Okay.  Are you able to -- to read in
24  English?

Page 16

1    A.   Yes.
2    Q.   Okay.
3    A.   A little.
4    Q.   I would ask you to turn to the last page
5  of this document, please.  Is that your signature?
6    A.   Yes.
7    Q.   Okay.  And if you flip back to the
8  previous page, it says, "I declare under penalty of
9  perjury under the laws of the United States of
10  America that the foregoing is true and correct."
11    A.   Yes.
12    Q.   And did you understand that when you
13  signed this document, that you were doing so under
14  the penalty of perjury?
15    A.   If I knew?
16    A.   Yes.
17    A.   If I signed this, I would have to say the
18  truth, isn't it?
19    Q.   Yes.
20    A.   Yes.
21    Q.   And if you did not do so, it was under
22  penalty of perjury?
23    A.   Yes.
24    Q.   Okay.  Did you sign this document on or

4 (Pages 13 to 16)

GUADALUPE NAVARA, JUNE 27, 2006

Page 17

1  about May the 3rd?
2     A.  Yes.  Yes.
3     Q.  Okay.  Did you read the document before
4  you signed it?
5     A.  Yes.  I have a copy.
6     Q.  Excuse me?
7     A.  No, that's okay.  No.
8     Q.  All right.  Where was it that -- where
9  were you physically when you signed the document?
10    A.  In my lawyer's office.
11    Q.  Okay.  Besides -- which lawyer are you
12 referring to?
13    A.  Al Hofeld.
14    Q.  Was anyone else in the room with you and
15 Mr. Hofeld?
16    A.  No.
17    Q.  Okay.  Do you see that there's also a
18 document -- excuse me.  The document is also signed
19 by Jeffrey Becker?
20    A.  Just the notary that went there.
21    Q.  Okay.  He was also --
22    A.  Yes, he was there.  Yes.
23    Q.  Did you type out the words in this
24 document?

Page 18

1     A.  No.
2     Q.  Okay.  Who did?
3     A.  My lawyer.
4     Q.  Okay.  Did you understand all the words
5  in the document before you signed it?
6     A.  Yes.  This one, yes.
7     Q.  Okay.  Did -- was there an interpreter
8  there to help you understand what was in the
9  document before you signed it?
10    A.  No, but I know how to read the document.
11 I know how to read it.
12    Q.  And you felt comfortable signing it
13 without an interpreter?
14    A.  Yes, because he is my attorney.
15    Q.  Well, whether or not he was your
16 attorney, though, did you feel comfortable that you
17 understood all the words in English?
18    A.  Yes.  Yes.
19    Q.  Okay.  We can set this document aside for
20 now.
21    MR. SCHUTTE:  Exhibit 2, please.
22        (WHEREUPON, a certain document was
23        marked Navara Deposition Exhibit
24        No. 2, for identification, as of

Page 19

1        6/27/06.)
2  BY MR. SCHUTTE:
3     Q.  Ms. Navara, I am handing you what we have
4  marked as Exhibit 2.  This is a document that your
5  lawyer filed on your behalf in this lawsuit?
6        Is that a yes?
7     A.  Yes.
8     Q.  My only question about this document
9  right now is whether you have ever seen it before I
10 just handed it to you.
11    A.  Yes.
12    Q.  Okay.  When did you first see this
13 document?
14    A.  The day -- I do not remember the day, but
15 I did see it.
16    Q.  The day that you said you saw the
17 document, were you in Mr. Hofeld's office?
18    A.  Just wait one second.
19    Q.  Please take as much time as you need.
20    MR. HOFELD:  Scott, just for the record, this
21 was never filed.  I think you asked whether it was
22 filed in the case.
23    THE WITNESS:  No wonder I didn't recognize
24 that.  Now we are talking about this one?

Page 20

1     MR. SCHUTTE:  Yes.  Let me step back and
2  correct something.  Thank you, Mr. Hofeld.  This
3  document was not filed.  It was signed and served
4  upon -- upon me by Mr. Hofeld.
5     MR. HOFELD:  Okay.  Ms. Navara, let me instruct
6  you to look at the document, okay, before you answer
7  any questions about it, and take your time.
8     THE WITNESS:  Okay.
9  BY MR. SCHUTTE:
10    Q.  Why don't you tell me when you are ready
11 to answer some questions.
12        (WHEREUPON, a certain document was
13        marked Navara Deposition Exhibit
14        No. 3, for identification, as of
15        6/27/06.)
16        (WHEREUPON, discussion was had off
17        the record.)
18 BY THE WITNESS:
19    A.  Yes, I have seen -- I have seen it.
20 BY MR. SCHUTTE:
21    Q.  Okay.  Do you remember when you saw it?
22    A.  Not the exact day, but I do have it.
23    Q.  Okay.  You say you do have a copy of it?
24    A.  Yes.

5 (Pages 17 to 20)

GUADALUPE NAVARA, JUNE 27, 2006

Page 21

1    Q.   Okay.  Do you remember whether when you
2  saw the document you were in Mr. Hofeld's office?
3    MR. HOFELD:  I am just going to object to the
4  form as leading.
5    THE WITNESS:  Can I answer?
6    MR. HOFELD:  Yes.
7  BY THE WITNESS:
8    A.   Yes.
9  BY MR. SCHUTTE:
10    Q.   Okay.
11    A.   I was at his office.
12    Q.   Okay.  Do you remember whether it was
13  before or after April the 24th?
14    MR. HOFELD:  Objection, vague.  I assume you
15  mean 2006.
16  BY MR. SCHUTTE:
17    Q.   Yes, April 24, 2006.
18    A.   Uh-huh.  Okay.
19    Q.   My question is, was it before or after
20  April 24 of 2006?
21    A.   Before or after?  After.
22    Q.   Do you recall whether it was in the month
23  of June?
24    A.   I don't remember.

Page 22

1    Q.   Okay.  When you read this document in
2  Mr. Hofeld's office sometime after April the 24th,
3  did you see any errors in it?
4    A.   Let me think.  I could say that, yes.
5    Q.   You saw some errors?
6    A.   I am going to change it to no.
7    Q.   Okay.  So you don't recall seeing any
8  errors?
9    A.   No.  I am going to say no.
10    Q.   Okay.  Let's move on.  And we have marked
11  as -- this next document as Exhibit 3.  This is a
12  copy provided to us by your attorney of your
13  mortgage with Long Beach Mortgage Company.
14    A.   Uh-huh.
15    Q.   Okay.  It has the bates labels ECL&G 43
16  to 56.
17    MR. HOFELD:  Scott, for the record I am going
18  to object because I don't think this is a complete
19  copy of the mortgage, because it's missing the
20  riders that are -- that were executed with the
21  mortgage.
22    If you don't intend to ask her any
23  questions about the riders, I don't have a problem
24  with that, but I just, for the record -- I don't

Page 23

1  think it's a complete copy of the mortgage.
2    MR. SCHUTTE:  I had intended to mark the riders
3  separately --
4    MR. HOFELD:  That's fine.
5    MR. SCHUTTE:  -- at some point later in the
6  deposition.
7    MR. HOFELD:  As long as we can -- as long as we
8  agree that this is a copy of the mortgage minus the
9  riders.
10    MR. SCHUTTE:  Understood.  Yes.
11    MR. HOFELD:  Okay.
12    MR. SCHUTTE:  I will represent for the record,
13  I am not trying to insinuate that the riders are not
14  part of the mortgage.
15    MR. HOFELD:  I didn't think you were, but I
16  didn't know if there was a mistake.
17    MR. SCHUTTE:  If you will go for it, I will
18  try.
19  BY MR. SCHUTTE:
20    Q.   Okay.  If you would look at the last page
21  of this document, Ms. Navara.  Is that your
22  signature?
23    A.   Yes.
24    Q.   Okay.  Do you remember when you signed

Page 24

1  this document?
2    A.   I believe it was April 29.  It was in
3  2004.
4    Q.   Okay.  And that was at the closing of
5  this loan?
6    A.   Yes.
7    Q.   Okay.  Are you familiar with that term,
8  "Closing"?
9    A.   The closing?
10    Q.   Yes.  You understand that term?
11    A.   Yes.  Yes.
12    Q.   Okay.  Did you read this document,
13  Exhibit 3, before you signed it on April 29, 2004,
14  at the closing?
15    A.   This?
16    Can you repeat that again?
17    Q.   I would be happy to.
18    Did you read this document before you
19  signed it at the closing on April 29, 2004?
20    A.   This -- when -- when Mr. Astudillo called
21  me -- when the broker called me, he had the papers
22  ready just for me to sign it.
23    Q.   Okay.  But did you read the document
24  before you signed it?

6 (Pages 21 to 24)

GUADALUPE NAVARA, JUNE 27, 2006

Page 25

1    A.   He didn't give me a time.
2    Q.   Mr. Astudillo?
3    A.   Yes.
4    Q.   Okay.  Is that Roger -- how did you say
5  his last name?
6    A.   Astudillo.
7    Q.   Okay.  Roger Astudillo?
8    A.   Astudillo.
9    MR. SCHUTTE:  Okay.  For the record, that's
10  A-s-t-u-d-i-l-l-o.
11  BY MR. SCHUTTE:
12    Q.   And your testimony, Ms. Navara, is that
13  he didn't give you time to read it?
14    A.   No.
15    Q.   Was there anyone else at the closing
16  besides Mr. Astudillo and yourself?
17    A.   My friend -- a friend.
18    Q.   Okay.  What was his or her name?
19    A.   Sergio Sanchez.
20    Q.   Is Mr. Sanchez a relative of yours?
21    A.   Just friends.
22    Q.   Has Mr. Sanchez ever performed any work
23  for you?
24    A.   No.

Page 26

1    Q.   Okay.  Have you ever made any payments to
2  Mr. Sanchez for any reason?
3    A.   Yes.
4    Q.   I seem to recall a check in September of
5  2003 to Mr. Sanchez for, I believe, a thousand
6  dollars.
7    A.   Yes.
8    Q.   What was that for?
9    A.   To pay bills.
10    Q.   What kind of bills?
11    A.   Electric, gas.
12    MR. HOFELD:  I am just going to object because
13  I think there's a vagueness in the question and the
14  answer, in the line of questioning.
15  BY MR. SCHUTTE:
16    Q.   Did you understand my question?
17    A.   Yes.
18    Q.   Okay.  Why were you making a payment to
19  Mr. Sanchez for electric bills?
20    A.   He lended me the money.
21    Q.   Is Mr. Sanchez an attorney?
22    A.   No.
23    Q.   Okay.  Was he at the closing just as your
24  friend?

Page 27

1    A.   He was with me on April 29.
2    Q.   Just as your friend?
3    A.   Just as friends, yes.
4    Q.   Not as your attorney or your broker?
5    A.   No.  No.
6    Q.   Okay.  Other than Mr. Sanchez, yourself,
7  and Mr. Astudillo, was anyone else at the closing?
8    A.   No.
9    Q.   Why was it, Ms. Navara, that you felt
10  that Mr. Astudillo wouldn't allow you any time to
11  read Exhibit 3?
12    A.   I don't understand why, because he
13  just -- he only had the papers ready.  I don't know.
14    Q.   Well, I am trying to understand your
15  testimony that he wouldn't give you the time to read
16  it.
17    A.   That's how it was.
18    Q.   Why was it that way?
19    A.   I don't understand.
20    Q.   Well, let me try again.
21         Did Mr. Astudillo tell you, you can't
22  read the document; you must just sign it?
23    A.   No, he didn't mention anything to me, but
24  he was helping me to sign, and putting the things

Page 28

1  away.  Then -- he was helping me, and then he gave
2  me another piece of paper quick, quick, like that.
3    Q.   Okay.  Well, when he gave you Exhibit 3
4  and asked you to sign it, did you say something
5  like, hold on, I want to read this before I sign it?
6    A.   No.
7    Q.   Okay.  Mr. Astudillo gave you a copy of
8  Exhibit 3 at the end of the closing, didn't he?
9    A.   Yes.
10    Q.   Okay.  And you took that with you?
11    A.   Yes.
12    Q.   And, in fact, you still have that
13  document today, don't you?
14    A.   Yes.
15    Q.   Okay.  After you left the closing, did
16  you read Exhibit 3?
17    A.   Days after.  I don't recall how many
18  days.
19    Q.   Okay.  Why did you read it -- why did you
20  read Exhibit 3 days after the closing?
21    A.   Well, I took them home, and I just left
22  them there, and I read them later.
23    Q.   Okay.  When you read Exhibit 3, did you
24  see anything that you did not agree with?

7 (Pages 25 to 28)

GUADALUPE NAVARA, JUNE 27, 2006

Page 29

1    A.    Now, which paper is that one, Exhibit 3?
2    Q.    The one in front of you.
3    A.    Oh, that one.  Oh, I'm so sorry.
4        Can you say that again?
5    Q.    Yes.  My question is, Ms. Navara, after
6  you finally had an opportunity to read the mortgage,
7  Exhibit 3, which you had already signed a few days
8  before, was there any part of it you didn't agree
9  with?
10    A.    Well, I called him, and I told him
11  that -- why I was going to pay from 50,000 --
12  50,000, and the payments were going to be 750,000 --
13      THE WITNESS:  No, 150,000.
14  BY THE WITNESS:
15    A.    That's why I asked him why.
16  BY MR. SCHUTTE:
17    Q.    Okay.  We will talk about that issue a
18  lot later.
19        Was there any -- other than the issue
20  about the amount of the loan, was there anything
21  about the mortgage, Exhibit 3, that you disagreed
22  with?
23    A.    Well, I could say that -- that it was
24  just that.

Page 30

1    Q.    Okay.  Now, on Exhibit 3, the mortgage,
2  in addition to signing at the end --
3    A.    Where is it, right here?
4    Q.    Where is what?
5    A.    The page that you were asking me.
6    Q.    I am asking about the whole document.
7    A.    The whole document, oh.
8    Q.    I am saying, in addition to signing the
9  document at the end, you also put your initials on
10  every page of the document; isn't that right?
11    A.    Yes, but I signed one inch of -- thick of
12  papers -- of documents.
13    Q.    I understand.  And you said that
14  Mr. Astudillo at no time during the closing told you
15  that you couldn't take the time to read the
16  documents?
17    A.    That is how it was.  That's how it is.
18    Q.    But you did initial -- put your initials
19  on every page of Exhibit 3?
20    A.    Yes, yes, in each one of the pages.
21    Q.    Okay.  I will ask you to turn to the page
22  with the ECL&G 49 in the lower right corner.
23    A.    Okay.
24    Q.    I am going to ask you about the number --

Page 31

1  paragraph number 8.  Let me read that for the
2  record.
3        It says, "Borrower's loan application.
4  Borrower shall be in default if during the loan
5  application process, Borrower or any persons or
6  entities acting at the direction of Borrower or with
7  Borrower's consent or knowledge gave material --
8  made materially false, misleading or inaccurate
9  information or statements to Lender or failed to
10  provide Lender with material information in
11  connection with the loan.  Material representations
12  include, but are not limited to, representations
13  concerning Borrower's occupancy of the property as
14  Borrower's principal residence."
15        Okay.  Ms. Navara, when you read the
16  mortgage, Exhibit 3, do you remember reading that
17  paragraph?
18      MR. HOFELD:  I am going to object.  I think it
19  assumes a fact not in evidence.  I don't think she
20  testified that she did read the mortgage.
21      THE INTERPRETER:  I'm sorry.
22      MR. HOFELD:  She can answer, obviously.
23  BY THE WITNESS:
24    A.    No.

Page 32

1  BY MR. SCHUTTE:
2    Q.    Have you ever read paragraph 8 before
3  today?
4    A.    No.
5    Q.    There was nothing -- setting aside your
6  belief that Mr. Astudillo didn't give you time to
7  read the mortgage at the closing, there was nothing
8  stopping you from reading the mortgage and,
9  specifically, paragraph 8 between April the 29th of
10  2004 and today, was there?
11    A.    Can I answer?
12    Q.    Sure.
13    A.    Because when this happened, like I am
14  saying, he had everything ready.
15    Q.    I am not asking -- I am not asking about
16  at the closing.  I am asking about after the
17  closing.
18    A.    After, to read it?
19    Q.    There was no reason why you couldn't have
20  read this?
21    A.    Well, after, it was too late already.  I
22  had already signed it, so that's why.
23    Q.    Okay.  That's -- we will get back to that
24  in a moment, but that's not my question.

8 (Pages 29 to 32)

GUADALUPE NAVARA, JUNE 27, 2006

Page 33

1      What my question is, is was there any
2  reason why between April 29 of 2004 and today you
3  couldn't have read paragraph 8 of the mortgage?
4      A.   I couldn't.
5      Q.   Okay.  Thank you.  We can put that
6  document aside.
7      MR. SCHUTTE:  It's 2:00 o'clock.  Do you want
8  to take a quick break or do you want to keep going?
9      MR. HOFELD:  How are you feeling?  Do you want
10 to take a break or keep going?
11     THE WITNESS:  Let's keep going.
12     THE INTERPRETER:  I would like to take a break,
13 probably, in a half hour.
14     MR. SCHUTTE:  Okay.  Sure.  That was you
15 talking?
16     THE INTERPRETER:  Me, the interpreter.
17     MR. SCHUTTE:  Let's mark this as Exhibit 4.
18         (WHEREUPON, a certain document was
19         marked Navara Deposition Exhibit
20         No. 4, for identification, as of
21         6/27/06.)
22 BY MR. SCHUTTE:
23     Q.   Ms. Navara, we have marked as Exhibit 4 a
24 copy of a mortgage application.

Page 34

1      MR. HOFELD:  And also, Scott, for the record, I
2  don't think it's complete.  I think it's four
3  pages -- it's a four-page document.  But once again,
4  you may not need the missing page.
5      MR. SCHUTTE:  What do you think the fourth page
6  is?
7      MR. HOFELD:  Actually, may I take a look?
8      MR. SCHUTTE:  Yes.  Is it the schedule of
9  itemization of --
10     MR. HOFELD:  It's the -- I don't know what to
11 call it.  It's not a full page of print.  It's
12 just -- I have no problem stipulating that that's
13 the first three pages of the loan application.
14     MR. SCHUTTE:  Do we have a copy of what page 36
15 looks like?
16         You have given us multiple copies of
17 documents with the same bates labels.
18     MR. HOFELD:  Multiple copies with the same --
19     MR. SCHUTTE:  In other words, there are, I
20 think, three different sets of documents that start
21 at ECL&G number 1.
22     MR. HOFELD:  Oh, no.
23     MR. SCHUTTE:  Yes.
24     MR. HOFELD:  Okay.

Page 35

1      MR. SCHUTTE:  36.
2      MR. HOFELD:  It is possible that I am thinking
3  of a loan application as it appears in your client's
4  file.
5      MR. SCHUTTE:  You are correct that the document
6  says that the last page of the exhibit is page 3 of
7  4.  We will try to correct that while we are on a
8  break.
9      MR. HOFELD:  I didn't mean to divert the --
10     MR. SCHUTTE:  What we can do is -- on a break,
11 we will try to -- we will swap in a four-page copy
12 of the application.
13     MR. HOFELD:  That's fine.
14 BY MR. SCHUTTE:
15     Q.   Okay.  Ms. Navara, can I ask you to take
16 a look at the last page of this document?  And can
17 you tell me if that's your signature?
18     A.   No, that's Astudillo.
19     Q.   Above Mr. Astudillo --
20     A.   Oh, above?
21     Q.   Yes.
22     A.   Yes, that's my signature.
23     Q.   Okay.  And you signed this document on
24 April the 29th of 2004?

Page 36

1      A.   Yes.
2      Q.   That was the date of the closing?
3      A.   Yes.
4      Q.   When you signed this document, all the
5  information in the document was already filled in,
6  wasn't it?
7      A.   Yes.
8      Q.   Did you read the document before you
9  signed it?
10     A.   He only showed it to me and just said,
11 "Sign here and there."  Yes.
12     Q.   Did he tell you that you couldn't read
13 it?
14     A.   No.
15     Q.   Okay.
16     A.   He just told me -- he just showed me if
17 my address was correct, and that's all.  He told me
18 to sign.
19     Q.   Okay.  Did you ever ask him during the
20 closing if you could have time to read any of the
21 documents?
22     A.   Well, I trusted him because he was
23 friends -- well, Sergio knows him.
24     Q.   So you trusted Mr. Astudillo?

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

GUADALUPE NAVARA, JUNE 27, 2006

Page 37

1   A.   Well, yes. Well, yes, that's what
2  happened.
3   Q.   There was no one from Long Beach Mortgage
4  Company at the closing, was there?
5   A.   No. I wasn't even there. I was only
6  told to sign, but he closed with the rest -- I
7  wasn't even there; without me.
8   Q.   I'm sorry, I didn't understand what you
9  just said. Did you say that --
10  A.   Because -- he is saying if someone from
11 Long Beach was at the closing? I did not see them
12 because I wasn't there. I only signed the papers.
13  Q.   Okay. Long Beach was not there when
14 Mr. Astudillo put the documents in front of you and
15 asked you to sign them?
16  A.   Yes, but there was no one from Long
17 Beach.
18  Q.   Okay. Was there anyone there from
19 Deutsche Bank?
20  A.   Just tell him that I know about this
21 bank -- I did not know about this bank.
22  Q.   Okay. Was there anyone there from
23 Citywide Title?
24  A.   No.

Page 38

1   Q.   After the closing, Ms. Navara, between
2  the closing and today, have you ever read this loan
3  application?
4   A.   Yes.
5   Q.   Okay. When did you first read this loan
6  application?
7   A.   Days after the 29th of April.
8   Q.   And why did you read this document days
9  after the 29th of April?
10  A.   Because like I am telling you, I didn't
11 have a reason to do that.
12  Q.   Okay. What I am asking -- and I'm sorry
13 if my question wasn't clear.
14       What I am asking is why -- when you did
15 read the document, why did you do it?
16  A.   Because I wanted to see -- sometimes I
17 don't catch -- I don't catch it well, so I have to,
18 like, read it and read it.
19  Q.   Okay. But why did you choose to pick up
20 the loan application days after the closing to read
21 it then?
22  A.   Because it was in the papers that were
23 given to me for the loan.
24  Q.   And did you read all of those papers?

Page 39

1   A.   I am not done yet.
2   Q.   Okay. You have been reading the papers
3  for more than two years?
4   A.   I thought that the case was already
5  closed.
6   Q.   What do you mean by "The case"?
7   A.   The loan. The loan.
8   Q.   How did you first meet Mr. Hofeld?
9   A.   I made a lot of phone calls, and I was
10 referred to many companies.
11  Q.   When you say "Companies," do you mean
12 lawyers?
13  A.   Lawyers, until he got my case.
14  Q.   So do I understand correctly that you
15 called Mr. Hofeld?
16      MR. HOFELD: I am just going to object,
17 leading.
18      THE WITNESS: Can I answer?
19      MR. HOFELD: Go ahead. Yes, absolutely. Yes.
20 BY THE WITNESS:
21  A.   Yes, when I went to my -- the case.
22 BY MR. SCHUTTE:
23  Q.   Okay. When you were calling all of these
24 lawyers, what was it that you thought had been done

Page 40

1  to you that was wrong?
2   A.   They have done wrong to me because it
3  wasn't given to me, the money that was supposed to
4  be given to me.
5   Q.   And what you are complaining about was
6  that the loan was for $50,000 instead of something
7  less than that?
8      MR. HOFELD: I am going to object because it's
9  leading. You can answer.
10 BY THE WITNESS:
11  A.   Well, yes.
12 BY MR. SCHUTTE:
13  Q.   Okay. Did you ever call Long Beach
14 Mortgage Company to complain about this issue?
15  A.   No. I called Washington Mutual.
16  Q.   Okay. When did you call --
17  A.   And that's where I make my payments.
18  Q.   Okay. When did you call Washington
19 Mutual?
20  A.   In 2005.
21  Q.   So after you had already met Mr. Hofeld?
22  A.   Yes.
23  Q.   And what did you say to Washington Mutual
24 when you called them?

10 (Pages 37 to 40)

GUADALUPE NAVARA, JUNE 27, 2006

Page 41

1    A.   Well, now, this is like this:  They
2  called me, and they said that they are calling me
3  about my second mortgage.  So I told them that I
4  wanted papers like this one.
5        What are they called?  What are these
6  called?
7    Q.   I don't know what you are referring to.
8    A.   That I need the records.
9    Q.   So you called Washington Mutual and asked
10  them for records?
11    A.   For records, yes, to see if they were the
12  same as mine.
13    Q.   Okay.  And what did Washington Mutual do
14  when you made that request?
15    A.   They just send me the -- the -- what do
16  you call these papers --
17    Q.   The loan history?
18    A.   -- the application, and they just send me
19  that, but no -- they didn't give me any more
20  information.
21    Q.   Okay.  Did you -- do you remember who you
22  spoke with at Washington Mutual?
23    A.   No.
24        This was after the lawsuit had already

Page 42

1  been filed?
2    A.   I believe so, yes.
3    Q.   Other than that conversation, have you
4  ever had any direct communication with Washington
5  Mutual --
6    A.   No.
7    Q.   -- or Long Beach Mortgage Company --
8    A.   No.
9    Q.   -- or Deutsche Bank?
10    A.   No.
11    MR. SCHUTTE:  Why don't we take a five to ten
12  minute break?
13    THE VIDEOGRAPHER:  Going off the video record.
14  The time is 2:15 p.m.
15        (WHEREUPON, a recess was had.)
16    THE VIDEOGRAPHER:  Back on the video record.
17  The time is 2:25 p.m.
18  BY MR. SCHUTTE:
19    Q.   Ms. Navara, let's go back to Exhibit
20  Number 4, the loan application.
21    A.   Did you say 4?
22    Q.   Yes, the loan application.  Yes.
23        Ms. Navara, in the red, where the court
24  reporter has stamped it, she's called that Number 4.

Page 43

1    A.   Okay.
2    Q.   Okay.  Now, as I understood your
3  testimony before the break, at some time after the
4  closing, you read this document?
5    A.   Yes.
6    Q.   And then you made the calls to many
7  lawyers before you found Mr. Hofeld?
8    A.   Yes.
9    Q.   That's right?
10    A.   Yes.
11    Q.   Was it this document, the loan
12  application, the document that made you think you
13  had harm done to you?
14    A.   No, it was the $8,000 that he retained
15  from me, because that's my money.
16    Q.   I see.  Okay.  We will talk about that in
17  a little while.
18        When you read the loan application,
19  Ms. Navara, did you see on the document that there
20  was a liability of $26,000 showing to ACS
21  Consulting?
22    A.   I saw it after.
23    Q.   Right.  You saw it when you read the loan
24  application?

Page 44

1    A.   Yes, after.  After.
2    Q.   Okay.  When you read that, did you call
3  Long Beach or Washington Mutual to tell them about
4  it?
5    A.   I called Roger, and he was on vacation,
6  so I called New Millenium, and I spoke to
7  Antoinette, and she told me that when he will be
8  back from vacation, that he would talk to him --
9  that she would talk to him.
10    Q.   Right.  And did you talk to Mr. Astudillo
11  when he came back from vacation?
12    A.   I don't remember it.  I don't remember,
13  because I spoke to Antoinette -- yes, I did talk to
14  Astudillo, and I asked him why, and he said that
15  that's what he charged.
16    Q.   What was what he charged?
17    A.   The 8,000 that he retained.
18    Q.   Was what he told you he charged?
19    A.   That's what he says.
20    Q.   Will you agree with me, Ms. Navara, that
21  where the loan application says that prior to the
22  closing you owed $26,000 to ACS Consulting, that
23  that's not correct, is it?
24    A.   That is not correct, no.

11 (Pages 41 to 44)

GUADALUPE NAVARA, JUNE 27, 2006

Page 45

1    Q.   Okay. When you saw that there was a
2 mistake on the loan application, did you make any
3 effort to tell Long Beach about that?
4    A.   No. I did talk to Roger. I talked to
5 him, and he told me that that's how the business is.
6    Q.   Okay. Did he tell you anything else?
7    A.   Because it was according to them that I
8 was foreclosed, and that's why -- and that's why he
9 would do that, that he retained the $8,000 -- he
10 kept the $8,000.
11    Q.   Okay. All right. I am going to ask you
12 a few questions about some background questions,
13 okay.
14         Are you currently employed?
15    A.   Is that necessary?
16    Q.   Yes.
17         Are you currently employed?
18    A.   No.
19    Q.   Okay. Your loan application says you are
20 retired.
21    A.   Yes.
22    Q.   What year did you retire?
23    A.   2000 -- no, no. '92. In '92.
24    Q.   1992?

Page 46

1    A.   Uh-huh, yes.
2    Q.   Okay. Since 1992, what has been your
3 source of income?
4    A.   I rent four apartments. I maintain them.
5    Q.   Okay. And two of those apartments are at
6 2715 South Kostner?
7         THE INTERPRETER: I'm sorry, what was the
8 address?
9 BY MR. SCHUTTE:
10    Q.   2715 South Kostner?
11    A.   Yes.
12    Q.   And two of them are at 2843 South Drake?
13    A.   Yes.
14    Q.   Okay. Do you have any --
15         THE INTERPRETER: I'm sorry, Counsel. I notice
16 that you are talking a little bit faster or,
17 probably, I am getting a little tired, but just a
18 bit slower.
19         MR. SCHUTTE: I will slow down.
20 BY MR. SCHUTTE:
21    Q.   Other than the rental income from those
22 four apartments, have you had any other sources of
23 income since 1992?
24    A.   No.

Page 47

1    Q.   Okay. What was the last job you had
2 before you retired?
3    A.   Let me see. Insco Optical.
4    Q.   Okay. What did you do for Insco Optical?
5    A.   Packing.
6    Q.   It was a manufacturing job?
7    A.   Yes.
8    Q.   Okay. How long did you work for Insco
9 Optical?
10    A.   From '88 to '92. How many years?
11    Q.   Do you have a -- any kind of retirement
12 payments coming from any of your employers?
13    A.   No.
14    Q.   Okay. During the course of your
15 employment, before you retired, and when you were
16 working for anybody, not just Insco Optical, did you
17 ever work in the banking industry?
18    A.   No.
19    Q.   Did you ever do any work -- work that
20 involved mortgages?
21    A.   No.
22    Q.   What is your educational background?
23    A.   Do you mean the grade?
24    Q.   Yes. What's the highest level of

Page 48

1 education you have had?
2    A.   Four.
3    Q.   Four years of high school?
4    A.   Grammar school.
5    Q.   Okay. Was that in the U.S. or in Mexico?
6    A.   Mexico.
7    Q.   Have you had any education since those
8 four years of grammar school?
9    A.   No.
10    Q.   What year did you come to the United
11 States from Mexico?
12    A.   '64.
13    Q.   You said you became a citizen in 2002?
14    A.   Yes.
15    Q.   Where do you currently live?
16    A.   In 2715 South Kostner.
17    Q.   That's the same address where your two
18 rental units are?
19    A.   Yes.
20    Q.   Do you live in one of the two units?
21    A.   I live in the coach house. There is an
22 apartment on the back. There's two in the front,
23 and the coach house in the back. I live in the
24 coach house.

12 (Pages 45 to 48)

GUADALUPE NAVARA, JUNE 27, 2006

Page 49

1    Q.   Okay.  What is the address of the coach
2  house?
3    A.   It's the same address.
4    Q.   Okay.
5    A.   It's the same lot and -- like, in the
6  place of the garage is the -- that's a house.
7    Q.   Is it above the garage?
8    A.   No.  It's two floors; the bottom and the
9  second.  Kitchen and bathrooms on the first floor
10 and a bathroom upstairs --
11   THE WITNESS:  No.
12 BY THE WITNESS:
13   A.   -- or bedrooms upstairs, and the living
14 room.
15 BY MR. SCHUTTE:
16   Q.   Does mail come to you at the coach house?
17   A.   No, only one mail for everybody.
18   Q.   What is that address?
19   A.   The same address.
20   Q.   2715 South Kostner?
21   A.   Yes.
22   Q.   So the people who live in the second unit
23 and the people who live in the first unit and you
24 all get your mail in the same mailbox?

Page 50

1    A.   Yes.
2    Q.   Do you recall in April of 2004 who lived
3  in the rental units?
4    A.   I don't remember in the front -- in the
5  front I remember; the Rodriguez family.
6    Q.   Are there apartment numbers for the two
7  units?
8    A.   The first floor is the first one, and the
9  second.
10   Q.   So they are not called Unit 1 and Unit 2?
11   A.   No.
12   Q.   All right.  And, again, I am trying to
13 understand how this looks.  The two rental units are
14 two floors of the same building?
15   A.   Yes.
16   Q.   And your coach house is a separate
17 building on the same lot?
18   A.   Yes.
19   Q.   The Rodriguez family that lived in one of
20 the units in 2004, are they related to you?
21   A.   No.
22   Q.   Is that Jesse Rodriguez?
23   A.   Jesse Rodriguez.
24   Q.   Okay.  Do you recall that the person who

Page 51

1  lived in the second floor unit in March of 2002 was
2  Guillermo Garcia?
3    A.   I believe so, but I don't exactly recall.
4    Q.   Okay.  Does the Rodriguez family continue
5  to live in your rental unit?
6    A.   Yes.
7    Q.   In the first floor?
8    A.   In the first and the second.  Their son
9  lives on the second floor.
10   Q.   There's the building with the two units
11 and then there's the coach house that you live in.
12 Is there a separate garage?
13   A.   No.  Instead of a garage, they built a
14 house.
15   Q.   So there is no garage?
16   A.   No garage.
17   Q.   The two -- the only two buildings on the
18 lot is the rental unit and the coach house?
19   A.   Yes.
20   Q.   How long have you owned the property at
21 2715 South Kostner?
22   A.   For 36 years, I believe.
23   Q.   You purchased it in around 1970?
24   A.   1970 exact, yes.

Page 52

1    Q.   In 1970, you were married?
2    A.   Yes.
3    Q.   And you bought the property with your
4  husband?
5    A.   Yes.
6    Q.   Is it correct that you were divorced from
7  him in 1981?
8    A.   No, '74.
9    Q.   You were divorced in 1974?
10   A.   Yes.
11   Q.   Since 1974, have you been the sole owner
12 of the property?
13   A.   Yes.
14   Q.   When you bought the property in 1970, did
15 you pay for that in cash or did you have a loan?
16   A.   A loan.
17   Q.   Okay.  You said something earlier about
18 contacting Washington Mutual about a second loan?
19   A.   No.
20   Q.   Okay.  Have you ever had a second
21 mortgage or a home equity line of credit on the
22 property?
23   A.   With whom?
24   Q.   With anyone?

13 (Pages 49 to 52)

GUADALUPE NAVARA, JUNE 27, 2006

Page 53

1    MR. HOFELD:  Scott, I am just going to object
2 on vagueness grounds in case she doesn't know what
3 you are asking.
4    THE WITNESS:  Okay.
5 BY MR. SCHUTTE:
6    Q.   Did you understand my question?
7    A.   Can you repeat it again?
8    Q.   Okay.  Well, let me try it this way:  You
9 had a -- you had a mortgage with -- with First
10 National Acceptance Company?
11    A.   The original mortgage was with Diamond
12 Mortgage Company, and in 2 -- in 1992, First
13 National took over that --
14    Q.   I see.
15    A.   -- the mortgage.
16    Q.   And so you had -- was Diamond the initial
17 mortgage you had in 1970?
18    A.   No.  In 1970 was Civic Savings.
19    Q.   So you had a loan with Civic Savings --
20    A.   The first one, yes.
21    Q.   -- and then you refinanced with Diamond?
22    A.   Yes.
23    Q.   Okay.  Diamond then became First National
24 Acceptance?

Page 54

1    A.   Correct, in '92.
2    Q.   And then you paid off the First National
3 Acceptance loan when you refinanced with Long Beach?
4    A.   Yes.
5    Q.   Have you ever had any other loans secured
6 by the property at 2715 South Kostner?
7    A.   No.
8    Q.   Okay.  Thank you.
9        How long have you lived in the coach
10 house?
11    A.   That house hasn't been rented for years.
12 My son lived there.  I live there now.
13    Q.   Do you remember when you started living
14 there?
15    A.   No, I don't remember.  No.
16    Q.   Before you moved into the coach house,
17 where did you live?
18    A.   Up in my attic.
19    Q.   Okay.  At 2715?
20    A.   Yes.
21    Q.   That's above the two rental units?
22    A.   Yes.
23    Q.   Okay.  Done anyone else live with you in
24 the coach house?

Page 55

1    A.   No.
2    Q.   Okay.  Was the coach house on the
3 property when you bought it in 1970?
4    A.   Yes.
5    Q.   Okay.  Does the coach house have a
6 separate electrical service?
7    A.   Yes.
8    Q.   So do you get two electric bills ever
9 month?
10    A.   Yes.
11    Q.   One bill is for the coach house?
12    A.   And one is for the first floor.
13    Q.   Is there a bill for the second floor?
14    A.   They pay their own electric.
15    Q.   The second floor does?
16    A.   Yes.
17    Q.   Do you pay the first floor's electric?
18    A.   Yes.
19    Q.   Okay.  Does the coach house have its own
20 gas service?
21    A.   Yes.
22    Q.   Okay.  How many gas services are there
23 for the rental units?
24    A.   Each apartment has its meter.

Page 56

1    Q.   Who pays the gas for the rental units?
2    A.   They pay their own gas.
3    Q.   So the renters pay their own gas?
4    A.   Yes.
5    Q.   And with electricity, you pay the first
6 floor?
7    A.   The first floor, yes.
8    Q.   And they pay -- they pay the second
9 floor?
10    A.   Yes.
11    Q.   Was that the same arrangement that was in
12 place in 2004?
13    A.   Yes.
14    Q.   Okay.  How many water meters are there
15 for the property?
16    A.   Each apartment -- each apartment has its
17 water heater --
18        THE INTERPRETER:  A water heater, right?
19 BY MR. SCHUTTE:
20    Q.   I'm sorry if I was incorrect; water
21 meter.
22    A.   No, there's only one for all --
23    Q.   Okay.
24    A.   -- all the apartments.

14 (Pages 53 to 56)

GUADALUPE NAVARA, JUNE 27, 2006

Page 57

1    Q.   And you pay for that?
2    A.   The water, yes, I pay.
3    Q.   And you also pay the sewer?
4    A.   It comes included in the water bill.
5    Q.   Right. But the -- the rental units don't
6  pay for the water or sewer?
7    A.   No, they don't pay that.
8    Q.   Thank you.
9         Do you pay the phone service for the
10  rental units?
11   A.   No.
12   Q.   Okay. Is there a separate phone service
13  to the coach house?
14   A.   No.
15   Q.   The phone number (773) 762-0685, where
16  does that ring?
17   A.   In the attic.
18   Q.   Do you pay for the phone line that goes
19  to the attic?
20   A.   Yes.
21   Q.   Okay. Is there a way to access the attic
22  without going through either of the rental units?
23   A.   Through the porch.
24   Q.   When you lived in the attic, how did you

Page 58

1  get in and out?
2    A.   Through the porch. One door only.
3    Q.   So is it on the back porch?
4    A.   Yes, the back porch. Yes.
5    Q.   Do you carry insurance on the rental
6  units?
7    A.   Yes.
8    Q.   Okay. Do you know who your insurer is
9  today?
10   A.   Yes, it is insured through Gaylord
11  Insurance.
12   Q.   Gaylord Nelson?
13   A.   Yes.
14   Q.   Is there separate insurance on the coach
15  house?
16   A.   No, it is the same insurance from the
17  front to the back. It is the same insurance.
18   Q.   To make sure I understand correctly, you
19  have one insurance policy with Gaylord Nelson that
20  covers the rental units and the coach house?
21   A.   Yes.
22   Q.   Okay. Have you ever taken out a separate
23  loan for the coach house?
24   A.   No.

Page 59

1    Q.   Is it your understanding that your loan
2  with Long Beach covers both the rental units and the
3  coach house?
4    A.   Well, because they pay the insurance, and
5  the insurance is included in the -- in the payments.
6    Q.   Your insurance comes through the mortgage
7  company; through Long Beach?
8    A.   Yes.
9    Q.   Okay. My question, though, is whether
10  the mortgage you had with Long Beach covers the
11  rental units and the coach house.
12   A.   In which way?
13   Q.   Well, when you borrowed the money, the
14  $50,000, and took out a mortgage, is it your
15  understanding that that mortgage covers the lot and
16  all the buildings on it?
17   A.   Yes, that's how it is.
18   Q.   Okay. So when you pay interest on the
19  loan, it's for the coach house and the rental units?
20   A.   Yes.
21   MR. SCHUTTE: All right. This will be 5. This
22  will be 6 and this will be 7.
23        (WHEREUPON, certain documents were
24         marked Navara Deposition Exhibit

Page 60

1         Nos. 5 - 7, for identification, as
2         of 6/27/06.)
3  BY MR. SCHUTTE:
4    Q.   Ms. Navara, I am handing you what we have
5  marked as Exhibits 5, 6, and 7, which are your
6  income tax returns for 2003, 2004, and 2005. You
7  should feel free to take as much time as you want to
8  review those.
9    MR. HOFELD: Scott, I'm sorry, I just need to
10  clarify. Is 5 -- Exhibit 5 is for the year the
11  2005?
12   MR. SCHUTTE: Is 2003.
13   MR. HOFELD: Okay.
14   MR. SCHUTTE: 2004 is 6 and 2005 is 7.
15   MR. HOFELD: 2004 is 6 and 2005 is 7.
16   MR. SCHUTTE: Right.
17   MR. HOFELD: Okay. Thanks.
18  BY MR. SCHUTTE:
19   Q.   Ms. Navara, these were provided to us by
20  your attorney.
21   A.   Yes.
22   Q.   Okay. Each of the three documents has
23  the name Richard Rylewicz on the front, in the
24  corner.

15 (Pages 57 to 60)

GUADALUPE NAVARA, JUNE 27, 2006

Page 61

1    A.    Yes.
2    Q.    Is he your tax preparer?
3    A.    He is the accountant.
4    Q.    How long has he been your accountant?
5    A.    Since, I will say, the '80s, because I am
6  not sure.
7    Q.    Okay.  Has he been your accountant at
8  least from 2000 to the present?
9    A.    Yes.
10    Q.    Okay.  The Exhibits 5, 6, and 7 that we
11  were provided are tax returns that aren't signed by
12  you.
13    A.    Okay.
14    Q.    Okay.  Are these the -- even though I
15  assume you signed them before you sent them in, is
16  it your understanding that these are identical to
17  what you signed and sent to the government?
18    A.    Yes.
19    Q.    Okay.  For the years 2003, 2004, and
20  2005, have you filed any amendments?
21    A.    For this?
22    Q.    Yes, for these tax returns.
23    A.    What is an amendment?
24    Q.    Have you filed a document with the

Page 62

1  government saying, my original return was wrong; I
2  need to fix it?
3    A.    No.
4    Q.    And are you currently considering doing
5  that?
6    A.    No.
7    Q.    Okay.  Can we take a look at Exhibit 6,
8  the tax return for 2004?
9    A.    Okay.  Where is the 6?
10    MR. HOFELD:  Ms. Navara, look.  This is where
11  the exhibit numbers are, on the front, okay.
12    THE WITNESS:  Okay.
13  BY MR. SCHUTTE:
14    Q.    And specifically, Ms. Navara, I want to
15  look at the page with 142 in the corner.
16    A.    Yes.
17    Q.    Okay.  Do you recall, Ms. Navara, whether
18  you reviewed this page before you signed it and sent
19  it to the government?
20    A.    No, because I have been with this
21  accountant for years.
22    Q.    Do you see where it says "Properties" in
23  column A?
24    A.    Where is it?

Page 63

1    MR. SCHUTTE:  Al, do you mind if I show her?
2    MR. HOFELD:  No.  I can show her.
3         He is asking you about 1A.  Right, Scott?
4    MR. SCHUTTE:  Yes.
5    MR. HOFELD:  1A.
6  BY MR. SCHUTTE:
7    Q.    In 1A, at line 3, it's showing that you
8  received rents of $11,200 on the 2715 South
9  Kostner --
10    A.    Yes.
11    Q.    -- properties during 2004?
12    A.    Yes.
13    Q.    Is that accurate?
14    A.    Yes.
15    Q.    Okay.  At line 7, you have told the
16  government that you had $1,320 of maintenance and
17  cleaning expenses for the 2715 South Kostner?
18    A.    Yes.
19    Q.    Okay.  What sort of cleaning and
20  maintenance expenses are those?
21    A.    Cutting grass, cleaning.
22    Q.    What sort of cleaning --
23    A.    Odd jobs.  Well, cutting the grass and
24  fixing -- odd jobs in the house.

Page 64

1    Q.    Okay.  Would those include odd jobs in
2  the coach house?
3    A.    Yes.
4    Q.    Okay.  Who performs the odd jobs for you
5  at that property?
6    A.    Sometimes my brother, myself.
7    Q.    Okay.  And the -- the grass that's cut,
8  who does that?
9    A.    My brother.
10    Q.    Okay.  And the grass is for the coach
11  house and the rental units?
12    A.    It's the same yard.
13    Q.    Okay.  Line 9 shows insurance of $564.
14    A.    Line what?
15    Q.    Nine.
16    A.    Insurance?
17    Q.    Yes, insurance of $564.
18    A.    Yes.
19    Q.    Is that the insurance policy for the
20  entire lot?
21    A.    Well, it's usually $800, but they gave me
22  a discount.  I don't know why.
23    Q.    Okay.  And line 12 shows mortgage
24  interest of $2,847?

16 (Pages 61 to 64)

Page 65

1    A.    Yes.
2    Q.    Is it your understanding that that's
3  interest on the First National Acceptance and then
4  the Long Beach loan?
5    A.    Yes.
6    Q.    Line 14 is for repairs, 2,310.  Do you
7  remember what repairs you did in 2004?
8    A.    The apartments.  Whatever -- whatever the
9  people that rent, they destroy or it's not working
10  anymore, it has to be repaired.
11    Q.    Did you do any repairs in 2004 in the
12  coach house?
13    A.    No.
14    Q.    Okay.
15    A.    I don't think so, no.
16    Q.    Okay.  Supplies is 15, $779.  What sort
17  of supplies does that refer to?
18    A.    Where is that?
19    Q.    Line 15, please.
20    A.    That would be from the hardware store
21  and --
22    Q.    Okay.  Including supplies for the coach
23  house?
24    A.    Yes.

Page 66

1    Q.    Okay.  Line 16 is for taxes.  Is that the
2  Cook County property taxes?
3    A.    Yes.
4    Q.    Do you know, Mrs. Navara, whether the
5  coach house is included in the assessment for the
6  property?
7    A.    Yes.
8    Q.    Your understanding is that it is?
9    A.    It's got to be.
10    Q.    Has anyone ever told you that it's not?
11    A.    No, no one.
12    Q.    Line 17 is utilities, $1,627.
13    A.    Yes.
14    Q.    What utilities expenses are included in
15  that number?
16    A.    Utilities are electric and gas.
17    Q.    Okay.  Anything else?
18    A.    That's all.
19    Q.    Water and sewer?
20    A.    Water and sewer, yes.  I forgot.
21    Q.    Okay.  And landscaping, 261.  Do you see
22  where that is?
23    A.    Yes.
24    Q.    Is that landscaping that -- like the

Page 67

1  grass is for the whole property?
2    A.    Yes.
3    Q.    Okay.  In the calendar year 2004, from
4  January 1, 2004 to December 31, 2004, did you live
5  in the coach house every day?
6    A.    I am -- I live there and I go to my attic
7  also, so I live in both.
8    Q.    When did you live in the attic?
9    A.    I have my animals up in the attic, so --
10    Q.    Okay.
11    A.    So I have to go both places, up in the
12  attic, because that's where my dogs are.
13    Q.    Between the attic and the coach house,
14  you lived at the property every day during 2004?
15    A.    Yes.
16    Q.    Okay.  We can set those documents aside.
17       Is renting and managing the property on
18  Kostner and Drake, is that your primary occupation?
19    A.    Yes.
20    Q.    Okay.  I want to ask some questions now
21  about your decision to refinance in 2004, okay.
22       Why did you decide to refinance in 2004?
23    A.    Because I had to do some -- some
24  payments.

Page 68

1    Q.    What payments?
2    A.    Gas, electric, and odd jobs that I have
3  to do.
4    Q.    Okay.  I believe in your affidavit,
5  Exhibit 1, you said the reason that you wanted to
6  refinance was because you were in foreclosure.
7    A.    Well, also, yes.
8    Q.    What was the main reason?
9    A.    The foreclosure.
10    Q.    Okay.  How much did you owe --
11    A.    They said 19,000.
12    Q.    I'm sorry, I wasn't finished with my
13  question.  I apologize.
14       How much did you owe for electric and gas
15  and odd jobs in March of 2004?
16    A.    From the top of my head, I can't come up
17  with that.  It's in there -- it's in the tax return.
18    Q.    Okay.  Well, you mentioned earlier that
19  you had borrowed some money from Mr. Sanchez to pay
20  for electric and gas, and things like that.  And you
21  paid him back a thousand dollars in 2003?
22    A.    Yes.
23    Q.    Okay.  Did you have any other loans like
24  that, that you wanted to pay off with your

17 (Pages 65 to 68)

GUADALUPE NAVARA, JUNE 27, 2006

Page 69

1 refinance?
2      A.    My friend, I owed him $6,000, so I had to
3 pay him.
4      Q.    Who is the friend?
5      A.    Sergio.
6      Q.    Okay.  And after you refinanced, did you
7 pay Mr. Sanchez $6,000?
8      A.    Yes.
9      Q.    Was it always your intent -- strike that.
10 I will start over.
11          When you went to Mr. Astudillo to
12 refinance your loan, did you plan to use part of the
13 money you received from the refinancing to pay
14 Mr. Sanchez?
15      A.    Yes.
16      Q.    You also planned to use some of the money
17 to pay off your first -- your loan with First
18 National Acceptance Company?
19      A.    Yes.
20      Q.    Other than those two things, what else
21 did you want to use the refinancing to pay off?
22      A.    That's all.
23      Q.    Okay.  How did you end up going to see
24 Mr. Astudillo?

Page 70

1      A.    My friend Sergio referred me.
2      Q.    Are you still in touch with Sergio?
3      A.    Yes.
4      Q.    When is the last time you spoke to him?
5      A.    Yesterday.
6      Q.    Have you talked to him about this
7 deposition?
8      A.    No, I forgot.
9      Q.    Have you talked to him about -- strike
10 that.  I'm sorry.
11          When is the last time you spoke to
12 Mr. Astudillo?
13      A.    May of 2000 -- May 10 of 2005.
14      Q.    Why is it that you recall that date so
15 well?
16      A.    Because we had a court date, and he was
17 there, and so myself and a girlfriend.
18      Q.    A court date where?
19      A.    At the federal building.
20      Q.    In this case?
21      A.    Yes.
22      Q.    And Astudillo was in court?
23      A.    (Witness nods head.)
24      Q.    Is that correct?

Page 71

1      A.    Everybody was there, but they didn't have
2 no court.  But somehow the -- they suspend the court
3 date.  I don't know what happened.
4      Q.    Was Mr. Hofeld there?
5      A.    No.
6      Q.    Did you talk to Mr. Astudillo on May the
7 10th of 2005?
8      A.    Yes.
9      Q.    Can you tell me everything you can
10 remember that you talked to him about?
11      A.    On that day, after we left the court, he
12 offered us a ride, and we went with him.
13      Q.    Okay.  Did you talk to him at any time
14 that day about the lawsuit?
15      A.    The lawsuit?  No -- well, we were here,
16 so --
17      Q.    When you say "Here," do you mean the
18 federal building?
19      A.    At the federal building.
20      Q.    But you didn't discuss the lawsuit?
21      A.    No.
22      Q.    Was Mr. Sanchez there?
23      A.    No.
24      Q.    Okay.

Page 72

1      A.    My friend -- one of my friends was there.
2      Q.    What was his or her name?
3      A.    Her name is Jeanette Buckle.
4      Q.    B-a-k-o?
5      A.    Buckle.  Like Buckle.
6      Q.    Take taco?
7      A.    No.
8      Q.    Let's go back to when your friend
9 Mr. Sanchez referred you to Mr. Astudillo.
10          You said that you think that the first
11 day that you met Mr. Astudillo was on March the 16th
12 of 2004.
13      A.    Yes.
14      Q.    How much earlier than that did
15 Mr. Sanchez tell you about Mr. Astudillo?
16      A.    I believe it was between the 1st of
17 March --
18      Q.    And the 16th of March?
19      A.    Yes.  He told me to go; that he would
20 make the -- you know -- to talk about the lawn, and
21 I went on the 16th.
22      Q.    Okay.  What does Mr. Sanchez do for a
23 living?
24      A.    He works in a factory.

18 (Pages 69 to 72)

GUADALUPE NAVARA, JUNE 27, 2006

Page 73

1    Q.   Okay.  Do you know if he loans money to
2 other people besides you?
3    A.   To his friends.  His friends, you know.
4    Q.   Does he charge interest to you?
5    A.   No.
6    Q.   Do you currently owe any money to
7 Mr. Sanchez?
8    A.   Yes.
9    Q.   Are you considering refinancing your
10 loan?
11    A.   No.
12    Q.   How much do you currently owe to him?
13    A.   About 700.
14    Q.   Okay.  At the closing, Ms. Navara, was
15 Mr. Sanchez there for the entire time you were
16 there?
17    A.   On April 29 --
18    Q.   Yes, ma'am.
19    A.   -- when I signed it, that's it.
20    Q.   But was Mr. Sanchez there on that day for
21 the entire meeting with Mr. Astudillo?
22    A.   Just Astudillo, Sergio, and myself.
23    Q.   Okay.  At any time on April the 29th of
24 2004, were you alone with Mr. Astudillo when

Page 74

1 Mr. Sanchez was not there?
2    A.   No.  I don't remember.
3    Q.   Okay.  Do you recall what it was that
4 Mr. Sanchez said to you sometime between March the
5 1st of 2004 and March the 16th, 2004, when he told
6 you about Mr. Astudillo?
7    A.   Well, because he saw me so worried, and
8 he told me, "Let's go see Astudillo."
9    Q.   Okay.  Why were you worried?
10    A.   Why?  Because they foreclosed my house.
11 I was terrified, worried.
12    Q.   And the "They" you are referring to is
13 the First National Acceptance Company?
14    A.   I don't understand that.
15    Q.   When you said "They," you meant First
16 National Acceptance Company?
17    A.   Now, where is this coming from?  I don't
18 understand.
19    Q.   Let me try to start over.
20       I think I heard you say that you were
21 terrified because "They were foreclosing me."
22    A.   Yes, they.
23    Q.   And "They" was First National Acceptance
24 Company?

Page 75

1    A.   First National, yes.
2    Q.   I am making sure that the record is clear
3 so that if the judge reads this or sees it, he
4 understands.
5    A.   Okay.
6    Q.   Did --
7    MR. HOFELD:  I still don't think she answered
8 the question.  I don't think there was a yes or a
9 no.
10 BY MR. SCHUTTE:
11    Q.   It was First National Acceptance Company
12 that was foreclosing you?
13    A.   Yes.
14    MR. HOFELD:  Okay.  Thanks.
15    MR. SCHUTTE:  Thank you.
16 BY MR. SCHUTTE:
17    Q.   When Mr. Sanchez referred you to
18 Mr. Astudillo, did you feel that he was pressuring
19 you to refinance so that he could get his $6,000?
20    A.   No.
21    Q.   How long had you owed him $6,000?
22    A.   I believe it was in March.
23    Q.   Were you making payments to him?
24    A.   No.

Page 76

1    Q.   Okay.  And he wasn't charging you
2 interest?
3    A.   No.
4    Q.   Do you remember anything else that
5 Mr. Sanchez said to you about Mr. Astudillo?
6    A.   Well, he was going because he would fix
7 his taxes for him, and that's how he knows him.
8    Q.   Mr. Astudillo does Mr. Sanchez's taxes?
9    A.   Yes.
10    Q.   Did Mr. Sanchez go with you to see
11 Mr. Astudillo?
12    A.   Yes.
13    Q.   Okay.  Mr. Astudillo -- do you remember
14 where his office was?
15    A.   On 26th Street, but I don't remember the
16 address.
17    Q.   Was it 4329 West 26th Street?
18    A.   I can't say yes or no because I can't --
19    THE WITNESS:  The numbers I couldn't remember.
20 BY THE WITNESS:
21    A.   -- I can't remember the numbers.
22    MR. SCHUTTE:  Let's mark this as 8.
23       (WHEREUPON, a certain document was
24       marked Navara Deposition Exhibit

19 (Pages 73 to 76)

GUADALUPE NAVARA, JUNE 27, 2006

---

Page 77

1          No. 8, for identification, as of
2          6/27/06.)
3 BY MR. SCHUTTE:
4     Q.   Ms. Navara, we have marked as Exhibit 8
5 right here a document that your attorney has
6 produced to us. For the record, it has the number
7 ECL&G 10.
8     A.   Yes.
9     Q.   Do you recognize what this document is?
10    A.   It's Exhibit 8?
11    Q.   Eight, yes.
12    A.   Eight.
13    Q.   Yes. Do you know what that is?
14    A.   That is Astudillo's card -- business
15 card.
16    Q.   Do you remember when he gave this to you?
17    A.   On March 16.
18    Q.   Okay. And his card says that his
19 business is called Astudillo Consulting.
20    A.   Yes.
21    Q.   Okay. And it says also there "ACS." Do
22 you see that?
23    A.   Yes.
24    Q.   The card says his address is 4329 West

---

Page 78

1 26th Street in Chicago?
2     A.   I can't see the address here, but that's
3 what it is.
4     Q.   May I see that?
5     A.   Maybe my glasses.
6     Q.   It's hard to read.
7          Now, underneath the back part -- the
8 black part of the card, there's some writing.
9     MR. SCHUTTE: Al, do you mind if I point?
10    MR. HOFELD: No.
11 BY THE WITNESS:
12    Q.   Where, right here?
13 BY MR. SCHUTTE:
14    Q.   I am referring, Ms. Navara, to this area
15 right here.
16          Is that the back of the card?
17    A.   Yes, this is the back. Yes.
18    Q.   Okay. My Spanish is not so good, but the
19 top line, it says, "Serving the community with
20 the" -- what's the word before "Services"?
21    A.   What's --
22    Q.   What does the top line say? Perhaps you
23 could just translate it.
24    A.   "The following."

---

Page 79

1     Q.   "Serving the community with the following
2 services."
3     A.   Uh-huh.
4     Q.   Is that accurate?
5     THE INTERPRETER: Yes, it is. That's the
6 interpreter saying yes, it is.
7 BY MR. SCHUTTE:
8     Q.   Yes. Thank you.
9          What's the first line?
10    THE INTERPRETER: Counsel, you are asking the
11 interpreter?
12    MR. SCHUTTE: Yes, perhaps I could ask you --
13 without Counsel's objection, could I have the
14 interpreter interpret what that says, the following
15 five or six lines?
16    MR. HOFELD: Sure.
17    THE INTERPRETER: So I am going to start when
18 it says "Prestamos"?
19    MR. SCHUTTE: Yes.
20    THE INTERPRETER: Okay. Let me read it first,
21 and then I will read it to you.
22    MR. SCHUTTE: Okay.
23    THE INTERPRETER: "We lend for buying a house,
24 refinancing a house, income tax, public notary, and

---

Page 80

1 much more. Call us now."
2 BY MR. SCHUTTE:
3     Q.   Okay. And this was the card that
4 Mr. Astudillo gave you on March the 16th?
5     A.   Yes.
6     Q.   Can you tell me everything you can
7 remember about what you discussed with Mr. Astudillo
8 on March the 16th of 2004?
9     A.   The loan.
10    Q.   Anything else?
11    A.   No.
12    Q.   Do you remember with any more detail what
13 he said and what you said?
14    A.   No, I don't remember. Don't remember.
15    Q.   Okay. You don't remember anything more
16 specific about what he said and what you said?
17    A.   No.
18    Q.   Now, do you remember whether Mr. Sanchez
19 said anything during this meeting?
20    A.   No. He didn't say anything.
21    Q.   Was he there for the entire meeting?
22    A.   It wasn't -- there wasn't a meeting.
23    Q.   There was no meeting on March the 16th?
24    A.   No.

---

20 (Pages 77 to 80)

Page 81

1    Q.   Did you --
2    A.   I just talked to him.  That's it.
3    Q.   Did you talk to him at his office?
4    A.   Yes, at the office.
5    Q.   For how long did you talk to him?
6    A.   Some 40 minutes or so.
7    Q.   Okay.  And that's what I am referring to
8  as a meeting.
9    A.   Because he was contacting New Millenium,
10  and that's why it took that time.
11    Q.   Okay.  How did you know he was contacting
12  New Millenium?
13    A.   I was sitting there across from him.
14    Q.   What did he say?
15    A.   He talked to New Millenium.  I didn't pay
16  attention, but he was talking about the loan.
17    Q.   Okay.  Mr. Astudillo didn't work for New
18  Millenium, did he?
19    MR. HOFELD:  I am going to object.  I mean, I
20  think that question calls for a legal conclusion.
21  BY MR. SCHUTTE:
22    Q.   Let me rephrase it.  I would like to
23  rephrase the question.
24         Was it your understanding that

Page 82

1  Mr. Astudillo worked for the business shown on his
2  business card, Exhibit 8?
3    MR. HOFELD:  I am going to object just because
4  it's a leading question.  But she's allowed to
5  answer, obviously.
6  BY THE WITNESS:
7    A.   Well, I can answer that.  This is his
8  business.
9  BY MR. SCHUTTE:
10    Q.   Okay.  Did you have an understanding on
11  March the 16th that Mr. Astudillo worked for New
12  Millenium?
13    A.   Well, as I was hearing him talking, I
14  thought that he was an employee of New Millenium.  I
15  don't know.
16    Q.   Okay.  Why did you think he was an
17  employee of New Millenium?
18    A.   Because he was talking and doing the
19  paperwork.
20    Q.   Okay.  Do you remember anything else
21  about what was said during the meeting on March the
22  16th?
23    A.   No.
24    Q.   Okay.  Was Mr. Sanchez there for the

Page 83

1  entire 40 minutes?
2    A.   Yes.
3    Q.   During the meeting, did you talk to
4  Mr. Astudillo in Spanish or English?
5    A.   In Spanish.
6    Q.   Okay.  And when Mr. -- when you heard
7  Mr. Astudillo talking to, you believe, New
8  Millenium, was he talking in Spanish or English?
9    A.   In English.
10    Q.   Were you able to understand the English
11  that they were talking?
12    A.   I wasn't paying much attention, and he
13  was doing, like, the paperwork.
14    Q.   Okay.  What did you do while he was
15  talking to New Millenium?
16    A.   Waited to see how the case was going.
17    Q.   Did you consider going to anyone else
18  besides Mr. Astudillo?
19    A.   No.
20    Q.   During that meeting on March the 16th,
21  did Mr. Astudillo mention Long Beach Mortgage
22  Company?
23    A.   No, just New Millenium.
24    Q.   Did you give Mr. Astudillo any

Page 84

1  information during the March 16 meeting?
2    A.   About what information?
3    Q.   I am asking if you recall giving him any
4  information.
5    A.   No.
6    MR. HOFELD:  I am just going to object on
7  vagueness grounds to the last question, for the
8  record.
9  BY MR. SCHUTTE:
10    Q.   Your testimony was that you didn't give
11  him any information?
12    A.   I gave him the information for the
13  application.  That's all.
14    Q.   Right.  But you did give him information
15  for an application?
16    A.   Talking about that, yes.
17    Q.   Okay.  Can I ask you -- you can put that
18  Exhibit 8 aside.  Can you hand those to me?
19         I am going to hand you Exhibit 1.
20    MR. SCHUTTE?  Do you mind if I keep these over
21  here?
22    MR. HOFELD:  No, I don't mind.
23  BY MR. SCHUTTE:
24    Q.   I am handing you Exhibit 1 again, which

21 (Pages 81 to 84)

GUADALUPE NAVARA, JUNE 27, 2006

Page 85

1  is your affidavit.
2       In paragraph 3, you say, "During the
3  first meeting with Mr. Astudillo, I told him that I
4  needed to borrow just enough to pay off my balance
5  with First National Acceptance, which was
6  approximately 19,600."
7       Okay.  Do you see that?
8    A.   Yes.  19,000.
9    Q.   Right.  You told me earlier today that
10 you wanted to borrow enough money to pay off First
11 National Acceptance and the $6,000 that you owed to
12 Mr. Sanchez.
13   A.   Yes.  Well, we had that conversation.
14   Q.   What conversation?
15   A.   About the 9,000 and the foreclosure.
16   Q.   Okay.  Did you tell him that you wanted
17 to borrow $6,000 to pay off Mr. Sanchez?
18   A.   No.
19   Q.   Can you help me understand?  Because I
20 thought you said earlier that when you went to
21 Mr. Astudillo, you intended to borrow around
22 $25,000; $19,000 or so to pay off First National
23 Acceptance, and 6,000 to pay off Mr. Sanchez; is
24 that right?

Page 86

1    A.   No, not the conversation for the 6,000
2  for my friend Sergio.  I did not have that
3  conversation.
4    Q.   Okay.  So now it's your testimony that
5  you did not intend to borrow money to pay off
6  Mr. Sanchez?
7       MR. HOFELD:  I am going to object.  I think
8  that may mischaracterize her earlier testimony.
9  BY THE WITNESS:
10   A.   Okay.  So -- the intention -- what I went
11 to ask for the loan was to make the payoff to First
12 National Acceptance.
13 BY MR. SCHUTTE:
14   Q.   Okay.  And Mr. Sanchez -- well, strike
15 that.
16       When -- how did you intend to pay off
17 Mr. Sanchez?
18   A.   When the money from the loan was going to
19 be given to me, he did not give me a date or
20 anything.
21   Q.   Okay.  So now it's your testimony that
22 the only amount you intended to buy -- excuse me, to
23 borrow was $19,600 to pay off First National
24 Acceptance?

Page 87

1       MR. HOFELD:  Again, I am going to object.  I
2  think it mischaracterizes earlier testimony.
3       THE WITNESS:  So I answer?
4       MR. HOFELD:  Yes.
5  BY THE WITNESS:
6    A.   Okay.  Well, this 19,000 were going to be
7  paid with the 5,000, so -- no, with the 50,000.
8  BY MR. SCHUTTE:
9    Q.   I want to -- well, let's move on.
10      Is it -- your affidavit next says that
11 "He," meaning Mr. Astudillo, "said that $50,000 was
12 the minimum amount I could borrow."
13   A.   Was the minimum.
14   Q.   That's what he told you at the March --
15   A.   Yes.
16   Q.   That's what he told you at the March 16
17 meeting?
18   A.   Yes.
19   Q.   Are you sure about that?
20   A.   Yes.
21   Q.   Okay.  And then you say, "I never
22 requested any cash from my loan transaction with
23 Mr. Astudillo, New Millenium Mortgage Corporation or
24 Long Beach Mortgage Company."

Page 88

1    A.   Yes, I did say that, but he told me that
2  that was the minimum that he could borrow.
3    Q.   He told you that on March the 16th?
4    A.   Yes.
5       MR. SCHUTTE:  Let's mark this as 9, please.
6       (WHEREUPON, a certain document was
7       marked Navara Deposition Exhibit
8       No. 9, for identification, as of
9       6/27/06.)
10 BY MR. SCHUTTE:
11   Q.   I am handing you, Ms. Navara, Exhibit 9,
12 which, for the record, has the bates numbers ECL&G
13 81 through 84.
14      Could I ask you to turn to the last page
15 of this document?  And I can ask you, is that your
16 signature?
17   A.   Yes.
18   Q.   Okay.  And it was dated March the 16th,
19 2004?
20   A.   Yes.
21   Q.   Did you sign this document during your
22 40-minute meeting with Mr. Astudillo at his office?
23   A.   Yes.
24   Q.   Okay.  Did you read this document before

22 (Pages 85 to 88)

GUADALUPE NAVARA, JUNE 27, 2006

Page 89

1  you signed it?
2      A.   No.
3      Q.   Why not?
4      A.   Well, he just -- he just showed me what
5  it indicates, the page, and sign it.
6      Q.   What did he show you that it indicated?
7      A.   Well, right here, the Kostner and Drake,
8  the appraisal, and to sign it.
9      Q.   Where are you referring to when you say
10  the cost of the appraisal?
11      A.   Right here.
12      Q.   Okay.
13      MR. HOFELD:  Scott, she's looking at the top of
14  the last page, under "Assets" --
15      MR. SCHUTTE:  The "Assets And Liabilities"
16  section, for the record.
17  BY MR. SCHUTTE:
18      Q.   What else did he indicate to you on this
19  document before you signed it?
20      A.   That's it.
21      Q.   Okay.
22      A.   And to wait for the -- the closing, but
23  he never told me about the closing.
24      Q.   Okay.  Prior to today, have you ever

Page 90

1  looked at this loan application dated March the 16th
2  of 2004?
3      A.   No.
4      Q.   Okay.  On the last page, there's a
5  section 7 called "Details of Transaction."
6      A.   Where is it that you are stating?
7      MR. SCHUTTE:  May I indicate, Al?
8      MR. HOFELD:  Yes, please do.
9  BY MR. SCHUTTE:
10      Q.   Right here.
11      A.   Oh.
12      Q.   Under that section --
13      A.   Oh, yes, detail of the transaction.
14      Q.   Yes.  And in that section, just above
15  where you signed on March the 16th, the document
16  says that the amount to refinance was $17,000, the
17  estimated prepaid items, $1,748.68.
18      A.   Yes.
19      Q.   Estimated closing costs of $2,710, and
20  total cost of $21,458.68.
21      A.   Uh-huh.
22      Q.   And then down slightly lower it says that
23  the loan amount was going to be $37,000, and that
24  the cash to you was $15,541.32.

Page 91

1      A.   Okay.
2      Q.   Do you see that?
3      A.   Yes.  It's like he said, that I didn't
4  qualify, and that's why he had me to sign papers on
5  April the 29th.
6      Q.   He said -- when did he tell you that you
7  didn't qualify?
8      A.   Like, in the middle, because I was
9  waiting for the closing.  It was March the 16th.  It
10  takes, like, a month for the closing.  It was March.
11  So the following month, in April, he told me that I
12  didn't qualify.
13      Q.   Okay.
14      A.   And that's why he looked for a loan for
15  me with Long Beach.
16      Q.   Isn't it correct, Ms. Navara, that when
17  you left Mr. Astudillo's office on March the 16th,
18  you thought you were applying for a loan for
19  $37,000, and that you were going to get cash of
20  $15,541.32?
21      A.   Yes, but because he told me that it did
22  not go through -- did not pass, the mortgage.
23      Q.   I am talking about when you left the
24  meeting.  You thought you were going to get a

Page 92

1  $37,000 loan and get more than $15,500 in cash?
2      A.   That's what he told me --
3      Q.   Yes.
4      A.   -- and what it says.
5      Q.   He told you that --
6      A.   He told me that, but because afterwards
7  he said that I didn't qualify.
8      Q.   Okay.  I think we are on the same page,
9  but I want you to answer yes or no to the specific
10  question.
11          When you left Mr. Astudillo's office on
12  March 16, 2004, you thought you were trying to get
13  approval for a loan of $37,000, and cash from that
14  loan of more than $15,000?
15      MR. HOFELD:  I am going to object.  I think it
16  mischaracterizes earlier testimony.
17      THE WITNESS:  So then should I answer?
18      MR. HOFELD:  Yes.
19  BY MR. SCHUTTE:
20      Q.   It's a yes or no question.
21      A.   No.
22      Q.   What did you think you were applying for
23  when you left the meeting?
24      A.   For a loan, but he didn't mention

23 (Pages 89 to 92)

Page 93

1  anything to me until after.
2     Q.   If you will look at the second page of
3  Exhibit 9.
4     A.   Which one?
5     Q.   The second page.  That one.  The
6  information on the Liabilities side, where it says
7  "First National ACCCO."
8     A.   Acceptance, yes.
9     Q.   "Unpaid balance, $17,000."
10    A.   Yes.
11    Q.   Is that information you gave -- is that
12  information that you gave to Mr. Astudillo?
13    A.   Yes.
14    Q.   Okay.  Is the information about the First
15  Premiere, is that information that you gave to
16  Mr. Astudillo?
17    A.   Yes.
18    Q.   Okay.  And also for Capital One?
19    A.   Yes.
20    Q.   Okay.  Did you tell Mr. Astudillo about
21  the $6,000 that you owed to Mr. Sanchez?
22    A.   No.
23    Q.   Okay.  At any point, did you ever tell
24  New Millenium about the $6,000 that you owed to

Page 94

1  Mr. Sanchez?
2     A.   No.
3     Q.   Okay.  Did you ever tell Long Beach?
4     A.   No.
5     Q.   No?
6     A.   No.
7     Q.   When you -- you ultimately got a check
8  for $18,000 after the closing, correct?
9     A.   Correct.
10    Q.   And you cashed that check?
11         After some difficulty, you cashed --
12    A.   After some difficulty.  Yes.  No, he gave
13  me a check from his account.
14    Q.   Okay.  When Mr. Astudillo gave you a
15  check from his account, you cashed that check?
16    A.   Yes.  I -- yes, I did deposit it in my
17  checking account.
18    Q.   Okay.  Is that money still in your
19  checking account?
20    A.   Some money.
21    Q.   How much?
22    A.   I spent -- maybe 300.
23    Q.   Okay.  Which means that you spent
24  17,700?

Page 95

1     A.   (Witness nods head.)
2     Q.   That's a yes?
3     A.   Yes.
4     Q.   Okay.  What did you do with that money?
5     A.   I -- I live off my rents, so I spent it
6  on food and things; clothes.
7     Q.   Did you use some of it to pay back
8  Mr. Sanchez?
9     A.   Yes, I did that; the first thing I did.
10         MR. SCHUTTE:  We have to change the tape.  Why
11  don't we use this as a ten-minute break.
12         MR. HOFELD:  Sure.
13         THE VIDEOGRAPHER:  We are going off the video
14  record.  The time is 3:47 p.m.
15             (WHEREUPON, a recess was had.)
16         THE VIDEOGRAPHER:  We are back on the video
17  record.  The time is 3:59 p.m.
18  BY MR. SCHUTTE:
19    Q.   I thought I understood your testimony
20  earlier to be that sometime after the March 16
21  meeting, Mr. Astudillo told you that you didn't
22  qualify for a loan.
23    A.   Yes.
24    Q.   Did you have an understanding as to who

Page 96

1  Mr. Astudillo was trying to get financing from?
2     A.   He didn't mention it to me.
3     Q.   Okay.  When is the first time that you
4  found out that your loan was going to be from Long
5  Beach?
6     A.   On April 29.
7     Q.   Okay.  When Mr. Astudillo -- strike that.
8         You said in your affidavit that
9  Mr. Astudillo told you on March 16 that $50,000 was
10  the minimum amount you could borrow?
11    A.   Yes.
12    Q.   He told you that on March the 16th?
13    A.   I am going to change that.  No.
14    Q.   When did he tell you that?
15    A.   When I signed the papers, on April 29.
16    Q.   So the affidavit line that said that
17  $50,000 was the minimum amount you could borrow,
18  that he told you that on March 16, that was wrong?
19    A.   About the 50,000?
20    Q.   Yes.
21    A.   Yes, because when he told me that I
22  didn't qualify, I didn't pay attention to it.
23    Q.   Did you have any contact with
24  Mr. Astudillo between March 16 and April 29?

GUADALUPE NAVARA, JUNE 27, 2006

Page 97

1    A.    Yes.
2    Q.    How many times did you speak with him?
3    A.    I called him because he was taking too
4  long on the loan, and that's when he told me that I
5  didn't qualify.
6    Q.    When --
7    A.    And -- I didn't qualify, and that he
8  looked for another loan, and to go and to sign the
9  papers.
10   Q.    When did you have that conversation?
11   A.    On the 16th -- like a month.
12   Q.    So the middle of April?
13   A.    Yes.
14   Q.    Okay.  Did you talk to Mr. Astudillo
15 after the conversation in the middle of April and
16 the closing on April 29?
17   A.    Yes, I did talk to him.
18   Q.    What did you talk about in that
19 conversation?
20   A.    That's when he told me to go sign the
21 papers.
22   Q.    Did he tell you anything else, other
23 than, "Come to my office to sign the papers"?
24   A.    I don't remember.

Page 98

1    Q.    Okay.  In the conversation that --
2    A.    No.
3    Q.    In the conversation that he told you that
4  you didn't qualify, do you remember him telling you
5  anything else?
6    A.    No, I don't remember.
7    Q.    Okay.  We are going to talk now about the
8  closing.
9         The closing took place at Mr. Astudillo's
10 office?
11   A.    Yes.
12   Q.    The only people that were there were you,
13 Mr. Astudillo, and Mr. Sanchez?
14   A.    Yes.
15   Q.    How long were the three of you together?
16   A.    For -- until I finished signing the
17 papers.
18   Q.    How long did that take?
19   A.    I am going to say some 20 minutes.
20   Q.    Other than signing the papers, do you
21 recall having any conversations with Mr. Astudillo
22 on April the 29th?
23   A.    Yes.  I called him, and I told him what
24 was -- what was happening with the loan.

Page 99

1    Q.    I am talking about only on the 29th.
2    A.    On the 29th?  When he called me to go and
3  sign the papers, that's it.
4    Q.    Okay.  On the 29th he had you sign all
5  the papers?
6    A.    Yes.
7    Q.    Do you remember him telling you anything
8  else?
9    A.    That he was going to call me when the
10 closing was going to be.
11   Q.    The closing was on April --
12   A.    But he never called me.
13   Q.    The closing was on April the 29th?
14   A.    When I signed the papers.
15   Q.    Yes.  You spent 20 minutes with him on
16 April the 29th?
17   A.    Or less.
18   Q.    All right.  Other than signing the
19 papers, did you discuss anything with Mr. Astudillo
20 on the 29th?
21   A.    No.
22        MR. HOFELD:  I am just going to object on
23 vagueness grounds.
24 BY MR. SCHUTTE:

Page 100

1    Q.    Did Mr. Sanchez say anything on April the
2  29th?
3    A.    No, he didn't say anything.
4    Q.    Okay.  You say in your affidavit that at
5  the closing on April 29, Mr. Astudillo told you for
6  the first time that you were going to get $25,000
7  from the transaction.
8    A.    That's what he told me.
9    Q.    What was your reaction?
10   A.    I said, well, that was good, because I
11 didn't expect it.
12        MR. HOFELD:  I'm sorry, I didn't hear the
13 answer.  Could you read it back?
14        (WHEREUPON, the record was read by
15         the reporter.)
16        MR. HOFELD:  Okay.  Thanks.
17 BY MR. SCHUTTE:
18   Q.    You thought it was good that you were
19 going to get $25,000 more?
20   A.    Well, yes.  I wasn't expecting it.  I
21 just wanted to do the payoff.
22   Q.    Do I understand correctly that the fact
23 that the loan was more than you thought it was going
24 to be was not something that you were upset with?

25 (Pages 97 to 100)

GUADALUPE NAVARA, JUNE 27, 2006

Page 101

1    A.   No.  The only thing that I had mentioned
2 to him; that I was going to pay 100,000 -- what is
3 that called -- what is it called, taxes or something
4 like that?  Interest.
5    Q.   I see.
6    A.   In interest.
7    Q.   You only became concerned later when you
8 found out that you weren't going to get the whole
9 $25,000, and he was going to keep some?
10    A.   Oh, I got pretty upset.
11    Q.   About him keeping the $8,000?
12    A.   Well, yes.
13    Q.   Okay.  But you didn't get upset about the
14 fact the loan was bigger?
15    A.   No.
16    Q.   Okay.  In your affidavit, you say,
17 "Mr. Astudillo called me several days later to tell
18 me to come to his office and pick up the check."
19    A.   After April 29 --
20    Q.   Yes.
21    A.   -- he called me to go to get the check.
22    Q.   Before he called you, had you read the
23 loan application, the one we have marked as
24 Exhibit 4?

Page 102

1    A.   This one?
2    Q.   Yes.
3    A.   This, no.
4    Q.   Okay.  What happened after he called you
5 and told you to come and pick up the check?
6    A.   I went to pick up the check, and that's
7 when I knew that it was for 18,000.  And I asked him
8 why, and he said that because I was in foreclosure.
9    Q.   Okay.  By the way, do you have a car?
10    A.   No, not right now.
11    Q.   How do you get -- how did you get back
12 and forth to Mr. Astudillo's office?
13    A.   It's like a block away.
14    Q.   Oh.
15    A.   Yes.
16    Q.   So his office is roughly 26th and
17 Kostner?
18    A.   Right.
19    Q.   Okay.  The check that he gave you when
20 you went to his office was for $18,000?
21    A.   Yes.
22    Q.   Okay.  Was it made out to you?
23    A.   No.
24    Q.   Who was it made out to?

Page 103

1    A.   To ACS.
2    Q.   Okay.
3    A.   Astudillo Consulting Services.
4    Q.   Do you remember anything else he said to
5 you, other than that that's the way we do business
6 because we are in foreclosure?
7    A.   No.  No.  Not besides that, no.
8    MR. SCHUTTE:  Let's go off the record for a
9 minute.
10    THE VIDEOGRAPHER:  Going off the video record.
11 The time is 4:12 p.m.
12        (WHEREUPON, discussion was had off
13         the record.)
14    THE VIDEOGRAPHER:  Back on the video record.
15 The time is 4:13 p.m.
16 BY MR. SCHUTTE:
17    Q.   When you left Mr. Astudillo's office, did
18 you take the check for $18,000 with you?
19    A.   Yes.
20    Q.   When did you try to cash that check?
21    A.   About five days later --
22    Q.   Okay.
23    A.   -- more or less.
24    Q.   Before you tried to cash the check, did

Page 104

1 you call New Millenium?
2    A.   Yes.
3    Q.   Okay.  And that's when you spoke to
4 Antoinette?
5    A.   Yes.
6    Q.   Okay.  How did you get the phone number
7 for New Millenium?
8    A.   Astudillo gave it to me; Roger.
9    Q.   Gave it to you?
10    A.   Yes.
11    Q.   And when you called her, she said that he
12 was on vacation, Mr. Astudillo?
13    A.   Yes.
14    Q.   And then you tried to cash the check?
15    A.   Yes.
16    Q.   Okay.  What happened when you tried to
17 cash the check?
18    A.   They wouldn't cash it because it was not
19 under my name.
20    Q.   What happened next?
21    A.   I talked to Astudillo.
22    Q.   When was that?
23    A.   Maybe the same day or two days -- or the
24 following day.

26 (Pages 101 to 104)

GUADALUPE NAVARA, JUNE 27, 2006

Page 105

1    Q.   After you tried to cash it?
2    A.   Yes.
3    Q.   So let's see if I have the time right --
4  time line right on this.  The closing was on
5  April 29.
6    A.   Yes.
7    Q.   He called you about five days later to
8  come pick up the check?
9    A.   Yes.
10   Q.   Okay.  Yet, you then waited another five
11 days before you tried to cash it?
12   A.   Yes.
13   Q.   Okay.  And then how long after that
14 did he -- strike that.
15       At some point did you go with
16 Mr. Astudillo to try to cash the check?
17   A.   When I told him that they didn't want to
18 cash it, we went to his bank, and they did not want
19 to cash it either.
20   Q.   Why not?
21   A.   Because it was under ACS.
22       MR. HOFELD:  Ms. Navara, can you wait to answer
23 until the translator translates the question?  Okay.
24 BY MR. SCHUTTE:

Page 106

1    Q.   Okay.  And then what do you recall
2  happened next?
3    A.   Well, after that, he called me to go get
4  the check -- for the other check.
5    Q.   And what was that check -- who was that
6  check made out to?
7    A.   To me, my name.
8    Q.   Okay.  And did you cash that check?
9    A.   Yes.
10   Q.   Okay.  Who made -- the check that you
11 cashed, who was that from?
12   A.   It was from Astudillo account.
13 Astudillo.
14   Q.   Okay.  Between the time that you picked
15 up the check from Mr. Astudillo to you and when you
16 saw him at the federal building on May the 10th,
17 2005, had you had any contact with Mr. Astudillo?
18   A.   At that time he -- I am going to tell it
19 in Spanish.  He told me to pass by his office; that
20 he would like to speak to me.
21   Q.   Was that before or after the lawsuit was
22 filed?
23   A.   On May the 10th.  No, the following day.
24   Q.   May the 11th, 2005?

Page 107

1    A.   Yes.
2    Q.   Did you do that?
3    A.   Like what?
4    Q.   Go pass by his office the next day?
5    A.   Yes, I did pass by to see.
6    Q.   And did you talk to him?
7    A.   Yes.
8    Q.   What did you discuss?
9    A.   He told me that he could give me back,
10 like, 5,000 some, but that's all, and I said no.
11   Q.   So he offered to give you 5,000 of the
12 8,000 back?
13   A.   Uh-huh.
14   Q.   And you said no?
15   A.   No.
16   Q.   Why did you say no?
17   A.   Because my case was already in court.
18   Q.   What is it, Ms. Navara, that you hope to
19 obtain from this lawsuit?
20   A.   Well, in one part, my money has been
21 stolen, and I want justice and I want my money.
22   Q.   Okay.  Who stole your money?
23   A.   Well, Astudillo, because I made the deal
24 with him.

Page 108

1        (WHEREUPON, a certain document was
2        marked Navara Deposition Exhibit
3        No. 10, for identification, as of
4        6/27/06.)
5  BY MR. SCHUTTE:
6    Q.   Ms. Navara, I am going to hand you what
7  we have marked as Exhibit 10.  This is a document
8  that's been provided to me by your lawyer in this
9  lawsuit, okay.
10       At the end of the document, there's a
11 two-page letter from the law firm of Edelman, Combs,
12 Latturner & Goodwin --
13   A.   Yes.
14   Q.   -- to Long Beach and Washington Mutual.
15 Do you see that?
16   A.   Yes.
17   Q.   Okay.  In the first paragraph,
18 Mr. Edelman --
19   A.   Which one is it?  Wait.
20   Q.   The paragraph that says, "Please be
21 advised."
22   A.   Yes.
23   Q.   "Please be advised that we have been
24 retained by the above client to file suit against

27 (Pages 105 to 108)

GUADALUPE NAVARA, JUNE 27, 2006

Page 109

1   you, and that we claim a lien upon said recovery for
2   one-third or such amount as a court awards."
3       A.   Okay.
4       Q.   Did you have a written agreement with
5   your law firm?
6       A.   When they got the case?
7       Q.   Yes.
8       A.   Yes.
9       Q.   Does that agreement provide that they get
10  one-third of what they recover?
11      MR. HOFELD:  Scott, I am going to object,
12  privileged grounds to what the agreement says.
13      MR. SCHUTTE:  The agreement?
14      MR. HOFELD:  Yes.
15      MR. SCHUTTE:  You are taking the position that
16  the agreement is privileged?
17      MR. HOFELD:  I think at least part of it is.
18  If you are going -- I mean, if you are going to
19  limit your questions to the fee arrangement, I could
20  allow -- I could allow that.  But I think -- I
21  definitely think there are major portions of the
22  retainer agreement that are privileged.
23      MR. SCHUTTE:  Have you produced a redacted
24  copy?  I don't think you have.

Page 110

1       MR. HOFELD:  I don't think you guys requested
2   it at all in any of your requests.
3       MR. SCHUTTE:  We are, obviously, going to do
4   that because I think it goes to some of the class
5   certification factors.
6       MR. HOFELD:  I don't mind if you ask about the
7   fee arrangement.
8       MR. SCHUTTE:  I am, frankly, not sure whether
9   you were able to answer my question, so let me ask
10  it again, please.
11  BY MR. SCHUTTE:
12      Q.   Is it your understanding that
13  Mr. Hofeld's firm will be entitled to one-third of
14  any amount that they recover for you?
15      A.   Yes.
16      Q.   Okay.  Are you paying them anything other
17  than that?
18      A.   No.
19      Q.   Fine.  Are you paying any of the costs
20  associated with this lawsuit?
21      A.   No.
22      Q.   Okay.  In the next paragraph of the
23  letter we were looking at, it starts, "You are
24  further notified" -- do you see that?  "You are

Page 111

1   further notified that our client elects to cancel
2   the above loan."
3       Is that what you elected to do, is to try
4   to cancel the loan?
5       A.   No.
6       Q.   You don't want to cancel the loan?
7       A.   Oh, yes, I want to.
8       Q.   Why did you answer the question no the
9   first time?
10      A.   Because I was confused.
11      Q.   Okay.  So your answer is that you do want
12  to try to cancel the loan?
13      A.   Yes.  To dismiss it, right?  Yes.
14      Q.   To cancel the loan?
15      A.   Yes.
16      Q.   If we could -- could I see that document,
17  please?
18      Also attached to Exhibit 10 is a letter
19  from some other attorneys for Long Beach to
20  Mr. Hofeld.  I am going to show you that page.
21      A.   Uh-huh.
22      Q.   Okay.  It's a two-page -- actually, it's
23  a three-page letter.  And my first question is
24  whether you have ever seen this letter before.

Page 112

1       MR. HOFELD:  I'm sorry.  Scott, this is the
2   February 11, 2005 letter?
3       MR. SCHUTTE:  That's right.
4       MR. HOFELD:  Okay.
5   BY THE WITNESS:
6       A.   Yes.
7   BY MR. SCHUTTE:
8       Q.   Okay.  When did you see this letter?
9       A.   It had to be, like, two days; like the
10  12th.
11      Q.   Of February?
12      A.   Yes.
13      Q.   In 2005?
14      A.   Yes.
15      Q.   So you are aware that lawyers for Long
16  Beach believed they had uncovered evidence
17  suggesting that the mortgage broker or you may have
18  perpetrated fraud or engaged in misrepresentations
19  to Long Beach in connection with the origination of
20  the loan?  You were aware of that?
21      A.   No.
22      Q.   You weren't aware that --
23      A.   About what?
24      Q.   You weren't aware that Long Beach was --

28 (Pages 109 to 112)

## Page 113

1 had believed they had uncovered evidence of fraud?
2    A.   I do not know about that.
3    Q.   Okay.
4    MR. SCHUTTE:  Let's mark this as Exhibit 11.
5         (WHEREUPON, a certain document was
6         marked Navara Deposition Exhibit
7         No. 11, for identification, as of
8         6/27/06.)
9 BY MR. SCHUTTE:
10   Q.   Mrs. Navara, I am going to hand you what
11 we have marked as Exhibit 11.  For the record, it is
12 a one-page document labelled LBM 0097.
13   A.   Uh-huh.  Yes.
14   Q.   Have you ever seen this document before?
15   A.   Yes.
16   Q.   When did you first see it?
17   A.   When my attorney sent me the papers.
18   Q.   When was that?
19   A.   It had to be at the end of 2004.  I can't
20 recall very well.
21   Q.   Is that your signature on Exhibit 11?
22   A.   It looks like my signature.
23   Q.   Do you remember signing this document?
24   A.   I don't remember this.

## Page 114

1    Q.   It's dated April the 26th of 2004.  Do
2 you see that?
3    A.   This is not my handwriting.
4    Q.   But you believe it's your signature?
5    A.   I believe it's my signature, but I am not
6 sure.
7    Q.   Do you see that at the bottom of the
8 letter, just above your signature, there is a phone
9 number?
10   A.   Yes.
11   Q.   Is the 762-0685 in your handwriting?
12   A.   Yes.
13   Q.   Was it true, Ms. Navara, that as of April
14 the 26th, 2004, that you owed money to ACS
15 Consulting for professional services that you have
16 not paid?
17   A.   No.
18   Q.   Okay.  The phone number, (773) 762-0685,
19 is that the --
20   A.   That's my phone number.
21   Q.   Okay.
22   MR. HOFELD:  Do you guys mind if we take a
23 one-minute break?
24   MR. SCHUTTE:  Sure.

## Page 115

1    THE VIDEOGRAPHER:  Going off the video record.
2 The time is 4:33 p.m.
3         (WHEREUPON, a recess was had.)
4         (WHEREUPON, certain documents were
5         marked Navara Deposition Exhibit
6         Nos. 12 - 14, for identification, as
7         of 6/27/06.)
8    THE VIDEOGRAPHER:  Back on the video record.
9 The time is 4:41 p.m.
10 BY MR. SCHUTTE:
11   Q.   Ms. Navara, this is Exhibit 12.  For the
12 record, it's a one-page document bates labelled
13 LBM 0098.  It appears to be a letter dated April 26,
14 2004.
15        Is that your signature at the bottom of
16 this letter?
17   A.   Yes.
18   Q.   The letter states, "This letter is to
19 explain that I," meaning you, "have not used any
20 other name but Guadalupe Navara.  I have never been
21 known by any other name."
22        Do you remember signing this document?
23   A.   Yes.
24   Q.   Where did you sign this document?

## Page 116

1    A.   At his office.
2    Q.   On what date?
3    A.   But I don't remember the day.
4    Q.   Could it have been April the 26th?
5    A.   Don't know.
6    Q.   So you were at his office at least one
7 time between March the 16th and April the 29th?
8    MR. HOFELD:  I am going to object.  I think
9 that mischaracterizes testimony.
10 BY MR. SCHUTTE:
11   Q.   Can you answer the question?
12   A.   Okay.  Yes.
13   Q.   You don't remember when?
14   A.   The date -- this is -- the month -- the
15 "26th," that's not my handwriting.
16   Q.   I understand that.  But the signature is
17 yours?
18   A.   That's mine.
19   Q.   Right.  And you remember signing your
20 name to this note?
21   A.   Yes.
22   Q.   Okay.  But you just don't remember when?
23   A.   No.
24   Q.   But you did do it at Mr. Astudillo's

29 (Pages 113 to 116)

GUADALUPE NAVARA, JUNE 27, 2006

Page 117

1  office?
2      A.    Yes.
3      Q.    And the handwriting of the letter itself
4  is not yours?
5      A.    Is not, no.
6      Q.    Do you know whose it is?
7      A.    Astudillo, I believe.
8      Q.    Okay.  We have marked as Exhibit 13 a
9  one-page document that, for the record, has the
10 bates label LBM 0095.
11          Have you ever seen this document before?
12     A.    Yes.
13     Q.    When did you first see it?
14     A.    After April 29.
15     Q.    You saw it for the first time after the
16 closing?
17     A.    Yes.
18     Q.    Do you remember how it was that you saw
19 it?
20     A.    Well, when I was checking all the papers.
21     Q.    When was it that you were checking all
22 the papers?
23     A.    After April 29.  I don't remember the
24 exact day.

Page 118

1      Q.    Okay.  Well, in that time frame we talked
2  about earlier, it was approximately five days
3  between the closing on April the 29th and when
4  Mr. Astudillo called you to come pick up the checks?
5      A.    Yes.
6      Q.    All right.  Did you see this document,
7  Exhibit 13, before or after you went to
8  Mr. Astudillo's office to pick up the checks -- the
9  check?
10     A.    After the check?  Yes, after the check.
11     Q.    And that was the first time you saw it?
12     A.    Yes.
13     Q.    Do you know who Saul Carrera is?
14     A.    No.
15     Q.    To your knowledge, Ms. Navara, was it
16 true that ACS offered to you a settlement of $24,000
17 to resolve your account with them?
18     A.    Not with him; with the mortgage.
19     Q.    What do you mean, "With the mortgage"?
20     A.    That I was going to get this money for
21 the mortgage.
22     Q.    Other than assisting you with the
23 refinance of your loan, have you ever done any
24 business with Mr. Astudillo?

Page 119

1      A.    No.
2      Q.    Okay.  Was the first time you met him on
3  March the 16th, 2004?
4      A.    Yes.
5      Q.    Okay.  We have marked as Exhibit 14 a
6  one-page document with the bates label ECL&G 36.
7  And I will represent to you, Ms. Navara, that that's
8  a document that your attorneys have provided to us.
9      A.    Uh-huh.
10     Q.    Is that your signature on this document?
11     A.    Yes.
12     Q.    Okay.  When did you sign this document?
13     A.    Now, this is the thing that I don't
14 remember.
15     Q.    You don't remember when you signed it?
16     A.    No.
17     Q.    You may have to turn the document upside
18 down to see this.  But this document was faxed
19 either to or from New Millenium on April the 29th.
20     A.    Oh, okay.  Maybe.
21     Q.    Okay.  So you believe that you may have
22 signed this document sometime on or before April 29?
23     A.    Okay.  The first paper was -- in my
24 papers wasn't signed.

Page 120

1      Q.    Okay.  But this one is signed, isn't it?
2      A.    I don't know how they did it, but no.
3  But the paper that I had, it wasn't signed.  I
4  didn't sign anything.
5      Q.    Okay.  But you testified already that
6  you, in fact -- you signed Exhibit 14.
7      A.    Which one, this one?
8      Q.    Yes.
9          MR. HOFELD:  Exhibit 14.
10 BY THE WITNESS:
11     A.    Yes.
12 BY MR. SCHUTTE:
13     Q.    Okay.  You just don't remember when?
14     A.    No, I don't remember.
15     Q.    But it would have been before April the
16 29th?
17         MR. HOFELD:  I am going to object.  I think
18 that mischaracterizes testimony or assumes facts not
19 in evidence.
20 BY THE WITNESS:
21     A.    Uh-huh.
22 BY MR. SCHUTTE:
23     Q.    That's yes?
24     A.    I don't remember about this, because the

30 (Pages 117 to 120)

GUADALUPE NAVARA, JUNE 27, 2006

## Page 121

1  one that I have -- that I had wasn't signed.
2     Q.   I am not asking about the one that wasn't
3  signed; I am asking about the one that is signed.
4        Do you have any explanation, Ms. Navara,
5  as to how it was that your signature came to appear
6  on a document that was faxed to or from New
7  Millenium on April the 29th?
8     A.   I don't know how.
9     Q.   Okay.
10    A.   No.
11    Q.   Did you ever try to call Mr. Carrera at
12  ACS?
13    A.   No, because I don't know him. I don't
14  know how to call. I didn't know how to call.
15    MR. SCHUTTE: Can we go off the record for one
16  minute?
17    MR. HOFELD: Sure.
18    THE VIDEOGRAPHER: Going off the video record.
19  The time is 4:51 p.m.
20       (WHEREUPON, a recess was had.)
21    THE VIDEOGRAPHER: Back on the video record.
22  The time is 4:53 p.m.
23  BY MR. SCHUTTE:
24    Q.   Ms. Navara, in order to assist both your

## Page 122

1  attorney and us in determining whether some of the
2  signatures on these documents are yours, we would
3  like to get examples of your handwriting. I have
4  discussed this with your attorney in the hall, and
5  if he has an objection, he will so state. But what
6  we would like to have you do is to write your name
7  five times and then your phone number five times on
8  this document, and then we will make it an exhibit.
9        Are you able to write okay with your --
10    A.   Well, it's slow, but I can.
11    MR. HOFELD: What did you say, it's slow? I'm
12  sorry, I didn't hear.
13    THE WITNESS: Very slow.
14    MR. HOFELD: Okay.
15    THE WITNESS: (Witness complies).
16    MR. SCHUTTE: Please mark this as Exhibit 15.
17       (WHEREUPON, a certain document was
18        marked Navara Deposition Exhibit
19        No. 15, for identification, as of
20        6/27/06.)
21    MR. HOFELD: Will you make a copy for me before
22  we leave?
23    MR. SCHUTTE: Yes.
24    MR. HOFELD: That would be great.

## Page 123

1     MR. SCHUTTE: We will make two copies and let
2  the court reporter take the original.
3     MR. HOFELD: Honestly, I don't know what the
4  condition is with her hand. I don't know if you
5  want to ask her a couple questions on the record.
6     MR. SCHUTTE: Yes.
7     MR. HOFELD: And then if you do, I can always
8  on redirect.
9     MR. SCHUTTE: I will ask her.
10    MR. HOFELD: Okay.
11  BY MR. SCHUTTE:
12    Q.   Mrs. Navara, I see that you have a guard
13  on your hand. Is that for carpal tunnel?
14    A.   No, this is -- no. This is another
15  accident. I went to the hospital, and by mistake
16  they cut the nerve that controls the -- over here
17  (Indicating), on this side.
18    Q.   When did that accident occur?
19    A.   This was on October 9, 2003.
20    Q.   Okay. Is your -- with respect to that
21  injury, is your hand in about the same condition now
22  as it was in March and April of 2004?
23    A.   The way I sign very slow, yes.
24    Q.   Okay.

## Page 124

1     A.   The same.
2     MR. SCHUTTE: Well, then we are going to close
3  the deposition for today and try to find a time to
4  reschedule to conclude.
5     THE VIDEOGRAPHER: Going off the video record.
6  The time is 5:00 o'clock p.m.
7        (WHEREUPON, the deposition was
8         adjourned sine die.)

31 (Pages 121 to 124)

GUADALUPE NAVARA, JUNE 27, 2006

Page 125

1  STATE OF ILLINOIS   )
2                     ) SS:
3  COUNTY OF DU PAGE  )
4        I, LISA O'BRIEN ZURAWSKI, a Notary Public
5  within and for the County of Du Page State of
6  Illinois, and a Certified Shorthand Reporter of said
7  state, do hereby certify:
8        That previous to the commencement of the
9  examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12        That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction
15  and constitutes a true record of the testimony given
16  and the proceedings had;
17        That the said deposition was taken before
18  me at the time and place specified;
19        That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in the
23  outcome of this action.
24

Page 126

1        IN WITNESS WHEREOF, I do hereunto set my
2  hand and affix my seal of office at Chicago,
3  Illinois, this 10th day of July, 2006.
4
5
6        Notary Public, DuPage
7        County, Illinois.
8        My commission expires 7/26/06.
9
10
11  C.S.R. Certificate No. 84-3822.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 127

1            I N D E X
2  WITNESS                    EXAMINATION
3  GUADALUPE NAVARA
4  By Mr. Schutte                4
5
6          E X H I B I T S
7  NUMBER                      PAGE
8  Navara Deposition Exhibit

9  No. 1                      14
10  No. 2                      18
11  No. 3                      20
12  No. 4                      33
13  Nos. 5 - 7                  59
14  No. 8                      76
15  No. 9                      88
16  No. 10                    108
17  No. 11                    113
18  Nos. 12 - 14               115
19  No. 15                    122
20
21
22
23
24

32 (Pages 125 to 127)