# Exhibit 1, Part 2

GUADALUPE NAVARA - JULY 14, 2006

Page 128

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF ILLINOIS
3                EASTERN DIVISION
4
5   GUADALUPE NAVARA,              )
6       Plaintiff,                )
7       vs.                       ) No. 05 C 0864
8   LONG BEACH MORTGAGE COMPANY;   )
9   WASHINGTON MUTUAL BANK, FA;    )
10  NEW MILLENIUM MORTGAGE CORPORATION;)
11  ROGELIO A. ASTUDILLO, a/k/a    )
12  ROGER ASTUDILLO,              )
13      Defendants.               )
14
15
16       July 14, 2006
17       10:31 a.m.
18
19       The videotaped deposition of
20  GUADALUPE NAVARA resumed pursuant to adjournment
21  at Suite 4000, One IBM Plaza, Chicago, Illinois.
22
23
24

Page 129

1   PRESENT:
2       EDELMAN, COMBS, LATTURNER & GOODWIN, LLC,
3       (120 South LaSalle Street, 18th Floor,
4       Chicago, Illinois 60603,
5       312-739-4200), by:
6       MR. AL HOFELD, JR.,
7          appeared on behalf of the Plaintiff;
8       JENNER & BLOCK, LLP,
9       (One IBM Plaza,
10      330 North Wabash Avenue, Suite 4000,
11      Chicago, Illinois 60611,
12      312-222-9350), by:
13      MR. SCOTT T. SCHUTTE,
14      MS. BETHANY K. BIESENTHAL,
15         appeared on behalf of the Defendants.
16
17  ALSO PRESENT:
18      MS. CARINA JULIAN, Interpreter,
19      Atlas Language Services, Inc.;
20      MR. NOAH CARNEY, Legal Videographer,
21      Esquire Deposition Services.
22
23  REPORTED BY: NANCY A. GUIDOLIN, C.S.R.,
24      Certificate No. 84-2531.

Page 130

1      THE VIDEOGRAPHER: Going on the video record
2   at 10:31 a.m. Here continues the videotaped
3   deposition of Guadalupe Navara.
4          CARINA JULIAN,
5   having been previously sworn to interpret the
6   questions put to the witness from English into
7   Spanish language and the answers of the witness
8   from Spanish into English.
9          GUADALUPE NAVARA,
10  called as a witness herein, having been previously
11  duly sworn and having testified, was examined and
12  testified through the interpreter as follows:
13          EXAMINATION (Resumed)
14  BY MR. SCHUTTE:
15      Q.   Good morning, Ms. Navara.
16      A.   Good morning.
17      Q.   Do you understand that you are still
18  under oath from the first day of your deposition?
19      A.   Yes.
20      Q.   All right. And you have an obligation
21  to tell the truth?
22      A.   Yes.
23      Q.   Okay. You were first deposed on June
24  the 27th. Other than your attorney have you

Page 131

1   discussed your deposition of June the 27th with
2   anyone since then?
3      A.   No.
4      Q.   Have you spoken with Sergio Sanchez
5   since June 27th?
6      A.   Yes.
7      Q.   Have you discussed the deposition with
8   him?
9      A.   No.
10     Q.   Have you discussed the lawsuit with
11  him?
12     A.   Just mentioned it. That's it.
13     Q.   Okay. Since the last deposition?
14     A.   No, no. Before, prior.
15     Q.   Thank you. Do you know what
16  Mr. Sanchez' address is?
17     A.   2715 South Kostner.
18     Q.   Do you know his phone number?
19     A.   312-9 -- I don't remember it very well.
20  609-6573.
21     Q.   Your understanding is that Mr. Sanchez
22  resides currently at 2715 South Kostner?
23     A.   Yes.
24     Q.   Is 2715 South Kostner -- that's your

1 (Pages 128 to 131)

GUADALUPE NAVARA - JULY 14, 2006

Page 128

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ILLINOIS
3    EASTERN DIVISION
4
5    GUADALUPE NAVARA,        )
6        Plaintiff,        )
7    vs.        ) No. 05 C 0864
8    LONG BEACH MORTGAGE COMPANY;    )
9    WASHINGTON MUTUAL BANK, FA;    )
10   NEW MILLENIUM MORTGAGE CORPORATION;)
11   ROGELIO A. ASTUDILLO, a/k/a    )
12   ROGER ASTUDILLO,        )
13       Defendants.    )
14
15
16       July 14, 2006
17       10:31 a.m.
18
19       The videotaped deposition of
20   GUADALUPE NAVARA resumed pursuant to adjournment
21   at Suite 4000, One IBM Plaza, Chicago, Illinois.
22
23
24

Page 129

1    PRESENT:
2    EDELMAN, COMBS, LATTURNER & GOODWIN, LLC,
3    (120 South LaSalle Street, 18th Floor,
4    Chicago, Illinois 60603,
5    312-739-4200), by:
6    MR. AL HOFELD, JR.,
7       appeared on behalf of the Plaintiff;
8    JENNER & BLOCK, LLP,
9    (One IBM Plaza,
10   330 North Wabash Avenue, Suite 4000,
11   Chicago, Illinois 60611,
12   312-222-9350), by:
13   MR. SCOTT T. SCHUTTE,
14   MS. BETHANY K. BIESENTHAL,
15      appeared on behalf of the Defendants.
16
17   ALSO PRESENT:
18   MS. CARINA JULIAN, Interpreter,
19   Atlas Language Services, Inc.;
20   MR. NOAH CARNEY, Legal Videographer,
21   Esquire Deposition Services.
22
23   REPORTED BY: NANCY A. GUIDOLIN, C.S.R.,
24   Certificate No. 84-2531.

Page 130

1    THE VIDEOGRAPHER: Going on the video record
2    at 10:31 a.m. Here continues the videotaped
3    deposition of Guadalupe Navara.
4    CARINA JULIAN,
5    having been previously sworn to interpret the
6    questions put to the witness from English into
7    Spanish language and the answers of the witness
8    from Spanish into English.
9    GUADALUPE NAVARA,
10   called as a witness herein, having been previously
11   duly sworn and having testified, was examined and
12   testified through the interpreter as follows:
13       EXAMINATION (Resumed)
14   BY MR. SCHUTTE:
15       Q.   Good morning, Ms. Navara.
16       A.   Good morning.
17       Q.   Do you understand that you are still
18   under oath from the first day of your deposition?
19       A.   Yes.
20       Q.   All right. And you have an obligation
21   to tell the truth?
22       A.   Yes.
23       Q.   Okay. You were first deposed on June
24   the 27th. Other than your attorney have you

Page 131

1    discussed your deposition of June the 27th with
2    anyone since then?
3        A.   No.
4        Q.   Have you spoken with Sergio Sanchez
5    since June 27th?
6        A.   Yes.
7        Q.   Have you discussed the deposition with
8    him?
9        A.   No.
10       Q.   Have you discussed the lawsuit with
11   him?
12       A.   Just mentioned it. That's it.
13       Q.   Okay. Since the last deposition?
14       A.   No, no. Before, prior.
15       Q.   Thank you. Do you know what
16   Mr. Sanchez' address is?
17       A.   2715 South Kostner.
18       Q.   Do you know his phone number?
19       A.   312-9 -- I don't remember it very well.
20   609-6573.
21       Q.   Your understanding is that Mr. Sanchez
22   resides currently at 2715 South Kostner?
23       A.   Yes.
24       Q.   Is 2715 South Kostner -- that's your

1 (Pages 128 to 131)

GUADALUPE NAVARA - JULY 14, 2006

Page 132

1 address, isn't it?
2    A.  Yes.
3    Q.  Okay.  Mr. Sanchez lives in your house?
4    A.  Yes.
5    Q.  Does he live in the coach house?
6    A.  Yes.
7    Q.  When did Mr. Sanchez move into the
8 coach house?
9    A.  In the '90s.  He lives with me.
10    Q.  And he has lived with you since the
11 1990s?
12    A.  I have known him since that time.
13    Q.  Okay.  But how long has he lived in the
14 coach house with you?
15    A.  From that time about.
16    Q.  Okay.  Does he pay rent?
17    A.  Well, he pays 60 plus he helps me to do
18 work.
19    Q.  Do you pay him when he helps you do
20 work?
21    A.  No.
22    Q.  Okay.  Is the work that he does work on
23 the apartment building?
24    A.  Yes.

Page 133

1    Q.  During 2005, Ms. Navara, did anyone
2 besides Mr. Sanchez do work on the apartment
3 building?
4    A.  2005?  No.
5    Q.  Mr. Sanchez was the only one who did
6 work on the apartment building?
7    A.  Yes.
8    Q.  Does that work include cleaning and
9 maintenance?
10    A.  Well, he helps me with things, but he
11 is not an expert.
12    Q.  Can you give me an example of the sort
13 of things that he helps you with on the apartment
14 building?
15    A.  Yes.  Let me see.  If a water pipe
16 burst --
17    Q.  Right.
18    A.  -- he will fix it.
19    Q.  When is the last time a water pipe
20 burst in the apartment?
21    A.  No.  It's been a long time, a long
22 time.
23    Q.  Okay.  I am going to show you what we
24 have marked last time during your deposition as

Page 134

1 Exhibit 6.
2    MR. HOFELD:  Is this an additional copy?
3    MR. SCHUTTE:  Yes.
4    MR. HOFELD:  Okay.  Thanks.
5    MR. SCHUTTE:  I am trying to be courteous and
6 helpful.
7    MR. HOFELD:  I appreciate it very much.
8 BY MR. SCHUTTE:
9    Q.  And, Ms. Navara, if you could turn to
10 the page that is numbered 142 in the lower right
11 corner.
12    A.  Okay.
13    Q.  Do you see in -- step back.
14       This is a document that we looked at
15 during your last deposition.  Do you remember
16 that?
17    A.  Yes.
18    Q.  Okay.  And the column under
19 "Properties" marked A --
20    MR. SCHUTTE:  Al, do you mind if I indicate?
21    MR. HOFELD:  No.
22 BY MR. SCHUTTE:
23    Q.  This column here marked "A" refers to
24 the property at 2715 South Kostner?

Page 135

1    A.  Yes.
2    Q.  Okay.  There is an entry there under
3 Line 14 for repairs.
4    A.  14?  Uh-huh.
5    Q.  Yes.  Were those repairs performed by
6 Mr. Sanchez?
7    A.  My brother.  My brother helps me and --
8 he also helps me.
9    Q.  Okay.  How much do you pay your brother
10 for this work?
11    A.  Well, I give him money and he lives
12 with me.
13    Q.  Where does he live?
14    A.  On Drake, 2843 South Drake.
15    Q.  Okay.  Does he pay you rent?
16    A.  No.
17    Q.  Okay.  When you pay him for the --
18 well, the work that is listed on Line 14, the
19 repairs --
20    A.  Uh-huh.
21    Q.  -- did you actually give him money for
22 that work?
23    A.  I give him money, yes.  I give him
24 money, because he doesn't work, and he helps me.

2 (Pages 132 to 135)

GUADALUPE NAVARA - JULY 14, 2006

Page 136

1  So I pay him.
2      Q.  And you allowed him to live in your
3  apartment on Drake without paying rent?
4      A.  Yes.
5      Q.  You recall, Ms. Navara, that the last
6  time that we were together we talked about $6,000
7  that you owed to Mr. Sanchez in early 2003?
8      A.  Yes.
9      Q.  Do you remember that?
10     A.  Yes.
11     Q.  And I believe you told me that when you
12  obtained the loan from Long Beach, my client, you
13  used some portion of that money to pay back
14  Mr. Sanchez's $6,000?
15     A.  Yes.
16     Q.  Okay.  The $6,000, had you borrowed
17  that from Mr. Sanchez in one payment or over time?
18     A.  In one payment.
19     Q.  Okay.  When did he make that one $6,000
20  payment to you?
21     A.  I believe it was in month 7 of 2003.
22     MR. HOFELD:  Scott, just for the record, one
23  of the documents that were produced this morning
24  may shed some light on the answer to your

Page 137

1  question.
2      MR. SCHUTTE:
3      MR. HOFELD:  Just so you know it's there.
4      MR. SCHUTTE:  Okay.
5      MR. HOFELD:  I believe there is a deposit
6  receipt.
7      MR. SCHUTTE:  I see it.  Could I have those
8  documents?  Are we on 16?  15 was your signatures.
9      MR. HOFELD:  Right.
10     MR. SCHUTTE:  Can we mark this as 16 then?
11  Do you want these back?
12     MR. HOFELD:  Please.
13     MR. SCHUTTE:  We are going to have to make an
14  extra copy then.
15     MR. HOFELD:  That's fine.
16     MR. SCHUTTE:  Okay.
17     MR. HOFELD:  Do you want to identify them for
18  the record?
19          (WHEREUPON, a certain document was
20          marked Navara Deposition Exhibit
21          No. 16, for identification, as of
22          7-14-06.)
23  BY MR. SCHUTTE:
24     Q.  We have marked and handed to you,

Page 138

1  Ms. Navara, Exhibit 16, which is some documents
2  that your attorney gave to us this morning.
3      A.  Yes.
4      Q.  Did you give these documents to your
5  attorney?
6      A.  Yes.
7      Q.  Okay.  Where did you find them?
8      A.  Within the papers of April 29th.
9      MR. HOFELD:  Okay.  Ms. Navara, he is asking
10  you a question about all of the documents in the
11  packet.
12  BY THE WITNESS:
13     A.  Oh, all of the packet?  Okay.
14  BY MR. SCHUTTE:
15     Q.  Okay.  Where were these documents?
16     A.  Where I have my papers.
17     Q.  When was the first time that you looked
18  for these documents?
19     A.  Well, the other time when I came and I
20  told you that one of the piece of paper wasn't
21  signed, this one (indicating).
22     Q.  Yes.
23     A.  After that, that's when I found it, the
24  papers.

Page 139

1      Q.  Okay.  Are you referring specifically
2  to the third paper in the document, the one that
3  says, "ACS" at the top?
4      A.  Yes.
5      Q.  Okay.  We had talked about this
6  document or something that was similar to this
7  document last time, and for the record I believe
8  that we had marked it as Exhibit 14, but Exhibit
9  14 did not have this writing at the bottom.
10     A.  Okay.
11     Q.  If you could flip to the page -- the
12  third page there.
13     A.  Yes.
14     Q.  Okay.  That writing at the bottom, is
15  that your handwriting?
16     A.  No.
17     Q.  Whose handwriting is it?
18     A.  One of my girlfriends.
19     Q.  Okay.  What was her name?
20     A.  Janette.
21     Q.  What is Janette's last name?  Do you
22  know?
23     A.  Bucko.
24     Q.  When did she make these notes?

3 (Pages 136 to 139)

GUADALUPE NAVARA - JULY 14, 2006

Page 140

1    A.   Let me see.  This week.  I believe that
2  it was Monday or Tuesday.
3    Q.   Just a few days ago?
4    A.   Yes.
5    Q.   Okay.  Were you present with your
6  friend Janette when she made these notes?
7    A.   Yes.
8    Q.   Okay.  What were you -- can you tell me
9  about why you and Janette were looking at this
10  document?
11    A.   That's when I found that paper, this
12  one (indicating).
13    Q.   And the witness is indicating to the
14  second page of the document.  Yes?  This page?
15    A.   Yes.
16    Q.   The one that has ASC at the top?
17    A.   ACS, uh-huh.
18    Q.   Actually, I believe it has ASC.
19    A.   ACS.
20    MR. HOFELD:  He asked you a question,
21  Ms. Navara.
22    MR. SCHUTTE:  Can we go off the record for
23  two minutes?
24    MR. HOFELD:  Sure.

Page 141

1    THE VIDEOGRAPHER:  Going off the video
2  record.  The time is 10:46 a.m.
3    (WHEREUPON, discussion was had off
4    the record.)
5    THE VIDEOGRAPHER:  Back on the video record.
6  The time is 10:49 a.m.
7  BY MR. SCHUTTE:
8    Q.   Ms. Navara, with the agreement of your
9  counsel, I have taken Exhibit 16 and handwritten
10  numbers in the lower right corner to assist us as
11  we discuss this document.
12    I am going to see if we can work
13  through this slowly.  Page 2 of Exhibit 16, is
14  this a document that you said that you looked for
15  and found in your papers from April 29th of 2004?
16    A.   I don't understand very well.
17    Q.   Okay.  Where did you find this Page 2
18  of Exhibit 16?
19    A.   It wasn't in my papers.  They were
20  separate, and that's when I found it.
21    Q.   Whose papers were they with?
22    A.   Well, the papers that I do like for my
23  payments.
24    Q.   What sort of payments?

Page 142

1    A.   Credit card payments or --
2    Q.   Were the documents that you had given
3  to Mr. Hofeld previously collected together as
4  documents for the loan closing?
5    A.   Which papers?
6    Q.   These documents in Exhibit 16 we just
7  got from your attorney today.
8    A.   Yes.
9    Q.   Okay.  And he has represented to me
10  that he only got them from you this week.
11    A.   Right.
12    Q.   You had previously given him documents
13  from your files a long time ago, correct?
14    A.   Yes.
15    Q.   Okay.  And I think what I am
16  understanding from your testimony is that these
17  documents that you gave him this week were in a
18  different place than the ones that you had given
19  previously?
20    A.   Right.
21    Q.   Okay.  So after the last deposition did
22  you go and look for additional documents?
23    A.   I went to look for this, for this
24  document.

Page 143

1    Q.   And you are indicating Page 2 of
2  Exhibit 16?
3    A.   Yes.
4    Q.   And you found that in your file of
5  papers that you use to make payments?
6    A.   Yes.
7    Q.   What did you do when you found Page 2
8  of Exhibit 16?
9    A.   Well, I had to bring it.
10    Q.   Okay.  Well, did you call your friend
11  Janette?
12    A.   Yes.
13    Q.   Okay.  Why did you call Janette?
14    A.   Because she helps me with things that I
15  don't quite understand.
16    Q.   Okay.  Ms. Navara, I want you to answer
17  this question yes or no.
18    A.   Okay.
19    Q.   Before you called Janette, did you call
20  Mr. Hofeld?
21    A.   No.
22    Q.   After you called Janette, what did you
23  do?
24    A.   We made this cover, and these two

4 (Pages 140 to 143)

Page 144

1   letters are not the same in writing.
2       Q.   Okay.  On the Page 2 document, the one
3   that you found in your other papers, do you
4   remember when you first received that document?
5       A.   No.  It could have been in April.
6       Q.   Do you know who created it?
7       A.   Well, it has got the name ACS.
8       Q.   Okay.  For the record, I believe,
9   Ms. Navara, it has ASC at the top of this
10  document.  It may be an error, but it has ASC.  Do
11  you see that?
12      A.   I didn't even know.
13      Q.   Okay.  Do you don't know who created
14  this document?
15      A.   No.
16      Q.   Okay.  Now, the notes that you made on
17  Page 3 -- excuse me, the notes that Janette made,
18  were you speaking with her when she made these
19  notes?
20      A.   We were together like here.
21      Q.   Okay.  And the notes indicate
22  differences between Pages 2 and 3?
23      A.   Yes.
24      Q.   Okay.  Did your conversation with

Page 145

1   Janette refresh your memories as to when you
2   signed the Page 3 document?
3       A.   No.
4       Q.   Okay.  Did it refresh your memory or
5   your recollection about anything having to do with
6   this letter from Mr. Carrera to you?
7       A.   No.
8       Q.   Okay.  Can we jump forward, Ms. Navara,
9   to Page 5, and before I got distracted I was
10  asking you about the $6,000 payment that
11  Mr. Sanchez had made to you.
12      A.   Yes.
13      Q.   Yes.  And Mr. Hofeld told me there was
14  documents within Exhibit 16 that may shed some
15  light as to when he made that payment to you.
16      A.   It was the 7th month of 2003.
17      Q.   Right.  And Page 5 is some sort of
18  communication from Citibank referring to a deposit
19  that you made on July the 18th of 2003?
20      A.   Yes.
21      Q.   To your recollection is that --
22      A.   I found that.
23      Q.   Oh, thank you.  Sorry.
24          To your recollection, then, is that

Page 146

1   when you believe Mr. Sanchez gave you the $6,000
2   was in July of 2003?
3       A.   Yes.
4       Q.   And this is the same $6,000 that you
5   paid back to Mr. Sanchez after you obtained a loan
6   from Long Beach?
7       A.   Yes.
8       Q.   Okay.  After you deposited the $6,000
9   in July of 2003, what did you do with that money?
10      A.   I have bills to pay and some work in
11  the house, and that's all.
12      Q.   All right.  The bills to pay, were
13  those utility bills for the rental units at 2715
14  South Kostner?
15      A.   Yes.
16      Q.   And the work to be done you said at the
17  apartment, were you referring to work to be done
18  at the two-unit building at 2715 South Kostner?
19      A.   Yes.
20      Q.   Okay.  Now, on Exhibit 16, the same one
21  that is in front of you, at Page 4 -- do you know
22  whose handwriting that is, Ms. Navara, on Page 4?
23      A.   4?  Okay.
24      Q.   I am sorry?

Page 147

1       A.   Okay.
2       Q.   Do you know whose handwriting that is?
3       A.   That's my friend Janette's.
4       Q.   Okay.  When did Janette -- if you know,
5   when did she write Page 4 of Exhibit 16?
6       A.   It has to be last week.  I don't know
7   the exact date.
8       Q.   Okay.  Where does Janette live?
9       A.   Do you know what, I don't remember.
10      Q.   Okay.  Do you know how her last name is
11  spelled?
12      A.   Bucko?
13      Q.   Yes.
14      A.   No.  Bucko, that's how it sounds.
15      Q.   Okay.  Does Mr. Sanchez know Janette?
16      A.   Yes.
17      Q.   Does Janette live in your neighborhood?
18      A.   No.  She lives in the suburbs.
19      Q.   Which suburb?  Do you know?
20      A.   I can't remember right now.
21      Q.   Okay.  Were you with Janette when she
22  wrote the words on Page 4 of Exhibit 16?
23      A.   Yes.
24      Q.   Okay.  And forgive me, because I am not

5 (Pages 144 to 147)

GUADALUPE NAVARA - JULY 14, 2006

Page 148

1   sure that I remember what you said.  When do you
2   think that she wrote this?
3      A.   Last week or something.
4      Q.   When she wrote this, you were with her?
5      A.   Yes.
6      Q.   Was anyone else there?
7      A.   No.
8      Q.   Okay.  You see that in the lower left
9   corner on Page 4 there is a signature line for
10  Mr. Sanchez?
11     A.   Yes.
12     Q.   Okay.  Is that Mr. Sanchez's signature?
13     A.   It is his signature.
14     Q.   When did he sign this?
15     A.   About four days ago or something.
16     Q.   Okay.  Were you with him when he signed
17  it?
18     A.   Yes.
19     Q.   Was Janette there?
20     A.   No.
21     Q.   Okay.  Did you ask Mr. Sanchez to sign
22  this?
23     A.   Yes.
24     Q.   Okay.  What was Mr. Sanchez's reaction

Page 149

1   when you asked him to sign this?
2      A.   He signed it.
3      Q.   Okay.  Did he ask you any questions
4   about it?
5      A.   No.
6      Q.   Did he make any corrections?
7      A.   No.
8      Q.   Did he ask you why you were asking him
9   to sign it?
10     A.   Because he knows the problem.
11     Q.   He knows what problem?
12     A.   About the loan.
13     Q.   About the loan?  What problem with the
14  loan?
15     A.   Well, he knows when I went to a studio
16  on March 16th.  So he signed the letter.
17     Q.   Okay.  You have told me that you have
18  not discussed either the lawsuit or the deposition
19  with Mr. Sanchez since June 27th.
20     MR. HOFELD:  I am going to object.  I think
21  that mischaracterizes the testimony.
22  BY THE WITNESS:
23     A.   What can I do?
24  BY MR. SCHUTTE:

Page 150

1      Q.   I am asking -- I thought that I asked
2   earlier whether you had discussed either the
3   deposition or the lawsuit with Mr. Sanchez since
4   we were last together on June 27th, and I thought
5   that your answer was no.
6      A.   Well, yes, because Janette knows.
7      Q.   Because what?
8      A.   My girlfriend knows about it.
9      Q.   Okay.  I am asking about Mr. Sanchez,
10  and let me -- tell you where I am going, because I
11  am not trying to play tricks here.
12          If I were Mr. Sanchez and somebody
13  handed me this document four days ago and asked me
14  to sign it, I would say, "What is this about?"
15  or, "Why would you ask me to sign it?"  And your
16  testimony was that he didn't ask any questions.
17  He just signed it.
18     A.   Yes.  He just signed it.
19     Q.   Okay.  Is there anything in Page 4 of
20  Exhibit 16 that you think is incorrect?
21     A.   No.
22     Q.   Okay.  There is a signature line for
23  you in the lower right corner.
24     A.   Yes.

Page 151

1      Q.   Okay.  Is there any reason why you have
2   not signed this?
3      A.   I will sign it right now.
4      Q.   You don't need to sign it.  I am just
5   asking.
6      A.   No.  There is no reason.
7      Q.   Let's take a look at Page 1 of
8   Exhibit 16.  It appears to be a business card from
9   someone at Harris Bank, specifically Adriana
10  Balderas.  Okay.  Who is Adriana Balderas?
11     A.   I don't know who she is.
12     Q.   Okay.  Do you know why you have her
13  business card?
14     A.   Because I wanted to know the Bank's
15  address.
16     Q.   Okay.  When did you get this business
17  card?
18     A.   Tuesday or -- Monday or Tuesday.
19     Q.   Why did you want to get the Bank's
20  address -- the address of Harris Bank?
21     A.   Because when I went to Astudillo on
22  March 16th, I didn't look as to what Bank it was.
23     MR. HOFELD:  I am sorry.  Could you please
24  repeat that?  The court reporter, if you would.

6 (Pages 148 to 151)

GUADALUPE NAVARA - JULY 14, 2006

Page 152

1    (WHEREUPON, the record was read by
2        the reporter as requested.)
3    MR. SCHUTTE: Astudillo. For the record
4  that's A-s-t-u-d-i-l-l-o.
5  BY MR. SCHUTTE:
6    Q.   Did you go with Mr. Astudillo to a bank
7  on March 16th?
8    A.   Yes.
9    Q.   Did you just go to a bank with
10  Mr. Astudillo on March the 16th before or after
11  you went to his office at 4723 26th Street? And
12  let me correct that. It's 4329 West 26th Street.
13    A.   No. It was after the 16th. No. I am
14  going to correct that. It's April 29th.
15    Q.   Okay.
16    A.   After that.
17    Q.   I see. Was this one of the places that
18  you went to try and cash the checks?
19    A.   I went to my Citibank, and they won't
20  cash it, and then just tell him that later I went
21  to a studio, and him and I went to this bank,
22  Harris Bank.
23    Q.   I had understood from your affidavit
24  that you first tried to check -- cash the check at

Page 153

1  the Citibank located at 26th and Pulaski.
2    A.   Yes.
3    Q.   Okay. And then you went with
4  Mr. Astudillo to a LaSalle Bank in the mall at
5  26th and Cicero?
6    A.   I would like to change that, because
7  it's Harris Bank.
8    Q.   Okay. Is there anything else in that
9  affidavit that needs to be changed? I am going to
10  hand it to you. I will tell you what, maybe to
11  expedite things you can look over that document
12  during the break and let me know if anything needs
13  to be changed.
14    A.   Okay.
15    Q.   So to sum this up, Page 1 of Exhibit 16
16  shows the address of the Harris Bank where you
17  went with Mr. Astudillo to try to cash the $26,000
18  check sometime after April 29, 2004?
19    MR. HOFELD: I am just going to object that
20  it assumes a fact not in evidence. I don't think
21  that it was 26,000.
22    BY THE WITNESS:
23    A.   It was 18.
24    BY MR. SCHUTTE:

Page 154

1    Q.   I see. Everything else, though, was
2  correct?
3    A.   Yes.
4    Q.   Thank you. Page 7 of Exhibit 16, can
5  you tell me what this document is?
6    A.   This document is when -- on May 10th we
7  went to court, and I found Astudillo and Ramos at
8  the courthouse.
9    Q.   Okay. Was Mr. Ramos -- strike that.
10        Did you understand Mr. Ramos to be
11  Mr. Astudillo's attorney?
12    A.   No.
13    Q.   Do you know who Mr. Ramos is?
14    A.   I only met him one time. That time.
15    Q.   Okay. Do you know why he was there?
16    A.   According to him he was with New
17  Millenium.
18    Q.   Whose handwriting is this on Exhibit
19  16, Page 7?
20    A.   Exhibit 16, Page 7?
21    Q.   Yes. The one that is in front of you
22  now.
23    A.   Oh, this one?
24    Q.   Yes.

Page 155

1    A.   This over here is Sergio's writing
2  (indicating).
3    Q.   Okay. Is there any writing on this
4  page of anyone besides Sergio?
5    A.   No.
6    Q.   So Mr. Sanchez was with you when you
7  went to court on May the 10th, 2005?
8    A.   No. Mr. Sanchez was not with me in
9  court.
10    Q.   Okay. Do you know when Mr. Sanchez
11  made these notes on Page 7 of Exhibit 16?
12    A.   Because in the same month of May Horay
13  Ramos called me up to meet him at this address.
14    Q.   Okay. Is that meeting one in which you
15  were offered $5,000 to settle the claim?
16    A.   No. That was with Astudillo.
17    Q.   Okay. Let's talk then about this
18  meeting with Mr. Ramos.
19    MR. HOFELD: I am just going to object to
20  mischaracterization.
21    MR. SCHUTTE: There was a mischaracterization
22  when I said that I was going to ask her about a
23  meeting with Mr. Ramos?
24    MR. HOFELD: Yeah. I don't think there was a

7 (Pages 152 to 155)

GUADALUPE NAVARA - JULY 14, 2006

Page 156

1  meeting, but you can ask her that.
2  BY MR. SCHUTTE:
3      Q.  Okay.  All right.  Let me make sure
4  that I understand where we are here.  You went to
5  court on May 10, 2005.  Mr. Astudillo was there?
6      A.  Yes.
7      Q.  Mr. Ramos was there?
8      A.  Yes.
9      Q.  You understood Mr. Ramos to be
10  affiliated with New Millenium?
11      A.  He told me.
12      Q.  Okay.  He asked you to meet with him
13  sometime after that at the address?
14      A.  He gave me this card.
15      Q.  Okay.  And what did he say when he gave
16  you that card?
17      A.  That I should call -- if I need
18  anything, that I should call him.
19      Q.  Okay.  Need anything with respect to
20  what?
21      A.  I got no idea.
22      Q.  Okay.  Did he ask you about having a
23  meeting with him sometime after that?
24      A.  Yes.  After May 10th he left a message

Page 157

1  on the answering machine to meet him at this
2  address.
3      Q.  And this --
4      A.  1801 South Ashland.
5      Q.  Okay.  Did you ever meet Mr. Ramos at
6  1801 South Ashland?
7      A.  No.
8      Q.  Okay.  When was it that Mr. Sanchez
9  made these notes on Page 7, if you know?
10      A.  I ask him to write that because of my
11  hand.
12      Q.  When did you ask him to write that?
13      A.  After May 10th.  Within the month of
14  May.  It was after May 10th.  It was like May
15  10th -- after that.
16      Q.  Why did you not meet with Mr. Ramos as
17  he had requested?
18      A.  Because they want to settle with me
19  again.
20      Q.  Any other reason?
21      A.  No.
22      Q.  Did you understand Mr. Ramos to be --
23  when you said "they," did you understand Mr. Ramos
24  to be working with Mr. Astudillo?

Page 158

1      A.  He told me that he was with New
2  Millenium.  So --
3      Q.  Okay.  Okay.  Now, on Page 7 there is
4  another business card on the side.  Do you see
5  that, Kroeschell, Inc.?
6      A.  No.  This is just a paper that I have.
7      Q.  All right.  I got you.  Now, on Page 8
8  of Exhibit 16, it's, I think, the same as Page 7
9  except it looks like your handwriting in the lower
10  left.
11      A.  Yes.  That's -- uh-huh.
12      Q.  When did you make that note that says,
13  "Home 773-Ramos"?
14      A.  Within the same month of May.
15      Q.  Okay.  And why did you write down that
16  information sometime in the month of May?
17      A.  Because I want to have prove of -- that
18  these people call me up.
19      Q.  Have you spoken with Mr. Ramos since
20  May of 2005?
21      A.  No.
22      Q.  How many baths are there total in the
23  two-unit apartment at 2715?  How many bathrooms?
24      A.  One in each apartment.

Page 159

1      Q.  So two in the apartment building?
2      A.  Yes.
3      Q.  How many in the coach house?
4      A.  One.
5      Q.  Okay.  Is the bathroom in the couch
6  house a full bath with a tub or a shower?
7      A.  Yes.
8      Q.  Okay.  Is there a garage on the
9  property?
10      A.  No.
11      Q.  Okay.  Are you the person responsible
12  for paying the Cook County property taxes on 2715
13  South Kostner?
14      A.  Yes.
15      Q.  Does the tax bill for that property
16  come to you?
17      A.  It comes to me, but I send it to the
18  company, to Washington Mutual.
19      MR. SCHUTTE:  Okay.  Can we mark this as
20  Exhibit 17, please?
21          (WHEREUPON, a certain document was
22          marked Navara Deposition Exhibit
23          No. 17, for identification, as of
24          7-14-06.)

8 (Pages 156 to 159)

GUADALUPE NAVARA - JULY 14, 2006

Page 160

1   BY MR. SCHUTTE:
2       Q.   Ms. Navara, we have marked as Exhibit
3   17 a document that your attorney has provided to
4   us.
5       A.   Yes.
6       Q.   Actually, I am sorry.  I want to
7   correct that.  This is a document that was in the
8   files of Long Beach Mortgage.  Okay.  And it
9   appears to be a bill from Com Ed for electrical
10  service.
11      A.   Correct.
12      Q.   It has your name in the upper left
13  corner?
14      A.   Yes.
15      Q.   And it has the service location of 2715
16  South Kostner Avenue, No. 1F.  Do you see that?
17      A.   Yes.  First front.
18      Q.   Was it -- I thought that I asked you
19  last time whether there were apartment numbers and
20  you told me that there were not.
21      A.   What is that?
22      Q.   Last time we were together I asked you
23  whether the two units in the apartment building
24  had apartment numbers, and you said no.

Page 161

1       A.   No.  Not me.  I don't remember that.
2   Why not?
3       Q.   Do they have numbers?
4       A.   It's first and second.
5       Q.   Okay.  And is that -- is it called
6   No. 1F and 2F?
7       A.   First floor, yes.
8       Q.   Are their separate mailing addresses?
9       A.   No.
10      Q.   Okay.  How exactly does that work?
11  Does your mail come to the mailbox and the tenant
12  gives you your mail and --
13      A.   Everybody picks up their own mail.
14      Q.   Why have you never arranged to have
15  your own mailbox at the coach house?
16      A.   It was never necessary.  It has
17  never been necessary.
18      Q.   Has it ever -- strike that.
19      This Exhibit 17, what electrical
20  service is this bill for?
21      A.   This is for -- this is for the first
22  floor and the attic.
23      Q.   Okay.  So the bill marked as Exhibit 17
24  is for the first floor and the attic?

Page 162

1       A.   Yes.
2       Q.   This is a bill for electrical service
3   in 2003.  Do you see that?
4       A.   Uh-huh.  Yes.
5       Q.   Yes.  Who paid this bill in 2003?
6       A.   I do.
7       Q.   Was there, to your knowledge, a
8   separate bill for Apartment 2F?
9       A.   The second floor?  No.  They are
10  separate, first floor and second.
11      Q.   That's what I was asking.  So there is
12  a separate bill from this one for the second floor
13  apartment?
14      A.   Now, that is paid by the tenants.
15      Q.   Okay.  But the bill would come to them
16  separately?
17      A.   Yes, yes.
18      Q.   Okay.  And then there would be a third
19  bill that would come for the coach house?
20      A.   Yes.
21      Q.   Okay.  But this bill, Exhibit 17,
22  covers the first floor and the attic.
23      A.   Wait a minute.  Wait a minute.  The
24  first floor covers the attic and the rear house.

Page 163

1       Q.   The coach house?
2       A.   The coach house.
3       Q.   Where you and Mr. Sanchez have lived?
4       A.   Yes.
5       Q.   All right.  And you paid this bill?
6       A.   Yes.
7       Q.   And this bill is one of the utility
8   expenses that you deduct on your Federal taxes?
9       A.   Yes.
10      Q.   There are no renters who live in the
11  attic, are there?
12      A.   We have my dogs and things like that,
13  and we go back and forth.
14      Q.   Okay.
15      A.   In both places.
16      MR. HOFELD:  I am sorry.  Could you read back
17  the answer?
18          (WHEREUPON, the record was read by
19          the reporter as requested.)
20      MR. HOFELD:  Okay.  I was wondering if I
21  heard it right.  Okay.  Thanks.
22      MR. SCHUTTE:  Let's mark this as -- let's
23  mark this as 18, please.
24          (WHEREUPON, a certain document was

9 (Pages 160 to 163)

GUADALUPE NAVARA - JULY 14, 2006

Page 164

1    marked Navara Deposition Exhibit
2    No. 18, for identification, as of
3    7-14-06.)
4    BY MR. SCHUTTE:
5        Q.    We have marked as Exhibit 18 another
6    document from Long Beach's files, and to be clear
7    this is Long Beach's file on your loan that's at
8    issue in this lawsuit.  It has a Bates number of
9    LBM 0341.  Do you know what this document is
10   Ms. Navara?
11       A.    Department of Revenue.  I don't know.
12       Q.    Does this look like the water and sewer
13   bill for the property at 2715 South Kostner?
14       A.    Yes.
15       Q.    Okay.
16       MR. HOFELD:  I am just going to object to the
17   foundation, Scott, because this may be two
18   documents here, one photocopied document.
19   BY THE WITNESS:
20       A.    That's not the bill from there.
21   BY MR. SCHUTTE:
22       Q.    What is this bill from then?
23       A.    If it's water, it has got to be for
24   Drake.

Page 165

1        Q.    Well, in the lower right, if I could
2    call your attention, it says, "Premises 2715 South
3    Kostner."
4        A.    Okay.
5        Q.    Okay.  You typically get and pay a
6    water and sewer bill for 2715 Kostner, do you not?
7        A.    Okay.  Yes.
8        Q.    And this is a water and sewer bill from
9    April or March of 2003?
10       A.    Yes.
11       Q.    Was this bill for the water and sewer
12   service for both the rental units and the coach
13   house?
14       A.    Yes.
15       Q.    Okay.  And this is also a utility
16   expense that you deduct on your Federal income
17   taxes?
18       A.    Yes.
19       Q.    Okay.  Do you remember, Ms. Navara,
20   that in connection with applying for the loan from
21   Long Beach you were asked to provide utility bills
22   like Exhibit 17 and 18?
23       A.    They did not ask me that.
24       Q.    Okay.  Do you have any understanding as

Page 166

1    to why Long Beach, my client, had documents like
2    Exhibit 17 and 18 in your loan file?
3        A.    No.  I have no idea.  No.
4        MR. SCHUTTE:  Let's mark this as Exhibit 19.
5            (WHEREUPON, a certain document was
6            marked Navara Deposition Exhibit
7            No. 19, for identification, as of
8            7-14-06.)
9    BY MR. SCHUTTE:
10       Q.    We have handed you what we have marked
11   as Exhibit 19.  For the record it has a Bates
12   number of LBM 0316, and this is another document
13   from Long Beach's files.
14       A.    Okay.
15       Q.    And this appears to be an SBC phone
16   bill from 2000 -- December of 2003 for building
17   first floor 2715 South Kostner.  Do you see that?
18       A.    First floor?  No.
19       Q.    Yes.  In the --
20       MR. SCHUTTE:  May I, Al?
21       MR. HOFELD:  Sure.
22   BY MR. SCHUTTE:
23       Q.    Indicating to the right here.
24       A.    Oh, here?

Page 167

1        Q.    I am sorry, ma'am.  Up here
2    (indicating).
3        A.    Right here.
4        Q.    Just to the right of the SBC logo.  Do
5    you see that?
6        A.    Yes.
7        Q.    And just to the right there is an
8    account number which is also a phone number,
9    773-782-0685.  Do you see that?
10       A.    762-7665?
11       Q.    It says 773, I believe, 782-0685.
12       A.    No.  I have no idea.  Where?
13       Q.    Maybe my eyes are bad, Ms. Navara.  I
14   think that it is 762.
15       A.    0685?
16       Q.    Yes.  That's your phone number, right?
17       A.    That's my phone number.
18       Q.    And that's the phone that you told me
19   last time was in the attic?
20       A.    Yes.
21       Q.    Does it ring in the coach house?
22       A.    I take the receiver at home.
23       Q.    Okay.  By the way, you told me that
24   Mr. Sanchez's number began with a 312.

10 (Pages 164 to 167)

GUADALUPE NAVARA - JULY 14, 2006

Page 168

1    A.    Yes.
2    Q.    Is that his cell phone?
3    A.    That's the company's.
4    Q.    But is it a cell phone?
5    A.    Yes.
6    Q.    What company does Mr. Sanchez work for?
7    A.    Let me see.  JB Connor.
8    Q.    What does that company do?
9    A.    It's a realtor.
10   Q.    I thought that you told me last time
11   that Mr. Sanchez worked at a factory.
12   A.    Well, he works at that factory.  Well,
13   yes.  He works at that factory.
14   Q.    JB Connor is a realtor?
15   A.    Yes.
16   Q.    What kind of factory is associated with
17   a realtor?
18   A.    They rent warehouses.
19   Q.    Okay.  Okay.  Going back to Exhibit 19,
20   the account number is your phone number,
21   773-762-0685?
22   A.    Yes.
23   Q.    Okay.  Is this bill also for phone
24   service in the two apartments?

Page 169

1    A.    No.
2    Q.    Okay.  We can set that document aside.
3    MR. SCHUTTE:  Exhibit 20.
4          (WHEREUPON, a certain document was
5          marked Navara Deposition Exhibit
6          No. 20, for identification, as of
7          7-14-06.)
8    BY MR. SCHUTTE:
9    Q.    We have marked as Exhibit 20 a document
10   with the Bates label LBM 0164, which indicates it
11   came from Long Beach's loan file.  Okay.  It's an
12   occupancy agreement dated April 29th of 2004.
13         Did you sign that document on April
14   the 29th, 2004?
15   A.    Yes.  That's my signature.
16   Q.    Did you read the document before you
17   signed it?
18   A.    No.
19   Q.    Okay.  You could have read the document
20   before you signed it, could you have not?
21   MR. HOFELD:  Objection; leading and
22   mischaracterizes the testimony.
23   BY THE WITNESS:
24   A.    I couldn't read it, because they are

Page 170

1    just telling me sign here, sign here, sign here.
2    So --
3    BY MR. SCHUTTE:
4    Q.    But you could have stopped and said I
5    want to read this before I sign it?
6    A.    I could have, but no, I didn't.
7    Q.    You could have but you didn't, correct?
8    A.    Correct.
9    Q.    Put that aside.
10   MR. SCHUTTE:  Mark this as 21, please.
11         (WHEREUPON, a certain document was
12         marked Navara Deposition Exhibit
13         No. 21, for identification, as of
14         7-14-06.)
15   BY MR. SCHUTTE:
16   Q.    We have marked as Exhibit 21 a document
17   for the record Bates labelled ECL&G 61 and 62.
18   Ma'am, on the second page of this document is that
19   your signature?
20   A.    Yes.
21   Q.    Is this one of the documents that you
22   signed at the closing on April the 29th?
23   A.    Yes.
24   Q.    Did you read this document before you

Page 171

1    signed it?
2    A.    No.
3    Q.    Did you discuss this document with
4    Mr. Astudillo before you signed it?
5    A.    No.
6    Q.    I also believe Mr. Sanchez was at the
7    closing?
8    A.    He was just there, but he had nothing
9    to do with this.
10   Q.    Okay.  You didn't ask him about this
11   document?
12   A.    He does not know about this either.
13   Q.    Well, my question was:  Do you remember
14   whether you asked him about that document?
15   A.    No.
16   MR. HOFELD:  Exhibit 22, please.
17         (WHEREUPON, a certain document was
18         marked Navara Deposition Exhibit
19         No. 22, for identification, as of
20         7-14-06.)
21   BY MR. SCHUTTE:
22   Q.    Exhibit 22 has a Bates label ECL&G 63,
23   64, 65.  The last page of this document,
24   Ms. Navara, is that your signature?

11 (Pages 168 to 171)

GUADALUPE NAVARA  -  JULY 14, 2006

Page 172

1    A.   Yes.
2    Q.   Okay.  Your signature appears twice on
3  that page, correct?  At the top of the page and
4  again below?
5    A.   It is mine.
6    Q.   Okay.  Who signed the document between
7  your two signatures?
8    A.   I don't know.
9    Q.   Okay.  Did that signature -- was that
10  signature on the document when you signed it?
11    A.   No.
12    Q.   You specifically recall that it wasn't
13  on there when you signed it?
14    A.   I believe that it wasn't.
15    Q.   Did you read this document before you
16  signed it?
17    A.   No.
18    Q.   Okay.  You could have, correct?
19    A.   He just explained to me what it was.
20    Q.   Okay.  Mr. Astudillo explained to you
21  what it was?
22    A.   He had mentioned that.  Yes.
23    Q.   Okay.  What did he tell you that this
24  document was?

Page 173

1    A.   That -- the amount that I was going to
2  receive.
3    Q.   Okay.  And he told you the amount that
4  you were going to receive before you signed this?
5    A.   Yes.
6    Q.   What amount did he tell you that you
7  were going to receive?
8    A.   25.
9    Q.   Okay.  Did he tell you how that 25,000
10  was going to come to you?
11    MR. HOFELD:  I am just going to object; vague
12  and ambiguous.
13  BY THE WITNESS:
14    A.   It has a book with checks.
15  BY MR. SCHUTTE:
16    Q.   Okay.
17    A.   And he only showed me that he was going
18  to pay me with that.
19    Q.   Okay.  He had a book of checks?
20    A.   Yes.  With City Wide address -- title
21  company.
22    Q.   To make sure that I understand that,
23  Mr. Astudillo had a book of checks from City Wide
24  Title?

Page 174

1    A.   Yes.
2    Q.   Were these checks made out to anyone?
3    A.   No.  He said that that's how he will
4  pay everybody.
5    Q.   I see.  On the second page of
6  Exhibit 22, Ms. Navara, down at the very bottom,
7  Lines 1303, 1304 and 1305 --
8    THE INTERPRETER:  I am sorry.  Can you repeat
9  the numbers?
10  BY MR. SCHUTTE:
11    Q.   Sure.  1303, 1304 and 1305.  Did he
12  tell you -- Mr. Astudillo tell you before you
13  signed this document that there were going to be
14  checks written by City Wide to Capital One Bank?
15    A.   No.  He did not mention that to me.
16    Q.   Did he mention that the check was going
17  to be written to First Premier?
18    A.   I told him not to pay that.
19    Q.   Why?
20    A.   Not to pay that.  Because it was just
21  $107.
22    Q.   Okay.  So he actually discussed this
23  Line 1303 with you?
24    A.   I did not notice that about this until

Page 175

1  after he paid for it.
2    Q.   Okay.  Did you notice that he had --
3  that the Exhibit 22 had directions to pay ACS
4  $26,000?
5    A.   No.  He did not mention that to me.
6    MR. SCHUTTE:  Could you mark this as Exhibit
7  23, please?
8        (WHEREUPON, a certain document was
9         marked Navara Deposition Exhibit
10         No. 23, for identification, as of
11         7-14-06.)
12  BY MR. SCHUTTE:
13    Q.   Is that your signature, Ms. Navara, at
14  the bottom of Exhibit 23?
15    A.   Yes.
16    Q.   You signed that on March the 16th of
17  2004?
18    A.   Yes.
19    Q.   Was this signed when you were at
20  Mr. Astudillo's office?
21    A.   Yes.
22    Q.   Exhibit 23, which is a Borrowers
23  Certification and Authorization with a Bates
24  number of ECL&G 88, it refers to New Millennium

12 (Pages 172 to 175)

GUADALUPE NAVARA  -  JULY 14, 2006

Page 176

1   Mortgage Group Corp. in several places, correct?
2       A.   Yes.
3       Q.   Okay.  All of your dealings,
4   Ms. Navara, were with Mr. Astudillo, correct?
5       A.   Yes.
6       MR. HOFELD:  I am going to object.  I think
7   that may call for a legal conclusion.
8   BY MR. SCHUTTE:
9       Q.   Okay.  When was the first time that you
10  learned that your loan that had closed on April
11  29th was coming from Long Beach?
12      A.   No.  I did not know that.
13      Q.   Okay.  When did you first learn that?
14      A.   I did not know this, because the
15  mortgage went to Washington Mutual.
16      Q.   When did you first learn that the
17  mortgage went to Washington Mutual?
18      A.   On April 29th.
19      MR. SCHUTTE:  24, please.
20          (WHEREUPON, a certain document was
21          marked Navara Deposition Exhibit
22          No. 24, for identification, as of
23          7-14-06.)
24  BY MR. SCHUTTE:

Page 177

1       Q.   Exhibit 24, Ms. Navara, has the Bates
2   label ECL&G 46.  Do you recognize the check on
3   page -- excuse me, on Exhibit 24?
4       A.   Yes.
5       Q.   What is that?
6       A.   It's for 8,000.
7       Q.   Okay.  And is this the 8,000 that you
8   contend that Mr. Astudillo kept that he shouldn't
9   have kept?
10      A.   Yes.
11      MR. SCHUTTE:  25 I believe.
12          (WHEREUPON, a certain document was
13          marked Navara Deposition Exhibit
14          No. 25, for identification, as of
15          7-14-06.)
16  BY MR. SCHUTTE:
17      Q.   Ms. Navara, we have marked as Exhibit
18  25 a one-page document, ECL&G 47.  Do you
19  recognize this document, ma'am?
20      A.   Yes.
21      Q.   What is this document?
22      A.   This is the check that he gave me.
23      Q.   Mr. Astudillo?
24      A.   Mr. Astudillo.

Page 178

1       Q.   This is the check that you tried to
2   cash with him?
3       A.   The one for 18,000, yes.
4       Q.   Yes.
5       A.   But this one is signed by Roger.
6       Q.   Right.  Well, ultimately he signed and
7   cashed the check and then wrote you a personal
8   check, correct?
9       A.   Yes.
10      Q.   Let's mark this as Exhibit 26, please.
11          (WHEREUPON, a certain document was
12          marked Navara Deposition Exhibit
13          No. 26, for identification, as of
14          7-14-06.)
15  BY MR. SCHUTTE:
16      Q.   And we are handing you Exhibit 26,
17  which is ECL&G 11, which I believe is the check
18  that he wrote to you.
19      A.   Yes.
20      Q.   Okay.  And it was from this check that
21  you repaid Mr. Sanchez the $6,000 that he owed
22  you -- that you owed to him?
23      A.   Yes.
24      Q.   Ma'am, do you know why if Mr. Astudillo

Page 179

1   had a City Wide check's book why he did not make
2   the $18,000 check directly to you?
3       A.   I don't know.  It's his
4   business.
5       MR. SCHUTTE:  Exhibit 27, please.
6          (WHEREUPON, a certain document was
7          marked Navara Deposition Exhibit
8          No. 27, for identification, as of
9          7-14-06.)
10  BY MR. SCHUTTE:
11      Q.   Exhibit 27 has the Bates number
12  ECL&G 97.  Have you ever seen this document
13  before?
14      A.   What is the amount?
15      Q.   $683.53.
16      A.   I have never seen that.
17      Q.   Okay.  Did you ever make a payment to
18  Mr. Astudillo of $683.53?
19      A.   No.
20      MR. SCHUTTE:  Why don't we take a very short
21  break, and we can come back and finish up very
22  quickly.
23      THE VIDEOGRAPHER:  Going off the video
24  record.  The time is 11:53 a.m.

13 (Pages 176 to 179)

GUADALUPE NAVARA - JULY 14, 2006

Page 180

1    (WHEREUPON, a recess was had.)
2    THE VIDEOGRAPHER: Back on the video record.
3    The time is 12:04 p.m.
4    BY MR. SCHUTTE:
5    Q.   Ms. Navara, do you know a person by the
6    name of Luse Maria Padilla?
7    A.   No.
8    Q.   Did you ever deal with a person by that
9    name at New Millennium?
10   A.   No.
11   Q.   Okay. The only people that you dealt
12   with from New Millennium in any way that you
13   recall is George Ramos?
14   A.   Astudillo only.
15   Q.   Astudillo and then George Ramos in May
16   of 2005?
17   A.   Yes.
18   Q.   And then the woman named Antoinette?
19   A.   Antoinette.
20   Q.   Okay. And then I believe that you told
21   me last time that you only had had one
22   conversation with Washington Mutual, and that was
23   to obtain some information about your loan?
24   A.   Yes.

Page 181

1    Q.   Do you remember any other people at
2    either New Millennium or Long -- excuse me, or
3    Washington Mutual that you have had contact with?
4    A.   No.
5    MR. SCHUTTE: I apologize, Al, but I only
6    have one copy of this document. So I will let you
7    look at it, and then we can deal with it. What
8    are we on? 28.
9    (WHEREUPON, a certain document was
10   marked Navara Deposition Exhibit
11   No. 28, for identification, as of
12   7-14-06.)
13   BY MR. SCHUTTE:
14   Q.   We have marked as Exhibit 28 a series
15   of documents that we received from your lawyer.
16   A.   Yes.
17   Q.   Do you know what these documents are?
18   A.   Yes.
19   Q.   Okay. Will you flip to the second
20   page? Do you know whose handwriting that is on
21   the second page?
22   A.   Mine.
23   Q.   Okay. What is the -- what were you
24   doing there where you were making those notations?

Page 182

1    A.   Which page is this?
2    Q.   The page that has the number 1 in the
3    lower right corner, ma'am.
4    A.   No. 1? This one?
5    Q.   Yes.
6    A.   Okay.
7    Q.   What were you doing when you made those
8    notations?
9    A.   Because I wanted to know how much money
10   that I lended to my brother.
11   Q.   And this is the brother that lives in
12   Drake?
13   A.   No. In Mexico.
14   Q.   Okay. Nothing really to do with this
15   case?
16   A.   Nothing to do with this case.
17   Q.   Okay. Thank you.
18   A.   Nothing whatsoever.
19   Q.   And are all of these documents wire
20   transfer documents related to money that you
21   loaned to your brother?
22   A.   Yes.
23   Q.   The very last page, Ms. Navara, No. 7,
24   is a check to Citibank -- excuse me, a Citibank

Page 183

1    check to People's Gas?
2    A.   Yes.
3    Q.   Okay. And this corresponds to one of
4    the entries on Page 1 of 1,000 for gas?
5    A.   Yes.
6    Q.   Okay. What does a $1,000 check to
7    People's Gas have to do with your brother in
8    Mexico?
9    A.   None. It just appeared there, but it
10   has nothing to do.
11   Q.   Well, I am just confused, though,
12   because you said that Page 1 was you calculating
13   how much you loaned to your brother in Mexico, and
14   you included in that a thousand dollars with a
15   notation gas and --
16   A.   No.
17   Q.   What does the thousand dollar gas check
18   relate to?
19   A.   The gas that I paid in 2004, but it has
20   nothing to do with the rest of the papers.
21   Q.   But it does relate to the one entry on
22   Page 1 that says one thousand gas?
23   A.   Oh, because they wanted to know how I
24   spend the money, in what I spend the money.

14 (Pages 180 to 183)

GUADALUPE NAVARA - JULY 14, 2006

Page 184

1    Q.   Who is "they"?
2    A.   You wanted to know.  Long Beach.
3    Q.   But this is in November -- the check to
4    Citibank is dated November the 18th of 2004.
5    A.   The one for a thousand dollars?
6    Q.   Yes, ma'am.
7    A.   What is the name in it?
8    Q.   People's Gas.
9    A.   And who paid it?
10   Q.   It says name -- it appears to be some
11   sort of a cashier's check with the name of the
12   remitter being Guadalupe Navara.
13   A.   Because I pay for this gas bill.
14   Q.   Is that your brother's gas bill?
15   A.   No, no, no.  This my gas on Kostner.
16   Q.   Okay.  Let's put that aside.
17   MR. SCHUTTE:  29, please.
18        (WHEREUPON, a certain document was
19        marked Navara Deposition Exhibit
20        No. 29, for identification, as of
21        7-14-06.)
22   BY MR. SCHUTTE:
23   Q.   This is a two-page document with a
24   label ECL&G 66 and 67.  Is that your signature on

Page 185

1    the first page, ma'am?
2    A.   Yes.
3    Q.   Okay.  And you signed that on April 29,
4    2004?
5    A.   Yes.
6    Q.   Did you read this before you signed it?
7    A.   No.
8    Q.   Did you discuss this document with
9    Mr. Astudillo?
10   A.   He just told me to sign the papers.
11   MR. SCHUTTE:  30.
12        (WHEREUPON, a certain document was
13        marked Navara Deposition Exhibit
14        No. 30, for identification, as of
15        7-14-06.)
16   BY MR. SCHUTTE:
17   Q.   Exhibit 30, ma'am, is a one-page
18   document Bates labelled ECL&G 13.
19        Okay.  Is that your signature in the
20   lower left corner?
21   A.   Yes.
22   Q.   Do you know when you signed this
23   document?
24   A.   It has got to be on April 29th.

Page 186

1    Q.   Okay.  There is a signature just above
2    yours.  Do you know whose signature that is?
3    A.   No.
4    Q.   Do you need to take a break to answer
5    that?
6    A.   Sorry.  I thought that I shut it off.
7    THE VIDEOGRAPHER:  Going off the video
8    record.  The time is 12:12 p.m.
9        (WHEREUPON, a recess was had.)
10   THE VIDEOGRAPHER:  Back on the video record.
11   The time is 12:13 p.m.
12   BY MR. SCHUTTE:
13   Q.   I believe you said that you didn't know
14   whose signature that was?
15   A.   No.
16   Q.   When you signed the document on April
17   the 29th, was that signature already on there?
18   A.   Perhaps.
19   MR. SCHUTTE:  31.
20        (WHEREUPON, a certain document was
21        marked Navara Deposition Exhibit
22        No. 31, for identification, as of
23        7-14-06.)
24   BY MR. SCHUTTE:

Page 187

1    Q.   Ms. Navara, this is a one-page document
2    labeled ECL&G 91.  It says it's a signature name
3    affidavit.
4    A.   Okay.
5    Q.   And it says there, ma'am, that, "This
6    is to certify that my legal signature is as
7    written and typed below."
8    THE INTERPRETER:  I am sorry.  Could you --
9    the interpreter needs that to be repeated.
10   BY MR. SCHUTTE:
11   Q.   Sure.  "This is to certify that my
12   legal signature is as written and typed below."
13   A.   On print?
14   Q.   Yes.  Is that your signature just below
15   that?
16   A.   It doesn't seem like it.  No.
17   Q.   You don't think that's your signature?
18   A.   I don't believe so.  Or maybe.  I don't
19   know.
20   Q.   Do you remember signing this document?
21   A.   This signature is mine.
22   Q.   Oh, yes, ma'am, that's the one that I
23   was indicating to.
24   A.   Oh, I was looking over here

15 (Pages 184 to 187)

Page 188

1  (indicating).
2     Q.   Now I understand.  The signature in the
3  middle of the page is yours?  Yes?
4     A.   No.
5     Q.   Ma'am, this one here (indicating).
6     A.   This one, yes.  That one is mine
7  (indicating).
8     MR. SCHUTTE:  And the witness is indicating
9  to the signature just below where it says, "This
10  is to certify."
11  BY MR. SCHUTTE:
12     Q.   And you signed that document on April
13  the 29th of 2004?
14     A.   On April 29th, yes.
15     Q.   Okay.  Was there a notary public in the
16  room when you signed that document?
17     A.   No.
18     MR. SCHUTTE:  32.
19          (WHEREUPON, a certain document was
20          marked Navara Deposition Exhibit
21          No. 32, for identification, as of
22          7-14-06.)
23  BY MR. SCHUTTE:
24     Q.   Exhibit 32, Ms. Navara, is a notice of

Page 189

1  right to cancel, ECL&G 89.  It has your name.  Is
2  that your signature on the bottom?
3     A.   It is my signature.
4     Q.   Okay.  Did you discuss this document
5  with Mr. Astudillo before you signed it?
6     A.   No.
7     Q.   Okay.  When was it to your
8  recollection, Ms. Navara, that you first learned
9  that Mr. Astudillo planned to keep $8,000?
10     A.   In -- let me see.  When I got -- when I
11  got the $18,000 check.
12     Q.   Do you remember when that was?
13     A.   May 4th.  Something like that.
14     Q.   Okay.  Ma'am, do you understand that
15  you are attempting to represent a class of people
16  in this lawsuit?
17     A.   Yes.
18     Q.   What do you understand your obligations
19  to be?
20     A.   It is to see for the interests of the
21  member of the class.
22     Q.   Okay.  What have you done so far in
23  this lawsuit to look into the interest of the
24  class?

Page 190

1     A.   To make sure that any settlement is
2  adequate for everybody in the class.
3     Q.   Okay.  Do you understand that you have
4  a responsibility to monitor the progress of the
5  lawsuit?
6     A.   Yes.
7     Q.   Okay.  What have you done so far,
8  Ms. Navara, to monitor the progress of the
9  lawsuit?
10     A.   I called my attorney to make sure that
11  he is doing the things well.
12     Q.   Okay.  Approximately how many hours
13  have you spent monitoring the progress of the
14  lawsuit?
15     A.   I wouldn't be able to say like a time.
16     Q.   More than ten hours?
17     A.   I can't say.
18     Q.   Okay.  Throughout your testimony today,
19  you know, you have answered my questions.  Have
20  there been any questions that you have not
21  understood when I have asked them?
22     A.   No.
23     Q.   Okay.  And when you haven't understood,
24  you have asked me to repeat it?

Page 191

1     A.   Correct.  Right.
2     Q.   Okay.  Are you taking any medications
3  today that would impact your ability to testify?
4     A.   No.
5     Q.   Okay.  Is there any other reason why
6  you wouldn't have been able to testify truthfully
7  and accurately today?
8     A.   Like what?
9     Q.   I am just asking.  I want to make sure
10  that there is nothing wrong.  You are not feeling
11  poorly, you have not suffered a head injury
12  recently that would make it impossible for you to
13  remember to tell the truth today.
14     A.   I answered the questions according to
15  what it is.
16     Q.   Okay.  But you are not feeling poorly
17  today?
18     A.   No.
19     MR. SCHUTTE:  Okay.  I have nothing further.
20     MR. HOFELD:  Okay.  You wanted her to review
21  her affidavit during the break.
22     MR. SCHUTTE:  Yes.
23     MR. HOFELD:  Do you want to ask her about it
24  again?  Do you want to do that?

16 (Pages 188 to 191)

GUADALUPE NAVARA - JULY 14, 2006

Page 192

1    MR. SCHUTTE: Oh, sure. I will ask her about
2 it.
3    MR. HOFELD: If you don't, I can. So
4 whatever you want to do is fine.
5 BY MR. SCHUTTE:
6    Q. Excuse my reach.
7       Counsel reminds me that I had asked you
8 during the break to look at Exhibit 1, your
9 affidavit, because you had told me there was an
10 error in Paragraph 7 where it referred to LaSalle
11 Bank and it should have been Harris Bank?
12    A. Yes.
13    Q. Did you see any other errors in this
14 affidavit?
15    A. Yes, $50,000 -- this $50,000 he told me
16 about this money on April 29th.
17    Q. Okay. He didn't tell you about it
18 during the first meeting?
19    A. No.
20    Q. Okay. Did you read that paragraph
21 before you signed it under oath on May the 3rd of
22 2005?
23    A. May 3, 2005?
24    Q. Yes.

Page 193

1    A. Yes.
2    Q. When was it that you first realized
3 that that statement in Paragraph 3 was an error?
4    A. When he gave me the 18,000.
5    Q. Oh, no, ma'am. I am sorry. My
6 question is when did you first realize that the
7 error was in the affidavit?
8    A. On April 29th, when he told me that the
9 $50,000 is the minimum.
10    Q. Okay. Right. I understand that now.
11 I am asking something slightly different.
12       You signed that affidavit on May the
13 3rd of 2005, correct?
14    A. Yes.
15    Q. Okay. And you now told me that the
16 statement in Paragraph 3 was a mistake in that.
17    A. No. I would like to like scratch that.
18 You mean about the $50,000?
19    Q. Yes.
20    A. I would like to, how can I say it to
21 you, correct it. I want to correct it.
22    Q. That's fine, and I am allowing you to
23 do that. In fact, I asked you to do that. My
24 question is: When did you realize that there was

Page 194

1 an error in this document?
2    A. In May something. I can't remember.
3    Q. Of 2005?
4    A. Yes.
5    Q. After you had signed the affidavit?
6    A. Yes.
7    MR. SCHUTTE: Okay. I have nothing further.
8    MR. HOFELD: I just have one short line of
9 questioning to try to clear something up.
10       EXAMINATION
11 BY MR. HOFELD:
12    Q. Ms. Navara, I want to show you Exhibit
13 25, which Mr. Schutte showed you earlier in the
14 deposition today, and I believe that you
15 identified it --
16    A. Yes.
17    Q. -- as the check that you and
18 Mr. Astudillo went to the bank together in order
19 to try to cash; is that correct?
20    A. Yes.
21    Q. Okay. Do you see the date of the check
22 on Exhibit 25?
23    A. The date is the 28th, May 28th.
24    Q. 2004?

Page 195

1    A. 2004.
2    Q. Now, I want to show you one more
3 document. I only have one copy.
4    MR. SCHUTTE: Can I see it?
5    MR. HOFELD: Yeah. Absolutely.
6    MR. SCHUTTE: Can you take the note off so I
7 don't --
8    MR. HOFELD: Sure. And for the record the
9 document --
10    MR. SCHUTTE: I understand.
11    MR. HOFELD: Actually, the document that I
12 want to show you -- show Ms. Navara is Exhibit L
13 of Plaintiff's Response to Defendants' Motion to
14 Dismiss. And we can mark it as 33, and I guess we
15 can -- do you mind if we make a copy before we
16 leave?
17    MR. SCHUTTE: No.
18       (WHEREUPON, a certain document was
19       marked Navara Deposition Exhibit
20       No. 33, for identification, as of
21       7-14-06.)
22 BY MR. HOFELD:
23    Q. Okay. Ms. Navara, what does the
24 document in Exhibit 33 appear to be? Take a

17 (Pages 192 to 195)

GUADALUPE NAVARA - JULY 14, 2006

**Page 196**

1  moment to look at it carefully.
2      A.  Okay.
3      Q.  It has three pages.  Have you looked at
4  all three pages?
5      A.  Yeah.  Okay.
6      Q.  Just let me know when you are done
7  looking.
8      A.  Okay.  I am finished.
9      Q.  Okay.  What do the documents in Exhibit
10  33 appear to be?
11      A.  This is the check that Astudillo gave
12  me, and I made copies of that.  This is the back
13  of this check.
14      Q.  When you are saying "this" and you are
15  pointing, what are you pointing to for the record?
16      A.  This (indicating).
17      Q.  You are pointing to --
18      A.  The back of the check.
19      Q.  -- where there is a signature.  What
20  does it say?
21      A.  It says, "Roger Astudillo.  Pay to the
22  order of Guadalupe Navara."
23      Q.  Okay.  So is it correct that you
24  recognize the document in Exhibit 33 as a copy of

**Page 197**

1  the check that Astudillo gave to you?
2      A.  Yes.
3      Q.  Is this the check that you went to the
4  bank with him to try to cash?
5      A.  Yes.
6      Q.  And what is the date on this check?
7      A.  May 4th.
8      Q.  Okay.  So that's different from the
9  date on the check in Exhibit 25, which was May 28,
10  right?
11      A.  Yes.
12      Q.  So my question to you is:  Which
13  exhibit contains the check that you actually took
14  to the bank with Mr. Astudillo to try to cash?
15  The one in Exhibit 25 or the one in Exhibit 33?
16      A.  This one (indicating).
17      Q.  Which is the one in Exhibit 33?
18      A.  Yes.
19      MR. HOFELD:  Okay.  No further questions.
20      MR. SCHUTTE:  I have nothing further.  Thank
21  you for your time.
22      THE VIDEOGRAPHER:  Going off the video
23  record.  The time is 12:30 p.m.
24          FURTHER DEPONENT SAITH NOT.

**Page 198**

**Page 199**

1          IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4  GUADALUPE NAVARA,                )
5       Plaintiff,          )
6       vs.                 ) No. 05 C 0864
7  LONG BEACH MORTGAGE COMPANY;     )
8  WASHINGTON MUTUAL BANK, FA;      )
9  NEW MILLENIUM MORTGAGE CORPORATION;)
10  ROGELIO A. ASTUDILLO, a/k/a      )
11  ROGER ASTUDILLO,                 )
12       Defendants.         )
13      I certify that I have read the
14  transcript of my deposition, consisting of Pages 1
15  to 197, inclusive, and I do again subscribe and
16  make oath that the same is a true, correct and
17  complete transcript of my deposition so given, and
18  includes changes, if any, so made by me.
19
20          GUADALUPE NAVARA
21  SUBSCRIBED AND SWORN TO
22  before me this      day
23  of        , A.D. 2006.
24      Notary Public

18 (Pages 196 to 199)

GUADALUPE NAVARA  -  JULY 14, 2006

Page 200

1  STATE OF ILLINOIS )
2          )
3  COUNTY OF DU PAGE )
4          I, NANCY A. GUIDOLIN, a Notary Public
5  within and for the County of DuPage, State of
6  Illinois, and a Certified Shorthand Reporter of
7  said state, do hereby certify:
8          That previous to the commencement of
9  the examination of the witness herein, the witness
10  was duly sworn to testify the whole truth
11  concerning the matters herein;
12          That the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting under my
15  personal direction and constitutes a true record
16  of the testimony given and the proceedings
17  had;
18          That the said deposition was taken
19  before me at the time and place specified;
20          That I am not a relative or employee or
21  attorney or counsel, nor a relative or employee of
22  such attorney or counsel for any of the parties
23  hereto, nor interested directly or indirectly in
24  the outcome of this action.

Page 201

1          IN WITNESS WHEREOF, I do hereunto set
2  my hand and affix my seal of office at Chicago,
3  Illinois, this 28th day of July, 2006.
4
5
6          Notary Public
7          DuPage County, Illinois
8
9
10  C.S.R. Certificate No. 84-2531.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 202

1              I N D E X
2  WITNESS                    EXAMINATION
3  GUADALUPE NAVARA
4    By Mr. Schutte              130
5    By Mr. Hofeld              194
6
7
8
9          E X H I B I T S
10  NUMBER                  MARKED FOR ID
11  Navara Deposition Exhibit
12    No. 16                    137
13    No. 17                    159
14    No. 18                    163
15    No. 19                    166
16    No. 20                    169
17    No. 21                    170
18    No. 22                    171
19    No. 23                    175
20    No. 24                    176
21    No. 25                    177
22    No. 26                    178
23    No. 27                    179
24    No. 28                    181

Page 203

1          E X H I B I T S
2
3  NUMBER                  MARKED FOR ID
4  Navara Deposition Exhibit
5    No. 29                    184
6    No. 30                    185
7    No. 31                    186
8    No. 32                    188
9    No. 33                    195
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

19 (Pages 200 to 203)