# Exhibit 7

Page 1

```
 1       IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF ILLINOIS
 3               EASTERN DIVISION
 4  LONG BEACH MORTGAGE COMPANY    )
 5  TRUTH IN LENDING ACT FAMILY    )MDL Case No.
 6  RIDER LITIGATION           )07 CV 06543
 7  ------------------------------)
 8  THIS DOCUMENT RELATES TO:   )Centralized
 9  Navara v. Long Beach Mortgage Co.)before
10  U.S.D.C. N.D. Ill          )
11  Civil Action No. 05-0864   )Judge Wayne R.
12  Carye v. Long Beach Mortgage Co. )Anderson
13  U.S.D.C., D. Mass,         )
14  Civil Action No. 06-10887  )
15  (N.D. Ill. Civil Action No.   )
16  07-06544)                  )
17  Shelton v. Long Beach      )
18  Mortgage Co.               )
19  U.S.D.C., N.D. Ill.        )MAY 28, 2008
20  Civil Action No. 06-2323   )
21      THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL
22         The videotaped deposition of ERICK
23  SHELTON, called for examination, taken pursuant to
24  the Federal Rules of Civil Procedure of the United
```

Page 2

```
 1  States District Courts pertaining to the taking of
 2  depositions, taken before MARIA C. SUK, a Certified
 3  Shorthand Reporter of the State of Illinois,
 4  CSR No. 84-4453, at Suite 3400, 321 North Clark
 5  Street, Chicago, Illinois, on the 28th day of May,
 6  A.D. 2008, at 1:12 p.m.
 7  PRESENT:
 8      THE BROOKS LAW FIRM,
 9      (15008 Woodlawn Avenue,
10      Dolton, Illinois 60419,
11      708-841-8000), by:
12      MR. LLOYD J. BROOKS,
13          appeared on behalf of Erick Shelton;
14
15      HOWREY LLP,
16      (321 North Clark Street, Suite 3400,
17      Chicago, Illinois 60610,
18      312-846-5645), by:
19      MR. GABRIEL A. CROWSON,
20          appeared on behalf of Long Beach
21          Mortgage Company.
22  ALSO PRESENT: MR. SCOTT JOHNSON,
23          Legal Videographer.
24  REPORTED BY: MARIA C. SUK, CSR No. 84-4453.
```

Page 3

```
 1      THE VIDEOGRAPHER:  We are going on the video
 2  record at 1:12 p.m.
 3          My name is Scott Johnson, and I'm a
 4  legal videographer in association with Esquire
 5  Deposition Services.  Our address is 311 West
 6  Monroe Street in Chicago, Illinois.
 7          The court reporter today is Maria Suk,
 8  also from Esquire Deposition Services.
 9          Here begins the videotaped deposition of
10  Erick Shelton, taking place at 321 North Clark
11  Street here in Chicago, Illinois.  The date today
12  is May 28, 2008.
13          This deposition is being taken in the
14  matter of Shelton versus Long Beach Mortgage.  The
15  case number is 06 C 2323.
16          Will counsel please state their names
17  for the record?
18      MR. CROWSON:  Gabriel Crowson for defendant
19  Long Beach Mortgage Company.
20      MR. BROOKS:  Lloyd Brooks on behalf of
21  plaintiff Erick Shelton.
22      THE VIDEOGRAPHER:  Would the court reporter
23  please swear in the witness?
24          (WHEREUPON, the witness was duly
```

Page 4

```
 1          sworn.)
 2      MR. CROWSON:  One additional thing for the
 3  record.  In addition to the individual case
 4  mentioned by the videographer, this case will be
 5  part of the MDL action which bears the caption
 6  United States District Court for the Northern
 7  District of Illinois, Eastern Division, Long Beach
 8  Mortgage Company Truth in Lending Act Family Rider
 9  Litigation, MDL Case No. 07 CV 06543.
10          ERICK SHELTON,
11  called as a witness herein, having been first duly
12  sworn, was examined and testified as follows:
13          EXAMINATION
14  BY MR. CROWSON:
15      Q.   Good afternoon, Mr. Shelton.
16      A.   Good afternoon.
17      Q.   My name's Gabe Crowson.  I represent
18  Long Beach Mortgage Company.
19          Would you please state and spell your
20  name for the record?
21      A.   Erick Shelton, E-R-I-C-K S-H-E-L-T-O-N.
22      Q.   Are you a junior or a senior?
23      A.   No.
24      Q.   Have you ever given a deposition in a
```

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

ERICK SHELTON, MAY 28, 2008

Page 5

1  case before?
2    A.  No.
3    Q.  Your lawyer may have gone over some of
4  the ground rules, but I'll just kind of go over
5  them again.  I'm going to be asking a bunch of
6  questions of you today about your lawsuit and some
7  related items.  You'll be giving the answers.
8  There's no judge here or anything, but the court
9  reporter is taking down everything I say and
10  everything that you say, and it's important that
11  you let me finish my question before you begin your
12  response, and then I'll let you finish your
13  response before I begin my question.  That way,
14  she's -- can only take down one person at a time.
15         It's also important that even though I
16  may know what you mean when you kind of nod your
17  head or you say "uh-huh" or whatever, you need to
18  kind of give a verbal yes or no answer to all my
19  questions.
20         And if for whatever reason you don't
21  understand one of my questions, you know, please
22  let me know, and I'll try to rephrase it or state
23  it a different way.
24    A.  Okay.

Page 6

1    Q.  Is there any reason that would impair
2  your ability to understand my questions today?
3    A.  (Inaudible.)  No reason.
4    Q.  No reason?  And do you understand that
5  you're being deposed in connection with a lawsuit
6  that was filed against Long Beach Mortgage Company?
7    A.  Yes.
8    Q.  And that the testimony is being taken
9  down by a court reporter today?
10    A.  Yes.
11    Q.  And it's also being videotaped by a --
12  legal videographer?
13    A.  Yes.
14    Q.  Do you understand that the testimony and
15  the videotape could be shown to a judge or a jury
16  later on in this lawsuit?
17    A.  Yes.
18    Q.  What's your present address?
19    A.  My present --
20    Q.  Address.  Where you currently live.
21    A.  11-- 1123 East 82nd.
22    Q.  East Eighty- --
23    A.  82nd.
24    Q.  82nd.  And is that in Chicago?

Page 7

1    A.  Yeah.  Chicago, Illinois.
2    Q.  How long have you lived there?
3    A.  Probably three, three years.
4    Q.  Three years?  So maybe sometime in '05?
5    A.  '0- -- December.
6    Q.  December of '05?
7    A.  I moved in -- as a matter of fact I
8  moved in December the 6th '06 -- '05.  Before New
9  Year's.
10    Q.  Do you remember where you were living at
11  before the East 82nd Street address?
12    A.  Yeah.  What's that?  67- -- 67 Artesian.
13  6708 Artesian.
14    Q.  Artesian Street?
15    A.  Yes.
16    Q.  And that's in Chicago too?
17    A.  Yes.
18    Q.  And that's the address that involves the
19  loan that is the subject of your lawsuit?
20    A.  Yes.
21    Q.  How long did you live at that address?
22    A.  I don't know.  Three months and a half.
23    Q.  Three and a half months?
24    A.  Yeah.

Page 8

1    Q.  And where did you live before 6708
2  Artesian Street?
3    A.  6101 South Green.
4    Q.  6101 South Green Street?
5    A.  Yeah.
6    Q.  Do you remember how long you lived
7  there?
8    A.  With my sister about seven years.
9    Q.  Seven years?
10    A.  Yes.
11    Q.  And that's your sister's house?
12    A.  Yes.
13    Q.  Did you own any part of the South Green
14  Street address?
15    A.  No, sir.
16    Q.  Did you rent any part of it from your
17  sister?
18    A.  The bedroom.
19    Q.  And is that your sister Kasaundra
20  Shelton?
21    A.  Yes.  That's my baby.
22    Q.  Your baby sister?
23    A.  My older sister.
24    Q.  Oh.  Now, the -- your current address,

2 (Pages 5 to 8)

Page 9

1  1123 East 82nd Street, do you own that house?
2     A.   It's an apartment.
3     Q.   It's an apartment?
4     A.   Me and -- well, my -- what would you
5  call him?  My helper?
6     Q.   Your helper?
7     A.   We live together as roommates.
8     Q.   Do you share the rent at that place?
9     A.   Yes.
10    Q.   And when you lived at 6708 Artesian
11 Street, was there someone else that lived there
12 with you as well?
13    A.   Yes.
14    Q.   A roommate?
15    A.   Yes.
16    Q.   What was that person's name?
17    A.   Michael Bibbs.
18    Q.   Did Mr. Bibbs pay any rent to you?
19    A.   Yes.
20    Q.   How much a --
21    A.   $500 a month.
22    Q.   $500?
23    A.   Yeah.
24    Q.   Did you have a lease agreement with

Page 10

1  Mr. Bibbs?
2     A.   No, no.
3     Q.   Did you have an oral understanding with
4  Mr. Bibbs?
5     A.   Yes, yes.  It was his building.
6     Q.   I'm sorry?
7     A.   It was his building.
8     Q.   It was his building?
9     A.   I mean, when his father died, he was the
10 paid beneficiary.
11    Q.   It was his father's building?
12    A.   Right.
13    Q.   And then he got it when his father died?
14    A.   Right.
15    Q.   And then did he sell it to you?
16    A.   Yes.
17    Q.   And that would have been, like, in July
18 of 2005?
19    A.   Yes.
20         (WHEREUPON, there was a short
21         interruption.)
22 BY MR. CROWSON:
23    Q.   Do you need to -- one of the things I
24 forgot to say, too, was if you need to take a break

Page 11

1  for anything, let me know.  It's not an endurance
2  test.  We can stop for a few minutes, and we'll
3  periodically take breaks about every hour.
4         And it's also not a memory test.  I
5  mean, if -- I may be asking for specific dates and
6  things.  If you -- you know, if you can't remember
7  something, you know, it's okay to say "I don't
8  remember," but as the day goes on, if something
9  jogs your memory, please let me know that you all
10 of a sudden remember something.
11        So around July of 2005 you bought the
12 Artesian Street home from Mr. Bibbs?
13    A.   Yes.
14    Q.   Did you have a written purchase
15 agreement with him?
16    A.   I don't remember.  No.  No.
17    Q.   Did you have an oral understanding as to
18 the price?
19    A.   No.
20    Q.   Do you remember how much you paid for
21 the house?
22    A.   No.
23    Q.   Before you purchased the Artesian Street
24 home, had you ever owned any house on your own?

Page 12

1     A.   No, sir.
2     Q.   Had you ever had any mortgage loan ever
3  before?
4     A.   No, sir.
5     Q.   What was the reason why you decided to
6  buy the Artesian Street address?
7     A.   To help Michael Bibbs out.  He was, like
8  -- we call him -- I call him my nephew because when
9  his mother had passed, since he was an infant and
10 my sister took care of him all his life, so he used
11 to call me uncle, and I was his -- I mean, he was
12 my nephew.  But he was living with his grandmother.
13 That's not his biologic grandma, but she used to
14 baby-sit him all the time.
15        So he said he was tired of sleeping on
16 the floor and is there any way he could sell the
17 building, and I told him I'll look into it and find
18 someone who could sell the building.
19    Q.   You were going to help him find someone
20 to buy the building?
21    A.   To buy the building.
22    Q.   And then -- but why did you end up being
23 the person who bought the building?
24    A.   Because I had talked to the guy named

3 (Pages 9 to 12)

ERICK SHELTON, MAY 28, 2008

Page 13

1 Dre, and he -- I told them that Michael wanted to
2 sell the building and -- because Michael called me
3 and asked me to find some -- what do you call them?
4 What do you call them? The -- sell your building?
5 What do you call them? Well, anyway, he told me to
6 -- I forgot what you call them. To find someone to
7 help him sell the building. So I called Dre and
8 asked him do he know anyone to help Michael sell
9 the building. Dre asked for Michael's number and
10 said dad told him and said I would get -- so I
11 guess Michael thought -- knew that I had good
12 credit, you know, as far as I have a credit card
13 and just a phone, as far as that, so I had, like,
14 good credit. And Dre said, "Well, don't worry. We
15 could do it. You buy the building for him."
16       And I told Michael, "Well, I don't know.
17 I ain't got no money."
18       Dre said that he -- we could get the
19 building with no money down. So I told Michael,
20 "If I get the building, you've got to pay rent, and
21 you could live back in your own building."
22       So that's how that happened.
23    Q.    The person you called Dre, is that Andre
24 Colbert?

Page 14

1    A.    Yes. Excuse me. And the thing I was
2 looking for, real estate. Was looking for a real
3 estate.
4    Q.    A real estate agent?
5    A.    Right.
6    Q.    So Michael wasn't living in the building
7 at the time?
8    A.    No.
9    Q.    He was living with his grandmother?
10    A.    Grandmother.
11    Q.    He was tired of living there?
12    A.    No. Actually, his father had went to
13 jail for drinking. He died in jail. So he left
14 the keys with Michael's auntie, so Michael's auntie
15 then would never let him back in the building, and
16 Michael found out that he's the paid beneficial or
17 whatever because his father ain't had no more kids
18 but Mike. So everything went to Michael. So
19 that's how we found out.
20    Q.    So Michael owned the house as he
21 inherited it from his father, but he -- his aunt
22 wouldn't let him live in the house?
23    A.    Correct.
24    Q.    And then so he needed to sell the house

Page 15

1 to someone else --
2    A.    Not -- not --
3    Q.    Let me back up. He needed a way to be
4 able to get to live in the house?
5    A.    Correct.
6    Q.    And so he needed to -- he used you to be
7 the buyer; is that correct?
8    A.    Correct.
9    Q.    Because you had good credit?
10    A.    Correct.
11    Q.    And what was -- did Mr. Colbert, did he
12 not have good enough credit to buy it on his own?
13    A.    I'm not for sure. I'm not for sure.
14    Q.    So you basically -- I think this is a
15 fair, you know, rehash of it -- only bought the
16 property to help out your friend?
17    A.    Correct.
18    Q.    Now, did you intend to actually move
19 into the house?
20    A.    Yes. I moved in with him in that house.
21 So we both shared the first floor apartment. By me
22 it was spending on -- I said I'll take care of my
23 part and his part and we pay the bills, and it was
24 a two-flat, and the person that lived upstairs.

Page 16

1    Q.    So it was a two-story building?
2    A.    Correct.
3    Q.    You and Michael were going to share the
4 first floor?
5    A.    We did.
6    Q.    And there was someone else living on the
7 second floor?
8    A.    Yes.
9    Q.    The person on the second floor, what was
10 his name?
11    A.    I don't remember. It was rented out to
12 his wife or -- I know her name was Mary.
13    Q.    And did that person pay rent?
14    A.    Yes.
15    Q.    About how much was that?
16    A.    It was $700.
17    Q.    And did Michael pay rent to you?
18    A.    Yes.
19    Q.    How much was that?
20    A.    Five.
21    Q.    And do you remember what the -- did you
22 make the mortgage payments once you moved into the
23 house?
24    A.    One.

4 (Pages 13 to 16)

ERICK SHELTON, MAY 28, 2008

Page 17

1    Q.   One?
2    A.   One.
3    Q.   Do you remember how much the monthly
4  mortgage payment --
5    A.   At first I was recall that it was 13,
6  but actually I -- I -- it was 18. But they sent me
7  two different mortgage. And the one had, like,
8  $1259, and another one had -- the other one had
9  $500 on it. I'm thinking because I was late, that
10 was the late fee, so that's why I thought -- but
11 18, I wasn't never told I could pay them -- there
12 wasn't no way I could pay that much.
13    Q.   So you thought the monthly payment was
14 going to be about $1300 a month?
15    A.   Correct.
16    Q.   And it ended up being about $1800 a
17 month?
18    A.   Correct.
19    Q.   And it was because you ended up having
20 two mortgage loans?
21    A.   Correct.
22    Q.   One for about $1250 or so a month?
23    A.   Yes.
24    Q.   And then another one for $500-something?

Page 18

1    A.   Yes.
2    Q.   And you were -- when you moved into the
3  house, did you have a job?
4    A.   No. I never worked a day in my life.
5    Q.   You never worked a day in your life?
6    A.   (No audible response.)
7    Q.   Were you basically counting on the money
8  from the person on the second floor and then the
9  money from Michael to pay the entire mortgage
10 payment?
11    A.   Yes.
12    Q.   And what happened after you made the
13 first mortgage payment?
14    A.   The first mortgage payment, I sent them
15 12-something over the -- over the debit card. And
16 it was kind of late. So they sent me another
17 mortgage paper, and it was for 5, and I -- I was
18 thinking it was a late fee or whatever, but I paid
19 them anyway. So it -- that was the rest. And I --
20 I asked, why do I have two different types of
21 mortgage? Why didn't it come in one? That's how
22 that happened.
23    Q.   And did you call up somebody at Long
24 Beach and ask --

Page 19

1    A.   Yes.
2    Q.   -- those questions?
3    A.   Yes. I called Washington Mutual, and
4  they told me that I had two different types of
5  mortgage, one for some- -- I don't recall which way
6  to say it, how she said it. But one was for a
7  lower rate and a higher rate. Something like that.
8    Q.   Is it something called, like, an 80/20
9  mortgage loan? Have you ever heard that phrase?
10    A.   80/20? I don't recall.
11    Q.   Do you remember what the loan amount was
12 when you started off? How much you had to borrow
13 from Long Beach?
14    A.   No.
15    Q.   And what did you do after you spoke with
16 someone at Washington Mutual and found out that you
17 had two mortgage loans?
18    A.   I started to move out.
19    Q.   You moved out right away?
20    A.   Yeah. I mean, Michael Bibbs moved --
21 because he moved with his girlfriend, so he left in
22 November, the early beginning of November. I left
23 at the end of November because there wasn't no --
24 the people upstairs had moved already, and it

Page 20

1  wasn't no way we could (inaudible) there, and I was
2  wondering why was my mortgage so high.
3    Q.   Did you get -- did it go into
4  foreclosure?
5    A.   No, no, not right then and there.
6    Q.   Did it -- at some point did it go into
7  foreclosure?
8    A.   Well, that -- not that I recall. I
9  don't recall. Soon will (inaudible). I ain't
10 there, so I guess it did in the long run, yeah.
11    Q.   So you ultimately basically just let --
12 you just moved out and let the lender come and --
13    A.   No, no, no. What we did, I had the --
14 (inaudible ) -- the guy that used to clean up
15 around the building, I left him there to watch the
16 building for me until we get everything
17 straightened out. And, actually, I called the
18 Washington Mutual, and they prefer -- I was trying
19 to sell the building back, and she preferred me to
20 some other lady. I don't remember her name.
21    Q.   About how many times did you have to
22 call Washington Mutual?
23    A.   I called them numerous times, and I had
24 told them, well, I'm -- I'm -- (inaudible) come,

5 (Pages 17 to 20)

ERICK SHELTON, MAY 28, 2008

Page 21

1  and, you know, and I can't afford to pay this, and
2  some lady was like, "Well, you've got to deal with
3  it." (Inaudible.) But I think I called them about
4  three times.
5      Q.  Did anybody else ever move into the
6  house after you and Michael left?
7      A.  No, sir.
8      Q.  Did you sell the house to anyone else?
9      A.  No, sir.
10     Q.  And so you never -- there were -- there
11 were never any other tenants that came in to rent
12 the house from you?
13     A.  Not -- not -- only the guy that I left
14 there stayed in there.
15     Q.  Did he continue to pay rent?
16     A.  No. I let him stay there. I was paying
17 him to watch the building, and I give him $25 for
18 something to eat, you know, because he was staying
19 there because they had cut off the heat or
20 whatever, you know.
21     Q.  Oh, so it was like a maintenance guy
22 that was just there kind of watching the place?
23     A.  Correct. And clean up around the
24 building.

Page 22

1      Q.  And that wasn't -- what was that
2  person's name?
3      A.  Rufus Nichols.
4      Q.  Rufus -- what was --
5      A.  Nichols.
6      Q.  Nichols. And Mr. Nichols wasn't the
7  person who was the original tenant?
8      A.  No, sir.
9      Q.  I just want to make clear, when you
10 moved in, you didn't have any other source of
11 employment or income when you moved into the
12 Artesian Street house?
13     A.  No, sir.
14     Q.  And your thought process was that you
15 were going to be able to pay the mortgage payment
16 based on the rent from Mary of about $700 and the
17 money -- the $500 from Michael?
18     A.  Correct. With my SSI.
19     Q.  Your Social Security income?
20     A.  My Social Security. I don't -- I only
21 have to put on about $150 to, you know, keep up
22 with the bills.
23     Q.  Right. About how much a month did you
24 get in Social Security?

Page 23

1      A.  Well, at that time I was getting, like,
2  five something.
3      Q.  About $500 a month?
4      A.  About.
5      Q.  A little over $500?
6      A.  A little over five.
7      Q.  Do you still get Social Security income?
8      A.  Yes, sir.
9      Q.  About how much is it?
10     A.  $635.
11     Q.  And is that the only income that you
12 have right now?
13     A.  Yes, sir.
14     Q.  Did you -- did Mr. Colbert ever -- was
15 he the person that basically handled the loan and
16 the purchase for you?
17     A.  No, sir. Michelle was. I forget her
18 last name, but she was actually handling
19 everything.
20     Q.  Michelle Smith?
21     A.  Yes, I guess.
22     Q.  Was she a real estate agent?
23     A.  That I knew her, I was introduced as she
24 was.

Page 24

1      Q.  Who introduced you to her?
2      A.  Andre Colbert.
3      Q.  So you had never known Michelle before?
4      A.  No, sir.
5      Q.  And what did she do for you?
6      A.  Well, we had to take the -- my ID
7  because it didn't have no -- the -- to get in the
8  bank. In order for me to put some money in the
9  bank, I had to have my signature on my ID. They
10 wouldn't take it. I think this was Seaway Bank.
11 They would not take it. So she took me to 99th to
12 take another picture ID so I could have my
13 signature on my ID. And then my -- with my
14 coordination messed up, I signed it about five or
15 six times before it was right. And then it was
16 like --
17     Q.  So Michelle took you to a bank to get an
18 ID card?
19     A.  No. I had my card. Not to the bank.
20 They had -- they -- they say in order to -- for the
21 loan to go through, you have to keep your credit
22 up.
23     Q.  Uh-huh.
24     A.  I already had good credit that I knew

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

Page 25

1 of, and they wanted to put the (inaudible) in the
2 bank. But we went to Seaway Bank to open up a
3 banking account. They wouldn't take it because it
4 only had an X on my ID. So she took me back to
5 99th to take a picture ID over again so I could
6 sign my signature so we could have a bank account.
7     Q.    So before you met Michelle, you didn't
8 have your own bank account?
9     A.    No, sir.
10    Q.    And you needed a bank account in order
11 to get a loan?
12    A.    Yes, sir. That's what I was told.
13    Q.    Who told you that?
14    A.    Michelle.
15    Q.    So Michelle helped you open up the bank
16 account?
17    A.    Yes.
18    Q.    And you already had an ID card at the
19 time?
20    A.    Yes.
21    Q.    And in the signature spot it just has an
22 X?
23    A.    The first one did. So I take it over to
24 get the -- my signature on there, and it was a

Page 26

1 little sloppy, but it was on there.
2     Q.    Uh-huh.
3     A.    That's how I was able to get the -- my
4 bank account.
5     Q.    Do you still have that same ID card?
6     A.    Yes.
7     Q.    Do you have it with you today?
8     A.    Yes.
9     Q.    Maybe when we take a break I can make a
10 copy of that if you don't mind.
11         Mr. Shelton, I'm sure this is a
12 sensitive subject, but I kind of want to go over it
13 a little bit. I understand that some years ago you
14 were shot?
15    A.    Yes.
16    Q.    And do you remember how long ago that
17 was?
18    A.    Yes. In 1996.
19    Q.    You were born in 1970?
20    A.    Yes.
21    Q.    So you were about 26 then?
22    A.    Who, me?
23    Q.    Yeah.
24    A.    No. I'm 37.

Page 27

1     Q.    No. In 1996 you were 26?
2     A.    Oh, yes.
3     Q.    And because of the shooting, is that why
4 you're in a wheelchair?
5     A.    Yes.
6     Q.    And has it -- does it impair any of your
7 other abilities, your injury?
8     A.    Everywhere. I have a prosthetic eye and
9 my coordination and the way I talk a little bit.
10 That's about -- and sometimes my rememory.
11    Q.    Your memory?
12    A.    Yeah.
13    Q.    What about -- has it impacted your
14 ability to read and write?
15    A.    Yes.
16    Q.    How so?
17    A.    A lot. Because I really can't write
18 that good.
19    Q.    You couldn't write that good beforehand?
20    A.    Yeah.
21    Q.    And so it makes it harder to write
22 stuff?
23    A.    Yes.
24    Q.    What about to read things?

Page 28

1     A.    I can't -- it's real hard.
2     Q.    Real hard?
3     A.    Yes.
4     Q.    Do you -- what about signing your name?
5     A.    It's hard.
6     Q.    It's hard?
7     A.    Yeah. Like I say, it be sloppy, but I
8 guess you could try to figure it out.
9     Q.    Has it -- has it gotten worse over time?
10    A.    Well, it's been actually a -- the same.
11    Q.    So, I mean -- so your signature in 2005
12 would be about the same as your signature today?
13    A.    No, no. In 2005 -- well, in 2005 my
14 signature was right because I got shot in 2006.
15    Q.    I thought you said you got shot in 1996.
16    A.    Excuse me. 1996. You're right. 2005
17 it's still the same.
18    Q.    Okay.
19    A.    Excuse me.
20    Q.    Do you have someone who helps you take
21 care of your financial affairs?
22    A.    Yes.
23    Q.    Who would that be?
24    A.    My sister, Kasaundra. She's my baby.

7 (Pages 25 to 28)

ERICK SHELTON, MAY 28, 2008

Page 29

1    Q.    Kasaundra?
2    A.    Yeah.
3    Q.    Is that the way you say her name,
4  Kasaundra?
5    A.    Kasaundra.
6    Q.    What does she do for you?
7    A.    Well, you know, I have a really -- I
8  would say my nerves that cause me to shake, and so
9  she cook and, you know, she iron for me.  She did a
10  lot for me.  She's, like, my home care.
11    Q.    Right.  What about, like, your financial
12  stuff?  Do you still have a bank account today?
13    A.    No.
14    Q.    What about your Social Security checks?
15    A.    She on that because it's my name on it
16  and her name on it.
17    Q.    The checks are made out to both you and
18  your sister?
19    A.    Yes.  For her being my baby.
20    Q.    Does she read or explain, like, mail or
21  documents for you?
22    A.    Yes.  Things that I don't understand,
23  yes.  She'll -- or my niece will.
24    Q.    What's your niece's name?

Page 30

1    A.    Her name's Melissa.
2    Q.    Melissa?  What's her last name?
3    A.    Head.
4    Q.    Hage?
5    A.    Head (indicating).
6    Q.    Oh, Head.  Got it.  Sorry.
7          Did Kasaundra help you out when you
8  bought the house at Artesian?
9    A.    No, no.  Actually, I was trying to make
10  it be a surprise.  Thought I could do it on my own
11  because me and Andre, we go along well, so I -- I
12  put my trust in him.  So she never knew about it
13  because she always didn't really ever trust Andre.
14    Q.    Why didn't she trust him?
15    A.    Well, just because the crowd he ran
16  around with back in the day.
17    Q.    The crowd he had?
18    A.    Yeah, back in the day.  She don't really
19  trust nobody.
20    Q.    That's the way sisters are sometimes, I
21  guess.
22    A.    Yeah.
23    Q.    Did Andre, you know, read or explain
24  documents to you about the house sale?

Page 31

1    A.    No.
2    Q.    Did he -- did he give you any documents?
3    A.    No, no, no.  Well, at the close?
4    Q.    At the closing or beforehand.
5    A.    No.  Not -- well, Dre, at the closing,
6  Dre didn't even say nothing.  It was a table like
7  this, but he sat in the corner, so -- and I said --
8  my lawyer was sitting there, Michelle sat right
9  there, Michael Bibbs sit where you're sitting
10  there.  Her lawyer was sitting there, too.
11    Q.    Well, let's -- we'll talk about the
12  closing in a little while.  I guess what I'm trying
13  to figure out is, before you actually went to the
14  closing, you -- you and Michael had reached some
15  understanding where you had to buy the house based
16  on your credit so that he could move in?
17    A.    Yes.
18    Q.    About how long before the closing was --
19  did you have that understanding with him?
20    A.    Would you repeat that?
21    Q.    Sure.  I mean, I think the documents say
22  that the closing was around July 12, 2005.
23    A.    Yeah.
24    Q.    About how long before that date did you

Page 32

1  and Michael start talking about you buying the
2  house?
3    A.    Well, we actually started talking about,
4  like, the beginning of June or a little before.
5    Q.    And you don't remember signing any
6  purchase agreement with Michael?
7    A.    No, sir.
8    Q.    Did you understand that you needed to
9  get a loan to buy the house?
10    A.    I didn't understand at first until they
11  told me.
12    Q.    Who told you?
13    A.    Michelle and Andre Colbert.
14    Q.    Michelle and Andre told you that you
15  needed to get a loan?
16    A.    Yes.
17    Q.    About when did they tell you that?
18    A.    Well, this was, like, the same time when
19  they found out that I could be the owner of the
20  building.
21    Q.    And did Michelle or Andre go about
22  taking care of getting the loan?
23    A.    Well, I assume they did because I ain't
24  seen nothing.

8 (Pages 29 to 32)

Page 33

1    Q.    You never -- you didn't see anything
2  about a loan?
3    A.    No, sir.
4    Q.    Did you talk to anybody about a loan
5  other than Michelle and Andre?
6    A.    No, sir.
7    Q.    Did you ever hear the name Marnette
8  James?
9    A.    Yes.  At the closing.
10    Q.    That was the first time you had ever
11  heard of Marnette James?
12    A.    No, I had -- I had spoke to her once
13  over the phone, and she was -- she was -- I forgot
14  what she asked.  She asked me a question.  I don't
15  recall what she asked me, but I spoke to her once.
16    Q.    About how long before the closing was
17  that?
18    A.    I think the middle of June.
19    Q.    That was the only time you had ever
20  spoke to her?
21    A.    Yes.
22    Q.    She called you?
23    A.    No.  I -- I believe Michelle called her.
24    Q.    Michelle called Marnette?

Page 34

1    A.    Marnette.
2    Q.    And then how did you talk to Marnette?
3    A.    Because Michelle handed me the phone.
4    Q.    Oh, you were with Michelle at the
5  same --
6    A.    Michelle came over to my house, and when
7  she talked to Marnette, Michelle gave me the phone
8  to speak to her, and Marnette asked me something.
9    Q.    Why was -- do you know why Michelle was
10  already on the phone with Marnette?
11    A.    I don't know.
12    Q.    Do you know if it had anything to do
13  about the loan?
14    A.    No, I don't know if it had anything to
15  do about the loan, but I know it had something to
16  do with me.
17    Q.    And then Michelle put you on the phone
18  to talk to Marnette?
19    A.    Yes.
20    Q.    And then Marnette asked you a question,
21  but you don't remember what it was?
22    A.    Right.
23    Q.    And was that the entire conversation?
24    A.    Yes.

Page 35

1    Q.    Do you know if it had anything to do
2  about your employment or income?
3    A.    No.
4    Q.    Did you know that Marnette was working
5  for a company called First Capital Mortgage?
6    A.    No.
7    MR. BROOKS:  Just for clarification, did he
8  know at the time, or does he know now?
9  BY MR. CROWSON:
10    Q.    Did you know then?
11    A.    No.
12    Q.    Do you know now?
13    A.    Yes.
14    Q.    Did you know at the closing?
15    A.    No.  I -- I thought they worked for the
16  real estate.
17    Q.    And so I take it that you didn't talk to
18  anybody at Washington Mutual or Long Beach at that
19  time?
20    A.    No.
21    Q.    And so other than that one conversation
22  with Marnette and talking with Michelle and Andre,
23  you had never talked to anybody about the actual
24  loan?

Page 36

1    A.    No.
2    Q.    And what did Michelle or Andre tell you
3  about, I guess, the status of the loan?
4    A.    Well, it wasn't really with Andre
5  Colbert.  It was Michelle.  She didn't say anything
6  about the loan.  She said that I can keep up my
7  credit in order to get the building.  That was the
8  conversation.
9    Q.    You had to keep up your credit to get
10  the building?
11    A.    Yeah, or to get the loan or whatever.
12    Q.    Did you -- did she tell you anything
13  about the interest rate of the loan?
14    A.    No, sir.
15    Q.    Did she tell you anything about the
16  total amount of the loan?
17    A.    No, sir.
18    Q.    What about the monthly payment?
19    A.    Well, I recall the mortgage, I thought
20  it was 13.
21    Q.    When did you -- when did you first think
22  that?
23    A.    When did I first think?
24    Q.    When did you first think that the

Page 37

1  payment was going to be $1300 a month?
2      A.   When everyone was talking at the
3  closing.
4      Q.   Okay.  So you didn't know until you got
5  to the closing what the payment was going to be?
6      A.   No, sir.
7      Q.   And you didn't know anything about the
8  interest rate?
9      A.   What's the interest rate?  I mean, I
10  don't even know what interest rate is.
11      Q.   So you wouldn't know anything about,
12  like, the types of fees that are charged when you
13  go to a closing?
14      A.   No.
15      Q.   Did you say that Michelle was a -- was
16  she a real estate agent?
17      A.   Yes.
18      Q.   Did you know whether she received a
19  commission for being a real estate agent?
20      A.   No.
21      Q.   Do you know in general whether real
22  estate agents get commissions?
23      A.   Well, I'm pretty sure.  No, I mean, if
24  you get a commission, it's like a -- yeah, I'm

Page 38

1  pretty sure of that, yeah.
2      Q.   When did you -- when did you first know
3  that Long Beach or Washington Mutual was your
4  lender?
5      A.   At the close.
6      Q.   Did anyone at Long Beach ever do
7  anything to make you get the loan?
8      A.   No, sir.
9      Q.   I guess we'll kind of switch gears a
10  little bit.  I'd like to explain in your own
11  words what you think Long Beach has done wrong to
12  you in this lawsuit.
13      A.   Well, that I recall, they put a lender
14  on -- as far as on my -- on anything I own.  So, I
15  mean, that's why I'm suing.
16      Q.   They put a lien on -- on the stuff you
17  own?
18      A.   Yeah, on anything I ever try and get.  I
19  can't get nothing.
20      Q.   Other than the lien on your personal
21  property, do you claim that Long Beach has done
22  anything else?
23      A.   No.
24      Q.   And I'm not -- when I ask, you know, if

Page 39

1  there's anything else, I'm not trying to trick you
2  or suggest that there is something else.  I just
3  kind of want to, you know, exhaust your knowledge
4  of everything that you know about this case, and
5  so, you know, periodically I may say stuff like
6  that, "Is there anything else, is there anything
7  else?"  And it doesn't mean that there necessarily
8  is, but just -- I'm trying to get everything that
9  you know all today.
10      And so what you -- what you claim is --
11  is that Long Beach took a a lien on your -- on
12  your personal property?
13      A.   Yes.
14      Q.   And when did you -- when did you first
15  feel that they had done something wrong?
16      A.   When I wasn't explained what was going
17  on and -- about the interest rate and all, I never
18  -- nobody never explained it to me.
19      Q.   That was -- you're talking about at the
20  closing?
21      A.   Yeah.  For -- I think it was Washington
22  Mutual and Long Beach Mortgage.  I mean, I never
23  knew what nothing really meant.
24      Q.   So did someone at the closing tell you

Page 40

1  about the lien on your personal property?
2      A.   No.  I guess -- it was a couple of
3  months ago someone told me that because I was
4  actually -- (inaudible) calling around, and as a
5  matter of fact, they took my -- they took my -- my
6  circuit breaker.
7      Q.   Your circuit breaker?
8      A.   Yeah.  Because I put the lien on things
9  and -- I own or whatever.
10      Q.   You had a circuit breaker at the
11  Artesian Street address?
12      A.   No.  As of now on 82nd.
13      Q.   And you --
14      A.   82nd and Woodlawn.
15      Q.   And you think that Long Beach came and
16  took the circuit breaker --
17      A.   Yeah.
18      Q.   -- at the East 82nd Street --
19      A.   Yeah, yes, because the lady I talked to
20  said that I was -- they were sending me mail as far
21  as I was -- what is it called?  (Inaudible.)
22      Q.   Did you say predatory lending?
23      A.   Yeah.  Is that what it's called?
24      Q.   Some people call it that.

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

Page 41

1    A.    I forget what you call it.
2    Q.    When did that take place?
3    A.    It took place, like, two months ago,
4  three months ago.
5    Q.    And that was when you thought that Long
6  Beach had done something wrong with the lien?
7    A.    Right, because they was sending me mail.
8    Q.    Long Beach was sending you mail?
9    A.    At first Long Beach was sending me mail
10  about the mortgage, but they stopped, and I think
11  Washington Mutual or someone else was sending me
12  mail.
13    Q.    And when were they sending you mail?
14    A.    They were sending me mail recently. I
15  don't know who it came from.
16    Q.    They were sending you mail to the East
17  82nd Street address?
18    A.    Yeah, yes.
19    Q.    What was it all about?
20    A.    That my -- all of my property that they
21  thought I had could be taken. I mean, my car,
22  jewelry, furniture, until I paid -- paid somebody.
23    Q.    Do you still have those letters?
24    A.    I probably still do.

Page 42

1    Q.    Did you give any of them to your -- your
2  attorney?
3    A.    No, I don't think I gave him that one.
4    Q.    Just let me think if I get this
5  straight.
6         At the -- at the closing someone was
7  explaining some stuff about the loan to you?
8    A.    No.
9    Q.    No one talked to you?
10    A.    No. At the closing it was -- it was
11  nothing explained but, "Sign this, sign this, sign
12  this."
13    Q.    And then what happened after the
14  closing?
15    A.    The man that was sitting right here, I
16  guess, I don't know what you call him, he's the one
17  handing out the checks. And after I signed about
18  that many papers, a bunch of papers over there,
19  then he went in the back and came with -- with
20  checks and gave about four checks out.
21    Q.    I guess what I'm trying to figure out
22  is, like, once the closing was done, kind of when
23  you first thought that there was some problem with
24  a lien on your personal property.

Page 43

1    A.    Uh-huh. You said when the closing was
2  first done? I didn't know nothing about that.
3    Q.    Right, right. But I'm trying to figure
4  out when after the closing did you first kind of
5  realize that --
6    A.    Well, well, it was when I called
7  Washington Mutual. I had tried to get the building
8  the tuckpointing, and I thought my credit was good
9  enough, but I think they said a lien on me or
10  something.
11    Q.    You tried to get the --
12    A.    I was trying to fix the building.
13    Q.    You were trying to fix up the building?
14    A.    In case of tuckpointing, and so I was
15  trying to finance, and I couldn't finance.
16    Q.    And what did you do when you first
17  thought that there was a lien on your personal
18  property?
19    A.    I called Washington Mutual, and I had
20  told them I wanted them to explain to me what's
21  going on, and I had told them -- I told them that I
22  don't understand what's going on here.
23    Q.    What did they say?
24    A.    I don't recall at the moment what was

Page 44

1  said, but I know I talked to them a couple of
2  times, and I was explaining to them that I'm on a
3  fixed income, I don't work or nothing like that,
4  and the lady never said nothing back in reply. I
5  guess she said, "Oh, well. Ha, ha."
6    Q.    Did you -- did you ever call up an
7  attorney to talk about the lien?
8    A.    Not -- not right then and there. It was
9  some lady who was the second time I had called up
10  Washington Mutual, and she preferred me to somebody
11  on 55th that worked out of the building. I don't
12  recall her name. I tried to get their name.
13  (Inaudible). But they're on 55th. And she told
14  me, "Well, we'll come and look at the building
15  either Wednesday or Friday." So I'm like, "Okay."
16  But she called me back the same day and told me
17  bring all my paperwork. So when she looked through
18  my paperwork, she found there was something major,
19  and she called the attorney for me.
20    Q.    So the lady that you met with, she
21  wasn't an attorney?
22    A.    No. She would buy buildings or -- she
23  -- her firm -- I don't know what they is.
24    Q.    But you met her, and then she --

Page 45

```
 1    A.   She's the one who preferred me to an
 2  attorney.
 3    Q.   And is that Mr. Brooks?
 4    A.   No.  His name was -- I forget his name.
 5  It wasn't Mr. Brooks.
 6    Q.   When did you -- when did you first --
 7  when did you first hook up with Mr. Brooks?
 8    A.   My father had called Mr. Brooks.  I
 9  don't know when.  I don't remember, sir.
10    Q.   Did you ever -- did you ever talk to
11  Mr. Brooks about it?  And I'm not trying to get out
12  what you guys talked about.  I just want to know
13  kind of around when.
14    A.   Did I ever talk to Mr. Brooks about the
15  case?
16    Q.   Yeah.
17    A.   Yeah, I had explained to him what had --
18  what went down.
19    Q.   And I guess what I'm trying to figure
20  out is, about when did that happen?
21    A.   I had Mr. Brooks about, I think, two
22  years.  I don't recall.
23    Q.   About two years ago?
24    A.   It's been about a year I've been with
```

Page 46

```
 1  Mr. Brooks.
 2    Q.   Do you know if you have a written
 3  retainer agreement with Mr. Brooks?
 4    A.   What's that?
 5    Q.   A written -- do you have any kind of
 6  written agreement for Mr. Brooks' legal services?
 7    A.   Yes, I believe so.
 8    Q.   Is it in writing?
 9    A.   Yes, I believe so.
10    Q.   Do you remember signing it?
11    A.   Yes.
12    Q.   Did -- that's all right.  Has -- other
13  than the circuit breaker that we were just talking
14  about, has Long Beach taken any personal property
15  from you that you -- that you're aware of?
16    A.   No.  I had none for them to take, but
17  no, they haven't.
18    Q.   Have you been, like, harmed in any
19  economic way from the -- the lien on your property?
20    A.   What's that mean?
21    Q.   Like have you -- have you lost money or
22  anything?
23    A.   No.
24    Q.   What -- what is it that you want to get
```

Page 47

```
 1  out of this lawsuit?
 2    A.   Well, I want to -- want to get a fair
 3  opportunity, a fair chance to -- to understand why
 4  they didn't look through the documents and
 5  everything to know that this was really false, you
 6  know.
 7    Q.   You wanted a fair chance to look over
 8  all the documents?  Is that what you said?
 9    A.   Yeah, yeah.
10    Q.   Were you given any documents after the
11  closing to take home with you?
12    A.   I don't know.  There was so many papers
13  I don't -- I couldn't even tell you which ones are
14  the documents but I -- which one is that?  The long
15  sheet like?
16    Q.   I guess what I'm asking is, did you
17  leave the closing with some documents?
18    A.   Yes.
19    Q.   I'm not asking you exactly which --
20    A.   Yes.
21    Q.   About how thick of a --
22    A.   (Indicating.)
23    Q.   It's about 2 --
24    A.   And there was two of them.
```

Page 48

```
 1    Q.   Two envelopes?
 2    A.   Yes.
 3    Q.   Did anyone explain to you then that you
 4  had two envelopes for two loans?
 5    A.   Well, they wrote me a check for $200
 6  saying that I had to mail out to someone in about a
 7  week's time.
 8    Q.   They gave you a check for $200 that you
 9  had to mail to somebody else?
10    A.   Yes.  I had to do it before a week.
11    MR. CROWSON:  We've been going about an hour.
12  Do you guys want to take a little five-minute
13  break?
14    MR. BROOKS:  I'm fine, so it doesn't matter to
15  me.
16  BY MR. CROWSON:
17    Q.   You want to just keep going ahead?
18    A.   Keep going.
19    Q.   Do you -- are you aware that -- let me
20  ask you this first.
21         Do you know what a class action lawsuit
22  is?
23    A.   Yes.
24    Q.   And in your own words, what is it?
```

12 (Pages 45 to 48)

ERICK SHELTON, MAY 28, 2008

Page 49

1    A.   In my own words, a class lawsuit -- say
2  it again.
3    Q.   Well, just tell me in your own words
4  what you think a class action lawsuit is.
5    A.   In my own words it's about the
6  Washington Mutual -- Washington Mutual.  I mean,
7  about the documents?  I mean, I'm pretty sure that
8  I wasn't the only one -- my own words was about
9  Washington Mutual.
10    Q.   And I guess what I'm not asking is, not
11  specific about what happened in this case, but just
12  in general, have you ever heard of a class action
13  case?
14    A.   Not recently.  Recently, but not back
15  then.
16    Q.   Right.
17    A.   I never heard of it.
18    Q.   And I guess what I'm just trying to
19  figure out is, just in general, do you know what a
20  class action case is?
21    A.   Well, I -- I knew what it was, but I
22  forgot.  My memory ain't that good, but I knew what
23  it was, but I forgot that fast.
24    Q.   So you can't -- can you tell me today

Page 50

1  just kind of what you believe a class action case
2  is?
3    A.   Yeah.  Class action case is --
4    Q.   And you can take your time.
5    A.   Class action, I think it's when a lot of
6  people sign documents that don't mean -- explain
7  about what was going on.
8    Q.   Are you aware that the lawsuit that you
9  filed against Long Beach was filed as a class
10  action case?
11    A.   Yes, sir.
12    Q.   Did you know it was going to be filed as
13  a class action?
14    A.   Yes, sir.
15    Q.   Did you know that you were going to be a
16  proposed class representative?
17    A.   In the long run I did, I -- but once it
18  was explained to me I did.
19    Q.   And what's your understanding as to what
20  a class representative has to do?
21    A.   Represent for everybody else.
22    Q.   Represent everybody else?
23    A.   I guess represent for everybody else
24  what they don't know about the documents.  It

Page 51

1  wasn't explained.
2    Q.   And I guess, how is it that you go about
3  doing that?
4    A.   I do -- I go about doing what?
5    Q.   How is it that you go about making sure
6  that you represent all the other people who weren't
7  explained the documents?
8    A.   I guess by talking to you and making
9  sure it gets right, I guess.  I don't know.
10    Q.   Do you know anybody else who got a loan
11  with Long Beach Mortgage Company?
12    A.   No.
13    Q.   Do you know who is included in the class
14  of people that you want to represent?
15    A.   No.
16    Q.   And I'm not asking for names.  Just, in
17  general, do you know what it's going to encompass?
18    A.   Yeah.  I mean, I know what it's going to
19  encompass.  They didn't explain what was going on
20  before you signed the documents.  Knowing their
21  legal rights.
22    Q.   And I guess what I'm asking is, do you
23  know who's going to be in that class?
24    A.   No, I don't.

Page 52

1    Q.   And do you know the names of any of the
2  other named plaintiffs who want to be class
3  representatives as well?
4    A.   I don't understand.
5    Q.   Do you know if other plaintiffs filed a
6  lawsuit similar to your case?
7    A.   No, sir.
8    Q.   Have you ever heard of a person named
9  Guadalupe Navara?
10    A.   Who?
11    Q.   Guadalupe Navara?
12    A.   No, sir.
13    Q.   What about Albert Stentson?
14    A.   No, sir.
15    Q.   What about Charlene Sullivan?
16    A.   Who?
17    Q.   Charlene Sullivan?
18    A.   Charlene?
19    Q.   Yeah.
20    A.   No, sir.
21    Q.   Have you ever heard of the Edelman law
22  firm?
23    A.   (No audible response.)
24    Q.   Is that a no?  You've got to say no.

13 (Pages 49 to 52)

ERICK SHELTON, MAY 28, 2008

Page 53

1    A.   Oh, no, sir.
2    Q.   Have you ever heard of the Christopher
3  Lathay law firm?
4    A.   No, sir.
5    Q.   Is Mr. Brooks your only lawyer for this
6  case?
7    A.   Yes, sir.
8    Q.   Have you looked at any of the documents
9  that were filed with the court about your case?
10   A.   No, sir.
11   Q.   You've never gotten any?
12   A.   The ones -- I'm kind of confused when
13  you say documents, what -- is that papers?
14   Q.   I'm sorry.  I'm not talking about the
15  loan papers that you got at your closing.  I'm
16  talking about papers that are filed with the court
17  on your behalf about this lawsuit.
18   A.   No, sir.
19   Q.   You don't remember ever getting any of
20  those?
21   A.   The only papers I -- I recall was the
22  papers when I said that they was taking my rights
23  from me as far as my -- if I owned a car or
24  jewelry, all that being taken away from me.

Page 54

1    Q.   So you were shown a piece of paper
2  that --
3    A.   No.  It was mailed to me.
4    Q.   It was mailed to you?
5    A.   Yes.
6    Q.   Who mailed it to you?
7    A.   I don't recall the name.
8    Q.   Was it Mr. Brooks?
9    A.   No.  It was from, I think -- I guess it
10  was from the people that -- I don't recall.  This
11  was the same people that was saying that I
12  (inaudible).  I don't know.  I don't know.
13   Q.   And it was -- was it a piece of paper
14  about your Long Beach loan?
15   A.   That too.  It was Erick Shelton vs. Long
16  Beach Mortgage.  That's what it was.
17   Q.   And you don't remember where you got
18  that from?
19   A.   They mailed it to me.
20   Q.   Who mailed it to you?
21   A.   If I recall, was it Long Beach Mortgage?
22  They mailed it to me twice.  I think -- if I
23  recall, it was Long Beach Mortgage.  I don't
24  recall.  I don't remember the name.

Page 55

1    Q.   When?  When did this happen?
2    A.   This happened, actually, a month and a
3  half ago.
4    Q.   About two weeks ago?
5    A.   No.  About two months ago.
6    Q.   Oh, two months ago you got something in
7  the mail?
8    A.   Yes.
9    Q.   And it said Erick Shelton vs. Long Beach
10  Mortgage Company?
11   A.   Yes, that I recall.
12   Q.   Did you ever review drafts of papers
13  before they were filed with the court?
14   A.   Did I ever what?
15   Q.   Did you ever review a draft of a paper
16  that needed to be filed with the court?
17   A.   I don't understand what that is.
18   Q.   Well, I guess, do you remember when you
19  filed the lawsuit against Long Beach?
20   A.   No, I don't.
21   Q.   Do you think it would have been sometime
22  around January of 2007?
23   A.   I don't recall.
24   Q.   And I guess what I want to know is, do

Page 56

1  you remember seeing any paperwork that needed to be
2  filed with the court?
3    A.   That they mailed me?
4    Q.   Did anyone.
5    A.   Not that I recall.
6    Q.   Have you ever had to sign any
7  declarations or affidavits for this case?
8    A.   No.
9    Q.   Have you ever heard of a motion for a
10  class certification?
11   A.   A motion?  No.
12   Q.   So I take it you don't recall ever
13  seeing a piece of paper filed with the court that
14  said motion for a class certification?
15   A.   No.
16   Q.   And I know this is going to get kind of
17  boring, but do you remember seeing a piece of paper
18  filed with the court called consolidated class
19  action complaint?
20   A.   No.
21   Q.   At some point after you first met up
22  with Mr. Brooks did you ever have to gather any
23  documents at home about your loan?
24   A.   Yes.

14 (Pages 53 to 56)

ERICK SHELTON, MAY 28, 2008

Page 57

1    Q.   Do you remember when that was?
2    A.   I would say I've probably been dealing
3  with Mr. Brooks going on a year, two years ago
4  probably.
5    Q.   Did you give him --
6    A.   I faxed them to him.  Any information
7  that had to do with the building I probably faxed
8  to him.
9    Q.   And was that the only time that you ever
10  sent any documents to Mr. Brooks?
11    A.   Yes.
12    MR. CROWSON:  We can mark this part of the
13  deposition confidential.
14        (WHEREUPON, certain proceedings.
15         were had designated as
16         confidential and are transcribed
17         under separate cover.)
18
19
20
21
22
23
24

Page 60

1        (WHEREUPON, the following
2         proceedings were had not
3         designated as confidential:)
4  BY MR. CROWSON:
5    Q.   Have you ever gone by any other names
6  other than Erick Shelton?
7    A.   No.
8    Q.   And are you married?
9    A.   No.
10    Q.   Have you ever been married?
11    A.   No.
12    Q.   What's the highest level of schooling
13  that you had?
14    A.   12.
15    Q.   12th grade?
16    A.   (No audible response.)
17    Q.   Did you get a high school diploma?
18    A.   Well, no.  I ain't got that in my first
19  year of college because I was playing ball, and I
20  went to some school in college to get that.  Went
21  to Arizona.
22    Q.   Oh, you went to Arizona to play -- to
23  play --
24    A.   Ball, yeah.  It was a junior college.

Page 61

1    Q.   Football or --
2    A.   Basketball.
3    Q.   And so do you have a high school degree?
4    A.   No.
5    Q.   And how long did you go to the junior
6  college in Arizona?
7    A.   Six months.
8    Q.   What was the name of the school?
9    A.   Eastern, Eastern Arizona.
10    Q.   Do you remember what year that was?
11    A.   '88.  I graduated.  The end of '85
12  probably.
13    Q.   Were you --
14    A.   No.  Excuse me.  It wasn't in '85
15  because that's when I went to Erick Brown School.
16  Late -- '98, I believe.
17    Q.   '98?
18    A.   Uh-huh.  Well, I mean '89.
19    Q.   1989.  So you would have been about
20  19 years old?
21    A.   Yeah, uh-huh.
22    Q.   And were you going -- did you have,
23  like, a major or a specific study program?
24    A.   Yes.  Computer science.

Page 62

1    Q.   Computer science?
2    A.   (No audible response.)
3    Q.   Did you take any kind of law classes?
4    A.   No, sir.
5    Q.   What about business or finance?
6    A.   No, sir.
7    Q.   What about, like, classes on loans or
8  mortgages?
9    A.   No, sir.
10    Q.   Have you ever gone to any school after
11  the six months at Eastern Arizona?
12    A.   No, sir.
13    Q.   Have you -- have you ever served in the
14  military?
15    A.   No, sir.
16    Q.   What did you do after you spent about
17  six months at Eastern Arizona?
18    A.   Sat at home.
19    Q.   Sat at home?
20    A.   Outside.  Yeah.  I never did nothing.
21    Q.   You didn't have a -- any jobs then?
22    A.   No, sir.
23    Q.   And you never had any job?
24    A.   No, sir.

15 (Pages 57 to 62)

ERICK SHELTON, MAY 28, 2008

Page 63

1    Q.   When you say you sat at home, was that,
2  like, your parents' home?
3    A.   Yes.
4    Q.   And then at some point did you move in
5  with your sister?
6    A.   Well, after I got shot.
7    Q.   And that was in 1996?
8    A.   Well, I lived with my parents in '96
9  because the end of -- I moved with my sister in,
10  like, '97. Yeah.
11    Q.   And so then you stayed at your sister's
12  house from around '97 until the time that you
13  bought the house at Artesian Street?
14    A.   Yeah.
15    Q.   And you lived there for a few months?
16    A.   Right.
17    Q.   And then you moved back in with your
18  sister?
19    A.   No. I moved on 82nd.
20    Q.   Oh, the one that you split with the
21  roommate?
22    A.   Yes.
23    Q.   And so the -- the Artesian Avenue --
24  Street is the only house that you ever owned in

Page 64

1  your life?
2    A.   Yes.
3    Q.   And you've never managed, like, rental
4  property?
5    A.   No, sir.
6    Q.   And the loan that you got for the
7  Artesian Avenue house is the only mortgage loan
8  that you ever had?
9    A.   Yes, sir.
10    Q.   Before you filed the lawsuit against
11  Long Beach, had you ever filed a lawsuit before?
12    A.   No, sir.
13    Q.   Had you ever been sued in a case before?
14    A.   No, sir.
15    Q.   And before this case had you ever sought
16  to be a class representative?
17    A.   Excuse me?
18    Q.   Before this lawsuit that we're talking
19  about today, had you sought to be a class
20  representative in a class action?
21    A.   I don't understand.
22    Q.   Earlier we were talking about how you're
23  seeking to be a class representative for this
24  lawsuit.

Page 65

1    A.   Okay.
2    Q.   I guess what I'm asking is, other than
3  the one we're talking about, had you ever done that
4  same thing before?
5    A.   No, sir.
6    Q.   Have you ever had to testify in any kind
7  of trial or anything like that?
8    A.   No, sir.
9    Q.   Have you ever filed for a bankruptcy?
10    A.   No, sir.
11    Q.   And I take it since you've never been
12  married, you've never been involved in any divorce
13  proceedings?
14    A.   No, sir.
15    Q.   Have you ever been evicted before?
16    A.   Yes, sir.
17    Q.   When was that?
18    A.   In '91.
19    Q.   Where were you living then?
20    A.   With my mother. Oh, with my mother and
21  father on 85th and Artesian. No. 85th and Agro.
22  85th and Eskabon.
23    Q.   85th Street?
24    A.   Yeah.

Page 66

1    Q.   You were renting that?
2    A.   No. I was living there.
3    Q.   Oh, and your mom got evicted?
4    A.   Yeah. No. My mom ain't -- no. I lived
5  with my mother and my daddy on -- when I come home
6  from school. That's what you said, right?
7    Q.   I'm sorry. I didn't -- I didn't follow.
8    A.   Is that what you just asked?
9    Q.   I was asking if you had ever been
10  evicted before.
11    A.   Oh, no.
12    Q.   Okay. Sorry. I probably wasn't
13  clear.
14          (WHEREUPON, certain proceedings
15          were had designated as
16          confidential and are transcribed
17          under separate cover.)
18
19
20
21
22
23
24

16 (Pages 63 to 66)

Page 69

```
 1            (WHEREUPON, the following
 2            proceedings were had not
 3            designated as confidential:)
 4  BY MR. CROWSON:
 5     Q.   And did you say earlier that you spelled
 6  your name E-R-I-C-K?
 7     A.   Yes.
 8     Q.   Do you sign it with the K at the end?
 9     A.   Sometimes.
10     MR. CROWSON:  Let's take, like, five minutes
11  while he changes the tape out.
12     THE VIDEOGRAPHER:  We're off the record at
13  2:35 p.m.
14            (WHEREUPON, a recess was had.)
15     THE VIDEOGRAPHER:  Back on the record at 2:44
16  p.m.
17  BY MR. CROWSON:
18     Q.   Mr. Shelton, do you know what the status
19  of your lawsuit is?  Do you kind of know where it's
20  progressed in the litigation process?
21     A.   Come again.
22     Q.   Do you know -- can you kind of tell me
23  in your own words where the present status of your
24  lawsuit is against Long Beach?
```

Page 70

```
 1     A.   No.
 2     Q.   About how much time have you spent doing
 3  things for the lawsuit?
 4     A.   How much time I spent?
 5     Q.   Correct.  Just a ball park, maybe in
 6  hours.
 7     A.   I didn't spend no time.
 8     Q.   No time?
 9     A.   I really -- I mean, any paper I get or
10  see, I fax it to my lawyer.
11     Q.   Have you met with Mr. Brooks over the
12  course of the last year or two?
13     A.   Yeah, yeah, yeah.
14     Q.   About how many times?
15     A.   About twice.
16     Q.   Twice?  Was that in person or over the
17  telephone?
18     A.   It was in person.
19     Q.   About how long did those meetings last?
20     A.   Well, we had -- I had to go to court for
21  -- I don't know.  In court.  I go to City Hall or
22  something and -- and meet him up there.
23     Q.   You had to go to City Hall one time?
24     A.   Yeah, for (inaudible).
```

Page 71

```
 1     Q.   And Mr. Brooks came with you then?
 2     A.   Yeah.
 3     Q.   But did it have anything to do about
 4  this case?
 5     A.   Well, yeah.  I -- well, I don't know if
 6  it was this one or it was another case.
 7     Q.   And did you have a meeting with
 8  Mr. Brooks to get ready for today's deposition?
 9     A.   No, I didn't have no meeting with him.
10     Q.   Did you talk to him beforehand?
11     A.   Yeah, I talked to him.
12     Q.   When was that?
13     A.   Before we came up here.
14     Q.   Today?
15     A.   Yeah.
16     Q.   About how long did that -- did you take?
17     A.   A second, two, three.
18     Q.   I take it that -- did you look at any
19  documents?
20     A.   No.
21     Q.   That's the only time that you met with
22  Mr. Brooks to get ready for today's session?
23     A.   Yes.
24     Q.   Do you have any expectation of a certain
```

Page 72

```
 1  amount of time that you need to spend to work on
 2  this case in the future?
 3     A.   I don't know.
 4     Q.   You don't know?
 5     A.   (No audible response.)
 6     Q.   What is it that you think -- what is it
 7  that -- do you know if -- do you know if there's a
 8  trial, where it will take place?
 9     A.   Do I know -- excuse me.  Say it again.
10     Q.   Do you know if this case has to go to a
11  trial?
12     A.   No, I don't.
13     Q.   If it does, do you know where that's
14  going to take place?  Like what city?
15     A.   No, no.
16     Q.   Do you know who the judge is for the
17  case?
18     A.   I don't.
19     Q.   Have you spoken with Michelle about this
20  lawsuit since your loan closing?
21     A.   No.  No, I ain't spoke to her.  She came
22  to my house once, and I called my lawyer.
23     Q.   She came to your house once after the
24  closing?
```

17 (Pages 69 to 72)

Page 73

1    A.   Yes.
2    Q.   About how long after?
3    A.   No.  That was about after -- that was
4  last summer, I believe.
5    Q.   And --
6    A.   Once they found out that they was
7  getting the statement papers or what have you.
8  Then she approached, came over to my house.
9    Q.   What kind of papers?
10    A.   I guess to come to court or whatever.
11    Q.   Oh, she came to your house?
12    A.   Yes.
13    Q.   And did you talk about the lawsuit?
14    A.   No, I didn't talk to her about that
15  because -- I had called my lawyer.
16    Q.   When she came over, you called your
17  lawyer?
18    A.   Yes.
19    Q.   Why did you call your lawyer?
20    A.   Because I had nothing to talk to her
21  about.
22    Q.   Is that the only time that you ever saw
23  her?
24    A.   Yes, yes.

Page 74

1    Q.   Have you ever -- do you still talk to
2  Mr. Andre Colbert?
3    A.   Yes.  (Inaudible).  One of our fellow
4  friends had died.  I seen him at the funeral, but
5  we not discuss nothing.
6    Q.   So you see him every day?  Is that what
7  you said?
8    A.   No.  I said one of our close friends had
9  died.  I seen him at the funeral.
10    Q.   Oh.  Is that the only time that you've
11  seen him since the closing?
12    A.   Yes.  No.  I've seen him before that.  I
13  have seen him a day before that, too.
14    Q.   And you didn't talk to him about this
15  case at all?
16    A.   No, sir.
17    Q.   What about your sister?  Do you talk to
18  her about this lawsuit?
19    A.   No, sir.
20    Q.   Are there any family or friends that
21  you've talked to about this case?
22    A.   Well, I mean, my -- not the case, but me
23  and my father, we talk often, and he tries to
24  explain to me about certain things.

Page 75

1    Q.   Like what?
2    A.   About what -- what things mean.  Like
3  what an ARM means, a fixed rate and all that.
4    Q.   So your father's pretty knowledgeable
5  about kind of financial/mortgage type stuff or --
6    A.   Well, no.  He's a very smart guy.  He --
7  I mean, I guess he do know a little something about
8  it.
9    Q.   So you and him every now and then talk
10  about kind of mortgages, and he kind of explained
11  some stuff to you?
12    A.   Yes, yeah.
13    Q.   Do you ever talk about Long Beach or --
14    A.   No.
15    Q.   Did you talk to your father when you
16  were going to get the property at Artesian Street
17  to get his advice?
18    A.   At the very end because he has to come
19  with me on the day of the closing, but I told him
20  no because Michelle said could no one be in the
21  room.  But the people that's closing, they
22  (inaudible).
23    Q.   So other than that, you didn't talk to
24  your father about the loan at all?

Page 76

1    A.   No.
2    Q.   And then so, like, today, other than
3  your father, are there any other friends or family
4  that you would talk about mortgages or about Long
5  Beach?
6    A.   (No audible response.)
7    Q.   Is that a no?
8    A.   Oh, no.
9    Q.   What about Mr. Bibbs?  Do you still talk
10  with him?
11    A.   Yes.
12    Q.   How often do you see him or talk to him?
13    A.   Very often because he still comes around
14  my sister's house.
15    Q.   Where does he live now?
16    A.   I don't recall exactly, but I know he
17  stays in the neighborhood around her house, but I
18  don't recall what house.
19    Q.   And then I think you said he moved out
20  of the Artesian Street house right before you did?
21    A.   Correct.
22    Q.   And he never moved back in?
23    A.   Correct.
24    Q.   And do you talk to him about this case

18 (Pages 73 to 76)

Page 77

1 or Long Beach?
2    A.    No, sir.
3    Q.    What about your sister Kasaundra?
4    A.    Yes.
5    Q.    You talk to her about it?
6    A.    Oh, no, sir.  I thought you say is that
7 her name.
8    Q.    Sorry.  And let's kind of just talk
9 about the actual closing.  You were explaining
10 earlier, who was at the -- who was physically there
11 at the closing?
12    A.    Okay.  Well, he -- he was the man that, I guess, passed the
13 checks out, I was there, Michelle was there, a
14 lawyer, I think his name was Mark, he was there,
15 Michael Bibbs was there, Dre was there, and Margene
16 came a little bit later.
17    Q.    Marnette?
18    A.    Marnette, yeah.
19    Q.    Mark was the lawyer for Michael Bibbs?
20    A.    Yeah.  Well, he -- he was the lawyer for
21 -- that's Michelle's lawyer, but she said we could
22 use him.
23    Q.    Do you remember if his name was, like,
24 Mark Amanata?

Page 78

1    A.    I really don't recall his last name, but
2 I think his name was Mark.
3    Q.    Was he your lawyer at the closing too?
4    A.    He was supposed to have been.
5    Q.    He was supposed to be your lawyer?
6    A.    Yes.
7    Q.    Did -- so we've got Michelle, Mark,
8 Michael Bibbs, Mr. Colbert, Marnette, you and
9 somebody else who passed out the checks?
10    A.    Yeah.
11    Q.    Was there anybody else?
12    A.    No.  That was it.
13    Q.    Did anybody else come into the closing?
14    A.    No.
15    Q.    So did anyone during the course of the
16 closing leave before it was done?
17    A.    Well, the only one who left and would
18 come back was the guy that -- that was passed out
19 the checks.  I think he took the paperwork in the
20 back or whatever and came back with the checks.
21    Q.    So he took some of the paperwork out and
22 came back?
23    A.    Yeah.
24    Q.    Is that the only time he left?

Page 79

1    A.    Yeah.  He was the only one leaving and
2 coming.
3    Q.    So what happened at the closing?
4    A.    Well, after the closing he passed out
5 the checks, and he -- (inaudible ).  He came full
6 of papers and the -- a check that they told me I
7 had to mail off, and everybody went their separate
8 ways.
9    Q.    Did you sign paperwork before he began
10 passing out the checks?
11    A.    Did I sign paperwork?  Yes.  Them was
12 them papers to close I was signing.  First it was
13 Michelle sitting next to me telling me where, you
14 know, "Sign there."  I'm thinking they were telling
15 me where I was signing was right.  And then
16 Marnette came in, so Michelle scooted over and
17 Marnette sat down.
18    Q.    About how long did this whole process
19 take?
20    A.    I'd say about a half hour.
21    Q.    About an hour?
22    A.    Hour.
23    Q.    And did you sign all the documents that
24 were presented to you?

Page 80

1    A.    Yes.
2    Q.    And did you ask any questions about
3 them?
4    A.    Yes.  On certain parts I was, like, what
5 that mean?  And I was -- she was telling me
6 something about what it means, but I don't recall
7 what she was saying, but it sounded good, so I was,
8 like, okay.
9    Q.    Who did you ask the question --
10    A.    Marnette.
11    Q.    Marnette?
12    A.    I was asking Marnette these questions.
13    Q.    And then she explained some of the
14 documents to you?
15    A.    Yeah.
16    Q.    Did you ask the lawyer, Mark, any
17 questions?
18    A.    No, because he was on the other side
19 helping Michael Bibbs sign papers.
20    Q.    Did anyone help you sign your name to
21 any of the documents?
22    A.    No.
23    Q.    So you physically signed everything that
24 was presented to you?

19 (Pages 77 to 80)

Page 81

1    A.    To me, yes.
2    Q.    Did you give anyone else authorization
3 to sign your name?
4    A.    No, sir.
5    Q.    Did you understand that anybody was
6 doing that?
7    A.    Signing my name?
8    Q.    Right.
9    A.    No, sir.
10    Q.    Was Mark explaining the documents to
11 Mr. Bibbs?
12    A.    He was -- he was asking -- no. He was
13 actually telling him the same thing. "Sign, sign,
14 sign." And it wasn't explained from paper to paper
15 to paper.
16    Q.    Right. Did you try to read any of the
17 documents before you signed them?
18    A.    A little bit of -- there was the
19 question I was asked what that means because I was
20 able to understand some of it. So I was asking
21 what that means.
22    Q.    So were you able to have the time to
23 read some of the documents if you wanted to?
24    A.    If I -- if I wanted to, yeah, I would

Page 82

1 have a little time. But it was like -- she looked
2 -- she looked over the papers before me and was,
3 like, "Well, sign," you know, and I signed, and
4 that was done.
5    Q.    Was there any time pressure to get
6 everything out without -- to get everything signed
7 without reading any of it?
8    A.    No.
9    Q.    And then after all the paperwork was
10 signed, the other guy who was there passed out the
11 checks?
12    A.    Yes, yeah. After he looked -- took the
13 papers, left -- so -- but he left for about at
14 least ten minutes. I guess he was looking over the
15 paperwork, whatever, and he came back with some
16 checks.
17    Q.    And then he passed out the checks to
18 whoever needed to get them?
19    A.    Yes.
20    Q.    And then what happened after that?
21    A.    Then that was it.
22    Q.    Did -- did he give you, like, a copy set
23 of the paperwork?
24    A.    Yes. And the copy set -- two envelopes.

Page 83

1    Q.    Did you take that home with you?
2    A.    Yes.
3    Q.    Did -- and there was one check made out
4 to you?
5    A.    Yes. It -- it was -- it was made out to
6 me for $200, and they told me to mail it off to
7 somewhere, and they say it have to be there in a
8 week.
9    Q.    Was there -- did you have to help out
10 anybody else, like, cash one of their checks?
11    A.    Help out who? Excuse me. I mean, I
12 don't understand what you're saying.
13    Q.    Was there a -- never mind. I was
14 thinking of somebody else. Sorry.
15        What did Mr. Colbert do at the closing?
16    A.    He just sat there like -- he really sat
17 in the corner and didn't say nothing. He didn't
18 say nothing.
19    Q.    He sat at the table or at the corner?
20    A.    He just sat in the corner.
21    Q.    Did he sign any document then?
22    A.    No, sir.
23    Q.    Were the only people that had to sign
24 documents you and Mr. Bibbs?

Page 84

1    A.    Yes, sir.
2    Q.    And were there a couple of checks made
3 out to Mr. Bibbs?
4    A.    One.
5    Q.    One?
6    A.    One. One was made out to everybody. I
7 mean, Marnette had got a check, Michelle had got a
8 check, that lawyer Mark had got a check, and
9 Michael Bibbs got a check.
10    Q.    What -- did you know why everybody was
11 getting a check?
12    A.    I didn't really understand why. I mean,
13 I -- I guess because -- I thought Michelle was
14 getting a -- a -- a -- what do you call that? The
15 --
16    Q.    Commission?
17    A.    Commission. I thought that's what
18 Michelle and Marnette was getting, a commission.
19    Q.    So you thought Michelle was getting a
20 commission?
21    A.    Right. And was splitting with Marnette.
22 And I thought the lawyer was getting a check for
23 being there, whatever. But I didn't think nothing
24 of it.

20 (Pages 81 to 84)

ERICK SHELTON, MAY 28, 2008

Page 85

1    Q.   Do you remember if -- did Michael give
2  you any of the money from his check?
3    A.   Yes.  When we got home after ten days, I
4  guess the check had to have been pros- -- pros- --
5    Q.   Processed?
6    A.   Yeah.  In ten working days.  And he gave
7  me three months of payment.
8    Q.   Three months of rent payments?
9    A.   Rent payments, yeah.
10    Q.   So he gave you about $1500?
11    A.   Yeah.
12    Q.   And that was -- that was all the money
13  he gave you?
14    A.   And he helped me with the -- he was
15  helping me with the lights and other little
16  utilities, but that was all he -- that was all the
17  money he gave me.  He ain't got no money after
18  (inaudible.)
19    Q.   So he just gave you about $1500?
20    A.   No.  It was a little bit more than that.
21  That was just for rent.  I think he -- all together
22  about 25.
23    Q.   $2500?
24    A.   Yeah.  To help with the bills, like he

Page 86

1  had got a phone put in his name in his room, and I
2  got the -- my phone, so he was paying the
3  (inaudible.)
4    Q.   So he gave you about $1500 to cover
5  three months of rent?
6    A.   Right.
7    Q.   And about another thousand for some of
8  the bills and utilities?
9    A.   Yes.
10    Q.   Did he give you any money as, like,
11  payment for helping him get the loan just in
12  general?
13    A.   No.
14    Q.   And did you ever talk to Marnette after
15  the closing?
16    A.   No, sir.
17    Q.   What about the lawyer, Mark?
18    A.   No, sir.
19    Q.   And Michelle, just the one time that she
20  came to your house?
21    A.   Yes, sir.
22    Q.   Did you -- did Andre or Michelle ever
23  present you any documents before the closing that
24  you had to sign for the loan?

Page 87

1    A.   No, sir.
2    Q.   Were you mailed any documents?
3    A.   No, sir.
4    Q.   So the only -- the only documents that
5  you ever signed for your loan were when you were at
6  the closing?
7    A.   Yes, sir.
8    Q.   And you signed them yourself, everything
9  that was presented to you at the closing?
10    A.   Yes, sir.
11    Q.   Before you got the loan for the Artesian
12  Street address, do you know what your credit score
13  was?
14    A.   Yes, sir.  I believe it was, like, 6.1.
15    Q.   6.1?
16    A.   Or 6.0.
17    Q.   Or, like, 610?
18    A.   610.  There you go.
19    Q.   Did you have credit card accounts?
20    A.   Yes, sir.  I had one credit card when I
21  was living with my sister.  When -- when they
22  approached and gave me the thousand dollars to put
23  in the bank, they said I was qualified for a Visa
24  card.  This was Chase Bank.

Page 88

1    Q.   This was before the closing?
2    A.   Yes.
3    Q.   That was when you went to open up a bank
4  account?
5    A.   Yes.
6    Q.   They said that you qualified for a
7  credit card?
8    A.   Yes.
9    Q.   And that's the only credit card you've
10  ever had?
11    A.   No.  I had one before that when I was
12  living with my sister.
13    Q.   What bank was that with?
14    A.   I don't recall.  I've got it in my
15  wallet, though.
16    Q.   You still have it?
17    A.   Yes.
18    Q.   When did you first starting using that
19  -- or when did you first open that one?
20    A.   Well, I first opened that one in, I
21  think, 2000.
22    Q.   So you got the one around 2000 that you
23  don't remember the bank, and then you got the one
24  with Chase in 2005?

21 (Pages 85 to 88)

ERICK SHELTON, MAY 28, 2008

Page 89

1    A.    Correct.
2    Q.    Do you still have both of those?
3    A.    Yes.
4    Q.    Do you know what the limit is on those?
5    A.    It's five.
6    Q.    $500 on both?
7    A.    Yes.
8    Q.    Do you keep a balance on those of, like,
9    charges that you've -- that you've made?
10    A.    Well, my sister was because she used to
11    pay -- before I got the one in '05, when I had the
12    one in 2000, she would pay my bill for me.  So I
13    was keeping up with that bill until everything went
14    down.
15    Q.    Everything went down meaning after you
16    had moved into the house?
17    A.    Correct.
18    Q.    So did you -- did you use the card
19    yourself to make purchases and things?
20    A.    Yes.
21    Q.    And then your sister would pay the bill?
22    A.    No.  Well, you lost me.
23    Q.    The card that you got in 2000?
24    A.    Okay.

Page 90

1    Q.    Did you use that to buy stuff?
2    A.    No, no.  I used that to pay bills.
3    Q.    To pay bills?
4    A.    Cause --
5    Q.    And then did your sister make the
6    payment each month?
7    A.    Yes.
8    Q.    To your knowledge, was it ever late or
9    derogatory?
10    A.    No, sir.
11    Q.    What about the one that you got in 2005?
12    A.    What do you mean?
13    Q.    Has it -- has it ever been late?
14    A.    Yes.
15    Q.    It has?
16    A.    Yes.
17    Q.    Before or after the closing?
18    A.    Before.  Well, it was -- I ain't used it
19    until the -- I got in the building.
20    Q.    Do you have any kind of student loans?
21    A.    No, sir.
22    Q.    Do you have any other, you know, credit
23    accounts other than the two credit cards?
24    A.    No, sir.

Page 91

1    Q.    Have you ever been delinquent on any
2    kind of other bills or payment obligations?
3    A.    What you mean?
4    Q.    Like a gas bill or a utility bill or
5    anything like that?
6    A.    Well, at Artesian.
7    Q.    At Artesian?
8    A.    Yeah.
9    Q.    So after the closing?
10    A.    After the closing.
11    Q.    So -- and I guess what I want -- before
12    the July of '05 closing, all you had was the credit
13    card that you had opened in 2000?
14    A.    Yes.
15    Q.    And the one that you'd gotten from Chase
16    in 2005?
17    A.    Yes.
18    Q.    And at that time had you ever -- did you
19    have any other debts that were late or delinquent?
20    A.    No, sir.
21    Q.    And you believe that around that time
22    your credit score would have been, like, 610 or
23    6.1?
24    A.    Yes, sir.  I believe it was 6.1.

Page 92

1    Q.    Why is it that you believe that that's
2    what it was?
3    A.    Because the young lady that was going
4    over the papers had told me my credit score before
5    they gave me a make-believe job or whatever.
6    Because I ain't -- I ain't know -- she said -- used
7    the word that -- our firm or something.  I was,
8    like, no, it was four years ago.  I've been shot
9    for 12 years.  So I was like no, and she said,
10    well, somebody put down that and that you could
11    have got the loan with your regular credit score,
12    and that was -- which was 6.1 or something.
13    Q.    So this was at the closing?  Someone
14    told you your credit score?
15    A.    (Inaudible.)  This was after -- after I
16    was trying to sell the building.
17    Q.    Oh, someone told you what your credit
18    score was?
19    A.    When I went to meet the lady, and she
20    told me to bring the papers with me.
21    Q.    To bring the papers from the -- when you
22    first bought it?
23    A.    Correct.
24    Q.    And that's when she brought up that it

22 (Pages 89 to 92)

Page 93

1  looked like you had worked somewhere that you had
2  never worked at?
3      A.   Correct.
4      Q.   And before she pointed that out to you,
5  had you ever known that there was paperwork that
6  said that you had worked somewhere that you didn't?
7      A.   No, sir.
8      Q.   Had you ever -- before you went to your
9  closing, had you ever gotten, like, a credit report
10  from somebody?
11      A.   No, sir.
12      Q.   Had you ever, like, called up one of the
13  credit bureaus to see what your credit score was?
14      A.   No, sir.
15      Q.   And when you met with this lady after
16  your closing, how did she know what your credit
17  score was?
18      A.   Because she had all of the papers.
19      Q.   It was in the papers?
20      A.   All the papers.
21      Q.   Is it your understanding that -- do you
22  -- let me ask it this way.  Do you know today that
23  there was an application sent to Long Beach that
24  said that you worked at Contemporary Financial

Page 94

1  Services?
2      A.   What's that?  Say it again.
3      Q.   Do you understand today that some
4  paperwork was sent to Long Beach that said that you
5  worked somewhere that didn't work at?
6      A.   I didn't know.
7      Q.   You didn't know that?
8      A.   Some paper -- you said did I know that
9  somebody -- I mean, some papers was sent out today
10  about that I worked somewhere?
11      Q.   I guess I'm phrasing it really bad.  I'm
12  sorry.
13          As we sit here today --
14      A.   Uh-huh.
15      Q.   -- do you understand that when you got
16  your loan, some paperwork was sent to Long Beach
17  that said that you worked somewhere that you
18  actually didn't?
19      A.   No, I didn't.
20      Q.   You don't -- you don't --
21      A.   I don't recall them telling me I worked
22  somewhere where I didn't work.
23      Q.   Who told you that?
24      A.   I said I don't recall that.

Page 95

1      Q.   You don't recall that?
2      A.   I never was told that.  Is that what
3  you're saying?
4      Q.   Yeah.  Do you understand that it was
5  told to Long Beach that you worked somewhere that
6  you actually didn't?
7      A.   No, sir.
8      Q.   But when -- when you got your loan in
9  2005, you didn't have a job?
10      A.   No, sir.
11      Q.   Do you know why anyone would have
12  falsified documents to make it seem as if you
13  worked somewhere that you didn't?
14      A.   Do I know what?  So I can get the
15  building, I yes.
16      Q.   So you can get the loan?
17      A.   The building.
18      Q.   So you can get --
19      A.   I -- I don't know why they did it.
20      Q.   Let me do it this way.
21          Maybe it will be a little bit easier if
22  I just showed you some of the stuff that I'm
23  talking about.
24      MR. CROWSON:  Can you mark this as Exhibit 1?

Page 96

1              (WHEREUPON, a certain document was
2              marked Shelton Deposition Exhibit
3              No. 1, for identification, as of
4              5-28-08.)
5  BY MR. CROWSON:
6      Q.   Mr. Shelton, I have handed you what the
7  court reporter has marked as Exhibit 1, which is a
8  copy of a Uniform Residential Loan Application,
9  which bears the Bates stamps LBM 216 through 218.
10  Can you look at the bottom of the first page?
11      A.   Where my signature at?
12      Q.   Where there's some initials.  Do you see
13  where I'm talking about?
14      A.   Yeah.
15      Q.   Are those your initials?
16      A.   Yes.
17      Q.   And let's flip over to the last page.
18  And on the left side kind of, you know, about a
19  third of the way up, there's a place for a
20  signature?
21      A.   Yes.
22      Q.   Is that your signature?
23      A.   Yes.
24      Q.   And is that your handwriting where the

23 (Pages 93 to 96)

ERICK SHELTON, MAY 28, 2008

Page 97

1  date is at?
2     A.   Where's that?
3     Q.   Right next to your signature.
4     A.   No.
5     Q.   That's not yours? But it is your
6  signature?
7     A.   Yes.
8     Q.   Do you remember ever signing this
9  document?
10    A.   Well, you know, it was so many papers.
11 It looks familiar.
12    Q.   It's possible that this is one of the
13 paperworks that you signed at the closing?
14    A.   Yeah. It's my signature on like this, I
15 signed it, but the date, I ain't signed no date
16 like that.
17    Q.   Now, let's go back to the first page.
18    MR. CROWSON:  Lloyd, you may have to help him
19 out.
20 BY MR. CROWSON:
21    Q.   On the left side about a third of the
22 way up from the bottom it's -- I know it's kind of
23 small print, but it says, "Name and Address of
24 Employer:  Contemporary Financial Services."

Page 98

1        Do you see where I'm talking about?
2     A.   Yeah.
3     Q.   You see where I'm talking about?
4     A.   Yeah.
5     Q.   Have you ever worked at a place called
6  Contemporary Financial Services?
7     A.   I ain't never worked.
8     Q.   And so you've never been an office
9  manager?
10    A.   No, sir.
11    Q.   And then if we -- let's go to the next
12 page. At the top, the first section is called,
13 "Monthly Income." And there's a -- again, I know
14 it's kind of small, but it says, "Employment
15 Income:  $3,236 a month."
16    A.   What about it?
17    Q.   You see in the monthly income section?
18    A.   Right here?
19    MR. BROOKS:  Uh-huh.
20 BY MR. CROWSON:
21    Q.   Right. You see what I'm talking about?
22    A.   Yes.
23    Q.   You didn't make that much money per
24 month then?

Page 99

1     A.   No. I wish I did.
2     Q.   And then if you go down a little bit
3  further on the left side, there's a spot for a
4  listing of checking accounts, and there's one that
5  says, "Bank One checking account."
6     A.   Okay.
7     Q.   And then it looks like it lists $3,500
8  in that account?
9     A.   Okay.
10    Q.   Do you see what I'm talking about?
11    A.   Yeah, right here.
12    Q.   In July 2005 did you have a checking
13 account at Bank One?
14    A.   July 2005?
15    Q.   Right.
16    A.   No, sir.
17    Q.   So it's not accurate that you were --
18 this document incorrectly suggests that you worked
19 at Contemporary Financial Services?
20    A.   Uh-huh.
21    Q.   It's not true that you worked at
22 Contemporary Financial Services?
23    A.   No.
24    Q.   And it's not true that you made $3,236

Page 100

1  per month?
2     A.   No.
3     Q.   And I guess what I want to know is, do
4  you have any idea why this piece of paper that you
5  signed at the closing would have inaccurate or
6  false stuff in it?
7     A.   No. I guess I would just sign and
8  wasn't looking, so if it was there before I signed
9  it, I -- I didn't pay attention because I wouldn't
10 have signed it.
11    Q.   Right. So if you would have saw that it
12 suggested that you worked at Contemporary Financial
13 Services --
14    A.   I would never have signed it.
15    Q.   I guess, do you know who put this stuff
16 on here?
17    A.   Well, you know, I don't know who did the
18 paperwork, but I just know I signed it from
19 Marnette and Michelle, but I really don't know who
20 made up the paperwork.
21    Q.   Do you know where they got this
22 information from that you worked at Contemporary
23 Financial Services?
24    A.   No, sir. I mean, this was, like, four

24 (Pages 97 to 100)

Page 101

1 years ago, right? I've been shot since '96. I
2 cannot work there like that. I mean -- so I really
3 don't know.
4    Q.    Do you -- is it fair for me to say that
5 you know that when a lender like Long Beach decides
6 to loan money to somebody that they have to believe
7 that the information in the application is
8 accurate?
9    A.    Well, no, no. I believe it all depends
10 on who it comes from.
11    Q.    What do you mean by that?
12    A.    I mean, it all depends on the person
13 that works there, I guess. I mean, even though
14 that -- I don't know what -- I don't know. No, I
15 don't believe -- what was the question you asked me
16 again? I'm -- excuse me. Would you repeat
17 yourself?
18    Q.    Sure, sure. And I'll rephrase it if we
19 have to. It's kind of a long-winded question.
20        Do you agree with me that a lender, when
21 they make a loan to somebody, they have to know how
22 much that person has in income?
23    A.    Yes, I agree.
24    Q.    And would you agree with me that they

Page 102

1 have to believe that the -- the information in the
2 application is accurate?
3    A.    Yes and no.
4    Q.    Why yes and no?
5    A.    Because after they verified that, then
6 I'll say yes, but for -- for a hearsay, I say no.
7    Q.    So as long as they verify it --
8    A.    Yeah.
9    Q.    -- it would be okay?
10    A.    Yeah, I guess.
11    Q.    Does -- have you even heard of the
12 company Contemporary Financial Services?
13    A.    Oh, the -- what is that, though?
14    Q.    That's what I'm asking. Have you ever
15 even heard of that company?
16    A.    No, sir.
17    Q.    Does -- does Michael Bibbs work
18 anywhere?
19    A.    No, sir.
20    Q.    Did he work in 2005 when you got the
21 loan?
22    A.    No, sir. He was on house arrest
23 hisself, and what had happened, I guess he went
24 over his boundaries and thought that he was going

Page 103

1 to get locked back up, so we couldn't -- we really
2 couldn't do the closing without him, but he told me
3 to proceed on and, if so, just hold his chair for
4 him, but they never came after him, so he was there
5 at the closing.
6    Q.    What about Mr. Colbert? Did he work
7 anywhere in July of 2005?
8    A.    I'm not familiar.
9    Q.    Does Mr. Colbert live in Wheaton,
10 Illinois?
11    A.    In who?
12    Q.    In Wheaton.
13    A.    Not that I know of.
14    Q.    He lives in Chicago?
15    A.    Yeah. Where -- in Wheaton, Illinois?
16    Q.    Did you ever meet Marnette James face to
17 face before the closing?
18    A.    No, sir.
19    Q.    In order to get the loan for the
20 Artesian Street sale, did you think that you could
21 -- you could get the loan just on your Social
22 Security income?
23    A.    Well, I wasn't -- I wasn't -- the
24 outcome on my sister came down I was --

Page 104

1 (inaudible.) I thought you could get things with
2 no money down, and it all depends on how your
3 credit is.
4    Q.    So as long as you had good credit --
5    A.    Yeah. That's why I wasn't looking for
6 my Social Security to upgrade the building or
7 whatever. I was going off of my -- my credit.
8    Q.    Just your credit?
9    A.    Yeah.
10    Q.    And would you agree with me that a
11 lender needs to know how somebody is going to pay
12 the bill each month before they give them a loan?
13    A.    Yeah. I agree.
14    Q.    And let's just take your situation. How
15 would a lender know that you could make the payment
16 each month?
17    A.    I guess by going through my background.
18 Of doing research, I guess, to know if I'm
19 qualified to pay that type of -- or get that type
20 of loan.
21    Q.    And I guess -- I think that's kind of
22 your credit score. I guess what I'm asking is, how
23 would a lender know that you had the money each
24 month to make the payment?

25 (Pages 101 to 104)

ERICK SHELTON, MAY 28, 2008

Page 105

1    A.  How would they know?  By my paperwork, I
2  guess?
3    THE COURT REPORTER:  By what?
4  BY THE WITNESS:
5    A.  By my paperwork or -- I don't know.  I
6  think by the research.  Going through and making
7  sure that I'm qualified to pay it.  Right?  I mean,
8  that answer's right.
9  BY MR. CROWSON:
10   Q.  Well, when you got the loan from Long
11 Beach, I think you said your only income was the
12 $500 in Social Security per month?
13   A.  Correct.
14   Q.  And yet at least -- you at least
15 initially thought that the payment was going to be
16 about $1300 a month?
17   A.  Correct.
18   Q.  I guess, how would a lender know that
19 you can make that $1300 payment every month when
20 your only income is Social Security?
21   A.  Verify that I got someone staying
22 upstairs and to verify that I have a roommate to
23 pay that much money.  That's where we come up with
24 that $1300.

Page 106

1    Q.  So based on the money coming from --
2    A.  Upstairs.
3    Q.  -- the tenant --
4    A.  Yeah.
5    Q.  -- and Michael living on the first
6  floor?
7    A.  Yes.
8    Q.  Was there -- what was in the house at
9  Artesian when you guys moved in?
10   A.  Well, it was -- it was like -- I guess
11 his father's friend -- I ain't never seen the house
12 until the close because I was going off of word of
13 mouth, but we couldn't get on the first floor, so
14 nobody knew what was in there.  But they called the
15 locksmith, showed him the papers to prove that we
16 got access to the house.  Now, once we got in
17 there, like, it was furniture-wise, but it was,
18 like, an older model furniture-wise, so the people
19 that was upstairs weren't there, and we just
20 gradually got a little bit of other furniture -- of
21 the model -- of the day, rather.
22   Q.  Did you move any of your personal stuff
23 into the house?
24   A.  Yes, yes.

Page 107

1    Q.  What kind of stuff?
2    A.  I had a black entertainment center, a
3  television and a VC- -- a DVD, and that was about
4  it.  A couple of curtains and table cloths and
5  stuff.
6    Q.  Did you -- did you take all of that
7  stuff when you left?
8    A.  Yes.
9    Q.  Did you leave any of your personal stuff
10 there when you left?
11   A.  Well, it was mostly like covers and --
12 and the bathroom belongings and stuff.
13   MR. BROOKS:  Do you think you've got another
14 hour or so?
15   MR. CROWSON:  Probably.  At most, an hour and
16 a half.  Do you want to take a break, call --
17   MR. BROOKS:  No, no.  How long do you think it
18 would take your father?
19   THE WITNESS:  It will take him about 15 or 20
20 minutes to get here.
21   MR. BROOKS:  Maybe we'll go another half hour.
22   THE WITNESS:  Because the traffic.
23 BY MR. CROWSON:
24   Q.  Do you know if there was a -- I'm sorry.

Page 108

1  I forgot.  What was the name of the person that
2  lived on the second floor?
3    A.  I just know her by Mary.
4    Q.  Just Mary?
5    A.  Mary, yeah.
6    Q.  Do you know if there was a lease with
7  that person?
8    A.  No, it wasn't.  I think -- she came on
9  the close -- the day of the closing.
10   Q.  She came to the house the day of the
11 closing?
12   A.  Yeah.  I mean, either Michelle or Dre
13 found her, and they moved her upstairs.  So it
14 wasn't no lease.  It was a month-to-month thing.
15 And they end up moving, like -- (inaudible).  They
16 ended up moving, like, September, I think.  I
17 believe.
18   Q.  Who knew the -- who knew them?
19 Mr. Colbert knew the tenant, or Michael did?
20   A.  Colbert or Michelle.
21   Q.  Michelle?
22   A.  I don't know.
23   Q.  Does the name Steven Mitchell ring a
24 bell?

26 (Pages 105 to 108)

ERICK SHELTON, MAY 28, 2008

Page 109

1    A.   Steven Mitchell?
2    Q.   That's all right.
3    MR. CROWSON: Let's mark this as No. 2.
4         (WHEREUPON, a certain document was
5         marked Shelton Deposition Exhibit
6         No. 2, for identification, as of
7         5-28-08.)
8  BY MR. CROWSON:
9    Q.   Just let me know when you've had a
10 second to glance over it.
11   A.   Yeah.
12   Q.   For the record, Mr. Shelton, I've handed
13 you what we've marked as Exhibit 2, which is a copy
14 of a one-page document entitled, "Apartment Lease."
15 Right in the middle of the page on the right side
16 it looks like a signature of your name. Is that
17 your signature?
18   A.   At the bottom?
19   Q.   In the middle.
20   A.   No.
21   Q.   It's not your signature?
22   A.   The print? What's that guy talking
23 about? Oh, no, no.
24   Q.   That's not your signature?

Page 110

1    A.   No. It's too neat.
2    Q.   Have you ever seen this document before,
3  if you remember?
4         You've got to say no.
5    A.   I mean, I don't recall. I don't recall
6  seeing this.
7    Q.   And you don't know who Steven Mitchell
8  is?
9    A.   No.
10   Q.   Do you know if that was the person that
11 lived on the second floor?
12   A.   No, his name wasn't Steven. No, his
13 name wasn't Steven. It was a big guy.
14 (Inaudible.) His name wasn't Steven, though.
15   Q.   So it was a big guy that lived there,
16 and his -- had a girlfriend named Mary?
17   A.   Yeah. They moved in the day that we
18 closed. They moved in then. So I just know the
19 lady's named Mary.
20   Q.   Do you have any idea why there would be
21 a document that has your -- a forged signature of
22 your name?
23   A.   No, I have no idea.
24   Q.   Do you have any idea who signed your

Page 111

1  name like this on this piece of paper?
2    A.   No.
3    Q.   Did you ever authorize anyone else to
4  sign your name on an apartment lease document?
5    A.   No.
6    Q.   And you weren't expecting $700 -- I'm
7  sorry. The people who lived on the second floor
8  were going to pay you $700 a month?
9    A.   Yes.
10   Q.   And if you look at the top of this page,
11 it says, "Monthly Rent: $1100 a month."
12   A.   No.
13   Q.   That's not accurate, right?
14   A.   No.
15   Q.   Do you know if this document was given
16 to Marnette or to Long Beach so that you could get
17 a loan?
18   A.   I don't know. But I have a question. I
19 mean, for the -- for the -- for the date, why do it
20 got '06 when it was closed on '05?
21   Q.   Well, actually, if you look at the top,
22 the left corner, it says, "Date of Lease,
23 June 15th, 2005."
24   A.   Okay. So what's that '06 mean?

Page 112

1    Q.   It looks like -- this document is
2  suggesting that the lease was going to end on
3  July 15, 2006.
4    Q.   So -- so is this the person that moved
5  in or signed the lease?
6    Q.   Unfortunately, I'm the only one that's
7  supposed to ask questions.
8    A.   I'm sorry. I'm just --
9    Q.   I understand that you're confused about
10 this but --
11   A.   I'm asking you questions. I'm sorry.
12   Q.   That's okay. Your lawyer will have a
13 copy of the document if you want to talk to him
14 about it afterwards.
15   A.   Okay.
16   Q.   But you -- you don't remember ever
17 signing any leases in writing for the Artesian
18 Street address ever?
19   A.   No, nothing. No.
20        (WHEREUPON, a certain document was
21        marked Shelton Deposition Exhibit
22        No. 3, for identification, as of
23        5-28-08.)
24 BY MR. CROWSON:

27 (Pages 109 to 112)

ERICK SHELTON, MAY 28, 2008

Page 113

1    Q.   Mr. Shelton, for the record, I've handed
2  you what we've marked as Exhibit 3, which is a
3  five-page document entitled, "Real Estate
4  Contract," that has the Bates stamp Shelton v. Long
5  Beach, Plaintiffs' Production, 202 through 206.
6        If you turn to the fourth page of the
7  document, in the middle there's a section that
8  says, "Buyers," and it looks like your -- or your
9  name signed there.
10       Is that your signature?
11   A.   No, it's not.
12   Q.   Is that your handwriting underneath
13  where it has the date, June 28, 2005, right
14  underneath the signature?
15   A.   No.
16   Q.   Do you remember ever even ever seeing a
17  document like this called "Real Estate Contract"?
18   A.   I don't recall.
19   Q.   Do you know what Michael Bibbs'
20  signature looks like?
21   A.   Yeah, yeah.  What I know is M, how he
22  makes his M.  He curves it around.
23   Q.   But if you look on that same page where
24  it has -- where it's supposed to be your signature,

Page 114

1  right to the right of it under "seller," it has the
2  signed name "Michael Bibbs."
3    A.   That don't look like his signature.
4    Q.   That don't look like his signature?
5    A.   He don't make his M's like that.
6    Q.   Did you ever authorize anybody to sign
7  your name to a real estate contract document?
8    A.   No, sir.
9    Q.   Do you -- was there ever any agreement
10  between you and Mr. Bibbs on the purchase price of
11  the house at Artesian Street?
12   A.   No, sir.
13   Q.   If you look at the -- at the first page
14  of the document, in the -- in the middle and then
15  all the way to the right side, there's a line,
16  "Purchase Price," and then it lists $257,000.
17       Do you see where I'm talking about?
18   A.   Yeah.
19   Q.   Do you remember if that was the amount
20  that was required to buy the house at Artesian
21  Street?
22   A.   No, sir.
23   Q.   Did you ever think that there needed to
24  be a written document for you to buy the house at

Page 115

1  Artesian?
2    A.   Can you explain?
3    Q.   Sure.  Let me just kind of ask, just
4  generically, when one person wants to sell their
5  house to somebody else, do you think it's normal
6  for them to have a signed document that says that?
7    A.   Yes.
8    Q.   And I guess what I'm asking is, when you
9  got -- bought the house from Mr. Bibbs, did you
10  ever think that you needed to sign a contract?
11   A.   No, sir, I didn't think.  I didn't think
12  that.
13   Q.   You didn't think that?
14   A.   (No audible response.)
15   Q.   Do you know why it would have been --
16  why you wouldn't have needed to sign a contract?
17   A.   Well, for one thing, I think I wouldn't
18  need it because we was like family, and we was real
19  close.  I know he wouldn't do nothing like that.
20  But the -- it would be good to have a document to
21  sign to secure me on that part.  I probably feel
22  that way now, but I didn't feel that way then
23  because I -- with Michael, 27 now, I know he
24  wouldn't do me like that.

Page 116

1    Q.   Do you hold any ill will toward Michael
2  for -- for this transaction?
3    A.   Well, no, because -- no, because he
4  really didn't know nothing about it hisself, and, I
5  mean, I see the man day in, and we eat barbecue or
6  whatever, but I hold no grudge, no will against him
7  on that because I hold a grudge on Michelle and
8  Andre Colbert.
9    Q.   You hold the ill will toward Michelle?
10   A.   Not ill will.  I just don't even talk to
11  them because they had to go like this.
12   Q.   Do you think that she did you wrong
13  by --
14   A.   Yeah.
15   Q.   Why do you think that?
16   A.   Because most of all of this is a false
17  alarm, so I'm getting the short end of the stick.
18  You know, so I think it really ain't fair.
19   Q.   So you think that you're getting the
20  short end of the stick and Michelle was the person
21  that put you in that position?
22   A.   Well, I believe Michelle and Andre
23  Colbert.
24   Q.   Why do you think Andre?

28 (Pages 113 to 116)

ERICK SHELTON, MAY 28, 2008

Page 117

1    A.   From introducing me to Michelle, he
2  probably didn't know what she do, but just
3  (inaudible).
4    Q.   So you fault Andre for introducing you
5  to Michelle?
6    A.   Yeah.
7    Q.   Did you know how Andre knew Michelle
8  before you guys met?
9    A.   No, sir.
10   MR. BROOKS:  Let's take that quick break.
11   MR. CROWSON:  Yeah.
12   THE VIDEOGRAPHER:  We are off the record at
13  3:53.
14       (WHEREUPON, a recess was had.)
15   THE VIDEOGRAPHER:  Back on the record at
16  3:56 p.m.
17       (WHEREUPON, a certain document was
18       marked Shelton Deposition Exhibit
19       No. 4, for identification, as of
20       5-28-08.)
21  BY MR. CROWSON:
22   Q.   Mr. Shelton, I have handed you what
23  we've marked as Exhibit 4, which is a copy of a
24  letter dated June 27, 2005, regarding payment

Page 118

1  shock. If you look under the signature line,
2  there's a signed version of your name.
3       Is that your signature?
4    A.   No.
5    Q.   Do you remember ever seeing a letter
6  like this?
7    A.   No, I don't remember -- I don't recall
8  or I don't remember. Because every paper I seen
9  has a lot of words on it. This would be
10  (inaudible).
11   Q.   You would remember it?
12   A.   Yeah.
13   Q.   And you don't remember ever seeing this?
14   A.   (Inaudible.)
15   Q.   Do you have your own computer?
16   A.   I have a computer.
17   Q.   Do you type on it?
18   A.   No. My daughter do.
19   THE COURT REPORTER:  What did you say? Oh, my
20  daughter?
21   THE WITNESS:  Yeah.
22  BY MR. CROWSON:
23   Q.   It looks like a letter. And the first
24  sentence says, "As you know, I am currently

Page 119

1  employed by a professional mortgage broker. For
2  the past year, I have had increasing responsibility
3  as well as being trained to process loans."
4       Do you see where I'm talking about?
5    A.   Yeah.
6    Q.   It's not true that you were ever
7  employed by a professional mortgage broker?
8    A.   (No audible response.)
9    Q.   Is that a no?
10   A.   No.
11   Q.   Did you ever authorize anybody to sign
12  your name to a letter like this?
13   A.   No, sir.
14   Q.   Do you know why -- do you have any idea
15  who signed your name to this piece of paper?
16   A.   No, sir.
17   Q.   Did you say hold on a second?
18   A.   I said no sir.
19   Q.   Oh, no, sir. I'm sorry.
20       Do you have any idea why a letter would
21  have been written like this and someone else signed
22  your name to it?
23   A.   No, sir.
24   Q.   That's all I have for that one. That's

Page 120

1  all the questions I have for that one.
2       (WHEREUPON, a certain document was
3       marked Shelton Deposition Exhibit
4       No. 5, for identification, as of
5       5-28-08.)
6  BY MR. CROWSON:
7    Q.   Mr. Shelton, for the record what I have
8  handed you is a copy of what we've marked as
9  Exhibit 5. It's a document entitled,
10  "Fixed/Adjustable Rate Note." It bears the Bates
11  stamp LBM 121 through 123.
12       I'd like you to turn to the third page.
13  Near the bottom on the left side there's a
14  signature line.
15       Is that your signature?
16   A.   Yeah, that looks like my signature.
17   Q.   Do you recall signing a document like
18  this at your loan closing?
19   A.   I'm trying to remember if I'd seen these
20  X.
21   Q.   Oh, on the second page?
22   A.   Yeah. I was trying to remember if I had
23  seen something like that before. I probably did.
24  Probably.

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

Page 121

1    Q.   It's probably one of the documents that
2  you signed?
3    A.   Yeah.
4    Q.   If you look on the first page there's a
5  Section No. 1, "Borrower's Promise to Pay," and
6  then there's a sentence, "I promise to pay
7  $205,000"?
8    A.   Wait --
9    Q.   On the first page --
10   A.   I see.
11   Q.   Do you see the amount?
12   A.   Yeah.
13   Q.   Do you ever recall that that was the
14  amount of one of your mortgage loans?
15   A.   Not really, no.
16   Q.   You don't remember?
17   A.   No, because it wasn't nothing that said
18  I promise to pay.
19   Q.   I'm sorry.  Say that again.
20   A.   There wasn't nothing that I was writing
21  down that said, "I promise to pay."  I'm saying
22  that it wasn't on there that said, "I promise to
23  pay."  I'm saying I don't remember that.  If it was
24  down there, I don't remember it.

Page 122

1    Q.   Did anyone ever talk to you about one of
2  your loans being $205,600?
3    A.   No, sir.
4    Q.   Did anyone ever talk to you about the
5  interest rate being 6.45 percent?
6    A.   No, sir.
7    Q.   Do you remember ever asking any
8  questions or getting anyone to explain this
9  document to you at the closing?
10   A.   This document right here?
11   Q.   Or just any -- in general, any document.
12   A.   Well, I remember on some paper asking
13  what that means, but I'm not for sure which one was
14  it.
15   Q.   All right.  You can set that one aside.
16        (WHEREUPON, a certain document was
17        marked Shelton Deposition Exhibit
18        No. 6, for identification, as of
19        5-28-08.)
20  BY MR. CROWSON:
21   Q.   Mr. Shelton, I've handed you what we've
22  marked as Exhibit 6, which is a two-page document
23  entitled, "Truth-in-Lending Disclosure Statement."
24  It bears the Bates stamp Shelton v. Long Beach,

Page 123

1  Plaintiffs' Production, 27 through 28.
2        If you look at the bottom on the left
3  side of the first page, there's a line with your
4  name.
5        Do you recognize that as your signature?
6    A.   Yeah.
7    Q.   Is that your handwriting where it has
8  the date right next to it?
9    A.   No.
10   Q.   But that is your signature?
11   A.   Yeah.
12   Q.   Do you remember if this was one of the
13  documents that you signed at your closing?
14   A.   I don't remember.
15   Q.   You don't remember?
16   A.   (No response.)
17   Q.   Sorry.  You've got to say no.
18   A.   Oh, no.
19   Q.   Does this document ring any bells as to
20  whether you may have asked any questions about
21  this?
22   A.   Oh, this is not the one.
23   Q.   It's not?
24   A.   (No audible response.)

Page 124

1    Q.   Just in general, Mr. Shelton, would you
2  agree with me that when someone signs their name to
3  a document that they're responsible for the
4  contents of the document?
5        MR. BROOKS:  I'm going to object to that
6  question.  It calls for a legal conclusion, but you
7  can answer it if you think you know an answer to
8  it.
9  BY THE WITNESS:
10   A.   (Inaudible.)
11  BY MR. CROWSON:
12   Q.   You don't have an answer to it?
13   A.   (No audible response.)
14   Q.   Do you think it's important -- do you
15  think that signatures to documents are important?
16   A.   Yeah.
17   Q.   Just a few more.
18        (WHEREUPON, a certain document was
19        marked Shelton Deposition Exhibit
20        No. 7, for identification, as of
21        5-28-08.)
22  BY MR. CROWSON:
23   Q.   For the record, Mr. Shelton, I've handed
24  you what we've marked as Exhibit 7.  It's a

30 (Pages 121 to 124)

Page 125

1 two-page document entitled, "Settlement Statement."
2 It has the Bates stamp Shelton v. Long Beach,
3 Plaintiffs' Production 25-26.
4 If you look at the bottom of the first
5 page, there's a line with your name and a
6 signature.
7 Do you see where I'm talking about?
8 A. Yeah. The bottom?
9 Q. Right. Is that your signature?
10 A. Yeah.
11 Q. And then to the right of that it has a
12 line for Michael Bibbs and a signature above that.
13 Do you see where I'm talking about?
14 A. Yeah.
15 Q. Do you recognize that as Mr. Bibbs'
16 signature, or do you know?
17 A. I don't know. It's something like that,
18 but it ain't like that.
19 Q. And what about -- let's turn to the
20 second page.
21 Again, at the bottom there's a line with
22 your name and a signature above it.
23 Do you see where I'm talking about?
24 A. Yes.

Page 126

1 Q. Is that your signature?
2 A. Yes.
3 Q. Do you remember, does this document ring
4 any bells whether you recall it at your closing?
5 A. Yeah.
6 Q. You remember this one?
7 A. Yeah.
8 Q. Is there something particular about it
9 that you remember? Is there some reason why you
10 remember this one?
11 A. Yes, because all of -- I think this has
12 something to do with all the people get paid or
13 something.
14 Q. Right.
15 A. And it was the longer sheet of paper,
16 though.
17 Q. So that one jogged your memory that
18 you --
19 A. Yeah.
20 Q. Did you -- at the closing did you look
21 at the numbers to see what people were getting
22 paid?
23 A. No, no, I did not.
24 Q. Did you -- so you didn't really pay any

Page 127

1 attention to the -- to the various numbers?
2 A. Because once I signed the paper, they
3 removed it kind of fast like, "Sign that" and took
4 it away. I ain't really, but it caught my eye
5 sight that I remember these numbers.
6 Q. Did you -- did you want to look over the
7 numbers a little bit more, or did you care one way
8 or the other?
9 A. I didn't really, you know, know what it
10 was for so --
11 Q. It didn't matter to you?
12 A. It didn't matter, right.
13 Q. Did you -- do you remember if you asked
14 any questions or were explained anything in
15 particular about this document?
16 A. No. (Inaudible.)
17 (WHEREUPON, a certain document was
18 marked Shelton Deposition Exhibit
19 No. 8, for identification, as of
20 5-28-08.)
21 BY MR. CROWSON:
22 Q. Mr. Shelton, I have handed you what
23 we've marked as Exhibit 8, which is a copy of a
24 document entitled, "Mortgage." It has the Bates

Page 128

1 stamp Shelton v. Long Beach, Plaintiffs'
2 Production, 1 through 21.
3 If you look on the first page near the
4 bottom on the left side, there's some marks for
5 initials. Do you see where I'm talking about?
6 Is that a yes?
7 A. Yes.
8 Q. Are those your initials?
9 A. Yes.
10 Q. And then if we flip over several pages
11 to the page that's marked Plaintiffs' Production
12 14, if you look at the top of that page there's a
13 line with your name and a signature above that. Is
14 that your signature?
15 A. Yes.
16 Q. You said you generally don't sign your
17 name with the K at the end, or you do?
18 A. Sometimes I do, sometimes I don't. It
19 all depends on how they mailed it to me.
20 Q. Oh, okay.
21 A. If they mailed it E-R-I-C, I mailed it
22 back to them like that. Or if there's a K at the
23 end. Because, like, my Social Security got a K on
24 the end, but my ID don't. It got a C on the end.

31 (Pages 125 to 128)

Page 129

1    Q.   Right.  Is your middle initial K?
2    A.   No.  My middle initial L.
3    Q.   And if we can flip over a few more pages
4 to the one that's marked Plaintiff Production 19.
5        A couple of more.  This page at
6 Plaintiffs' Production 19 is entitled, "1-4 Family
7 Rider, Assignment of Rents," at the top.  Do you
8 see where I'm talking about?
9    A.   And what does it say?
10    Q.   At the top do you see where it says,
11 "1-4 Family Rider"?
12    A.   Yeah.
13    Q.   Do you remember ever reading or seeing
14 this document before?
15    A.   No.
16    Q.   Do you know if this happens to be the
17 document that would have made you believe that Long
18 Beach had a lien on your property?
19    A.   Not that I remember.
20    Q.   And on the lower right corner there's a
21 line for initials.  And there's two initials.  Are
22 those yours?
23    A.   Yes.
24    Q.   And let's turn to the very next page.

Page 130

1 Near the bottom on the left there's a signature
2 line with your name and a signature above it.  Is
3 that your signature?
4    A.   Yeah.
5    Q.   When you moved into the house at
6 Artesian Avenue, did it have a heating system?
7    A.   Yeah, yes.
8    Q.   Was it a -- like a central electrical
9 unit?
10    A.   No.  It was a radiator center.
11    Q.   A radiator?
12    A.   Yes.
13    Q.   Was it attached to the house?
14    A.   I don't know what you mean.
15    Q.   Was it -- was it a -- you know, part of
16 the house?
17    A.   The radiator?
18    Q.   Yeah.
19    A.   Yeah.  It was in the inside.
20    Q.   And did you intend for it to stay there?
21    A.   That's how people are going to stay
22 warm, I guess.  Yes, I intended on it staying
23 there.
24    Q.   And so I take it when you moved out, you

Page 131

1 didn't remove the heating system?
2    A.   No, no.
3    Q.   I'm going to ask sort of a similar
4 question for a bunch of other things.  Did it have
5 a cooling system, an air conditioner unit?
6    A.   No, sir.
7    Q.   Did it have a window AC unit?
8    A.   No, sir.
9    Q.   What about electricity?
10    A.   It had electricity, but the people
11 before they moved upstairs tried to -- too much
12 electricity and caused a fire, and I had to pay to
13 get it rewired.  I had called some electric
14 company, and he rewired the upstairs for me because
15 they were trying to run some washing machines to
16 the outlet, whatever.
17    Q.   Did you have electrical wiring
18 downstairs on the first floor?
19    A.   Electrical wiring?
20    Q.   Wiring.  Like --
21    A.   Yes.
22    Q.   Did you take any of that electrical
23 wiring system when you left?
24    A.   No.  I didn't take nothing.

Page 132

1    Q.   Did it have a gas system?
2    A.   What's that?
3    Q.   Like did it have natural gas for the
4 stove or water heater, anything like that?
5    A.   Yeah.  Was them things coming off the
6 floor?
7    Q.   Uh-huh.
8    A.   Yeah.
9    Q.   Did you take any part of that when you
10 left?
11    A.   No, sir.
12    Q.   Did it have, you know, plumbing for
13 water?
14    A.   No.  Excuse me.  What you mean by that?
15 Like the sinks and stuff?
16    Q.   Right.
17    A.   Yes, it had that.
18    Q.   And so did you take any part of that
19 when you left?
20    A.   No, sir.
21    Q.   Did it have any fire prevention devices?
22 Smoke alarms or fire extinguishers?
23    A.   Well, I put up two smoke alarms.
24    Q.   You put up two smoke alarms?

32 (Pages 129 to 132)

ERICK SHELTON, MAY 28, 2008

Page 133

1    A.   Yes. When I got there it didn't have
2  any. I took them with me.
3    Q.   You took the smoke alarms with you when
4  you left?
5    A.   Yes. I left one up there and took the
6  other one with me because the way the house is
7  made, I had to -- like the bathroom going to the
8  kitchen, I took the one out the hallway.
9    Q.   You took one and left one there?
10   A.   Right.
11   Q.   Did it have any kind of security system?
12   A.   No, sir.
13   Q.   Did it have bathtubs?
14   A.   Yes, sir.
15   Q.   Did you take any of those when you left?
16   A.   No, sir.
17   Q.   When you moved in, did you intend for
18 the bathtubs to stay attached to the property?
19   A.   No, sir. If Michael Bibbs was to help
20 me, we was planning on getting another bathtub
21 because his father repainted the tub, and the paint
22 was coming off.
23   Q.   So you were going to replace it?
24   A.   We was going to replace it.

Page 134

1    Q.   And did you -- but you didn't take any
2  bathtub when you left?
3    A.   No, sir.
4    Q.   Did it have a water heater?
5    A.   Yeah, yes.
6    Q.   Was that attached to the house?
7    A.   It was in the basement.
8    Q.   Was it attached to the house in the
9  basement?
10   A.   Yes.
11   Q.   Did you take that when you left?
12   A.   No, sir.
13   Q.   Did it have something called a water
14 closet?
15   A.   What's that?
16   Q.   I'm not sure.
17   A.   No, I didn't take that.
18   Q.   Did it have any sinks?
19   A.   If it had sinks in the house?
20   Q.   Yeah, in the kitchen or the bathrooms.
21   A.   Yeah, yes.
22   Q.   Were those attached to the property?
23   A.   To -- well, yes.
24   Q.   Did you take any of the sinks when you

Page 135

1  left?
2    A.   No, sir.
3    Q.   Did it have an oven range?
4    A.   Who?
5    Q.   An oven to cook on.
6    A.   Yeah. With the stove electric.
7    Q.   It had a stove?
8    A.   It was a stove in there, a refrigerator
9  in there. I left all of that. I didn't take none
10 of it.
11   Q.   Did it have a refrigerator when you
12 moved in?
13   A.   Yes. That was his father's
14 refrigerator. It was big enough so we decided to
15 keep it, but when we left, it was still there.
16   Q.   What about a dishwasher?
17   A.   None.
18   Q.   It didn't have one?
19   A.   (No audible response).
20   Q.   What about a garbage disposal?
21   A.   (No audible response.)
22   Q.   No?
23   A.   No, sir.
24   Q.   Did it have a washing machine?

Page 136

1    A.   Yes, they had a washing machine and
2  dryer in the basement, but it really didn't work.
3  So we left -- it was left there.
4    Q.   Did it have any storm windows?
5    A.   Yes, sir. That's the one.
6    Q.   Were those -- did you take any of the
7  storm windows when you left?
8    A.   No, sir.
9    Q.   Did it have any storm doors?
10   A.   No, sir.
11   Q.   Did it have any screens for the windows?
12   A.   No, sir.
13   Q.   What about blinds for the windows?
14   A.   Yeah, it had blinds.
15   Q.   Did you take any of the blinds when you
16 left?
17   A.   No, sir. My blinds. I took some
18 convertible blinds.
19   Q.   That you had brought in?
20   A.   Yeah, I brought them in. I took them
21 off. But the ones when we purchased the house,
22 they was blinds like that. We left them there in
23 the front.
24   Q.   Did it have any shades for the windows?

33 (Pages 133 to 136)

ERICK SHELTON, MAY 28, 2008

Page 137

1    A.    No, sir.
2    Q.    What about curtains or curtains rods?
3    A.    No, sir.
4    Q.    Did it have mirrors in any of the
5  bathrooms?
6    A.    Yeah.
7    Q.    Were they attached to the wall?
8    A.    Yes, sir.
9    Q.    Did you take any of the mirrors when you
10  left?
11    A.    No, sir.
12    Q.    Did it have cabinets in the kitchen?
13    A.    Yes, sir.
14    Q.    Were they attached to the wall?
15    A.    Yes, sir.
16    Q.    Did you take any of those when you left?
17    A.    No, sir.
18    Q.    What kind of, like, flooring did it
19  have? Hardwood or carpet?
20    A.    You're talking about in the front --
21  living room?
22    Q.    Or any rooms.
23    A.    It had carpet in the dining room and
24  living room and the kitchen had like --

Page 138

1    Q.    Tile?
2    A.    Tile.
3    Q.    Did you take any of the carpet or tile
4  when you left?
5    A.    No, sir.
6    Q.    Earlier you had mentioned a check that
7  you got at the closing that you had to mail off to
8  somebody else?
9    A.    Yes, sir.
10    Q.    Do you remember if the amount was about
11  $975?
12    A.    No, sir. It was $200.
13    Q.    Do you remember getting a check for
14  $975?
15    A.    No, sir.
16    Q.    When Mr. Bibbs paid you, like, the three
17  month of rent, did he give you different checks or
18  did he -- how did he pay you?
19    A.    No, sir. He gave it to me in cash.
20    Q.    He gave you cash?
21    A.    Yeah. And I put that in the bank.
22    Q.    Did he ever write you any checks for
23  rent or --
24    A.    He wrote me one check, but I believe --

Page 139

1  he wrote it on the wrong side, and it was sent
2  back. I mean, that's the check. They sent it
3  back. He wrote -- he signed his signature on the
4  left side of the thing, and it's supposed to be
5  signed on the right side, so they sent it back.
6    Q.    Did he rewrite you a new check?
7    A.    No, no, he didn't rewrite it. He put me
8  on hold.
9    Q.    He did what?
10    A.    Put me on hold.
11    Q.    Put you on hold?
12    A.    Yeah.
13    Q.    Like "I'll pay you later"?
14    A.    Yeah.
15    Q.    Is it fair to say that you bought the
16  house at Artesian and got a loan to pay for it to
17  help out Mr. Bibbs?
18    A.    Yes, it's fair to say that.
19    Q.    Is there any other reason why you got
20  the house?
21    A.    No, there wouldn't be no other reason.
22    Q.    And did Long Beach have anything to do
23  with you wanting to help out Mr. Bibbs to get into
24  the house?

Page 140

1    A.    No, sir.
2    Q.    Did Long Beach force you to buy the
3  house at Artesian Street?
4    A.    No, sir.
5    Q.    Did they force you to get a loan to buy
6  the house at Artesian?
7    A.    No, sir.
8    Q.    Did Long Beach make you sign the loan
9  documents at your closing?
10    A.    No.
11    Q.    Did you ever think that you could have
12  gotten a better interest rate for your loan?
13    A.    Well, at first I didn't even know what
14  interest rate mean. I mean, but yeah. What do you
15  mean? As far as the mortgage?
16    Q.    Yes.
17    A.    Yes, I -- yes.
18    Q.    You think you should have gotten a
19  better rate?
20    A.    Rate down, lower.
21    Q.    Lower rate?
22    A.    Yeah.
23    Q.    Why do you think that?
24    A.    She told me because I was on a fixed or

34 (Pages 137 to 140)

ERICK SHELTON, MAY 28, 2008

Page 141

1  -- I didn't know what that means. A fixed or a
2  ARM, whatever that means, rate. And after six
3  months, I could sell the building and -- but they
4  wanted me (inaudible ) something back to them, but
5  I wasn't there for (inaudible) and talk to someone
6  else.
7      Q.   Who was telling you this?
8      A.   Who was -- Michelle was saying.
9      Q.   Michelle?
10     A.   Yeah, in six months I could sell the
11 building.
12     THE COURT REPORTER: Could what?
13 BY THE WITNESS:
14     A.   Sell the building back to them, their
15 company.
16 BY MR. CROWSON:
17     Q.   You could sell the building back to who?
18     A.   To them.
19     Q.   To --
20     A.   I guess to Long Beach Mortgage or
21 whatever.
22     Q.   Oh.
23     A.   In six months.
24     Q.   Why in six months?

Page 142

1      A.   I don't know. I guess that's when the
2  mortgage rate or whatever, you could -- a mortgage
3  rate.
4      Q.   And Michelle was the one that was
5  telling you this?
6      A.   Yeah. And the lady told me, "You can't
7  sell this until a year." You've got to keep up
8  with your mortgage. You can refinance in six
9  months.
10     Q.   Who told you that?
11     A.   The lady that was looking over the
12 papers.
13     Q.   Do you remember, like, what organization
14 or company this lady came from?
15     A.   I got that from my father.
16     Q.   Your father told you about it?
17     A.   No. He remembered. He went with me, so
18 I probably got that subject to he remember the name
19 or whatever.
20     Q.   Did you -- did Michelle or Andre ever
21 tell you that Marnette was acting as your mortgage
22 broker?
23     A.   No.
24     Q.   Do you know if Long Beach has, like,

Page 143

1  foreclosed on the house at Artesian Street? Have
2  they taken it back?
3      A.   As of right now?
4      Q.   Right.
5      A.   I believe so.
6      Q.   They have, or you think so?
7      A.   I believe so.
8      Q.   Have they taken any of your personal
9  property?
10     A.   Well, no, sir.
11     Q.   Did you ever give any documents or
12 information to Marnette James before you went to
13 your closing?
14     A.   No, sir.
15     Q.   Did you ever give anything to Andre or
16 Michelle to give to Marnette?
17     A.   I think my Social Security number.
18     Q.   That was it?
19     THE COURT REPORTER: You think your sister
20 what?
21     MR. CROWSON: Social Security number.
22 BY THE WITNESS:
23     A.   My Social Security number.
24 BY MR. CROWSON:

Page 144

1      Q.   That was the only thing that you ever
2  gave to her?
3      A.   Yeah. I think that's why I had the
4  conversation with her. I gave her my Social
5  Security number to check my -- my credit, I
6  believe.
7      Q.   So that's the only thing that you
8  remember ever having to give to Marnette?
9      A.   Yeah, I believe so.
10     MR. CROWSON: That's all I have.
11     MR. BROOKS: I've just got a couple questions.
12         EXAMINATION
13 BY MR. BROOKS:
14     Q.   Erick, when you purchased the property
15 from Michael, was it your intention to move in the
16 property and live there?
17     A.   No, not at first. Until he asked me to
18 because he was living with his grandmother on the
19 floor. He say he was tired of sleeping on the
20 floor. He wanted to live back at home so could I
21 help him purchase the property, and I told him,
22 well, I'll move in with you, but you've got to help
23 take care of me, too.
24     Q.   So -- but once you made the decision to

35 (Pages 141 to 144)

Page 145

1  buy the property, it was partly your intention to
2  buy it to live in it, too?
3      A.  Yes.
4      Q.  Mr. Crowson had asked you about whether
5  or not Long Beach had foreclosed on the property.
6          Do you remember that?
7      A.  Yeah.
8      Q.  When they foreclosed on the property,
9  did you have anything that belonged to you at some
10 point that was still in the property?  Strike that.
11 Let me ask it a different way.
12         When you moved out of the property, did
13 you leave behind anything?
14     A.  Old stuff like clothes and stuff that
15 belonged in the bathroom.
16     Q.  But it was stuff that belonged to you?
17     A.  Yeah.
18     Q.  And so that stuff stayed in the building
19 even after it was foreclosed?
20     A.  I assume so because I had the guy
21 watching the building.
22     Q.  And you also mentioned that there were
23 -- there was a refrigerator there?
24     A.  Yeah.

Page 146

1      Q.  Was there also a stove?
2      A.  Yeah.
3      Q.  And you left that stuff behind?
4      A.  Yeah.
5      Q.  Even after it was foreclosed on?
6      A.  Yeah.
7      MR. BROOKS:  That's all I have.
8          FURTHER EXAMINATION
9  BY MR. CROWSON:
10     Q.  When you said that it wasn't your
11 intention at first to move into the house, what did
12 you mean by that?
13     A.  I was just gonna rent it out unless
14 somebody else lived in there, but Michael wanted
15 the place -- he wanted to move back home because
16 him and his father used to stay there, and I was
17 like, well, we're gonna have to move in together
18 and keep up the mortgage with the people that moved
19 in upstairs.
20     Q.  Okay.  So when Michael first brought up
21 the idea of buying the house at Artesian, was it
22 your intention that you would rent it out to people
23 and not live there?
24     A.  Excuse me.  When he what?

Page 147

1      Q.  When Michael first brought up the idea
2  of buying the house at Artesian, was it your
3  intention to just rent it out to people and not
4  live there yourself?
5      A.  Well, if he was the one who moved in,
6  that was my intention.  But since he wanted to move
7  back home and we was so close, I told him I'll move
8  there with him.
9      Q.  So when he decided to move in there as
10 well --
11     A.  Right.  That was -- we were talking
12 about this before the closing.  He say he want to
13 move back home.
14     Q.  When did he tell you that, that he
15 wanted to also move back into the house?
16     A.  Well, when his father died like
17 September the 25th, I believe that was '04, and
18 once he found out that he was the paid beneficial
19 or whatever, his auntie then was taking -- would
20 take care of the father but wouldn't give him the
21 keys or whatever.  So he was trying to find that
22 way in, so when he told me to see if he could find
23 a mortgage -- what do you call that?  What Michelle
24 is again?

Page 148

1      Q.  Real estate agent?
2      A.  Yeah.  We could find a real estate
3  agent, and then he'll sell the building because the
4  other chick there didn't want to do nothing anyway,
5  so he went to (inaudible) and got the original
6  death certificate logged in there.
7      Q.  I guess what I'm just trying to clear up
8  is, when you first made the decision that you were
9  going to buy the house at Artesian, were you
10 intending to move into the house as well?
11     A.  No, sir.
12     Q.  That's all I wanted to know.  And one
13 thing I forgot to do, you had mentioned the ID card
14 that you have.  I want to just make a copy of that
15 and we'll add it as an exhibit.
16     THE VIDEOGRAPHER:  Are we done?
17     MR. CROWSON:  Yeah.  We can go off the record.
18     THE VIDEOGRAPHER:  We're off the record at
19 4:41.
20         (WHEREUPON, a certain document was
21         marked Shelton Deposition Exhibit
22         No. 9, for identification, as of
23         5-28-08.)
24     THE VIDEOGRAPHER:  Back on the record at

36 (Pages 145 to 148)

ERICK SHELTON, MAY 28, 2008

Page 149

1  4:46 p.m.
2  BY MR. CROWSON:
3    Q.  Mr. Shelton, I've handed you what the
4  court reporter has marked as Exhibit 9, which is a
5  photocopy of the ID card that you handed us at the
6  break.  I just want you to verify that it's a copy
7  of your ID card that actually contains your
8  signature.
9    A.  Yes.
10    MR. CROWSON:  All right.  That's all I have.
11    THE VIDEOGRAPHER:  We're off the record at
12  4:46.
13    (WHEREUPON, the following
14    proceedings were had off the video
15    record.)
16    MR. BROOKS:  We are going to be reserving my
17  client's signature.
18    FURTHER DEPONENT SAITH NOT.
19
20
21
22
23
24

Page 150

1  LONG BEACH MORTGAGE COMPANY    )
2  TRUTH IN LENDING ACT FAMILY    )MDL Case No.
3  RIDER LITIGATION        )07 CV 06543
4  ---------------------------------)
5  THIS DOCUMENT RELATES TO:    )
6  Shelton v. Long Beach    )
7  Mortgage Co.        )
8  U.S.D.C., N.D. Ill.        )
9  Civil Action No. 06-2323, et al. )
10    I hereby certify that I have read the
11  foregoing transcript of my deposition given at the
12  time and place aforesaid, consisting of Pages 1 to
13  149, inclusive, and I do again subscribe and make
14  oath that the same is a true, correct and complete
15  transcript of my deposition so given as aforesaid,
16  and includes changes, if any, so made by me.
17
18        ERICK SHELTON
19
20  SUBSCRIBED AND SWORN TO before me
21  this    day of        , A.D. 200 .
22
23    Notary Public
24

Page 151

1    I, MARIA C. SUK, a Certified Shorthand
2  Reporter of the State of Illinois, do hereby
3  certify:
4    That previous to the commencement of the
5  examination of the witness, the witness was duly
6  sworn to testify the whole truth concerning the
7  matters herein;
8    That the foregoing deposition transcript
9  was reported stenographically by me, was thereafter
10  reduced to typewriting under my personal direction
11  and constitutes a true record of the testimony
12  given and the proceedings had;
13    That the said deposition was taken
14  before me at the time and place specified;
15    That I am not a relative or employee or
16  attorney or counsel, nor a relative or employee of
17  such attorney or counsel for any of the parties
18  hereto, nor interested directly or indirectly in
19  the outcome of this action.
20    IN WITNESS WHEREOF, I do hereunto set my
21  hand at Chicago, Illinois, this 4th day of June,
22  2008.
23
24        C.S.R. Certificate No. 84-4453.

Page 152

1        I N D E X
2  WITNESS            EXAMINATION
3  ERICK SHELTON
4    By Mr. Crowson        4, 146
5    By Mr. Brooks        144
6
7
8        E X H I B I T S
9  NUMBER            MARKED FOR ID
10  Shelton Deposition Exhibit
11    No. 1            96
12    No. 2            109
13    No. 3            112
14    No. 4            117
15    No. 5            120
16    No. 6            122
17    No. 7            124
18    No. 8            127
19    No. 9            148
20
21    C O N F I D E N T I A L   P A G E S
22        Pages 58 to 59
23        Pages 67 to 68
24

37 (Pages 149 to 152)