# Exhibit 8

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4                        MDL CASE NO. 07-CV-06543

5  * * * * * * * * * * * * * * * * * *

6  LONG BEACH MORTGAGE COMPANY

   TRUTH IN LENDING ACT FAMILY RIDER

7  LITIGATION

8  THIS DOCUMENT RELATES TO

9  Navara v. Long Beach Mortgage Co.

   U.S.D.C., N.D. Ill., Civil Action No. 05-0864

10

   Carye v. Long Beach Mortgage Co.

11 U.S.D.C., D. Mass., Civil Action No. 06-10887

   (N.D. Ill. Civil Action No. 07-06544)

12

   Shelton v. Long Beach Mortgage Co.

13 U.S.D.C., N.D. Ill., Civil Action No. 06-2323

14 * * * * * * * * * * * * * * * * * *

15          VIDEOTAPED DEPOSITION OF CHARLENE

16 SULLIVAN, a witness called by counsel for the

17 Defendant, taken pursuant to the Rhode Island Rules

18 of Civil Procedure before Elizabette M. Afonso,

19 Professional Shorthand Reporter and Commissioner

20 for the State of Rhode Island and Providence

21 Plantations, at the offices of Esquire Deposition

22 Services, 10 Weybosset Street, Providence, Rhode

23 Island 02903, commencing at 10:01 a.m. on Monday,

24 May 12, 2008.

Page 2

```
1 APPEARANCES:
2
3 CHRISTOPHER M. LEFEBVRE, PC
4 by Christopher M. Lefebvre, Esquire
5 2 Dexter Street
6 P.O. Box 479
7 Pawtucket, Rhode Island  02862
8 401.728.6060
9        On behalf of the plaintiff
10
11 HOWREY
12 by Gabriel A. Crowson, Esquire
13 321 North Clark Street
14 Suite 3400
15 Chicago, Illinois  60610
16 312.846.5645
17 crowsong@howrey.com
18        On behalf of the defendant
19
20 Also present:  Kristin Zarnetske, videographer
21
22
23
24
```

Page 4

```
1        THE VIDEOGRAPHER:  Tape No. 1 of the
2  videotaped deposition of Charlene Sullivan taken by
3  defendant in the matter of Long Beach Mortgage
4  Company Truth in lending Act Family Rider
5  Litigation in the United States District Court for
6  the Northern District of Illinois Eastern Division.
7  Case No. 07CV06543.
8        This deposition is being held on May
9  12th, 2008 at approximately 10:01 a.m.  My name is
10 Kristin Zarnetske.  I'm the legal videographer
11 representing Esquire Deposition Services.  The
12 court reporter, also an association with Esquire,
13 is Liz Afonso.  This deposition is being held at
14 the firm of Esquire Deposition Services located at
15 10 Weybosset Street, Providence, Rhode Island.
16        Will counsel present please introduce
17 themselves for the record.
18        MR. CROWSON:  Gabriel Crowson for
19 defendant, Long Beach Mortgage Company.
20        MR. LEFEBVRE:  Christopher Lefebvre for
21 the deponent.
22        THE VIDEOGRAPHER:  Thank you.  Will the
23 court reporter please swear in the witness.
24
```

Page 3

```
1            INDEX
2
3 DEPONENT                    PAGE
4
5 CHARLENE SULLIVAN
6
7 EXAMINATION BY MR. CROWSON          5, 69
8
9 EXAMINATION BY MR. LEFEBVRE        65, 70
10
11        EXHIBITS
12 NO.    DESCRIPTION         PAGE
13
14 1    Consolidated Class Action Complaint    32
15
16 2    Plaintiff's Motion for Class Certification  34
17
18 3    Plaintiff Charlene Sullivan's Response to  44
19      Long Beach's First Set of Discovery Request
20
21 4    Mortgage                48
22
23 5    Uniform Residential Loan Application    60
24   (Exhibits attached to original transcript.)
```

Page 5

```
1        PROCEEDINGS
2
3        CHARLENE SULLIVAN, having been first duly
4  sworn, was examined and testified as follows:
5
6            EXAMINATION
7  BY MR. CROWSON:
8  Q.   Good morning, Ms. Sullivan.
9  A.   Good morning.
10 Q.   My name is Gab Crowson.  I represent Long Beach
11 Mortgage Company in the lawsuit that you filed.
12        Would you please state and spell your
13 name for the record again?
14 A.   Charlene Sullivan, C-H-A-R-L-E-N-E, Sullivan,
15 S-U-L-L-I-V-A-N.
16 Q.   And have you ever gone by any other names?
17 A.   No.
18 Q.   Have you ever given a deposition before?
19 A.   No.
20 Q.   Your lawyer may have gone over some of the ground
21 rules, but I'll just kind of go over them again.
22        I'll be asking the questions, you'll be
23 giving responses.  As you can see, a court reporter
24 here is taking everything down.  For that reason,
```

2 (Pages 2 to 5)

Page 6

1  it's important that you give a verbal answer to all
2  my questions even though I may know what you're
3  talking about when you nod your head or say uh-huh;
4  she needs to able to get a verbal answer down.
5       Also, it's important because she can only
6  take down one person at a time that you let me
7  finish my question before you begin your response,
8  and then I'll let you finish your response before I
9  begin my next question.
10       And if you need to take a break for any
11  reason, to get some coffee or water, you know, it's
12  not an endurance test, please, you know, let me
13  know that you want to take a few minutes.
14       Also, if you ever don't understand one of
15  my questions because of my accent or just the way I
16  phrase something, please feel free to let me know
17  that you didn't understand a part of it, you'd like
18  me to rephrase it or restate it again?
19 A.  Okay.
20 Q.  Is there anything that would impair your ability to
21  understand my questions today and truthfully answer
22  them?
23 A.  No.
24 Q.  And you understand that you're being deposed in

Page 7

1  connection with a lawsuit that's been filed against
2  Long Beach Mortgage Company?
3 A.  Yes.
4 Q.  And that the testimony is being taken down by a
5  court reporter and also videotaped by a
6  videographer?
7 A.  Yes.
8 Q.  And that the videotape and the testimony could be
9  shown to a judge or jury later on in this lawsuit?
10 A.  Yes.
11 Q.  I'd like you, Ms. Sullivan, to explain in your own
12  words what you think Long Beach has done wrong in
13  this case?
14 A.  Failed to disclose their lien on all of my personal
15  property in my home.
16 Q.  Is there anything else other than the failure to
17  disclose a security interest?  Is there anything
18  else that you think that they have done wrong?
19 A.  No.
20 Q.  When did you first feel that Long Beach had done
21  something wrong to you?
22 A.  I guess it's a couple of years ago now.
23 Q.  Do you remember when you got your loan with Long
24  Beach?

Page 8

1 A.  I don't know, 2004, I think.  It's quite a long
2  time ago now.
3 Q.  And just so we're clear, this isn't a memory test,
4  if you don't remember something, particularly a
5  specific date, you know, just say you don't know --
6 A.  Date wise I have no idea.
7 Q.  -- but I will ask, you know, as the course of the
8  day goes on, if you do -- you know, if something
9  jogs your memory, please let me know.
10       And I guess what I'm trying to figure out
11  is you got your loan sometime in '04 or '05
12  possibly, and I'm trying to figure out when did you
13  first figure out that --
14 A.  I want to say summer of '04 was when I got the
15  loan.
16 Q.  Okay.  Summer of '04.
17       And when did you first feel that Long
18  Beach had done something wrong with the security
19  interest?
20 A.  Well, I reviewed -- after the fact, I reviewed my
21  papers, and it just didn't seem that they should be
22  able to seize my personal property.
23 Q.  Okay.  So after you got your loan, you reviewed the
24  loan papers at your house?

Page 9

1 A.  Mm-hmm.
2 Q.  Is that a yes?
3 A.  Yes.
4 Q.  Sorry.
5       And what did you do when you first saw
6  the security interest?
7 A.  I contacted Mr. Lefebvre to look over the papers.
8 Q.  How did you know Mr. Lefebvre?
9 A.  From the book.
10 Q.  You just looked him up in the phonebook?
11 A.  I didn't know him from Adam.
12 Q.  Okay.  So you hadn't -- he hadn't been your
13  attorney before?
14 A.  No.
15 Q.  And when you first contacted Mr. Lefebvre, did you
16  enter into an attorney-client relationship with
17  him?
18 A.  Yes.
19 Q.  Do you claim that the security interest has caused
20  you any kind of damages or economic injury?
21 A.  No.
22 Q.  What is it that you want from this lawsuit?
23 A.  That's a good question.  I don't -- I just want
24  them to remove that kind of a stipulation out of

3 (Pages 6 to 9)

Page 10

1    their paperwork.

2 Q.   To not use that rider anymore?

3 A.   Yes. And I don't think they have any right to

4    seize personal property of a home.

5 Q.   Are you aware whether -- let me ask personally you,

6    I think I saw in some of your answers that Long

7    Beach foreclosed upon your house at some point?

8 A.   They certainly did.

9 Q.   Is it they started the foreclosure, or did they

10    actually seize your home?

11 A.   No. They foreclosed it.

12 Q.   So you no longer live at the address?

13 A.   Correct.

14 Q.   And as part of the foreclosure, did Long Beach

15    seize any of your personal property or effects?

16 A.   Not at this time. There's still things over in the

17    house that they could seize should they choose.

18 Q.   What's still in the house?

19 A.   I still have some personal things over there.

20 Q.   What's your current address?

21 A.   8 Manning Street.

22 Q.   And what town is that in?

23 A.   Pawtucket.

24 Q.   Pawtucket.

Page 11

1      Do you own or rent that house?

2 A.   Rent.

3 Q.   Would you be able to go back to the house at -- is

4    it Littlefield Street -- and get your personal

5    effects from there?

6 A.   I think I can. I don't know.

7 Q.   Are you aware whether Long Beach has ever enforced

8    the rider in a foreclosure against another

9    consumer?

10 A.   I have no idea.

11 Q.   And you wouldn't know whether they ever took some

12    other consumer's personal property through the

13    rider?

14 A.   I have no idea.

15 Q.   Are you aware that Long Beach no longer uses the

16    rider in its mortgage loans?

17 A.   No.

18 Q.   And, correct me if I'm wrong, is a fair rephrasing

19    of your testimony that one of the things that you

20    want from this lawsuit is for Long Beach not to use

21    that form anymore?

22 A.   Mm-hmm. That's correct.

23 Q.   Are you aware that you're a proposed class

24    representative for a class action lawsuit?

Page 12

1 A.   Yes.

2 Q.   Could you tell me, in your own words, what the role

3    of a class representative is in a class action?

4 A.   To keep the other members of the class informed of

5    what's going on with the case either by phone calls

6    or letters or faxes or --

7 Q.   So it's to keep the --

8 A.   -- any communication.

9 Q.   To keep the members of the class informed about the

10    case?

11 A.   Right.

12 Q.   All right. Is there anything else that you can

13    think of?

14 A.   No.

15 Q.   And a lot of times throughout the day, I'll ask

16    anything else, it's not a way to trick you or make

17    you think there is something else. I just want to

18    get everything that you know, because this

19    will be the only time that we get to talk before

20    there's a trial in this case.

21      When I say "anything else," I'm not

22    trying to trip you up or anything. I just want to

23    make sure that I've covered everything.

24 A.   Mm-hmm.

Page 13

1 Q.   Can you tell me who is in the proposed class that

2    you seek to represent?

3 A.   All of the people that have filed suit against Long

4    Beach over the same rider.

5 Q.   Do you know anybody that's in the class?

6 A.   No.

7 Q.   Do you know anyone who's had a loan with Long Beach

8    that had the one-to-four family rider?

9 A.   No. I never heard of Long Beach before I had them

10    for a mortgage person.

11 Q.   Do you know the other plaintiffs who want to be

12    class representatives in this lawsuit?

13 A.   No.

14 Q.   I'll just rattle off their names. So you don't

15    know the name Guadalupe Navara?

16 A.   No.

17 Q.   What about Eric Shelton?

18 A.   No.

19 Q.   Or Albert Stinson?

20 A.   No.

21 Q.   If there's a trial in this case, do you know where

22    it will take place?

23 A.   Chicago.

24 Q.   Is that your understanding of where the case is at

4 (Pages 10 to 13)

**Esquire Deposition Services**
**1-877-465-7236**

Page 14

1    right now?
2 A.  Yes.
3 Q.  What's your understanding of the status of the case
4    right now?
5 A.  The status?
6 Q.  Right. Where it's progressed in the litigation
7    process, I suppose?
8 A.  We're trying to get the case certified.
9 Q.  Have you reviewed any of the court papers that have
10   been filed in the lawsuit?
11 A.  Yes.
12 Q.  Do you know -- or do you recall which ones?
13 A.  I think both.
14 Q.  Both?
15 A.  The Boston and the Chicago.
16 Q.  I guess what I meant was: Do you recall the actual
17   -- the names of the pieces of paper that were filed
18   in the court?
19 A.  Oh, no, no.
20 Q.  Did you remember looking at certain papers that
21   were filed in court?
22 A.  Yes.
23 Q.  You just don't remember what the names of them
24   were?

Page 15

1 A.  Sorry.
2 Q.  I understand.
3        Do you know if what you reviewed were
4    drafts that had not been filed yet, or whether it
5    was the paper after it had already been filed with
6    the court?
7 A.  I believe they were the filed papers.
8 Q.  So do you recall ever reviewing drafts before they
9    were filed with the court perhaps to get your
10   feedback on them?
11 A.  No.
12 Q.  Have you ever signed any affidavits or declarations
13   for the motion to get the class certified?
14 A.  Yes.
15 Q.  You have?
16 A.  I think I have. I've signed plenty of affidavits.
17 Q.  We can mark the next few questions confidential,
18   because they're going to be some personal things
19   that I want to just confirm.
20        I have your date of birth as March 5,
21   1956?
22 A.  That's my brother's birth date.
23 Q.  Oh, that's your brother's birth date.
24        And that's Mr. Lawrence Balmforth?

Page 16

1 A.  Right.
2 Q.  What is your date of birth?
3 A.  1/1/48.
4 Q.  New Year's Day, right?
5 A.  New Year's Day.
6 Q.  And your social security number is?
7 A.  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.
8 Q.  And are you presently married?
9 A.  No.
10 Q.  Have you ever been married?
11 A.  No.
12 Q.  And do you have any children?
13 A.  Yes.
14 Q.  How many?
15 A.  One biological daughter, and I have adopted her two
16   grand -- my two grandchildren.
17 Q.  Can you tell me the highest level of education that
18   you've received?
19 A.  I graduated from high school, and I did a year of
20   vocational school.
21 Q.  What kind of vocational school?
22 A.  I'm a licensed travel agent.
23 Q.  So you went to vocational school to take classes on
24   being a travel agent?

Page 17

1 A.  Mm-hmm. That's not my primary job.
2 Q.  What's your primary job?
3 A.  I'm an emergency room secretary.
4 Q.  Where is that at?
5 A.  Memorial Hospital.
6 Q.  And how long have you held that job?
7 A.  Thirty years.
8 Q.  Wow!
9        Were you a full-time travel agent before
10   you started working at Memorial Hospital?
11 A.  No.
12 Q.  Have you ever been --
13 A.  I thought I was going to get to have a life when my
14   daughter grew up.
15 Q.  I'm sorry?
16 A.  When my daughter was an adult, I went to vocational
17   school to be a travel agent, because that's what I
18   wanted to do.
19 Q.  Oh, okay.
20 A.  But then I got my two grandchildren, and I had to
21   stay at the hospital to provide medical insurance
22   for the two of them.
23 Q.  Understand.
24        I guess I was thinking that you had gone

5 (Pages 14 to 17)

Page 18

1  to the vocational school right after high school.
2 A.  No.
3 Q.  But you went some --
4 A.  Midlife.
5 Q.  Midlife, right.
6       And other than the vocational school, you
7  haven't had any courses or educational training
8  after high school?
9 A.  No.
10 Q.  And were there any legal or law-related classes at
11  the vocational school that you took?
12 A.  No.
13 Q.  How about any business or, you know, mortgage
14  lending type courses?
15 A.  No.
16 Q.  So you haven't had any kind of schooling or
17  mortgage lending or anything like that?
18 A.  No.
19 Q.  And have you ever served in the military?
20 A.  No.
21 Q.  And you said your current address was 8 Manning
22  Street in Pawtucket, Rhode Island?
23 A.  Correct.
24 Q.  How long have you lived there?

Page 19

1 A.  Since last July.
2 Q.  So that's July of 2007?
3 A.  Right.
4 Q.  And before that, you were living at the house --
5 A.  At the house.
6 Q.  -- 190 Littlefield Street in Pawtucket?
7 A.  Right.
8 Q.  And is July of '07 around the time that the house
9  was foreclosed upon?
10 A.  They foreclosed it in August.
11 Q.  August 2007?
12 A.  August 14th, if you'd like to know the date.
13 Q.  How long had you been living at the house in
14  Littlefield?
15 A.  From the day of purchase, I believe January of '01.
16 Q.  January 2001?
17 A.  Mm-hmm.
18 Q.  And do you remember what your address was before
19  the Littlefield Street?
20 A.  Mm-hmm. 325 Prospect Street.
21 Q.  That's in Pawtucket?
22 A.  Pawtucket.
23 Q.  Did you own or rent that house?
24 A.  Rent for 26 years.

Page 20

1 Q.  Was the house at Littlefield the first time that
2  you ever owned a house?
3 A.  Yes.
4 Q.  So that would have been the first time that you
5  ever had a mortgage loan?
6 A.  Correct.
7 Q.  Do you remember who the mortgage lender was when
8  you first bought the house?
9 A.  Litton and -- I don't remember.  There was two
10  mortgages on it, Litton and --
11 Q.  Would it have been OCWEN Federal Bank?
12 A.  OCWEN.
13 Q.  So it was OCWEN and Littleton?
14 A.  Litton.
15 Q.  Litton.
16       And did you ever -- was the loan with
17  Long Beach the next loan that you got for the house
18  --
19 A.  I wanted to consolidate both mortgages into one
20  mortgage.
21 Q.  And so I take it, other than renting your current
22  house now, you don't own any other real estate?
23 A.  No.
24 Q.  Do you manage any rental properties?

Page 21

1 A.  No.
2 Q.  When you moved into the house at -- or when you
3  bought the house at Littlefield Street, is it a
4  two-unit house?
5 A.  Yes.
6 Q.  And do you know if the person who owned the house
7  at the time if they leased out part of it to
8  someone else?
9 A.  The previous owner?
10 Q.  Correct.
11 A.  Yes, they did.
12 Q.  They did.
13       Do you remember how much the rent was?
14 A.  I have no idea.
15 Q.  And then when you moved into the house, it was
16  going to be you and your brother that were going to
17  live there?
18 A.  Correct.
19 Q.  And was it going to be you were going to live in
20  one unit, he was going to live in the other?
21 A.  Correct.
22 Q.  So you weren't going to have any other tenants at
23  the house?
24 A.  No.

6 (Pages 18 to 21)

Page 22

1 Q.   And your brother was a co-borrower on the loan?
2 A.   Yes.
3 Q.   And did you have an understanding with him that he
4       was going to pay half of the mortgage --
5 A.   Right.
6 Q.   -- each payment?
7 A.   Right.
8 Q.   I thought I saw in one of the discovery answers
9       that it said that he was suppose to pay half of the
10      mortgage, did at some point he not pay part of his
11      share?
12 A.   That's correct.
13 Q.   And was that one of the reasons that led to the
14      foreclosure?
15 A.   Yes.  I bought a front porch.
16 Q.   I'm sorry?
17 A.   The house has a beautiful front porch.
18 Q.   Was that the reason --
19 A.   I fell in love with the porch.
20 Q.   That was the main reason that you wanted to buy --
21 A.   Bought the house.  I bought a porch.
22 Q.   Other than the case against Long Beach, have you
23      ever filed a lawsuit before?
24 A.   Does a paternity suit count?

Page 23

1 Q.   We won't go into the details of it, but I'll just
2       note.
3           Was that -- do you remember what court
4       that was in?
5           THE WITNESS:  What's the court over here
6       on the river?
7           MR. LEFEBVRE:  You got to look at him.
8           THE WITNESS:  You can't answer?
9 Q.   A courthouse here in Providence?
10 A.   Yes.
11 Q.   And that was a lawsuit that you filed?
12 A.   Yes.
13 Q.   Do you remember when that was?
14 A.   1967.
15 Q.   Other than that one lawsuit and the one we're
16      talking about today, any other lawsuits?
17 A.   No.
18 Q.   Have you ever been sued before?
19 A.   No.
20 Q.   Have you ever -- you said you had never given a
21      deposition before, have you ever had to testify in
22      court or at trial?
23 A.   Only at the paternity suit.
24 Q.   And other than the one suit we're talking about

Page 24

1       today, have you ever sought to be a class
2       representative in a class action?
3 A.   No.
4 Q.   Have you ever been involved in a class action as a
5       class member?
6 A.   No.
7 Q.   Have you ever filed for a bankruptcy?
8 A.   Yes.
9 Q.   And, again, we won't go into the details, but I
10      just kind of want to know kind of when and where
11      that was?
12 A.   Last -- probably during the foreclosure.
13 Q.   Oh, so sometime maybe last year?
14 A.   Yes.
15 Q.   And is that a court here in Providence?
16 A.   Yes.
17 Q.   Is that still going on, or is it over with?
18 A.   That's done with.
19 Q.   It's done?
20 A.   (Witness indicating.)
21 Q.   And you said you've never been married, so I guess
22      you haven't been involved in any divorce
23      proceedings?
24 A.   No.

Page 25

1 Q.   And other than a foreclosure, have you ever been
2       involved in any eviction proceedings?
3 A.   No.
4 Q.   Do you have any understanding as to your time
5       commitments to be a class representative in this
6       case?
7 A.   Time?
8 Q.   Like, do you have any understanding as to how much
9       time you may need to set aside for this lawsuit?
10 A.   No.
11 Q.   Roughly, how much time have you spent in the past
12      working on this lawsuit or being involved in it, if
13      you can give me a ballpark?
14 A.   I would say it's about two years now.
15 Q.   I'm talking -- I guess what I mean is, I know the
16      lawsuit has been going on for two years, I guess
17      what I mean is, personally, how much time have you
18      spent doing things for the lawsuit?
19 A.   Okay.  I've had a couple of meetings with
20      Mr. Lefebvre.  I don't know, a few hours a month
21      maybe.
22 Q.   About how many meetings have you had with
23      Mr. Lefebvre?
24 A.   Five or six.

7 (Pages 22 to 25)

Page 26

1 Q.   Is that in person or telephone?

2 A.   Both.

3 Q.   Both.

4      Other than Mr. Lefebvre, was anybody

5      involved in -- anybody else at these meetings or on

6      the phone with your guys?

7 A.   No.

8 Q.   Have you met any other lawyers that have been

9      working on this case?

10 A.  No.

11 Q. Do you know the names of any of the other lawyers?

12 A.  Mr. Edelton -- Edelman.

13 Q.  Edelman?

14 A.  Edelman.

15 Q. Have you spoken or met him, or you just recognize

16     his name?

17 A.  No. Just know his name.

18 Q.  Is it because of the papers that you've seen?

19 A.  Mm-hmm.

20 Q.  Is that --

21 A.  Yes.

22     MR. LEFEBVRE: I guess Dan just has a

23     memorable name.

24     MR. CROWSON: Yeah, he does. Everybody

Page 27

1      knows him.

2      MR. LEFEBVRE: From Rhode Island to

3      California.

4      MR. CROWSON: Right.

5 Q.   And I take it you haven't had any contact with any

6      expert witnesses for this lawsuit?

7 A.   No.

8 Q.   Other than the loan package of materials that you

9      had from your loan closing with Long Beach, did you

10     have any other documents about Long Beach or about

11     your Long Beach loan?

12 A.  Other than my mortgage packet?

13 Q.  Right.

14 A.  No.

15 Q.  Had you ever communicated in writing with anyone at

16     Long Beach either before or after you got your

17     loan?

18 A.  No.

19 Q.  Do you know the names of any of the other lawyers

20     at the Dan Edelman firm?

21 A.  No.

22 Q.  Michael Aschenbrener?

23 A.  No.

24 Q.  Cathy Combs?

Page 28

1 A.   No.

2 Q.   How about a guy named Lloyd Brooks?

3 A.   No.

4 Q.   And Mr. Lefebvre is the only attorney that you have

5      a retainer agreement with?

6 A.   Yes.

7 Q.   What did you do to get ready for today's

8      deposition?

9 A.   What did I do to get ready?

10 Q.  Right.

11 A.  Nothing in particular.

12 Q.  Did you have any meetings with Mr. Levebvre

13     specifically to get ready for today's session?

14 A.  Yes.

15 Q.  When was that?

16 A.  This morning.

17 Q.  This morning.

18     About how long did that meeting last?

19 A.  Fifteen, 20 minutes.

20 Q.  Did you look at any documents during that session?

21 A.  He showed me my loan application.

22 Q.  Is that the only document you can recall reviewing?

23 A.  Mm-hmm. Yes.

24 Q.  And was there anyone else at the meeting?

Page 29

1 A.   No.

2 Q.   Did you happen to review any documents at home

3      without Mr. Lefebvre to get ready for today's

4      deposition?

5 A.   I have my packet with my -- with the two filings

6      that he made, but I haven't really gone over them.

7 Q.   Okay. The filings that he made, would that be the

8      complaints that were filed in court?

9 A.   Right.

10 Q.  What about the motion for class certification, do

11     you have a copy of that?

12 A.  Do you want me to look?

13 Q.  Just if you remember?

14 A.  I don't know.

15 Q.  I know all these things are basically lawyer mumbo

16     jumbo on the top.

17     And I think you said earlier that you

18     didn't recognize or you didn't know the names of

19     the other named plaintiffs, so I take it you've

20     never spoken with any of them?

21 A.  No.

22 Q.  And you don't know anybody else who had a Long

23     Beach mortgage loan?

24 A.  No.

8 (Pages 26 to 29)

1 Q.   Have you spoken with -- other than your lawyer,
2      have you spoken with any family member or friends
3      about this lawsuit?
4 A.   No.
5 Q.   What about any coworkers?
6 A.   No.
7 Q.   What about your brother, Mr. Balm -- is it worth or
8      forth?
9 A    Torth.
10 Q.  i. ilmforth. Have you spoken with him about it?
11 A.  Yes.
12 Q.  About this lawsuit or about the foreclosure or
13     both?
14 A.  Both.
15 Q.  And when you spoke to him about this lawsuit, what
16     did you guys talk about?
17 A.  I just told him that there was a lawsuit. We
18     didn't really go into anything.
19 Q.  What did he say when you told him that you were
20     involved in a lawsuit?
21 A.  Larry is very unconcerned about most things. Do
22     what you got to do.
23 Q.  So he didn't really care one way or the other?
24 A.  Right.

1 Q.   Did he ever show any incentive or desire to be part
2      of the lawsuit?
3 A.   No.
4          We're not exactly on good terms right
5      now.
6 Q.   Because of the foreclosure?
7 A.   Right.
8 Q.   Was the -- and I hate to bring this up too much,
9      but was the foreclosure -- were there any court
10     appearances or, you know, court proceedings that
11     you guys had to go through with the foreclosure?
12 A.  No.
13 Q.  Did you or Larry get a lawyer for the foreclosure?
14 A.  No. I couldn't have stopped it anyway, why pay a
15     lawyer to go down the tubes.
16 Q.  And so other than the one conversation where you
17     told Larry about the lawsuit, have you ever spoken
18     with him again about this case?
19 A.  No.
20 Q.  What about -- other than your lawyer, have you
21     spoken to anybody about today's deposition?
22 A.  No.
23 Q.  Have you told any family or friends or coworkers
24     that you had to give a deposition today?

1 A.   No.
2 Q.   I just kind of need some water, so if you guys want
3      to take like a five-minute break.
4          THE VIDEOGRAPHER: The time is 10:36 a.m.
5      We're going off the record.
6          (A short break was taken.)
7          THE VIDEOGRAPHER: The time is 10:43 a.m.
8      We're back on the record.
9          MR. CROWSON: Can you mark this Exhibit
10     1?
11         (Exhibit No. 1, marked for
12     identification.)
13 Q.   All right. Ms. Sullivan, I'm going to hand you
14     what the court reporter has marked as Exhibit 1
15     which is a copy of the Consolidated Class Action
16     Complaint filed in the Northern District of
17     Illinois without the exhibits that were attached to
18     the complaint.
19         Just flip through it, and then let me
20     know when you're ready. I have a few questions
21     about it.
22 A.   (Witness complies.)
23 Q.   Do you recall ever seeing either a draft or a final
24     version of this document?

1 A.   I think I have a copy of it.
2 Q.   And what do you think you have as a copy? Would it
3      be the version that was already filed with the
4      courthouse?
5 A.   I don't know if it's the version that was filed.
6 Q.   Do you remember ever seeing a draft of this
7      document and being asked to provide any comments on
8      it?
9 A.   No.
10 Q.  And if you look on the first page at the top
11     there's a line that goes across, and one of the
12     things it says "Filed January 21, 2008," do you see
13     what I'm talking about?
14 A.  Okay. At the top?
15 Q.  Yes, ma'am.
16 A.  Yes.
17 Q.  All right. And at that time, January of 2008, had
18     your house on Littlefield Street already been
19     foreclosed upon?
20 A.  It was foreclosed in August of '07.
21 Q.  Okay. So would it be fair to say that as of
22     January 21, 2008, you didn't own the house anymore?
23 A.  Correct.
24 Q.  Okay. And when you got your loan from Long Beach,

9 (Pages 30 to 33)

Page 34

1    you had already owned the house at Littlefield; is
2    that correct?
3 A.    What?
4 Q.    At that time that you got your mortgage loan from
5    Long Beach, it was to refinance the loan that you
6    already had on the house, so you had already owned
7    the house?
8 A.    Correct. For two years.
9 Q.    Right. You can set that one aside. I'm going to
10    ask the same thing about another document.
11        MR. CROWSON: This will be two.
12        (Exhibit No. 2, marked for
13    identification.)
14 Q.    I handed you what the court reporter has marked as
15    Exhibit 2 which is a copy of Plaintiffs' Memorandum
16    in Support of Motion for Class Certification
17    without the exhibits, and if you can just take a
18    second and glance through it if you want?
19 A.    (Witness complies.) These both look the same.
20 Q.    And for Exhibit 2, do you remember ever seeing a
21    copy of that document?
22 A.    Well, like I said, I have a lot of documents in my
23    envelope. To say that it's this particular one.
24 Q.    All right. You can't just -- you can't say for

Page 35

1    sure one way or the other?
2 A.    No.
3 Q.    All right.
4 A.    To tell you the truth, the two of these look
5    exactly alike until I was looking at the way
6    they're typed up.
7 Q.    The court papers that you do have at home, have you
8    studied and read them?
9 A.    I wouldn't say I've studied them. I looked them
10    over.
11 Q.    Okay. And the same for Exhibit 2, do you remember
12    ever seeing a draft of that document and being
13    asked to give any comments or feedback on it?
14 A.    I may have been.
15 Q.    You just don't remember?
16 A.    I have no idea.
17 Q.    And do you remember ever signing a declaration or
18    an affidavit for the motion for a class
19    certification?
20        And I guess maybe a better way to look at
21    is, if, again, if you look at the top line, it says
22    "Filed March 19th, 2008"?
23 A.    Mm-hmm.
24 Q.    A couple of months ago.

Page 36

1        Around that time frame, do you remember
2    signing any declarations or affidavits?
3 A.    I signed some papers for Mr. Lefebvre.
4 Q.    You don't know which?
5 A.    Right now I don't remember what's what.
6 Q.    So you can't say one way for sure, one way or the
7    other, whether you had signed an affidavit for a
8    motion for class certification?
9 A.    Not an affidavit, no, I can't be sure.
10 Q.    Okay. You can set those aside. I don't have
11    anymore questions with those.
12        Before you and your brother moved into
13    the house at Littlefield Street, did he own any
14    other houses before that one?
15 A.    Did he?
16 Q.    Right.
17 A.    He owned a house in Warwick.
18 Q.    Warwick, Rhode Island?
19 A.    (Witness indicating.)
20 Q.    Do you know if he had tenants that lived there with
21    him? Did he have leases?
22 A.    He had a wife that lived with him.
23 Q.    But he didn't have -- he didn't rent part of it?
24 A.    It was a one-family house.

Page 37

1 Q.    Did he ever own any homes where he rented part of
2    it out to a tenant?
3 A.    No.
4 Q.    And did he ever manage rental property?
5 A.    No.
6 Q.    And I take it as -- you said you always wanted to
7    be a travel agent, is that something that you do
8    kind of on the side now?
9 A.    I use to.
10 Q.    You use to?
11 A.    (Witness indicating.)
12        The internet's kind of put the screws to
13    travel agents.
14 Q.    That's true.
15        So you don't do that anymore at all?
16 A.    I have my license, but rarely.
17 Q.    Just focus on the job at Memorial Hospital?
18 A.    Right.
19        I keep my license current in case I get
20    to have a life.
21 Q.    What do you have to do to keep the license current?
22 A.    I have to pay my yearly fee.
23 Q.    Do you have to take any continuing education
24    courses or anything like that?

10 (Pages 34 to 37)

Page 38

1 A.  No.

2 Q.  So just pay an annual fee?

3 A.  Mm-hmm. I imagine if I ever get into a travel
4     agency, I'll have to take some kind of classes.

5 Q.  Right.

6         Let's talk a little bit about when you
7     got the loan with Long Beach, and I'll represent to
8     you that at least from the loan paperwork that we
9     have that it looks like the date of the loan was
10    July 25, 2005, does that sound about correct?

11 A. It was the summer, mm-hmm.

12 Q.  Can you walk me through the process of how and why
13    you and your brother went and got the loan at that
14    time?

15 A. I wanted to consolidate from having two mortgages
16    to one mortgage.

17 Q.  And what did you do to go about consolidating those
18    two mortgages?

19 A. I called the mortgage person to see if I could
20    refinance into one loan.

21 Q.  What was the name of the person or company that you
22    called?

23 A. I don't remember.

24 Q.  Was it a mortgage broker type person?

Page 39

1 A.  Yeah.

2 Q.  And how did you get that company or person's name?

3 A. I don't remember. I don't have any idea where I
4     got his name. Somebody had to have recommended him
5     to me.

6 Q.  Maybe a friend or a coworker may have recommended
7     him?

8 A. A friend or somebody.

9 Q.  Did you happen to look online or in the phonebook?

10 A. I'm not a computer person.

11 Q.  And then what happened when you made the initial
12    contact with the mortgage broker person?

13 A. He wanted my tax returns and my pay stubs from me
14    and my brother, and then he got in touch with me,
15    and he said he had a loan, a mortgage he could get
16    me.

17 Q.  About how long did the process take?

18 A. I would think a couple of months.

19 Q.  And did he give you options as to which loan or
20    which company you could go with?

21 A. I don't think he did.

22 Q.  And when he told you that he could get you a
23    mortgage loan, was that a mortgage loan with Long
24    Beach?

Page 40

1 A.  Correct.

2 Q.  And was that the first time that you had come to
3     know that Long Beach was going to be the mortgage
4     lender?

5 A.  Mm-hmm.

6 Q.  Is that a yes?

7 A.  Yes.

8 Q.  And you hadn't had any -- you hadn't even heard of
9     Long Beach before that point?

10 A. No. I think that's safe to say.

11 Q.  And so did you ever -- during that process, did you
12    ever have to talk or communicate in writing with
13    anybody at Long Beach?

14 A. No.

15 Q.  You just communicated with your mortgage broker?

16 A. Mortgage person, yeah.

17 Q.  And do you remember the name of his company or her
18    company?

19 A. No. But I know it was up in Massachusetts, if
20    that's any help to you.

21 Q.  Narrows it down to at least one state.

22        Did you have to go to a -- physically for
23 a closing?

24 A. He came to my house.

Page 41

1 Q.  The mortgage broker?

2 A.  Mm-hmm.

3 Q.  To get you to sign the papers?

4 A.  Mm-hmm. I think he came twice to the house: Once
5     when we were initially talking to him about a
6     mortgage, and then he came back for the closing.

7 Q.  Did he get you to sign anything or get any
8     paperwork from you during the first visit?

9 A. I want to say he got our financial stuff at the
10    first visit.

11 Q.  Do you remember having to sign any applications or
12    documents during that visit?

13 A. I may have, but I don't remember.

14 Q.  And then the second visit he came that was to
15    actually --

16 A. Close.

17 Q.  -- close the loan?

18 A. Mm-hmm.

19 Q.  Who was at your house when that happened?

20 A. My brother and myself and a gentleman. I don't
21    remember his name. Must be in the papers
22    somewhere.

23 Q.  Anybody else?

24 A. No. My mother was in the house if that --

11 (Pages 38 to 41)

Page 42

1 Q.   And either you or your brother had a lawyer with
2      you?
3 A.   No.
4 Q.   Did the mortgage person explain the documents to
5      you?
6 A.   Explain in what way?
7 Q.   Just did he describe them or go over them as you
8      had to sign them?
9 A.   Basically, you know, this is this, sign this.
10 Q.  Did he -- about how long did it take?
11 A.  Half hour maybe.
12 Q.  Did you read over the documents before you signed
13      them?
14 A.  I would say glanced over.
15 Q.  Did you, as you were signing the documents, do you
16      remember seeing the one-to-four family rider with
17      the mortgage?
18 A.  The paper itself?
19 Q.  Right.
20 A.  Yes.
21 Q.  Did you read it or glance over it before you signed
22      it?
23 A.  I can't say that I actually read it, no.
24      Will I read anything else?  I certainly

Page 43

1      will.
2 Q.   Did you ask any questions, or did your brother ask
3      any questions about the documents as you were
4      signing them?
5 A.   No.
6 Q.   Were you given a package of the documents at that
7      time?
8 A.   No.
9 Q.   And then at some point, did you go and read over
10      any of the documents?
11 A.  I looked over them.
12 Q.  Was that the same day or --
13 A.  No.
14 Q.  A couple of months later?
15 A.  I would say months later.
16 Q.  And was that the first time that you saw the family
17      rider and the security interest?
18 A.  Right.
19 Q.  And then you called Mr. Lefebvre?
20 A.  To go over them.
21 Q.  The loan that you got from Long Beach, was the
22      entire amount used to pay off the two mortgages
23      that you already had on the house?
24 A.  Yes.

Page 44

1 Q.   Was there any portion of it that -- cash proceeds
2      to you or your brother?
3 A.   I want to say there was, like, $4,000 or something.
4 Q.   Did you use any of that money to make improvements
5      or repairs to the house?
6 A.   Yes.
7 Q.   What kind of improvements?
8 A.   I had to do -- I told you I bought a porch.  I
9      bought the handyman special.  It needed all kinds
10      of repairs.
11 Q.  So did the $4,000 or $5,000 cover all the repairs
12      that you --
13 A.  No.  It covered some plumbing issues and a hot
14      water heater.
15 Q.  That you needed to get fixed or replaced?
16 A.  Right.
17      (Exhibit No. 3, marked for
18      identification.)
19 Q.  Handing you what the court reporter has marked as
20      Exhibit 3 which is a document entitled, "Plaintiff
21      Charlene Sullivan's Response to Long Beach First
22      Set of Discovery Requests."
23      Can you flip to the last page?
24 A.  (Witness complies.)

Page 45

1 Q.   There's a -- it's a document called "verification,"
2      do you see what I'm talking about?
3 A.   Mm-hmm.
4 Q.   Is that your signature on the line near the right?
5 A.   Yes, it is.
6 Q.   And can you just tell me in your own words what's
7      your understanding as to why you signed this piece
8      of paper?
9 A.   Why I signed it?
10 Q.  Correct.
11 A.  Mr. Lefebvre and I went through this document, and
12      at the end, he asked me to sign it.
13 Q.  Would it be fair to say that it was to certify the
14      accuracy of the answers in the previous pages?
15 A.  Yeah, that would be accurate.
16 Q.  Now, did you -- before you signed it, did you read
17      over the pages to check the answers to make sure
18      that they were accurate?
19 A.  Yes.  We went over it together.
20 Q.  Had you ever seen a draft of this document that
21      only had the questions and not the answers filled
22      in?
23 A.  No.
24 Q.  So the first time that you saw this document, the

12 (Pages 42 to 45)

Page 46

1    answers had already been filled in?

2 A.  Yes.  There were also conversations that I had had

3    with Mr. Lefebvre.

4 Q.  If you turn to, I guess it's the third page.

5 A.  (Witness complies.)

6 Q.  The top says, "Response to Interrogatories".

7 A.  Mm-hmm.

8 Q.  And then there's Question 1, and then the answer

9    read, "It is my understanding that Long Beach

10    failed to properly disclose its security interest

11    in my personal property on the truth and lending

12    disclosure statement."  Do you see what I'm talking

13    about?

14 A.  Yes.

15 Q.  And I guess my only question really is:  Where --

16    see how to phrase this.  How is it that you -- and

17    I don't want you to tell me anything that your

18    lawyers ever told you.

19        Do you have any kind of independent

20    understanding as to why or how Long Beach violated

21    the Truth and Lending Act?

22 A.  It wasn't disclosed to me when I signed the

23    original mortgage.

24 Q.  And I guess what I want to know is, other than

Page 47

1    information that your lawyer may have given you,

2    does that understanding come from anything else?

3 A.  No.  I think that when I signed the paper that the

4    person going over it should have gone over that in

5    particular --

6 Q.  And did you --

7 A.  -- that all of my household belongings would be in

8    jeopardy of seizure.

9 Q.  And did you get that understanding when you first

10    read the rider yourself?

11 A.  No.

12 Q.  It was after you had spoken with Mr. Lefebvre?

13 A.  Well, I brought it to Mr. Lefebvre after I read it

14    fully, let's put it that way.

15 Q.  Okay.  Got it.

16        And I think we've covered this already,

17    but are you aware whether Long Beach has ever taken

18    a consumer's personal property because of the

19    one-to-four family rider?

20 A.  I don't have any first hand knowledge of it, no.

21    Maybe somebody else has first hand knowledge.

22 Q.  And do you know if Long Beach continues to use the

23    one-to-four family rider with its mortgage loans?

24    You said it did not so --

Page 48

1 Q.  Other than what I told you, do you have any

2    understanding --

3 A.  No.

4        (Exhibit No. 4, marked for

5    identification.)

6 Q.  Ms. Sullivan, I've handed you what we've marked as

7    Exhibit 4 which is a copy of a document that Long

8    Beach produced, and it has a Bates stamp at the

9    bottom, Long Beach MDL 59 through Long Beach MDL

10    79.

11 A.  Where are you looking?

12 Q.  At the lower right-hand corner.

13        MR. LEFEBVRE:  Right here, Charlene.

14    Over in the right is a number.

15        THE WITNESS:  Okay.

16 Q.  Those are Bates stamps that lawyers put on

17    documents to identify them for future references.

18        And on the left side, the lower part, are

19    those your initials on the mortgage?

20 A.  Yes.

21 Q.  And your initials are on every page, one through

22    14; is that correct?

23 A.  Yes.

24 Q.  And is that your signature where it says Charlene

Page 49

1    Sullivan, borrower, on page Long Beach 72?

2 A.  Yes.

3 Q.  And let's flip over a few more to Long Beach 77,

4    that's the page that starts the one-to-four family

5    rider document?

6 A.  Right.

7 Q.  And are those your initials on the left side at the

8    bottom?

9 A.  Yes.

10 Q.  And then the next page, is that your signature?

11 A.  Yes.

12 Q.  Is this the document that you were talking about

13    that you claim took the security interest in your

14    personal property and that you ultimately wanted to

15    talk to Mr. Lefebvre about?

16 A.  The page 77, yes.

17 Q.  Okay.  Great.

18        I guess I want to list out some of the

19    things and see if they were in -- if they were at

20    the house when you got there.

21        When you and your brother bought the

22    house at Littlefield Street, did it have a heating

23    system?

24 A.  Yes.

13 (Pages 46 to 49)

Page 50

1 Q.   Was it -- what kind of heating system?

2 A.   Gas.

3 Q.   Was it affixed to the property?

4 A.   Yes.

5 Q.   And when you moved in, did you intend to keep it
6       attached to the property?

7 A.   Yes.

8 Q.   And after the house was foreclosed upon, I take it
9       that you and your brother didn't take out the
10      heating system?

11 A.  No.

12 Q.  All right.  And this is going to take a few
13      minutes, but I'm going to do the same thing for a
14      lot of other things listed here.
15          Did it have a cooling system?

16 A.  No.

17 Q.  So it didn't have a central AC?

18 A.  No.

19 Q.  Did it have window AC units?

20 A.  No.

21 Q.  I guess you don't need them up in Rhode Island?

22 A.  No.  You need them.  They didn't supply them.

23 Q.  Did you ultimately put in any kind of air
24      conditioning system?

Page 51

1 A.   Mm-hmm.  Yes.

2 Q.   Was it a central AC unit or --

3 A.   Window.

4 Q.   -- window units?

5          Did you take the window units when the
6       house was foreclosed on?

7 A.   I brought it to my apartment.

8 Q.   Was it just one window unit?

9 A.   Yes.

10 Q.  And you took that one with you?

11 A.  Yes.

12 Q.  Did it have a electricity system?

13 A.  Yes.

14 Q.  Was it affixed to the house?

15 A.  Yes.

16 Q.  And when you moved in, did you intend for it to
17      stay attached?

18 A.  Yes.

19 Q.  And when you moved out, I take it you didn't take
20      any of it with you?

21 A.  No.

22 Q.  Did it have gas flow, like a gas system for ovens
23      or stoves maybe?

24 A.  No.

Page 52

1 Q.   What about any fire prevention devices?

2 A.   The things on the ceiling.

3 Q.   Smoke detectors?

4 A.   Smoke detectors.

5 Q.   Were those attached to the property when you were
6       there?

7 A.   Yes.

8 Q.   Did you intend for them to stay attached?

9 A.   Yes.

10 Q.  Did you take any of them when you left?

11 A.  No.

12 Q.  Did it have any security or access controls -- did
13      it have a security system?

14 A.  No.

15 Q.  What about inside plumbing?

16 A.  Has inside plumbing.

17 Q.  I think that was one of the things you said you had
18      --

19 A.  Such as it is.

20 Q.  You had to get repaired?

21 A.  Yes.

22 Q.  Were the plumbing pipes attached to the property?

23 A.  Yes.

24 Q.  And did you take any of them with you?

Page 53

1 A.   No.

2 Q.   Did it have a bathtub?

3 A.   Yes.  Still has a bathtub.

4 Q.   So I take it that you intended for them to stay
5       attached?

6 A.   Yes.

7 Q.   Did it have a water heater?

8 A.   Yes.

9 Q.   Was it attached to the property?

10 A.  Yes.

11 Q.  Did you intend for it to stay attached?

12 A.  Yes.

13 Q.  And when you left, I take it you didn't take the
14      water heater?

15 A.  No.

16 Q.  I'm not sure what this is, but did it have a water
17      closet?

18 A.  If it does, it still does.

19 Q.  Do you know what a water closet is?

20 A.  I think it use to be a bathroom.

21 Q.  Okay.  Because I don't.

22 A.  I'm a little older than you.

23 Q.  Did it have sinks?

24 A.  Yes.

14 (Pages 50 to 53)

Page 54

1 Q.   Were they attached to the house?

2 A.   Mm-hmm.  Yes.

3 Q.   Did you take any of the sinks when you left?

4 A.   No.

5 Q.   What about oven ranges and often stoves?

6 A.   I brought my stove with me, and I took my stove

7      with me.

8 Q.   What about an oven range, did it have one of those?

9 A.   It was part of the stove.

10 Q.  That was something you brought in --

11 A.  Mm-hmm.

12 Q.  -- and then you took it out?

13 A.  I took if out.

14 Q.  Did it have a refrigerator?

15 A.  No.  I brought one, and I took it.

16 Q.  What about a dishwasher?

17 A.  It's attached to the house.

18 Q.  Is it still there?

19 A.  Yes.

20 Q.  What about a garbage disposal?

21 A.  Yes.

22 Q.  It was there?

23 A.  Mm-hmm.

24 Q.  And is it still there?

Page 55

1 A.   It's still there.

2 Q.   What about a washing machine?

3 A.   I brought one and I took it.

4 Q.   What about a drier?

5 A.   The drier is still in the house.

6 Q.   It was there when you got there?

7 A.   No.

8 Q.   You brought one?

9 A.   Mm-hmm.

10 Q.  And it's still there?

11 A.  And it's still there.

12 Q.  What about any storm windows?

13 A.  They were there, and they're still there.

14 Q.  What about any storm doors?

15 A.  I put one on the front door, and it's still there.

16 Q.  Did you intend for the storm door to remain part of

17      the house or to remain attached to the house?

18 A.  Sure.

19 Q.  What about any window screens?

20 A.  They're there.

21 Q.  Were they attached to the house?

22 A.  Yes.

23 Q.  Are they still there?

24 A.  Yes.

Page 56

1 Q.   What about window blinds?

2 A.   They're still there.

3 Q.   Were they attached to the house when you moved in?

4 A.   No.  I put up shades.

5 Q.   Did you take the blinds or shades when you moved

6      out?

7 A.   No.

8 Q.   What about curtains or curtain rods?

9 A.   Took my curtains, not the curtain rod.

10 Q.  Did it have mirrors in any of the rooms?

11 A.  Just in the bathroom.

12 Q.  Was it attached to the wall?

13 A.  Mm-hmm.  Yes.

14 Q.  Did you intend for it to stay attached?

15 A.  Yes.

16 Q.  And is it still there?

17 A.  Yes.

18 Q.  What about cabinets?

19 A.  Cabinets are all there.

20 Q.  Were they attached to the house?

21 A.  Yes.

22 Q.  And are they -- they're still there?

23 A.  Still there.

24 Q.  What about paneling for the walls?  Did it have any

Page 57

1      wood paneling?

2 A.   No.

3 Q.   What kind of --

4 A.   It's wallpapered.

5 Q.   What about for the floors, did it have carpet or

6      hardwood or tile?

7 A.   Only one room has carpeting.

8 Q.   What did the other rooms have?

9 A.   Hardwood.

10 Q.  Is the carpet still attached to the floor?

11 A.  Yes.

12 Q.  What about the hardwood?

13 A.  It's still on the floor.

14 Q.  When you first bought the house, did you enter into

15      a real estate purchase agreement with the current

16      owner?

17 A.  Sure.

18 Q.  Do you still have a copy of that?

19 A.  I don't know if I have it or if he has it.

20 Q.  But you maintained it, you didn't discard it at

21      some point after you bought the house?

22 A.  I don't think I did.  I'm a bit of a pack rat.

23 Q.  Do you recall having to negotiate or put into that

24      agreement certain items that needed to stay in the

15 (Pages 54 to 57)

Page 58

1   house or needed to go?
2 A.  No.
3 Q.  And I'm sure we covered some of these already, but
4      I just want to make sure.
5          Other than the family rider that you
6      allege took a security interest by Long Beach, do
7      you have any other problems or issues with your
8      Long Beach mortgage loan?
9 A   Other issues with it?
10 Q.  Right.
11         Do you claim that Long Beach did anything
12     else illegally or wrongfully to you other than the
13     rider?
14 A.  Aside from giving me the loan, no.
15 Q.  Why do you say that?
16 A.  I had shaky credit at the beginning.  If I was
17     giving mortgages out, I would have never given a
18     mortgage to me or my brother.
19 Q.  Because of --
20 A.  Because of we were --
21 Q.  -- the poor credit score?
22 A.  -- living too close to the edge, and it only takes
23     one little thing to slide you over.
24 Q.  What about the first mortgage that you --

Page 59

1 A.  That's what I mean, the original mortgage.
2 Q.  That was OCWEN and --
3 A.  Litton.
4 Q.  -- Litton?
5          So you believe that you overextended
6      yourself by getting those loans?
7 A.  Right.  I think I was in the hole before I ever set
8      foot in the house.
9 Q.  And then you got the Long Beach loan to refinance
10     those --
11 A.  To try and rectify.
12 Q.  But to the extent that you were already
13     overextended that Long Beach --
14 A.  Flushed.
15 Q.  -- didn't really do anything at that point?
16 A.  Just flushed.
17 Q.  What do you mean?
18 A.  You know how you flush the toilet?
19 Q.  And you don't claim to have suffered any actual
20     damages or economic harm because of the family
21     rider?
22 A.  No.
23 Q.  Is that a no?
24 A.  No.

Page 60

1 Q.  I'm sorry.
2          And Long Beach has not seized any of your
3      personal property when they did the foreclosure?
4 A.  No, not yet.
5 Q.  Do you want to take another break for a few more
6      minutes while she changes the tape?  I'm almost
7      done.
8          THE VIDEOGRAPHER:  The time is 11:22 a.m.
9      We're going off the record, and this is the end of
10     Tape No. 1.
11         (A short break was taken.)
12         THE VIDEOGRAPHER:  The time is 11:28 a.m.
13     on May 12th, 2008.  This is Tape No. 2 of the
14     videotaped deposition of Charlene Sullivan.
15         MR. CROWSON:  This will be five.
16         (Exhibit No. 5, marked for
17     identification.)
18 Q.  Ms. Sullivan, I'm handing you what the court
19     reporter has marked as Exhibit 5 --
20         THE VIDEOGRAPHER:  Counsel, I'm sorry to
21     interrupt, if you could just raise that.
22 Q.  -- which is a copy of your loan application for the
23     Long Beach mortgage loan, and it's Bate stamped at
24     the bottom Long Beach 2, 3, 5 and 4, pages were out

Page 61

1      of order.
2 A.  Mm-hmm.  Yes.
3 Q.  Are those your initials at the bottom left corner?
4 A.  Yes.
5 Q.  And then on page 3 --
6 A.  Yes.
7 Q.  -- is that your signature in the co-borrower's
8      signature section?
9 A.  Page 3?
10 Q.  I'm sorry.  It's Long Beach 5, actually, sorry.
11 A.  Yes.
12 Q.  And before we took a break, you were saying that I
13     guess you were overextended with the initial loan
14     that you got.
15         Do you remember if the Long Beach loan
16     lowered or increased your monthly payments?
17 A.  I think it lowered it.
18 Q.  All right.  Was that one of the reasons why you
19     went and did the refinance at that time?
20 A.  Yes.
21 Q.  And if we look on the page that's Long Beach 3 at
22     the top, when you got the loan with Long Beach, was
23     your job at Memorial Hospital the only source of
24     income that you had?

16 (Pages 58 to 61)

Page 62

1 A.   Correct.

2 Q.   You didn't have any other part-time jobs at that

3      time?

4 A.   Nothing.

5 Q.   And you weren't -- were you doing anything as a

6      travel agent at that time?

7 A.   No.

8 Q.   And you're listed as a co-borrower, and I think it

9      says based monthly income $2,830 per month?

10 A.  I think that's --

11 Q.  Does that sound about right?

12 A.  No, it doesn't.

13 Q.  Too high or too low?

14 A.  Too high.

15 Q.  Roughly, how much were you making at that time?

16 A.  I would say probably 500 a week.

17 Q.  So about 2,000 a month?

18 A.  Mm-hmm.

19 Q.  Do you know why that figure of 2,830 is in the

20     application?

21 A.  No.  Because like I said, I gave him all of my

22     income tax reports and all of my pay stubs.

23 Q.  Did you read over the application before you signed

24     it to check these figures?

Page 63

1 A.   No.

2 Q.   If you had saw that, would you have pointed it out?

3 A.   Yes.

4 Q.   And where it says borrower, it lists 4,159 base

5      income, does that sound about right for your

6      brother's monthly income?

7 A.   I would think it does.  Like I said, I gave all of

8      our financials to the guy.

9          Larry's a truck driver, so that's very

10     possible that that's what he makes.

11 Q.  And under the borrower column, it says other, 810,

12     do you know what that refers to?

13 A.  It says "rental income," but like I said, we

14     weren't renting anything.

15 Q.  Is that --

16 A.  We were equal partners in the house.

17 Q.  But do you know what that 810 figure represents?

18 A.  No.

19 Q.  Is that -- never mind.

20         Does Secure Mortgage Corporation ring a

21     bell in terms of the mortgage broker that you were

22     working with?

23 A.  I don't remember his name at all.  I know he was a

24     nice guy.

Page 64

1 Q.   How about Todd Carges does that sound --

2 A.   I think that's his name, Todd.

3 Q.   And the only purpose in getting your Long Beach

4      mortgage loan was to refinance the loans that you

5      had previously had?

6 A.   Right.

7 Q.   And to use a little bit of the cash to make some

8      improvements to the house?

9 A.   Right.

10 Q.  The house that you lived at at 325 Prospect; is

11     that correct -- did you ever rent any part of that

12     house out to someone else?

13 A.  No.  I was a renter.

14 Q.  It was a single-family house?

15 A.  No.  It's a large complex.

16 Q.  Oh, an apartment complex?

17 A.  Mm-hmm.

18 Q.  And just so I'm clear, do you allege or claim

19     anything in this lawsuit that Long Beach did to

20     overextend yourself in terms of your mortgage

21     payments?

22 A.  That they did?

23 Q.  Right.

24 A.  Other than this wrong amount in my co-borrower

Page 65

1      thing, no.

2 Q.   And then other than the family rider that we talked

3      about?

4 A.   Right.

5 Q.   That's all I have.

6          MR. LEFEBVRE:  Just a few questions.

7          MR. CROWSON:  Yes.

8              EXAMINATION

9 BY MR. LEFEBVRE:

10 Q.  Charlene, at the time that you took out the Long

11     Beach refinance, was your mother living with you?

12 A.  Yes.

13 Q.  And how old is your mother today?

14 A.  Eighty-six.

15 Q.  So she would have been about 83 at the time of the

16     refinance, give or take?

17 A.  Give or take.

18 Q.  And what was her monthly income at the time of the

19     Long Beach refinance, approximately, if you know?

20 A.  About 600 a month.

21 Q.  That's her only source of income?

22 A.  That's hers, yes.

23 Q.  Okay.  Do you know who the judge is in the

24     Massachusetts case before it was transferred to

17 (Pages 62 to 65)

Page 66

1    Chicago?
2 A.    Young.
3 Q.    Now, you weren't asked this, but maybe you were, do
4    you understand that you have certain
5    responsibilities as a class representative?
6 A.    Yes.
7 Q.    All right.  Can you tell us what those -- what your
8    understanding is of those responsibilities?
9 A.    To make sure all of the other class participants
10    are kept informed.
11 Q.    Do you have a responsibility to appear at
12    depositions?
13 A.    Yes.
14 Q.    How about responsibility to review documents?
15 A.    Yes.
16 Q.    How about a responsibility to appear at trial?
17 A.    Yes.
18 Q.    Do you have any financial responsibilities to the
19    case?
20 A.    For all of the communications, filings,
21    correspondence.
22 Q.    Okay.  Now, you work full time?
23 A.    Work full time.
24 Q.    And you were asked about your -- if you had thought

Page 67

1    about your commitment to this case.
2        You have, what, every other weekend off?
3 A.    Yes.
4 Q.    And one or sometimes two days per week?
5 A.    Per week.
6 Q.    Are you willing to commit the necessary time to
7    appear at trial to adequately represent the members
8    of this putative class action?
9 A.    Yes.
10 Q.    And you were asked what you wanted, and I believe
11    you said you wanted Long Beach to stop using the
12    form, correct?
13 A.    Correct.
14 Q.    Are you asking that any type of money be paid to
15    the class?
16 A.    Yes.
17 Q.    And tell me what you're asking?  How much?  Do you
18    have a dollar figure?
19 A.    For the whole class?
20 Q.    Yes.
21 A.    500,000.
22 Q.    And is that what you understand to be statutory
23    damages?
24 A.    Right, statutory.

Page 68

1 Q.    And are you also asking that your lawyers' fees be
2    paid if successful?
3 A.    Yes.
4 Q.    Now, you were also asked about documents.  You've
5    received a lot of documents over the last few
6    years, correct?
7 A.    Yes, I have.
8 Q.    Okay.  And do you remember signing an authorization
9    authorizing the filing of the original complaint?
10 A.    Yes.
11 Q.    And that was signed before or after the complaint
12    was filed, do you recall?
13 A.    Before the class was filed.
14 Q.    Before the complaint?
15 A.    Before it was filed.
16 Q.    I'm asking.  Yes, it was --
17 A.    Yes.  Before it was filed.
18 Q.    Okay.  Just give me one more second, and I'll be
19    done, I think.
20        Now, relative to preparing for today's
21    deposition, you and I met this morning?
22 A.    Correct.
23 Q.    And we also met at least two other occasions prior
24    to today's date to prepare for your deposition?

Page 69

1 A.    Correct.
2 Q.    Okay.  And you did review many documents?
3 A.    Many documents.
4 Q.    Are you nervous today, a little bit?
5 A.    I'd say.
6 Q.    Okay.  But your testimony today was true and
7    accurate to the best of your knowledge and belief?
8 A.    Absolutely.
9 Q.    Is there anything that you want to correct or
10    change at this time?
11 A.    No.
12        MR. LEFEBVRE:  Okay.  And just for the
13    record, we'd like to read and sign.
14        MR. CROWSON:  I have a few --
15        MR. LEFEBVRE:  Sure.  Just I forgot to
16    mention that earlier.
17        MR. CROWSON:  Right.  Of course.
18        EXAMINATION
19 BY MR. CROWSON:
20 Q.    You mentioned that your mother lived with you at
21    the Littlefield address?
22 A.    My mother's lived with me my entire life.
23 Q.    And she makes roughly $600 a month?
24 A.    Social security, yes.

18 (Pages 66 to 69)

Page 70

1 Q.   Does she contribute that money or part of it to the
2      mortgage payments?
3 A.   No.
4 Q.   So she doesn't pay any rent or anything?
5 A.   Six hundred dollars doesn't take her very far.
6 Q.   I agree.
7          And you mentioned that in addition to
8      your request that Long Beach not use the form
9      anymore that you want $500,000 in statutory damages
10     for the entire class; is that correct?
11 A.  For the entire class.
12 Q.  And is it fair to say that your understanding as to
13     whether you should be able to get $500,000 in
14     statutory damages comes from your attorney?
15 A.  Yes.
16 Q.  That's all I have.
17         MR. LEFEBVRE: One follow-up.
18              EXAMINATION
19 BY MR. LEFEBVRE:
20 Q.  On the statutory damage claim, it's your
21     understanding that you're asking that statutory
22     damages be awarded for the group of people who got
23     the same type of form as you during the one-year
24     period prior to filing your complaint in

Page 71

1    Massachusetts?
2 A.  Yes.
3 Q.  Okay.  That's all I have.
4        THE VIDEOGRAPHER:  The time is 11:41 a.m.
5    on May 12th, 2008.  This is the end of Tape No. 2,
6    and this completes the videotaped deposition of
7    Charleie Sullivan.
8
9        (Whereupon the Deposition of
10   Charlene Sullivan concluded at 11:41 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 72

1    ERRATA SHEET DISTRIBUTION INFORMATION
2    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4      ERRATA SHEET DISTRIBUTION INFORMATION
5      The original of the Errata Sheet has been
6    delivered to Christopher M. Lefebvre, Esquire.
7        When the Errata Sheet has been completed
8    by the deponent and signed, a copy thereof should
9    be delivered to each party of record and the
10   ORIGINAL forwarded to Gabriel A. Crowson, Esquire,
11   to whom the original deposition transcript was
12   delivered.
13       INSTRUCTIONS TO DEPONENT
14       After reading this volume of your
15   deposition, please indicate any corrections or
16   changes to your testimony and the reasons therefor
17   on the Errata Sheet supplied to you and sign it.
18   DO NOT make marks or notations on the transcript
19   volume itself.  Add additional sheet if necessary.
20   Please refer to the above instructions for errata
21   sheet distribution information.
22
23
24

Page 73

1    PLEASE ATTACH TO THE DEPOSITION OF
2    CHARLENE SULLIVAN        DATE TAKEN: 05/12/2008
3         ERRATA SHEET
4    Please refer to page 72 for errata sheet
5    instructions and distribution instructions
6    PAGE   LINE   CHANGE          REASON
7
8
9
10
11
12
13
14
15       I have read the foregoing transcript of
16   my deposition and except for any corrections or
17   changes noted above, I hereby subscribe to the
18   transcript as an accurate record of the statements
19   made by me.
20       Executed this      day of      , 2008.
21
22
23          CHARLENE SULLIVAN
24

19 (Pages 70 to 73)

**Esquire Deposition Services**
**1-877-465-7236**

Page 74

1  CERTIFICATE
2
3  STATE OF RHODE ISLAND and
4  PROVIDENCE PLANTATIONS
5
6
7      I, Elizabette M. Afonso, a Professional
8  Shorthand Reporter and Commissioner in and for the
9  State of Rhode Island and Providence Plantations,
10  do hereby certify that CHARLENE SULLIVAN, the
11  witness whose deposition is hereinbefore set forth,
12  was duly sworn by me and that such deposition is a
13  true and accurate record, to the best of my
14  knowledge, skills and ability, of the testimony
15  given by such witness.
16      IN WITNESS WHEREOF, I have hereunto set
17  my hand and seal this 16th day of May, 2008.
18
19
20      _____
        Elizabette M. Afonso
21      Notary Public
22
23  My commission expires:
    November 1, 2009
24

**Esquire Deposition Services**
**1-877-465-7236**