# Exhibit 13,
# Part 1

ROGELIO A. ASTUDILLO, JULY 19, 2006

Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2         EASTERN DIVISION
3    GUADALUPE NAVARA          )
                               )
4    VS.              ) 05 C 0864
                               )
5    LONG BEACH MORTGAGE COMPANY; ) Judge Filip
     DEUTSCHE BANK NATIONAL TRUST )
6    COMPANY; NEW MILLENNIUM     ) Magistrate Judge Denlow
     MORTGAGE GROUP CORP.; ROGELIO)
7    A. ASTUDILLO, a/k/a ROGER    )
     ASTUDILLO              )
8
9
10       TELEPHONIC DEPOSITION OF
11         ROGELIO A. ASTUDILLO
12           July 19, 2006
13
14       TELEPHONIC DEPOSITION of ROGELIO A. ASTUDILLO,
15   produced as a witness at the instance of the
16   Plaintiff, and duly sworn, was taken in the
17   above-styled and numbered cause on the 19th day of
18   July, 2006, from 10:22 a.m. to 10:41 a.m., before
19   Renee W. Crouch, Certified Shorthand Reporter in and
20   for the State of Texas, reported by computerized
21   stenotype machine, at the offices of Adame
22   Reporting, 2212 Primrose Street, McAllen, Texas,
23   pursuant to the Federal Rules of Civil Procedure and
24   the provisions stated on the record or attached
25   hereto.

Page 2

1       APPEARANCES
2
     FOR THE PLAINTIFF:
3
         Al Hofeld, Jr.
4        EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
         120 South LaSalle Street
5        18th Floor
         Chicago, Illinois  60603
6
7    FOR THE DEFENDANT, Long Beach Mortgage Company and
            Deutsche Bank:
8
         Bethany K. Biesenthal
9        JENNER & BLOCK, LLP
         One IBM Plaza
10       Chicago, Illinois 60611
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2    ROGELIO A. ASTUDILLO
3    Questions by Mr. Hofeld........................3
4    Witness' Signature Page/Corrections............18
5    Reporter's Certificate.........................20
6
7              EXHIBITS
8    (None)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            ROGELIO A. ASTUDILLO,
2    having been first duly sworn, testified as follows:
3            EXAMINATION
4       Q   (BY MR. HOFELD)  Mr. Astudillo, are you
5    there?
6       A   I am here.
7       Q   Okay.  Very good.  Would you please state
8    your full name for the record.
9       A   It's Rogelio Antonio Astudillo.
10      Q   How do you spell Antonio?
11      A   A-N-T-O-N-I-O.
12      Q   Okay.  Mr. Astudillo, I'm also having a
13   little difficulty hearing you.  Did you say A-N --
14      A   A-N --
15      Q   -- T-O-N-I-O?
16      A   Correct.
17      Q   Okay.  Now, I'm not sure whether or not
18   we're going to be able to -- it doesn't look like
19   we're going to be able to complete this deposition
20   this morning because there were certain documents
21   that were overnighted to Adame Court Reporting there
22   that haven't arrived yet, but I'm going to go ahead
23   and ask you a few questions.  And with your
24   cooperation, we could continue the remainder of the
25   deposition to a date in the near future that's

                                        1 (Pages 1 to 4)

ROGELIO A. ASTUDILLO, JULY 19, 2006

Page 5

1  convenient for you, okay?
2      A   That's fine.  Is that going to be okay
3  with the Court, because I received the notice --
4      Q   Right.  I understand.  I understand your
5  concern.  Well, I'll tell you, if it's done by
6  agreement, if -- you know, if you're cooperating
7  with me and with Ms. Biesenthal here, we will
8  represent to the Court that we reached an agreement.
9      A   That's fine.
10     Q   Okay?  And then we will -- and then
11 pursuant to the agreement, we will not try to
12 enforce the rule to show cause as long as you're
13 cooperating.
14     A   That's fine.
15     Q   Okay.  Now, Mr. Astudillo, we served you
16 with a subpoena for documents from ACS in -- I
17 believe it was in April.  Do you recall that?
18     A   Yes, I do.
19     Q   Okay.  Yeah.  I believe we served you on
20 April 10th.
21     A   Correct.
22     Q   Okay.  We have not received any ACS
23 documents from you.
24     A   Reason being, due to the move, you know,
25 my documents still were not brought to us down to

Page 6

1  Texas from Chicago.
2      Q   Where are the documents physically located
3  at this time?
4      A   At this time, they are still in my
5  previous location in Chicago.  They are in process
6  to be delivered to me.
7      Q   What is the address where they are
8  located?
9      A   4329 West 26th Street.
10     Q   I'm sorry.  Did you say West 26th?
11     A   Correct, 26th Street.
12     Q   Okay.  What is the ZIP there?
13     A   60623.
14     Q   And is that an office?
15     A   Well, it was an office.  It's no longer an
16 office.
17     Q   Okay.  Is that space where your documents
18 are being stored, is that space currently in use?
19     A   No, no longer.  It was, to my knowledge,
20 occupied by another company.
21     Q   So it is currently occupied by another
22 company?
23     A   It's in the process of being occupied.
24 It's not physically yet.  They were remodeling, to
25 my understanding.

Page 7

1      Q   Okay.  When do you -- are you -- do I
2  understand you to say that you have made an
3  arrangement with somebody in Chicago to ship the
4  records --
5      A   They are actually --
6      Q   -- UPS to you in Texas?
7      A   Yes.
8      Q   Okay.  And who did you make that
9  arrangement with?
10     A   Actually, it's a family member delivering
11 them via, I guess, vehicle.  They are hand
12 delivering them to me, all my documents that I have
13 in Chicago.
14     Q   Okay.  What's the name of the family
15 member?
16     A   Jose Hernandez.
17     Q   And where does Mr. Hernandez live?
18     A   He currently lives in Texas.
19     Q   What's his address, please?
20     A   2304 Frontera Road.
21     Q   And, I'm sorry, the numbers again, because
22 of the bad connection are 4304?
23     A   No.  23 --
24     Q   Yes.
25     A   -- 04.

Page 8

1      Q   Okay.  And that was Frontera Road?
2      A   Yes.  Do you want me to spell that?
3      Q   F-R-O-N-T-E-R-A?
4      A   Correct.
5      Q   Okay.  And what's the ZIP code?
6      A   78504.
7      Q   And what's the town?
8      A   McAllen.
9      Q   I'm sorry.  I couldn't hear you at all.
10     A   It's McAllen.
11     Q   McAllen?
12     A   Correct.
13     Q   Wow, this connection is really terrible.
14     A   It's McAllen, Texas.
15     Q   Okay.  Mr. Astudillo, when realistically
16 do you expect to have the ACS records from Chicago
17 in your hands?
18     A   By the end of the month, of this month,
19 July.
20     Q   By the end of July?
21     A   Yes, correct.
22     Q   Okay.  And will that include all of the
23 records relating to Guadalupe Navara, if there are
24 such records?
25     A   Correct.

2 (Pages 5 to 8)

ROGELIO A. ASTUDILLO, JULY 19, 2006

Page 9

1    Q   When is Mr. Hernandez coming to Chicago to
2   retrieve the documents?
3    A   He should be there next week by -- I'm
4   sorry. Let me retract it. He should be there by
5   this weekend. He's heading out that way on Friday.
6   He'll be there by Sunday.
7    Q   Is he driving or flying?
8    A   He's driving.
9    Q   Is that the only purpose for which he's
10   coming to Chicago?
11    A   Basically that and pick up my personal
12   belongings.
13    Q   Do you have Mr. Hernandez' phone number,
14   please?
15    A   956 -- you know what. I would need to get
16   it to you. I don't have it memorized.
17        Hello?
18    Q   Can you hear me now?
19    A   Yes.
20    Q   Can you hear me now?
21    A   Yes, I can.
22    Q   Sure. Mr. Astudillo, what is your phone
23   number, please?
24    A   It is area code 956.
25    Q   Yes.

Page 10

1    A   249.
2    Q   249?
3    A   Yes.
4    Q   Okay.
5    A   9378.
6    Q   9378?
7    A   Correct.
8    Q   Okay. And is that your cell or a land
9   line at home?
10    A   That is my cell phone number.
11    Q   Thank you. Well, here's the thing,
12   Mr. Astudillo. We, the attorneys here, would very
13   much like to see any documents, especially relating
14   to Ms. Navara, any ACS documents relating to
15   Ms. Navara, and we would like to see them prior to
16   the continuation of your deposition because we
17   probably will want to ask you some questions about
18   some of the documents.
19        So what I would like to do is get
20   those documents first. And I think we would be
21   happy to agree to give you until the end of the
22   month to produce those documents to us and --
23   without, you know, without any further -- you know,
24   without trying to secure any further action from the
25   Court. But it would need to be -- that would need

Page 11

1   to be a firm deadline. If -- you know, if -- we
2   would need to have those documents responsive to my
3   subpoena in our hands by July 31st.
4    A   Okay.
5    Q   As long as you can agree, you know, to
6   produce them by no later than July 31st, then we can
7   continue your deposition until a date shortly after
8   that. And we won't -- you know, we won't press for
9   further action from the Court. Can you agree to
10   produce those documents responsive to my subpoena by
11   July 31st?
12    A   I agree.
13    Q   Okay. Now, what would be -- what would be
14   a good date for you, a convenient date for you to
15   appear for the continuation of your deposition after
16   July 31st?
17    A   Well, how much time do you need? I'll
18   leave that up to you.
19    Q   I would say we would probably want to set
20   it approximately a week after we receive the
21   documents. So if we give you until July 31st to
22   give us the documents, then one week later should be
23   fine. I'm afraid I don't have a calendar in front
24   of me. Is there a calendar there in the room?
25    A   No.

Page 12

1    Q   Okay. I can get a calendar if you want to
2   hold on for just a second. I'll put you on hold for
3   one minute, okay?
4    A   Sounds good.
5        (Off the Record)
6    Q   (BY MR. HOFELD) Okay. Can you both hear
7   me?
8    A   Yes.
9    Q   Okay. Very good. I have a 2006 calendar
10   in front of me. Mr. Astudillo, what I would propose
11   is if you produce the documents to us by July 31st,
12   meaning we would need to actually have them
13   physically in our hands by that date here in
14   Chicago, then we could continue your deposition to
15   Thursday, August 10th. Do you know if that date
16   would be convenient for you?
17    A   Yes, that's fine.
18    Q   Is that okay?
19    A   That is fine.
20    Q   All right. So let's -- by agreement,
21   then, you're going to produce the ACS documents
22   requested in our subpoena by July 31st, and we will
23   continue your deposition on August 10th at 10 a.m.
24   And I think we will arrange to have the deposition
25   occur at the same location there in McAllen.

ROGELIO A. ASTUDILLO, JULY 19, 2006

Page 13

1   And, actually, Renee, do you happen
2  to know if you are available that day?
3   THE COURT REPORTER: I don't know,
4  but I'm sure that would be fine.
5   MR. HOFELD: All right. So we'll
6  talk to Schwab about that.
7   Can you hear me now?
8   THE COURT REPORTER: Yes, sir.
9   THE WITNESS: Yes.
10   MR. HOFELD: Okay. Renee, what I
11  would like you to do, please, is to hold on to the
12  exhibits.
13   THE COURT REPORTER: Sure.
14   MR. HOFELD: Take them with you back
15  to Schwab's office. And once we determine who the
16  court reporter is going to be for that day, you can
17  either bring them with you or give them to that
18  person.
19   THE COURT REPORTER: That's fine.
20   Q   (BY MR. HOFELD) Okay. Mr. Astudillo,
21  have you looked at any documents today in
22  preparation for this deposition?
23   A   No, not today.
24   Q   Excuse me?
25   A   No, not today. No, sir.

Page 14

1   Q   Okay. Did you look at any documents prior
2  to today in preparation for this deposition?
3   A   As I get -- as I receive the documents
4  from I believe you and the Courts, I would read
5  them.
6   Q   Okay. Very good.
7   Okay. I also think it's good to
8  continue this deposition because now that we know,
9  Mr. Astudillo, that you're willing to cooperate and
10  because of the technological problem that we're
11  having this morning with the bad connection and the
12  bad interference, I think it makes sense for us to
13  come to Texas in person so that we can talk to you
14  there. So that's what we're going to plan to do on
15  August 10th.
16   Okay. I believe we've made all the
17  arrangements we need to make.
18   MS. BIESENTHAL: I think so.
19   MR. HOFELD: And, Mr. Astudillo, let
20  me give you -- I'll give you my phone number and
21  Ms. Biesenthal can give you her phone number so that
22  if there's any problem of any kind or if there's
23  some problem with the documents, you can please give
24  us a call and we can talk about it, okay?
25   THE WITNESS: Correct.

Page 15

1   MR. HOFELD: All right. My number is
2  312.
3   THE WITNESS: Can you -- hold on one
4  second, sir.
5   MR. HOFELD: Sure.
6   THE WITNESS: Okay. First of all,
7  what's your name again, sir?
8   MR. HOFELD: Sure. My name is Al,
9  A-L, is the first name. And the last name is
10  David. It's spelled H-O-F as in Frank E-L-D as in
11  David. And I represent Ms. Navara. And my direct
12  line is (312) 917-4515. Do you want to read that
13  back?
14   THE WITNESS: (312) 917-4515.
15   MR. HOFELD: That's correct. And
16  I'll let Ms. Biesenthal give you her information.
17   MS. BIESENTHAL: Mr. Astudillo, can
18  you hear me?
19   THE WITNESS: I can hear you.
20   MS. BIESENTHAL: Okay. My first name
21  is Bethany, B as in boy, E-T-H-A-N-Y. My last name
22  is Biesenthal. B as in boy I-E-S-E-N-T-H-A-L. And
23  my direct line is (312) 840-7229.
24   THE WITNESS: And you are, I'm sorry?
25   MS. BIESENTHAL: And I represent Long

Page 16

1  Beach and Deutsche Bank.
2   THE WITNESS: Will you be here also
3  on the 10th?
4   MS. BIESENTHAL: I will. Do you want
5  to repeat back my number?
6   THE WITNESS: 312.
7   MS. BIESENTHAL: Yes.
8   THE WITNESS: 840 --
9   MS. BIESENTHAL: Okay. I lost you
10  there for a second.
11   THE WITNESS: Yes.
12   MS. BIESENTHAL: Can you start over?
13   THE WITNESS: I'll start again. 312.
14   MS. BIESENTHAL: Yes.
15   THE WITNESS: 840-7229.
16   MS. BIESENTHAL: That's right.
17   MR. HOFELD: Ms. Crouch?
18   THE COURT REPORTER: Yes.
19   MR. HOFELD: We've been on the record
20  all this time, correct?
21   THE COURT REPORTER: Correct.
22   MR. HOFELD: Okay. And for the
23  record, you still have only -- you still have only
24  received exhibits from one law firm, right?
25   THE COURT REPORTER: Correct.

4 (Pages 13 to 16)

ROGELIO A. ASTUDILLO, JULY 19, 2006

Page 17

1      MR. HOFELD:  The exhibits from the
2  Jenner & Block law firm haven't arrived yet, to your
3  knowledge?
4      THE COURT REPORTER:  Not to my
5  knowledge, no.
6      Q   (BY MR. HOFELD)  Okay.  Mr. Astudillo,
7  how far away do you live from the -- from this
8  McAllen location?
9      A   Relatively close, about 10 minutes away.
10     Q   Very good.  So it's convenient for you?
11     A   Correct.
12     Q   Okay.  Then I think we have an agreement.
13  We've already stated it on the record.  The
14  documents responsive to plaintiff's subpoena to ACS
15  will be produced by July 31st by Mr. Astudillo.
16         They will be in Chicago by that day
17  in my office and I'll send copies immediately to
18  Ms. Biesenthal.  And then we will see you in
19  McAllen, Texas at 10 a.m. on August 10th for the
20  continuation of your deposition.
21     A   Correct.
22     Q   Very good.  Thank you very much.
23     A   You're welcome.
24         MS. BIESENTHAL:  Thank you.
25         MR. HOFELD:  And we can go off the

Page 18

1  record.
2
3          (Deposition Concluded)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 19

1          CHANGES AND SIGNATURE
2  PAGE LINE    CHANGE              REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 20

1
2      I, ROGELIO A. ASTUDILLO, have read the
   foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted
   above.
4
5
6
                ROGELIO A. ASTUDILLO
7
8
9
10  THE STATE OF           )
11  COUNTY OF              )
12
13      Before me,          , on this day
    personally appeared ROGELIO A. ASTUDILLO, known to
14  me (or proved to me on the oath of
    _____ or through
15  _____ (description of identity
    card or other document)) to be the person whose name
16  is subscribed to the foregoing instrument and
    acknowledged to me that he executed the same for the
17  purposes and consideration therein expressed.
18      (Seal) Given under my hand and seal of office
    this    day of      ,    .
19
20
21          NOTARY PUBLIC IN AND FOR
            THE STATE OF
22
23
24
25

5 (Pages 17 to 20)

ROGELIO A. ASTUDILLO, JULY 19, 2006

Page 21

```
 1       IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION
 3    GUADALUPE NAVARA          )
                                )
 4    VS.            ) 05 C 0864
                                )
 5    LONG BEACH MORTGAGE COMPANY; ) Judge Filip
      DEUTSCHE BANK NATIONAL TRUST )
 6    COMPANY; NEW MILLENNIUM     ) Magistrate Judge Denlow
      MORTGAGE GROUP CORP.; ROGELIO)
 7    A. ASTUDILLO, a/k/a ROGER   )
      ASTUDILLO              )
 8
 9            REPORTER'S CERTIFICATION
               TELEPHONIC DEPOSITION OF
10               ROGELIO A. ASTUDILLO
                    JULY 19, 2006
11
12       I, Renee W. Crouch, Certified Shorthand
13    Reporter in and for the State of Texas, hereby
14    certify to the following:
15       That the witness, ROGELIO A. ASTUDILLO, was
16    duly sworn by the officer and that the transcript of
17    the deposition is a true record of the testimony
18    given by the witness;
19       That the deposition transcript was submitted on
20    _____ to the witness or to the attorney
21    for the witness for examination, signature, and
22    returned to Schwab Court Reporting Service by
23    _____;
24       I further certify that I am neither counsel
25    for, related to, nor employed by any of the parties
```

Page 22

```
 1    in the action in which this proceeding was taken,
 2    and further that I am not financially or otherwise
 3    interested in the outcome of this action.
 4       Further certification requirements pursuant to
 5    the Federal Rules of Civil Procedure will be
 6    complied with after they have occurred.
 7       CERTIFIED to by me this 19th day of
 8    September, 2006.
 9
10
11
              Renee W. Crouch
12            Texas CSR 5645
              Expiration Date: 12/31/07
13            SCHWAB COURT REPORTING SERVICE
              Firm Number 181
14            P.O. Box 3665
              Brownsville, Texas  78520
15            (956) 544-5126
16
17
18
19
20
21
22
23
24
25
```

Page 23

```
 1       IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION
 3    GUADALUPE NAVARA          )
                                )
 4    VS.            ) 05 C 0864
                                )
 5    LONG BEACH MORTGAGE COMPANY; ) Judge Filip
      DEUTSCHE BANK NATIONAL TRUST )
 6    COMPANY; NEW MILLENNIUM     ) Magistrate Judge Denlow
      MORTGAGE GROUP CORP.; ROGELIO)
 7    A. ASTUDILLO, a/k/a ROGER   )
      ASTUDILLO              )
 8
 9            TELEPHONIC DEPOSITION OF
               ROGELIO A. ASTUDILLO
10                 JULY 19, 2006
11
12            FURTHER CERTIFICATION
13
14       The original deposition was/was not returned to
15    Schwab Court Reporting Service by           ;
16       If returned, the attached Changes and Signature
17    page(s) contain(s) any changes and the reasons
18    therefor;
19       If returned, the original deposition was
20    delivered to Al Hofeld, Jr., Custodial Attorney;
21       That the deposition was delivered in accordance
22    with the Federal Rules of Civil Procedure, and that
23    a copy of this certificate was served on all parties
24    shown herein.
25       CERTIFIED to by me this _____ day of
```

Page 24

```
 1    _____, 2006.
 2
 3
              Sydnee Schwab
 4            Texas CSR 3442
              Expiration Date: 12/31/07
 5            SCHWAB COURT REPORTING SERVICE
              Firm Number 181
 6            P.O. Box 3665
              Brownsville, Texas  78520
 7            (956) 544-5126
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

6 (Pages 21 to 24)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION
3    GUADALUPE NAVARA          )
                               )
4    VS.               ) 05 C 0864
                               )
5    LONG BEACH MORTGAGE COMPANY; ) Judge Filip
     DEUTSCHE BANK NATIONAL TRUST )
6    COMPANY; NEW MILLENNIUM    ) Magistrate Judge Denlow
     MORTGAGE GROUP CORP.; ROGELIO)
7    A. ASTUDILLO, a/k/a ROGER   )
     ASTUDILLO              )
8
9
10           ORAL DEPOSITION OF
11           ROGELIO A. ASTUDILLO
12             August 10, 2006
13
14      ORAL DEPOSITION of ROGELIO A. ASTUDILLO,
15   produced as a witness at the instance of the
16   Plaintiff, and duly sworn, was taken in the
17   above-styled and numbered cause on the 10th day of
18   August, 2006, from 10:11 a.m. to 6:35 p.m., before
19   Renee W. Crouch, Certified Shorthand Reporter in and
20   for the State of Texas, reported by computerized
21   stenotype machine, at the offices of Adame
22   Reporting, 2212 Primrose Street, McAllen, Texas,
23   pursuant to the Federal Rules of Civil Procedure and
24   the provisions stated on the record or attached
25   hereto.

Page 2

1          A P P E A R A N C E S
2
     FOR THE PLAINTIFF:
3
         Al Hofeld, Jr.
4        EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
         120 South LaSalle Street
5        18th Floor
         Chicago, Illinois 60603
6
7    FOR THE DEFENDANT, Long Beach Mortgage Company and
                   Deutsche Bank:
8
         Bethany K. Biesenthal
9        JENNER & BLOCK, LLP
         One IBM Plaza
10       Chicago, Illinois 60611
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2    ROGELIO A. ASTUDILLO
3    Questions by Mr. Hofeld.......................4
     Questions by Ms. Biesenthal................242
4    Questions by Mr. Hofeld.....................263
5    Witness' Signature Page/Corrections..........267
6    Reporter's Certificate......................269
7
8              EXHIBITS
9
     EXHIBIT    DESCRIPTION          PAGE
10
     No. 1   Notice of Subpoenas for Documents   10
11
     No. 2   8-4-06 Astudillo Letter        15
12
     No. 3   Conversation Log          18
13
     No. 4   Various Documents          61
14
     No. 5   Various Documents         159
15
     No. 6   Citywide Title Documents      204
16
     No. 7   Navara Records        213
17
     No. 8   Navara Records        219
18
     No. 9   Complaint             231
19
     No. 10  Second Amended Complaint      233
20
     Defendant's No. 1   ACS Payoff Letter    252
21
     Defendant's No. 2   Navara Affidavit    255
22
23
24
25

Page 4

1           ROGELIO A. ASTUDILLO,
2    having been first duly sworn, testified as follows:
3              EXAMINATION
4       Q    (BY MR. HOFELD) Mr. Astudillo --
5       A    Yes.
6       Q    -- have you been deposed before? Have you
7    ever given a deposition?
8       A    No.
9       Q    Have you ever been a party to a lawsuit
10   before?
11      A    No.
12      Q    Either as a defendant or as a plaintiff?
13      A    No.
14      Q    Let me explain the ground rules of a
15   deposition. I'm asking questions, you're giving
16   answers, the court reporter is taking down
17   everything you and I say. Because she needs to --
18   she can only listen to one person at a time, it's
19   important that no one talk over anyone else. Please
20   wait until I finish my questions before you give an
21   answer. Please make all of your responses verbal.
22   If you're giving a clear answer, such as a yes or
23   no, say yes or no. You know, mumbled responses or
24   uh-huhs, the things we usually say in colloquial
25   conversation she can't record. So make sure you say

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

**Page 5**

1    yes or no.
2        If there's ever a time when you don't
3    understand a question that I ask, ask for
4    clarification.  It will be assumed that any answers
5    you give are the answers that are responsive to the
6    questions otherwise.
7        From time to time, one or both
8    attorneys may make objections to questions asked by
9    the other.  In that event, you're still required to
10   answer the question.  Do you understand those rules?
11   A    Yes.
12   Q    Okay.  Do you have any questions before we
13   proceed?
14   A    I don't -- not at this moment.
15   Q    Okay.  Are you under any medication today
16   that would affect your ability to understand and
17   answer questions?
18   A    No.
19   Q    Are you on any medication that would
20   affect your ability to tell the truth?
21   A    No.
22   Q    And you understand that you're under oath
23   to tell the truth today?
24   A    Yes.
25   Q    Okay.  Mr. Astudillo, where are you

**Page 6**

1    currently employed?
2    A    Countrywide Home Loans.
3    Q    And what's the address of your office?
4    A    1109 Nolana Avenue, McAllen, Texas.
5    Q    What's the ZIP code there?
6    A    78504.
7    Q    And what is your position there?
8    A    I am a home loan consultant.
9    Q    How long have you held that position?
10   A    Eleven months.
11   Q    Were you first hired by Countrywide 11
12   months ago?
13   A    Correct, yes.
14   Q    What's the phone number there?
15   A    (956) 992-0853.
16   Q    And the fax number?
17   A    956 -- may I clarify that?  Let me
18   double-check that.
19   Q    Sure.
20   A    I don't know if I -- okay.  Let me
21   rephrase.  The phone number is (956) 992-8550 and
22   the fax number is 992-0853.
23   Q    Who's your supervisor there?
24   A    Mirtha, M-I-R-T-H-A, Ortiz, O-R-T-I-Z.
25   Q    Has she been your supervisor the entire

**Page 7**

1    time you've been employed there?
2    A    No.
3    Q    Who was your supervisor immediately before
4    Ortiz?
5    A    It was Denise Gunnerson,
6    G-U-N-N-E-R-S-O-N.
7    Q    Have you had any other supervisors while
8    you've been employed?
9    A    No.
10   Q    What is Mirtha's title?
11   A    She's sales manager.
12   Q    And what is Denise Gunnerson's title?
13   A    She's branch manager.
14   Q    Is Denise still working there?
15   A    No.
16   Q    What employment did you have immediately
17   preceding your job with Countrywide?
18   A    I'm sorry.  Can you clarify that?
19   Q    Sure.  What job, if any, did you hold
20   right before you went to work for Countrywide?
21   A    I was with New Millennium Mortgage.
22   Q    What was the approximate date that you
23   were hired with Countrywide?
24   A    September 6, 2005.
25   Q    And what was the approximate last day of

**Page 8**

1    your job with New Millennium?
2    A    August 31st of 2005.
3    Q    What employment did you have before you
4    worked for New Millennium?
5    A    I'm sorry.  I'm trying to think.  I would
6    say it was Reyes Mortgage.  R-E-Y-E-S Mortgage.
7    Q    What was your position there?
8    A    I was a loan officer.
9    Q    And do you remember the approximate start
10   and end dates of your employment there?
11   A    I really don't.  It was -- I'm thinking.
12   Q    If it comes to you, you can let me know.
13   A    Yes, okay.
14   Q    And prior to Reyes Mortgage, where did you
15   work?
16   A    Worldwide Mortgage.
17   Q    And what were the approximate dates of
18   your employment there?
19        MS. BIESENTHAL:  I'm sorry.  What was
20   that?
21        THE WITNESS:  Worldwide Mortgage.
22        MS. BIESENTHAL:  Sorry.
23        THE WITNESS:  Do you know what, I
24   don't remember off the top of my head.
25   Q    (BY MR. HOFELD)  You can tell me later if

2 (Pages 5 to 8)

Page 9

1    it comes to you.
2        A    Yes, okay.
3        Q    Reyes Mortgage was a job you had in
4    Chicago?
5        A    Yes.
6        Q    Same goes for Worldwide?
7        A    Yes.
8        Q    Mr. Astudillo, did you look at any
9    documents in preparation for your deposition today?
10        A    No.
11        Q    Did you look at any documents between the
12    time when we began your deposition in July and
13    today?
14        A    Yes.
15        Q    Okay.  Which documents did you look at?
16        A    All the documents that you sent me that I
17    received from you guys.
18        Q    Which documents are those?
19        A    The petitions, summons, all your
20    schedules.  I mean, every single document you have
21    sent me via mail, I received.  I don't recall the
22    names.
23        Q    So all the documents that we've mailed to
24    you?
25        A    I have received.

Page 10

1        Q    And all the documents that any special
2    process server has presented to you?
3        A    Yes.
4        Q    Since the time you've lived -- you
5    relocated to Texas from Chicago, have you used any
6    other -- have you had any other residential address
7    other than your current one?
8        A    No.
9        Q    Have you used any other mailing address?
10        A    No.  Can I clarify that?
11        Q    Please do.
12        A    I'm sorry.  I still have the mailing
13    address in my previous home, 3038 South Avers.
14        Q    Where is that?
15        A    Chicago, Illinois.
16        Q    You still use that as a mailing address?
17        A    I haven't changed my -- all my bills from
18    there yet.
19        Q    Mr. Astudillo, I'm handing you what the
20    court reporter has marked as Deposition Exhibit 1.
21    Take a moment and flip through the pages in
22    Exhibit 1 and then I'll ask you some questions about
23    it.
24        A    Okay.
25        Q    Is this a document that looks familiar to

Page 11

1    you?
2        A    Yes.
3        Q    What is it, please?
4        A    It says Notice of Subpoenas for Documents.
5        Q    Does Exhibit 1 contain a subpoena?
6        A    I'm sorry.  Did you ask me a question?
7        Q    Yes, I did.  The question was:  Does
8    Exhibit 1 contain a subpoena?
9        A    Yes.
10        Q    And is it a subpoena to you?
11        A    Yes.
12        Q    Okay.  Does this appear to be a copy of
13    the subpoena that was served on you in April of 2006
14    by a special process server?
15        A    I believe -- yes.
16        Q    Okay.  Well, let's look at the rider to
17    the subpoena.  It's the second to the last page of
18    Exhibit 1.  Did you look for documents that would be
19    responsive to this subpoena that you received?
20        A    To this particular subpoena, no.
21        Q    Okay.  Let me make sure you understand my
22    question.  You received a subpoena for documents
23    from my office initially in April of 2006, correct?
24        A    Yes.
25        Q    Okay.  Now, I think you just testified a

Page 12

1    moment ago that this appears to be a copy of that
2    same subpoena that you received; is that correct?
3        A    Yes.
4        Q    Now, in response to that subpoena that you
5    received, that subpoena for documents, did you
6    search for documents?
7        A    No.
8        Q    Okay.  So you haven't complied with the
9    subpoena?
10        A    No.
11        Q    Okay.
12        A    Well, can I clarify that?
13        Q    Please do.
14        A    I actually -- yes, because I didn't have
15    the files until I spoke to you again.  And at that
16    time, I did look for the documents because I didn't
17    have the actual file that I had from my office.
18    When I relocated, I didn't bring my documents with
19    me.
20        Q    I believe when we began your deposition a
21    couple of weeks ago, you indicated that the files
22    were all still located in Chicago; is that correct?
23        A    Last subpoena, correct.  Yes, I did.
24        Q    I'm sorry.  When we began your deposition,
25    when you appeared here and I and Ms. Biesenthal were

3 (Pages 9 to 12)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 13

1 on the phone.
2      A   Okay.
3      Q   Okay.  That was the first time you
4 appeared for your deposition.  Do you understand
5 that?
6      A   I do, but I wasn't because we had a
7 previous deposition over the phone on July -- I
8 don't recall the date.
9      Q   Okay.  That's what I'm asking you about.
10 You recall that, right?
11     A   Yes.
12     Q   You recall when we started your deposition
13 on that date in July, right?
14     A   Oh, okay.  Yes, I'm sorry.
15     Q   Now, at that time, I believe you testified
16 that all of the documents and records pertaining to
17 ACS were located in Chicago.
18     A   Correct, yes.  I'm sorry.
19     Q   And that was true, correct?
20     A   That is true.  I'm sorry about that.
21     Q   Where are those documents now?
22     A   They have arrived to my property, my
23 location, my home.
24     Q   Here in Texas?
25     A   That's correct.

Page 14

1      Q   Okay.  And do you have all of the
2 documents and records?
3      A   The ones that you have in possession, yes,
4 that I e-mailed you, sir.
5      Q   Okay.  But I'm not asking about that.  My
6 question is:  Do you have now in your possession all
7 of the documents and records relating to ACS that
8 were previously in Chicago?
9      A   With me?  Not right now with me, but in my
10 home, yes.
11     Q   Okay.  So the complete records for the
12 company, ACS, are now in your possession?
13     A   Correct.
14     Q   Okay.  And did you look through all of
15 those records --
16     A   Oh, yes.
17     Q   -- in order to -- let me finish the
18 question -- in order to attempt to look for
19 documents that would be responsive to the subpoena?
20     A   Yes.
21     Q   Okay.  And did you produce any documents
22 in response to the subpoena?
23     A   Yes.
24     Q   What document or documents did you
25 produce?

Page 15

1      A   Two documents, one was an explanation via
2 e-mail to you, and a conversation of -- a
3 conversation log.
4      Q   Okay.  Mr. Astudillo, I'm going to hand
5 you what the court reporter has marked Exhibit 2.
6 Does that document look familiar?
7      A   Yes.
8      Q   Okay.  Is that a copy of the e-mail that
9 you sent to me on August 4th?
10     A   It appears so, yes.
11     Q   And is that the document that you referred
12 to a moment ago when you said that you produced an
13 explanation to me?
14     A   Yes.
15     Q   Okay.  And have you had a chance to read
16 this over?
17     A   Yes.
18     Q   Okay.  I'm going to ask you a couple of
19 questions about it.  This document explains why you
20 don't have any documents relating to any account
21 that Ms. Navara had with ACS, correct?
22     A   Yes.
23     Q   Okay.  But this document also explains
24 some of the circumstances surrounding your contact
25 with Ms. Navara, correct?

Page 16

1      A   Yes.
2      Q   For example, this document says that all
3 services were performed by phone -- or via phone,
4 right?
5      A   Yes.
6      Q   Does this document also say that any
7 documentation that you had was given to Ms. Navara?
8      A   That I obtained, yes.
9      Q   In other words, it was not retained by
10 you?
11     A   Correct.
12     Q   Or by ACS?
13     A   Yes.  I'm sorry.
14     Q   There's a reference in here, it says, "The
15 documentation that was faxed was given directly to
16 the buyer."  What does that mean?
17     A   I meant to say client.
18     Q   That would be Ms. Navara?
19     A   Ms. Navara, correct.
20     Q   Mr. Astudillo, where did the information
21 that you communicated to me in this e-mail come
22 from?  In other words, did it come from your memory?
23     A   No.  It came from -- well, from my actual
24 circumstances of the process that I did for
25 Ms. Navara.

4 (Pages 13 to 16)

ROGELIO A. ASTUDILLO,  AUGUST 10, 2006

Page 17

1    Q   And how did you recall the information
2  that you communicated to me in this e-mail?  In
3  other words -- let me rephrase that.
4          Was there any document that you were
5  looking at when you wrote this e-mail or shortly
6  before you wrote the e-mail to refresh your
7  recollection of services you performed?
8    A   No, sir.
9    Q   Okay.  So this e-mail was based on your
10  personal independent recollection of events?
11    A   Yes.
12    Q   Is that correct?
13    A   Correct.
14    Q   Now, this e-mail indicates that it was
15  sent 6:02 p.m., Friday, August 4th.  Do you remember
16  having a conversation with me on Monday, August 7th?
17    A   Yes.
18    Q   That was a telephone conversation.  And in
19  that conversation, as I recall, you identified at
20  least one document, at least one written record that
21  was responsive to the subpoena.  Do you recall that?
22    A   Yes.
23        MS. BIESENTHAL:  Object to foundation
24  and leading.
25    Q   (BY MR. HOFELD)  Look at, if you would,

Page 18

1  what the court reporter has marked as Exhibit 3.
2  Can you take a look at Exhibit 3, please, and tell
3  me whether this is a document that you recognize.
4    A   Yes, this is a document that I recognize.
5    Q   Okay.  And what is this document?
6    A   This is a document called a conversation
7  log.
8    Q   Okay.  And does Exhibit 3 indicate that
9  you e-mailed -- did you e-mail this document to me
10  on Tuesday, August 8th?
11    A   Yes.
12    Q   Okay.  And is this the document that you
13  identified to me in the phone conversation that you
14  and I had on Monday?
15    A   Yes.
16    Q   And, Mr. Astudillo, where did you find
17  this document?
18    A   In a file that I have.
19    Q   Okay.  Do you know when this document was
20  created?
21    A   As it occurred.
22    Q   And when you say you found it in a file
23  that you have, was that one of the files of ACS
24  records that was transported from Chicago to
25  McAllen?

Page 19

1    A   Yes.
2    Q   What kind of file was it in?
3    A   It was in a manila folder with
4  Ms. Guadalupe Navara's name.
5    Q   Navara's name was on the tab of --
6    A   Yes.
7    Q   -- the manila folder?
8    A   Yes.  Sorry.
9    Q   That's okay.  Was there anything else in
10  the folder besides this document?
11    A   No.
12    Q   Were there any other files that related to
13  Ms. Navara?
14    A   No.
15    Q   Or to any account or services with ACS?
16    A   No.
17    Q   Okay.  And you searched through all the
18  records that you have now in your possession, right?
19    A   Yes.
20    Q   And this is the only document that you
21  could find that has anything to do with Guadalupe
22  Navara?
23    A   At this particular time, yes.
24    Q   Well, are there other documents that you
25  haven't yet searched through?

Page 20

1    A   I will try to track down First National,
2  Marc Smith, and Diamond Mortgage, and HUD.  And I
3  will try to see if I can obtain a copy of that
4  documentation that I gave Ms. Navara.
5    Q   Okay.  Let me clarify what I'm asking you
6  so you understand.  I'm asking you about documents
7  that were kept by ACS, documents that are records of
8  ACS.  I'm not asking you about documents that might
9  be records of third parties, okay.
10          So have you looked through -- again,
11  let me ask you this:  Have you looked through all of
12  the documents and records and files created and
13  maintained by ACS?
14    A   Yes.
15    Q   Okay.  And this is -- this, the one in
16  Exhibit 3, is the only one that you've located that
17  involves Guadalupe Navara?
18    A   Yes.
19    Q   Okay.  Let's take a close look at the
20  document in Exhibit 3.  I'm going to ask you to read
21  it, partly because there are things in here that I
22  can't make out, words that I can't make out because
23  of the handwriting.  Underneath where it says
24  "conversation log" and then "remarks," there's some
25  handwritten information.  Can you read what that

5 (Pages 17 to 20)

Page 21

1  says, for the record.
2      A  It says "seed file, TU/RI."
3      Q  And what does that mean?  What does seed
4  file mean?
5      A  It's just an origination, another word for
6  documentation, original document or initiated
7  document.
8      Q  What does TU stand for?
9      A  TU is used for Trans Union.
10     Q  Is that what it means in this instance?
11     A  That's what it stands for, but in this
12  instance, it's irrelevant.  I just use it as a
13  general documentation for a conversation.
14     Q  What does it mean to you?  By the way is
15  this your handwriting in Exhibit 3?
16     A  Yes.
17     Q  These are notes that you personally made?
18     A  Yes.
19     Q  Okay.  So you wrote the word -- you wrote
20  the abbreviation "TU" down.  So I want to know what
21  it means to you.
22     A  TU.  It stands for Trans Union.
23     Q  Okay.  And what does RI mean?
24     A  Roll in.
25     Q  Did you say roll in?

Page 22

1      A  Roll in, like roll in.  This is also used
2  for documentation for when I originate loans, we're
3  rolling in closing costs.
4      Q  Why did you put TU or Trans Union down
5  here?
6      A  It's just a general form that I have.  And
7  it's already pre-made and I just made copies of it,
8  never changed it.
9      Q  Is it because you planned on making
10  Ms. Navara a loan?
11     A  No.  It's just a general form that I use,
12  sir.
13     Q  To the left in the left-hand column where
14  it says "initials," whose initials are those,
15  starting from the first one closest to the top of
16  the page going downward and on to the next page?
17     A  They are all mine, sir.
18     Q  Those are all your initials?
19     A  Stands for R.A.A.
20     Q  Okay.  Starting with the word "customer"
21  in the first entry, would you please read for the
22  record each of these entries.  And I may interrupt
23  you to ask about particular words.
24     A  Okay.  "Customer came to office with
25  Sergio Sanchez, current tax customer.  He brought

Page 23

1  customer to see if I could help with issues of
2  mortgage problems.  Customer advised that she was in
3  foreclosure and wanted to see if I could negotiate
4  recurrent lender new terms.  Advised customer to
5  bring any documents pertaining to loan.  She would
6  be back later."
7      Q  Okay.  The word after the word "terms,"
8  does that appear to be a period?  Or is that the end
9  of the sentence?
10     A  That is a period.
11     Q  Okay.
12     A  Do you want me to state periods, commas,
13  and so forth?
14     Q  Do you know what, that would be a good
15  idea.
16     A  Okay.
17     Q  Thank you.
18         Why don't you start with the second
19  entry.
20     A  Okay.  "Ms. Navara brought documents from
21  National Acceptance, I called National Acceptance to
22  see if they could rework her loan and find out why
23  she was late in foreclosure.  The account
24  representative advised customer stopped paying.
25  Customer advised that she had finished paying off

Page 24

1  her loan or that is what she thought the bank stated
2  that they had.  Reworked the loan because the
3  original note was a balloon note that the previous
4  mortgage did for her.  They advised us to forward
5  any questions to previous bank, HUD, H-U-D.  We
6  called HUD and they advised us that HUD took loan
7  due to Diamond Mortgage going out of business.  They
8  collected payments until they sold loan to National
9  Acceptance."
10     Q  Great.  You can continue.
11     A  "Customer advised she was very suspicious
12  about this issue.  I advised her that I could refer
13  her to an attorney to have all documents reviewed.
14  She agreed."
15         Next entry?
16     Q  Please.
17     A  "Gave customer number and name of attorney
18  Marc Smith."
19         Next entry, "Customer came to office
20  and said that probably could not have anything done
21  legally against National Acceptance or Diamond
22  Mortgage.  We tried to have National Acceptance
23  rework her loan and put her on another plan with
24  them, but they would not, due to previous mortgage,
25  late payments, payment history, and current

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 25

1  delinquency and foreclosure. They needed to get
2  paid in full. Customer advised she did not have the
3  money, asked if I could do a refinance. I advised
4  her that I could, but would need to contact New
5  Millennium Mortgage. Customer asked me to do so."
6      Q  Now, Mr. Astudillo, are these entries
7  sequential? If I count correctly, there are one --
8  judging from your initials and the paragraphing,
9  there are one, two, three -- either four or five.
10     A  There are five.
11     Q  Five? Okay. Are they sequential? In
12 other words, were they made one after the other,
13 starting with the first one on the first page?
14     A  At the same time?
15     Q  No. What I mean is --
16     A  The same date?
17     Q  Let's look at the first page of the
18 conversation log, page 2 of Exhibit 3, the paragraph
19 that starts "customer came."
20     A  Uh-huh.
21     Q  Okay. That entry.
22     A  Yes.
23     Q  Was that made before the second entry, the
24 one that begins "Ms. Navara brought"?
25     A  Yes.

Page 26

1      Q  Okay. And similarly, did the events and
2  the information that you describe in each entry
3  occur sequentially? In other words, the first
4  paragraph that begins "customer came to office," and
5  then you described what happened and what you did,
6  did those events occur before the events that are
7  described in the second entry?
8      A  Yes.
9      Q  Okay. And similarly the events described
10 in the second entry occurred before the events
11 described in the third entry, correct?
12     A  Yes, that's correct.
13     Q  Okay. And then is it your testimony that
14 the entry, the first entry on page 2 of the
15 conversation log where it says "gave customer," is
16 it your testimony or your belief that that entry is
17 a separate entry by itself, or is it a continuation
18 of the entry that starts at the bottom of the first
19 page of the conversation log?
20     A  That would be a continuation.
21     Q  Okay. So there are four entries?
22     A  Yes. I do apologize.
23     Q  Sure. And the events and communications
24 that you describe in the third entry occurred after
25 those that are described in the second entry, right?

Page 27

1      A  Yes.
2      Q  Okay. And the events that occurred --
3  excuse me: The events and communications that are
4  described in the last entry, the fourth entry,
5  occurred before those that are described above in
6  the third entry, right?
7      A  Yes.
8      Q  Okay.
9          MS. BIESENTHAL:  Can you read his
10 question back? I think he may have switched it.
11     (The record was read as requested.)
12     Q  (BY MR. HOFELD) Okay. Let me rephrase
13 that because that was a mistake.
14         Thank you, Counsel.
15         What I meant to say, Mr. Astudillo,
16 what I meant to ask you is whether the events that
17 are described in the last entry, the events and
18 communications described there occurred after the
19 events described in the preceding entry.
20     A  Yes.
21     Q  Okay. Mr. Astudillo, why are there no
22 dates on your conversation log?
23     A  I usually do it. I don't always put
24 dates, especially when it's just conversations and
25 proceedings of what transpired.

Page 28

1      Q  Is it your contention, though, that these
2  were services that you provided to Ms. Navara?
3      A  Yes.
4      Q  Were these services that you charged her
5  for later?
6      A  Yes.
7      Q  Did you, acting on behalf of ACS, provide
8  any other services to Ms. Navara that are not noted
9  in your conversation log?
10     A  No.
11     Q  Mr. Astudillo, do you recall when you
12 provided the services described in your conversation
13 log?
14     A  It was on or about February and March
15 prior to the actual refinance.
16     Q  When was the refinance?
17     A  The proceedings? You know what, I would
18 need to look at the actual application because I
19 don't have it in front of me. I don't remember by
20 memory.
21     Q  And by refinance, what are you referring
22 to exactly?
23     A  Refinance, starting her refinance process
24 of her current address that she lives in, property
25 that was in foreclosure with First National

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 29

1  Acceptance.
2      Q  Do you remember when that refinance
3  occurred approximately?
4      A  I don't remember.
5      Q  And how is it that you know that the
6  services described in your log were provided in
7  February or March?
8      A  Because they were right before I actually
9  initiated the refinance.
10     Q  And what year --
11     A  2004, sir.
12     Q  The services described in the log were
13 provided in February and/or March of 2004?
14     A  Yes, and they could go as far back as
15 maybe January of 2004.
16     Q  Mr. Astudillo, from the way the first
17 entry reads, it sounds as though there was an
18 in-person meeting between yourself and Ms. Navara,
19 would you agree?
20     A  Yes.
21     Q  Okay.  And in that meeting, according to
22 your log, it appears that the service you provided
23 was to listen to Ms. Navara's description of her
24 problem and, secondly, to advise the customer to
25 bring in her loan documents; is that correct?

Page 30

1      MS. BIESENTHAL:  Objection, leading.
2      THE WITNESS:  No.  I also provided,
3  that's not on here, is evaluation, assessment of her
4  process and her current situation.  After the
5  assessment and evaluation of her verbal comments, I
6  advised her to bring in her documents.
7      My notations, as I mentioned to you
8  on the phone, were short.
9      Q  (BY MR. HOFELD)  Do you recall how long
10 that first meeting was?
11     A  Must have been about close to an hour, if
12 not an hour.
13     Q  Okay.  And how is it that you recall that
14 it was an hour long?
15     A  Based on my notations.
16     Q  Where does it record the time?
17     A  It doesn't.  It's just based on my
18 notations and personal recollection of that
19 particular situation in her file.
20     Q  Let's look at the second entry a little
21 bit more closely.
22     A  Yes.
23     Q  It starts out "she brought documents."
24     A  Uh-huh, yes.
25     Q  Was this a second meeting with Ms. Navara?

Page 31

1      A  Correct.
2      Q  Okay.  And during this meeting, you called
3  National Acceptance, correct?
4      A  Yes.
5      Q  Okay.  You also called HUD?
6      A  Correct.
7      Q  Is that correct?
8      A  Yes.
9      Q  And these were services that you were
10 providing?
11     A  Yes.
12     Q  Were there any other services that you
13 provided in the second meeting that are indicated in
14 your log?
15     A  Can you clarify that?
16     Q  Sure.  I'm trying to understand what the
17 services are that you believe you provided to
18 Ms. Navara.  And so I'm asking you specifically now
19 about the second meeting.  And your conversation log
20 for that meeting indicates that you called First
21 National and you called HUD, correct?
22     A  Yes.
23     Q  Okay.  And what I'm asking you now is:
24 Are there any other services that you provided to
25 Ms. Navara in the second meeting with her?

Page 32

1      A  Yes.  Once again, I assessed, advised,
2  consulted, initiated phone conversations.  Once
3  again, I didn't -- my notations are short.
4      Q  Do you recall how long the second meeting
5  lasted?
6      A  I want to say about maybe two hours, two
7  and a half hours.
8      Q  And how do you know that, Mr. Astudillo?
9      A  Once again, based on my notations and my
10 comment log and recollections of her particular
11 case.
12     Q  Is it your testimony that there was
13 continuous conversation for that two and a half
14 hours?
15     A  Yes.
16     Q  And who was that conversation with,
17 Mr. Astudillo?
18     A  Various people.  Ms. Navara, a
19 representative from -- several representatives from
20 National Acceptance and several representatives from
21 HUD to obtain the proper department and person to
22 contact and speak to.
23     Q  Did you keep names of anybody you talked
24 to?
25     A  Unfortunately I didn't, sir.

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 33

1    Q   Did you keep a record of the number of
2  people you talked to?
3    A   No.
4    Q   I'm trying to understand what took so long
5  in your conversations, if it's true that your
6  conversations took two and a half hours.
7         You have here in your log that when
8  you called First National, they told you that she
9  simply stopped paying the loan and that was it.  Was
10  there anything else that First National told you?
11    A   Yes.
12    Q   What else do you recall them telling you
13  in that conversation?
14    A   Giving me the information and the
15  documentation that Ms. Navara actually has in her
16  possession, explaining the whole situation of why
17  she was in the situation she was, me relaying
18  information that Ms. Navara was telling me when she
19  was in front of me about her recollection of the
20  situation with her loan, putting me on hold,
21  transferring me to several departments trying to
22  obtain the correct person to speak to, asking me to
23  get -- if I had authorization.  They even spoke to
24  Ms. Navara, being that I didn't have something in
25  writing from her saying that I could speak on her

Page 34

1  behalf.
2    Q   But you don't have copies of any of those
3  documents that you just referred to in your records
4  for ACS, correct?
5    A   I don't.  Ms. Navara does.
6    Q   In the third entry, do you recall whether
7  this was a separate meeting or was this a
8  continuation of the same meeting that you just
9  discussed?
10    A   It's a separate meeting.
11    Q   And do you recall when that meeting was?
12    A   The proceedings of this took several
13  months, weeks.  I don't exactly know time frames,
14  but it didn't --
15    Q   So the answer is no, you don't recall when
16  this meeting occurred?  You don't recall when this
17  meeting occurred, the meeting that's described in
18  your third entry?
19    A   Exact date, no, sir.
20    Q   Okay.  And do you recall how long the
21  meeting lasted?
22    A   That was brief, about maybe 15 to 30
23  minutes.
24    Q   And the service you provided in that
25  meeting was to refer her to an attorney; is that

Page 35

1  correct?
2    A   Yes and no.  I also relayed information of
3  any outcome of her situation.
4    Q   What does that mean?
5    A   Sorry.  I just relayed -- I just -- I'm
6  looking for the proper word to say.  I just
7  reaffirmed what had just happened prior to the prior
8  meeting and advised her of seeking an attorney to
9  help -- legal help.
10    Q   Did you call Marc Smith to discuss
11  Guadalupe Navara with him?
12    A   Yes.  I briefed him of the customer's
13  name, information, and case, yes.
14    Q   And that was before you sent her to see
15  him?
16    A   Correct.  It was about the same time.  I
17  didn't note that on my log, but yes.
18    Q   Is the last entry based -- do you recall
19  whether the last entry in your phone conversation
20  log is based on a meeting with Ms. Navara or a phone
21  conversation?
22    A   No.  This was a meeting.  She came to my
23  office.
24    Q   Okay.  And according to your log, in that
25  meeting, you called National Acceptance?

Page 36

1    A   Yes.
2    Q   To see if they could rework her loan?
3    A   Yes.
4    Q   Did you provide any other services that
5  you recall or that are described in your log at that
6  last meeting?
7    A   No.  That's it.
8    Q   Okay.  And how long did that meeting last?
9    A   That was maybe 45 minutes.  Shouldn't --
10    Q   Mr. Astudillo, let me ask you some
11  background questions about ACS.  When was ACS
12  founded?
13    A   2001, I believe.
14    Q   Who founded it?
15    A   I did.  I'm sorry.  Let me rephrase that.
16  That's 2000.  Sorry about that.
17    Q   And what kind of corporate entity was it?
18    A   It was originally a sole proprietorship.
19    Q   Did that change?
20    A   Yeah.  It became a corporation.
21    Q   When did it become a corporation?
22    A   I don't have the exact date and I don't
23  have those records with me, so I couldn't tell you a
24  specific date.
25    Q   That's okay.  What's your best

9 (Pages 33 to 36)

Page 37

1   recollection about when it became a corporation?
2       A   I want to say maybe 2002.
3       Q   Was it dissolved at any point?
4       A   Yes.
5       Q   When was it dissolved?
6       A   The specific date, again, I don't recall,
7   but I could get that information for you, sir.
8       Q   Approximately when, in your recollection,
9   was it dissolved?
10      A   Maybe 2004.
11      Q   And why was it dissolved?
12      A   It was just a lack of -- I let it expire.
13  I didn't follow with the fees, the filing fees that
14  you have to update.
15      Q   You let what expire?
16      A   The corporation license with the City of
17  Chicago.  And it just -- it was dissolved.  I didn't
18  follow through with it.
19      Q   And why didn't you follow through?
20      A   It was just not making a lot of money and
21  it was just -- I was focusing more so on mortgages
22  at the particular time.
23      Q   Did ACS -- well, when it became a
24  corporation, were you an officer of the corporation?
25      A   Sole officer, yes.

Page 38

1       Q   And what was your title?
2       A   President.
3       Q   Were there any other officers ever?
4       A   I believe my wife was in it.
5       Q   When did she become an officer?
6       A   Actually, I want to say that I think we --
7   once again, I don't recall exactly, but I want to
8   say that maybe it was both of us originally.  And I
9   want to say, I have to look at it because it's been
10  a while since I -- it's been a sore subject.
11      Q   So she may have become an officer at the
12  same time you did?
13      A   Yes.
14      Q   And that would have been approximately in
15  2002?
16      A   Yes.
17      Q   Do you recall what her -- what officer she
18  was?
19      A   I think she must have been CFO, chief
20  financial officer.
21      Q   Mr. Astudillo, did ACS ever employ any
22  persons other than yourself or your wife?
23      A   Yes.
24      Q   Who were the employees?
25      A   It was assistant Saul Carrera for a brief

Page 39

1   period of time.
2       Q   You said assistant.
3       A   Yeah.  He was just assisting me.
4       Q   What was his title?
5       A   Assistant.
6       Q   Were there any other employees?
7       A   No.
8       Q   So Mr. Carrera was the only employee in
9   the entire history of the time that ACS was
10  operating?
11      A   Technically, yes.
12      Q   Well, were there any other employees?
13      A   No.  When I say technically, he wasn't
14  fully employed through ACS.  He was an assistant of
15  mine so --
16      Q   Okay.  When you say he wasn't fully
17  employed, what do you mean?
18      A   He wasn't employed by ACS.  He was
19  assisting me.  He wasn't getting paid a salary or
20  hourly wages.
21      Q   Was he volunteering to help you?
22      A   No.  I would give -- I would -- as
23  assisting me, I would pay him sometimes in cash for
24  some additional services, messenger, answering
25  phones and so forth.  But I hate to use the word

Page 40

1   employed.
2       Q   When did he work for you?
3       A   On or about the end of 2003.  I want to
4   say maybe October to about maybe January of 2004.
5       Q   Did he have regular hours?
6       A   No.
7       Q   How frequently did he perform work for
8   you?
9       A   Maybe once, twice a week on and off.
10      Q   And how long each week?
11      A   It varied.  It could be from 3 hours to 20
12  hours.
13      Q   That's 3 hours to 20 hours per week?
14      A   It varies.  Yes.
15      Q   Okay.  Did you do federal or state
16  withholding for the money that you were paying to
17  Mr. Carrera?
18      A   No.
19      Q   And how did you decide how much to pay
20  Mr. Carrera?
21      A   There was no set fee or schedule or
22  amount.  It was just depending on the particular
23  job.  It varied between 20 to maybe $75.
24      Q   Per job or per hour?
25      A   Per job.

Page 41

1    Q    Did you keep records of the work that he
2  did?
3    A    For taxes, I believe I did have some
4  records.
5    Q    What I mean is did you keep records of the
6  particular tasks that he performed day to day or
7  week to week?
8    A    Oh, no. Sorry.
9    Q    In other words, did you keep any kind of
10  log of the work that he did for you?
11    A    No.
12    Q    Okay. Did he keep any kind of log or
13  record of the work and the tasks that he did for
14  you?
15    A    No.
16        MS. BIESENTHAL: Object to
17  foundation.
18    Q    (BY MR. HOFELD) Mr. Astudillo, did you
19  know Mr. Carrera before he began working as your
20  assistant?
21    A    Yes.
22    Q    And what was your relationship with him?
23    A    Acquaintance.
24    Q    I'm sorry?
25    A    Acquaintance.

Page 42

1    Q    Okay. How did you meet him?
2    A    Mutual friends.
3    Q    Is Mr. Carrera a relative of yours?
4    A    No.
5    Q    How did you first meet Mr. Carrera?
6    A    At a basketball court.
7    Q    What were the circumstances?
8    A    Playing basketball.
9    Q    You both were playing basketball?
10    A    Yes. It was a group.
11    Q    And how was it that you came to hire him
12  as an assistant?
13    A    He was out of work and asked if I had any
14  odd jobs that he could do.
15    Q    Mr. Astudillo, what kinds of services did
16  ACS provide?
17    A    A variety; taxes, consultations of rental,
18  financial. It was property management advice, just
19  basically an overall general of consulting in any
20  way that the customers could -- notarizations of
21  letters, translations of letters, legal
22  documentation translating. Anything that the
23  community needed that they would come to me, I would
24  try to assist them in any way.
25    Q    You mentioned taxes. What did you do?

Page 43

1  What service did you provide?
2    A    I prepared income taxes.
3    Q    You mentioned consultations with respect
4  to rental or rentals. What is that?
5    A    Yeah. Customers would come that had
6  rental properties and would need to have a lease
7  filled out. I would fill it out for them, I would
8  complete it. I would advise them of what the rental
9  income in the neighborhood for that particular unit
10  would be renting for.
11    Q    You mentioned financial consultations.
12  What did you mean by that?
13    A    Customers would come and ask -- they had a
14  401K, would it be wise to cash it out. Customers
15  that would have a job that was no longer employed
16  and had a 401K, what to do with it; refer them to
17  different financial institutions, such as Bank One,
18  Citibank, any financial institution in the
19  neighborhood to maybe go talk to about IRAs, the
20  benefits.
21    Q    You also mentioned property management.
22    A    Correct. Customers would come that had
23  different properties. I would advise them to maybe
24  see if they could put them in trust, how to manage
25  their properties. I mean, it's just general --

Page 44

1  anything I could help them with, I would try to.
2    Q    What training or education qualified you
3  to give those kinds of advice?
4    A    I had community college for two years with
5  Daley College, and just my own personal stumbles and
6  bad experiences that I've encountered through my
7  mortgage experience and networking with agents of
8  several different institutions.
9    Q    Did you hold any certifications, licenses,
10  anything of that nature?
11    A    No.
12    Q    In any of those areas that you described
13  you performed services?
14    A    No, sir.
15    Q    Were you trained to provide financial
16  advice?
17    A    In a -- can you elaborate to that?
18    Q    Yeah. Did you undergo any -- did you
19  participate in any training program in order to
20  learn how to be a financial advisor?
21    A    Not a set course; but through my previous
22  employment of Worldwide Mortgage, the owner had an
23  extensive financial background, and I would attend
24  to his daily seminars that he would provide. But
25  nothing in a set educational course, if that's what

11 (Pages 41 to 44)

Page 45

1  you're asking, no.
2      Q   What position did you hold at Worldwide?
3      A   Loan officer.
4      Q   You were making mortgage loans?
5      A   Correct.
6      Q   Did you undergo any professional training
7  or certification in property management?
8      A   No.
9      Q   Did you have any legal training of any
10  kind?
11      A   No.
12      Q   Did you undergo any training on how to
13  prepare and file tax returns?
14      A   Yes.
15      Q   And what was that?
16      A   The IRS trainings that they offered,
17  seminars.
18      Q   Do you have a certificate from having
19  participated in those trainings?
20      A   IRS doesn't offer certificates.  They just
21  enroll you in classes and you just take the forms.
22  They don't issue a certification, sir.
23      Q   Do you have any record that you
24  participated in those trainings?
25      A   I believe I may have some records, yes.

Page 46

1      Q   What was the address of ACS's office,
2  Mr. Astudillo?
3      A   4329 West 26th Street, Chicago, Illinois
4  60623, Suite 200.
5      Q   Was that the only office where ACS ever
6  operated, or did it have other offices?
7      A   No.  That's the only office.
8      Q   Where did ACS have its bank account or
9  bank accounts?
10      A   With Harris Bank.
11      Q   How many accounts did ACS have?
12      A   Just one, the savings.
13      Q   Did ACS ever have accounts with other
14  banks?
15      A   No.
16      Q   Did it ever have an account other than a
17  savings account?
18      A   No.
19      Q   Who was the authorized signer --
20      A   Me.
21      Q   -- on that account?
22      A   I was.
23      Q   Was your wife -- excuse me.  Was your wife
24  ever authorized as a signer on the Harris Bank
25  account for ACS?

Page 47

1      A   No.
2      Q   Where were your personal bank accounts?
3      A   Harris Bank.
4      Q   How many did you have?
5      A   I just had a checking.
6      Q   Was it a joint checking with your wife?
7      A   Yes.
8      Q   Did you have any other accounts at Harris
9  besides the checking?
10      A   I had two savings accounts for my children
11  under their name.
12      Q   Those were at Harris?
13      A   Yes.
14      Q   How old were your children in 2004?
15      A   I had, I want to say, a 4 year old.  I
16  think he was 4 at that time.
17      Q   What's his birth date?
18      A   April 1st of '99.
19      Q   Okay.  What's his name?
20      A   Armani.
21      Q   A-R-M-A-N (sic)?
22      A   Correct.
23      Q   Same last name as you?
24      A   Correct.
25      Q   And, I'm sorry, your second child, how

Page 48

1  old --
2      A   I believe he was 2 years old at that time.
3      Q   And what's his name.
4      A   Roman.
5      Q   I'm sorry?
6      A   Roman.
7      Q   Okay.  And what's his birthday?
8      A   October 7 of 2002.
9      Q   And Arman's -- what day in April was he
10  born?
11      A   1st of April.
12      Q   And these accounts were at Harris?
13      A   Correct.
14      Q   And, Mr. Astudillo, what's your wife's
15  name?
16      A   Melissa.  M-E-L-I-S-S-A.
17      Q   Astudillo?
18      A   Correct.
19      Q   Was she using the same name in 2004?
20      A   Yes.
21          Can I make a correction?
22      Q   Please do.
23      A   On my son's birth year, the second child,
24  Roman, his was 2001.
25      Q   Okay. Mr. Astudillo, who was authorized

12 (Pages 45 to 48)

Page 49

1  to make withdrawals from the ACS bank account at
2  Harris?
3      A   Just me.
4      Q   Who was authorized to cash checks against
5  that account?
6      A   Just me.
7      Q   And the personal bank account that you had
8  with your wife -- by the way, do you have any
9  other -- did you personally have any other accounts
10 at any other financial institutions in 2004?
11     A   I don't believe so.
12     Q   Okay.  Who was authorized to make
13 withdrawals from your -- well, who was authorized to
14 write checks against your checking account, your
15 personal checking account?
16     A   My wife and I.
17     Q   Mr. Astudillo, let's go back to Exhibit 1,
18 which is the subpoena that you received from my
19 office.
20     A   Yes.
21     Q   Let's look at the rider to the subpoena.
22 Are you there?
23     A   Yes.
24     Q   What records did ACS keep of professional
25 services that it rendered?  And understand that I'm

Page 50

1  asking you generally about ACS's systems and
2  providers and not necessarily about Ms. Navara
3  particularly.
4          So the question is:  What kind of
5  recordkeeping did ACS do for the services that it
6  rendered?
7      A   It depends on the services.  Generally
8  it's just a conversation long.  Being that all
9  documentation is given to the customer directly, I
10 don't keep any records for myself.  Just -- maybe
11 just names, phone numbers of the customers
12 themselves and any conversations that we had or
13 notations that I made similar to Ms. Navara's.
14     Q   So generally the only records of services
15 rendered would be in the conversation log?
16     A   Generally.  It all depends on the actual
17 service provided.  For example, if I provided -- I
18 completed a lease for a customer, I didn't keep the
19 lease or a copy of it.  I might have kept a receipt
20 if they paid me cash.
21     Q   By the way, Mr. Astudillo, this
22 conversation log that you kept, is it one log, one
23 book that you made entries in for all customers?
24     A   No.  It's an individual form just like the
25 one you have, sir.

Page 51

1      Q   Okay.  So you would fill out -- your
2  practice was to fill out a form, a separate form for
3  each customer?
4      A   Correct.
5      Q   Did you keep any record of charges for the
6  services?
7      A   A receipt book, sir.
8      Q   You kept a receipt book?
9      A   Yeah, just manually written down on files
10 that I got paid on cash.
11     Q   Okay.  But what I'm asking you I think is
12 a little different.  I'm asking you, did you write
13 down anywhere what you were charging the customer or
14 what you were going to charge the customer?
15     A   No, sir.
16     Q   Did you have a schedule of rates that you
17 would consult to determine what you were going to
18 charge a customer for any given service?
19     A   No, sir.
20     Q   So ACS didn't maintain a schedule of rates
21 for services at all?
22     A   No, sir.
23     Q   Did you have any written agreement -- did
24 you have written agreements or contracts with your
25 customers for services that you would perform?

Page 52

1      A   No.
2      Q   Did you provide any prospectus or
3  disclosure indicating what the services that you
4  intended to perform for them would be?
5      A   Unfortunately, no, sir.
6      Q   Okay.  Did you provide them prospectively,
7  in other words, before you performed the services,
8  with any kind of estimate of what the charge for the
9  service or services would be?
10     A   Not written.  Verbally, yes.
11     Q   Did you keep computer records?  Did you
12 keep record on the computer of anything relating to
13 your customers?  Strike that.
14         Did you use the computer or computer
15 records in any way for ACS?
16     A   If I typed up letters, yes.
17     Q   Okay.  Did you keep any account
18 information on the computer?
19     A   No.
20     Q   Did you keep any information about your
21 customers on the computer?
22     A   For tax purposes, yes.
23     Q   What information would that have been?
24     A   The actual tax return.
25     Q   Anything else?

13 (Pages 49 to 52)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 53

1    A    No.
2    Q    Did you keep any record of balances owed
3  to you or owed to ACS by customers on the computer?
4    A    No.
5    Q    Did you keep any record of payments that
6  may have been made by a customer on the computer?
7    A    No, sir.
8    Q    Did ACS prepare invoices for services that
9  were rendered?
10   A    No.
11   Q    Did you prepare account statements --
12   A    No.
13   Q    -- for services rendered?
14   A    No.
15   Q    Mr. Astudillo, how did you determine how
16  much you would charge your customers?
17   A    Case by case, depending on the job
18  itself -- or services, excuse me.
19   Q    And what do you mean specifically?
20   A    If I provided a lease, it's not going to
21  be the same rate as just -- depending on how much
22  work I have to do, if I -- there's no general table
23  or set rules that I set. It's just case by case, as
24  I mentioned.
25   Q    If you provided a lease, how would you

Page 54

1  determine how much you would charge or how much did
2  you charge?
3    A    Sometimes, depending on how many times the
4  client would come back, maybe $5, maybe $10. I
5  mean, it was for the community. It all depends on
6  the job itself.
7    Q    When you incorporated with the secretary
8  of the state of Illinois --
9    A    Yes.
10   Q    -- did you incorporate it as a for-profit
11  or as a not-for-profit?
12   A    It was a corporation for profit.
13   Q    Did you charge -- were your rates
14  determined on the basis of the amount of time you
15  spent?
16   A    No. It was just on the particular job
17  itself, service.
18   Q    How much did you charge to prepare a
19  federal tax return?
20   A    Depending on the schedules they required,
21  they ranged from 40 to maybe $160.
22   Q    And by the way, when you talked about
23  providing a lease or consulting concerning a rental
24  lease, were you -- who were your customers? Were
25  your customers landlords?

Page 55

1    A    Landlords, tenants.
2    Q    Okay. When you say "provided a lease,"
3  which is what you just said a moment ago, what do
4  you mean by that exactly? What was the service you
5  provided?
6    A    Well, the customer would say, "I want to
7  rent an apartment. In the case of a tenant, I want
8  to rent a particular apartment, but I want to make
9  sure that I only have a specific time that I want to
10  be in it." So they would ask me to prepare a lease
11  for them to take it to their landlord and vice
12  versa.
13        Landlords would come and say, "Well,
14  you know, I have this client or tenant, potential
15  tenant, and I want to set up a lease or what do you
16  advise me to do, should it just be month to month or
17  should I do a lease?" And obviously I would advise
18  them towards getting a lease.
19   Q    So you would actually prepare the lease?
20   A    I would complete it for them, correct.
21   Q    Okay. You would complete the lease?
22   A    Yes.
23   Q    Did you use a form document?
24   A    Yes.
25   Q    That had blanks in it?

Page 56

1    A    (Nodding)
2    Q    And when you say you completed the lease,
3  you would fill in the blanks on the form legal
4  document?
5    A    The information the customer brought me,
6  yes.
7    Q    And that information would be things like
8  address, monthly rental amount, names of lessees and
9  lessors and similar information, right?
10   A    Yes.
11   Q    You didn't actually draft the legal
12  language of the lease itself, did you?
13   A    No.
14   Q    How much would you charge typically for
15  financial advice, financial consulting?
16   A    It varied. There was no specific amount.
17  I mean, it just depended on the whole situation. It
18  would range from maybe $100 to, I don't know, 500,
19  $600.
20   Q    What kinds of things did it depend on?
21   A    How much work I had to actually get
22  involved, how much --
23   Q    So the amount of time you spent?
24   A    Follow-ups, yes.
25   Q    What else? I'm sorry I interrupted you.

14 (Pages 53 to 56)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 57

1     A   Follow-ups, documents, faxes, phone calls,
2   continuing communication, follow-ups for future, see
3   how things were going with clients.
4     Q   And what about for your property
5   management consultations?  How much did you charge
6   for those and what did your rates depend on?
7     A   Sometimes I didn't charge anything, just
8   depending on how much information I provided them,
9   what actual information I helped them with.  If I
10  gave them a referral, it would be zero.  If it was a
11  previous client, it would be no money.  It was all
12  part of an overall service that I had repeated
13  customers that would come to me with those home,
14  property management -- that was not just somebody
15  that would come off the street and say, "Okay, I
16  need for you to manage my property."  These are
17  clients that I prepared taxes for and I would give
18  them advice.  Sometimes I charged them through the
19  taxes, sometimes I charged them through some other
20  services, but it was not a set amount.  So I can't
21  answer you with an exact amount, sir.
22    Q   But could you tell me -- for the other
23  types of services you provided, you were able to
24  give me a range of your charge.
25    A   Correct.

Page 58

1     Q   Your charges.
2     A   Correct.
3     Q   Can you do that for your property
4   management services?
5     A   Well, in this particular case, like I
6   said, it was -- the property management was not a
7   service that I provided a tremendous amount of --
8     Q   Okay.
9     A   It was just for certain clients that, as I
10  mentioned to you, I prepared income taxes and they
11  had rental properties.  I would advise them to try
12  to see if they -- different avenues of saving money.
13    Q   You did charge for your -- for some of
14  your services, right?
15    A   In some instances.  I mean, if you want a
16  specific amount, I would maybe say $150, $200.  I
17  mean, it's not --
18    Q   Per job?  Per hour?
19    A   It's just per overall service.
20    Q   But you charged less for some services and
21  more for others, correct?
22    A   That is correct, sir.
23    Q   And how did you distinguish between them?
24  How did you conclude that some services get a higher
25  rate and others get a lower rate?

Page 59

1     A   It was just case by case, the intense --
2   as I mentioned, I can't charge 150 for a tax service
3   and charge them the same amount for a preparation of
4   a lease.  It's just depending on the client,
5   depending on the -- you know, is it a repeated
6   customer?  Is it a friend?  Is it a friend of a
7   family -- is it a referral?  It's just an overall --
8   it just depended on the client itself and how he
9   came to me.  Basically that's why there's no -- just
10  a set table, and I never set a set table for my
11  business.
12    Q   No set rates?
13    A   No set rates, excuse me.
14    Q   How much did you charge for notarization
15  of documents?
16    A   $1, sir.
17    Q   And how about for translations of
18  documents?
19    A   It varied.  It would be from $1 to $100.
20        MR. HOFELD:  Can we take a quick
21  break?  Do you want to take a break?
22        THE WITNESS:  You read my mind.
23        MR. HOFELD:  Good.  It's probably a
24  good time.
25        (Recess taken)

Page 60

1     Q   (BY MR. HOFELD)  Mr. Astudillo, you
2   mentioned that you kept a record in the form of a
3   receipt or a receipt book.  You mentioned earlier
4   that you would write out receipts?
5     A   Yes.
6     Q   Okay.  Would you make those notations in a
7   receipt book?
8     A   Yeah, carbon copy receipts, you know, for
9   like cash transactions, the smaller deals, you know,
10  we would give a lease or a notarized letter, we
11  would just write out a receipt and I would keep the
12  carbon copy and the customer keeps the original.
13    Q   So you would give the customer a receipt
14  for payment that you received from them?
15    A   On cash transactions, yes.
16    Q   Okay.  And what information would you
17  write on the receipt typically?
18    A   Their name, the date, and the amount.
19    Q   You didn't write the service provided?
20    A   Sometimes.  I mean, it's a very small
21  receipt, so very minimal.  Maybe "notarized letter,"
22  something to that extent.
23    Q   Did you accept payment by check?  Did ACS
24  accept payment by check?
25    A   Not all the time, but sometimes we did.

15 (Pages 57 to 60)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 61

1  Q  Did you accept credit cards?
2  A  No.
3  Q  Where is the receipt book now?
4  A  It's in my possession at home.
5  Q  Did you just use one receipt book during
6  the time that ACS operated as a business?
7  A  Yes. It was a very thick book.
8  Q  Okay. I'm going to hand you some
9  documents. The court reporter has marked that set
10 of documents as Exhibit 4. I'm going to give you a
11 chance to look through them. But first I want to
12 ask you a couple of quick questions. In fact, we're
13 going to go through them page by page.
14 A  Okay.
15 Q  But first I want to ask you a couple of
16 questions about one or two of them. If you could
17 turn with me, Mr. Astudillo, to page 87 -- I believe
18 it may be 88. Are you at 88?
19 A  Yes.
20 Q  It appears to be a handwritten note with
21 the date of 4/26/04 written in the top right-hand
22 corner and the name on the signature line is
23 Guadalupe Navara. Do you see those items?
24 A  Yes.
25 Q  Okay. Can you read this out loud for me,

Page 62

1  please.
2  A  It starts from the top, date 4/26/04, "To
3  whom it may concern. This letter is to explain that
4  I have not used any other name but Guadalupe Navara.
5  I have never been known by any other name," signed
6  Guadalupe Navara and typed or print Guadalupe
7  Navara's name.
8  Q  Do you recognize the handwriting on this
9  page?
10 A  Yes.
11 Q  Whose handwriting is that?
12 A  That's mine.
13 Q  Is there any handwriting on this page that
14 doesn't belong to you?
15 A  Yes.
16 Q  Can you identify it?
17 A  The signature of Guadalupe Navara.
18 Q  Okay. Anything else?
19 A  No, that's it.
20 Q  Okay. Let's start from the top of
21 Exhibit 4. Mr. Astudillo, would you turn to page 3.
22 This is a multi-page document -- the one that starts
23 on page 2 is a multi-page document, looks like it
24 goes through your page 10. Take a moment to look at
25 it. By the way, I should tell you that these are --

Page 63

1  Exhibit 4 consists of documents produced to the
2  plaintiff in this lawsuit by New Millennium Mortgage
3  Group Corp., okay?
4  A  Okay.
5  MS. BIESENTHAL: I'm going to object
6  to Exhibit 4 as an improper compilation, instead of
7  just admitting each exhibit in individually.
8  MR. HOFELD: Sure.
9  THE WITNESS: Excuse me. Can you --
10 can I ask a question to counselor?
11 MR. HOFELD: No. Unfortunately
12 you're not allowed to ask questions of us.
13 THE WITNESS: Sure. Okay.
14 MS. BIESENTHAL: I'm just objecting
15 for the record. You can still answer his questions
16 about these documents.
17 MR. HOFELD: I will say for the
18 record that after New Millennium produced the
19 documents in Exhibit 4, they produced a few
20 additional documents consisting of agreements and
21 communications between Long Beach Mortgage Company
22 and New Millennium, and those documents are not
23 included in the Exhibit 4 at this deposition. But
24 I'm not going to be asking you any questions about
25 them.

Page 64

1  THE WITNESS: Okay.
2  Can I ask you a question, sir?
3  MR. HOFELD: It depends.
4  THE WITNESS: General? Do I just --
5  do I have the right to get a copy of these exhibits,
6  copies?
7  MR. HOFELD: I would be happy to send
8  you one. Sure.
9  THE WITNESS: Okay. That's my
10 question.
11 Q  (BY MR. HOFELD) Have you had a chance to
12 look at the document that begins on page 2 of
13 Exhibit 4?
14 A  Page 2? I'm sorry.
15 Q  Yeah. I want you to take a look at the
16 document --
17 A  Yes.
18 Q  -- that begins on page 2 of Exhibit 4.
19 A  Okay.
20 Q  Okay. Is this a document that you
21 recognize?
22 A  It looks familiar.
23 Q  Can you identify it?
24 A  It looks like it's a loan origination
25 agreement from New Millennium with me, Rogelio

16 (Pages 61 to 64)

ROGELIO A. ASTUDILLO,  AUGUST 10, 2006

Page 65

1  Astudillo.
2      Q   Okay.  And if you turn to page 8, is that
3  your signature on page 8?
4      A   It appears to be so.
5      Q   Okay.  Let's look at page 10.
6      A   Yes, sir.
7      Q   Do you recognize the handwriting on this
8  page?
9      A   Yeah.  This is mine.
10     Q   Okay.  Mr. Astudillo, do you recall
11 signing the loan originator agreement with New
12 Millennium Mortgage Company around the time you were
13 hired?
14     A   Yes, I do.
15     Q   Do you believe this is a copy of that
16 agreement?
17     A   I believe so.  I'm not 100 percent
18 certain, sir.
19     Q   Do you have any reason to believe it's not
20 a copy of that agreement?  In other words, do you
21 have any reason to believe this is not the agreement
22 you signed?
23     A   I don't have a reason, no.
24     Q   Okay.
25         MS. BIESENTHAL:  And, Al, if I could

Page 66

1  clarify my objection.
2         MR. HOFELD:  Sure.
3         MS. BIESENTHAL:  I don't have any
4  objection, for example, to this particular document,
5  the loan originator agreement.  But I guess I would
6  just reserve my right to object to other documents
7  contained in this entire production.
8         MR. HOFELD:  I'm still not sure I
9  understand.
10        MS. BIESENTHAL:  Since we won't be
11 going through -- I mean, I assume you won't be going
12 through and laying a foundation for every single
13 document in this.  So maybe my objection is
14 premature.
15        MR. HOFELD:  Okay.
16        Okay.  Just for the record, the
17 documents in Exhibit 4 are the way they are.  They
18 are in the order that they were produced in by New
19 Millennium.  New Millennium produced them to us in
20 one packet of documents in the same order that the
21 docs in Exhibit 4 are in.  And they produced them
22 all at one time, with the exception that I mentioned
23 earlier.
24     Q   (BY MR. HOFELD)  Mr. Astudillo, would you
25 turn to the document that starts on page 10.  It

Page 67

1  appears to be a seven-page document.
2         MS. BIESENTHAL:  Do you mean 11?
3      Q   (BY MR. HOFELD)  I do mean 11.  I'm
4  sorry.  It appears to be a seven-page document.  If
5  you would take a look at all seven pages.
6      A   Okay.
7      Q   And if you could turn with me to page 17.
8      A   Okay.
9      Q   Is that your signature at the bottom?
10     A   Yes.
11     Q   Okay.  Is that your handwriting --
12     A   No.
13     Q   -- with the date in the printed date to
14 the right of your signature?
15     A   I'm sorry.  Yes.
16     Q   Is that your handwriting above where it
17 says, "I, Rogelio Astudillo"?
18     A   No, that's not my writing.
19     Q   Okay.  Do you recognize this document,
20 Mr. Astudillo?
21     A   Yes.
22     Q   What is it?
23     A   It's an application for certification
24 of -- a certification to be a loan officer with the
25 state of Illinois.

Page 68

1      Q   Is it a copy of the application that you
2  completed?
3      A   It's a copy of the application that I
4  signed.
5      Q   Okay.
6      A   It was already filled out for me.
7      Q   Did you review it before you signed it?
8      A   Yes.
9      Q   When did you complete this application?
10     A   The day I signed it, sir, April 4th of
11 2005.
12     Q   Mr. Astudillo, could you turn to page 21,
13 please, in Exhibit 4.
14     A   Yes.
15     Q   Do you recognize the handwriting on this
16 page?
17     A   Yes.
18     Q   Okay.  Take a look at -- it's a two-page
19 document, starts on 21, goes to 22.  Looking at the
20 document as a whole, do you recognize this document?
21     A   Yes.
22     Q   And what is this document?
23     A   It's an application of employment.
24     Q   Okay.  Is it the application of employment
25 that you completed prior to going to work for New

17 (Pages 65 to 68)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 69

1   Millennium?
2       A   Correct.
3       Q   And page 2 of the application, is your
4   handwriting on this page?
5       A   Yes.
6       Q   Is that your signature at the bottom?
7       A   Yes.
8       Q   And your handwritten date to the right of
9   your signature?
10      A   Yes.
11      Q   Okay. Mr. Astudillo, on page 1 of the
12  employment application at the bottom of the first
13  block of questions, it says, "How were you referred
14  to us." Do you see that?
15      A   I'm sorry. Where?
16      Q   Sure. On the first page, page 21 of
17  Exhibit 4, the last question in the first block of
18  questions.
19      A   Yes.
20      Q   "How were you referred to us," do you see
21  that?
22      A   Yes.
23      Q   Okay. And it says Antoinette Berzin.
24      A   Correct.
25      Q   Who is Antoinette Berzin?

Page 70

1       A   She was a coworker of mine at Worldwide
2   Mortgage.
3       Q   Did she later work for you in any way?
4       A   For me, no.
5       Q   Did she later work for New Millennium, as
6   far as you know?
7       A   Yes.
8       Q   She did?
9       A   Yes.
10      Q   What did she do for New Millennium?
11          MS. BIESENTHAL: Objection,
12  foundation.
13          THE WITNESS: Processor. She
14  processed the loans for New Millennium.
15      Q   (BY MR. HOFELD) Do you know when she was
16  hired?
17      A   No.
18      Q   Do you know approximately; for example,
19  the year?
20      A   No, sir.
21      Q   Do you know who at New Millennium hired
22  her?
23      A   No, sir.
24      Q   Okay. When do you -- what's the
25  approximate timing of your first recollection of her

Page 71

1   being at New Millennium?
2       A   About December of 2002.
3       Q   Do you think that might have been when she
4   was hired?
5       A   I can't say.
6       Q   Or when she started working there?
7       A   Once again, I can't say. I don't know,
8   sir.
9       Q   You said December of --
10      A   That's when my recollection of her being
11  with New Millennium, December of 2002.
12      Q   Do you know who her supervisor was at New
13  Millennium?
14      A   No, sir.
15      Q   Do you know if she's still working for New
16  Millennium?
17      A   No, sir.
18      Q   You don't know?
19      A   No, I don't know.
20      Q   Or she's not still working there?
21      A   I don't know if she's still working with
22  New Millennium.
23      Q   When did you last talk with Ms. Berzin?
24      A   I believe when I was leaving, somewhere in
25  August of 2004.

Page 72

1       Q   Okay.
2       A   Or five, excuse me. I'm sorry.
3       Q   So you haven't had any contact with her
4   since you've left Chicago?
5       A   No, sir.
6       Q   Was she a processor for the entire time
7   that she was at New Millennium that you're aware of?
8       A   That I'm aware of, yes.
9       Q   And what did she do as a processor, if you
10  know?
11      A   She processed the loans. She would take
12  the completed application and obtain document --
13  additional documentation to be able to close the
14  loan, the documentation that the lender would
15  require.
16      Q   And how do you know what she did? In
17  other words, did you have occasion to work with her?
18      A   Yes, at Worldwide, and my knowledge of
19  what a processor does.
20      Q   I'm sorry. What I mean is did you work
21  with her at all when she was at New Millennium and
22  you also were at New Millennium?
23      A   Yes.
24      Q   Okay. Did you work in the same office?
25      A   Yes.

18 (Pages 69 to 72)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 73

1    Q    And which office was that?
2    A    That was the one on Laramie.
3    Q    Do you remember the exact address?  If you
4    don't, it may come out.
5    A    3108, I think, North Laramie.  But
6    previous to that they were in another office that I
7    would send my loans to.  I'm trying to remember the
8    address or the location.
9    Q    It may come out.  You may see it in the
10   documents.
11   A    Okay.
12   Q    You can correct yourself later.
13   A    Okay.
14   Q    But the Laramie office, the one you think
15   was at 3108 North Laramie was the office where you
16   and Ms. Berzin worked together?
17   A    Where we worked -- yes, correct.
18   Q    Okay.  Were you part of the same team or
19   did you work as a pair or she was just --
20   A    We --
21   Q    Go ahead.  I'm sorry.
22   A    Yes, we were -- we worked together.  She
23   would process some of my loans -- or the majority of
24   my loans.
25   Q    And she was working as a processor for New

Page 74

1    Millennium?
2    A    Correct.
3    Q    In April 2004?
4    A    Yes.
5    Q    And she was part of your team at that
6    time?
7    A    Correct.
8    Q    In other words, she was processing loans
9    for you at that time?
10   A    Correct.
11   Q    Mr. Astudillo, on page 2 of your loan
12   application, you listed Mr. Carrera as a reference.
13   A    Correct.
14   Q    Okay.  He must have been more than an
15   acquaintance if you listed him as a reference; is
16   that true?
17   A    That is correct.
18   Q    Was he a friend of yours?
19   A    At the end he was a friend, correct.
20   Q    You filled out this loan application in
21   July of 2002, right?
22   A    Correct.
23   Q    He was a friend of yours at that time?
24   A    Yes.
25   Q    Okay.  Apart from being your friend, was

Page 75

1    he in a position to comment on your qualifications
2    for a job?
3    A    No.  He was just a reference, a personal
4    reference in case they needed to get ahold of me.
5    Q    Who was Todd O'Rourke?
6    A    He was an appraiser that I used.
7    Q    When did you start using him?
8    A    When I was at Worldwide Mortgage.
9    Q    Did you continue to use him when you went
10   to work with New Millennium?
11   A    Correct, yes.
12   Q    Mr. Astudillo, did you interview for a
13   position at New Millennium?
14   A    Yes.
15   Q    Who interviewed you, do you recall?
16   A    It was Arlene.
17   Q    Okay.  Do you recall her last name?
18   A    Arlene -- her name showed up here.
19   Arlene -- I can't think of her last name.  Arlene --
20   may I look at the documents?
21   Q    Sure.
22   A    It's here.  I saw her name.  Lozano.
23   Q    L-O-Z --
24   A    L-O-Z-A-N-O.
25   Q    Thank you.  Do you know who told you that

Page 76

1    you were hired at New Millennium?
2    A    That's a good question.  I don't remember.
3    Q    Do you recall if someone called you or if
4    you went into their office?
5    A    Antoinette Berzin.  She had mentioned that
6    they had accepted me.  That's really -- that's how I
7    found out.
8    Q    That is how you found out that you got the
9    job?
10   A    Yes.
11   Q    How did you find out about New Millennium?
12   A    Antoinette Berzin referred me to New
13   Millennium.
14   Q    She encouraged you to apply?
15   A    She -- well, I don't want to say
16   encouraged me to apply.  She just advised me of
17   positions and the company itself.
18   Q    Did she indicate there was an opening?
19   A    Yes.
20   Q    She told you there was an opening?
21   A    Yes.
22   Q    What was the title of the position you
23   were hired into initially?
24   A    Loan officer.
25   Q    Okay.  And who was your supervisor

19 (Pages 73 to 76)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 77

1  initially?
2      A   It would be Luce Maria.  Once again, I --
3  Padilla.  Luce Maria Padilla, P-A-D, as in David,
4  I-L-L-A.
5      Q   Thank you.  What were your hours at New
6  Millennium, Mr. Astudillo?
7      A   They varied, sir.  There was no set hours.
8  They ranged from -- could be 8:30 in the morning
9  until 10 o'clock in the evening.
10     Q   Meaning that 8:30 in the morning would be
11  the earliest you'd start?
12     A   Yes.
13     Q   And 10 o'clock would be the latest you'd
14  finish a day?
15     A   Sometimes no.  It would be maybe sometimes
16  11:00.  It all depends on the time I spent with the
17  customers.
18     Q   And you worked in the Laramie office of
19  New Millennium; is that correct?
20     A   That's where we were located out of, yes,
21  sir.
22     Q   Who else worked in that office?
23     A   Several different people.  Many loan
24  officers and processors.
25     Q   Do you recall -- how many, approximately?

Page 78

1      A   I don't know.  Maybe 15.  Maybe more.
2      Q   Fifteen loan officers and processors
3  combined?
4      A   No.  Processors, about three or four.
5      Q   Yeah, I know, this is approximate.  But
6  when you said 15, you meant 15 loan officers,
7  approximately?
8      A   Yes.
9      Q   And three to four processors,
10  approximately?
11     A   Correct.
12     Q   Do you recall the names of any of the
13  other people?
14     A   Honestly I don't know.  The processor
15  is -- I remember Antoinette and Jesse.  Jesse, I
16  can't remember his last name, sir.  He was a
17  processor.
18     Q   Was Ms. Padilla your supervisor the entire
19  time you were at New Millennium?
20     A   Yes.
21     Q   Was she your immediate supervisor or your
22  ultimate supervisor?
23     A   That would be the ultimate.
24     Q   Who was your immediate?
25     A   I would want to say maybe it would be

Page 79

1  Olivia.  I think she just got married.  Olivia.  I
2  don't recall the last name, but her name was Olivia.
3  She was sales manager for the Laramie office, and
4  sometimes I would report to her.
5      Q   Where did Luce office?
6      A   Luce's office?
7      Q   Uh-huh.
8      A   Was at Laramie.
9      Q   Same location?
10     A   Same location, yes.
11     Q   What was Luce's title or position?
12     A   She was the president slash, I believe,
13  owner.
14     Q   How were you paid?  Hourly, salary,
15  commission?
16     A   Commission, sir.
17     Q   Commission only?
18     A   Correct.
19     Q   And what was the --
20     A   The base?
21     Q   Yeah.  What was the base?
22     A   70 percent commission.
23     Q   Now, that's 70 percent of what?
24     A   Total commission, such as originations,
25  yield spread premium, and part of the processing

Page 80

1  fee.
2      Q   So if I understand you correctly, your
3  commission was 70 percent of the combined total of
4  the origination fee, the yield spread, and the
5  processing fee?
6      A   Some of the processing fee, yes.
7      Q   Oh, okay.
8      A   Half of the processing fee.
9      Q   So 50 percent of the processing fee?
10     A   Yes.
11     Q   70 percent of the combined total of the
12  origination fee, and the yield spread premium?
13     A   Correct.
14     Q   Were there any other fees that your
15  commission -- that you derived commission from?
16     A   No.
17     Q   Okay.  And the remainder, the 30 percent
18  in the case of the origination and the YSP, and the
19  50 percent in the case of the processor's processing
20  fee, those amounts went to New Millennium?
21     A   They went to New Millennium, the house,
22  correct.
23     Q   Do you work closely with anybody else
24  besides Antoinette?
25     A   Arlene and Luce Maria.

ROGELIO A. ASTUDILLO,  AUGUST 10, 2006

Page 81

1    Q   Anybody else?
2    A   Olivia and Antoinette.
3    Q   Let's go back to some documents,
4  Mr. Astudillo, back to Exhibit 4 for a second.
5    A   Yes.
6    Q   Let's go to 28, page 28 of Exhibit 4.
7    A   Okay.
8    Q   Is this a document that you recognize?
9    A   Yes.
10    Q   What is it?
11    A   It's my certification from the state of
12  Illinois, provisional loan officer certification to
13  originate loans.
14    Q   This particular copy is marked "void."  Do
15  you see that?
16    A   Yes.
17    Q   Do you know why that is?
18    A   That's how it comes out to avoid, I
19  believe, fraud, to be able to duplicate these
20  certifications.  That's how the state makes them.  I
21  could be wrong but that's why.
22    Q   If you read on this one, it says "sign and
23  date below to terminate," and then it has a date,
24  handwritten date, 10/13/05 and then a signature.
25    A   Uh-huh.

Page 82

1    Q   Do you think this particular one is marked
2  void because it was terminated?
3    A   I don't know, sir.
4    Q   Okay.  Did you leave New Millennium
5  voluntarily?
6    A   Yes.
7    Q   Or were you asked to leave?
8    A   Voluntarily.
9    Q   And why did you leave?
10    A   I was relocating, moving to Texas.
11    Q   Okay.  And why did you want to relocate to
12  Texas?
13    A   To raise a family in a more slower-paced
14  community, to be able to afford a better education
15  for them without having them in a private school in
16  Chicago.
17    Q   Okay.  Let's turn to page 34 of Exhibit 4.
18  And this is a -- the document indicates that it's a
19  four-page document, but there are only -- I believe
20  there are only three pages here.
21    A   Okay.
22    Q   Okay?  Take a look at all three pages and
23  then I'll ask you some questions.
24    A   Okay.
25    Q   Is this a document that you recognize?

Page 83

1    A   Yes.
2    Q   And what is this document?
3    A   It's a residential loan application.
4    Q   And does it appear to be -- let me take
5  you to page 3.  Is that your signature at the bottom
6  of the page?
7    A   Correct.
8    Q   And is that your handwritten date?
9    A   Correct.
10    Q   Looking back to page 1, is any of the
11  handwriting on this page yours?
12    A   No, sir -- or yes.
13    Q   Which handwriting is yours?
14    A   The date of birth, years of school, the
15  years in property current residence, the -- in print
16  current employer's information.
17    Q   Mr. Astudillo, does this appear to be an
18  application for a loan from Guadalupe Navara to New
19  Millennium Mortgage Group Corp.?
20    A   The original application, yes.
21    Q   Did you prepare this application?
22    A   Yes.
23    Q   Do you recall when you prepared it?
24    A   About the 16th of March.  It's dated on
25  the application.

Page 84

1    Q   Do you have any independent recollection
2  of when you prepared it?
3    A   That, somewhere near that particular time
4  frame, correct.
5    Q   Okay.
6    A   Yes.
7    Q   And the services that you have provided,
8  the consultation that you provided to Ms. Navara
9  with First National and HUD, and the attorney, that
10  was provided earlier, correct --
11    A   Correct.
12    Q   -- that was -- those communications and
13  events described in your conversation log occurred
14  before you completed a loan application for New
15  Millennium for her?
16    A   Yes, sir.
17    Q   Let's turn to page 2 of the loan
18  application.
19    A   Okay.
20    Q   You see under Assets and Liabilities the
21  liabilities side?
22    A   Yes.
23    Q   There are three liabilities listed.  One
24  to First National, looks like it says First Nat.,
25  LACCCO.  Do you see that?

21 (Pages 81 to 84)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 85

1    A    Yes.
2    Q    And then there's a liability owed to First
3 Premier and a liability owed to Capital One. Do you
4 see that?
5    A    Yes.
6    Q    There's no liability listed on here to
7 ACS, is there?
8    A    Correct.
9    Q    And there's no liability listed on here to
10 Rogelio Astudillo, is there?
11    A    Correct.
12    Q    And let's look at page 3 of the loan
13 application. Do you see that under Assets and
14 Liability there are two properties listed?
15    A    Yes.
16    Q    Okay. And the combined value of those
17 properties given is 535,000?
18    A    Estimates, yes.
19    Q    Estimated. Where does it say estimated?
20 I'm sorry.
21    A    It doesn't.
22    Q    Okay.
23    A    But when you originate an application, you
24 take off -- you take the verbal information from the
25 client.

Page 86

1    Q    Okay.
2    A    So that's why it's an estimate.
3    Q    Very good. So Ms. Navara was in your
4 presence when you --
5    A    Correct.
6    Q    -- took this loan application?
7    A    Yes, sir.
8    Q    Okay. And you believe that was on
9 March 16th, 2004?
10    A    That sounds about right, yes.
11    Q    And the only encumbrance on the property,
12 according to the Asset and Liability schedule, is a
13 17,000-dollar mortgage or lien; is that correct?
14    A    That seems correct.
15    Q    Okay. So she had a lot of equity in the
16 property at this time?
17    A    It appears, yes.
18    Q    Actually, a lot of equity in both
19 properties.
20    A    Correct.
21    Q    And you see the loan amount is $37,000?
22    A    That is correct.
23    Q    Okay. And let's look at the very bottom.
24 Under the box to the right-hand -- the bottom right
25 corner of the page, it says "name and address of

Page 87

1 interviewer's employer." Do you see that?
2    A    Yes.
3    Q    Here it lists the Milwaukee address of New
4 Millennium.
5    A    That's the other address that I was trying
6 to remember that I mentioned to you earlier.
7    Q    But you didn't actually work in that
8 office?
9    A    No. This is apparently when New
10 Millennium had several offices. And when it came
11 about, I guess this is the address that the
12 processor was at.
13    Q    The phone number there underneath your
14 signature, was that the phone number for the Laramie
15 office where you worked?
16    A    I don't remember if -- that would --
17 probably would not be the phone number to the New
18 Millennium office in the Laramie office.
19    Q    Do you remember what the phone number for
20 the Laramie office was?
21    A    No, I don't.
22    Q    We may see it in the documents.
23    A    Okay.
24    Q    So if there's a document that refreshes
25 your recollection, please let me know.

Page 88

1    A    Okay.
2    Q    The next page -- actually, let's -- I'm
3 sorry. Let's go back to the loan application for a
4 second. I have a couple more questions. This
5 document contains printed information specific to
6 Ms. Navara and her property, right?
7    A    Yes.
8    Q    How is that information generated onto
9 this form?
10    A    It was typed in in the computer and based
11 on what the customer verbally gave.
12    Q    Did you type it in?
13    A    Yes.
14    Q    Why don't you describe your job duties as
15 a loan officer so that we have a better idea of your
16 background at New Millennium.
17    A    You contact customer, interview them, ask
18 what their reasoning for obtaining a mortgage loan
19 is, pull a credit report, input the information on
20 the application, assess the credit, the income and
21 the overall loan, decide what program they might
22 qualify for, and try to get a loan through a
23 particular bank with the credit criteria, financial
24 criteria, and so forth.
25    Q    Did the job ever involve performing

22 (Pages 85 to 88)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 89

1  closings as well?
2      A   Be present at closings, yes. I would
3  attend to all my closings.
4      Q   Did you have any other job duties at New
5  Millennium?
6      A   Collect documentation from customer,
7  follow up with customer, follow up with the
8  appraisal, sometimes order title, sometimes order
9  payoff to the mortgage, sometimes order verification
10  of income -- or employment, excuse me. I mean,
11  everything that the duty that the processor would
12  do, the loan officer should be able to do in case
13  that you would process your own loans.
14      Q   And did you process your own loans
15  sometimes?
16      A   Yes.
17      Q   You testified earlier that you believed
18  that Antoinette processed the majority of your
19  loans?
20      A   Correct.
21      Q   And you processed the remainder yourself?
22      A   Yes.
23      Q   Did you ever have to -- did you
24  communicate directly with lenders?
25      A   Yes.

Page 90

1      Q   Did you communicate directly with title
2  companies or closing agents?
3      A   Yes.
4      Q   Did you ever share processing tasks with
5  Antoinette when she was processing one of your
6  loans?
7          MS. BIESENTHAL: Objection, vague.
8      Q   (BY MR. HOFELD) Do you understand the
9  question?
10      A   Yes, I do.
11      Q   Okay.
12      A   Yes and no. In the sense that we --
13  generally if I started to process my own loan, I
14  would process my own loan. She might -- I might ask
15  her to get information for me, maybe order the title
16  or maybe follow up with the appraisal. And that's
17  what I mean.
18      Q   So if I understood you correctly,
19  sometimes you would start to process your own loan,
20  and then she would help you out with discreet tasks?
21      A   Minimal tasks, correct.
22      Q   Good. Thanks.
23          Mr. Astudillo, I'm going to ask you
24  about pages 37, 38, 39. I guess we can take each
25  one at a time so as not to get confusing. Let's

Page 91

1  look at 37 first. Is this a document that you're
2  familiar with?
3      A   Yes.
4      Q   What is this document?
5      A   This is an itemization of amount financed.
6  It's something like a good faith estimate.
7      Q   Okay. And is this a document that you
8  prepared?
9      A   Correct.
10      Q   And do you see the handwritten date at the
11  bottom of the page?
12      A   Correct.
13      Q   Is that your handwriting?
14      A   The date is mine, sir.
15      Q   Okay. And you see at the top in the top
16  left it says "creditor," and then it says "New
17  Millennium Mortgage Group Corp."?
18      A   Correct.
19      Q   Do you recall whether it was your
20  intention for New Millennium to make a loan to
21  Ms. Navara?
22      A   To broker the loan?
23      Q   No, to actually make the loan, to
24  originate it.
25      A   Yes. That's New Millennium, that's what

Page 92

1  they do. Is that your question?
2      Q   No. Maybe not. Let's look -- I'll ask
3  you again, the same question in a moment. Let's
4  look at 38.
5      A   Okay.
6      Q   Is this a type of document that you're
7  familiar with?
8      A   Yes.
9      Q   And what is this document?
10      A   It's called a Truth in Lending Disclosure
11  Statement.
12      Q   Okay. And is that your handwritten date
13  at the bottom of the page?
14      A   That is correct.
15      Q   Okay. Is this the preliminary Truth in
16  Lending Statement that you prepared in connection
17  with Guadalupe Navara's application to New
18  Millennium?
19      A   Correct.
20      Q   Okay. And you see again in the upper left
21  corner it says "creditor" and then it says "New
22  Millennium Mortgage Group Corp."?
23      A   Uh-huh.
24      Q   Now, going to the next page, 39, of
25  Exhibit 4, is this a type of document that you're

23 (Pages 89 to 92)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 93

1  familiar with?
2      A   Yes.
3      Q   What is this document?
4      A   It's called a good faith estimate.
5      Q   And do you see your handwritten -- do you
6  see your handwriting at the bottom of the page?
7      A   The date, yes.
8      Q   Okay.  And is this a document that you
9  prepared?
10     A   Correct.
11     Q   Okay.  And you believe you prepared this
12  document on the date indicated?
13     A   Correct.
14     Q   March 16, 2004?
15     A   Correct.
16     Q   Okay.  And do you recall where you were
17  with Ms. Navara at the time you prepared this loan
18  application?
19     A   She was in my office on 26th Street, 4329
20  West 26th Street.
21     Q   Okay.  So you were not in your office on
22  Laramie?
23     A   No, I was not.
24     Q   You were not at New Millennium?
25     A   No.  Correct.

Page 94

1      Q   Okay.  And you see on the good faith
2  estimate, again in the upper left-hand corner, it
3  says "lender" and it says "New Millennium
4  Mortgage Group Corp."?
5      A   Okay.
6      Q   Now, I'll come back to the question I was
7  trying to ask you.  The documents that we've
8  reviewed so far seem to indicate that the actual
9  lender, the entity that was going to make the loan
10  of money was New Millennium.  Do you agree?
11     A   Based on what your -- what's on here, yes,
12  I do, but that's not what it was.
13     Q   Okay.  Do you have any recollection
14  whether -- well, why do these documents say New
15  Millennium?  You prepared these documents.
16     A   Correct.
17     Q   So why is it -- why is the lender or the
18  creditor indicated as New Millennium?
19     A   That's the way the software is, sir.  The
20  software for the mortgage, that's how it was
21  prepared.  That's how it comes out when you input a
22  new application.  The software that New Millennium
23  uses is Genesis.  The name of the software is called
24  Genesis.  And that's how it has been.  I mean, it's
25  a pre-set software with the name of New Millennium

Page 95

1  Mortgage Group Corp. on it.
2      Q   Okay.  So is it your testimony that no
3  matter who the ultimate lender is going to be, the
4  initial application and the initial disclosures are
5  going to indicate New Millennium --
6      A   Yes.
7      Q   -- as the creditor or the lender?
8      A   Yes.
9      Q   And that was true for all of the loans
10  that you did?
11     A   Yes.
12     Q   All the loans that you were the loan
13  officer for?
14     A   Yes.
15     Q   Okay.  Mr. Astudillo, let's take a look at
16  39.  Do you recognize the handwriting on this page?
17     A   39?
18     Q   40.  Your 40.  I'm sorry.
19     A   Okay.  Yes.
20     Q   Whose handwriting is that?
21     A   That's mine.
22     Q   Okay.  And similarly on page -- your 41.
23     A   The numbers, yes.
24     Q   The handwritten numbers, you mean?
25     A   Yes.

Page 96

1      Q   Okay.  And do you recognize this document?
2      A   Yes.
3      Q   What is it?
4      A   It's a residential lease.
5      Q   Okay.  And who were the parties to the
6  lease?
7      A   The lessor and lessee, Guadalupe Navara,
8  and I can't read the name of the person.
9      Q   Okay.  Do you know why your handwriting is
10  on a lease between Ms. Navara and the other party
11  here?
12     A   Yes.
13     Q   Sergio Sanchez?
14     A   Sergio Sanchez, yes, I do.
15     Q   Why?
16     A   To prove her rental income.  She didn't
17  have and I gave her a lease.  She got it signed.
18  This is the information that Ms. Sanchez -- I mean,
19  Ms. Navara stated for us to prove her income.
20     Q   Okay.  Let's look at your 42 and your 43.
21     A   Okay.
22     Q   Is this a document that you recognize?
23     A   Yes.
24     Q   And what is this document?
25     A   It's a residential lease.

24 (Pages 93 to 96)

Page 97

1    Q   For a different property?
2    A   I believe so, sir.
3    Q   Let's see.
4    A   I don't know.
5    Q   Okay.  Well, take a look at it.  I want
6   you to always take the time you need to look at the
7   documents before you answer any questions.
8        So this is a lease for a different
9   property; is that right?
10   A   I believe so, yes.
11   Q   Okay.  It appears to be a lease for
12  2715 Kostner?
13   A   Yes.
14   Q   Okay.  Whereas the previous lease, the one
15  we previously looked at was for 2843 South Drake?
16   A   Yes.
17   Q   But the lease on pages 42 and 43 is a
18  lease between Guadalupe Navara and a person by the
19  name of Jesse Rodriguez?
20   A   It appears, correct.
21   Q   Okay.  Is the handwriting on page 1 of
22  this lease your handwriting?
23   A   Yes.
24   Q   And the handwriting on page 2 of the
25  lease, is it yours?

Page 98

1    A   The numbers, yes.
2    Q   Okay.  And, again, I'm talking about the
3   lease between Rodriguez and Navara, right?
4    A   Yes.
5    Q   And so you prepared this lease for
6   Ms. Navara?
7    A   Yes.
8    Q   Do you remember when you prepared this
9   lease?
10   A   On or about after the 16th of March, as
11  the process went along.
12   Q   And, finally, your pages 44 and 45 --
13  well, not finally.  I'm sorry.  Pages 44 and 45 of
14  Exhibit 4 appears to be another lease; is that
15  correct?
16   A   Correct.
17   Q   And it's another lease between Guadalupe
18  Navara and a person by the name of Garcia.  Do you
19  see that?
20   A   Yes.
21   Q   Okay.  Is that your handwriting on page 1
22  of the lease?
23   A   Yes.
24   Q   And how about the handwriting on page 2 --
25   A   Yes.

Page 99

1    Q   -- of this lease is yours?
2    A   Yes, sir.
3    Q   Did you prepare this lease for Ms. Navara?
4    A   For Ms. Navara, yes.
5    Q   And, again, you believe it was
6   approximately in March 2004?
7    A   Correct.
8    Q   Okay.  And page 46 and 47 of Exhibit 4, do
9   you recognize this document?
10   A   Yes.
11   Q   And what is it, please?
12   A   It's a residential lease.
13   Q   Between Guadalupe Navara and Armando
14  Guzman?
15   A   Correct.
16   Q   Do you recognize the handwriting on page 1
17  of the lease?
18   A   Yes.
19   Q   Whose is it?
20   A   It's mine.
21   Q   And does any of the handwriting on page 2
22  of the lease belong to you?
23   A   Yes.
24   Q   Could you identify it, please.
25   A   The dates -- the numbers, excuse me, and

Page 100

1   the N/A.
2    Q   Okay.  The numerals, the handwritten
3   numerals?
4    A   Yes.
5    Q   Okay.  This is also a lease that you
6   prepared for Ms. Navara?
7    A   Correct.
8    Q   Some time in March of '04?
9    A   In the process of it, correct.
10       THE WITNESS:  I hate to cut you off.
11  Could I take a break?
12       MR. HOFELD:  Oh, absolutely.  Do you
13  need to take a break?
14       THE WITNESS:  I'm sorry.
15       MR. HOFELD:  Definitely.
16       (Recess taken)
17   Q   (BY MR. HOFELD)  Mr. Astudillo, let's
18  look at -- I want to look at 48.
19   A   Correct.
20   Q   49, I'm sorry.  It appears to be a
21  partial -- appears to be one page of a multi-page
22  document.  But I want to ask you if that's your
23  signature at the bottom of the page.
24   A   49?
25   Q   Yes.

ROGELIO A. ASTUDILLO,  AUGUST 10, 2006

Page 101

1    A    Yes.
2    Q    And what about the handwritten dates on
3  the page?
4    A    Correct.
5    Q    Okay.  Let's look at 53 in Exhibit 4.  Are
6  you there?
7    A    Yes.  Just a quick note.
8    Q    Okay.
9    A    Page 49 should be part of page --
10  continuation page of 51, 52.  And page 53 is part of
11  page -- well, let me see.  Where is it at?  I don't
12  know where that other page would be.  53, I believe,
13  is -- seems to be the same.  I might be wrong.  I'm
14  sorry.  Go ahead.
15    Q    That's all right.  Looking at 53, is this
16  a document that you recognize?
17    A    Correct.
18    Q    What is this document?
19    A    This is a mortgage loan origination
20  agreement.
21    Q    Is it the agreement between New Millennium
22  Mortgage Corporation and Guadalupe Navara?
23    A    Yes.
24    Q    For a loan?
25    A    Yes.

Page 102

1    Q    Is that your signature in the bottom left?
2    A    Yes.
3    Q    And your handwritten date?
4    A    Correct.
5    Q    Mr. Astudillo, I'm looking at page 55,
6  Exhibit 4.
7    A    Okay.
8    Q    Is this a document that you're familiar
9  with?
10    A    Correct.
11    Q    What is this document?
12    A    It's called a Notice of Right to Cancel.
13    Q    And is that your handwritten date on the
14  bottom of the page?
15    A    Yes.
16    Q    Okay.  Did you provide this document to
17  Ms. Navara?
18    A    Yes.
19    Q    Was it provided on March 16, 2004?
20    A    Yes.
21    Q    Why did you provide this document on the
22  application date for the loan?
23    A    It's just part of the refinance
24  application.  That's the way New Millennium wants it
25  to be.

Page 103

1    Q    I see.  Mr. Astudillo, let's look at
2  documents 58 and 59 in Exhibit 4.
3    A    Okay.
4    Q    Is this a document that you recognize?
5    A    Yes.
6    Q    What is this document?
7    A    It's a Preferred Provider Service Notice.
8    Q    And what is its purpose?
9    A    Just to advise the customer of the
10  potential third party companies that would be
11  involved with their loan.
12    Q    Okay.  And is that your handwritten date
13  on the second page of this document?
14    A    Yes.
15    Q    Going back to page 1 of the document, one
16  of the entities listed there is Citywide Title.
17    A    Correct.
18    Q    What was the relationship between Citywide
19  Title and New Millennium, if any?
20    A    They are the company that provides the
21  title policy for New Millennium -- or one of the
22  companies.
23    Q    How many -- I think they are the only
24  title company listed on this disclosure in
25  Exhibit 4, aren't they?

Page 104

1    A    Yes, to my -- yes.
2    Q    Did New Millennium use Citywide Title for
3  title policy exclusively?
4    A    I did.  I originated this deal, yes.
5    Q    Oh, okay.  You personally used Citywide
6  Title exclusively on the loans that you handled?
7    A    Yes.
8    Q    I'm sorry.  The loans that you -- the
9  loans for which you were the loan officer, you
10  always used Citywide Title?
11    A    Correct.
12    Q    And you used them -- go ahead.  I'm sorry.
13    A    With the correction of a purchase.  This
14  is the title policy that I used for refinance
15  purposes, refinanced loans.
16    Q    So let me clarify the question.  So for
17  those refinanced loans for which you were the loan
18  officer, you always used Citywide Title as the title
19  insurer?
20    A    Yes.
21    Q    Did you also always use them to close
22  refinanced loans?
23    A    Yes.
24    Q    So they were the closing agent on those
25  loans?

26 (Pages 101 to 104)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 105

1    A    Yes.
2    Q    And, again, those are loans that you were
3    the loan officer for, correct?
4    A    Yes.
5    Q    And who did you have a relationship with
6    at Citywide Title, do you recall?
7    A    As far as what, sir?
8    Q    Well, if you used Citywide -- did you
9    communicate with Citywide Title?
10    A    Yes.
11    Q    And you communicated with them directly to
12    order the title insurance, yes?
13    A    Yes.
14    Q    Did you communicate with them directly to
15    order title search?
16    A    Yes.
17        MS. BIESENTHAL: Objection, leading.
18    Q    (BY MR. HOFELD) Did you communicate
19    directly with them to set up closing?
20    A    Yes.
21    Q    And these communications involved phone
22    conversations with certain persons at Citywide
23    Title?
24    A    Phone, fax, and e-mail.
25    Q    Okay. So you also sent documents to

Page 106

1    Citywide Title?
2        MS. BIESENTHAL: Again, these
3    questions are leading.
4        THE WITNESS: Yes.
5    Q    (BY MR. HOFELD) And when you had phone
6    conversations with them or when you were faxing
7    documents, were there particular individuals at
8    Citywide Title that you would deal with?
9    A    Yes.
10    Q    Do you recall who they were?
11    A    They varied depending on the department.
12    Q    Sure.
13    A    Title policy was ordered through a fax,
14    nobody in particular. Closing was with the closing
15    department and whoever was at that particular
16    department that particular day or week or month,
17    whoever was employed.
18    Q    Sure.
19    A    Specific name, don't -- they have changed.
20    I mean, I've dealt with, I believe -- I want to say
21    with maybe Rosie, I think. There's a young lady by
22    the name of Rosie. Funding department, you know, if
23    I start naming names, I'm going to be giving you the
24    wrong information, and I'd rather not do that.
25    Q    So you said you dealt with Rosie in the

Page 107

1    closing department?
2    A    At the closing department, setting up
3    closings.
4    Q    Do you recall the names of any other
5    individuals that you dealt with at Citywide Title?
6    A    There was a Kayla. There was, I believe,
7    I want to say Mark for some reason. I didn't know
8    you were going to ask me these questions. I would
9    have -- that's as far as I can remember as far as
10    names.
11    Q    Okay.
12    A    If you need me, I could get a list based
13    on my files and --
14    Q    Thanks for the offer. I appreciate it.
15        Did you deal with Citywide Title
16    prior to going to work for New Millennium?
17    A    Yes.
18    Q    You worked with them when you were at
19    Citywide -- I mean, at --
20    A    Reyes Mortgage.
21    Q    At Reyes Mortgage?
22    A    Yes.
23    Q    Did you use Citywide for anything when you
24    were at Worldwide Mortgage?
25    A    No.

Page 108

1    Q    What did you use them for when you were at
2    Reyes Mortgage?
3    A    Same thing, ordering title policies, title
4    searches. They would do the closings for our loans.
5    Q    Did the loan officers at New Millennium
6    have some choice in the matter of who they would
7    select as the closing agent for loans that they
8    were --
9    A    I don't know, sir.
10    Q    Okay. But what I'm trying to ask is: Did
11    you select Citywide Title for your loans, or did New
12    Millennium select Citywide Title for you?
13    A    Citywide Title was doing business with New
14    Millennium through my contact, so I selected them.
15        MR. HOFELD: Could you read that
16    back, please.
17        (The record was read as requested.)
18    Q    (BY MR. HOFELD) Do you mean that they
19    started doing more business -- that New Millennium
20    started doing more business with Citywide Title when
21    you came to work for New Millennium?
22    A    Because of my loans, just for me
23    personally, my personal experience, yes. I don't
24    know what the overall percentage was or business
25    that New Millennium was doing with Citywide prior to

27 (Pages 105 to 108)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 109

1　me being there or not because I had that contact
2　through Reyes Mortgage before.
3　　　Q    Were other loan officers at New
4　Millennium, if you know, also using Citywide Title
5　to close loans?
6　　　A    I don't know, sir.
7　　　Q    Okay.  Did they have a -- who did you say
8　you dealt with in the funding department at Citywide
9　Title?
10　　　A    Kayla.  There was a Kayla.
11　　　Q    Kayla?
12　　　A    Kayla -- that's all -- Kayla is just the
13　name.  The last name I don't remember.
14　　　Q    Do you know how to spell her first name?
15　　　A    K-A-Y-L-A.
16　　　Q    Okay.  Did they have a disbursement
17　department or was that the same?
18　　　A    She was the disbursement and the funding
19　department all in one.  That's my contact that I
20　dealt with.
21　　　Q    Okay.  Do you recall the names of any of
22　the people that you dealt with at Citywide in
23　connection with the Navara loan?
24　　　A    With the Navara loan.  I know that there's
25　the possibility of Rosie.  The disbursement

Page 110

1　department, I don't remember the exact name, but I
2　know that I have them and I could provide them for
3　you.  I just don't have them.
4　　　Q    Where would you look in order to find
5　them?
6　　　A    I guess it would be in the loans that --
7　the loan file that New Millennium would have, it
8　would be under.  So if they provided that for you,
9　it might be under who was the contact person.
10　　　Q    Well, if you see any information in the
11　documents, in later documents, if you see any
12　information in documents that you look at later that
13　refreshes your memory about who you dealt with at
14　Citywide Title for the Navara loan, please let me
15　know.
16　　　A    Yes, I will.
17　　　Q    Mr. Astudillo, looking at pages 65 and 66
18　in Exhibit 4, are you looking at that document?
19　　　A    65, yes.
20　　　Q    Is this a document that you recognize?
21　　　A    Yes.
22　　　Q    What is it, please?
23　　　A    It says Borrower Tangible Benefit
24　Disclosure.
25　　　Q    Okay.  Do you recognize the handwriting on

Page 111

1　this document?
2　　　A    Page 65, it's mine.
3　　　Q    On page 65 where there's a checkmark next
4　to where it says "other benefits," and then the
5　handwritten print reads "buyout; foreclosure, and
6　pay other personal bills."
7　　　A    Uh-huh.
8　　　Q    This doesn't indicate that there was going
9　to be any cash out to the borrower, does it?
10　　　　　MS. BIESENTHAL:  Objection, leading.
11　　　　　THE WITNESS:  Yes, it does.
12　　　Q    (BY MR. HOFELD)  Where does it indicate
13　that?
14　　　A    "X."  Where it says "X," "I/we will
15　receive cash back from the new loan to pay certain
16　required expenses."
17　　　Q    Oh, okay.  Do you know what it means by
18　"required expenses"?
19　　　A    It's just a general form that the system
20　generates, sir.
21　　　Q    You don't know what it refers to?
22　　　A    Certain expenses?
23　　　Q    Yeah.
24　　　A    For Ms. Navara?
25　　　Q    Yeah.

Page 112

1　　　A    No, sir, not any particular expenses.
2　　　Q    Or in general what that means, certain
3　required expenses?
4　　　A    No, I don't know, sir.
5　　　Q    Okay.  Let's look at 67, Exhibit 4.  Take
6　a moment to look over this document.
7　　　A    Okay.
8　　　Q    Is this a document that you recognize?
9　　　A    Yes.
10　　　Q    What is this document, please?
11　　　A    I believe this is a closing -- or it's
12　called a mortgage document order request form.
13　　　Q    Okay.  Do you recognize the handwriting on
14　this page?
15　　　A    Yes.
16　　　Q    Whose handwriting is it?
17　　　A    It's Antoinette's.
18　　　Q    And the general -- this appears to be a
19　form document of Long Beach Mortgage.  Do you see
20　that at the top?
21　　　A    Yes.
22　　　Q    Okay.  This is the first document we've
23　come across so far that indicates any involvement by
24　Long Beach in Ms. Navara's loan; is that correct?
25　　　A    Yeah.  This is correct.

28 (Pages 109 to 112)

Page 113

1    Q   And do you see the date on this document
2  is 4/29/04?
3    A   Yes.
4    Q   Do you know at what point a decision was
5  made for Long Beach to be the lender for Ms. Navara?
6    A   It had to be somewhere in March when the
7  file was submitted. For the record, this document
8  should have been -- this was presented at the time
9  of the loan to be closed, so this is out of order.
10    Q   Right. And you're talking about page 67?
11    A   Correct.
12    Q   Okay. Right. Do you see at the top, in
13  the top left of page 67, it says "attention," it
14  looks like it says "Roger"?
15    A   Correct.
16    Q   Do you believe that refers to you?
17    A   It does refer to me, sir.
18    Q   And also under -- it also says "attention"
19  in print and then in handwriting it says "Roger."
20    A   Yes.
21    Q   Do you have any recollection of the
22  communications that you had -- well, first of all,
23  you testified earlier that one of your duties as a
24  loan officer was to communicate -- was to contact
25  lenders to find loan programs that an applicant to

Page 114

1  New Millennium might qualify for.
2    A   Yes.
3    Q   And did you -- were you the one who
4  actually contacted the lenders?
5    A   Yes.
6    Q   Okay. And do you have any recollection of
7  having communicated with Long Beach in connection
8  with the Navara loan?
9    A   Yes.
10    Q   And the processing of that loan?
11    A   Yes, sir.
12    Q   Do you recall who you talked to?
13    A   The first contact would have been Michael
14  O'Brian, the account executive for Long Beach
15  Mortgage.
16    Q   Why would he have been your first contact?
17    A   He's my account representative. He's the
18  salesperson, if you may, for Long Beach. He's the
19  person that would come to our company and offer Long
20  Beach's services and programs.
21    Q   And when you say he would come to the
22  company, what do you mean?
23    A   He would come to our offices and visit and
24  bring any specials that Long Beach was having that
25  particular month and just point of sale, point of

Page 115

1  contact.
2    Q   How often did he come to the office?
3    A   Not often. It was mostly communications
4  through phone with him.
5    Q   How often would he call?
6    A   He would call -- we would be in contact
7  with him maybe seven, eight -- say ten times minimum
8  out of the month. Quite often.
9    Q   And what was the purpose of those phone
10  calls?
11        MS. BIESENTHAL: Objection,
12  foundation.
13        THE WITNESS: Offering sales,
14  services, promotions, new programs, any specials
15  they would be running that particular month for the
16  rates, just sales calls.
17    Q   (BY MR. HOFELD) And were these sales
18  calls, were they made to you in particular?
19    A   To my cell phone, yes.
20    Q   To your cell phone?
21    A   Yes.
22    Q   Do you know if anybody else received those
23  kinds of sales calls from Mr. O'Brian?
24    A   I would be assuming the rest of the loan
25  officers and maybe processors for New Millennium.

Page 116

1    Q   Okay. And how do you know that?
2    A   Personal experience. I've seen them in
3  the office talking to them and also calling and
4  asking for them, returning calls from the processor.
5    Q   They told you they were returning calls
6  from --
7    A   Yes.
8    Q   -- New Millennium's salesperson?
9    A   Processors.
10    Q   Processors?
11    A   When he would come into the office, he
12  would also talk to other loan officers.
13    Q   Okay. And how frequently or infrequently
14  did he actually visit in person?
15    A   Frequently. To the New Millennium in
16  Laramie, I couldn't say an exact number. I want to
17  say maybe, like I said, ten times, maybe, minimum
18  out of the month, maybe more because I wasn't always
19  in the New Millennium office, so I couldn't say a
20  specific number.
21    Q   Sure. But when you talk about ten times
22  per month, that's the approximate number of visits,
23  personal visits, by Mr. O'Brian per month?
24    A   Yes.
25    Q   And this was going on during March and

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 117

1    April and May of 2004?
2        A    Yes.
3        Q    And these visits were to the Laramie
4    office?
5        A    To my office also on 26th Street, because
6    that's where I would be sometimes, and I would meet
7    him, we would have lunch, I believe also to the
8    Milwaukee office. So it just -- in general, the
9    amounts is what I mean.
10       Q    How often did he come by your office on
11   26th Street?
12       A    That wasn't often. It was maybe once in a
13   blue moon, once in a very long time.
14       Q    Okay. How many times total do you think
15   it occurred?
16       A    Maybe three times.
17       Q    And you had lunch with him on those
18   occasions?
19       A    Yes.
20       Q    Did he take you out?
21       A    It was a mutual --
22           MS. BIESENTHAL: Objection, vague.
23           THE WITNESS: It was mutual. We
24   would go to lunch together.
25       Q    (BY MR. HOFELD) Sure. Who would pay?

Page 118

1        A    We would pay our own separate meals.
2        Q    Do you remember when those visits
3    occurred, the ones to your office on 26th Street?
4        A    Honestly, I don't. They were sporadic so
5    I couldn't say.
6        Q    Sure.
7        A    2003. A couple in -- maybe one in 2004.
8    I can't say it was in March or February or anything
9    like that, but through the year.
10       Q    Sure. What did you and Mr. O'Brian
11   discuss when you had lunch with him?
12       A    Several --
13           MS. BIESENTHAL: Objection,
14   foundation.
15           THE WITNESS: Many different topics,
16   personal, health, family, work, a mix, a variety of
17   conversations, topics.
18       Q    (BY MR. HOFELD) Where did you guys have
19   lunch?
20           MS. BIESENTHAL: Same objection.
21           THE WITNESS: Local restaurants, I
22   mean, fast food places, taquerias, which is Mexican
23   restaurants.
24       Q    (BY MR. HOFELD) What was the name of it
25   again?

Page 119

1        A    There is no name.
2        Q    I thought you mentioned a name of a
3    restaurant.
4        A    Taquerias, which is -- that's another name
5    for taco stands, taco restaurants.
6        Q    And why did the two of you have lunch
7    together?
8           MS. BIESENTHAL: Objection,
9    foundation.
10          THE WITNESS: It was my previous
11   comment or statement, I'm sorry, just to catch up on
12   business, work. I mean, business, family, health,
13   just he would come by the office and go have some
14   lunch.
15       Q    (BY MR. HOFELD) Yeah. What kind of
16   business did you discuss?
17       A    Mortgage business.
18       Q    What specifically about mortgage business?
19       A    Their programs, their specials, just
20   basically their particular loan programs that they
21   would carry, the rates that they would have, as I
22   mentioned, any new programs that were coming about
23   in the future. That's it.
24       Q    So those were all things that he was
25   communicating to you?

Page 120

1        A    Yes.
2        Q    So he did most of the talking at your
3    lunches?
4           MS. BIESENTHAL: Objection, leading.
5           THE WITNESS: No, sir.
6        Q    (BY MR. HOFELD) Do you recall dealing
7    with anybody else at Long Beach? Can you recall
8    anybody else that you talked to over the phone?
9        A    Yes, the processor. I don't know if
10   that's the right name for him, but it's equivalent
11   to a processor. It was the person that was having
12   the file and collecting the information that we were
13   sending to them. And then I believe it would have
14   been the closer, in this case it's Rick. That's it.
15       Q    Let's back up for a second. You said you
16   dealt with someone who is the equivalent of a
17   processor?
18       A    Correct.
19       Q    Do you remember that person's name?
20       A    I believe it was -- gee whiz. I knew you
21   were going to ask me that. For some reason, I want
22   to say Guadalupe. Maybe I'm wrong there. Or I
23   think for Ms. Navara's particular file -- no,
24   actually, it would be Rick Patel because he was a
25   processor.

Page 121

1    Q   Okay.  So you had phone conversations with
2  Rick Patel?
3    A   Yes.
4         MS. BIESENTHAL:  Objection,
5  foundation.
6    Q   (BY MR. HOFELD)  And when you said Rick
7  Patel and you pointed to a document, were you
8  pointing to page 67 in Exhibit 4?
9    A   Yes.  I'm sorry.
10   Q   And did you mean to indicate at the top
11  where in handwriting it says "Rick P."?
12   A   Yes.
13   Q   And when you talked with Rick Patel, what
14  kind of things did you discuss with him?
15        MS. BIESENTHAL:  Objection,
16  foundation.
17        THE WITNESS:  It was business,
18  requesting documentation, status of file, process,
19  you know, of where the file was at with Long Beach
20  Mortgage.
21   Q   (BY MR. HOFELD)  Sure.  Did you ever have
22  lunch with him?
23   A   No.
24   Q   Did he ever visit your office at New
25  Millennium?

Page 122

1    A   No.
2    Q   Or your office on 26th Street?
3    A   No.
4    Q   Did you ever meet him in person?
5    A   No.
6    Q   And so is it correct that the phone
7  conversations you had with Mr. Patel, Rick Patel,
8  were during the course of your business as a loan
9  officer at New Millennium?
10   A   For this particular file, yes.  They had
11  other processors.
12   Q   Was he the processor at Long Beach you
13  dealt with for other loans as well?
14   A   Yes.
15   Q   How many Long Beach loans did you broker
16  when you were at New Millennium?
17   A   Oh, my goodness.  Sorry.  An exact number,
18  I don't know, sir.  I don't have a -- roughly, I
19  want to say maybe 20, maybe more.  It might be a
20  little bit less.  I never kept track of that.
21   Q   In 2004 do you have any idea what
22  percentage of the loans you originated were Long
23  Beach loans?
24   A   I want to say between 35 percent, 40
25  percent maybe.  I might be off a lot, so I'm just

Page 123

1  giving you a rough estimate.
2    Q   I understand.  We understand.  And do you
3  know about how many loans you originated in 2004
4  total?
5    A   Total?
6    Q   Yes.
7    A   Maybe 40, maybe more.  I don't know.  I
8  could also get you that record.
9    Q   Where would you go to get that record?
10   A   I could call New Millennium Mortgage and
11  get that information from them.
12        (Recess taken)
13   Q   (BY MR. HOFELD)  Mr. Astudillo, let me
14  ask you a couple more questions about document 67
15  there in Exhibit 4.  You see about a quarter of the
16  way down the page it says "closing company name" and
17  it says "Citywide Title Corporation" in handwritten
18  print?
19   A   Uh-huh.
20   Q   And then underneath that a couple of lines
21  down it says "contact," colon and it says -- I
22  believe it says Rosie Delgado.
23   A   Yes.
24   Q   Is that the Rosie that you referred to who
25  was in the closing department at Citywide Title?

Page 124

1    A   Yes.
2    Q   So Delgado is the last name -- is Rosie's
3  last name, right?
4    A   I'm assuming it is, yes.  It's the same
5  Rosie.
6    Q   Does that sound familiar?
7    A   Yes.
8    Q   You see No. 6 on the page that says
9  "delivery type"?
10   A   Uh-huh.
11   Q   And then you go across the various
12  options, the last one says Fed Ex.
13   A   Yes.
14   Q   And then to the right of that there's a
15  note that says, "Roger will pick up file."
16   A   Yes.
17   Q   What file was being referred to there, if
18  you know?
19   A   The file would be referring to
20  Ms. Navara's file, the closing file that would have
21  been delivered to Citywide from Long Beach Mortgage,
22  which would have been the closing instructions and
23  the closing documents.
24   Q   Okay.  So this appears to -- would you
25  agree with me that this appears to indicate that you

31 (Pages 121 to 124)

Page 125

1  were going to pick up the closing file from Citywide
2  Title?
3      A   No, from Long Beach.
4      Q   Do you recall whether you, in fact, picked
5  up the loan file?
6      A   Yes, I did.
7      Q   Excuse me.  The closing file?
8      A   Yes, I did.
9      Q   Where did you pick it up from?
10     A   From Long Beach, wherever their address
11  is.  I want to say it's -- I don't know, if we go
12  along the line and see the address for Long Beach.
13  I picked it up at their office.  It was in a suburb,
14  Woodfield, I want to say, Woodfield, Illinois, and I
15  delivered it to Citywide Title so they could prepare
16  their documents for closing.
17     Q   Why weren't they simply -- why weren't
18  they simply Fed Exed?
19     A   It was just too late in the evening for
20  the loan to -- when it got clear to close and Fed Ex
21  was already -- it had gone out.  It wouldn't have
22  been delivered until the next following day.  I
23  believe it would have been the 29th.  I don't know
24  if that was the last day of the month.  I don't have
25  a calendar in front of me, but that's why it would

Page 126

1  have happened, to try to close it the same
2  particular day.
3      Q   Do you have a recollection of the Navara
4  closing?
5      A   Yes.
6      Q   What do you recall?
7      A   The closer closing her loan.  For
8  convenience factor, they closed her in my office on
9  26th Street, 4329 West 26th Street, Chicago,
10  Illinois 60623.
11     Q   If you recall -- do you recall anything
12  else about the closing?
13     A   It was a late evening closing.
14     Q   Excuse me?
15     A   It was a late evening closing.
16     Q   Okay.  Do you recall what time?
17     A   I would say 7:30, 8 o'clock, maybe.
18     Q   Was anybody else present?
19     A   Besides the closer and Ms. Navara?
20     Q   Yes.
21     A   And myself?  No.
22     Q   Who was the closer?
23     A   I saw his name.  His name is -- it's a
24  gentleman.  I'm trying to remember his name.  I
25  can't remember his name.  Rafael is his first name,

Page 127

1  and I don't recall his last name.
2      Q   And your testimony is that he was present
3  in person at the closing?
4      A   He was the closer, correct.
5      Q   In your office?
6      A   Yes, sir.
7      Q   I know he may have been the closer, but
8  your testimony is also he was present in your office
9  when the Navara loan was closed?
10     A   Yes, sir.
11     Q   Correct?
12     A   That's correct, sir.
13     Q   Do you recognize the signature at the
14  bottom of page 67?
15     A   Yes.
16     Q   Whose signature is that?
17     A   Antoinette Berzin's.
18     Q   Okay.  Let's look at page 68.  Is this a
19  document that you recognize?
20     A   Yes.
21     Q   What is it?
22     A   A summary of debts and disbursements.
23     Q   Okay.  It appears to be the summary of
24  debts and disbursements compared in connection with
25  the Long Beach loan to Ms. Navara brokered by New

Page 128

1  Millennium; is that correct?
2      A   That is correct.
3      Q   Do you see your handwriting anywhere on
4  this page?
5      A   No, sir.
6      Q   Okay.  And let's look at the creditors and
7  debts.  There's one to First National, which, if you
8  recall, was also listed on the March 16th loan
9  application that you completed with Ms. Navara.
10     A   Yes.
11     Q   There's a creditor, Capital One.
12     A   Yes.
13     Q   That was also a debt listed on the initial
14  loan application, correct?
15     A   Yes.
16     Q   And First Premiere is a creditor here.
17  They were also on the loan application, correct?
18     A   That is correct.
19     Q   Then there's a debt to -- a creditor by
20  the name of ACS Consulting.  Is that your company?
21     A   Yes, sir.
22     Q   And that debt appears to be in the amount
23  of -- well, the balance owing on the debt, according
24  to this page 68, was $24,000.
25     A   That is correct.

32 (Pages 125 to 128)