# Exhibit 13,
# Part 2

Page 129

1      Q    And the next column indicates a payoff to
2    ACS Consulting in the amount of $24,000.
3      A    That is correct.
4      Q    Okay.  Why was this debt not listed on the
5    initial loan application that you completed for
6    Ms. Navara?
7      A    Because in the original loan application,
8    we were -- I was not aware through the process of
9    application that when a customer is in foreclosure,
10   they can't cash out.  So this came about after
11   the fact of the application.
12     Q    Mr. Astudillo, page 68 indicates that the
13   debt in the amount of $24,000 was a debt that was
14   owed to ACS Consulting.  And this is a summary of
15   debts and disbursements, which indicates the
16   creditors that were going to receive disbursements.
17   This document -- do you see anywhere on this
18   document where it indicates that Ms. Navara was
19   going to receive some cash?
20     A    No.  Not on this one, no, sir.
21     Q    At the time that you took Ms. Navara's
22   loan application on March 16 of 2004, she owed,
23   according to your -- in your mind, she owed ACS some
24   money; is that correct?
25     A    At the time of application?

Page 130

1      Q    Yes.
2      A    Yes, there was.
3      Q    Had she paid any money to ACS at that
4    time?
5      A    No, sir.
6      Q    Or before that time?
7      A    No, sir.
8      Q    Okay.  And you testified earlier that the
9    services you provided were all provided prior to the
10   time the loan application was completed, correct?
11     A    That is correct.
12     Q    So why did that March 16 loan application
13   not include or not list any debt owing to ACS?
14     A    Because there was -- that amount of money
15   of 24,000 was not actually what was owed to ACS.
16     Q    What amount of money was owed to ACS?
17     A    It was $8,000.
18     Q    And why was that $8,000 not listed on the
19   loan application that you prepared?
20     A    Because she was going to pay me out of her
21   cash proceeds.
22     Q    She was going to pay --
23     A    ACS Consulting out of her cash proceeds
24   from her refinance of her house.
25     Q    Okay.  And are there any documents that

Page 131

1    you have in your possession that substantiate that?
2      A    Can you --
3      Q    Did you have any written agreement with
4    Ms. Navara?
5      A    No, sir.  It was all verbal.
6      Q    Okay.  Mr. Astudillo, did you provide
7    information to Long Beach regarding this
8    24,000-dollar debt to ACS Consulting?
9      A    A payoff letter, yes.
10     Q    Why did you indicate to Long Beach that
11   the $24,000 was going to be paid as a debt to ACS?
12     A    So Ms. Navara could get her money out of
13   her proceeds.
14     Q    But if the agreement -- you say the
15   agreement between you and Ms. Navara was for her to
16   take cash out to pay ACS?
17     A    Yes.
18     Q    Okay.  So why wasn't this just indicated
19   as cash out?  Why was it instead indicated as a debt
20   owed to ACS?
21     A    Because, as I mentioned earlier, Long
22   Beach policies for refinance where the customer is
23   in foreclosure cannot take cash out.  And Long
24   Beach's minimum loan amount is $50,000.  Otherwise,
25   the loan would not be done.

Page 132

1      Q    So you disguised the fact that she was
2    going to get cash out by representing this as a debt
3    to ACS?
4      A    To help Ms. Navara, yes.  Yes.
5      Q    Did Long Beach -- was Long Beach aware of
6    your --
7      A    No, sir.
8      Q    -- arrangement?
9      A    No, sir.
10     Q    Excuse me.  I'm sorry.  Just for the
11   record, was Long Beach aware of your arrangement
12   with Ms. Navara?
13     A    No, sir.
14     Q    And you disguised the fact that she was
15   going to get cash out as a debt owing to ACS so that
16   Long Beach would approve the loan, correct?
17     A    Can you clarify the first part?
18     Q    Sure.  You represented a debt to ACS
19   instead of as cash out to Ms. Navara in your
20   communications with Long Beach so that she would be
21   approved for the loan, correct?
22     A    Correct, yes.
23     Q    And you also wanted to get paid; is that
24   right?
25     A    For my services through ACS, yes.

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 133

1    Q    And it was also a way for you to get paid
2  in view of Long Beach's policy of not allowing cash
3  out when they refinance a foreclosure.
4    Q    Can you clarify that?
5    Q    Sure.  If you had indicated to Long Beach
6  that Ms. Navara was going to get cash out, Long
7  Beach would not have approved the loan because of
8  their policy that the borrower can't get cash out on
9  a foreclosure, correct?
10   A    No.  The policy is the minimum loan amount
11 has to be $50,000.
12   Q    Right.  That I understand.
13   A    And they can't take out any cash.
14   Q    Correct.
15   A    When they are in foreclosure, yes.
16   Q    Correct.  Okay.  So my question to you is:
17 Disguising money that she was going to repay you out
18 of her cash as a debt to ACS rather than as cash out
19 was a way to get around Long Beach's policy?
20   A    Yes.
21   Q    Mr. Astudillo, if you could turn, please,
22 to page 69 -- excuse me, page 70.
23   A    Okay.
24   Q    Is this a document you recognize?
25   A    Yes.

Page 134

1    Q    What is it, please?
2    A    It's a mortgage loan commitment.
3    Q    Is it a mortgage loan commitment for a
4  loan to Guadalupe Navara?
5    A    I believe -- yes.
6    Q    And is that your signature at the bottom?
7    A    No.
8    Q    Okay.  Do you know whose signature it is?
9    A    No.
10   Q    It's your name, though, the signed name is
11 your name, correct?
12   A    That is correct.
13   Q    But you don't believe that is your
14 signature?
15   A    I know that's not my signature.
16   Q    And why not?
17   A    Because I know my signature.
18   Q    Do you know who would have signed your
19 name?
20   A    No, sir.
21   Q    Do you know if you authorized anyone to
22 sign your name?
23   A    No, sir.
24   Q    You see the date that this document was
25 prepared in the upper right?

Page 135

1    A    Yes.
2    Q    It says April 23rd, 2004.
3    A    Correct.
4    Q    And it indicates above that the lender is
5  New Millennium.
6    A    Yes.
7    Q    Do you see that?
8    A    Yes.
9    Q    Does this indicate to you that the loan --
10 that Long Beach was not yet involved in the process
11 of making a loan to Ms. Navara?  That's a bad
12 question.  Strike that.
13        Was Long Beach -- does this indicate
14 that Long Beach didn't become Ms. Navara's lender
15 until after April 23rd, 2004?
16   A    No.
17   Q    Why does this document, if you know, refer
18 to the lender as New Millennium?
19   A    As I stated earlier, the software that
20 they use apparently has the verbiage of lender
21 already on there, and the broker's name goes on
22 there.  I don't know why the software is that way.
23   Q    But I thought you testified that that was
24 true of initial disclosures, preliminary
25 application, preliminary GFE, and preliminary TILA.

Page 136

1    A    Correct.
2    Q    The date of this document is April 23,
3  2004, six days before the loan closing, according to
4  the documents.
5    A    Correct.
6    Q    And this document still says New
7  Millennium.  It doesn't say Long Beach.
8    A    Yes.
9    Q    So I guess I'm a little confused.  If Long
10 Beach was the lender at this point, why wouldn't
11 this document, the mortgage loan commitment,
12 indicate Long Beach as the lender?
13   A    I don't know why.  This is not a document
14 that I prepared, sir.
15   Q    And that handwriting on the right side
16 near the top?
17   A    That's not mine.
18   Q    That's not yours?
19   A    (Nodding)
20   Q    Okay.  Thanks.
21        Mr. Astudillo, I'm going to ask you
22 to look at pages 73 through 75 of Exhibit 4.  Is
23 this a document that you recognize?
24   A    Yes, sir.
25   Q    And what is it, please?

34 (Pages 133 to 136)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 137

1    A   It's a uniform residential loan
2 application.
3    Q   Okay.  On page 3 of the document, is that
4 your signature at the bottom?
5    A   Yes, that's my signature.
6    Q   Okay.  And the phone number there, whose
7 phone number is that?
8    A   I believe that would be New Millennium's
9 office in Laramie -- on Laramie.
10    Q   You believe that's the Laramie phone
11 number?
12    A   I believe that looks familiar.
13    Q   And to the right indicates a Bryn Mawr
14 address for New Millennium.
15    A   Okay.
16    Q   But that wasn't -- do you see that?
17    A   Yes.
18    Q   But that's not where you worked; is that
19 right?
20    A   Well, I guess this is where this software
21 came from or address where the New Millennium office
22 is at, as I mentioned to you --
23    Q   Right.
24    A   -- they have several -- or in this case,
25 they had three offices.

Page 138

1    Q   Let me ask a more clear question
2 hopefully.  You didn't work at the Bryn Mawr office,
3 did you?
4    A   Yes, I did.  I originated some loans
5 through Bryn Mawr.
6    Q   Were you actually physically located at
7 the Bryn Mawr office at any point?
8    A   I personally was not.
9    Q   Okay.  You were always located at the
10 Laramie office?
11    A   I was always -- that's where -- yes.
12    Q   Okay.  Now, looking at page 2 of this --
13 well, first of all, did you prepare this loan
14 application?
15    A   I believe so, yes.
16    Q   Okay.  And looking at page 2 of this
17 application under liabilities --
18    A   Yes.
19    Q   -- there is a debt listed to ACS
20 Consulting.  Do you see that?
21    A   Yes.
22    Q   Why is it listed here and not on the
23 original loan application that you completed with
24 Ms. Navara?
25    A   Because this application preceded the

Page 139

1 original one after Long Beach and several other
2 lenders stated that the minimum loan amount could
3 only be 50,000, and they could not -- customer could
4 not take cash out when they would be in
5 foreclosure -- or when they were in foreclosure.  So
6 this came right after that original application --
7 or not right after, but preceding prior to the
8 actual closing.
9    Q   So to put it in different words, you had
10 to make it look like she had close to $50,000 worth
11 of debt in order for her to get the loan?
12    A   Correct.
13    Q   Mr. Astudillo, why does this loan
14 application say $26,000 as the amount of the debt
15 owing to ACS, and the disbursement sheet that we
16 looked at a couple of minutes ago says $24,000?
17    A   I believe that's to make the numbers
18 coincide in the actual amount of 50,000 after all
19 the debts were disbursed, such as the real estate
20 taxes, insurance, and the payoffs to the mortgages.
21    Q   The numbers had to work out, in other
22 words?
23    A   Equal $50,000, correct.
24    Q   And, Mr. Astudillo, on page 3 of the loan
25 application, looking at the schedule of real

Page 140

1 estate --
2    A   Yes.
3    Q   -- it indicates a value, combined value of
4 Ms. Navara's two properties of 450,000.  Do you see
5 that?
6    A   That is correct.
7    Q   Was that the -- well, let me strike that.
8        The value for the Kostner property is
9 listed as 165,000.  Do you see that?
10    A   Yes.
11    Q   And do you recall if that was the final
12 amount arrived at after the appraisal was performed?
13    A   I believe that was -- prior to the
14 appraisal, it was something like of a verbal based
15 on comparable searches in the area after speaking to
16 the appraiser.
17    Q   Okay.  And, again, you prepared this loan
18 application by typing information into the computer
19 at New Millennium?
20    A   Yes, correct.
21        MR. HOFELD:  I believe I can finish
22 with these documents and then we can take a lunch
23 break.
24        MS. BIESENTHAL:  Great.
25        MR. HOFELD:  I'm very close.

35 (Pages 137 to 140)

Page 141

1    Q   (BY MR. HOFELD)  Mr. Astudillo, let's
2  look at 77.  Is this a document that you recognize?
3    A   Yes.
4    Q   What is this document, please?
5    A   It says truth in lending disclosure
6  statement.
7    Q   Is that your signature at the bottom?
8    A   That is correct.
9    Q   Did you prepare this document?
10    A   Yes.
11    Q   With the computer at New Millennium?
12    A   Yes.
13    Q   Okay.  According to the document it was
14  prepared on April 23rd, 2004.  Is that consistent
15  with your recollection?
16    A   It's almost consistent, correct.
17    Q   Mr. Astudillo, let's look at pages 78
18  through 82.  It appears that this is a complete
19  copy -- disagree with me if I'm wrong -- well, I
20  guess maybe there are two documents here.  I'm
21  sorry.  Let's look at --
22    A   No.  You were correct the first time.
23  It's all one document.
24    Q   And what is this document?
25    A   This is the loan brokerage disclosure

Page 142

1  statement.
2    Q   And was this the loan brokerage disclosure
3  statement used by New Millennium?
4    A   Generated through my laptop, yes, sir.
5    Q   Okay.  And is that your signature at the
6  bottom of page 82?
7    A   That is correct.
8    Q   And you were signing as the authorized
9  representative of New Millennium Mortgage, correct?
10    A   That is correct.
11    Q   Turning to 85 and 86, do you recognize
12  this document?
13    A   Yes.
14    Q   What is it, please?
15    A   It's a credit report from Factual Data.
16    Q   You see at the top it says New Millennium
17  Mortgage, Milwaukee, Bryn Mawr, et cetera?
18    A   Yes.
19    Q   Did you run Ms. Navara's credit?
20    A   Correct.
21    Q   Is this document the result of your having
22  run her credit?
23    A   Correct.
24    Q   There are no debts on here listed as owing
25  to ACS, correct?

Page 143

1    A   That is correct.
2    Q   Did you ever report Ms. Navara to credit
3  bureaus for nonpayment to ACS?
4    A   No, sir.
5    Q   Let's turn to 88, your 88.  You testified
6  a little bit about this earlier.  You indicated it
7  was your handwriting except for the signature.  Do
8  you recall why you had Ms. Navara sign this
9  statement?
10    A   I believe there was a couple variances on
11  her name on the credit report, if I'm not mistaken.
12  They wanted to make sure that she didn't go by
13  another name, aliases.
14    Q   Did you write -- do you recall whether
15  this was written, whether your note was written out
16  before she signed it, or did you have her sign
17  something and then write the note later?
18    A   No.  She signed this particular letter
19  with this particular print and information.
20    Q   You didn't sign her name, did you?
21    A   No, sir.
22       MR. HOFELD:  Okay.  We can break for
23  lunch or whatever.
24       (Luncheon recess)
25    Q   (BY MR. HOFELD)  Mr. Astudillo, I want to

Page 144

1  go back to Exhibit 3 for a moment.  Exhibit 3
2  contains the two-page conversation log.  At the top
3  of both pages there's a fax number.  Whose fax
4  number is that?
5    A   That's my home fax.
6    Q   Were these documents received at your home
7  on August 7th?
8    A   Yes.
9    Q   Who faxed them to you?
10    A   No.  I faxed them to my computer fax so I
11  could put them into an e-mail when I e-mailed it to
12  you the following morning.  So I received the -- I
13  have a copy of them; but instead of faxing it to
14  you, what I did is I faxed it to my computer fax,
15  saved it, and I attached it in the e-mail.
16    Q   So you faxed it from your home --
17    A   To my computer --
18    Q   -- to your computer --
19    A   -- to attach them because I don't have a
20  scanner.
21    Q   Is your computer located at your home?
22    A   Yes.
23    Q   And you e-mailed --
24    A   To you.
25    Q   You e-mailed the document to me from your

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 145

1  home.
2      A   Yes.
3      Q   From your home computer?
4      A   My home computer, correct.
5      Q   Mr. Astudillo, when you communicated with
6  Long Beach regarding a possible loan to Ms. Navara,
7  you were doing that on behalf of New Millennium
8  Mortgage Group Corp., correct?
9      A   That is correct.
10     Q   Okay. You were an employee at the time?
11     A   That is correct.
12     Q   This was in March and/or April of 2004,
13  correct?
14     A   By March, correct, yes.
15     Q   So in helping her get the loan, you were
16  working for New Millennium?
17     A   Yes.
18     Q   You weren't working for ACS?
19         MS. BIESENTHAL: Objection. These
20  questions are leading.
21         THE WITNESS: As a loan officer
22  working through New Millennium.
23     Q   (BY MR. HOFELD) Okay. And so when you
24  took a loan application from Ms. Navara on
25  March 16th, and at other times subsequently, you

Page 146

1  were authorized to do that by New Millennium,
2  correct?
3         MS. BIESENTHAL: Objection, leading.
4         THE WITNESS: That is correct.
5      Q   (BY MR. HOFELD) And you were authorized
6  to communicate with Ms. Navara regarding a potential
7  loan by New Millennium?
8         MS. BIESENTHAL: Same objection.
9         THE WITNESS: Yes.
10     Q   (BY MR. HOFELD) You were authorized by
11  New Millennium to act as a broker who would find
12  Ms. Navara a loan, correct?
13         MS. BIESENTHAL: Same objection.
14         THE WITNESS: Yes.
15     Q   (BY MR. HOFELD) And you were authorized
16  by New Millennium to communicate with potential
17  lenders information about Ms. Navara's credit and
18  financial profile, correct?
19         MS. BIESENTHAL: Same objection.
20         THE WITNESS: Yes.
21     Q   (BY MR. HOFELD) And you were authorized
22  to discuss with potential lenders Ms. Navara's
23  qualifying information, correct?
24         MS. BIESENTHAL: Leading.
25  Foundation.

Page 147

1          THE WITNESS: Yes.
2      Q   (BY MR. HOFELD) At the same time that
3  you were working for New Millennium, you also did
4  work for ACS?
5      A   That is true.
6      Q   And that was true in March and April of
7  2004?
8      A   That is true.
9      Q   Okay. Were you working for any other
10  companies --
11     A   No.
12     Q   -- at the time?
13     A   No.
14     Q   Did you have any other businesses yourself
15  at the time?
16     A   No, sir.
17     Q   Did you do any contract work for any other
18  company or person?
19     A   No, sir.
20     Q   At that time?
21     A   No, sir.
22     Q   And at the time you were working on
23  getting a loan for Ms. Navara, did you anticipate
24  that you would receive a commission from New
25  Millennium if you obtained her a loan?

Page 148

1      A   As usual, yes.
2      Q   And did you, in fact, receive a
3  commission?
4      A   No.
5      Q   Okay. Why didn't you receive a
6  commission, if you recall?
7      A   I just didn't accept a commission.
8      Q   And was that because you didn't need one?
9      A   I'm sorry?
10         MS. BIESENTHAL: Objection, vague.
11     Q   (BY MR. HOFELD) Was that because you
12  didn't need one because you were going to receive
13  $8,000?
14     A   I didn't think it was -- it wasn't fair to
15  the customer for me to get paid for something that I
16  was doing her a favor on, yes. I was getting paid
17  by ACS the $8,000, yes, that's correct.
18     Q   So, in other words, your compensation as a
19  broker came by means of the 8,000-dollar payment?
20     A   No.
21     Q   Well, it didn't come by means of any
22  commission.
23     A   Correct.
24     Q   From New Millennium.
25     A   Correct.

37 (Pages 145 to 148)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 149

1    Q    Okay. And you didn't accept a commission
2    from New Millennium for the loan because you were
3    going to receive the $8,000, correct?
4    A    No, just --
5        MS. BIESENTHAL: Objection,
6    mischaracterizes --
7        THE WITNESS: No.
8        MS. BIESENTHAL: -- his testimony.
9        If you would just wait --
10       THE WITNESS: Oh, I'm sorry.
11       MS. BIESENTHAL: -- for a second
12   before you answer so I can get my objection out on
13   the record. You're fine. I'm just letting you
14   know.
15       Q    (BY MR. HOFELD) I thought you testified
16   a moment ago that the reason you decided not to
17   accept a commission from New Millennium is because
18   you knew you were going to be paid the $8,000?
19       A    I said because it wasn't fair for the
20   customer to pay me for something I had already done
21   and I was going to get paid through ACS.
22       Q    So it wasn't fair for you to get paid
23   twice?
24       A    Correct.
25       Q    And you would have gotten paid twice if

Page 150

1    you had received both the broker's commission from
2    New Millennium for the loan and the $8,000?
3        A    That is correct.
4        Q    Okay. So in your mind, part of the -- you
5    were amply compensated by means of the $8,000 for
6    your work on the loan, correct?
7        A    No.
8        Q    Why not?
9        A    Because that wasn't part of the loan. It
10   was part of ACS services, the $8,000.
11       Q    How is it that you recall you didn't
12   receive a broker commission?
13       A    Because I didn't accept the check. And
14   they were -- I asked New Millennium not to write a
15   check out to me.
16       Q    Who did you speak with?
17       A    Luce Maria, the owner.
18       Q    Did you tell her why you didn't want a
19   check?
20       A    She didn't ask; and, no, I didn't tell
21   her.
22       Q    Mr. Astudillo, if the broker's commission
23   would have been -- strike that.
24           If the $8,000 was entirely for
25   services that ACS performed, why would it have been

Page 151

1    unfair in your mind for you to collect both a
2    broker's commission and the $8,000?
3        A    Because the amount of $8,000 were more
4    than enough -- I mean, more than sufficient to be
5    charged to the customer. I mean, I provided
6    services more intense through ACS than actually
7    through New Millennium.
8        Q    You're employed -- you were employed by
9    New Millennium?
10       A    Correct.
11       Q    And you were employed -- you were in the
12   business of originating loans. And I assume that
13   wasn't a volunteer position.
14       A    Not -- no, it is not.
15       Q    And you expected to be compensated for
16   loans that you brokered, correct?
17       A    That's true, but it's not always correct.
18       Q    Mr. Astudillo, what would have been
19   unfair? I still don't understand what would have
20   been unfair. If you performed services and you
21   charged Ms. Navara for those services --
22       A    Correct.
23       Q    -- it would have been fair for her to pay
24   for those services, correct?
25           MS. BIESENTHAL: Objection, asked and

Page 152

1    answered. Leading.
2        THE WITNESS: That would be correct.
3        Q    (BY MR. HOFELD) Okay. And at the same
4    time, if you performed services as a mortgage
5    broker, it would be fair for you to be compensated
6    for those services, correct?
7        A    That's correct.
8        Q    So where is the unfairness?
9        A    It's a personal choice. It's a personal
10   choice of saying that's fair, it's not fair.
11       Q    But I'm asking you personally where the
12   unfairness would have been.
13       MS. BIESENTHAL: Objection. Asked
14   and answered.
15       THE WITNESS: That's my personal
16   choice. It's my own personal view, it was unfair
17   for me to do.
18       Q    (BY MR. HOFELD) But what about it was
19   unfair to you?
20       MS. BIESENTHAL: Same objection.
21       THE WITNESS: The fact that I was
22   going to charge her for services for a loan. There
23   was no point in me charging them as far as me
24   getting compensated personally.
25       Q    (BY MR. HOFELD) Is that because you

ROGELIO A. ASTUDILLO,  AUGUST 10, 2006

Page 153

1  charged her so much in providing the services from
2  ACS?
3     A   No.  It was just for the simple fact that
4  I didn't want to charge her for both services.
5     Q   Mr. Astudillo, do you recall if you
6  shopped Ms. Navara's loan application around before
7  settling on a lender?
8     A   Yes, through -- yes, I did.
9     Q   How many other lenders did you consider?
10    A   There was four.
11    Q   Who were the other three?
12    A   Decision One, Freemont Investments, and
13  Countrywide.  Subprime.
14    Q   And how is it that you remember those
15  other three lenders today?
16    A   That's basically who I did business with
17  generally.
18    Q   Okay.  The four lenders?
19    A   The four lenders.
20    Q   All right.  Did you do business with Long
21  Beach prior to coming to New Millennium?
22    A   Yes.
23    Q   Okay.  You did business with Long Beach
24  when you were at Reyes?
25    A   Yes.

Page 154

1     Q   What percentage of the loans you
2  originated there were Long Beach loans?
3         MS. BIESENTHAL:  Objection,
4  foundation.
5         THE WITNESS:  I would say about maybe
6  10 to 15 percent.
7     Q   (BY MR. HOFELD)  Okay.  And who at Long
8  Beach did you deal with?
9     A   Michael O'Brian was my account
10  representative and whoever he had on his team as a
11  processor and funder and closer.
12    Q   Do you remember the names of anybody else
13  that you dealt with at Long Beach when you were at
14  Reyes Mortgage?
15    A   No, sir.  They have changed personnel, I'm
16  assuming, since then.
17    Q   No, not now.  Do you remember the names of
18  anybody that you dealt with at Long Beach at that
19  time, when you were at Reyes Mortgage?
20    A   No, sir.
21    Q   Okay.  And when you were at Worldwide, did
22  you originate loans that were funded by Long Beach?
23    A   Yes.
24    Q   And who were your contacts at Long Beach
25  at that time?

Page 155

1     A   That would have been my account
2  representative, Michael O'Brian -- or, sorry, the
3  account representative Michael O'Brian.  I believe
4  his other processor or case manager, I don't know
5  what you want to call it, I don't know the titles,
6  would have been probably Gloria, Gloria -- I want to
7  say Velasquez or Vasquez or something to that
8  extent.
9     Q   And what percentage of the loans that you
10  originated when you were at Worldwide were loans
11  made by Long Beach?
12    A   I don't know.  I'm going to say maybe
13  25 percent.
14    Q   When you were at Worldwide, how often did
15  you communicate with Michael O'Brian?
16    A   I want to say maybe twice a week.  Maybe
17  more.
18    Q   And what was the substance of those
19  communications?
20    A   His lenders' rates, programs,
21  pre-qualifications, you know, running a deal
22  verbally by him, see if it would fit in their
23  criteria or under their credit criteria, bouncing
24  ideas off of him of potential new buyers.
25    Q   Did you ever have lunch with him while you

Page 156

1  were at Worldwide?
2     A   I believe -- I believe not.
3     Q   Did he ever visit the office where you
4  worked at Worldwide?
5     A   Yes.
6     Q   And what did he do when he visited?
7     A   Passed out rate sheets, talked to all the
8  other loan officers, talked to the owners, the
9  managers, transactions, business transactions of new
10  and present loans they had or that New Millennium --
11  or that Worldwide had, excuse me.
12    Q   Loan programs?
13    A   Yes.
14    Q   When you worked at Reyes Mortgage
15  subsequently, how often did you talk with
16  Mr. O'Brian?
17    A   Same time.  I would say about the same
18  amount, one -- from two to three times a week over
19  the phone and maybe one or two visits from him to
20  the office.
21    Q   One or two visits in what period of time?
22    A   The period of time that I was working with
23  Reyes Mortgage.  I don't recall the exact dates.
24    Q   And how often did he -- how often did he
25  visit Worldwide when you were there?

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 157

1   A   He was there quite often, maybe three to
2   four times a week.
3   Q   Did you ever have lunch with him while you
4   were at Reyes?
5   A   Yes, once.
6   Q   And was there anybody else besides
7   Mr. O'Brian and Ms. Vasquez that was a point of
8   contact for you at Long Beach during the time that
9   you worked for either Reyes or Worldwide?
10   A   No. I believe -- I'm almost certain
11   that's it. I could be wrong, but it's -- those are
12   the two names that pop up.
13   Q   How was it that Long Beach became the
14   lender for Ms. Navara?
15   A   I sent them --
16       MS. BIESENTHAL: Objection,
17   foundation.
18       Go ahead.
19       THE WITNESS: I sent Michael O'Brian
20   the original application, credit report, and asked
21   to get a pre-qualification.
22   Q   (BY MR. HOFELD) Okay. But you also sent
23   similar information to the other three lenders?
24   A   Yes.
25   Q   Okay. So why is it that you decided or

Page 158

1   somebody decided to go with Long Beach?
2       MS. BIESENTHAL: Objection,
3   foundation.
4       THE WITNESS: I believe they had the
5   best program as far as the rate.
6   Q   (BY MR. HOFELD) Do you remember what the
7   rates were for the others?
8   A   No, sir.
9   Q   Was there any other reason why you chose
10   Long Beach?
11   A   No. I think their program was overall
12   better and --
13   Q   Better in what respect?
14   A   As I mentioned to you, I believe the
15   prepay penalty was not as -- what's the proper word?
16   The prepay penalty was not as severe as others. I
17   believe their prepay penalty was on a reducing
18   scale. The longer the period of time -- I don't
19   remember exactly, but I know that their overall
20   program was better. Maybe the rate and the prepay
21   penalty. That stands out in my head.
22   Q   Did you contact Long Beach first when you
23   were searching for a lender for Ms. Navara?
24   A   I believe I contacted all four of them at
25   the same time, I don't know exactly who was first or

Page 159

1   second, to be honest with you, via fax.
2   Q   Mr. Astudillo, I'm handing you what the
3   court reporter has marked as Exhibit 5.
4       MS. BIESENTHAL: I assume you don't
5   have a copy of that whole thing for me, right?
6       MR. HOFELD: No, I don't.
7       MS. BIESENTHAL: Hopefully I've got
8   most of it right here.
9   Q   (BY MR. HOFELD) Mr. Astudillo, you
10   testified that a gentleman by the name of Rafael was
11   the closer for the loan. Do you recall testifying
12   that?
13   A   That is correct.
14   Q   Okay. Do you remember Rafael's last name?
15   A   Rafael -- I wanted to say, for some
16   reason, it's Yepez, but it's not correct.
17   Q   Does Soto refresh your memory?
18   A   No, it doesn't, but if that's what you
19   have, I'm assuming that's what it is.
20   Q   Mr. Astudillo, let's look at 40 through
21   42.
22       MS. BIESENTHAL: What is that, Al?
23       MR. HOFELD: Oh, I'm sorry. It's a
24   loan application.
25       MS. BIESENTHAL: What's the date on

Page 160

1   it?
2       MR. HOFELD: Signed -- the signature
3   date is 4/29.
4   Q   (BY MR. HOFELD) Mr. Astudillo, is this a
5   document that you recognize?
6   A   Yes.
7   Q   And what is this document?
8   A   It looks like a copy of the uniform
9   residential application.
10   Q   Is that your signature at the bottom of
11   page 3 of the application?
12   A   That is correct.
13   Q   Those phone numbers underneath your
14   signature, whose phone numbers are those?
15   A   I'm assuming it's New Millennium Mortgage
16   Group Corp.
17   Q   Do you know which office?
18   A   I'm going to assume it's 8770 West Bryn
19   Mawr. Exhibit 5.
20   Q   Well, if you look back at page 75 of
21   Exhibit 4.
22   A   75?
23   Q   Yes.
24   A   Okay.
25   Q   Do you see there's a different phone

40 (Pages 157 to 160)

Page 161

1  number listed underneath your signature?
2      A   Yes.
3      Q   Do you know why?
4      A   No, I don't, sir. I'm assuming that's a
5  pre -- a field that's already completed.
6      Q   Well, your signature also looks different.
7      A   Okay.
8      Q   Do you notice that?
9      A   Yes.
10     Q   Okay. Do you know why?
11     A   Well, my signature looks different on a
12 lot of these documents, that is correct.
13     Q   Well, why don't you compare 40 through 42
14 in Exhibit 5 to --
15         MS. BIESENTHAL: What's 40 through
16 42?
17     Q   (BY MR. HOFELD) -- to 72. Excuse me.
18 It's 73 through 75 in Exhibit 4.
19     A   Okay.
20     Q   And tell me if these documents appear to
21 be identical except for the differences I asked you
22 about.
23     A   I'm sorry. Can you repeat your question,
24 please?
25     Q   Can you compare the two documents and tell

Page 162

1  me if they are identical except for the differences
2  that I asked you about?
3      A   And the differences are the signatures,
4  correct?
5      Q   Well, your signature and the phone numbers
6  underneath your signature.
7      A   Okay.
8      Q   And tell me if there are any other
9  differences.
10     A   Yes, the figures, the refinance amount.
11     Q   Where are you looking?
12     A   I'm looking at Exhibit 4, page 75, and I'm
13 looking at Exhibit 5, page 42.
14     Q   Okay.
15     A   Estimated prepaid amounts are different.
16 Estimated closing costs are different. The total
17 costs are different. And the cash to borrower is
18 different.
19     Q   Mr. Astudillo, which of these two loan
20 applications that you signed is the final one?
21     A   Exhibit 5, page 42.
22     Q   And how do you know that? How do you know
23 that this one is the final one?
24     A   The dates on I believe the preparation
25 date and also the figures and being that they are

Page 163

1  part of the final package that came to you. Other
2  than that, I couldn't tell you that's the exact,
3  exact one, and the dates coincide with the closing
4  date on Exhibit 5, page 42.
5      Q   But there is no date on the one in
6  Exhibit 4, correct?
7      A   That's correct, sir.
8      Q   Doesn't that make it difficult to tell
9  when this one was signed?
10     A   It can make it difficult, yes.
11     Q   Mr. Astudillo, could you turn to page 47
12 in Exhibit 5.
13     A   Yes. One second, please. 46, correct?
14     Q   47.
15     A   I'm sorry. Okay.
16     Q   Is this the type of document that you're
17 familiar with?
18     A   That is correct.
19         MS. BIESENTHAL: Al, do you mind if I
20 move to the next chair so I can look on with the
21 witness?
22         MR. HOFELD: Not at all.
23     Q   (BY MR. HOFELD) Is this the type of
24 document you're familiar with?
25     A   That is correct, sir.

Page 164

1      Q   And what is this?
2      A   This is a underwriting approval sheet from
3  Long Beach.
4      Q   It says that the underwriter for this loan
5  was a Jerry Jervert.
6      A   Correct.
7      Q   And it also says that the SCO was Jerry
8  Jervert.
9      A   That is correct.
10     Q   Do you know what an SCO is?
11     A   No, sir.
12     Q   Do you know who Jerry Jervert was?
13     A   Personally, no, but pertaining to this
14 file, the underwriter.
15     Q   Did you ever have any communications with
16 him?
17     A   No, sir.
18     Q   Under the conditions for approval, if you
19 look down at No. 9, it says "LOX, ACS Consulting on
20 10/03 to be paid off." Do you see that entry?
21     A   Correct.
22     Q   Do you know what LOX stands for?
23     A   Letter of explanation.
24     Q   And do you see down on No. 12 it says
25 that -- condition No. 12 it says "no cash out."

41 (Pages 161 to 164)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 165

1   A   That is correct.
2   Q   And that was because you didn't inform
3   Long Beach that Ms. Navara was going to receive cash
4   for this loan, correct?
5   A   That is correct.
6   Q   Also on this page 47 do you see,
7   Mr. Astudillo, it says at the top, in the top right,
8   it says "broker/branch," and then it says W-H-S-L-E,
9   which appears to be an abbreviation for wholesale.
10  Then it says Schaumburg, Illinois. Do you see that?
11  A   Yes.
12  Q   Does that refresh your recollection about
13  where the Long Beach branch office was located?
14  A   That is correct. It's actually
15  Schaumburg.
16  Q   And was that the office where you went to
17  pick up the closing package?
18  A   Correct.
19  Q   Okay. Mr. Astudillo, page 49, please.
20  A   Okay.
21  Q   This is a summary of debts and
22  disbursements different from the one we looked at
23  earlier.
24  A   Okay.
25  Q   This one has a balance to ACS of

Page 166

1   twenty-seven five. Do you see that?
2   A   Yes, I do.
3   Q   Okay. The one we looked at earlier had a
4   balance to ACS of $24,000. You can look at it, it's
5   page 68 in Exhibit 4.
6   A   Correct.
7   Q   Mr. Astudillo, and the one in Exhibit 4
8   appears to -- was prepared or is dated 4/29, do you
9   see that, whereas page 49 of Exhibit 5 is dated
10  April 23rd of '04.
11  A   Yes.
12  Q   Okay. Why is the balance amount to ACS on
13  the summary of debts and disbursements on April 23rd
14  $3500 more than the one dated April 29th?
15  A   First, April 29th is the most current.
16  April 23rd was previous to that, when the loan was
17  being processed prior to closing.
18  Q   Did her balance go down in those six days?
19  A   No, her balance actually didn't go down
20  because we were adjusting the numbers to make sure
21  she got the loan of 50,000.
22  Q   So --
23  A   And when I say "we," it's just myself and
24  Ms. Navara.
25  Q   But the balance is the amount that you

Page 167

1   were reporting that she owed ACS, correct?
2   A   That is correct.
3   Q   But she didn't actually owe ACS either
4   amount, I believe is what you testified earlier.
5   A   That is correct, sir.
6   Q   And the only reason for the change, the
7   downward change in the number of the debt is just to
8   make the numbers balance; again, like you testified
9   earlier?
10  A   That is correct, sir.
11  Q   Mr. Astudillo, I want to draw your
12  attention to the document that begins on page 63 of
13  Exhibit 5. Is this a type of document that you're
14  familiar with?
15  A   That is correct.
16  Q   And could you identify this document.
17  A   It's a small residential income property
18  appraiser report.
19  Q   Okay. And I want to draw your attention
20  to page 66 of the appraisal report. The bottom of
21  page 66 is the estimated value of the property. It
22  reads $165,000. Do you see that?
23  A   That is correct.
24  Q   Does that refresh your recollection about
25  the appraised value of Ms. Navara's home in

Page 168

1   connection with the loan that you brokered?
2   A   That sounds right, yes.
3   Q   Did you order this appraisal?
4   A   That is correct, sir.
5   Q   Did you personally call Mr. O'Rourke to
6   order the appraisal?
7   A   I faxed it to Mr. O'Rourke.
8   Q   You faxed what to him?
9   A   A request order form.
10  Q   Do you see a copy of that in the file yet?
11  A   Not yet. I'm still looking.
12  Q   Okay. Just let me know if you see it.
13  A   Okay.
14  Q   We can come back.
15       Mr. Astudillo, could you turn to
16  page 84, please.
17  A   Yes.
18  Q   Is this a type of document that you're
19  familiar with?
20  A   One second, please. No, I'm not -- I
21  haven't seen this one before.
22  Q   Okay. Does the name down at the bottom
23  where it says "loan funded by David Faber" look
24  familiar to you?
25  A   Yes, it sounds familiar.

ROGELIO A. ASTUDILLO,  AUGUST 10, 2006

Page 169

1    Q   It does?
2    A   Yes.
3    Q   Do you remember if you had any
4  communications with Mr. Faber?
5    A   On this particular loan or in general?
6    Q   In general.
7    A   Yes.
8    Q   Do you remember -- he was with Long Beach?
9    A   Yes.
10   Q   What kinds of things did you communicate
11 with him about?
12   A   In particular, just verifying if the loan
13 was funded or would have been funded on time.
14   Q   Your recollection is that he was in the
15 funding department?
16   A   Yes.
17   Q   Mr. Astudillo, looking at 88, Exhibit 5,
18 this looks like it's a hybrid document, actually.
19 It looks like it's a conflation of two documents,
20 but the top part indicates the payoffs. Do you see
21 that?
22   A   Correct.
23   Q   And the payoff to ACS that's indicated on
24 page 88 of Exhibit 5 is the $24,000, correct?
25   A   What page? I'm sorry.

Page 170

1    Q   I'm looking at page 88.
2    A   Yes.
3    Q   Mr. Astudillo, did you ever inform New
4  Millennium of the agreement that you say you had
5  with Ms. Navara regarding cash out and paying ACS?
6    A   No, sir.
7    Q   And when you communicated to Long Beach
8  that there was a debt owing to ACS Consulting, you
9  didn't tell them that you happened to be the
10 president of ACS Consulting, did you?
11   A   That is correct, no, I didn't.
12   Q   Did you indicate that you had any
13 affiliation whatsoever with ACS?
14   A   No, I didn't.
15   Q   So they had no idea that the debt that was
16 going to be paid off to ACS was actually going to be
17 paid to you personally, correct?
18   A   That is correct.
19   Q   And the same is -- Mr. Astudillo, let's
20 look at 95 in Exhibit 5.
21   A   Okay.
22   Q   Is this a document that you recognize?
23   A   That is correct.
24   Q   And what is this document?
25   A   It's a payoff letter.

Page 171

1    Q   It's a payoff letter to --
2    A   Addressed -- payable for Ms. Navara's
3  amount that she owed ACS that was sent over to Long
4  Beach.
5    Q   Okay. Did you ever actually mail this
6  letter to Ms. Navara?
7    A   No.
8    Q   Do you know who wrote this letter?
9    A   Typed it up? It was me that typed it up.
10   Q   You typed it?
11   A   Yes.
12   Q   Why didn't you sign your name?
13   A   Because if I signed my name, it would have
14 stated that Ms. Navara was going to get money, and
15 the loan would have not been done.
16   Q   Do you mean that if your name was on the
17 letterhead, Long Beach would know that Astudillo and
18 ACS Consulting were one in the same?
19   A   Correct.
20   Q   Mr. Astudillo, did you send this letter or
21 a copy of it to Long Beach?
22   A   I faxed it to them, yes, sir.
23   Q   Okay. And it looks, from the fax line at
24 the bottom, that it was faxed on April 29th, 2004 at
25 2:20 p.m. Would you agree?

Page 172

1    A   That is correct.
2    Q   Okay. And is that the fax number for New
3  Millennium, the (773) 227-2368?
4    A   I believe so.
5    Q   Was that the fax number for the Laramie
6  office?
7    A   I don't think so.
8    Q   Was that the fax number for your office on
9  26th Street, the ACS office?
10   A   No.
11   Q   Do you know where you faxed this from?
12   A   I faxed this to the New Millennium office
13 on Bryn Mawr and they faxed it to the office to New
14 Millennium -- I mean, to Long Beach. Excuse me.
15   Q   Why did you fax it -- why didn't you just
16 fax it directly to Long Beach?
17   A   Because I faxed New Millennium a copy of
18 the letter --
19   Q   So did --
20   A   -- directly to them because they are the
21 brokers.
22   Q   Where did you fax it from?
23   A   My office at 26th Street.
24   Q   I see. Okay. And then did you fax it on
25 to Long Beach yourself?

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 173

1    A    I believe -- I want to say yes, but I
2    might be wrong.  Antoinette maybe faxed it to them.
3    Q    And you think this occurred on April 29th
4    of 2004?
5    A    That seems correct, yes.
6    Q    Mr. Astudillo, if you didn't keep any
7    records for accounts of customers other than your
8    conversation log and your receipt book, why is there
9    an account number on this letter?
10    A    Because the payoff requested a loan number
11    and I put a loan number to make the payoff look --
12    Q    Legitimate?
13    A    Legitimate, correct.
14    Q    So you made up an account number?
15    A    For this particular file, yes, I did.
16    Q    Ms. Navara's file with ACS didn't have an
17    account number before you made this one up?
18    A    That is correct, sir.
19    Q    And the other accounts or customers with
20    ACS didn't have account numbers?
21    A    No.  We -- no, sir.
22    Q    You're agreeing with me, right?
23    A    Yes, sir, I am agreeing with you.
24    Q    Mr. Astudillo, look at 96, if you would.
25    This is a document, another copy of which I believe

Page 174

1    we've already looked at.  But what I want to ask you
2    about here, it appears that this document was faxed.
3    Do you have any recollection of faxing this
4    document?
5    A    Yes.  I faxed it to New Millennium.
6    Q    Okay.  And was that for the purpose of New
7    Millennium later faxing it to Long Beach?
8    A    Correct, having a copy and faxing it over
9    to them, yes.
10    Q    And either you or Antoinette would have
11    faxed it over to Long Beach?
12    A    If I advised Antoinette or myself --
13    Antoinette, she would have faxed it.
14    Q    And if she didn't do it --
15    A    I would have done it.
16    Q    You did it?  It was sent April 29th, 2004
17    at 11:03 a.m.?
18    A    Correct.
19    Q    From your office on 26th Street?
20    A    This particular fax, it was faxed from New
21    Millennium.
22    Q    Okay.  So was the preceding document,
23    No. 95.
24    A    Okay.
25    Q    And that one, if I understood your

Page 175

1    testimony correctly, you said No. 95 was faxed from
2    your office on 26th Street to New Millennium and
3    then someone at New Millennium, either you or
4    Antoinette, faxed it on to Long Beach.
5    A    Correct.  I would have advised Antoinette
6    to do it.
7    Q    So you're giving the same testimony with
8    respect to 96?
9    A    Yes, sir.
10    Q    Okay.  And what about 97?  Why don't you
11    take a minute to read this one.
12    A    Okay.
13    Q    Okay.  Does the handwriting on this
14    document look familiar?
15    A    Yes.
16    Q    Is it your handwriting?
17    A    Correct.
18    Q    Okay.  The signature of Ms. Navara's name,
19    though, is not your handwriting, right?
20    A    And/or the phone number, the numeric
21    number.
22    Q    Yeah, the numerals.
23    A    Numerals.  I'm sorry.
24    Q    Is this a document that you prepared?
25    A    For Ms. Navara, yes, sir.

Page 176

1    Q    And what is this document?
2    A    Stating that -- explaining the services
3    that ACS Consulting provided for Ms. Navara or --
4    yes.
5    Q    Now, the document doesn't actually explain
6    the specific services provided.
7    A    No, just -- no, sir.
8    Q    When we looked at the entry for an LOX
9    pertaining to ACS Consulting that was on the list of
10    conditions for the loan to close a few minutes ago,
11    do you recall that?
12    A    Yes, I do.
13    Q    Okay.  Would this be the LOX that
14    satisfied that condition to close?
15    A    I would believe so, yes, sir.
16    Q    Okay.  And, again, this document doesn't
17    identify any debt being owed to you personally,
18    correct?
19    A    I'm sorry.  Can you clarify?
20    Q    This document doesn't explain that
21    Ms. Navara was to pay you personally, right?
22    A    Pay Rogelio Astudillo personally?
23    Q    Yes.
24    A    No.  It's just --
25    Q    And this document doesn't identify that

44 (Pages 173 to 176)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 177

1    you were the president of ACS, correct?
2       A    That's correct.
3       Q    And this document doesn't identify that
4    you, Rogelio Astudillo, were actually the one that
5    provided the services on behalf of ACS, correct?
6       A    Correct.
7       Q    Is that your handwriting underneath the
8    signature line where it says -- where it has
9    Ms. Navara's name in print?
10      A    Yes.
11      Q    And the date on this document is 4/26/04.
12      A    Correct.
13      Q    Do you believe that you prepared this
14   document on that date?
15      A    Yes, I did.
16      Q    And when do you believe Ms. Navara signed
17   it?
18      A    Same day, sir.
19      Q    The closing -- according to the documents,
20   it appears that the closing occurred April 29th.
21      A    That is correct.
22      Q    So it's your testimony that she didn't
23   sign it on that day?
24      A    That is correct.
25      Q    And what leads you to make that

Page 178

1    conclusion?
2       A    I was present, and the date.
3       Q    You were present on April 26th?
4       A    In front of her, correct.
5       Q    You were present on April 29th for the
6    closing too, right?
7       A    That is correct, sir.
8       Q    And you were present on March 16th when
9    she filled out -- when you completed the initial
10   loan application?
11      A    That is correct, sir.
12      Q    Okay. Mr. Astudillo, would you please
13   look with me at document number 110 in Exhibit 5.
14   Is this a document you recognize?
15      A    That is correct.
16      Q    And what is this, please?
17      A    It's from Long Beach Mortgage. It says,
18   "Congratulations. Your loan has been approved with
19   Long Beach Mortgage Company." Do you want me to
20   continue?
21      Q    No. I'm just asking you what it is. Is
22   it correct to say that this is a notification to you
23   that Ms. Navara had been approved for a loan by Long
24   Beach?
25      A    That is correct.

Page 179

1       Q    And is this -- it's a fax -- top of it is
2    a facsimile transmittal sheet. Do you see that?
3       A    Uh-huh.
4       Q    And it says "to," and then it says
5    "Roger."
6       A    Correct.
7       Q    Is the Roger -- does that Roger written
8    here refer to you?
9       A    That is correct.
10      Q    That fax number, whose fax number is that?
11      A    I'm going to assume it's New Millennium
12   Mortgage Group Corp.
13      Q    Do you know which office?
14      A    I want to say it's probably the Bryn Mawr
15   office. I could be incorrect.
16      Q    Why would they be faxing you something at
17   the Bryn Mawr office?
18      A    Because they can't fax it to ACS to my
19   office on 26th Street.
20      Q    Right. But I thought you spent most of
21   your time at New Millennium in the Laramie office?
22      A    That's where I originated my loans. I
23   spent most of my time on 26th Street. I worked out
24   of my laptop.
25      Q    But did you have -- do you have an office

Page 180

1    on Bryn Mawr too?
2       A    New Millennium had an office on Bryn Mawr.
3       Q    But did you work in that office?
4       A    I originated loans out of there too,
5    that's correct.
6       Q    Wait a second. You testified earlier that
7    the only New Millennium office that you worked out
8    of or where you were physically located when you did
9    your work for New Millennium was the Laramie office.
10      A    That's the main office, yes, sir.
11      Q    Okay. So are you now changing your
12   testimony and telling me that you also worked at the
13   Bryn Mawr office?
14      A    No, sir. Being that it's a branch office,
15   we also have the right to work off of other
16   branches.
17      Q    My question, then, is: Why wasn't this
18   faxed to you at the Laramie office if you spent most
19   of your time there?
20      A    Because the processor might have been
21   there, and that's who they -- their point of contact
22   when an approval comes in is all the processors.
23      Q    You mean Antoinette --
24      A    Antoinette.
25      Q    -- might have been at the Bryn Mawr

45 (Pages 177 to 180)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 181

1  office?
2      A   That's correct.
3      Q   But earlier you testified that she worked
4  with you at the Laramie office.
5      A   She also did that too.
6      Q   Did she work at both offices?
7      A   Sometimes she did, sir.
8      Q   Okay.  Mr. Astudillo, would you please
9  look at the document that begins on page 111.  It's
10  a four-page document.  Just tell me if you would,
11  please, whether you see your handwriting anywhere on
12  this document.
13      A   No.
14      Q   Okay.  Thank you.  Let's look at 127.
15          MS. BIESENTHAL:  Wait, Al.
16          I think he means for you to look
17  through all four pages.
18          THE WITNESS:  All four pages?  I'm
19  sorry.
20      Q   (BY MR. HOFELD)  Yeah.  I meant for you
21  to look at the entire document, which consists of
22  four pages.
23      A   No.  Still no.
24      Q   Okay.  Looking at 127, the document that
25  begins on 127, this, again, is a four-page document.

Page 182

1  Please briefly look at each page and tell me whether
2  you see your handwriting anywhere.
3      A   No, sir.
4      Q   Okay.  How about the document that begins
5  on 131 -- 131 to 132.
6      A   No, sir.
7      Q   Actually, I think maybe it continues on to
8  133 as well.  Do you see your handwriting on any of
9  those three pages?
10      A   No.
11      Q   Mr. Astudillo, let's look at 160.
12      A   Okay.
13      Q   I just want to make sure we're looking at
14  the same document.
15      A   160.
16      Q   Yeah, thanks.  Do you see your handwriting
17  anywhere on this page?
18      A   No, sir.
19      Q   What about the handwritten dates, the
20  first one where it says "the date of the
21  transaction, which is," and the second one says
22  "midnight of."  Is that your handwriting?
23      A   It doesn't look familiar, sir.
24      Q   Okay.  Let's look at 168, please.  Is this
25  a type of document that's familiar to you?

Page 183

1      A   No, not really, sir.
2      Q   Have you ever seen an error and omissions
3  compliance agreement before?
4      A   I've seen it, but not like this one, sir.
5      Q   Do you see the notary seal at the bottom
6  left?
7      A   That is correct.
8      Q   Does that refresh your recollection as to
9  the full name of the person who closed -- who you
10  say closed Ms. Navara's loan?
11      A   I'm assuming the last name is correct,
12  yes.  Their first name is right, yes.
13      Q   Okay.  And you testified that Rafael was
14  present in your office when the loan was closed?
15      A   That is correct, sir.
16      Q   Did you see him sign and stamp documents
17  that called for notarization there at the closing?
18      A   I wasn't paying attention to what was
19  signed, but he was there.
20      Q   Do you recall one way or the other whether
21  he did sign or stamp?
22      A   Well, I saw him sign and stamp documents,
23  that's correct.
24      Q   Okay.  I thought you said you weren't
25  paying attention?

Page 184

1      A   I wasn't, but I heard the stamp and I saw
2  him do this while they did their closings.
3      Q   Mr. Astudillo, let's look at 197 together
4  in Exhibit 5.
5      A   Okay.
6      Q   Is this a document that you've seen
7  before?
8      A   That is correct.
9      Q   Okay.  And what is this document?
10      A   This is also a payoff letter.
11      Q   Okay.  Now, this is not a trick question.
12  So I want you to also turn back to 95 and look at
13  the two documents, 95 and 197 side by side.
14      A   Okay.
15      Q   Are these two copies of the same letter or
16  are they different letters?
17      A   They are different letters, sir.
18      Q   Okay.  Now, the one on 197 has what
19  appears to be a mistake in the initials for your
20  company.  Do you see that?  It says ASC and not ACS.
21      A   Okay.
22      Q   The date, if you look at the two dates
23  where it says "offer expires," on page 95, the date
24  is printed with slashes.  On page 197, it's printed
25  with dashes.  Do you see that?

46 (Pages 181 to 184)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 185

1    A   That's correct.
2    Q   Okay.  Why are there two different
3  letters?
4    A   One was a settlement originally of 27,500
5  and the other one was a settlement of 24,000.
6    Q   But, Mr. Astudillo, they both say that --
7  they both say that they are offering a settlement
8  for $24,000.
9    A   One has the balance of 24, the other one
10  has a balance of twenty-seven five.
11    Q   I see.  Okay.  I didn't notice that.  But
12  they are both dated April 29th, 2004, correct?
13    A   That is correct, sir.
14    Q   So why are there two letters from the same
15  date indicating different balances?
16    A   Once again, to justify the number of the
17  loan amount of 50,000 so the customer wouldn't bring
18  any money to closing.  So we settled for less in the
19  eyes of Long Beach.
20    Q   In your eyes, you were going to get the
21  same amount of money, regardless of what --
22    A   Can you elaborate on that?  I'm sorry.
23    Q   In your mind, you were going to be paid
24  the same amount of money, regardless of the amount
25  of debt that you stated to Long Beach, the amount of

Page 186

1  the ACS debt?
2        MS. BIESENTHAL:  Objection, vague.
3        THE WITNESS:  I'm sorry.  Can you
4  elaborate more on that, please?
5        MR. HOFELD:  Sure.  Actually, you can
6  strike that question.  It's not very important.
7    Q   (BY MR. HOFELD)  And, Mr. Astudillo, the
8  letter, a copy of which is document 197, has a fax
9  line at the top of the page.  Do you see that?
10        MS. BIESENTHAL:  It's cut off.
11        THE WITNESS:  It's cut off.
12    Q   (BY MR. HOFELD)  Okay.  Well, let me show
13  you mine.
14    A   Correct.
15    Q   Okay.  And it says May 4th, 2004.  Time,
16  15:59 or 3:59 in the afternoon.
17    A   Okay.
18    Q   Okay.  And the fax number is
19  (773) 277-8304.
20    A   04, correct.
21    Q   Is that the fax number at ACS?
22    A   That is correct.
23    Q   Okay.  And it says ACS --
24    A   That is correct.
25    Q   -- on the fax line, doesn't it?

Page 187

1    A   That's correct.
2    Q   And do you know why you were faxing this
3  letter from ACS after the closing?
4    A   I honestly don't recall why I would have
5  faxed -- they probably would have requested -- the
6  New Millennium office in Laramie -- the Laramie
7  location, central office, might have requested a
8  copy.  They might not have had it in the file.  It's
9  the only explanation that I could have.
10    Q   Well, do you recall who you were faxing it
11  to?
12    A   Like I said, if I would have been faxing
13  it at that time after the closing, it would have
14  been to the New Millennium office in -- the Laramie
15  office, which is the central office where they get a
16  shadow copy of the file that Long Beach would have
17  had, if that's the case.
18    Q   So you wouldn't have been faxing it to
19  Long Beach?
20    A   No, sir.
21    Q   And we didn't see a copy of 197 in the
22  documents that we looked at from New Millennium.
23    A   Okay.
24    Q   Did you see one?
25    A   I don't recall.  I didn't see one, no.

Page 188

1    Q   And, Mr. Astudillo, did you prepare the
2  original document, a copy of which is 197?
3    A   Did I prepare it?  Yes, sir.
4    Q   Okay.
5    A   Well, at this point, I'm going to say yes
6  just because I --
7    Q   Did you type it?
8    A   Computer, yes, sir.
9    Q   Okay.  And you signed -- you put Saul
10  Carrera's name?
11    A   That is correct.
12    Q   And you put payoff department?
13    A   That is correct.
14    Q   Even though ACS doesn't have -- isn't
15  divided into different departments?
16    A   No, sir.  That's correct.
17    Q   Let's look at 253 in Exhibit 5.  Are you
18  there?
19    A   Yes, sir.
20    Q   Okay.  Do you recognize the handwriting on
21  this document?
22    A   That is Antoinette's.
23    Q   Okay.  And what does this appear to be?
24    A   A fax cover letter.
25    Q   Fax cover page?

Page 189

1    A    Fax cover page. Excuse me.
2    Q    Or cover sheet?
3    A    Cover sheet.
4    Q    Did Antoinette also work in the Milwaukee
5  office?
6    A    I believe they had a Milwaukee office. I
7  don't know if they used the same, but yes.
8    Q    Mr. Astudillo, let's look at 271.
9    A    Okay.
10    Q    Do you recognize that handwriting on this
11  form?
12    A    Yeah. That's -- yes.
13    Q    Whose handwriting is that?
14    A    I believe that's mine, sir.
15    Q    Okay.
16    A    Not all of it, though.
17    Q    Okay. Which handwriting is not yours?
18    A    The top where it says "loan number,
19  customer's name," and the signature.
20    Q    What does this document address to you?
21    A    This is a settlement fee verification
22  form.
23    Q    272, is this a document you recognize?
24    A    That's correct.
25    Q    And what is it?

Page 190

1    A    This is a mortgage document order request
2  form.
3    Q    Where it says Roger, did that mean you?
4    A    That is correct.
5    Q    So this was faxed to you -- you believe
6  this was faxed to you by Rick Patel?
7    A    It would have been faxed to either me or
8  Antoinette, whoever. But being that I'm the loan
9  officer ...
10    Q    Mr. Astudillo, let's look at the docs
11  on -- the document on page 282.
12    A    Okay.
13    Q    Okay. There is a lot of scribbled
14  handwriting on this page. I want you to take a
15  moment and look at it and see if you recognize any
16  of it.
17    A    No, sir.
18    Q    You don't recognize any of the handwriting
19  on here?
20    A    No.
21    Q    Okay. And where it says Antoinette, you
22  believe that refers to Antoinette Berzin?
23    A    Correct.
24    Q    And where it says Roger, you believe
25  that's you?

Page 191

1    A    That is correct.
2    Q    Page 284, do you recognize any of the
3  handwriting in this document?
4    A    No, sir. No.
5    Q    Page 286, do you recognize this
6  handwriting, the handwriting on this document?
7    A    Looks familiar.
8    Q    Is it Antoinette's handwriting?
9    A    It looks like Antoinette's, but I couldn't
10  be certain.
11    Q    How about 287?
12    A    Also looks like Antoinette's.
13    Q    Now, is that your signature at the bottom
14  of 287?
15    A    No, it isn't.
16    Q    Whose signature is it?
17    A    I believe it's when I authorized
18  Antoinette to sign my signature.
19    Q    So you believe that's Antoinette's
20  signature?
21    A    It looks like it, correct, sir.
22    Q    And you think you authorized her to sign
23  on your behalf?
24    A    That's the only time that she would sign
25  something for me, correct.

Page 192

1    Q    When? What do you mean? What's the only
2  time when she --
3    A    When I authorized her to do so.
4    Q    Okay. Mr. Astudillo, let's look at
5  document 313, 314, and 315. It's another copy or
6  version of a loan application. Do you see that?
7    A    That is correct.
8    Q    Okay. This version of the loan
9  application states under liabilities on page 2 that
10  the debt to ACS was twenty-seven five. Do you see
11  that?
12    A    That is correct.
13    Q    Okay. Do you know when this application
14  was prepared?
15    A    I honestly -- would have had to have been
16  before April 13th or by April 13th.
17    Q    Why do you say that?
18    A    Because that's when it was faxed out.
19    Q    You're looking at the fax line that runs
20  on the bottom of page 1?
21    A    That is correct, sir.
22    Q    Okay. And can you tell where it was faxed
23  from or to?
24    A    It would have been faxed to Long Beach
25  when it was faxed out.

48 (Pages 189 to 192)

Page 193

1    Q   And this page 3 indicates that the
2  application was taken in person.  Do you see that?
3    A   It's just a -- the system automatically
4  just goes off the original application that was
5  taken.  It doesn't change it, sir.
6    Q   I'm not sure if we're communicating.  Do
7  you see on page 3 in the bottom left it says "to be
8  completed by the interviewer"?
9    A   Yes, sir.
10    Q   And the one that's checked is face-to-face
11  interview.
12    A   That is correct.
13    Q   Does that mean that this application was
14  taken in person?
15    A   As I mentioned to you, the answer to the
16  question, no, but it was a -- when you update your
17  file into the system, it automatically takes the
18  original information.
19    Q   I see.  So you're saying if the
20  application was taken in person to begin with --
21    A   That's correct.
22    Q   -- and that box was checked off at that
23  time, then all future updates to that application
24  will also indicate that the application was taken in
25  person or face-to-face?

Page 194

1    A   That is correct, sir.
2    Q   Okay.  And, again, when you took the
3  application the first time on March 16th, 2004, the
4  information that you input into the computer for the
5  application was obtained from Ms. Navara, correct?
6    A   That is correct, sir.
7    Q   And you asked her questions and she gave
8  you answers?
9    A   That is correct.
10    Q   And that was with respect to debts that
11  she had at the time?
12    A   That is correct.
13    Q   And her income?  You asked her about her
14  income?
15    A   Yes, sir.
16    Q   You asked her about the approximate value
17  of her properties?
18    A   That's correct.
19    Q   You asked her for her personal information
20  such as Social Security, residential address, Social
21  Security number, things like that?
22    A   Yes, sir.
23      MS. BIESENTHAL:  I'm going to object
24  that all these questions are leading.
25    Q   (BY MR. HOFELD)  She didn't fill out any

Page 195

1  of the loan applications that we've looked at so far
2  herself by hand, did she?
3    A   No.  We don't allow that.
4    Q   Okay.  Thanks.
5        Mr. Astudillo, you testified that you
6  prepared some leases for Ms. Navara.
7    A   Yes, sir.
8    Q   Did you charge her for that service?
9    A   No, sir.
10    Q   Why not?
11    A   Because it was part of her process for her
12  mortgage.
13    Q   And you anticipated getting paid from the
14  mortgage process?
15    A   I'm sorry?
16    Q   And did you anticipate getting paid from
17  the mortgage process?
18    A   No, sir.
19    Q   When did you make the decision that you
20  weren't going to charge her for preparing the
21  leases?
22    A   As soon as I started her mortgage
23  application, sir.
24    Q   Mr. Astudillo, let's go back to pages 2
25  through 4 of Exhibit 5 in front of you.

Page 196

1    A   Okay.
2    Q   Are you there?
3    A   Yes.
4    Q   Do you recognize this document?
5    A   Yes.
6    Q   What is this document?
7    A   This is settlement statement.
8    Q   Settlement statement for Ms. Navara's loan
9  from Long Beach?
10    A   Correct.
11    Q   There are some handwritten marks on this
12  document.  There's one or two on page 1 and there
13  are some marks and some handwritten words on page 2.
14  Do you recognize any of those as belonging to you?
15    A   No, sir.
16    Q   Okay.  Do you know who made those marks?
17    A   No, sir.
18    Q   And do you see anywhere on this HUD 1
19  settlement statement where it's indicated that
20  Ms. Navara is going to receive cash?
21    A   No, sir.
22    Q   And, Mr. Astudillo, did you prepare this
23  HUD 1 settlement statement?
24    A   No, sir.
25    Q   Did you provide the information to Long

Page 197

1  Beach or to Citywide Title that was used in the
2  preparation of this HUD 1 settlement statement?
3      A   Can you be more specific, please.
4      Q   Sure.  The information -- the charges --
5  for example, let's look at line 801, the loan
6  origination fee in the amount of -- to New
7  Millennium in the amount of $800.
8      A   Yes.
9      Q   Did you provide the fee information for
10  that fee to Long Beach or to Citywide Title?
11      A   Yes.
12      Q   In other words, you told them how much the
13  fee was going to be?
14      A   Correct.
15      Q   Okay.  And did you actually provide it to
16  Long Beach or to Citywide Title or both?
17      A   Actually, it was provided to Long Beach
18  only.  Citywide obtained it from Long Beach.
19      Q   Okay.  And how do you know that's the way
20  it worked?
21      A   Because that's the way it -- I mean,
22  that's the way the lenders work.  You can't provide
23  these fees to the title company.
24      Q   You can't provide those fees to the title
25  company directly?

Page 198

1      A   No.
2      Q   You have to provide it to the lender?
3      A   Through the fee sheet that's in your
4  exhibits, yes.
5      Q   And which fee sheet was that?  If you
6  could describe it a little bit more, I might be able
7  to find it.
8      A   It's the request for -- order of documents
9  from Long Beach.
10      Q   Okay.
11      A   And where it shows the amount of the loan,
12  the term of the loan, the rate, and the fees that
13  Long Beach was charging.  And then also there's a
14  section where New Millennium puts their fees on
15  there.  It's the request order form that's in your
16  exhibits.  I just don't recall exactly where it was.
17      Q   Okay.  So you provided -- so then you also
18  provided to Long Beach -- you also essentially told
19  Long Beach that there should be a reimbursement to
20  New Millennium in the amount of $50 for running a
21  credit report, which is line 804?
22      A   That is correct.
23          MS. BIESENTHAL:  Objection,
24  foundation.  Leading.
25      Q   (BY MR. HOFELD)  And when would you have

Page 199

1  provided this information to Long Beach?
2      A   Through the request order form, which is
3  also known as a fee sheet.
4      Q   And would that have been shortly before
5  the closing?
6      A   That is correct.
7      Q   And you personally provided it?
8      A   No.  My processor would have.
9      Q   Antoinette?
10      A   Antoinette, correct.
11      Q   But she would have provided it at your
12  direction, correct?
13      A   That is correct, sir.
14      Q   And the same is true -- the same is
15  true of the other fee to Long Beach, the processing
16  fee, correct?
17      A   That is correct.
18      Q   That's line 810.
19          Now, on line 1305 there's listed a
20  payment of $26,000 to ACS.
21      A   Correct.
22      Q   Okay.  And although you didn't prepare
23  this HUD 1, you supplied the name of ACS and the
24  payoff amount of $26,000 to Long Beach, right?
25      A   That is correct.

Page 200

1      Q   And you believe that Long Beach, in turn,
2  supplied it to Citywide Title?
3      A   Yes.
4      Q   Do you know who prepared the HUD 1?
5      A   No, I don't, sir.
6      Q   Who usually prepares it?
7      A   It would be the closer.
8      Q   In this case, Rafael was the closer,
9  right?
10      A   Yeah, the closer, but he's -- the closer
11  does the actual closing, not the one that -- I guess
12  it would be somebody else that prepares it, not
13  the -- it would be the closing department.
14      Q   I see.
15      A   So not -- I know that Rafael is the one
16  that does the closings, but he wouldn't be the one
17  that prepares the settlement statement.
18      Q   Do you know -- was Rafael an employee of
19  Citywide Title?
20      A   Yes, sir, I believe so.
21      Q   He wasn't one of those independent signing
22  agents, was he?
23      A   No, sir.  He was employed through
24  Citywide, correct.
25      Q   Okay.  Do you know whether the HUD 1 was

Page 201

1   prepared at -- I'm sorry.  You testified that you
2   believe the HUD 1 was prepared by the closing
3   department at Citywide Title?
4       A   That's correct.
5       Q   And earlier you gave a name or two, and
6   I'm afraid that I don't remember the names you gave.
7       A   I think it was Rosie.
8       Q   Okay.
9       A   Rosie --
10      Q   Go ahead.  I'm sorry.
11      A   Rosie, I believe, is --
12      Q   Delgado?
13      A   Delgado, correct.
14      Q   Do you know whether Rosie Delgado prepared
15  this HUD 1 settlement statement?
16      A   I wouldn't -- I'm assuming it would be
17  that she would have.  I'm not certain.  I wasn't
18  there to see her do it.
19      Q   Sure.  Mr. Astudillo, let's go back for
20  one second to document 197 in Exhibit 5.
21      A   Okay.
22      Q   You testified earlier that you sent this
23  document -- do you know what.  What did I say?  195?
24          MS. BIESENTHAL:  I thought you said
25  197.

Page 202

1           THE WITNESS:  I thought you said 197.
2       Q   (BY MR. HOFELD)  What did I say?  197?
3       A   Yes.
4       Q   I want to ask you not about 197.  I want
5   to ask you about 95.  Tell me when you're there.
6       A   Okay.
7       Q   You testified earlier that you sent this
8   to Long Beach.  Do you recall that?
9       A   Through New Millennium, yes.
10      Q   Yes.  And did you also submit this to New
11  Millennium prior to the time that the loan was
12  closed?
13      A   Prior to the time?
14      Q   Did you make this document or a copy of it
15  a part of the New Millennium file prior to the time
16  the loan was closed?
17      A   Through the process on the 29th, yes, I
18  did.
19      Q   Now, I understand that you faxed it out to
20  Long Beach on the 29th.
21      A   I faxed it through New Millennium and New
22  Millennium, in turn, faxed it to Long Beach,
23  correct.
24      Q   But do you know if this document or a copy
25  of it went into the New Millennium file prior to

Page 203

1   closing?
2       A   Prior to closing?
3       Q   Yes.
4       A   Before the 29th, sir, is that what you're
5   asking?
6       Q   Yes.
7       A   No, just on the 29th is when they had
8   it -- when I faxed it to them or when they had it.
9   Is that correct?
10      Q   No.  I think you got that screwed up.
11          It was only on the 29th that you made
12  that document a part of the New Millennium file,
13  right?
14      A   That is correct, yes.
15      Q   It wasn't any earlier than that?
16      A   That is correct.
17      Q   Okay.  Now we're straight.
18          Mr. Astudillo, prior to closing, did
19  anyone at New Millennium know that Ms. Navara was
20  going to be paying a debt to ACS at her closing?
21      A   Can you be more specific, please?
22      Q   Sure.  Was anybody at New Millennium aware
23  prior to Ms. Navara's closing on April 29th that she
24  was going to be paying off a debt to ACS; that is,
25  anyone besides you?

Page 204

1       A   Besides me?  I want to say maybe
2   Antoinette, maybe.
3       Q   Okay.  Anybody else?
4       A   No.
5       Q   Mr. Astudillo, I'm handing you what the
6   court reporter has marked as Exhibit 6.
7           MS. BIESENTHAL:  I've got to look on
8   with you on this one too.
9           THE WITNESS:  Okay.
10      Q   (BY MR. HOFELD)  I'm going to represent
11  to you that these are documents that were produced
12  to the plaintiff in this lawsuit by Citywide Title
13  Corporation for the Navara loan.
14          I'll represent to you that these --
15  Mr. Astudillo, would you look with me, please, at
16  page 46 of Exhibit 6.
17      A   I don't have it.  It's a blank copy.
18      Q   You don't have 46?
19      A   No, sir.
20      Q   Okay.  Do you mind if I just take a look?
21  Are you missing any other pages that you can tell?
22      A   No.  So far that's the only thing.
23      Q   Okay.  I'm going to -- I'll show you my
24  exhibit, my page 46, and we can look at it together.
25  And I can make a copy of this and make it part of

51 (Pages 201 to 204)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 205

1 the record. Take a moment to look at it.
2     A   Okay.
3     Q   It appears to be -- first of all, do you
4 recognize this document?
5     A   It's a check that Citywide paid to ACS.
6     Q   In the amount of $8,000. The date of the
7 check is May 4, 2004, yes?
8     A   That's correct.
9     Q   Okay. The back of the check also appears
10 on this page. Is that your signature at the top?
11     A   That is correct.
12     Q   Okay. And the stamp -- there's a stamp on
13 there that says Harris Bank. And above that it says
14 May 5th, 2004. Was the original of this check given
15 to you?
16     A   Yes, sir.
17     Q   And do you recall when you received it?
18     A   It would have been four days after the
19 actual closing, on the 29th.
20     Q   Judging from the date on the check?
21     A   Correct.
22     Q   And what did you do with it when you
23 received it?
24     A   I deposited it into my account, sir.
25     Q   At Harris Bank?

Page 206

1     A   At Harris Bank, correct.
2     Q   When you say your account, you mean the
3 ACS account or your personal account?
4     A   This one into my personal account.
5     Q   And why did you deposit this one into your
6 personal account?
7     A   Because my ACS account had expired and
8 lapsed, my savings account.
9     Q   What do you mean it expired or lapsed?
10 What do you mean by that?
11     A   It was closed by Harris Bank.
12     Q   Okay. When was it closed?
13     A   I don't remember the exact date, sir.
14     Q   But it was before --
15     A   It was before --
16     Q   Prior to May of 2004?
17     A   That is correct.
18     Q   Okay. Mr. Astudillo, look with me,
19 please, at -- do you have a page 47?
20     A   Yes.
21     Q   Okay. Take a look at that. Is this a
22 document that you recognize?
23     A   This is a document I recognize.
24     Q   Okay. And what is this document?
25     A   This is a check payable from Citywide

Page 207

1 Title for $18,000 to ACS, care of Rogelio Astudillo.
2     Q   Okay. And the same, page 47 appears that
3 there's a photocopy of the back of the check. Do
4 you see that?
5     A   Yes.
6     Q   Is that your signature at the top?
7     A   That is correct.
8     Q   And do you see the stamp containing the
9 words Harris Bank?
10     A   Yes.
11     Q   Okay. Was this check provided to you at
12 any point?
13     A   Yes, it was.
14     Q   And when was it provided to you?
15     A   On or about the 28th, maybe, or 27th of
16 May.
17     Q   Okay. And why was it provided to you?
18     A   This was a check that was re-cut from
19 Citywide Title to ACS of a previous voided check for
20 the same amount.
21     Q   Why was it re-cut?
22     A   Because when I obtained -- I gave this --
23 the original 18,000-dollar check to Ms. Navara, it
24 was payable to ACS. So when she tried to cash it or
25 deposit it into her account, they wouldn't accept it

Page 208

1 because it would have been endorsed by ACS to her,
2 and her name was not on there. So they wouldn't
3 allow her to cash it.
4     Q   Who did you talk with at Citywide to --
5     A   I believe it was the post-closing
6 department. It would have been probably Shirley,
7 whoever signed the check -- Sheryl, excuse me.
8     Q   Okay. Just to complete my question, just
9 to make sure that we're on the same page here, the
10 question is: Who did you talk with at Citywide
11 Title in order to get them to cut you another check
12 and --
13     A   My answer was to the post-closing
14 department. And I would assume it's Sheryl. I
15 can't read her last name.
16     Q   And then this 18,000-dollar check dated
17 May 28, 2004, what did you do with this check?
18     A   I took it to my bank, deposited it into my
19 account, and I reissued a certified cashier's check
20 to Ms. Guadalupe Navara for 18,000.
21     Q   Okay. Why didn't you just have Citywide
22 Title cut a new check made out to Ms. Navara?
23     A   Because she couldn't receive cash out.
24     Q   Because that wouldn't have been consistent
25 with the closing documents, correct?

52 (Pages 205 to 208)

Page 209

1    A   No, because that was part of the
2  stipulation, that she could not get cash out due to
3  a foreclosure as a stipulation from Long Beach.
4    Q   Right.  So if you were going to get a new
5  check cut, the payee had to be one of the creditors
6  that was paid off?
7    A   Yes.
8    Q   In the Long Beach loan, correct?
9    A   Yes, correct.  I'm sorry.  I'm sorry.
10    Q   As reflected in the closing documents,
11  right?
12    A   Yes, sir.
13    Q   Okay.  Let's go to 64, Mr. Astudillo, yet
14  another version of the summary of debts and
15  disbursements.  This particular one is dated May 4,
16  2004.  Do you see that?
17    A   (Nodding)
18    Q   And the payoff to ACS of $26,000 is
19  crossed out and there is a handwritten number in its
20  place, $24,816.95.  Do you see that?
21    A   Yes.
22    Q   Is that your handwriting, any of those
23  handwritten marks?
24    A   No, sir.
25    Q   Do you know who made those marks?

Page 210

1    A   No, sir.
2    Q   Do you know why the amount was adjusted
3  down from $26,000, which is also the amount stated
4  on the HUD 1?
5    A   No, sir.
6    Q   Page 66 and 67, do you recognize any of
7  the handwriting on these two pages?
8    A   No, sir.
9    Q   It's not your handwriting?
10    A   No, sir.
11    Q   It's not Antoinette's handwriting?
12    A   No, sir.
13    Q   Mr. Astudillo, let's look at 97 together.
14    A   Okay.
15    Q   Okay.  Is this a document that looks
16  familiar to you?
17    A   Yes.
18    Q   And what is this document?
19    A   It's a letter of explanation addressed to
20  Citywide Title from Rogelio Astudillo.
21    Q   And is it written in your handwriting?
22    A   That is correct.
23    Q   Is that your signature?
24    A   That is correct.
25    Q   And what was the purpose of this note?

Page 211

1    A   To advise Citywide Title that Guadalupe
2  Navara paid me $683.53 because that was the
3  difference amount that she had to bring to closing.
4  She had to bring cash to closing, and I paid it on
5  her behalf.
6    Q   Did she bring cash to closing?
7    A   No, sir.
8    Q   Was that a pre-closing stipulation that
9  she had to bring cash?
10    A   Based on the amount on the settlement
11  statement, yes.  Is that what you're asking?  Maybe
12  you need to specify.
13    Q   Well, let's look at the settlement
14  statement.
15    A   Okay.
16    Q   Let's go back to Exhibit 5.
17    A   Page 2?
18    Q   Yeah, page 2.  I see an amount, line 303.
19  It says "cash from the borrower in the amount of
20  683.05."
21    A   Correct.
22    Q   And she didn't bring that money with her
23  to closing?
24    A   No.
25    Q   Okay.  I guess I don't think -- that still

Page 212

1  doesn't answer my question whether this was a
2  pre-closing stipulation.
3    A   Can you be more specific to what you mean?
4    Q   Did anyone inform Ms. Navara prior to
5  closing that she had to bring cash to closing?
6    A   Yes.  I did.
7    Q   Is that reflected in any of the documents
8  that we've looked at so far today?
9    A   No.  It was a verbal communication to her.
10    Q   By you?
11    A   By me, correct.
12    Q   Okay.  102, please.  Does this document
13  look familiar to you?
14    A   Yes.  It's a request for title policy from
15  Citywide -- excuse me, from New Millennium Mortgage
16  Group Corp. to Citywide Title Corporation.
17    Q   Okay.  Do you see your handwriting on the
18  page here?
19    A   Yes.
20    Q   Where is that?
21    A   It's buyer, the customer's name, address,
22  pin number.
23    Q   At the top?
24    A   At the top.
25    Q   Okay.

53 (Pages 209 to 212)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 213

1      A    And the bottom of the page.
2      Q    Okay.  All the handwriting on the bottom
3  of the page is yours?
4      A    With the exception of the 495 number, 200,
5  295.
6      Q    Okay.  This document indicates that you
7  requested the title endorsements?
8      A    Correct.
9      Q    Okay.  Mr. Astudillo, I'm going to show
10  you -- wait a second.  Let me do something else
11  first.
12          Mr. Astudillo, I'm handing you
13  Exhibit 7.  This contains documents produced by the
14  plaintiff in this lawsuit.  Would you turn to
15  page 7, please.
16      A    Yes.
17      Q    Does this document look at all familiar to
18  you -- and pardon me.  Pages 7 and 8 are two sides
19  of the same document.  Does page 7 look at all
20  familiar to you?
21      A    Yes.
22      Q    What is it?
23      A    It's a check payable from Citywide Title
24  Corporation to ACS in the amount of $18,000.
25      Q    Okay.  But this one is dated May 4th.

Page 214

1      A    Correct.
2      Q    Okay.  And the back -- look at the next
3  page, which is a copy of the back of the check.  Is
4  that your signature at the top of the back of the
5  check?
6      A    That's my signature and my writing, yes.
7      Q    It's also -- where it says "pay to the
8  order of Guadalupe Navara," that's your handwriting?
9      A    Yes.
10      Q    Did you receive this check?
11      A    Yes, I did.
12      Q    And when did you receive it?
13      A    On the 4th of May.
14      Q    And by the way, how did you receive these
15  checks?
16      A    I picked them up at the title company.
17      Q    Okay.  Were they in an envelope?
18      A    Yes.
19      Q    And what did you do with this check once
20  you picked it up?
21      A    I endorsed it and I gave it to Ms. Navara.
22      Q    When did you do that?
23      A    I believe it was the same day of May 4th.
24      Q    Did you call her and ask her to come to
25  the office?  Did you mail it to her?  How did that

Page 215

1  work?
2      A    I called her.  She came to my office and
3  picked it up.
4      Q    And, Mr. Astudillo, what happened, if
5  anything, to that check after Ms. Navara picked it
6  up from your office?
7      A    I believe she went to Citibank and tried
8  to cash it, they wouldn't do it, a third-party
9  endorsement.  She called me, said she couldn't cash
10  it and she brought it back to me.  And I don't know
11  if it was the same day or days after that, but she
12  brought it back to me.
13      Q    Okay.  What did you do with it after you
14  received it?
15      A    I sent it back to Citywide Title.
16      Q    Okay.  Let's look at page 11.  Is this a
17  document you recognize?
18      A    Yes.
19      Q    And what is this?
20      A    It's a certified cashier's check from
21  Harris Bank to Guadalupe Navara in the amount of
22  $18,000.  Remitter was me, Rogelio A. Astudillo.
23      Q    And what were you remitting to her?  Or
24  why were you remitting $18,000 to her?
25      A    For the check that I obtained from

Page 216

1  Citywide Title from her transactions of her
2  refinance, part of the 24,000-dollar fee that was
3  charged to Ms. Navara.
4      Q    Mr. Astudillo, did Ms. Navara ever ask you
5  for cash out?
6      A    Yes.
7      Q    Did she ever tell you that she wanted cash
8  out?
9      A    Yes.
10      Q    What did she say she needed it for?
11      A    To pay some personal debt.
12      Q    Do you know what?
13      A    No.  She didn't ever elaborate.  She just
14  said she had debt that she wanted to take care of.
15      Q    Did you ask her what it was for?
16      A    Yes.  She said personal debts and do some
17  fixtures on her home.  She wanted to repair her
18  property at 27th and Kostner.
19      Q    Do you know what repairs?
20      A    No.  Just general repairs, I believe
21  siding, roofing, interior.
22      Q    Is that document anywhere that you've seen
23  in the file?
24      A    No.  It was verbal, verbal communication
25  from Ms. Navara to me.

54 (Pages 213 to 216)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 217

1    Q   Mr. Astudillo, let's look at page 10.
2    A   Okay.
3    Q   Does this document look familiar?
4    A   Yes, it does.
5    Q   And what is it, please?
6    A   It was one of my previous business cards
7   from Astudillo Consulting.
8    Q   Okay. There's some handwriting on it.
9   That doesn't belong to you, does it?
10   A   No, that's not my handwriting, correct.
11   Q   And the back of the card appears on this
12   page as well, right?
13   A   Yes.
14   Q   And it's in Spanish.
15   A   Correct.
16   Q   And it appears to list some of the
17   services that ACS provided, correct?
18   A   Correct.
19   Q   And how would you translate to English the
20   first of the services listed there?
21   A   Well, I'll translate the whole card. It
22   says, "Serving the community with the following
23   services." First line it states "Loans for purchase
24   of homes, refinancing homes, income tax, notary
25   public, and much more. Call us now."

Page 218

1    Q   Okay. You didn't mention earlier that the
2   services ACS provided included loans for home
3   purchases or refinances.
4    A   Correct.
5    Q   Okay. Did you charge for those services?
6    A   For what services, sir?
7    Q   The services I just mentioned.
8    A   The notary and the income tax --
9    Q   No.
10   A   -- yes. For the refinance and purchase of
11   a home through New Millennium, I do.
12   Q   So you charged for helping people find
13   loans for purchases and loans for refinancing. ACS
14   didn't charge for those services?
15   A   No, ACS doesn't charge for those services.
16   Q   Did you have a business card that
17   identified you as being with New Millennium?
18   A   I believe I did. I believe I did. I
19   don't recall that I did, actually -- let me rephrase
20   that. I did not have a business card from New
21   Millennium. I was never issued any.
22       MR. HOFELD: Let's make this 8.
23       MS. BIESENTHAL: Do you know what,
24   Al, can we take a quick break?
25       MR. HOFELD: Sure. Absolutely.

Page 219

1       (Recess taken)
2    Q   (BY MR. HOFELD) Mr. Astudillo, I'm
3   handing you what the court reporter has marked as 8,
4   Exhibit 8. These were additional documents produced
5   by the plaintiff in this lawsuit. I want to ask you
6   about the first page. Do you see there's a
7   photocopy of a business card from someone at Harris
8   Bank? I want to ask you to note the address.
9    A   2903 South Cicero Avenue, Cicero, Illinois
10   60804.
11   Q   Is that address familiar to you?
12   A   Yes.
13   Q   Why is that?
14   A   That's where my branch that I did
15   financial deposits was at.
16   Q   Okay. That's where you went to transact
17   your business?
18   A   Yes.
19   Q   Your business for ACS?
20   A   And personal.
21   Q   And your personal business?
22   A   Yes.
23   Q   Is that where you deposited the two checks
24   from Citywide Title, the first one for $8,000 dated
25   May 4th, and the second one -- the second one I

Page 220

1   think dated May 28th in the amount of 18,000?
2    A   Yes.
3    Q   I'm sorry. Both of those checks were
4   deposited at that branch, right?
5    A   Yes, sir.
6    Q   Okay. Mr. Astudillo, would you look at
7   page 2 in Exhibit 8. Do you recognize this
8   document?
9    A   Page 2?
10   Q   Yeah.
11   A   Yes.
12   Q   What does this document appear to be?
13   A   Payoff letter.
14   Q   Okay.
15   A   From ACS -- ASC to Guadalupe Navara.
16   Q   Okay. And I want to ask you to compare
17   this document with the document on page 197 of
18   Exhibit 5.
19   A   Page 197, sir?
20   Q   Yes.
21   A   Okay.
22   Q   Would you agree with me that the document
23   on page 2 of Exhibit 8 is a copy of a different
24   letter?
25   A   Will I agree --

55 (Pages 217 to 220)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 221

1  Q  In other words, these two letters are not
2  the same, are they?
3  A  They appear to be --
4  Q  Okay.  Look at the balance.  Page 2 of
5  Exhibit 8 states a balance of $26,000.
6  A  That's correct.
7  Q  Page 197 of Exhibit 5 states a balance of
8  twenty-seven five.
9  A  That's correct.
10  Q  Okay.  The expression of the date,
11  April 29, 2004, is also a little bit different.
12  Similarly, if you compare page 2 of Exhibit 8 to
13  page 95 of Exhibit 5.
14  A  Okay.
15  Q  These two letters are also different,
16  aren't they?
17  A  That is correct.
18  Q  So why is there a third -- yet a third
19  payoff letter stating a different balance?
20  A  Once again, to coincide with the final
21  number of 50,000.
22  Q  All of these -- well, did you prepare --
23  did you type up the letter on page 2 of Exhibit 8?
24  A  Yes, I did.
25  Q  Okay.  And did you do so on April 29th,

Page 222

1  2004?
2  A  Yes, I did.
3  Q  Why did you prepare three different
4  letters with different balances on the same day?
5  A  As I stated earlier, to make sure that the
6  final number actually matched with the application
7  that was going to be closed by Long Beach for
8  Guadalupe Navara's refinance amount.
9  Q  But did you discover -- I'm asking you
10  more specifically.  I mean, you could have -- seems
11  to me you could have satisfied that purpose by just
12  preparing one letter and sending it to Long Beach.
13  Did you discover twice that the letter you had
14  prepared was inadequate for some reason?
15  A  Did I -- can you be more specific to what
16  you mean?
17  Q  You rewrote the same letter three times on
18  the same day, right?
19  A  That is correct, sir.
20  Q  Okay.  Why did you -- do you recall why
21  you rewrote it the second -- prepared the same
22  letter the second and the third time?
23  A  Yes, sir.  As I stated earlier, so it
24  could match the exact amount to keep the loan at
25  50,000, same cash, same -- everything to be no

Page 223

1  higher than 50 and less cash from customer, which is
2  683, and that's as close as we could get.
3  Q  Did the balance amounts stated on these
4  three letters correspond with documents that you had
5  already submitted to Long Beach?
6  A  I believe -- I don't recall which one was
7  the last letter that was actually submitted to Long
8  Beach.  Whatever the last letter was that they have
9  on record is what the final letter was that I wrote
10  out, the corrected amount.
11  Q  The HUD 1 settlement statement that we
12  looked at, pages 2 through 4 of Exhibit 5, it
13  doesn't show that any part of the $26,000 to ACS was
14  going to go to you personally, does it?
15  A  No, sir.
16  Q  Mr. Astudillo, did you ever inform
17  Ms. Navara how much money you intended to charge her
18  for the services you provided?
19  A  Yes, I did.
20  Q  When did you do that?
21  A  Prior to the closing, sir.
22  Q  Do you remember which meeting it was?
23  A  A phone conversation with Ms. Navara.  I
24  want to say maybe the day before the closing.
25  Q  So that was after you had already provided

Page 224

1  the services, right?
2  A  Yes.
3  Q  Okay.  And that was the first time you
4  advised her of the fee for the services, correct?
5  A  I believe so, yes.
6  Q  Did you ever provide her with an invoice
7  of any kind?
8  A  As I stated earlier, no, sir.
9  Q  Okay.  Did you give her a copy -- do you
10  recall whether you gave her a copy of one of those
11  payoff statements that we've looked at?
12  A  I don't recall that I didn't or that I
13  did.  I may have or may not.
14  Q  Did you ever provide her with a written
15  explanation of the charges?
16  A  No, sir.
17  Q  Okay.  Did you tell her that she had to
18  pay you in order to close the loan?
19  A  No, sir.
20  Q  And, again, there was no -- Mr. Astudillo,
21  how did you decide to charge Ms. Navara $8,000 for
22  the services you provided?
23  A  Can you be more specific to your question,
24  please?
25  Q  How did you determine how much to charge

56 (Pages 221 to 224)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 225

1   Ms. Navara for the services you provided?
2      A   It was just an amount calculated based on
3   my previous services to her.
4      Q   What was the calculation based on?
5      A   My calculation just stated $8,000. There
6   was no timetable, there was no schedule of fees.
7   There was no written form or the time hourly.  It
8   was just an amount stated to her.
9      Q   You must have had some criteria going
10  through your mind.  I assume you just didn't say to
11  yourself, well, $8,000 sounds good.  That sounds
12  like, you know, a good chunk of change for me.  Why
13  don't I just charge her $8,000.  Or is that what
14  happened?
15     A   Actually, that was what happened, sir.
16     Q   Okay.  So you actually spent -- according
17  to your earlier testimony, you actually spent about
18  4 hours and 45 minutes providing the services that
19  you described in your log, yet you charged her
20  $8,000, correct?
21     A   Well, the log doesn't state other
22  particular services that I did while she was not
23  present.  There's phone calls, there was -- I mean,
24  so it's more time than just four hours just in the
25  log, as I stated to you in our conversation was a

Page 226

1   brief log.  I didn't write in detail every single
2   little item that I did.
3      Q   Earlier you testified that there weren't
4   any other services that you provided to Ms. Navara
5   outside of those described in the log.
6      A   That is correct.
7      Q   Do you recall that?
8      A   That is correct.
9      Q   Are you changing your testimony now?
10     A   No, sir.
11     Q   Okay.  So there's no other services that
12  you provided to Ms. Navara other than the ones that
13  are described or alluded to in your conversation
14  log?
15         MS. BIESENTHAL:  Objection.  I think
16  that actually may be a mischaracterization of his
17  testimony.
18     Q   (BY MR. HOFELD)  You can answer the
19  question.
20     A   Okay.  No.  It actually -- what was -- can
21  you repeat your question again?  I'm sorry.
22         MR. HOFELD:  Can you read it back?
23         (The record was read as requested.)
24     Q   (BY MR. HOFELD)  What's your answer?
25     A   That is true to that question.

Page 227

1      Q   Okay.  So the only services for which she
2   was charged, then, were the ones that you provided
3   that are alluded to in the log?
4      A   That is correct.
5      Q   Okay.  And you charged her the $8,000 for
6   those services?
7      A   That is correct.
8      Q   Do you think the work that you did
9   justified that charge?
10     A   I believe so.
11     Q   Why do you believe that, Mr. Astudillo?
12     A   It's a personal belief, sir.
13     Q   Do you have any basis for it?
14     A   In writing?  No, sir.
15     Q   In your own mind.
16     A   Yes, just the personal belief based on the
17  work and --
18     Q   What about the work?
19     A   Just the time that I took and --
20     Q   The 4 hours and 45 minutes?
21     A   As I stated to you, it was more than 4
22  hours, sir.
23     Q   Mr. Astudillo, you testified earlier that
24  the time spent in the first meeting in reviewing the
25  documents was an hour, second meeting you said 2 1/2

Page 228

1   hours.  Third, between 15 and 30 minutes.  Fourth,
2   45 minutes, approximately.
3      A   That is correct, sir.
4      Q   You're not trying to change your testimony
5   now, are you?
6      A   No, sir.
7         MS. BIESENTHAL:  I still think you're
8   mischaracterizing his earlier testimony.
9         MR. HOFELD:  That's fine.
10     Q   (BY MR. HOFELD)  So you think that 4
11  hours and 45 minutes worth of work justified an
12  8,000-dollar charge?
13     A   Yes, sir.
14     Q   But you have no basis for that
15  justification that you can state to me now?
16     A   I -- yes.
17     Q   What is the basis?
18     A   No.  I'm saying yes to what you're saying.
19     Q   You agree with me that --
20     A   I agree with what you're saying.
21     Q   So as you sit here today, you're unable to
22  articulate a basis for having charged Ms. Navara
23  $8,000?
24     A   Can you be more specific to what you want
25  me to state or verify or -- I mean, you say

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 229

1  articulate. What do you mean by that, sir?
2     Q   Can you explain the basis for having
3  charged $8,000 to Ms. Navara for performing 4 hours
4  and 45 minutes worth of work?
5     A   Yes, sir.
6     Q   What is that basis?
7     A   Based on the fact that I took and did a
8  risk by taking cash out so I could give to her so
9  she could stay out of foreclosure. The risk factor
10  which, in case now, I'm being sued because I did a
11  favor to Ms. Navara.
12     Q   Okay.
13     A   Is that justification to you? Yes, sir,
14  the risk factor was there.
15     Q   So that's a risk that you took on --
16     A   That's correct, sir.
17     Q   Excuse me. The question is: That's a
18  risk that you took on as an employee of New
19  Millennium, correct?
20     A   No.
21     Q   Well, Mr. Astudillo, when you informed
22  Long Beach that Ms. Navara owed a 26,000-dollar debt
23  to ACS, that wasn't true, was it?
24     A   No, sir, it's not true.
25     Q   Okay. And that representation was made in

Page 230

1  the course of your employment with New Millennium,
2  wasn't it?
3     MS. BIESENTHAL: Objection. Calls
4  for a legal conclusion.
5     Q   (BY MR. HOFELD) You were acting as a
6  broker for New Millennium when you made that
7  representation to Long Beach, right?
8     A   That is correct, sir.
9     Q   Okay. And so that was a risk that you
10  took when you were acting as a loan broker, right?
11     A   Actually, that was a favor that I did for
12  Ms. Navara.
13     Q   Okay. So it was a favor that you did for
14  Ms. Navara.
15     A   Correct.
16     Q   But you did it while you were acting as a
17  broker for New Millennium, right?
18     A   That is correct, sir.
19     Q   So you expect to be paid for the risk that
20  you took, correct?
21     A   No, sir. Just it's part of the
22  justification.
23     Q   Okay. But a couple of minutes ago you
24  testified that the $8,000 was justified by the risk
25  you took in having her take cash out, right?

Page 231

1     A   Part of the justification, correct, and
2  part of my services, sir. Maybe I don't have a law
3  degree, sir, but I do provide services.
4     Q   Mr. Astudillo, would you agree with me
5  that the loan -- that your getting the loan for
6  Ms. Navara also helped save her home at the time?
7     MS. BIESENTHAL: Objection,
8  foundation. Vague.
9     THE WITNESS: Yes, sir, I believe so.
10     Q   (BY MR. HOFELD) Okay. Was that part of
11  the justification in your mind for charging her
12  $8,000?
13     A   No, sir.
14     Q   Mr. Astudillo, did you receive a copy of
15  the complaint that was filed in this case?
16     This is Exhibit 9. Does that look
17  familiar to you?
18     MS. BIESENTHAL: Do you mean to have
19  the complaint and the second amended complaint as
20  the same exhibit?
21     MR. HOFELD: I'm going to ask about
22  them separately.
23     Q   (BY MR. HOFELD) Mr. Astudillo, have you
24  seen that document before?
25     A   Yes, sir.

Page 232

1     Q   Okay. And did you receive a copy of it?
2  Were you served with a copy of it?
3     A   I believe I received a copy with it, sir.
4  And I may have been served with it. I don't recall.
5  But I do have a copy of this.
6     Q   If you received a copy of it -- you do
7  have a copy in your possession?
8     A   Yes, sir.
9     Q   If you received a copy of it, do you
10  recall whether it was when you were still in
11  Chicago?
12     A   No, sir.
13     Q   You don't --
14     A   Or I apologize. Yes. Yes, sir, I was
15  still in Chicago.
16     Q   When you received it, did you read it?
17     A   Yes.
18     Q   As a result of reading it, did you
19  understand that you personally are named as a
20  defendant in this lawsuit?
21     A   Yes, sir.
22     Q   Okay. So you understand that the
23  complaint contains allegations against you
24  personally?
25     A   That is correct.

Page 233

1    Q   Have you ever hired an attorney to
2  represent you in this matter?
3    A   No, sir.
4    Q   Mr. Astudillo, does this document, the one
5  that I'm handing you as Exhibit 10, does that look
6  familiar to you?
7    A   Yes, sir.
8    Q   Do you have a copy of the second amended
9  complaint in your possession?
10   A   I believe I do.
11   Q   Okay.  Have you read it?
12   A   Yes, sir.
13   Q   Do you recall being served with it?
14   A   I don't recall being served with it.  I
15  know I do have a copy, so I don't know if it was
16  through the mail because I've been receiving quite a
17  bit of mail on this.
18   Q   Did you understand that if you -- that
19  doing nothing in response to a complaint filed
20  against you is a ground for having a judgment
21  entered against you?
22   A   No, sir, I didn't.
23   Q   Okay.  Why have you not hired an attorney,
24  Mr. Astudillo?
25   A   I just -- there's no particular reason.

Page 234

1  Well, there's two reasons.  One, I figured I'll go
2  through the courts and see where this goes and ends
3  up with.  Second, I've looked into attorneys.  I
4  don't have the money to hire one or retain one.
5    Q   Do you understand that you can represent
6  yourself?
7    A   No, I didn't know that I could represent
8  myself, sir.
9    Q   Have you ever looked into it?
10   A   No, sir.
11   Q   Mr. Astudillo, did you receive -- scratch
12  that.
13       Earlier you testified that you
14  received a subpoena for ACS documents, correct?
15   A   Yes, sir.
16   Q   And that was in April, April 2006, right?
17   A   I believe so, yes.
18   Q   And the first time that you attempted to
19  respond or cooperate with that subpoena was after
20  you received an order from the court indicating that
21  a contempt order might be entered against you,
22  correct?
23   A   I believe so, sir.
24   Q   Do you know if you received a copy of --
25  and the first time you produced any documents was

Page 235

1  after I informed you on August 7th that the court
2  had issued a bench warrant; isn't that correct?
3    A   Is that the -- I'm sorry.  Repeat your
4  question, please.
5    Q   Sure.
6        MR. HOFELD:  Can you read it back?
7        (The record was read as requested.)
8        THE WITNESS:  No, that's not correct.
9  It was after the first deposition that I was going
10  to get you the documents.
11   Q   (BY MR. HOFELD)  Okay.  But you didn't
12  actually produce any documents at the deposition.
13  We agreed that you would produce documents by the
14  end of July, right?
15   A   Correct.
16   Q   And you didn't produce any documents by
17  the end of July, did you?
18   A   No.  I -- no, sir.
19   Q   Okay.  And the first time you produced a
20  document was Tuesday, this Tuesday of this week,
21  August 8th, correct?
22   A   Based on your definition of documents,
23  yes, sir.
24   Q   Okay.  You sent me an e-mail --
25   A   Yes, sir.

Page 236

1    Q   -- on August 4th, right?
2    A   Correct, sir.
3    Q   But there were no documents attached to
4  that e-mail?
5    A   No, none.
6    Q   Mr. Astudillo, did you ever talk to New
7  Millennium or anyone at New Millennium about the
8  Navara loan after this lawsuit was filed?
9    A   Yes.
10   Q   Who did you speak with?
11   A   I spoke to Luce Maria and Arlene.
12   Q   Did they approach you?
13   A   No.  I think it was a mutual approach at
14  one of the court hearings that you guys were having.
15  And I forgot what it was.  It was an extension.  But
16  we saw each other in one of the court hearings.
17   Q   You and Luce Maria and Arlene?
18   A   Uh-huh, yes, sir.
19   Q   Was anybody else present at that court
20  hearing?
21   A   Ms. Navara was present and some lady that
22  was with Ms. Navara.
23   Q   And did you have any discussions with --
24  let's leave that for a second and I'll ask you some
25  more questions about that in a moment.

59 (Pages 233 to 236)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 237

1    Did you ever discuss the case or the
2 Navara loan with anyone else at New Millennium?
3    A    No.
4    Q    Okay. Did you ever have discussions with
5 Luce or Arlene at New Millennium?
6    A    At New Millennium?
7    Q    Yeah.
8    A    In their office?
9    Q    Anywhere at New Millennium.
10    A    No, sir.
11    Q    So the only discussions you had with them
12 occurred when you came to court?
13    A    Yes, sir.
14    Q    How many times did you come to court?
15    A    Excuse me. I believe it was -- I saw them
16 twice, actually.
17    Q    You came to court twice?
18    A    Yes.
19    Q    Do you remember the approximate dates?
20    A    No, I don't, sir. It was at the very
21 early stages of this lawsuit.
22    Q    Was it 2005?
23    A    Yes, it was in 2005. I want to say
24 maybe -- you guys had requested extensions with the
25 court. Early in the year of 2005. I don't recall

Page 238

1 exactly.
2    Q    Okay. And what did you discuss with Luce
3 and Arlene?
4    A    They were asking me if I had an attorney,
5 you know, just basically general questions about,
6 you know, what I was going to do about this.
7    Q    And what did you say?
8    A    Well, that I didn't have an attorney and
9 I -- just as I stated earlier, I mean, I just --
10 they didn't do anything. I just explained to them
11 that I didn't have an attorney and we're going to
12 continue coming to court and see what happens. Just
13 general conversation.
14    Q    And was that the first or the second time
15 you went to court when that conversation occurred?
16    A    I believe it might have been the second
17 time.
18    Q    Who was present -- the second time, was
19 that the time that Ms. Navara and another lady with
20 her also present?
21    A    Yes.
22    Q    When you went to court the first time, who
23 was present?
24    A    It was Arlene and Ms. Luce Maria Padilla.
25    Q    And what did you discuss on that occasion?

Page 239

1    A    Same thing, where is my attorney, and what
2 was going on in the case. And we were inside the
3 court where we were briefly talking. We didn't
4 discuss much there.
5    Q    Was anybody else present?
6    A    Not at the first meeting, sir.
7    Q    At the second meeting at court, did you
8 talk to Ms. Navara?
9    A    Yes, I did.
10    Q    Okay. What did you say to Ms. Navara?
11    A    What was going on. She was wondering what
12 had just happened. We just walked out of the
13 courthouse. Apparently you had ordered an extension
14 and you didn't show up or the attorneys didn't show
15 up where it was extended, and we didn't know about
16 it. I even offered her -- I gave her a ride home
17 because we lived -- we used to live in the same
18 community.
19    Q    Did you discuss anything on the way home?
20    A    Yeah, you know, what was going on with the
21 loan. She was -- she said, "There's nothing against
22 you, Roger, personally. It's just against Long
23 Beach and New Millennium because, you know, what
24 happened to the 37,000-dollar loan that we were
25 going to do and why is it 50." She was just --

Page 240

1 that's exactly what she said -- or don't quote me
2 word by word on that.
3    Q    Did you ever talk to her again --
4    A    Yes.
5    Q    -- about the loan or the lawsuit?
6    A    Yes, sir. She came to my office and we
7 discussed what was going on with the deal.
8    Q    When was that?
9    A    I believe it might have been two, three
10 days after the day at court.
11    Q    And what deal are you referring to?
12    A    I mean what was going on with the
13 situation in the lawsuit.
14    Q    And what did you discuss specifically?
15    A    I specifically stated that if it was the
16 issue of the $8,000, you know, if that's what it was
17 going to settle this issue with her. She said, "No,
18 it's something more greater. My attorney said that
19 if I settle now that, you know, I have to pay his
20 legal fees and all the expenses, so I can't afford
21 to pay him at this time, and I'm going to continue
22 with the lawsuit."
23    Q    Did you ever offer to settle with
24 Ms. Navara?
25    A    In my office, as I mentioned to you right

60 (Pages 237 to 240)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 241

1 now, yes, I did.
2    Q   How much did you offer to pay her?
3    A   The same amount, the 8,000-dollar
4 difference apparently is what the big issue was
5 originally. I think that if she would have got her
6 full $26,000, she would have been content and she
7 wouldn't have said anything.
8    Q   So you offered to repay her $8,000?
9    A   In installment payments, yes, I did.
10    Q   How much did you offer to pay per month?
11    A   We didn't get to that point because that's
12 when she stated what I mentioned earlier about
13 settling.
14    Q   And are you sure that you're correct about
15 the amount of the settlement that you offered her?
16    A   Yeah. To my knowledge, I want to say it
17 was 8,000.
18    Q   Why did you offer her that amount?
19    A   Because it's the amount that, to my
20 understanding, based on this lawsuit, was the cause
21 of the lawsuit. I believe that if she would have
22 received the $26,000, she would have been content
23 and there wouldn't have been a lawsuit.
24          MR. HOFELD: I don't believe I have
25 any further questions right now.

Page 242

1          MS. BIESENTHAL: I'll be brief, I
2 promise.
3          THE WITNESS: That's okay. Take your
4 time.
5              EXAMINATION
6    Q   (BY MS. BIESENTHAL) So if I could direct
7 your attention back to your Exhibit 3, it's your
8 conversation log. It should be under this stack.
9    A   Exhibit 3?
10    Q   That's right.
11    A   Okay.
12    Q   Now, if you look at the first paragraph in
13 the conversation log, it says, "Customer came to
14 office with Sergio Sanchez."
15    A   Correct, sir -- I mean, ma'am. Sorry,
16 ma'am.
17    Q   Do you know --
18          MR. HOFELD: I haven't checked, but I
19 think she's a woman.
20          MS. BIESENTHAL: I represent that I,
21 in fact, am a woman.
22    Q   (BY MS. BIESENTHAL) Do you know
23 Mr. Sanchez?
24    A   Yes, I do.
25    Q   How do you know him?

Page 243

1    A   He's a customer of mine -- or was a
2 customer of mine, excuse me.
3    Q   How long was he a customer of yours for?
4    A   I want to say almost maybe a whole year.
5    Q   And what kind of work did you do for him?
6    A   Prepared his income taxes for the previous
7 three years of 2003, 2002, 2001, and I believe even
8 2000.
9    Q   Did you only know him as a customer or did
10 you have --
11    A   No. I knew him as not a friend but an
12 acquaintance through the neighborhood. I would see
13 him shopping in the hardware store that was below my
14 business.
15    Q   So you knew him before he came to you to
16 prepare his tax returns?
17    A   Yes.
18    Q   Now, would he typically refer business to
19 you?
20    A   No.
21    Q   The only time he did it was with
22 Ms. Navara?
23    A   Correct.
24    Q   To your knowledge, did he receive any
25 commission for referring Ms. Navara's business to

Page 244

1 you?
2    A   No.
3    Q   Based on your testimony in this
4 conversation log, it appears that you met with or
5 spoke to Ms. Navara at least four times before she
6 even decided to obtain a loan; is that right?
7    A   That's correct.
8    Q   Because when she first came to meet with
9 you, she intended to work out a deal with her
10 original mortgager, correct?
11    A   Tried to, yes.
12    Q   Now, this third -- I don't believe
13 Mr. Hofeld asked you this, and if he did, I
14 apologize. But the third entry on your conversation
15 log, was that over the telephone, or did you meet in
16 person?
17    A   No. She met me in my office in person.
18    Q   So you actually met with her four times
19 before she decided to obtain her loan?
20          MR. HOFELD: I'm going to object
21 because I think it mischaracterizes earlier
22 testimony.
23          THE WITNESS: Yes.
24    Q   (BY MS. BIESENTHAL) The first time
25 Ms. Navara came to your office, did you have her

61 (Pages 241 to 244)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 245

1    fill out any documents, paperwork?
2    A   No, ma'am.
3    Q   When was the first time you had her fill
4    out paperwork as it relates to her loan?
5    A   The 16th of March.
6    Q   Which was -- was that the fourth meeting
7    listed on your conversation log?
8    A   That would have been after the last
9    meeting, I'm sorry.
10   Q   It was at some point after your last
11   meeting --
12   A   Yes, ma'am.
13   Q   -- recorded on your conversation log?
14       Now, you said earlier that the
15   conversation log summarizes the services that you
16   provided to Ms. Navara but that you also evaluated
17   and assessed her problem.
18   A   Her situation with her current mortgage,
19   the reason she was in foreclosure.  She stated that
20   she had originally taken out a loan with Diamond
21   Mortgage, which was a home improvement company, and
22   they had financed her.  And when she knew that
23   Diamond Mortgage was no longer in business, she --
24   we tried to track down documentation, and because of
25   the situation that she was in foreclosure now and

Page 246

1    she didn't understand why she was in foreclosure if
2    she had paid off the debt, to her understanding.
3    Q   What did your services of evaluation and
4    assessment, what did that entail?
5        MR. HOFELD:  Objection.  Asked and
6    answered.
7    Q   (BY MS. BIESENTHAL)  Go ahead.
8    A   I'm sorry.  Can you repeat your question?
9    Q   Sure.  What did your services of
10   evaluation and assessment, what did that entail?
11   A   I evaluated the information that we
12   obtained through phone conversations when the
13   customer was in my office, through National
14   Acceptance, through HUD departments.  I evaluated
15   her contract of why she was in foreclosure and the
16   information, as I mentioned to you, that I obtained
17   from National Acceptance, and in turn, explained
18   everything to her that she didn't understand.
19   That's the evaluation and assessment of her case.
20   Q   In the second meeting, you state
21   Ms. Navara brought documents from National
22   Acceptance.
23   A   She brought me information that she had
24   from Diamond Mortgage.
25   Q   From Diamond Mortgage?

Page 247

1    A   Yes, which was the original creditor.
2    Q   And did you review those documents?
3    A   Yes, I did.
4    Q   As part of your evaluation and assessment?
5    A   Correct.
6    Q   Okay.  I want to turn your attention to
7    Exhibit 4 counsel went over with you.  Turn to
8    page 40 of that exhibit.
9    A   Okay.
10   Q   Now, this is a residential lease that you
11   said you prepared for Ms. Navara --
12   A   Correct.
13   Q   -- to show that she had rental income?
14   A   Based on -- yes.
15   Q   Can you explain that to me?  Why would she
16   need to show that she had rental income?
17   A   That was the income that she was stating
18   on the application, yet her tenants that she had
19   were just verbal.  It was nothing in writing.  And
20   we needed to prove -- for the purposes of
21   qualification through the loan, we needed to prove
22   the income, the name, when this tenant was actually
23   in that particular apartment.
24   Q   So you and Ms. Navara made these up in
25   order to get approval for the loan?

Page 248

1    A   No.  I completed what she gave me.  I just
2    filled out the lease that she verbally stated to me.
3    Q   When did she give you the lease?
4    A   This was relayed to me from her, and I
5    completed it myself.
6    Q   So she knew that you were going to prepare
7    a lease and submit it so that she could receive
8    approval for her loan?
9    A   That is correct.
10   Q   And what's the date on this lease?
11   A   It's dated November 15, 2002.
12   Q   And when did you and Ms. Navara prepare
13   this?
14   A   I believe it was on or about sometime
15   after the 16th.  I want to say maybe 20th, end of
16   the month of March.  I don't recall the exact date.
17   Q   Of what year?
18   A   Of 2004.
19   Q   Now, if you would turn to the second page,
20   there's a signature there.
21   A   Yes.
22   Q   Do you know whose signature that is?
23   A   It appears to be Guadalupe Navara's.
24       MR. HOFELD:  Is that page 41?
25   Q   (BY MS. BIESENTHAL)  Oh, I'm sorry.  It's

62 (Pages 245 to 248)

Page 249

1    41. There's two signatures. I'm talking about the
2  one next to Ms. Navara's.
3       A   I don't know, but I'm going to assume it's
4  going to be Sergio Sanchez.
5       Q   Did you see him sign it?
6       A   No, ma'am.
7       Q   So did you prepare this and then give it
8  to Ms. Navara for signature?
9       A   Yes, ma'am.
10      Q   And then she brought it back to you at
11 some point with these signed?
12      A   Correct. That is true.
13      Q   If you'd flip to 42, the same thing. So
14 you and Ms. Navara made this lease dated in 2002,
15 correct?
16      A   Correct.
17      Q   And then on the second page, did you see
18 the individual, whoever signed this --
19      A   No, ma'am.
20      Q   -- sign the lease?
21      A   No, ma'am.
22      Q   Page 44.
23      A   Okay.
24      Q   This lease is also dated 2002.
25      A   That's correct.

Page 250

1       Q   And this is also -- this is another lease
2  that you and Ms. Navara put together in order to
3  show that she had rental income?
4       A   Correct.
5       Q   Correct? And it's postdated 2002.
6       A   Correct.
7       Q   And on page 45 did you see -- I can't
8  pronounce her name. Can you pronounce her name?
9       A   I believe it's Guillermo Garcia.
10      Q   Did you see her sign?
11      A   Him? No.
12      Q   Him sign?
13      A   No, ma'am.
14      Q   Turn to the next page, 46.
15      A   Okay.
16      Q   And now this lease is dated January 1st,
17 2003.
18      A   Correct.
19      Q   Did you and Ms. Navara prepare this in
20 2004?
21      A   That is correct.
22      Q   For the same purpose?
23      A   Correct.
24      Q   And if you'd turn to the second page, did
25 you see an individual other than Ms. Navara sign

Page 251

1  this lease?
2       A   No.
3       Q   So all four of these leases you gave to
4  Ms. Navara and she brought them back signed?
5       A   Correct, ma'am.
6       Q   Now, if you take a look at -- I'm going to
7  turn your attention to another exhibit that counsel
8  went through with you. It's in Exhibit 5.
9       A   Okay.
10      Q   And it's page 98 of 5.
11      A   Okay.
12      Q   That's the handwritten letter that
13 explains that the $26,000 was owed to ACS for
14 services rendered?
15      A   No.
16          MR. HOFELD:  That's not the right
17 exhibit.
18          MS. BIESENTHAL:  Oh, I'm sorry. 252.
19          THE WITNESS:  Okay.
20      Q   (BY MS. BIESENTHAL)  Okay. And this is
21 the letter that you discussed with counsel that
22 explains that the money owed to ACS was for
23 professional services rendered?
24      A   That is correct.
25      Q   Is that right?

Page 252

1            Did you see Ms. Navara sign this
2  letter?
3       A   Yes.
4       Q   When did you see her sign it?
5       A   The day I prepared it.
6       Q   And what was that date?
7       A   I'm going to state that it was probably
8  the 26th or so, maybe.
9       Q   So did Ms. Navara come into your office to
10 sign this?
11      A   Yes.
12      Q   Did you explain this document to her?
13      A   Yes.
14      Q   What did you tell her about it?
15      A   That this is for the purposes of obtaining
16 the loan. Otherwise, she can't get cash out. We
17 were going to state that she owed ACS an amount of
18 money for professional services.
19      Q   The court reporter is going to hand you
20 what's been marked as Defendant's Exhibit 1. If you
21 could take a minute and look that over. And that's
22 the payoff letter that you went over with counsel;
23 is that right?
24      A   Correct.
25      Q   But this copy of the letter has a

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 253

1    signature on it.
2        A    Uh-huh.
3        Q    Whose signature is that?
4        A    I'm assuming it's Guadalupe Navara's
5    signature.
6        Q    Did you see Ms. Navara sign this?
7        A    I don't remember that I did see her.
8        Q    Would there have been any reason for you
9    to ask her to sign this?
10        A    No.
11        Q    And you testified that you prepared
12    Ms. Navara's loan applications; is that right?
13        A    That is correct.
14        Q    And after you prepared her loan
15    applications, did you explain them to Ms. Navara?
16        A    Definitely, yes.
17        Q    Did you explain the column or the entry in
18    the liabilities column that said $26,000 was owed to
19    ACS?
20        A    Originally there was not.
21        Q    Okay.
22        A    There was no entry made on the original
23    application.
24        Q    Okay.  When you prepared her second
25    application, did you explain that portion in the

Page 254

1    liabilities column?
2        A    Yes, I did.
3        Q    And she understood what it was that you
4    were doing?
5        A    I believe she did, yes.
6            MR. HOFELD:  Object to lack of
7    foundation.
8        Q    (BY MS. BIESENTHAL)  Well, how do you
9    know she understood what you were doing?
10        A    She stated that that's fine, if that's the
11    only way we could do the loan.
12            MR. HOFELD:  Objection, hearsay.
13            MS. BIESENTHAL:  It's an admission by
14    a party opponent.
15        Q    (BY MS. BIESENTHAL)  Now, counsel also
16    talked to you about the fact that you didn't receive
17    commission on Ms. Navara's loan.
18        A    Yes.
19        Q    So did you waive your broker fee?
20        A    No, I didn't.  I just didn't get paid for
21    the services that I provided for New Millennium on
22    behalf of New Millennium.
23        Q    So you did not receive a broker fee?
24        A    I did not receive a check from New
25    Millennium.  The broker did receive a fee of I

Page 255

1    think -- I don't know what the check amount was.
2        Q    Now, you said you never told anyone at New
3    Millennium that you were disguising cash out, cash
4    proceeds as a pre-existing debt.
5        A    That is correct.
6        Q    Were you authorized by anyone at New
7    Millennium to do that?
8        A    Nobody knew at New Millennium.
9        Q    Had anyone at New Millennium ever told you
10    that that was an acceptable practice?
11        A    No.
12        Q    And you also testified that you never told
13    anyone at Long Beach about --
14        A    Definitely not.
15        Q    Okay.  The court reporter is handing you
16    what's been marked as Defendant's Exhibit 2.  This
17    is an affidavit that Ms. Navara prepared and
18    attached to a pleading in this case.
19            MR. HOFELD:  I'm just going to object
20    to the extent that the sworn testimony contained in
21    this exhibit is incomplete, since she's also given a
22    deposition in the case.
23        Q    (BY MS. BIESENTHAL)  Can you take a
24    minute and look this over.
25        A    Yes.

Page 256

1            Okay.
2        Q    Okay.  Now, if I could turn your attention
3    to paragraph 3, the first sentence states, "During
4    the first meeting with Mr. Astudillo, I told him
5    that I needed to borrow just enough to pay off my
6    balance with First National Acceptance, which was
7    approximately $19,600."  Is that a true statement?
8        A    That is not a true statement.
9        Q    Why not?
10        A    Because that was not our first meeting.
11        Q    Now paragraph 4, "At the closing at
12    Mr. Astudillo's office on April 29, Mr. Astudillo
13    told me for the first time that I would get $25,000
14    from my loan transaction."  Is that a true
15    statement?
16        A    It is incorrect.
17        Q    Why?
18        A    Because we actually discussed this prior
19    to the closing.
20        Q    How many times did you discuss it prior to
21    the closing?
22        A    At least two times.
23            MR. HOFELD:  Object as to vague and
24    ambiguous.
25        Q    (BY MS. BIESENTHAL)  And when did you

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 257

1. discuss it?
2    A   The first time?
3    Q   The first time.
4    A   Was when I was informed by Long Beach that
5  the minimum loan amount was 50,000 and when we
6  signed -- when I had to explain why I was increasing
7  the loan to 50,000 from 37,000, which was the
8  original application that she signed on March 16th.
9    Q   And when was the second time?
10    A   I want to say three, four days prior to
11  the closing.  Maybe -- I want to say maybe the 26th
12  or 25th of April, 2004.
13    Q   I'm sorry.  What was said during that
14  conversation?
15    A   Advising her the same situation, that the
16  only way that we could close this loan is if we do a
17  payoff from ACS in the amount of twenty -- whatever
18  the total amount was, 26,000 or so, or 24, to
19  complete a minimum loan amount of 50,000-dollar
20  requirement.
21    Q   I'd like you to turn the page to
22  paragraph 9, "I never sought or received any service
23  that I am aware of from ACS or Mr. Astudillo, apart
24  from obtaining the loan from New Millennium and Long
25  Beach."  Is that a true statement?

Page 258

1    A   That is not a true statement.
2    Q   Why is that?
3    A   As per my previous statements, we sought
4  out information from HUD, First National -- or
5  National Acceptance, the mortgage company that we
6  paid off, and also my referring her to an attorney,
7  which is Marc Smith, which she went to see, by the
8  way.
9    Q   Paragraph 11, "I never received, in the
10  closing documents I was given, a copy of the note
11  attached hereto as Exhibit O."
12        For the record, Exhibit O is the
13  handwritten letter LBM 252.
14        "The first time I saw this was when
15  my attorney mailed it to me and asked me questions
16  about it.  Although the signature appears to be
17  mine, I believe the other handwriting is
18  Mr. Astudillo's.  I do not recall signing this
19  document at my closing."
20        Now, as I stated, Exhibit O refers to
21  the handwritten letter that we just went over in
22  your Exhibit 5.
23    A   Explaining the --
24    Q   Explaining that the --
25        MR. HOFELD:  I'll let you look at it.

Page 259

1        MS. BIESENTHAL:  252.
2        THE WITNESS:  Oh, okay.
3    Q   (BY MS. BIESENTHAL)  So is that a true
4  statement that the first time Ms. Navara saw that
5  note was when her attorney mailed it to her and
6  asked her questions about it?
7    A   That is incorrect.
8        MR. HOFELD:  Object to lack of
9  foundation.
10    Q   (BY MS. BIESENTHAL)  And why is that?
11    A   She received copies of everything she
12  signed.
13    Q   And she signed that letter; is that
14  right --
15    A   That is correct.
16    Q   -- your earlier testimony?
17        Last, paragraph 12, "I never noticed,
18  until my attorney sent me a copy and asked me about
19  it, that my loan application states that I owe a
20  debt to ACS."  Now, you testified earlier that
21  that's not true; is that right?
22    A   That is correct.
23    Q   That's correct that it's not true?
24    A   That is correct that it's not true.
25    Q   You said that you offered a settlement to

Page 260

1  Ms. Navara at your office some time after the court
2  date that you referred to?
3    A   That is correct.
4    Q   And you said that her attorney told her
5  that she couldn't accept a settlement?
6    A   No.  Her attorney did not know that we
7  were meeting.
8    Q   What did you say her attorney told her?
9    A   That she stated that if she would settle
10  that she would be liable for the fees and expenses
11  that the attorney incurred.
12        MR. HOFELD:  I'm going to object to
13  double hearsay.
14    Q   (BY MS. BIESENTHAL)  Did she say anything
15  in that conversation about other issues that she had
16  with Long Beach?
17    A   Her -- as far as what?  I'm sorry.  Can
18  you elaborate on that question?
19    Q   To be more specific, did she say that she
20  couldn't settle because there was an issue with a
21  rider to her mortgage?
22    A   Oh, no, she didn't -- she didn't state to
23  that extent.  She stated something about that the
24  problem was not with me personally, it was with Long
25  Beach, but something about that, the 37 and

65 (Pages 257 to 260)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 261

1   50,000-dollar loan. That's what she stated. She
2   didn't go into any detail about any writers or
3   anything like that.
4       Q   Now, you mentioned that you had one
5   conversation -- or, actually, counsel mentioned that
6   he had one conversation with you on August 7th and
7   that was when you identified a document that was
8   responsive to your rider?
9       A   That is correct.
10      Q   And I know that you spoke to counsel when
11  I was present during your first deposition.
12      A   Correct.
13      Q   But other than those two occasions, have
14  you ever spoken to Mr. Hofeld?
15      A   I believe so. I want to say maybe the 3rd
16  of August or --
17      Q   Who contacted --
18      A   -- the 31st. I'm sorry. Can I retract
19  that? I left him a message on July 31st. He called
20  me August 2nd and stated to me what was going on.
21  And I responded that if he had received my voice
22  mail. He said, "No, I haven't, let me -- what
23  number did you dial?" And I gave him the number
24  that I received at the deposition on July, whatever
25  the first deposition date was.

Page 262

1       Q   And you said that Mr. Hofeld explained to
2   you what was going on. Can you tell me exactly what
3   he said?
4           MR. HOFELD: Objection,
5   mischaracterization.
6           THE WITNESS: He stated -- I advised
7   him of the problem that I had with the files being
8   delivered to me. There was an issue with the
9   automobile of my father-in-law that was delivering
10  them to me, and I didn't get a chance to get ahold
11  of the file and be able to -- or documents to look
12  for it.
13          And he, in turn, said that, you know,
14  he needed these documents, he was going to give me
15  an extension until the 4th, which was Friday, in the
16  afternoon. And that was it. I hate to quote word
17  by word, but something to that extent.
18      Q   (BY MS. BIESENTHAL) Any other
19  conversations with Mr. Hofeld?
20      A   Which -- on Monday, the -- I can't think
21  of the date. This Monday past, I believe it was, he
22  left me a message stating that there was a warrant
23  or he was going to -- there was a bench warrant for
24  my arrest because I hadn't complied with some
25  subpoenas of providing documentation and that he

Page 263

1   would give me until noon of the following day to
2   provide any documentation.
3           I, in turn, told him that there was
4   notations or a conversation log of sort and he said
5   to go ahead and please send it to him and get it,
6   which I, in turn, forwarded it to him via e-mail.
7       Q   Any other conversations?
8       A   No, that's it.
9           MS. BIESENTHAL: I have nothing
10  further.
11          Thank you.
12          MR. HOFELD: I have just a couple of
13  questions.
14          EXAMINATION
15      Q   (BY MR. HOFELD) Mr. Astudillo, you said
16  a couple of minutes ago that Ms. Navara received
17  copies of everything she signed at the closing?
18      A   Yes.
19      Q   When did she get her copies?
20      A   The same day, sir.
21      Q   Who made the copies?
22      A   I want to say I think it was either
23  myself -- I think it was me that put them in the
24  copier.
25      Q   And you gave them to her?

Page 264

1       A   Yeah -- well, the closer actually gave
2   them to her.
3       Q   And just to clarify, with respect to the
4   leases --
5       A   Yes, okay.
6       Q   -- you obtained the form documents for
7   those leases, correct? Did you obtain from
8   somewhere the form legal documents --
9       A   Oh, yes.
10      Q   -- for those leases?
11      A   Those documents I do have.
12      Q   Where did you get them from?
13      A   I believe I got them when I was at
14  Worldwide Mortgage.
15      Q   And you filled out the information called
16  for in the blanks in these leases, correct?
17      A   That is correct, sir.
18      Q   Okay. And, finally, Mr. Astudillo, with
19  respect to this arrangement that you talked with
20  counsel about where you increased the loan amount
21  and represented a debt to ACS in the amount of
22  26,000 with the understanding that Ms. Navara was
23  going to get some cash back from some portion of
24  that $26,000 in cash back and ACS would take a share
25  of it, is there anywhere -- is there any note -- you

66 (Pages 261 to 264)

Page 265

1 testified earlier there's no agreement to that
2 effect, correct? There's no written agreement
3 between you and Ms. Navara?
4     A    That is correct, sir.
5     Q    Is there any note -- did you ever make any
6 notation at all of that arrangement anywhere?
7     A    No, sir. That's something you don't write
8 down. I'm sorry.
9     Q    Okay. And why didn't you write it down in
10 your personal conversation log or any other note or
11 ACS record?
12     A    Because the approval from Long Beach
13 stated that there was no cash to customer.
14     Q    Right. But what I'm asking you is not why
15 didn't you put it down in any documents you sent to
16 Long Beach. I'm asking you why didn't you note it
17 in your conversation log or in any of your personal
18 records or your ACS records that there was an
19 agreement between you and Ms. Navara to that effect?
20     A    Just because you just don't write things
21 down like that. It's an agreement -- a verbal
22 agreement as a favor to, in this case, Ms. Navara
23 that I was going to do a payoff so she could get her
24 cash. So there's -- I couldn't put that in writing.
25 It's not something that should or can be done.

Page 266

1          If you're asking to hear that that is
2 illegal, yes, sir, that is illegal. So you couldn't
3 state that. As I mentioned earlier, I believe if
4 she would have received her $26,000, we wouldn't be
5 having this conversation today.
6          MR. HOFELD: No further questions.
7          THE WITNESS: Thank you.
8          MS. BIESENTHAL: Nothing further from
9 me.
10          (Deposition Concluded)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 267

1          CHANGES AND SIGNATURE
2 PAGE LINE    CHANGE          REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 268

1
2     I, ROGELIO A. ASTUDILLO, have read the
   foregoing deposition and hereby affix my signature
3 that same is true and correct, except as noted
   above.
4
5
6
7          ROGELIO A. ASTUDILLO
8
9
10 THE STATE OF          )
11 COUNTY OF             )
12
13     Before me,          , on this day
   personally appeared ROGELIO A. ASTUDILLO, known to
14 me (or proved to me on the oath of
   _____ or through
15 _____ (description of identity
   card or other document)) to be the person whose name
16 is subscribed to the foregoing instrument and
   acknowledged to me that he executed the same for the
17 purposes and consideration therein expressed.
18     (Seal) Given under my hand and seal of office
   this     day of          ,    .
19
20
21          NOTARY PUBLIC IN AND FOR
             THE STATE OF
22
23
24
25

67 (Pages 265 to 268)

ROGELIO A. ASTUDILLO, AUGUST 10, 2006

Page 269

1    IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION
3    GUADALUPE NAVARA        )
                             )
4    VS.           ) 05 C 0864
                             )
5    LONG BEACH MORTGAGE COMPANY; ) Judge Filip
     DEUTSCHE BANK NATIONAL TRUST )
6    COMPANY; NEW MILLENNIUM    ) Magistrate Judge Denlow
     MORTGAGE GROUP CORP.; ROGELIO)
7    A. ASTUDILLO, a/k/a ROGER  )
     ASTUDILLO              )
8
9            REPORTER'S CERTIFICATION
10    ORAL DEPOSITION OF ROGELIO A. ASTUDILLO
             AUGUST 10, 2006
11
12        I, Renee W. Crouch, Certified Shorthand
13    Reporter in and for the State of Texas, hereby
14    certify to the following:
15        That the witness, ROGELIO A. ASTUDILLO, was
16    duly sworn by the officer and that the transcript of
17    the deposition is a true record of the testimony
18    given by the witness;
19        That the deposition transcript was submitted on
20    _____ to the witness or to the attorney
21    for the witness for examination, signature, and
22    returned to Schwab Court Reporting Service by
23    _____;
24        I further certify that I am neither counsel
     for, related to, nor employed by any of the parties

Page 270

1    in the action in which this proceeding was taken,
2    and further that I am not financially or otherwise
3    interested in the outcome of this action.
4        Further certification requirements pursuant to
5    the Federal Rules of Civil Procedure will be
6    complied with after they have occurred.
7        CERTIFIED to by me this 19th day of
8    September, 2006.
9
10
11
             Renee W. Crouch
12           Texas CSR 5645
             Expiration Date: 12/31/07
13           SCHWAB COURT REPORTING SERVICE
             Firm Number 181
14           P.O. Box 3665
             Brownsville, Texas 78520
15           (956) 544-5126
16
17
18
19
20
21
22
23
24
25

Page 271

1    IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION
3    GUADALUPE NAVARA        )
                             )
4    VS.           ) 05 C 0864
                             )
5    LONG BEACH MORTGAGE COMPANY; ) Judge Filip
     DEUTSCHE BANK NATIONAL TRUST )
6    COMPANY; NEW MILLENNIUM    ) Magistrate Judge Denlow
     MORTGAGE GROUP CORP.; ROGELIO)
7    A. ASTUDILLO, a/k/a ROGER  )
     ASTUDILLO              )
8
9     ORAL DEPOSITION OF ROGELIO A. ASTUDILLO
                AUGUST 10, 2006
10
11           FURTHER CERTIFICATION
12
13        The original deposition was/was not returned to
14    Schwab Court Reporting Service by           ;
15        If returned, the attached Changes and Signature
16    page(s) contain(s) any changes and the reasons
17    therefor;
18        If returned, the original deposition was
19    delivered to Al Hofeld, Jr., Custodial Attorney;
20        That the deposition was delivered in accordance
21    with the Federal Rules of Civil Procedure, and that
22    a copy of this certificate was served on all parties
23    shown herein.
24        CERTIFIED to by me this _____ day of
25    _____, 2006.

Page 272

1
2
             Sydnee Schwab
3            Texas CSR 3442
             Expiration Date: 12/31/07
4            SCHWAB COURT REPORTING SERVICE
             Firm Number 181
5            P.O. Box 3665
             Brownsville, Texas 78520
6            (956) 544-5126
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

68 (Pages 269 to 272)