# Appendix of Unreported Cases

Westlaw.

12 C.F.R. Pt. 226, Supp. I

**Effective: January 14, 2008**

Code of Federal Regulations Currentness
  Title 12. Banks and Banking
    Chapter II. Federal Reserve System
      ⌐▤ Subchapter A. Board of Governors of the
      Federal Reserve System
        ⌐▤ Part 226. Truth in Lending (Regulation
        Z) (Refs & Annos)

      →SUPPLEMENT I TO PART 226--
      OFFICIAL           STAFF
      INTERPRETATIONS

<For compliance date(s) of amendment(s) to
supplement, see 72 FR 63462.>

Introduction

1. Official status. This commentary is the vehicle by
which the staff of the Division of Consumer and
Community Affairs of the Federal Reserve Board
issues official staff interpretations of Regulation Z, as
revised effective April 1, 1981. Good faith
compliance with this commentary affords protection
from liability under 130(f) of the Truth in Lending
Act. Section 130(f) (15 U.S.C. 1640) protects
creditors from civil liability for any act done or
omitted in good faith in conformity with any
interpretation issued by a duly authorized official or
employee of the Federal Reserve System.

2. Procedure for requesting interpretations. Under
appendix C of the regulation, anyone may request an
official staff interpretation. Interpretations that are
adopted will be incorporated in this commentary
following publication in the Federal Register. No
official staff interpretations are expected to be issued
other than by means of this commentary.

3. Status of previous interpretations. All statements
and opinions issued by the Federal Reserve Board
and its staff interpreting previous Regulation Z
remain effective until October 1, 1982, only insofar
as they interpret that regulation. When compliance
with revised Regulation Z becomes mandatory on
October 1, 1982, the Board and staff interpretations

of the previous regulation will be entirely superseded
by the revised regulation and this commentary except
with regard to liability under the previous regulation.

4. Rules of construction. (a) Lists that appear in the
commentary may be exhaustive or illustrative; the
appropriate construction should be clear from the
context. In most cases, illustrative lists are introduced
by phrases such as "including, but not limited to,"
"among other things," "for example," or "such as."

(b) Throughout the commentary and regulation,
reference to the regulation should be construed to
refer to revised Regulation Z, unless the context
indicates that a reference to previous Regulation Z is
also intended.

(c) Throughout the commentary, reference to "this
section" or "this paragraph" means the section or
paragraph in the regulation that is the subject of the
comment.

5. Comment designations. Each comment in the
commentary is identified by a number and the
regulatory section or paragraph which it interprets.
The comments are designated with as much
specificity as possible according to the particular
regulatory provision addressed. For example, some of
the comments to § 226.18(b) are further divided by
paragraph, such as Comment 18(b)(1)-1 and
Comment 18(b)(2)-1. In other cases, comments have
more general application and are designated, for
example, as Comment 18-1 or Comment 18(b)-1.
This introduction may be cited as Comments I-1
through I-7. Comments to the appendices may be
cited, for example, as Comment app. A-1.

6. Cross-references. The following cross-references
to related material appear at the end of each section
of the commentary:

(a) "Statute"--those sections of the Truth in Lending
Act on which the regulatory provision is based (and
any other relevant statutes);

(b) "Other sections"--other provisions in the
regulation necessary to understand that section;

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

(c) "Previous regulation"--parallel provisions in previous Regulation Z; and

(d) "1981 changes"--a brief description of the major changes made by the 1981 revisions to Regulation Z.

Where appropriate a fifth category ("Other regulations") provides cross-references to other regulations.

7. Transition rules. (a) Though compliance with the revised regulation is not mandatory until April 1, 1982, creditors may begin complying as of April 1, 1981. During the intervening year, a creditor may convert its entire operation to the new requirements at one time, or it may convert to the new requirements in stages. In general, however, a creditor may not mix the regulatory requirements when making disclosures for a particular closed-end transaction or open-end account; all the disclosures for a single closed-end transaction (or open-end account) must be made in accordance with the previous regulation, or all the disclosures must be made in accordance with the revised regulation. As an exception to the general rule, the revised rescission rules and the revised advertising rules may be followed even if the disclosures are based on the previous regulation. For purposes of this regulation, the creditor is not required to take any particular action beyond the requirements of the revised regulation to indicate its conversion to the revised regulation.

(b) The revised regulation may be relied on to determine if any disclosures are required for a particular transaction or to determine if a person is a creditor subject to Truth in Lending requirements, whether or not other operations have been converted to the revised regulation. For example, layaway plans are not subject to the revised regulation, nor are oral agreements to lend money if there is no finance charge. These provisions may be relied on even if the creditor is making other disclosures under the previous regulation. The new rules governing whether or not disclosures must be made for refinancings and assumptions are also available to a creditor that has not yet converted its operations to the revised regulation.

(c) In addition to the above rules, applicable to both open-end and closed-end credit, the following guidelines are relevant to open-end credit:

. The creditor need not remake initial disclosures that were made under the previous regulation, even if the revised periodic statements contain terminology that is inconsistent with those initial disclosures.

. A creditor may add inserts to its old open-end forms in order to convert them to the revised rules until such time as the old forms are used up.

. No change-in-terms notice is required for changes resulting from the conversion to the revised regulation.

. The previous billing rights statements are substantially similar to the revised billing rights statements and may continue to be used, except that, if the creditor has an automatic debit program, it must use the revised automatic debit provision.

. For those creditors wishing to use the annual billing rights statement, the creditor may count from the date on which it sent its last statement under the previous regulation in determining when to give the first statement under the new regulation. For example, if the creditor sent a semi-annual statement in June 1981, and converts to the new regulation in October 1981, the creditor must give the billing rights statement sometime in 1982, and it must not be fewer than 6 nor more than 18 months after the June statement.

. Section 226.11 of the revised regulation affects only credit balances that are created on or after the date the creditor converts the account to the revised regulation.

Subpart A--General

Section 226.1--Authority, Purpose, Coverage, Organization, Enforcement and Liability

1(c) Coverage.

1. Foreign applicability. Regulation Z applies to all persons (including branches of foreign banks and sellers located in the United States) that extend

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

Consumer credit reflects the new statutory exemption for agricultural credit.

Consummation is a significant departure from longstanding interpretations of the previous definition. It now focuses only on the time the consumer becomes contractually obligated, rather than the time the consumer pays a nonrefundable fee or suffers an economic penalty for failing to go forward with the credit transaction.

Credit generally parallels the previous definition, but modifies the previous interpretations of the definition by excluding more transactions.

Creditor reflects the statutory amendments to the act that were intended to eliminate the problem of multiple creditors in a transaction. The regularly standard is still used, but it is now defined in terms of the frequency of the credit extensions. The new definition also requires that there be a written agreement to pay in more than 4 installments if no finance charge is imposed. Finally, the obligation must be initially payable to a person for that person to be the creditor.

Dwelling reflects the statutory amendment that expanded the scope of the definition to include any residential structure, whether or not it is real property under state law.

Open-end credit reflects the amended statutory definition requiring that the creditor reasonably contemplate repeated transactions. The new definition no longer requires the consumer to have the privilege of paying either in installments or in full.

Periodic rate combines the previous definitions of period and periodic rate with clarification in the commentary concerning transaction charges and 360-day-year factors.

Security interest is much narrower than the previous definition. Reflecting the legislative history of the simplification amendments, incidental interests are expressly excluded from the definition. Except for purposes of rescission, interests that arise solely by operation of law are also excluded.

## Section 226.3--Exempt Transactions

3(a) Business, commercial, agricultural, or organizational credit.

1. Primary purposes. A creditor must determine in each case if the transaction is primarily for an exempt purpose. If some question exists as to the primary purpose for a credit extension, the creditor is, of course, free to make the disclosures, and the fact that disclosures are made under such circumstances is not controlling on the question of whether the transaction was exempt.

2. Factors. In determining whether credit to finance an acquisition--such as securities, antiques, or art--is primarily for business or commercial purposes (as opposed to a consumer purpose), the following factors should be considered:

. The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.

. The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.

. The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.

. The size of the transaction. The larger the transaction, the more likely it is to be business purpose.

. The borrower's statement of purpose for the loan.

Examples of business-purpose credit include:

. A loan to expand a business, even if it is secured by the borrower's residence or personal property.

. A loan to improve a principal residence by putting in a business office.

. A business account used occasionally for consumer

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

purposes.

Examples of consumer-purpose credit include:

. Credit extensions by a company to its employees or agents if the loans are used for personal purposes.

. A loan secured by a mechanic's tools to pay a child's tuition.

. A personal account used occasionally for business purposes.

3. Non-owner-occupied rental property. Credit extended to acquire, improve, or maintain rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes. This includes, for example, the acquisition of a warehouse that will be leased or a single-family house that will be rented to another person to live in. If the owner expects to occupy the property for more than 14 days during the coming year, the property cannot be considered non-owner-occupied and this special rule will not apply. For example, a beach house that the owner will occupy for a month in the coming summer and rent out the rest of the year is owner occupied and is not governed by this special rule. See Comment 3(a)-4, however, for rules relating to owner-occupied rental property.

4. Owner-occupied rental property. If credit is extended to acquire, improve, or maintain rental property that is or will be owner-occupied within the coming year, different rules apply:

. Credit extended to acquire the rental property is deemed to be for business purposes if it contains more than 2 housing units.

. Credit extended to improve or maintain the rental property is deemed to be for business purposes if it contains more than 4 housing units. Since the amended statute defines dwelling to include 1 to 4 housing units, this rule preserves the right of rescission for credit extended for purposes other than acquisition.

Neither of these rules means that an extension of credit for property containing fewer than the requisite

number of units is necessarily consumer credit. In such cases, the determination of whether it is business or consumer credit should be made by considering the factors listed in Comment 3(a)-2.

5. Business credit later refinanced. Business-purpose credit that is exempt from the regulation may later be rewritten for consumer purposes. Such a transaction is consumer credit requiring disclosures only if the existing obligation is satisfied and replaced by a new obligation made for consumer purposes undertaken by the same obligor.

6. Agricultural purpose. An agricultural purpose includes the planting, propagating, nurturing, harvesting, catching, storing, exhibiting, marketing, transporting, processing, or manufacturing of food, beverages (including alcoholic beverages), flowers, trees, livestock, poultry, bees, wildlife, fish, or shellfish by a natural person engaged in farming, fishing, or growing crops, flowers, trees, livestock, poultry, bees, or wildlife. The exemption also applies to a transaction involving real property that includes a dwelling (for example, the purchase of a farm with a homestead) if the transaction is primarily for agricultural purposes.

7. Organizational credit. The exemption for transactions in which the borrower is not a natural person applies, for example, to loans to corporations, partnerships, associations, churches, unions, and fraternal organizations. The exemption applies regardless of the purpose of the credit extension and regardless of the fact that a natural person may guarantee or provide security for the credit.

8. Land trusts. Credit extended for consumer purposes to a land trust is considered to be credit extended to a natural person rather than credit extended to an organization. In some jurisdictions, a financial institution financing a residential real estate transaction for an individual uses a land trust mechanism. Title to the property is conveyed to the land trust for which the financial institution itself is trustee. The underlying installment note is executed by the financial institution in its capacity as trustee and payment is secured by a trust deed, reflecting title in the financial institution as trustee. In some instances, the consumer executes a personal guaranty of the indebtedness. The note provides that it is payable only out of the property specifically

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

described in the trust deed and that the trustee has no personal liability on the note. Assuming the transactions are for personal, family, or household purposes, these transactions are subject to the regulation since in substance (if not form) consumer credit is being extended.

3(b) Credit over $25,000 not secured by real property or a dwelling.

1. Coverage. Since a mobile home can be a dwelling under § 226.2(a)(19), this exemption does not apply to a credit extension secured by a mobile home used or expected to be used as the principal dwelling of the consumer, even if the credit exceeds $25,000. A loan commitment for closed-end credit in excess of $25,000 is exempt even though the amounts actually drawn never actually reach $25,000.

2. Open-end credit. An open-end credit plan is exempt under § 226.3(b) (unless secured by real property or personal property used or expected to be used as the consumer's principal dwelling) if either of the following conditions is met:

. The creditor makes a firm commitment to lend over $25,000 with no requirement of additional credit information for any advances.

. The initial extension of credit on the line exceeds $25,000.

If a security interest is taken at a later time in any real property, or in personal property used or expected to be used as the consumer's principal dwelling, the plan would no longer be exempt. The creditor must comply with all of the requirements of the regulation including, for example, providing the consumer with an initial disclosure statement. If the security interest being added is in the consumer's principal dwelling, the creditor must also give the consumer the right to rescind the security interest. (See the commentary to § 226.15 concerning the right of rescission.)

3. Closed-end credit--subsequent changes. A closed-end loan for over $25,000 may later be rewritten for $25,000 or less, or a security interest in real property or in personal property used or expected to be used as the consumer's principal dwelling may be added to an extension of credit for over $25,000. Such a

transaction is consumer credit requiring disclosures only if the existing obligation is satisfied and replaced by a new obligation made for consumer purposes undertaken by the same obligor. (See the commentary to § 226.23(a)(1) regarding the right of rescission when a security interest in a consumer's principal dwelling is added to a previously exempt transaction.)

3(c) Public utility credit.

1. Examples. Examples of public utility services include:

. Gas, water, or electrical services.

. Cable television services.

. Installation of new sewer lines, water lines, conduits, telephone poles, or metering equipment in an area not already serviced by the utility.

The exemption does not apply to extensions of credit, for example:

. To purchase appliances such as gas or electric ranges, grills, or telephones.

. To finance home improvements such as new heating or air conditioning systems.

3(d) Securities or commodities accounts.

1. Coverage. This exemption does not apply to a transaction with a broker registered solely with the state, or to a separate credit extension in which the proceeds are used to purchase securities.

3(e) Home fuel budget plans.

1. Definition. Under a typical home fuel budget plan, the fuel dealer estimates the total cost of fuel for the season, bills the customer for an average monthly payment, and makes an adjustment in the final payment for any difference between the estimated and the actual cost of the fuel. Fuel is delivered as needed, no finance charge is assessed, and the customer may withdraw from the plan at any time. Under these circumstances, the arrangement is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

exempt from the regulation, even if a charge to cover the billing costs is imposed.

3(f) Student loan programs.

1. Coverage. This exemption applies to the Guaranteed Student Loan program (administered by the Federal government, State, and private non-profit agencies), the Auxiliary Loans to Assist Students (also known as PLUS) program, and the National Direct Student Loan program.

References

Statute: Sections 103(s) and (t) and 104.

Other sections: Section 226.12(a) and (b).

Previous regulation: Section 226.3 and Interpretations §§ 226.301 and 226.302.

1981 changes: The business credit exemption has been expanded to include credit for agricultural purposes. The rule of Interpretation § 226.302, concerning credit relating to structures containing more than 4 housing units, has been modified and somewhat expanded by providing more exclusions for transactions involving rental property.

The exemption for transactions above $25,000 secured by real estate has been narrowed; all transactions secured by the consumer's principal dwelling (even if not considered real property) are now subject to the regulation.

The public utility exemption now covers the financing of the extension of a utility into an area not earlier served by the utility, in addition to the financing of services.

The securities credit exemption has been extended to broker-dealers registered with the CFTC as well as the SEC.

A new exemption has been created for home fuel budget plans.

Section 226.4--Finance Charge

4(a) Definition.

1. Charges in comparable cash transactions. Charges imposed uniformly in cash and credit transactions are not finance charges. In determining whether an item is a finance charge, the creditor should compare the credit transaction in question with a similar cash transaction. A creditor financing the sale of property or services may compare charges with those payable in a similar cash transaction by the seller of the property or service.

i. For example, the following items are not finance charges:

A. Taxes, license fees, or registration fees paid by both cash and credit customers.

B. Discounts that are available to cash and credit customers, such as quantity discounts.

C. Discounts available to a particular group of consumers because they meet certain criteria, such as being members of an organization or having accounts at a particular financial institution. This is the case even if an individual must pay cash to obtain the discount, provided that credit customers who are members of the group and do not qualify for the discount pay no more than the nonmember cash customers.

D. Charges for a service policy, auto club membership, or policy of insurance against latent defects offered to or required of both cash and credit customers for the same price.

ii. In contrast, the following items are finance charges:

A. Inspection and handling fees for the staged disbursement of construction loan proceeds.

B. Fees for preparing a Truth in Lending disclosure statement, if permitted by law (for example, the Real Estate Settlement Procedures Act prohibits such charges in certain transactions secured by real property).

C. Charges for a required maintenance or service contract imposed only in a credit transaction.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                      Page 1
Slip Copy, 2008 WL 489360 (N.D.Ill.)
**(Cite as: 2008 WL 489360 (N.D.Ill.))**

C Sadowski v. Med1 Online, LLC
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
   United States District Court,N.D. Illinois,Eastern
                        Division.
           Dr. Francis SADOWSKI, Plaintiff,
                           v.
       MED1 ONLINE, LLC, and Joes Does 1-10,
                      Defendants.
                     No. 07 C 2973.

                     Feb. 20, 2008.

Cathleen M. Combs, Daniel A. Edelman, Dulijaza
Clark, James O. Latturner, Edelman, Combs,
Latturner & Goodwin, LLC, Chicago, IL, for
Plaintiff.
Spencer J. Marks, Bruce Michael Friedman, Jonathan
D. Rosen, Laser, Pokorny, Schwartz, Friedman &
Economos, P.C., Chicago, IL, for Defendants.

            *MEMORANDUM OPINION AND ORDER*

MARVIN E. ASPEN, District Judge.
**\*1** Presently before us are Plaintiff Dr. Francis
Sadowski's ("Plaintiff") Preliminary Motion for Class
Certification, Defendant Med1Online, LLC's
("Med1") Motion to Strike Plaintiff's Preliminary
Motion for Class Certification, and Med1's Motion to
Dismiss. For the reasons set forth below, we deny all
of the above motions.

                      **BACKGROUND**

Plaintiff alleges that on or about October 13, 2006, he
received two identical unsolicited faxes advertising
Med1's products, despite no prior relationship with
Med1. (Compl.¶¶ 7, 12). He also alleges that Med1
was responsible for sending these faxes and derived
economic benefit from them. (*Id.* ¶¶ 9, 10).

On May 2, 2007, Plaintiff filed its first amended
complaint in Illinois state court against Med1, a
Colorado corporation, and John Does 1-10, the "other
natural or artificial persons that were involved in the
sending of the facsimile advertisements."(*Id.* ¶¶ 4, 5).
His complaint alleged violations of the Telephone

and Consumer Protection Act, 47 U.S.C. § 227
("TCPA"), violations of the Illinois Consumer Fraud
Act, 815 ILCS 505/2 ("ICFA"), and a state law
conversion claim. On May 29, 2007, Med1 removed
this action to our court.

Since removal, there have been numerous motions
filed. Med1 filed a Motion to Dismiss on July 18,
2007. On September 7, 2007, Plaintiff filed a
Preliminary Motion for Class Certification. On
November 27, 2007, Med1 filed a motion to strike
Plaintiff's class certification motion. Also on
November 27, 2007, Med1 filed a Rule 68 Offer of
Judgment. On December 11, 2007, Plaintiff filed a
Motion to Declare Offer of Judgment Ineffective.
Finally, on December 13, 2007, we granted the
United States's Motion to Intervene.

                      **ANALYSIS**

As indicated above, this Opinion involves three
motions: (A) Med1's Motion to Strike Plaintiff's
Preliminary Motion for Class Certification; (B)
Plaintiff's Preliminary Motion for Class Certification;
(C) Med1's Motion to Dismiss. We address each of
these motions in turn below.

**A. Med1's Motion to Strike Plaintiff's Preliminary
         Motion for Class Certification**

Med1 argues that we should strike Plaintiff's Motion
for Class Certification because it is premature,
intended only to delay its pending Motion to Dismiss,
and brought in bad faith. We disagree.

First, Federal Rule of Civil Procedure 23(c)(1)
requires that a district court decide class certification
issues "at an early practicable time." In spite of this
language, Med1 argues that its Motion to Dismiss
should be decided before Plaintiff's class certification
motion because it was filed as Med1's "opening
move" and therefore fits within the exceptions listed
in *Illinois State Rifle Ass'n v. State of Illinois,* 717
F.Supp. 634, 639 n. 12 (N.D.Ill.1989) (deciding
motion to dismiss first because it was defendant's
"opening move" and the complaint was "facially
suspect in more than one respect that appeared

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

incurable"). However, the Seventh Circuit has rejected this reasoning and has maintained that "[t]he court must decide promptly whether the case should proceed as a representative action, without regard to the virtues of the plaintiffs' legal theory."*Koch v. Stanard,* 962 F.2d 605, 607 (7th Cir.1992); *see also Hart v. Sheahan,* 396 F.3d 887, 894 (7th Cir.2005). Therefore, we must decide Plaintiff's Motion for Class Certification even before turning to Med1's motion to dismiss.

**\*2** Med1 also contends that we should strike the Motion for Class Certification because it lacks good faith. Med1 argues that Plaintiff filed its motion prematurely only to avoid the risk that Med1 would file a Rule 68 Offer of Judgment, which might render class certification moot. *See White v. Humana Health Plan,* No. 06 C 5546, 2007 WL 1297130, at \*6-7 (N.D.Ill. May 2, 2007). Plaintiff's filing may have been a strategic move, however, that is not a reason for striking its motion. This is particularly the case given that Plaintiff could have filed the motion for certification up to ten days after the filing of an Offer of Judgment and still avoided mootness. *See W. Ry. Devices Corp. v. Lusida Rubber Prods. Inc.,* No. 06 C 0052, 2006 WL 1697119, at \*2-3 (N.D.Ill. June 13, 2006) (demonstrating the uniform consensus in the Northern District of Illinois that "filing a motion to certify a class during the ten day period after a defendant makes an offer of judgment prevents mootness of a plaintiff's claim").

Finally, Med1 argues that Plaintiff's bad faith is evidenced by the fact that he is unable to establish that anyone other than Plaintiff received the faxes at issue. Regardless of the motivation behind Plaintiff's motion for class certification, if Plaintiff's motion is "premature" (i.e., if Plaintiff cannot establish the class requirements of Rule 23), then the class certification motion will be denied and need not be stricken. Accordingly, Med1's Motion to Strike is denied.

**B. Plaintiff's Preliminary Motion for Class Certification**

Pursuant to Rule 23(a), a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of

the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."Fed.R.Civ.P. 23(a). If the numerosity, commonality, typicality, and adequacy requirements are satisfied, the plaintiff must also demonstrate that the proposed class qualifies under at least one of the three subsections of Rule 23(b). Fed.R.Civ.P. 23(b); *Cavin v. Home Loan Ctr., Inc.,* 236 F.R.D. 387, 391 (N.D.Ill.2006). Here, Plaintiff seeks certification under Rule 23(b)(3), which permits class actions where "questions of law or fact common to the members of the class predominate over any questions affecting individual members, and ... a class action is superior to other available methods for the fair and efficient adjudication of the controversy."Fed.R.Civ.P. 23(b)(3).

Plaintiff bears the burden of showing that the proposed class meets the requirements for certification and that the "class is indeed identifiable as a class."*Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006); *see also Retired Chi. Police Ass'n v. City of Chi.,* 7 F.3d 584, 596 (7th Cir.1993); *Hernandez v. Midland Credit Mgmt., Inc.,* 236 F.R.D. 406, 410 (N.D.Ill.2006). In evaluating a motion for class certification, we do not examine the merits of the case. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 2152-53, 40 L.Ed.2d 732 (1974); *Retired Chi. Police Ass'n,* 7 F.3d at 598. In addition, we retain broad discretion in determining whether class certification is appropriate given the particular facts of the case. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998); *Cavin,* 236 F.R.D. at 391;*Murray v. New Cingular Wireless Servs., Inc.,* 232 F.R.D. 295, 298 (N.D.Ill.2005).

**\*3** Before considering the list of Rule 23 requirements, we must address the implied requirement that the class as defined should be sufficiently identifiable. *Oshana,* 472 F.3d at 513;*see also Alliance to End Repression v. Rochford,* 565 F.2d 975, 977-78 (7th Cir.1977) (explaining that a class definition must be "sufficiently definite to permit ascertainment of the class members"); *G.M. Sign, Inc. v. Franklin Bank, S.S.B.,* No. 06 C 949, 2007 WL 43 653 59, at \*2 (N.D.Ill.Dec. 13, 2007); *Pastor v. State Farm Mut. Auto. Ins. Co.,* No. 05 C 1459, 2005 WL 2453900, at \*2 (N.D.Ill. Sept.30, 2005), *aff'd,*487 F.3d 1042 (7th Cir.2007). If a class definition requires "the court to conduct an inquiry

Slip Copy
Slip Copy, 2008 WL 489360 (N.D.Ill.)
**(Cite as: 2008 WL 489360 (N.D.Ill.))**

Page 3

into the merits of each class member's claim," then it is not sufficiently definite. *Id.; see also Kenro, Inc. v. Fax Daily, Inc.,* 962 F.Supp. 1162, 1169 (S.D.Ind.1997); *Drinkman v. Encore Receivable Mgmt., Inc.,* No. 07-C-363-S, 2007 WL 4458307, at *2 (W.D.Wis. Dec.7, 2007).

Plaintiff's class definition includes:

(a) all persons with Illinois fax numbers; (b) who, on or after a date four years (Telephone Consumer Protection Act-Count I), three years (Illinois Consumer Fraud Act-Count II), or five years (conversion-Count III), prior to the filing of this action, (c) were sent advertising faxes by defendant *(d) and with respect to whom defendant cannot provide evidence of express consent or an established business relationship prior to the transmission of the faxes.*

(Plaintiff's Mot. for Class Cert. at 1) (emphasis added). The fourth requirement of this class virtually mirrors the statutory language of the TCPA and would require the court to investigate-and the Defendants to provide evidence regarding-the relationship between each potential class member and the Defendants. *Kenro,* 962 F.Supp. at 1169. In a practical sense, requiring a court to evaluate the facts surrounding the alleged transmission of each fax would "swamp the benefits of class-action treatment." *Pastor,* 487 F.3d at 1047 (discouraging class-action treatment if a separate evidentiary hearing is required for each class member's claim). Thus, Plaintiff's class is not sufficiently identifiable to permit certification.[FN1]

> FN1. While we treat this issue as failure to define a sufficiently identifiable class, we also note that some courts have addressed this issue as a failure to meet the "commonality" and "typicality" requirements of Rule 23. *See Kenro,* 962 F.Supp. at 1169;*Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 404 (E.D.Pa.1995). In addition other courts have treated it as a failure to meet the predominance requirement of Rule 23(b)(3).*Kenro,* 962 F.Supp. at 1169 n. 6. Regardless of the precise name given to the requirement, however, Plaintiff's alleged class is improper.

In addition, federal courts have denied class certification in cases involving nearly identical class definition language. *See G .M. Sign, Inc.,* No. 06 C 949, 2007 WL 4365359, at *3 (denying class certification based upon a virtually identical class definition because it would improperly require the defendant to show the "lack of defense, namely proof of express permission or invitation prior to the receipt of the fax advertisement"); *Kenro,* 962 F.Supp. at 1169 (holding that an investigation into whether faxes were sent with express invitation or permission requires a factual inquiry with regard to each class member and thus is not permitted); *Forman,* 164 F.R.D. 400 (denying class certification based on identical language because it would improperly require the court to delve into liability issues).

*4 Plaintiff argues that we should certify the class nonetheless because other courts have certified class actions under the TCPA. However, we note that many of Plaintiff's cases involve state law and also that none of these cases are binding on this court. In addition, Plaintiff argues that class certification here is proper because defendants have the burden of proving an established business relationship under the TCPA. We agree with Plaintiff's argument that defendants have the burden of proving an established business relationship under the TCPA. *In re Matter of Rules & Regs. Implementing the Tel. Consumer Protection Act of 1991 & the Junk Fax Prevention Act of 2006,* 21 F.C.C.R. 3787, 3794 (April 6, 2006) [hereinafter "FCC Order"]. However, the issue presented at this juncture is not whether or not Med1 will have the burden of proof regarding its defenses, but instead whether Plaintiff's alleged class is ascertainable and whether class treatment is the proper vehicle for determining liability in this case. Because the determination of Plaintiff's class would involve highly fact-specific inquiries into the circumstances surrounding the transmission of each fax, we find that the class is not sufficiently identifiable and deny Plaintiff's Preliminary Motion for Class Certification.

### C. Med1's Motion to Dismiss

Med1 argues that we should dismiss Plaintiff's complaint because: (1) the TCPA violates the Due Process Clause and (2) the faxes at issue were not "unsolicited advertisements" under the TCPA. In

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4
Slip Copy, 2008 WL 489360 (N.D.Ill.)
**(Cite as: 2008 WL 489360 (N.D.Ill.))**

addition, Med1 argues that if we dismiss Plaintiff's TCPA claim, we should also decline to exercise supplemental jurisdiction over Plaintiff's ICFA and conversion claims. We address these arguments in turn below.

*1. Standard of Review*

A court may grant a motion to dismiss under Federal Rule of Procedure 12(b)(6) when "it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The purpose of a motion to dismiss under 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir.1990). A sufficient complaint need not give "detailed factual allegations," but it must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007).

*2. Due Process*

Med1 argues that Plaintiff's complaint should be dismissed because the TCPA's $500 statutory damage award is disproportionate to the offense and therefore violates the Due Process Clause of the Fifth Amendment.

The TCPA makes it unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, any unsolicited advertisement." 47 U.S.C. § 227(b)(1)(c). The statute authorizes a court to impose the greater of actual damages or $500 for each violation. Id. § 227(b)(3). In addition, the court has discretion to award up to $1500 for knowing or willful violations. Id. The congressional purpose behind this statute was two-fold. First, it was aimed at deterring the practice of shifting advertising costs to unwilling recipients, such as the cost of the materials used to print unsolicited faxes. Phillips Randolph Enters., LLC v. Rice Fields, No. 06 C 4968, 2007 WL 129052, at *2 (N.D. Ill. Jan 11, 2007); see also H.R. Rep. 102-317, at 10. Second, Congress recognized the unquantifiable harmful effects of occupying the recipient's fax machine, "such as business interruption costs and wasted

time." Phillips, No. 06 C 4968, 2007 WL 129052, at *2; see also H.R. Rep. 102-317, at 10.

*5 The Supreme Court has held that a statutory damages provision, such as the one at issue, only violates Due Process if it is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." St. Louis, Iron Mount & S. R.R. Co. v. Williams, 251 U.S. 63, 67, 40 S.Ct. 71, 64 L.Ed. 139 (1919); see also Arrez v. Kelly Servs., Inc., 522 F.Supp.2d 997, 1008 (N.D.Ill.2007). "In determining whether the penalty is grossly disproportionate, 'the fine need only bear some relationship to the offense's gravity; this is not a proportionality inquiry.'" Id. (quoting United States ex rel. Tyson v. Amerigroup Ill., Inc., 488 F.Supp.2d 719, 744 (N.D.Ill.2007)).

Courts have routinely upheld the constitutionality of TCPA's statutory damages provision.[FN2] For example, in Phillips, the court explained that TCPA's statutory damage provision is constitutional because the amounts are high enough to further the statute's purpose and "the severity of the potential punishment is not out of proportion with the offense or obviously unreasonable, even where the transmission consists of a single page." Phillips, No. 06 C 4968, 2007 WL 129052, at *2; see also Italia Foods Inc. v. Marinov Enters., Inc., No. 07 C 2494, 2007 WL 4117626, at *4 (N.D.Ill. Nov.16, 2007) (justifying the TCPA's statutory damages because "[t]he amount must be sufficient to serve as a disincentive to the practice of faxing unsolicited advertisements for any potential likely senders").[FN3]

> FN2. The courts that have found this provision unconstitutional all appear to have been reversed on appeal. See Missouri ex. rel. Nixon v. Am. Blast Fax, 196 F.Supp.2d 920, 934 (E.D.Mo.2002), rev'd, 323 F.3d, 649, 660 (8th Cir.2003); see also Rudgayzer & Gratt v. Enine, Inc., 193 Misc.2d 449, 749 N.Y.S.2d 855 (Civ.Ct.2002), rev'd, 4 Misc.3d 4, 779 N.Y.S.2d 882 (App. Term 2004); The Chair King, Inc. v. GTE Mobilnet of Houston, 135 S.W.3d 365 (Tex.App. 14th Dist.2004), rev'd, 184 S.W.3d 707 (Tex.2006).

> FN3. We acknowledge that much of Med1's motion focuses upon the alleged flawed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 489360 (N.D.Ill.)
**(Cite as: 2008 WL 489360 (N.D.Ill.))**

Page 5

reasoning of the court in *Kenro Inc.,* 962 F.Supp. 1162. (Mot. to Dismiss at 6-8). However, other courts in our district, such as in *Phillips* and *Italia Foods,* have upheld the statute based upon their own independent legal analysis, as we do here.

Med1 argues that in spite of these cases the provision is unconstitutional because the legislative record contains no specific empirical findings to support imposition of a $500 penalty. Med1 contends that this is particularly egregious because the statutory penalty amounts to "approximately 2500 times the actual damage."(Mot. to Dismiss at 9). Med1 is correct that the congressional record does not include precise damage calculations, such as the cost of ink and paper for each unsolicited fax, however, the record does contain information to justify the damages amount. For example, Congress justified the penalty because unwanted faxes not only force a recipient to bear the costs of advertising, such as ink and paper, but also less quantifiable costs, such as the interference with and interruption of the recipient's actual business communications. H.R.Rep. No. 102-317, at 10, 25. Given Congress's explanation, we find that the amount is not so severely disproportionate to congressional concerns regarding junk faxes or so obviously unreasonable to make it unconstitutional. *See also Italia Foods,* No. 07 C 2494, 2007 WL 4117626, at *4 (finding no Due Process violation even though a defendant may be required to pay up to 30,000 times the recipient's actual cost of receiving an unwanted fax).

Med1 also argues that Supreme Court jurisprudence forbids damages which are so disproportionate to the actual harm suffered. To support this argument, Med1 cites to *BMW v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) and *State Farm Mutual v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Those cases are clearly distinguishable, however, because they involve the constitutionality of excessive punitive damages awarded by juries and not statutorily-prescribed damage awards. *See Arrez,* 522 F.Supp.2d at 1008 ("[T]hose cases are not relevant to statutory penalties."); *Phillips,* No. 06 C 4968, 2007 WL 129052, at *2 ("[C]onsiderations pertinent to the validity of jury awards are not the same as those attendant to damage amounts by statute.").

*6 Med1 claims that these cases are still relevant to class actions where statutory damages are aggregated to amounts which could potentially bankrupt a small business defendant. (Mot. to Dismiss Reply at 5). The Seventh Circuit has held, however, that such reasoning as applied to statutory damages is impermissible. *Murray v. GMAC,* 434 F.3d 948, 953 (7th Cir.2006) (reversing district court decision that denied class certification even though the defendant would face billions of dollars for violations of the Fair Credit Reporting Act because "[t]he reason that damages can be substantial ... does not lie in an 'abuse' of Rule 23; it lies in the legislative decision to authorize awards as high as $1000 per person").[FN4]

> FN4. In any event, this argument is probably moot given that we are denying class certification.

For the reasons stated above, Med1's arguments are unavailing and we hold that the statute is constitutional.

### 3. Unsolicited Advertisement

Med1 argues that even if the TCPA is constitutional, Plaintiff's claim must still be dismissed because the faxes at issue do not qualify as "unsolicited advertisements," as defined in the statute.

The statute defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without the person's prior express invitation or permission, in writing or otherwise."47 U.S.C. § 227(a)(5). Thus there are at least two permissible fax types under the TCPA: (1) where the sender and the recipient have an established business relationship; or (2) if the fax is noncommercial in nature.

To qualify as the first permissible fax type, the FCC focuses on the relationship between the sender and the recipient to determine whether a fax qualifies as an"unsolicited advertisement." FCC Order at 3813-14. If the sender and the recipient already have an established business relationship, then the fax is deemed "transactional" and permitted. *Id.* In this case, Plaintiff alleges that he had no prior relationship with Med1 and that he had not authorized any fax transmission. (Compl.¶ 10). Since we must accept all

Slip Copy                                                                                              Page 6
Slip Copy, 2008 WL 489360 (N.D.Ill.)
**(Cite as: 2008 WL 489360 (N.D.Ill.))**

of Plaintiff's allegations as true at this stage of the proceedings, we may not dismiss Plaintiff's claim based upon an existing relationship with Med1.

Second, even without an established business relationship, a fax is not an "unsolicited advertisement" when it contains "messages that do not promote a commercial product or service."FCC Order at 3810; *see also Phillips Randolph Enters., LLC v. Adler-Weiner Research Chi., Inc.,* No. 06 C 5111, 2007 WL293928, at *1 (N.D.Ill. Jan. 30, 2007). For example, this includes "messages involving political or religious discourse, such as a request for a donation to a political campaign, political action committee or charitable organization."FCC Order at 3810. In addition, faxes are considered noncommercial if they are purely informational, such as industry news articles, legislative updates, or employee benefit information, and the sender's "primary purpose is informational, rather than to promote commercial products."*Id.* at 3814.

*7 Med1 argues that Plaintiff's TCPA claim must be dismissed because the fax was noncommercial, since it did not promote a product or service, and because the faxes were merely informational. Plaintiff's complaint alleges that Med1, "as the entity whose products or services were advertised in the faxes, derived economic benefit from the sending of the faxes."(Compl.¶ 10). In addition to the alleged economic benefit Med1 may have received from the faxes, an examination of the two identical faxes at issue appears to support to Plaintiff's allegations regarding the potential commercial in nature of the faxes.[FN5]Therefore, Plaintiff has adequately stated a claim that Med1's faxes amounted to a "unsolicited advertisements" under the TCPA, and Med1's motion to dismiss is denied.

> FN5. While we do not hold as a matter of law that the faxes at issue are "commercial" at this point in the litigation, the information in the faxes is sufficient to support the potential accuracy of Plaintiff's allegations. For example, the faxes explicitly state that Med1 is in the "Asset Acquisition Services" business and appear to use language that might be geared toward acquiring new customers. While Med1 does not list any prices on its forms, it does claim to pay

"TOP DOLLAR" for used medical equipment, describes its company as "a better way to buy medical equipment," and urges recipients to "Call us!" or visit its website.

## CONCLUSION

For the reasons described above, we deny Med1's Motion to Strike Plaintiff's Preliminary Motion for Class Certification, Plaintiff's Preliminary Motion for Class Certification, and Med1's Motion to Dismiss. It is so ordered.

N.D.Ill.,2008.
Sadowski v. Med1 Online, LLC
Slip Copy, 2008 WL 489360 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.))**

▷Guillory v. American Tobacco Co.
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
    United States District Court, N.D. Illinois, Eastern
                          Division.
        Morris GUILLORY and Arnold Melamed,
    individually and on behalf of all others similarly
                     situated, Plaintiffs,
                              v.
         THE AMERICAN TOBACCO COMPANY, et al.,
                         Defendants.
                        No. 97 C 8641.

                       March 20, 2001.

          MEMORANDUM OPINION AND ORDER

GUZMAN, J.
**\*1** This matter is before the Court on plaintiffs'
motion for class certification pursuant to Federal
Rule of Civil Procedure ("Rule") 23(b)(3). For the
reasons stated below, the Court denies the motion.

                          FACTS

This case is a putative class action brought by named
plaintiffs Morris Guillory and Arnold Melamed,
longtime cigarette smokers, who seek damages and
injunctive relief.[FN1] Defendants are various tobacco
companies as well as their hired public relations
firms. Plaintiffs' two count complaint alleges that
tobacco products sold by the defendants were
dangerous, defective, addictive and that such
information about these products was fraudulently
concealed from consumers. Count I alleges violations
of the Illinois Consumer Fraud and Deceptive
Business Practices Act, and Count II seeks medical
monitoring.

>        FN1. The Court accepts the allegations of
>        the plaintiffs' amended complaint as true
>        when determining whether the proposed
>        class should be certified. *See Johns v.*
>        *DeLeonardis,* 145 F.R.D. 480, 482
>        (N.D.Ill.1992).

Pursuant to Rule 23(b)(3), plaintiffs seek to certify a

class on behalf of:

    All Illinois residents who smoke or smoked cigarettes
    manufactured by Defendants, who started smoking
    while a minor, who purchase or purchased cigarettes
    in Illinois and who desire to participate in a program
    designed to assist them in the cessation of smoking
    and/or monitor their medical condition to promote
    early detection of disease caused by, contributed, or
    exacerbated by cigarette smoking.

(Pls.' Mem. Supp. Class Certification at 26.) On
behalf of the proposed class, plaintiffs seek to
establish a cessation program and a court supervised
medical monitoring program to be funded by
defendants, through which class members would
undergo periodic diagnostic testing and medical
examinations in order to promote the early detection
of diseases caused by smoking. On behalf of the
class, plaintiffs also seek compensatory and other
damages pursuant to the Illinois Consumer Fraud and
Deceptive Trade Practices Act, 815 ILL. COMP.
STAT. 505/1.

Plaintiffs contend that all prerequisites for class
certification have been met and that certification is
proper under Rule 23(b)(3). Defendant argues that
individual issues predominate precluding certification
of the class and that a class action lawsuit is not a
superior method for adjudicating this dispute.

                        DISCUSSION

I. PREREQUISITES TO CLASS CERTIFICATION

Rule 23 governs class certification determinations. It
requires that: (1) the class is so numerous that joinder
of all members is impracticable; (2) there are
questions of law or fact common to the class; (3) the
claims or defenses of the representative parties are
typical of the claims or defenses of the class; and (4)
the representative parties will fairly and adequately
protect the interests of the class. FED. R. CIV. P.
23(a). All of the elements must be satisfied in order
for certification of the class to occur. *Retired Chicago*
*Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th
Cir.1993) (citing *Harriston v. Chicago Tribune Co.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 2
Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.))

992 F.2d 697, 703 (7th Cir.1993)). The moving party has the burden to establish that each of the prerequisites of Rule 23(a) are satisfied. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161 (1982); *Valentino v. Howlett,* 528 F.2d 975, 979 (7th Cir.1976).

**\*2** Once all of the elements of Rule 23(a) are met, the moving party must also show that the action is maintainable under Rule 23(b)(1), (2), or (3).*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 611-13 (1997). Plaintiffs in this case seek certification under Rule 23(b)(3), which provides for certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."FED. R. CIV. P. 23(b)(3).

When determining a motion for class certification, the court does not conduct a "preliminary inquiry into the merits of a suit to determine whether it can be maintained as a class action."*In re VMS Secs. Litigation,* 136 F.R.D. 466, 473 (N.D.Ill.1991). However, in reaching its decision to certify, the court may consider the substantive elements of the plaintiff's claims and the proof necessary to sustain those claims so as to project the course of a trial on those issues. *Elliott v. ITT Corp.,* 150 F.R.D. 569, 573 (N.D.Ill.1992). If the party seeking class certification meets its burden showing that the certification requirements are satisfied, the court must certify the proposed class. *Falcon,* 457 U.S. at 161;*Vickers v. Trainor,* 546 F.2d 739, 747 (7th Cir.1976). The court maintains broad discretion to determine whether a proposed class satisfies the requirements and should err in favor of maintaining class actions. *King v. Kansas City S. Indus.,* 519 F.2d 20, 26 (7th Cir.1975); *Patterson v. General Motors Corp.,* 631 F.2d 476, 480 (7th Cir.1980).

There are two implied prerequisites to class certification that must be satisfied prior to addressing the issues raised by Rule 23(a). First, the class must be sufficiently defined so that the class is identifiable.*Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir.1977). Secondly, the named representatives must fall within the proposed class. *Id.*

A class must be clearly defined so that a Court can determine whether a particular individual is a member of the proposed class. *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 490 (S.D.Ill.1999). Whether the description of a class is sufficiently definite to permit ascertainment of the class members must be determined on a case-by-case basis. *Alliance to End Repression,* 565 F.2d at 977. However, the description must not be so broad as to include individuals who are without standing to maintain the action on their own behalf. *Clay,* 188 F.R.D. at 490.

In this case, the plaintiffs propose a class defined as:

All Illinois residents who smoke or smoked cigarettes manufactured by Defendants, who started smoking while a minor, who purchase or purchased cigarettes in Illinois and who desire to participate in a program designed to assist them in the cessation of smoking and/or monitor their medical condition to promote early detection of disease caused by, contributed, or exacerbated by cigarette smoking.

**\*3** (Pls.' Mem. Supp. Class Certification at 26.) There are several problems with this proposed definition. For one, if the Court were to certify this class as defined, potentially hundreds of plaintiffs would be added daily. Although it is permissible to encompass future members in a definition, the potential for a massive quantity of future members in this class makes it unmanageable. Also, the proposed class does not distinguish between current smokers and former smokers, thus making the exact membership of the class at any given time during the case impossible to ascertain. Furthermore, the plaintiffs propose a class of individuals who "desire to" participate in a medical monitoring and/or smoking cessation program. In this way, the class definition depends on a subjective criteria and improperly relies upon the subjective desires of individual class members. See *Simer v. Rios,* 661 F.2d 655, 669 (7th Cir.1981) (holding a class defined in relation to each individual's state of mind is not sufficiently definite). It is next to impossible for this Court to come up with a class in this case that would be sufficiently definite given the factors present in this case. Nevertheless, even if a sufficiently precise definition could be created by the Court, such efforts would be futile because plaintiffs have failed to meet the requirements of Rule 23.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.))

*A. Numerosity*

The proposed class must be so numerous that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1). The complaint need not allege the exact number or identity of class members. *Patrykus v. Gomilla,* 121 F.R.D. 357, 360 (N.D.Ill.1988). When the proposed class is estimated to be large, numbers alone may be indicative of numerosity. *See Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D.Ill.1986). In addition to estimating the size of the class, the court considers judicial economy and the ability of class members to institute individual suits. *Tenants Associated for a Better Spaulding v. United States Dep't of Housing & Urban Dev.,* 97 F.R.D. 726, 729 (N.D.Ill.1983). Plaintiff asserts that the class defined in their complaint, which is comprised of potentially millions of people, is sufficiently large to render joinder of all class members impracticable. According to various studies provided by the plaintiffs' experts, about 3,000,000 Illinois residents smoke. Countless others are former smokers who would also potentially be eligible for relief. Given these enormous figures, it is clear the numerosity requirement is satisfied.

*B. Commonality*

A named class representative may sue on behalf of the class only if there are questions of law or fact common to the class. FED. R. CIV. P. 23(a)(2). The commonality requirement in Rule (a)(2) "is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions."*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 609 (1997) (stating the Third Circuit's interpretation of the commonality requirement in *Georgine v. Amchem Prods., Inc.,* 83 F .3d 610, 625 (1996)). Since plaintiffs seek to certify the class action under Rule 23(b)(3), there is no reason to analyze commonality separately. Commonality is discussed in detail with the requirements of Rule 23(b)(3) in Section II.

*C. Typicality*

*4Rule 23(a)(3) requires the court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large. *De La Fuente v. Stokely-Van Camp,*

*Inc.,* 713 F.2d 225, 232 (7th Cir.1983). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."*Id.* Unlike the commonality requirement, the typicality inquiry focuses on the relationship between the representatives and the class as a whole. *Id.* Factual distinctions between the claims of the named plaintiffs and those of other class members will not defeat a finding of typicality. *Id.* Moreover, "similarity of legal theory may control even in the face of differences of fact."*Id.* Therefore, the consequence of a finding of typicality is that the named plaintiff's interests are aligned with the proposed class, and thus in pursuing their own claims, the named plaintiffs will also advance the interest of the class. *See In re American Med. Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996).

Plaintiffs contend that their claims are typical of the class's claims because all arise from defendants' common conduct. Plaintiffs assert that the common conduct consisted of defendants' acts of engaging in a conspiracy to manipulate the nicotine content in cigarettes and conceal and suppress information regarding the addictive properties of nicotine. (Pls.' Mem. Supp. Class Certification at 37-38.) Additionally, plaintiffs claim that typicality exists because all of the claims are based on the same remedial theory.

Defendants, on the other hand, claim that the named plaintiffs' claims do not satisfy the typicality requirement because no plaintiff or group of plaintiffs can be typical of the named proposed class. (Defs.' Mem. Opp'n to Class Certification at 41-42). Defendants argue that the substantial differences between the members of the putative class-most significantly in the areas of levels of exposure to nicotine and causation-make it impossible for any set of class representatives to be typical of the class as a whole. Specifically, the defendants rely on *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 490 (S.D.Ill.1999), to demonstrate that the typicality requirement has limitations, "particularly when the claimed injury is tied to a complex course of conduct engaged in by the defendants over a long period of time, as opposed to a single act to which all class members have been exposed equally."*Id.* (citing *Insolia v. Philip Morris Inc.,* 186 F.R.D. 535, 544

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                      Page 4
Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.))**

(W.D.Wis.1998)).

In *Clay,* the plaintiffs brought a civil action for declaratory and monetary relief on behalf of a proposed class of nationwide smokers who alleged that they bought and smoked the defendant's cigarettes when they were minors due to the company's advertising and promotional campaigns specifically targeting young adults. *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 485 (S.D.Ill.1999). The court found that the typicality requirement was not satisfied because the claims of the class representatives were not typical of one another or of the entire proposed class. The court reasoned that the plaintiff's case depended on proving that each class member was exposed to relatively the same amounts of tobacco propaganda and that the effect of this propaganda on each class member's decision to smoke was significantly equal.*Id. at 492.*However, to the extent that the advertising did reach the class members, the court noted that "it arrived through different mediums and with greatly varying degrees of success," and thus did not affect class members equally. *Id.*

**\*5** Similarly in this case, the plaintiff's claims are not consistent among each other and are not sufficiently typical of the class to support class certification. Plaintiff argues that even if differences exist between the plaintiffs factually, a finding of typicality will not be precluded where there is a strong similarity of the legal theories. *See De La Fuente,* 713 F.2d at 232. However, the differences among the plaintiffs and the proposed class members are not merely factual differences regarding the circumstances of how their claims initiated-they impact the very legal theories on which the class can proceed. For example, the plaintiffs allege they were involuntarily exposed to the harmful substances contained in cigarettes because the defendants deliberately concealed information regarding the health hazards associated with smoking and the addictive properties in nicotine, particularly within their advertising campaigns. In order to prove each of their claims, the plaintiff must demonstrate a causal connection between the alleged misconduct and the damages-namely that the defendants' deceptive advertising caused each class member to smoke. On a classwide basis, this will be impossible to prove. That is because it is likely that not all members of the class were similarly subject to equal amounts of tobacco propaganda as a minor.

The extent of their exposure, if at all, was likely different as was the method by which the advertising arrived at each class member. Additionally, it is not sufficient for the plaintiffs to argue that the defendants' advertising campaigns had the same effect on every class member. The fact is individuals begin smoking for myriad of reasons and the influence of advertising on an individual may be just one of those many reasons. While many class members may indeed have been enticed as minors by the tobacco industry's marketing strategies, just how much will undoubtedly vary between individual plaintiffs. Given, given the great variations between the class members' claims, typicality does not exist.

*D. Adequacy of Representation*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."To be an adequate class representative, a named plaintiff must: (1) not have claims which are antagonistic to or conflict with those of the other class members; (2) have sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) have competent and experienced attorneys that are generally able to conduct the litigation vigorously. *Gammon v. GC Servs. Ltd. Partnership,* 162 F.R.D. 313, 317 (N.D.Ill.1995).

Plaintiffs will adequately protect the interests of the class as their interests in obtaining relief are in alignment with those of absent class members. They do not appear to have any interests which are adverse to other members of the classes. *See Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992) ("A class is not fairly and adequately represented if class members have antagonistic or conflicting claims."). Additionally, plaintiffs' counsel appear qualified and have demonstrated prior experience in various types of class actions and consumer litigation. Accordingly, plaintiffs satisfy the adequacy of representation requirement.

II. COMMONALITY AND THE REQUIREMENTS OF RULE 23(B)(3)

**\*6** While having failed the typicality prerequisite of Rule 23(a), this Court must consider commonality and the requirements of Rule 23(b)(3).Rule 23(b)(3) requires a showing that "questions of law or fact common to the members of the class predominate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5
Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.))

and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."FED. R. CIV. P. 23(b)(3).

A. Predominance

In order to satisfy the requirement of predominance, the plaintiff must show that the common issues not only exist, but outweigh the individual questions.*Dhamer v. Bristol-Myers Squibb Co.,* 183 F.R.D. 520, 529 (N.D.Ill.1998). The common questions must be central to all claims for which relief is sought.*Id.* In evaluating a motion to certify, it is not proper to consider the merits of a suit. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974). However, a court may look beyond the pleadings to determine whether the requirements of Rule 23 have been satisfied. *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996). A court must "understand the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of certification issues."*Id.*

Plaintiffs identify the following common factual and legal issues in support of certification: 1) whether the nicotine contained in cigarettes is addictive; 2) whether defendants engaged in deceptive and fraudulent course of conduct concerning the health hazards of smoking and addictive characteristics of nicotine; 3) whether defendants deliberately exposed smokers to known hazardous substances; and 4) whether medical monitoring is an appropriate course of action under Illinois law if plaintiffs prove defendants did engage in a deceptive and fraudulent course of conduct. (Pls.' Mem. Supp. Class Certification at 35). Additionally, plaintiffs assert that evidence will demonstrate that: nicotine is addictive; that the defendants knew or should have known that nicotine was addictive; that the defendants denied that nicotine was addictive while knowing that it was; and that the levels of nicotine in cigarettes were manipulated in an attempt to cause addiction by the defendants.

Plaintiffs argue that these are sufficient common issues to justify certification, and that the predominance factor is satisfied because no material variation among the class claims exists. The common issues enumerated in this case all relate to defendants' allegedly deceptive conduct and whether medical monitoring and cessation programs are appropriate

remedies to provide to plaintiffs. However, plaintiffs fail to acknowledge that both claims raise a number of individual issues inherent in proving the elements of each cause of action in this case. After reviewing the common issues in relation to the numerous individual issues, the Court concludes that the predominance factor is not satisfied.

*1. Medical Monitoring Claims Require an Analysis of Individual Issues*

*7 It should be noted from the outset that it is far from clear whether Illinois recognizes medical monitoring [FN2] as an independent cause of action. *See, e.g., Carey v. Kerr-McGee Chem. LLC,* No. 96 C 8583, 1999 WL 966484, at *1 (N.D.Ill. Sept. 30, 1999)* ("[n]either the U.S. Court of Appeals for the Seventh Circuit nor any Illinois reviewing court has decided" whether Illinois would recognize a cause of action for medical monitoring absent present physical injury); *Campbell v. A.C. Equip. Servs. Corp., Inc.,* 242 Ill.App.3d 707, 711, 610 N.E.2d 745, 751 (4th Dist.1993) (court's disposition of case "should not be construed as recognizing a cause of action to recover expenses for medical monitoring without a current physical injury being present"). The elements a plaintiff must prove to establish a right to medical monitoring differ among the states.[FN3]However, in order to prevail on a theory of medical monitoring based on their theory of negligence, plaintiffs must demonstrate that defendants caused their exposure to tobacco. *See Redland Soccer v. Dep't of Army,* 696 A.2d 137, 145-46 (Pa.1997). In doing so, plaintiffs must show that defendants' actions caused plaintiffs to become addicted to cigarettes and thereby rendered their choice to smoke involuntary. *See, e.g., Barnes v. American Tobacco Co.,* 161 F.3d 127, 145 (3d Cir.1998).

> FN2. A claim for medical monitoring lies when a plaintiff seeks compensation for a toxic exposure that has not yet produced any physical manifestation of injury or disease. *Dhamer v. Bristol-Myers Squibb Co.,* 183 F.R.D. 520, 523 (N.D.Ill.1998). Although the viability of a cause of action for medical monitoring has not yet been addressed in many jurisdictions, including this one, courts that have recognized the claim have concluded that a plaintiff may recover the cost of diagnostic medical evaluation proved

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.))**

to be proximately caused by the defendant's wrongdoing. *See, e.g., In re Paoli R.R. Yard PCB Litigation, 916 F.2d 829, 852 (3d Cir.1990); see also Carey v. Kerr-McGee Chem. Corp., 999 F.Supp. 1109, 1114 (N.D.Ill.1998).*

FN3. Most states which recognize medical monitoring claims require the elements as set forth by the Supreme Court of Pennsylvania. Under this formulation, plaintiffs must prove: (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. *Redland Soccer Club, Inc. v. Dep't of Army, 696 A.2d 137, 145-46 (Pa.1997).*

Plaintiffs contend addiction is not an issue in this case. They argue that defendants' knowledge and intentional misuse and manipulation of the addictive properties of nicotine demonstrate their intentional misconduct and liability for designing and promoting a defective product. Plaintiffs argue that proof of addiction or dependence is not a prerequisite to class membership in this case and that addiction is not a determinant of any claim in their case. In the same breath, however, plaintiffs also contend that the addictive nature of nicotine is the predominating issue surrounding the defendants' deceit thus forming the basis of their two claims.

In the Court's view, addiction of any particular smoker in this class is an essential part of the plaintiffs' claims. Indeed, plaintiffs' own Amended Class Action Complaint establishes that when it alleges "[p]laintiffs and class members have been significantly exposed to proven hazardous substances through intentional or negligent actions of the Defendants, and/or through defective products for

which Defendants are strictly liable" and that "[a]s a result of this exposure, Plaintiffs and class members suffer significantly increased risks of contracting serious latent diseases ."(Am.Compl.¶ 24). The language of the complaint indicates that plaintiffs are focused on proving that their addiction created their injury. However, determining addiction requires making numerous individual inquiries about each class member, which is not appropriate for class treatment. *Dhamer, 183 F.R.D. at 531.* To determine whether someone is addicted, a court must first "examine both biological and psychological evidence."*Id.* As such, because proof of addiction requires these individual inquiries, class certification is improper.

**2. Causation Issues Prevent a Finding of Predominance**

**\*8** Individual causation issues also prevent a finding that common issues predominate. To demonstrate a violation of the Illinois Consumer Fraud Act, [FN4] plaintiffs must show that a deceptive act or misrepresentation proximately caused plaintiff's injury. *See*ILL. COMP. STAT. 505/10a(a) ("Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person.") In order to evaluate causation under the statute, plaintiffs must demonstrate individual proof of knowledge of the deceptive acts. Thus, each claimant must come forward with evidence that he/she was aware of the defendants' purported misstatements. This showing requires an individual analysis of the extent of exposure to the defendants' marketing and advertising campaigns and the extent to which this exposure played a role in the plaintiffs' respective decisions to smoke. Without determining what each plaintiff heard or saw, it is impossible to assign liability under the Act. It is these highly individualistic factual determinations associated with the issue of knowledge of misrepresentations that preclude certification. *See Williams v. Ford Motor Co., 192 F.R.D. 580, 585 (N.D.Ill.2000)* (refusing to certify an Illinois Consumer Fraud Act class action and noting that "[i]ndividual issues of causation, like issues of reliance and damages, often plague class actions brought under the Illinois Consumer Fraud Act.") (citing *Johnson v. Aronson Furniture Co., No. 96 C 117, 1998 WL 641342, at \*7 (N.D.Ill. Sept. 11, 1998)); Fisher v. Bristol-Myers Squibb Co., 181*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 7
Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.))**

F.R.D. 365, 372 (N.D.Ill.1998) (refusing to certify a proposed class because each plaintiff had to show that the allegedly deceptive acts caused the injuries and such an inquiry would raise "innumerable individual questions.")

> FN4. The Illinois Consumer Fraud Act, 815 ILL. COMP. STAT. 505, a plaintiff must show that: (1) the defendants engaged in a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; and (3) the deception occurred in the course of conduct involving trade or commerce.

In this case, the need for individual proof of knowledge to establish causation makes certification improper. This is because it is highly likely that the knowledge among the class members regarding defendants' statements concerning the effects of nicotine differs. Some plaintiffs may have been bombarded by tobacco propaganda while others may have never seen a cigarette ad or paid little or no attention to such ads. Additionally, each member's reliance on those purported misstatements varies. Each class member began smoking for different reasons. Some may have been influenced by peer pressured individual interests. Even if they began smoking due to deceptive advertising, more than likely not all of the members were subject to the same advertising, were exposed to it for the same amount of time, and were influenced by it in the same manner. Differences in the amount of exposure and injury lead to "disparate applications of legal rules," such as causation. Arch v. American Tobacco Co. Inc., 175 F.R.D. 469, 486 (E.D.Pa.1997).

*3. Affirmative Defenses Raise Individual Questions*

Defendants argue that the defenses of assumption of risk, contributory negligence, and the statute of limitations raise issues uncommon to the class. (Defs.' Mem. Opp'n to Class Certification at 33.) Although the defenses raised strike at the merits of the plaintiffs' claims, a brief analysis is warranted in order to properly decide the certification issue.

**\*9** Illinois law permits defendants to raise an assumption of risk defense to claims that are based upon negligence. Illinois uses a subjective test for assumption of risk, allowing the jury to consider an individual plaintiff's "knowledge, experience, and background in determining whether he assumed the risk of using a product known to him to be dangerous."*Boland v. Kawasaki Motors Mfg. Corp., USA,* 309 Ill.App.3d 645, 653, 722 N.E.2d 1234, 1240 (4th Dist.2000). This requires an examination as to what each and every plaintiff subjectively was aware of with regard to the risk and/or danger. *Barnes,* 161 F.3d at 137. It is impossible to determine such facts without mandating an individual inquiry into the specifics of each plaintiff's circumstances. Indeed, if defendants were not able to individually probe into the peculiarities of each class member's case, the result would be that they would be denied the opportunity to prepare a defense.

Similarly, the statute of limitations defense creates individual issues that prevent the common issues from predominating. If the defense is raised, the court will be required to determine when every class member's addiction became "reasonably ascertainable." *Emig v. American Tobacco Co., Inc.,* 184 F.R.D. 379, 391 (D.Kan.1998). Again, such a determination involves an inquiry into the specifics of each plaintiff's circumstances, in essence requiring hundreds of mini-trials. As such, this fact intensive analysis makes a class action suit an inappropriate method for adjudicating these claims. *See, e.g., Barnes,* 176 F.R.D. at 502 (noting that the determination of whether affirmative defenses apply to each plaintiff in a class action suit involves a "staggering" number of individual issues).

B. Superiority

Rule 23(b)(3) also requires that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy" before certification is proper. The rule lists four factors to be considered in determining whether a class action suit is superior including: a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and d) the difficulties likely to be encountered in the management of a class action. A court may also consider whether a large number of individual issues will be present in the proposed class

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.))**

action, and if so, superiority is less likely to be established. _Castano, 84 F.3d at 745 n. 19._

In this case, the proposed class action is unmanageable. As previously discussed, the plaintiffs' claims, the elements of proof to establish those claims, and affirmatives defenses available each require analysis of numerous individual issues. It is impossible to comprehend how a court could supervise such numerous inquiries. Additionally, with such a broad class definition, the enormity of the class would prevent judicial economy. Beyond the suit being unmanageable, the members of the proposed class would also have an interest in making individual decisions. First, the proposed class includes current and former smokers. However, these two groups do not share similar interests in litigation thus affecting the different tactical decisions made with regard to the case. Also, under the class definition, class members have different health conditions with varying degrees of severity. Because of those variances, their motivations are more individually focused, thus making a class action an inadequate method for resolving their claims against tobacco companies. For those reasons, it is clear that the class action is not the superior method for the adjudication of this case.

CONCLUSION

*10 For the foregoing reasons, the plaintiffs' motion for class certification is DENIED. [Docket No. 162-1]

SO ORDERED

N.D.Ill.,2001.
Guillory v. American Tobacco Co.
Not Reported in F.Supp.2d, 2001 WL 290603 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.))

**C**Maxwell v. Arrow Financial Services, LLC.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Stewart W. MAXWELL, Plaintiff,
v.
ARROW FINANCIAL SERVICES, LLC.,
Defendant.
**No. 03 C 1995.**

March 31, 2004.

Cathleen M. Combs, Daniel A. Edelman, Daniel A.
Edelman, Francis Richard Greene, Edelman, Combs
& Latturner, Chicago, IL, for Plaintiff.
Richard M. Waris, James Joseph Sipchen, Pretzel &
Stouffer, Chtd., Daniel John McMahon, Rebecca
Marie Rothmann, Jason Michael Kuzniar, Wilson,
Elser, Moskowitz, Edelman & Dicker, Chicago, IL,
for Defendant.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.
*1 Plaintiff Stewart W. Maxwell ("Mr.Maxwell")
brings a class action lawsuit against defendant Arrow
Financial Services, LLC ("Arrow") for violations of
the Maine Fair Debt Collection Practices Act
("Maine FDCPA"), 32 MRSA § 11001 et seq.,
relating to its alleged illegal practices in connection
with the collection of certain debts that are more than
seven years old. This matter is before the Court on
Mr. Maxwell's motion for class certification. For the
reasons stated below, the motion for class
certification is granted.

Factual Background

For the purposes of a motion to certify a class, the
allegations in the complaint are presumed to be true.
*Johns v. DeLeonardis,* 145 F.R.D. 480, 482
(N.D.Ill.1992). According to Mr. Maxwell's motion
for class certification, he is a resident of Maine
whose debt on a Citibank credit card was charged off
in approximately April 1991 after he failed to make
the payments. Defendant Arrow is a limited liability
company that acts as a collection agency and
purchases consumer debts at a portion of the face
value for the opportunity to enforce the debts against
the consumers.

On approximately October 21, 2002, Arrow sent Mr.
Maxwell a letter informing him that his debt had been
sent to a debt collection agency. The alleged
outstanding balance on the account was $6,707.24.
The letter offered to settle the past due account for 40
percent of the full balance if the repayment was made
in one payment by November 13, 2002. Relevant to
the claims at issue here, the letter stated: "Upon
receipt of the settlement amount and clearance of
funds the appropriate credit bureaus will be notified
that this account has been settled."Mr. Maxwell
alleges, and Arrow admitted in response to requests
for admission, that the letter Mr. Maxwell received
was a standard form letter and that there are "more
than 500 persons with Maine addresses who meet the
following criteria: (a) Defendant sent them a letter in
the form represented by Exhibit A; (b) on or after
February 3, 2002; (c) seeking to collect a debt
charged off more than seven years previous to the
date of the letter; (d) which was not returned by the
Postal Service ."(Def.'s Resp. to Pl.'s Req. for Admis.
¶ 12).

Based on the statement cited above, Mr. Maxwell
filed an amended complaint claiming that Arrow has
violated the Maine FDCPA, 32 MRSA §§
11013(2)(E) and (J), which prohibits debt collectors
from making false or misleading representations,
because pursuant to the Fair Credit Reporting Act
("FCRA"), "no consumer reporting agency may
make any consumer report containing ... accounts
placed for collection or charged to profit and loss
which antedate the report by more than seven
years."15 U.S.C. 1681c(a)(4). The Maine FDCPA
relevant to the claims at issue prohibits the same
false, deceptive, or misleading representations as the
corresponding section of the federal Fair Debt
Collection      Practices      Act      (the      "federal
FDCPA").*See*Notice of Maine Exemption from the
Fair Debt Collection Practices Act, 60 Fed.Reg.
66,972 (Dec. 27, 1995). The damages portion of one
of plaintiff's claims is supplied by the federal
FDCPA, 15 U.S.C. § 1692(k).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 2
Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.))

**\*2** Given that the age of the debt was greater than seven years old, Mr. Maxwell claims that Arrow's reference to a consumer's credit report in the letter it sent is misleading because it tells an unsophisticated consumer that, absent a payment, Arrow could have the debt appear on the consumer's credit report as an unpaid delinquent debt. Mr. Maxwell proposes a class consisting of "all natural persons with Maine addresses who meet the following criteria: a. Defendant sent them a letter in the form represented by Exhibit A; b. On or after a date one year prior to the original filing of this action in state court; c. Seeking to collect a debt charged off more than 7 years previous to the date of the letter; d. Which was not returned by the Postal Service."(Pl. Mo. for Cl. Cert., at 1).

Discussion

Motions for class certification must meet the requirements set under Rule 23 of the Federal Rules of Civil Procedure. Rule 23 establishes two main requirements for class certification. First, the action must satisfy all four elements of Rule 23(a): numerosity, commonality, typicality and adequacy of representation. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); Harriston v. Chicago Tribune Co., 992 F.2d 697, 703 (7th Cir.1993). Second, the proposed class must satisfy at least one of the three provisions under Rule 23(b). Mr. Maxwell seeks certification under Rule 23(b)(3), which requires a plaintiff to demonstrate that common questions of law or fact predominate over any questions affecting only individual class members and that a class action is a superior method of adjudicating the controversy.

As previously stated, for purposes of a motion to certify a class, the allegations in the complaint are presumed true. Johns, 145 F.R.D. at 482. The court does not reach the merits of the complaint or weigh evidence.Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); Koch v. Stanard, 962 F.2d 605, 607 (7th Cir.1992). The burden is on the party seeking class certification to demonstrate that the requirements of Rule 23 are satisfied. Gen. Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); Trotter v. Klincar, 748 F.2d 1177, 1184 (7th Cir.1984). Failure on part of the movant to satisfy

any one of the requirements of Rule 23(a) or (b) precludes class certification. Patterson v. Gen. Motors Corp., 631 F.2d 476, 480 (7th Cir.1980). The court has broad discretion in ruling on a motion for class certification. Retired Chicago Police Ass'n v. Chicago, 7 F.3d 584, 596 (7th Cir.1993). We now consider each element of the Rule 23 requirements in turn.

A. Requirements of Federal Rules of Civil Procedure 23(a)

1. *Numerosity*

Rule 23(a)(1) requires that the class must be "so numerous that joinder of all members is impracticable."Fed.R.Civ.P. 23(a)(1). Because there is no mystical number at which the numerosity requirement is established, courts have found this element satisfied when the putative class consists of as few as 10 to 40 members. See, e.g., Markham v. White, 171 F.R.D. 217, 221 (N.D.Ill.1997) (35-40 class members); Hendricks-Robinson v. Excel Corp., 164 F.R.D. 667, 671 (C.D.Ill.1996) (38 class members). Although a plaintiff need not allege the exact number or identity of the class members, the plaintiff ordinarily "must show some evidence or reasonable estimate of the number of class members."Long v. Thorton Township High Sch. Dist., 82 F.R.D. 186, 189 (N.D.Ill.1979). In determining whether the claimed class contains a sufficient number of members, the court is permitted to "make common sense assumptions in order to find support for numerosity."Cannon v. Nationwide Acceptance Corp., 1997 WL 139472, at *2 (N.D.Ill. March 25, 1997), quoting Evans v. U.S. Pipe & Foundry, 696 F.2d 295, 930 (11th Cir.1983).

**\*3** This Court previously has found that it is reasonable to assume the number of potential class members satisfies the numerosity requirement when the defendant allegedly used "preprinted, standardized debt collection letters in attempting to collect on the [allegedly delinquent] debt."Hamid v. Blatt, Hasenmiller, Leibsker, Moore & Pellettieri, et al., 2001 WL 1543516, at *3 (N.D.Ill. Nov.30, 2001), citing Peters v. AT & T, 179 F.R.D. 564, 567-68 (N.D.Ill.1998) ("Based on these facts it is reasonable to infer that many individuals received the form collection letter and that joinder of all the individuals would be impracticable."). Whether the numerosity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.))**

requirement is met in this case is complicated, however, by certain exceptions to the seven year reporting limitation under specific sections of the FCRA, 15 U.S.C. § 1681c(b)(1)-(3). Pursuant to the FCRA, "no consumer reporting agency may make any consumer report containing ... accounts placed for collection or charged to profit and loss which antedate the report by more than seven years." 15 U.S.C. 1681c(a)(4). However, creditors may report the satisfaction of a debt when it is more than seven years old if: (1) the debtor applied for credit in an amount exceeding $150,000; (2) the debtor applied for life insurance in an amount exceeding $150,000; or (3) the debtor applied for employment for a job with a salary exceeding $75,000. 15 U.S.C. § 1681c(b)(1)-(3).

Arrow argues that class certification is not merited in part because Mr. Maxwell has prematurely moved to certify a class without knowing how many potential members would be subject to these exceptions to the seven year reporting limitation. However, Arrow has admitted in its responses to Mr. Maxwell's requests for admissions that it sent the letter to at least 500 individuals with Maine addresses seeking to collect a debt charged off more than seven years before the letter was sent. (Def.'s Resp. to Pl.'s Req. for Admis. ¶ 12). This admission creates a strong basis to find that the numerosity requirement has been met. In addition, when identifying the potential class, the class definition can take into account any potential exceptions to the seven year reporting limitation. Thus, this Court finds that the numerosity requirement is satisfied in this case.

*2. Commonality*

Under Rule 23(a)(2), "questions of law or fact common to the class" must be present before a class may be certified. The existence of a common nucleus of operative facts is usually enough to establish commonality. *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). Courts consistently have found a common nucleus of operative facts if a defendant has allegedly directed standardized conduct toward the putative class members or if the class claims arise out of standardized documents. *Rosario,* 963 F.2d at 1018; *Johnson v. Aronson Furniture Co.,* 1998 WL 641342, at *3 (N.D.Ill. Sept.11, 1998); *Peterson v. H & R Block Tax Serv. Inc.,* 174 F.R.D. 78, 81 (N.D.Ill.1997).

*4 A plaintiff normally is only required to show that there is "at least one question of law or fact common to the class." *Arenson v. Whitehall Convalescent & Nursing Home, Inc.,* 164 F.R.D. 659, 663 (N.D.Ill.1996). When a "question of law refers to a standardized conduct by defendants toward members of the class, a common nucleus of operative facts is typically presented, and the commonality requirement is usually met." *Moore v. Simpson,* 1997 WL 570769, at *3 (N.D.Ill. Sept.10, 1997) (internal quotations omitted); *see also Rosario,* 963 F.2d at 1018 ("A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)."). Further, some factual variations among class members' claims alone is normally not enough to defeat a motion for class certification. *Hamid,* 2001 WL 1543516, at *4, citing *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998); *Patterson,* 631 F.2d 476, 481 (7th Cir.1980).

We conclude that Mr. Maxwell satisfies the requirements of Rule 23(a)(2). Specifically, we find that this case presents the following two questions that all arise from Arrow's standardized conduct in sending the form letter to all of the individuals against whom it attempted to collect: (1) whether Arrow regularly sends the letter at issue in this case to individuals with debts more than seven years old who do not meet any of the exceptions allowing their credit to be reported under 15 U.S.C. § 1681c(b)(1)-(3); and (2) if so, whether Arrow violated the Maine FDCPA by misrepresenting to debtors that it would report settlement and repayment of debts more than seven years old. The first question is a common question of fact and the second is a common question of law shared by the potential class of plaintiffs and defendant Arrow. These common questions both derive from Arrow's standardized conduct in attempting to collect on purported past due debts. Accordingly, we conclude that because the claims arise from Arrow's standardized collection notices, the claims are appropriate for treatment as a class action. *Keele v. Wexler,* 1996 WL 124452, at *4 (N.D.Ill. March 19, 1996), citing *Haroco, Inc. v. Am. Nat'l Bank & Trust,* 121 F.R.D. 664, 669 (N.D.Ill.1988).

*3. Typicality*

Under Rule 23(a)(3), the claims or defenses of the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.))

party representative must be typical of those of the class as a whole. The claim of a named plaintiff is typical of the class if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."*Johnson v. Aronson Furniture Co.,* 1998 WL 641342, at * 3, quoting *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) (internal quotation omitted). The typicality requirement is closely related to the commonality requirement under Rule 23(a).*Rosario,* 963 F.2d at 1918. Arrow argues that Mr. Maxwell cannot meet the typicality requirements under Rule 23(a)(3) because "whether the act of satisfaction of an outstanding debt by any particular putative class member is reportable by Arrow under the FCRA depends in the individual circumstances of the recipient."(Def. Resp. to Mot. for Cl. Cert., at 12). We disagree with Arrow and find that this is not a problem because the class can be defined to include only those individuals who received the letter and who had a debt that was more than seven years old which was not reportable under the FCRA. Thus, we conclude that Mr. Maxwell's claims are typical of the class because they arise from the same course of conduct and are based on the same general legal theory.

*4. Adequacy*

**\*5** Under Rule 23(a), the adequacy of representation requirement mandates that both the class representative and counsel for the named plaintiff must be able to zealously represent and advocate on behalf of the class as a whole.*Retired Chicago Police Ass'n,* 7 F.3d at 598. As the class representative, Mr. Maxwell must not have "antagonistic or conflicting claims with other members of the class," and he must have a "sufficient interest in the outcome of the case to ensure vigorous advocacy."*Sebo v. Rubenstein,* 188 F.R.D. 310, 316 (N.D.Ill.1999) (citation omitted). We have found no evidence in any of the filings in this case indicating that Mr. Maxwell's claims conflict with or are antagonistic to the claims of the proposed class members. This Court finds that Mr. Maxwell has demonstrated that he has a sufficient stake in the outcome of the litigation to ensure that he will be a zealous advocate as the named representative on behalf of the class.

In addition to the adequacy of representation of the class representative, the class counsel must also meet requirements for adequacy of representation. Counsel for the named plaintiff must be experienced and qualified and generally be able to conduct the litigation. *Id.* at 598;*Gammon v. GC Servs. Ltd. P'ship,* 162 F.R.D. 313, 317 (N.D.Ill.1995). Counsel for the named plaintiff in this case are experienced in handling class action lawsuits and have competently handled many cases before this Court in the past. This Court finds that the adequacy of representation requirement under Rule 23(a) has been met.

B. Requirements of Federal Rules of Civil Procedure 23(b)(3)

We now turn to the requirements for class certification under Rule 23(b). In addition to meeting class certification requirements under Rule 23(a), the plaintiff's proposed class must satisfy the requirements of one of the three subsections of Rule 23(b). Fed.R.Civ.P. 23(b). Certification under Rule 23(b)(3) is appropriate if (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3); *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir.2001); *Kremnitzer v. Cabera & Rephen, P.C.,* 202 F.R.D. 239, 242 (N.D.Ill.2001).

*1. Predominance of class issues over individual issues*

Under the predominance requirement of Rule 23(b), common questions of law or fact must predominate, but they need not be exclusive. *Scholes v. Moore,* 150 F.R.D. 133, 138 (N.D.Ill.1993). In determining whether common questions predominate, the court looks to whether there is a "common nucleus of operative facts." *Ziemack v. Centel Corp.,* 163 F.R.D. 530, 535 (N.D.Ill.1995). Arrow's alleged misleading statement in a debt collection letter sent to members of the class is at the core of Mr. Maxwell's complaint. The issues of law and fact that flow from Arrow's alleged misleading statement predominates over any individual issue or potential exception and forms the core of this complaint. Because the common issues of fact and law previously identified are likely to dominate this Court's attention, common questions of law and fact predominate.*Tatz v. Nanophase Tech.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 5
Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.))

*Corp.,* 2003 WL 21372471, at *9 (N.D.Ill. June 13, 2003).

**\*6** Arrow also argues that class certification is premature because additional discovery is needed to determine whether class or individual issues predominate. We find that Arrow's arguments are not sufficient to merit a finding that Mr. Maxwell has failed to establish that class issues predominate over individual issues. The only issues currently before the Court is whether Mr. Maxwell has pled in his motion the required elements of <u>Rule 23</u>, and we decline to speculate about additional facts that may be developed during discovery. Therefore, we conclude based on the pleadings that the class issues predominate over any perceived individual issues.

2. *Superiority of class action to other available methods for fair and efficient adjudication of the controversy*

Under <u>Rule 23(b)(3)</u>, a class action must also be superior to other available methods for the fair and efficient adjudication of the controversy.*Szabo,* 249 F.3d at 676. We find that a class action in this case is superior to other means of adjudication for three reasons. First, as discussed previously, this conflict contains a set of legal and factual issues that are shared by the members of the class, and class certification is more efficient than multiple individual suits at dealing with these common questions. *Tatz,* 2003 WL 21372471, at *9.

Second, a class action is superior to individual action in this case because litigation costs are high, the likely recovery is limited. Thus, recipients of the letter are unlikely to prosecute individual claims without the availability of cost-sharing efficiencies through a class action. *Tatz,* 2003 WL 21372471, at *10, citing *Haynes v. Logan Furniture Mart. Inc.,* 503 F.2d 1161, 1164-65 (7th Cir.1974). A class action is superior under <u>Rule 23(b)</u> when class members would be overwhelmed by the defendant's resources if they attempted to bring individual claims. *Tatz,* 2003 WL 21372471, at *10, citing *Chandler v. S.W. Jeep-Eagle, Inc.,* 162 F.R.D. 302, 310 (N.D.Ill.1995); *Alexander v. Centrafarm Group, N .V.,* 124 F.R.D. 178, 185 (N.D.Ill.1988). Here, the defendant is a large collection agency and purchaser of bad debts that is likely to have extensive resources that could far outpace those of the potential class of

plaintiffs.

Third, a class action is the superior method to resolve this case because it is a more efficient use of judicial resources than trying individual cases.*Tatz,* 2003 WL 21372471, at *10, citing *Scholes,* 143 F.R.D. at 189 ("Under these circumstances, class certification is the best way to manage this situation which could otherwise disintegrate into piecemeal adjudication of many individual actions involving essentially identical questions of law and fact."). Denial of the motion for class certification would potentially result in courts becoming consumed with many individual cases that seek to litigate an essential core of the same legal and factual issues.

Arrow, however, argues that the class action mechanism is not superior to individual Maine FDCPA causes of action or federal FDCPA causes of action on two theories. First, Arrow argues that certifying a two separate classes in this case of all Maine residents who received the letter and met the other class requirements, and all other United States citizens who received the letter and met the other class requirements is "duplicative and a waste of both the Court's and the parties' resources."(Def. Resp. to Motion for Class Certif. at p. 14). Arrow also claims that the pursuit of two parallel classes contradicts the primary purpose of class actions to reduce administrative and litigation costs. However, we have concluded that Maine's decision to establish its own standards under the Maine FDCPA as authorized under the federal FDCPA necessitates the establishment of two separate classes. In addition, we have taken steps to reduce duplicative costs by finding these matters related under Local Rule 40.4 and streamlining discovery, and we will continue to be mindful of these costs issues as the case progresses. Thus, we conclude that a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

C. The Maine FDCPA Creates an Alternate Cause of Action for Maine Residents

**\*7** Arrow also challenges the motion for class certification on the basis that the Maine version of the FDCPA does not preclude a national class action. (Def.'s Sur-Reply in Opposition to Mot. of Pls. for Cl. Certif. at 1-2). We agree with the defendant that a national class action is not precluded under all

Not Reported in F.Supp.2d                                                        Page 6
Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.))**

sections of the FDCPA when a state receives a statutory "exemption" from the Federal Trade Commission ("FTC"). In *Shapiro v. Haenn,* 176 F.Supp.2d. (D.Me.2002), the court found Maine's exemption from the federal FDCPA did not eliminate the plaintiff's federal private right of action under the statute. In *Haenn,* the plaintiff brought his claim under section 813 of the FDCPA, which creates a private right of action in federal courts against debt collectors who violate the provisions of the FDCPA. *Id.* at 44;15 U.S.C. § 1692k. The FTC expressly stated when it granted Maine the exemption to create the Maine FDCPA that the state was not exempted from section 813. *See*Notice of Maine Exemption from the Fair Debt Collection Practices Act, 60 Fed.Reg. 66,972, 66,976 (Dec. 27, 1995) ("Section 813 of the FDCPA is not included within the scope of the exemption granted by the Commission in response to Maine's request."); 16 C.F.R. § 901.6(d) ("no exemption shall extend to the civil liability provisions of Section 813 of the Act").

Section 813 of the FDCPA provides the civil liability provisions for both the federal Act and the Maine FDCPA because the FTC declined to grant the state an exemption on that provision. We do not believe, however, that plaintiffs from Maine should be required to join in a single national class action under the federal FDCPA. While Maine was not granted a civil liability exemption from the federal Act, it was granted an exemption on the substantive cause of action under which this claim was filed (MRSA § 11013(2)(E) and (J)). To limit Maine residents to a national class action under the federal FDCPA would undermine the purpose of creating the separate Maine FDCPA with enhanced consumer protections in some areas. *See*Notice of Maine Exemption from the Fair Debt Collection Practices Act. 60 Fed.Reg. at 66,978.

Based on all of the reasons discussed above, this Court finds that the Rule 23 requirements for a class certification have been met in this case in their entirety, and we grant Mr. Maxwell's motion for class certification. We propose the following class definition:

> All natural persons with Maine addresses who received a letter in the form represented by Exhibit A from Arrow Financial Services, LLC with respect to a debt charged off 7 years or more prior to the date of the letter, which letter was sent on or

after February 3, 2002, except those cases in which satisfaction of the debt identified in the letter was reported in connection with either (1) a credit transaction involving, or which may reasonably be expected to involve, a principal amount of $150,000 or more, (2) the underwriting of life insurance involving, or which may reasonably be expected to involve, a face amount of $150,000 or more or (3) the employment of any individual at an annual salary which equals, or which may reasonably be expected to equal $75,000 or more.

Conclusion

**\*8** For all the foregoing reasons, we grant the plaintiff's motion for class certification. This matter is set for status on April 15, 2004 at 9:00 a.m. at which we can discuss the proposed definition and/or the parties may submit a modified class definition.

It is so ordered.

N.D.Ill.,2004.
Maxwell v. Arrow Financial Services, LLC.
Not Reported in F.Supp.2d, 2004 WL 719278 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**(Cite as: 2007 WL 3226153 (D.Nev.))**

Page 1

**H**Johnson v. Wells Fargo Home Mortg., Inc.
D.Nev.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Nevada.
Wes JOHNSON, Plaintiff,
v.
WELLS FARGO HOME MORTGAGE, INC., a
California Corporation, dba America's Servicing
Company, et. al., al., Defendants.
**No. 3:05-CV-0321-RAM.**

Oct. 29, 2007.

Tory M. Pankopf, Reno, NV, for Plaintiff.
Bruce T. Beesley, Tricia M. Darby, Lewis and Roca
LLP, Reno, NV, for Defendant.

**MEMORANDUM DECISION AND ORDER**

ROBERT A. MCQUAID, JR., United States
Magistrate Judge.
**\*1** Before the court is Defendant Wells Fargo Bank,
N.A.'s Motion for Summary Judgment (Doc. # 70).
Plaintiff responded to the motion (Docs.# 73, 75) and
Defendant replied (Doc. # 76).

**I. BACKGROUND**

Plaintiff Wes Johnson alleges Defendant Wells Fargo
Home Mortgage, Inc. dba America's Servicing
Company (ASC) erroneously reported two of
Plaintiff's real property mortgage loans (Loans 55 and
56 purchased and serviced by Defendant) delinquent
to the credit reporting agencies (Doc. # 73 at 2, Doc.
# 66 at 3). Furthermore, Plaintiff alleges Defendant
foreclosed on Loan 56 and continued to erroneously
report both loans delinquent after Plaintiff spent nine
months making multiple phone calls and sending
correspondence, including cancelled checks and loan
documents, verifying the loans were current (Doc. #
73 at 2). Plaintiff asserts that, based on Defendant's
willful conduct, Plaintiff was precluded from
acquiring mortgage loans and refinancing existing
loans and was forced to pay higher interest rates on
mortgages and lines of credit (Doc. # 73 at 2).
Furthermore, Plaintiff asserts existing lines of credit
were reduced or cancelled (*Id.*).

Plaintiff's Amended Verified Complaint includes the
following causes of action: 1) violations of the Real
Estate Settlement Procedures Act (12 U.S.C. § 2605)
(RESPA); 2) violations of the Fair Credit Reporting
Act (15 U.S.C. § 1681s-2) (FCRA); 3) violations of
the Fair Debt Collection Practices Act (15 U.S.C. §
1692 et. seq.) (FDCPA); and, 4) negligence (Doc. #
66).

**II. STANDARD FOR SUMMARY JUDGMENT**

The purpose of summary judgment is to avoid
unnecessary trials when there is no dispute as to the
facts before the court. *Northwest Motorcycle Ass'n v.
U.S. Dep't of Agric.,* 18 F.3d 1468, 1471 (9th
Cir.1994). The moving party is entitled to summary
judgment where, viewing the evidence and the
inferences arising therefrom in favor of the
nonmovant, there are no genuine issues of material
fact in dispute and the moving party is entitled to
judgment as a matter of law. FED.R.CIV.P. 56(c);
*Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th
Cir.1996). Judgment as a matter of law is appropriate
where there is no legally sufficient evidentiary basis
for a reasonable jury to find for the nonmoving party.
FED.R.CIV.P. 50(a). Where reasonable minds could
differ on the material facts at issue, however,
summary judgment is not appropriate.*Warren v. City
of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert.
denied,*516 U.S. 1171 (1996).

The moving party bears the burden of informing the
court of the basis for its motion, together with
evidence demonstrating the absence of any genuine
issue of material fact. *Celotex Corp. v. Catrett,* 477
U.S. 317, 323 (1986). Once the moving party has met
its burden, the party opposing the motion may not
rest upon mere allegations or denials of the pleadings,
but must set forth specific facts showing there is a
genuine issue for trial. *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 248 (1986). Although the parties
may submit evidence in an inadmissible form, only
evidence which might be admissible at trial may be
considered by a trial court in ruling on a motion for
summary judgment.FED.R.CIV.P. 56(c); *Beyene v.
Coleman Sec. Serv., Inc.,* 854 F.2d 1179, 1181 (9th
Cir.1988).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2007 WL 3226153 (D.Nev.)
**(Cite as: 2007 WL 3226153 (D.Nev.))**

**\*2** In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Anderson,* 477 U.S. at 248. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Id.*

### III. DISCUSSION

Defendant moves for judgment as a matter of law on all four of Plaintiff's causes of action (Doc. # 70). First, Defendant asserts Plaintiff's first cause of action for violations of RESPA must be dismissed because RESPA does not apply to loans obtained to buy rental properties for business purposes (*Id.* at 6-8). Next, Defendant asserts Plaintiff's second cause of action, for violations of the FCRA, must be dismissed because the FCRA does not apply to commercial transactions, no private right of action exists for alleged violations of the initial duties imposed on a furnisher of information by § 1681s-2(a), and no evidence exists that a Credit-Reporting Agency (CRA) notified Defendant that Plaintiff disputed information on Plaintiff's credit report (*Id.* at 8-12). Then, Defendant asserts Plaintiff's third cause of action for violations of the FDCPA must be dismissed because Plaintiff is not a "consumer" and Defendant is not a "debt collector" as defined by the FDCPA (*Id.* at 12-16). Finally, Defendant asserts Plaintiff's fourth cause of action for negligence must be dismissed because it is barred by the economic loss doctrine (Doc. # 70 at 17-20).

Plaintiff argues his mortgages are federally related mortgage loans subject to RESPA and Defendant is equitably estopped and has waived the argument that RESPA is not applicable (Doc. # 73 at 3-7).

Additionally, Plaintiff argues he is not contending the FCRA is applicable to his business transactions, but is alleging Defendant did not conduct a reasonable investigation into the accuracy of the information it reported to the CRAs (*Id.* at 7-8). Furthermore, Plaintiff argues that he is, in fact, a "consumer" and Defendant is a "debt collector" as defined by the FDCPA (*Id.* at 8-9). Finally, Plaintiff argues the economic loss doctrine is not applicable and Defendant's failure to raise its affirmative defenses in its answer constitutes a waiver (*Id.* at 9, Doc. # 75 at 2-3).

**\*3** Defendant replies that Plaintiff is not a consumer under any of the federal acts upon which he sues and Defendant did not waive any defenses (Doc. # 76).

### A. *Waiver of Defenses*

Plaintiff asserts each of Defendant's defenses are affirmative defenses; therefore, Defendant's failure to plead such defenses constitutes a waiver (Doc. # 75 at 2). Plaintiff further asserts that Defendant admitted in its Answer at paragraphs 23 and 24 and in its affirmative defenses numbers 2, 10, 11, 14 and 15 that it complied with RESPA; therefore, Defendant is estopped from taking two different positions in the same action and has, therefore, waived any contention that RESPA doesn't apply (Doc. # 73 at 3).

If Defendant did, in fact, waive its defenses, the remaining issues in the instant motion are moot; therefore, the court will address this issue first.

### 1. *Affirmative Defenses*

FED.R.CIV.P. 8(c) provides:

In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and *any other matter constituting an avoidance or affirmative defense.* When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

justice so requires, shall treat the pleading as if there
had been a proper designation.

FED.R.CIV.P. 8(c) (emphasis added). The question is
whether Defendant's defenses fall within the
language "any other matter constituting an avoidance
or affirmative defense." *Id.*

The Ninth Circuit has held "[a] defense which
demonstrates that plaintiff has not met its burden of
proof is not an affirmative defense." *Zivkovic v.
Southern California Edison Co.,* 302 F.3d 1080, 1088
(9th Cir.2002) (*citing Flav-O-Rich v. Rawson Food
Service, Inc. (In re Rawson Food Service, Inc.),* 846
F.2d 1343, 1349 (11th Cir.1988)). The Eleventh
Circuit explained, in *Rawson Food Service, Inc.,* that
a defense which points out a defect in the plaintiff's
prima facie case is not an affirmative defense. 846
F.2d at 546. "An affirmative defense raises matters
extraneous to the plaintiff's *prima facie* case; as such,
they are derived from the common law plea of
'confession and avoidance.' On the other hand, some
defenses negate an element of the plaintiff's *prima
facie* case; these defenses are excluded from the
definition of affirmative defense in Fed.R.Civ.P.
8(c)." 846 F.2d at 1349 (*citing Ford Motor Co. v.
Transport Indemnity Co.,* 795 F.2d 538, 546 (6th
Cir.1986)) (internal citations omitted). Furthermore,
"it is well established that '[t]he party asserting an
affirmative defense usually has the burden of proving
it.' " 846 F.2d at 1349 (*citing Drexel Burnham
Lambert Group Inc. v. Galadari,* 777 F.2d 877, 880
(2d Cir.1985)).

a. *Applicability of Federal Statutes to Plaintiff's
Claims*

*4 Plaintiff has the burden of proving his claims are
properly asserted; therefore, whether or not Plaintiff's
first, second and third causes of action properly fall
under the federal statutes is not a matter (or question)
"extraneous" FN1 to Plaintiff's *prima facie* case. To
the contrary, Defendant's defenses, if true, negate an
element of Plaintiff's *prima facie* case. *Rawson Food
Service, Inc.,* 846 F.2d at 546. Furthermore,
Defendant's defenses clearly point out defects in
Plaintiff's *prima facie* case and, therefore, are not
affirmative defenses. *Id.* Accordingly, Plaintiff did
not waive these defenses.

FN1."An extraneous question is a question

that is beyond or beside the point to be
decided."BLACK'S LAW DICTIONARY
606 (7th ed.1999).

b. *Economic Loss Doctrine*

Plaintiff asserts the economic loss doctrine is an
affirmative defense and, therefore, has been waived.
However, Plaintiff provides no authority or support
for his conclusory statement that "Defendant did not
plead as an affirmative defense: 1) the economic loss
doctrine."(Doc. # 75 at 2).

It appears no court, in the Ninth Circuit or otherwise,
has held the economic loss doctrine is an affirmative
defense and at least one court has expressly held the
economic loss doctrine is not an affirmative defense
which can be waived under FED.R.CIV.P.
12(h)(1).*St. Paul Mercury Ins. Co. v. Viking Corp.,*
2007 WL 129063, 21 (E.D.Wis.2007) (official
citation not available). The *Viking Corp.* court
reasoned, and this court finds persuasive, that "courts
regularly decide motions to dismiss under Rule
12(b)(6) based on the economic loss doctrine. Given
that it is improper to grant a motion to dismiss under
Rule 12(b)(6) on the basis of an affirmative defense,
it logically follows that the economic loss doctrine is
not an affirmative defense which must be pled as
such."*Id.* At 22. Accordingly, Defendant did not
waive this defense.

2. *Inconsistent Positions*

Plaintiff argues that by admitting compliance with
RESPA Defendant has waived any contention that
RESPA does not apply to the two mortgages at issue
(Doc. # 73 at 3). Plaintiff contends that by admitting
compliance, Defendant has ultimately admitted it was
*required* to comply with RESPA. However,
Defendant does not assert that it was required to
comply with RESPA; Defendant asserts that
"standard loan servicing procedure requires
compliance with RESPA, regardless of the purpose
of the Loan."(Doc. # 76 at 2). In other words,
although RESPA does not apply to these loans,
Defendant has nevertheless complied with RESPA's
requirements.

Defendant may properly plead alternate defenses
under FED.R.CIV.P. 8(e)(2).Rule 8(e)(2) provides, in
pertinent part:

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**(Cite as: 2007 WL 3226153 (D.Nev.))**

Page 4

A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds. All statements shall be made subject to the obligations set forth in Rule 11.

**\*5**FED.R.CIV.P. 8(e)(2).

Here, the issue is one of alternative pleading. The Ninth Circuit has held that "[i]n light of the liberal pleading policy embodied in Rule 8(e)(2)... a pleading should not be construed as an admission against another alternative or inconsistent pleading in the same case."*Molsbergen v. United States,* 757 F.2d 1016, 1019 (9th Cir.), *cert. dismissed,*473 U.S. 934 (1985); *see also, McCalden v. California Library Ass'n,* 955 F.2d 1214, 1219 (9th Cir.1990). Under Rule 8(e)(2), Defendant may properly assert that RESPA does not apply, and in the alternative if RESPA does apply, Defendant has complied. Therefore, Plaintiff has not waived this defense.

**B. *RESPA Claims***

Defendant asserts Plaintiff's RESPA claims must be dismissed because RESPA does not apply to credit transactions "primarily for business, commercial or agricultural purposes" (Doc. # 70 at 6). Defendant contends Plaintiff's loans were used to acquire two four-plex rental properties for business purposes, which Plaintiff never intended to nor actually did occupy (Doc. # 70 at 7-8).

Plaintiff argues his two mortgage loans are "federally related mortgage loans" and are, therefore, subject to RESPA (Doc. # 73 at 4). Plaintiff further argues that RESPA applies because the loans were used to purchase real property and each loan was secured by real property (*Id.*).

Defendant responds that Plaintiff's loans are not

"federally related mortgage loans" under RESPA because Regulation Z plainly excludes commercial and business purpose loans from RESPA's definition (Doc. # 76 at 3). Defendant asserts RESPA directs the district court to apply the Truth in Lending Act's (TILA's) definition of commercial transactions, which is outlined in Regulation Z, and under Regulation Z credit obtained to acquire rental property that is not owner occupied is deemed to be for business purposes (*Id.* at 4).

1. *Definition of "Federally Related Mortgage Loan"*

The term "federally related mortgage loan" includes any loan which "is secured by a first or subordinate lien on residential property (including individual units of condominiums and cooperatives) designed principally for the occupancy of from one to four families, including any such secured loan, the proceeds of which are used to prepay or pay off an existing loan secured by the same property ..."12 U.S.C. § 2602(1)(A). The loan must also meet one of four other requirements expressed in the statute. *Id.*

The parties do not dispute that Plaintiff's loans may fall under the definition of "federally related mortgage loan" as it is defined in the statute. However, the parties do dispute whether RESPA applies to the loans.

2. *Applicability of RESPA to a "Federally Related Mortgage Loan"*

While RESPA does apply to federally related mortgage loans, RESPA explicitly exempts certain federally related mortgage loans from its coverage. 24 C.F.R. § 3500.5. Under paragraph (b) of Regulation X, "business purpose loans" (defined as "[a]n extension of credit primarily for a business, commercial, or agricultural purpose, as defined by Regulation Z, 12 C.F.R. 226.3(a)(1)") are excluded from RESPA's coverage. 24 C.F.R. § 3500.5(b)(2). In determining whether Plaintiff's loans fall under RESPA's definition of "business purpose loans", Regulation X directs this court to rely on Regulation Z. *Id.*Regulation Z expressly provides, in pertinent part, that "[c]redit extended to acquire ... rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes .... [furthermore, even] [i]f credit is extended to acquire rental property that is or will be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**(Cite as: 2007 WL 3226153 (D.Nev.))**

Page 5

owner-occupied within the coming year ... [c]redit extended to acquire rental property is deemed to be for business purposes if it contains more than 2 housing units." 12 C.F.R. Pt. 226, Supp. 1., § 226.3 at Comment 3(a)-3, 3(a)-4.

*6 Here, it is undisputed that Plaintiff acquired two four-plex rental properties, neither of which are now or ever were owner-occupied. Therefore, based on RESPA's clear direction to rely on Regulation Z and Regulation Z's unambiguous definition of "business purpose loans", Plaintiff's loans obtained to acquire two four-plex rental properties constitute "business purpose loans" and are exempted from RESPA.

Accordingly, summary judgment on Plaintiff's RESPA claims is *GRANTED.*

## C. *FCRA Claims*

Defendant asserts Plaintiff's FCRA claims must be dismissed because the FCRA does not apply to Plaintiff's business transactions, there is no evidence a CRA notified Defendant that Plaintiff disputed information it provided and there is no private right of action for violations of § 1681s-2(a) (Doc. # 70 at 8-12).

Plaintiff argues he is not asserting a cause of action under § 1681s-2(a) and Defendant admitted being notified that Plaintiff disputed information it reported to the CRAs (Doc. # 73 at 7-8). Furthermore, Plaintiff alleges Defendant violated § 1681s-2(b) by failing to conduct a reasonable investigation into the accuracy of the information Defendant reported to the CRAs (Doc. # 73 at 7-8).

Defendant responds that the FCRA is inapplicable to reports used for commercial purposes and it has not admitted it was notified by a CRA about Plaintiff disputing any information it provided to a CRA (Doc. # 76 at 5-6).

Defendant basically argues that, as a furnisher of information, it cannot be held liable under the FCRA for inaccurately reporting information to a CRA and failing to investigate disputed information if the transactions at issue are commercial transactions. However, Defendant cites no Ninth Circuit case law to support this contention. Furthermore, the cases

cited by Defendant deal with credit reports obtained and utilized for commercial purposes, not the liability of furnishers of information to a CRA regarding a commercial transaction. *See Mathews v. Worthen & Trust Co., 741 F.2d 217, 219 (8th Cir.1984)* (finding a particular transaction exempt from the FCRA because the credit report was used solely for a commercial purpose); *Podell v. Citicorp Diners Club, Inc., 914 F.Supp. 1025, 1036 (S.D.N.Y.1996)* (The loss of plaintiff's opportunity to participate in a real estate enterprise due to adverse information included in a furnished credit report is not the sort of loss cognizable under the FCRA); *Lucchesi v. Experian Information Solutions, Inc., 226 F.R.D. 172, 174 (S.D.N.Y.2005)* (report issued in connection with a business operated by the consumer cannot form basis of liability under the FCRA).

The Ninth Circuit has applied the FCRA broadly, focusing on the purpose for which the information was obtained by the CRA in addition to the purpose for which the credit report was sought. *Hansen v. Morgan, 582 F.2d 1214 (9th Cir.1978).* In *Hansen,* although analyzing a different subsection under the FCRA, the Ninth Circuit explained:

*7Section 1681a(d) of Title 15 defines "consumer report" to be:

"... Any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of this title. * * * "(Emphasis added.)

The credit report issued on the Hansens in this case falls directly within this definition. Since the Pocatello Credit Bureau knew nothing of the Morgans' real reason for requesting the report, it must have supplied this information with the expectation that the Morgans would use it for purposes consistent both with the FCRA and with the Bureau's form membership contract which closely correlated with the restrictions in the act. And unless the Bureau was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
(Cite as: 2007 WL 3226153 (D.Nev.))

generally collecting such information for purposes not permitted by the FCRA, it must have collected the information in the report for use consistent with the purposes stated in the act. There has been no suggestion otherwise. Accordingly, the credit report is (1) a written communication of information (2) by a consumer reporting agency (3) bearing on the Hansens' credit worthiness, credit standing or credit capacity (4) *which was both expected to be used, and collected in whole or in part, for the purpose of establishing the Hansens' consumer eligibility for credit transactions.*As such it is a consumer report under the FCRA.

Hansen, 582 F.2d at 1218 (emphasis added).

Citing to *Hansen,* the Seventh Circuit held that "a consumer may establish that a particular credit report is a 'consumer report' falling within the coverage of the FCRA if: (1) the person who requests the report actually uses the report for one of the 'consumer purposes' set forth in the FCRA; (2) the consumer reporting agency which prepares the report 'expects' the report to be used for one of the 'consumer purposes' set forth in the FCRA; or (3) the consumer reporting agency which prepared the report originally collected the information contained in the report expecting it to be used for one of the 'consumer purposes' set forth in the FCRA."*Ippolito v. WNS, Inc.,* 864 F.2d 440, 449 (7th Cir.1988).

The district court in the Western District of Kentucky also provides a persuasive analysis on this very issue, in *Breed v. Nationwide Ins. Co.,* 2007 WL 1231558, 1-2 (W.D.Ky.2007) (official citation not available), finding the plaintiff was entitled to at least proceed to trial. In *Breed,* the issue before the court was whether the reports produced by Trans Union that allegedly resulted in denials of credit and increased interest rates were "consumer reports" under the FCRA. *Id.* at 1. The plaintiff was a real estate investor who bought properties, rehabilitated them and then resold them for profit.*Id.* CCS, the furnisher of information, allegedly erroneously reported a negative item to Trans Union, which negatively affected the plaintiff's ability to procure credit. *Breed,* 2007 WL 1231558 at 1. The plaintiff alleged damages incurred as a result of higher interest rates on five mortgages and being denied credit three times when trying to purchase a vehicle. *Id.* The district court initially held such damages were not recoverable under the FCRA

because they arose from commercial transactions. *Id.* However, after further reviewing the developing case law, the district court withdrew its previous opinion finding the plaintiff could pursue his FCRA theory at least through trial. *Id.* at 1-2.Noting the Circuits are split as to whether the consumer's purpose for obtaining credit necessarily determines whether the report is a consumer report under the FCRA, the district court concluded that the developing case law does not provide a definitive or reliable answer.*Id.* at 2. Furthermore, the district court determined that the majority of Circuits, including the Ninth Circuit, suggest the expectations of the CRA at the time it prepared the credit report and at the time it collected the information contained in the report should be considered; therefore, to avoid injustice, the district court declined to dismiss any claims solely because they involved commercial transactions. *Id.*

**\*8** Defendant's argument that Plaintiff may not recover under the FCRA for losses resulting from the use of a credit report obtained solely for a commercial transaction is an accurate statement; however, it does not follow that because Defendant is reporting information regarding a commercial transaction to the CRAs, it is somehow insulated from all liability under the FCRA with regards to that transaction. Subsequent credit reports issued for "consumer purposes" containing the inaccurate information arguably do fall under the coverage of the FCRA. *See Hansen,* F.2d at 1218.

Plaintiff asserts Defendant's erroneous reporting of inaccurate information and willful failure to reasonably investigate the disputed information caused "credit lines to be reduced; credit line cancelled; credit line denied; two commercial loans denied; and personal financing denied."(Doc. # 66 at 6). Under these facts, the credit reports obtained for Plaintiff's commercial loans do not fall under the FCRA; however, the credit reports obtained in connection with Plaintiff's credit lines (provided they are personal lines of credit and not business lines of credit) and personal financing are "consumer reports" falling within the coverage of the FCRA.

The Ninth Circuit expressly recognizes a consumer's cause of action against a furnisher of credit information under § 1681s-2(b), *see Nelson v. Chase Manhattan Mortgage Corp.,* 282 F.3d 1057, 1058 (9th Cir.2002), and there is a genuine issue of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                             Page 7
Slip Copy, 2007 WL 3226153 (D.Nev.)
**(Cite as: 2007 WL 3226153 (D.Nev.))**

material fact as to whether Defendant was properly notified of the disputed information. Furthermore, there are genuine issues of material fact, as set forth above, precluding summary judgment on Plaintiff's FCRA claims.

Accordingly, summary judgment on Plaintiff's FCRA claims is *DENIED.*

**D. *FDCPA Claims***

Defendant asserts Plaintiff's FDCPA claims must be dismissed because Plaintiff is not a "consumer" and Defendant is not a "debt collector" as defined by the Act (Doc. # 70 at 12). Specifically, Defendant asserts the FDCPA does not apply to Plaintiff's loans because they are commercial in nature and the FDCPA does not apply to Defendant because Defendant did not act as a debt collector (*Id.* at 12-16).

Plaintiff argues the two loans are primarily for personal, family or household purposes and the real properties are part of Plaintiff's retirement planning; therefore, they are not commercial in nature (Doc. # 73 at 8-9). Plaintiff further argues Defendant is a debt collector because Defendant used ASC to collect the debt and Plaintiff did not discover ASC was actually Defendant until prior to filing his complaint (Doc. # 73 at 9). Finally, Plaintiff argues it is a question of fact as to whether Defendant is a debt collector (*Id.*).

Defendant responds that Plaintiff's theory of claiming the loans are part of his retirement planning, where he does not assert he ever actually lived in any of the rental properties, is untenable (Doc. # 76 at 7).

*1. Consumer Debt v. Business Debt*

**\*9** "The FDCPA protects consumers from unlawful debt collection practices. Consequently, the Act applies to consumer debts and not business loans. The term 'debt' is defined as: [A]ny obligation or alleged obligation *of a consumer* to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are *primarily for personal, family, or household purposes*...15 U.S.C. § 1692a(5)."*Bloom v. I.C. System, Inc.,* 972 F.2d 1067, 1068 (9th Cir.1992) (emphasis in original)."When

classifying a loan, courts typically 'examine the transaction as a whole,' paying particular attention to 'the purpose for which the credit was extended in order to determine whether [the] transaction was primarily consumer or commercial in nature.' " 972 F.2d at 1068 (citing *Tower v. Moss,* 625 F.2d 1161, 1166 (5th Cir.1980)). "The Act does not define 'transaction' but the consensus judicial interpretation is reflected in the Seventh Circuit's ruling that the statute is limited in reach 'to those obligations to pay arising from consensual transactions, where parties negotiate or contract for *consumer-related goods or services.*' " *Turner v. Cook,* 362 F.3d 1219, 1227 (9th Cir.2004) (internal citations omitted) (emphasis added).

At least one other district court has expressly found the FDCPA does not apply to rental properties. *Piper v. Portnoff Law Associates,* 215 F.R.D. 495, 502, n. 10 (E.D.Pa.2003). In making this determination, the district court reasoned that obligations owed by individuals who owned their property for business purposes did not qualify as debts under the FDCPA because the services were not primarily for personal, family or household purposes. *Piper,* 215 F.R.D. at 501. This reasoning is persuasive and in line with "consensus judicial interpretation." *Turner,* 362 F.3d at 1227.

Plaintiff does not dispute he acquired the loans to purchase two four-plexes in Portland, Oregon, which are rental properties, and that he never resided in either of the rental properties. Plaintiff merely asserts that "[t]he mortgages are primarily for personal, family or household purposes ... [because] ... the real properties are part of, among other purposes, the Plaintiff's retirement planning ... [and] ... [p]lanning for one's retirement is not a business loan."(Doc. # 73 at 8). Plaintiff also asserts this question is a question of fact for the jury (*Id.*).

As stated above, the Ninth Circuit instructs the district court, not the fact finder, to examine the transaction as a whole in determining whether it was primarily consumer or commercial in nature. *Bloom,* 972 F.2d at 1068. Here, Plaintiff is a real estate investor and developer in multiple states and has purchased over one hundred residential and commercial investment properties (Doc. # 70 at 2). The two loans at issue were used to acquire two residential investment properties in order to collect

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**(Cite as: 2007 WL 3226153 (D.Nev.))**

Page 8

rental payments (*Id.* at 3-4). Plaintiff has not used either of these rental properties for his personal residence or for any other personal, family or household purpose. Furthermore, Plaintiff cites to no authority supporting the proposition that obtaining rental properties, which he does not occupy, but merely uses to collect rental payments, is still consumer in nature because he uses the properties for retirement planning. Under these facts, Plaintiff's debt is business in nature, not consumer in nature.

### 2. Debt Collector

**\*10** Plaintiff argues Defendant is a "debt collector" because the mortgages were originally obtained through Resource Concepts and were eventually assigned to Defendant, Plaintiff did not discover ASC was actually Defendant until prior to filing his complaint and not knowing this relationship would lead a person to believe the debts were being collected by a third party (Doc. # 73 at 9).

While the term "debt collector" includes "any creditor, who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts", 15 U.S.C. § 1692a(6), Plaintiff's Amended Verified Complaint fails to allege that Wells Fargo used a name which would indicate a third person was collecting or attempting to collect a debt. Plaintiff alleges violations of §§ 1692d, 1692e, 1692f, 1692g and 1692h asserting the following facts: Wells Fargo acquired the loans on July 1, 2004 (Doc. # 66 at 3); Plaintiff made timely payments on the loans throughout the assignment (*Id.* at 4); Wells Fargo made an error by not crediting two payments to Loan 56 (*Id.*);Wells Fargo misapplied check 1080 to another account(*Id.*);Wells Fargo would not correct its error and alleged Loan 55 and Loan 56 were delinquent (*Id.* at 6); and, Wells Fargo eventually commenced foreclosure on Loan 56 (*Id.* at 9). Plaintiff's allegations indicate Plaintiff was fully aware that Defendant acquired the loans and Defendant attempted to collect the debt owed on those loans. Under these facts, Defendant is a creditor, not a debt collector.

Accordingly, summary judgment on Plaintiff's FDCPA claims is **GRANTED.**

### E. Negligence Claim

Defendant asserts Plaintiff's negligence claim should be dismissed because it is barred by Oregon's economic loss doctrine (Doc. # 70 at 17). Specifically, Defendant asserts that Plaintiff has not alleged a special relationship exists between Defendant and Plaintiff and, furthermore, Defendant did not owe Plaintiff a duty outside the realm of common law negligence standards (*Id.* at 18). Defendant further asserts the federal statutes do not create a duty beyond that of ordinary negligence, and even if a special relationship existed, Defendant's duty is limited by the foreseeability of the harm (*Id.* at 19-20).

Plaintiff argues the economic loss doctrine does not bar his claim because RESPA and the FCRA impose a statutory duty on Defendant owed to Plaintiff (Doc. # 73 at 9).

Defendant responds that none of the federal statutes relied upon by Plaintiff actually apply to him; therefore, Plaintiff's negligence claim is barred (Doc. # 76 at 9).

As previously discussed, the only federal statute applicable to Plaintiff's claims is the FCRA; therefore, the Court's analysis of the economic loss doctrine is limited to the FCRA.

The FCRA expressly precludes negligence actions against a furnisher of information, except under certain circumstances. Section 1681h(e) provides as follows:

**\*11**Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or *negligence* with respect to the reporting of information against any consumer reporting agency, Any user of information, *or any person who furnishes information to a consumer reporting agency,* based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, *Except as to false information furnished with malice or willful intent to injure such consumer.*

15 U.S.C. § 1681h(e) (emphasis added).

Plaintiff alleges Defendant willfully violated §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 9
Slip Copy, 2007 WL 3226153 (D.Nev.)
**(Cite as: 2007 WL 3226153 (D.Nev.))**

1681s-2(b) by failing to conduct a reasonable
investigation of the debt it reported to the CRAs after
being notified the debt was in dispute (Doc. # 66 at
12). Plaintiff also alleges Defendant violated, among
others, §§ 1681g and 1681h(*Id.* at 6). However,
Plaintiff makes no allegations that Defendant
furnished false information to the CRAs with malice
or a willful intent to injure Plaintiff. Therefore, under
these facts, the FCRA precludes Plaintiff's negligence
claim.

Because the FCRA precludes Plaintiff's negligence
claim, the district court need not decide whether
Oregon's economic loss doctrine bars this claim.

Accordingly, summary judgment on Plaintiff's
negligence claim is ***GRANTED.***

### IV. CONCLUSION

For the reasons set forth above, Defendant's Motion
for Summary Judgment (Doc. # 70) is ***GRANTED*** as
to Plaintiff's First, Third and Fourth Causes of Action
and ***DENIED*** as to Plaintiff's Second Cause of
Action.

D.Nev.,2007.
Johnson v. Wells Fargo Home Mortg., Inc.
Slip Copy, 2007 WL 3226153 (D.Nev.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.