# Appendix
# (Continued)

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 729747 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 729747 (N.D.Ill.))**

Page 1

▷Brider v. Nationwide Credit, Inc.
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Linda J. BRIDER, on behalf of herself and all others
similarly situated, Plaintiff,
v.
NATIONWIDE CREDIT INC., Defendant.
No. 97 C 3830.

Oct. 14, 1998.

MEMORANDUM OPINION AND ORDER

HOLDERMAN, District J.
*1 Plaintiff, Linda J. Brider ("Brider"), on behalf of herself and all others similarly situated, filed a one-count class action complaint against defendant, Nationwide Credit, Inc. ("Nationwide"), alleging a violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692*et seq.* ("FDCPA"). Plaintiff has filed a motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. For the following reasons, plaintiff's motion for class certification is denied.

BACKGROUND

Defendant Nationwide is a collection agency that collects delinquent student loans for the Department of Education. Plaintiff Brider incurred a student loan debt owed to Citibank that was guaranteed by the Higher Education Assistance Foundation ("HEAF"), a non-profit guaranty agency. The loan, in turn, was guaranteed under the Guaranteed Student Loan Program authorized under Title IV, part B of the Higher Education Act of 1965, as amended. 20 U.S.C. §§ 1071*et seq.* The Department of Education reinsured the loan under 20 U.S.C. § 1078(c). When the plaintiff defaulted, HEAF took assignment of the loan. The Department of Education eventually was assigned the loan and reimbursed HEAF under the reinsurance agreement. After several attempts to collect on this loan, the Department of Education referred the loan to Nationwide, one of the several collection agencies under contract with the Department of Education. On or about September 26,

1996, defendant sent plaintiff a notice letter for the purpose of collecting the student loan that plaintiff allegedly failed to repay. The notice letter informed plaintiff that this was an attempt to collect a debt allegedly owed to the "U.S. Department of Education." The notice letter further stated that Nationwide, Inc. had attempted to contact plaintiff by telephone or mail without success.

ANALYSIS

In order for a class to be certified under Rule 23, the party seeking class certification must demonstrate that the four requirements of Rule 23(a) are satisfied. Fed. Rule of Civ. P. 23(a). The four requirements are numerosity, commonality, typicality, and adequacy of representation. *Id.* All of these elements are prerequisites to certification and failure to meet any one of them precludes certification as a class. *Id.* It is undisputed that plaintiff has demonstrated the element of numerosity.[FN1]Thus, what it is left in dispute is whether plaintiff has failed to meet the typicality, commonality, and adequacy of representation requirements.

> FN1.Rule 23(a)(1) of the Federal Rules of Civil Procedure requires that the class be so numerous that joinder of all members is impracticable. Plaintiff asserts that defendant sent out numerous notice letters, such as the one sent to plaintiff, and therefore the proposed class would exceed the practicable amount for joinder. This court could not find any information in the record which indicates the approximate number of notice letters the defendant sent to Illinois residents. This court, however, relies on the parties' stipulation.

The issues of commonality and typicality are closely related. *Rosario v. Livaditits,* 963 F.2d 1013, 1018 (7th Cir.1992), *cert denied,*506 U.S. 1051, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993).Rule 23(a)(2) requires that the class have common questions of law or fact. Rule 23(a)(3) requires the claims of the named plaintiff be typical of the claims of the class. Furthermore, the class representative's claims "must have the same essential characteristics as the claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 1998 WL 729747 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 1998 WL 729747 (N.D.Ill.))

of the class at large." _Retired Chicago Police Ass'n v._
_City of Chicago, 7 F.3d 584, 597 (7th Cir.1993)_
(citing _De La Fuente v. Stokely-Van Camp, Inc., 713_
_F.2d 225, 232 (7th Cir.1983)_).

**\*2** Defendant argues that the plaintiff's claims are not
typical of those of the putative class because she has
not demonstrated that her claims have the "same
essential characteristics" as the putative class.
Plaintiff responds that such an argument is
"preposterous" because the violation claimed by the
plaintiff is the same as alleged on behalf of all the
class members. (Pl.'s Reply at 14.) In this case, it is
true that some claims of the class may arise from the
same practice of defendant Nationwide, mailing
notice letters with similar wording that plaintiff
alleges is false and deceptive. It is also true that
liability may be determined based on the same legal
theory. But as defendant noted, there is also the issue
as to which of the members of the proposed class had
received letters or phone calls prior to receiving the
letter similar to the one which plaintiff had received.

Some of the proposed class members could have
received letters that were different from the letters
plaintiff received prior to receiving the alleged
misleading letter. Some of the proposed class
members could have received phone calls prior to
receiving the letter. Thus, it is not all that evident as
plaintiff asserts that each of the members of the class
were violated "under exactly the same
circumstances" as the plaintiff. (Pl.'s Memo at 9.) Nor
is it evident that each member of the proposed class
would have claims with the same essential
characteristics. Therefore, this court finds that
plaintiff has failed to demonstrate the requirements of
commonality and typicality.

Moreover, this court also finds that the plaintiff has
failed to demonstrate the requirement of adequacy of
representation. The adequacy of representation
requirement ensures that a class representative fairly
and adequately represents and protects the interests of
the class. The protection involves two factors: (1) that
plaintiff's attorney be qualified, experienced, and
generally able to conduct the proposed litigation; and
(2) that the representative plaintiff not have interests
antagonistic to those of the class. _Retired Chicago_
_Police Ass'n, 7 F.3d at 598._ Defendant does not
contend that plaintiff's attorneys are not qualified or
experienced, instead defendant merely argues that

plaintiff is an inadequate representative for two
reasons: (1) she does not have a basic understanding
or knowledge of her lawsuit; and (2) her interests are
antagonistic to those of the class due to purported
credibility problems.

The class representative needs to have only a
marginal familiarity with the facts comprising the
action. _Eggleston v. Chicago Journeymen Plumbers'_
_Local Union No. 130, 657 F.2d 890, 896 (7th_
_Cir.1981)._ Merely because the plaintiff in this case
does not know all of the intricacies of the FDCPA is
not enough to deem her an inadequate representative.
Plaintiff has demonstrated that she has sufficient
knowledge of her claim, she understands that the
letter she received was allegedly misleading. The fact
that the plaintiff misunderstood the class which
would be involved in the lawsuit is a minor point of
little relevance. Plaintiff has a marginal familiarity
with the facts comprising the action and thus, a basic
understanding and knowledge of her lawsuit.

**\*3** Turning to defendant's next argument, however,
this court is quite concerned about the plaintiff's
adequacy as a representative of the class because of
plaintiff's credibility problems. The duty of serving as
a class representative requires diligence, honesty, and
integrity of which are important considerations in
allowing any plaintiff to represent a class._Cohen v._
_Beneficial Industrial Loan Corp., 337 U.S. 541, 549,_
_69 S.Ct. 1221, 93 L.Ed. 1528 (1949)._ Furthermore, a
plaintiff with credibility problems can have interests
"antagonistic to the class" that he or she is attempting
to represent. _Kaplan v. Pomerantz, 132 F.R.D. 504,_
_510 (N.D.Ill.1990)._ Incredulous prior testimony by a
class representative poses a problem for a class when
the case goes to trial. _Weinstein v. American_
_Biomaterials Corp., 123 F.R.D. 442, 446_
_(S.D.N.Y.1988)._

Defendant alleges that there are a number of
instances in plaintiff's deposition which indicate that
she is an inadequate class representative because her
testimony lacks credibility: (1) conflicting testimony
regarding this case; (2) lack of candor surrounding
her bankruptcy disclosures; (3) incredulous testimony
regarding plaintiff's other lawsuits; (4) incredulous
testimony regarding other matters such as
employment history. Plaintiff argues that defendant
mischaracterizes plaintiff's deposition testimony, and
then attacks her adequacy based on its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mischaracterization. As to the several of the credibility issues, however, defendant's attacks on plaintiff's credibility is well-founded. This court will address only those issues which it bases its denial of class certification because of inadequacy of representation.

Defendant argues that plaintiff lied when she denied involvement in any other lawsuits because she, in fact, had been a party to a number of other lawsuits. Plaintiff claims that defendant is merely attempting to disqualify Ms. Brider as a class representative because she has been involved in prior litigation and that the evasiveness of her testimony as to the other litigation resulted from a misunderstanding of counsel's initial question. Such a response by plaintiff lacks merit, however.

At her deposition, Ms. Brider was clearly asked, "Have you been involved in any legal cases where you were a plaintiff or a defendant other than this case, Linda Brider versus Nationwide Credit, Inc.?" (Dep. Tr. at 8.) Plaintiff's response was "No." (Dep. Tr. at 8.) After a short discussion off the record, the question was only slightly rephrased, but this time plaintiff responded "Yes." (Dep. Tr. at 9) Then, later in her deposition, plaintiff was specifically asked about various other lawsuits. First, plaintiff was specifically asked if she had ever been sued by the Chicago Housing Authority, of which plaintiff responded, "not that I am aware of."(Dep. Tr. at 59.) Upon being confronted with the documents surrounding that proceeding, plaintiff admitted that she had been. (Dep. Tr. at 60-61.) Plaintiff was also specifically asked if she had ever been sued by any creditors. (Dep. Tr. at 59.) Once again, plaintiff clearly responded, "not that I am aware of,"(Dep. Tr. at 59,) even after defense counsel clarified the question further. (Dep. Tr. at 59.) Upon being confronted with documents surrounding that proceeding, plaintiff admitted that she had been sued by a creditor. (Dep. Tr. at 64-65.)

*4 This court finds that one can reach no conclusion other than that plaintiff gave false answers to rather clear questions. Plaintiff was being more than evasive in answering the questions at her deposition. Plaintiff repeatedly gave false answers. This repeated denial of being involved in other litigation certainly pulls into question plaintiff's honesty and adequacy of her ability to represent the entire putative class. Thus,

plaintiff's deposition testimony certainly leaves her vulnerable to attack on cross examination when the case goes to trial.

The problem with the plaintiff's adequacy as a class representative does not end there, however. Plaintiff was asked in her deposition if, prior to receiving the alleged misleading letter in September 1996, Nationwide Credit had attempted to call her on the phone. (Dep. Tr. at 29.) Plaintiff responded that they had not because she did not have a phone. (Dep. Tr. at 29.) Then, more specifically, plaintiff was asked, "[i]n 1996 you did not have a phone?" and her response was "No." (Dep. Tr. at 29.) Plaintiff contends that this was a truthful answer because defense counsel asked specifically about September 1996, not November 1996, when plaintiff listed her phone number on a bankruptcy petition. Plaintiff's counsel, however, clearly ignores the specific question which asked if she had a phone "in 1996." There is no other reasonable interpretation of the question, other than the plain language of it. This clearly is an attempt by plaintiff's counsel to ignore the reality that plaintiff provided a false answer to an otherwise clear question.

Furthermore, this question may lead to subjects which may have relevance to this lawsuit, being that the letter states that defendant Nationwide has attempted to contact the recipient by telephone or mail without success. As previously stated, the issue as to which of the members of the proposed class had received letters or phone calls prior to receiving the alleged misleading letter, similar to the one plaintiff had received, may come into issue. Some of the proposed class members could have received letters different from the letters plaintiff received prior to receiving the alleged misleading letter. Some of the proposed class members could have received phone calls prior to receiving the letter. Therefore, the statement by plaintiff that she did not receive a phone call from defendant because she did not have a phone in 1996 may have some relevance to this lawsuit.

This court finds that Ms. Brider's credibility problems raise serious questions as to her ability to be an adequate class representative. Ms. Brider's false statements during the deposition may have relevance to the claims surrounding this lawsuit. Moreover, her statements call into question whether she will take into consideration the interest of all the class

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 4
Not Reported in F.Supp.2d, 1998 WL 729747 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 729747 (N.D.Ill.))**

members especially because her lack of credibility will make her vulnerable to attack at trial. Thus, this court finds that plaintiff has failed to prove that Ms. Brider will be an adequate class representative.

CONCLUSION

**\*5** Based on the fact that plaintiff has failed to prove the prerequisites to certification, certification of a class is precluded. For the above stated reasons, plaintiff's motion for class certification is DENIED. The parties are strongly urged to discuss settlement of this case and report on the status thereof at 10:00 a.m. on October 29, 1998.

N.D.Ill.,1998.
Brider v. Nationwide Credit, Inc.
Not Reported in F.Supp.2d, 1998 WL 729747 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2008 WL 687221 (N.D.Ill.)
**(Cite as: 2008 WL 687221 (N.D.Ill.))**

**H** Vodak v. City of Chicago
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois,Eastern
                         Division.
    Kevin VODAK, et al., individually and on behalf of
        others similarly situated, Plaintiffs,
                            v.
        CITY OF CHICAGO, et al., Defendants.
                      No. 03 C 2463.

                     March 10, 2008.

Janine L. Hoft, Joey L. Mogul, People's Law Office,
James Russell Fennerty, James R. Fennerty &
Associates, LLC, Jeffrey David Naffziger, Sudekum,
Cassidy & Shulruff, Chtd., Melinda L. Power, West
Town Community Law Office, Chicago, IL, for
Plaintiffs.
Richard Thomas Sikes, Jr., Jeffrey J. Mayer, Richard
Bruce Levy, Terrence J. Sheahan, Kellye L. Fabian,
Freeborn & Peters, LLP, Chicago, IL, for
Defendants.

            **MEMORANDUM OPINION AND ORDER**

VIRGINIA M. KENDALL, District Judge.
*1 This action arises out of a march in protest of the
war in Iraq that took place in downtown Chicago,
Illinois on March 20, 2003. Eleven plaintiffs
("Plaintiffs") brought this class action against the
City of Chicago ("the City"), the Chicago Police
Department (the "CPD"), and various Command
Personnel and officers of the CPD (collectively,
"Defendants"). On April 17, 2006, this Court
certified a class consisting of all persons who were
surrounded by Defendants on March 20, 2003 on
Chicago Avenue, just east of Michigan Avenue and
west of Mies Van Der Rohe Way (the "Bounded
Area"), between approximately 8:30 p.m. and 11:30
p.m. On May 16, 2006, Defendant City of Chicago
filed a counterclaim against Plaintiffs and the class
they represent (the "Counterclaim"). The City's
counterclaim relies on § 8-28-020 of the Municipal
Code of the City of Chicago (the "Ordinance"):

    Any person who causes the city or its agents to

incur costs in order to provide necessary services
as a result of such person's violation of any federal,
state or local law ... shall be liable to the city for
those costs. This liability shall be collectible in the
same manner as any other personal liability.

On August 30, 2006, this Court denied Plaintiffs'
Motion to Dismiss the City's counterclaim.

Now before the Court is the City's Motion for Class
Certification of its Counterclaim Against Class
Plaintiffs/Counter-Defendants. Because, with respect
to the proposed class of Counter-Defendants, the
requirements of commonality and predominance are
not satisfied in this case, the Motion for Class
Certification is Denied.

              **Counter-Plaintiff's Allegations**

Counter-Defendants participated in a march that
began in Federal Plaza in downtown Chicago.
(Defendant City of Chicago's Amended Counterclaim
(the "Counterclaim"), ¶¶ 6-7.) The march continued
until Counter-Defendants eventually were surrounded
by members of the CPD. (Counterclaim ¶ 11.) Many
of the Counter-Defendants then were arrested. (*Id.*)
Counter-Defendants allegedly violated numerous
state and local laws during their march through the
City of Chicago. (Counterclaim ¶ 14.) Among other
violations, Counter-Defendants failed to obtained a
permit for their march; hindered, obstructed or
delayed traffic on the streets of Chicago; and crossed
roadways at points other than those within marked
crosswalks. (*Id.*) As a result of Counter-Defendants'
conduct, the City of Chicago incurred extensive costs
to provide necessary services, including the extra
police forces that were called in to monitor and
control the march and traffic that was disrupted by
the march, and costs related to transporting,
processing and housing Counter-Defendants who
were arrested. (Counterclaim ¶ 12.)

                         **DISCUSSION**

**I. Requirements for Class Certification under
Rule 23**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2008 WL 687221 (N.D.Ill.)
(Cite as: 2008 WL 687221 (N.D.Ill.))

Without citing any authority in support of its position, the City argues that, because the only people subject to the City's counterclaim have already been certified by this Court as having satisfied Rule 23 requirements, it would be "a redundant and unnecessary exercise" to "re-examine those class Plaintiffs for certification as class Counter-Defendants."(Mem. in Support of Mtn. for Class Cert. at p. 6). Not true; certifying a class of Counter-Defendants for the purpose of adjudicating the City's counterclaims is not at all the same as certifying a Plaintiffs' class for the purpose of adjudicating common claims against the City-even if exactly the same individuals comprise both classes. Accordingly, the Court is not excused from its obligation to conduct a rigorous analysis to determine whether the requirements for certification in Rule 23 are met simply because the proposed class of Counter-Defendants is composed of the same individuals that comprise the Plaintiffs' class. See *General Telephone Co. v. Falcon,* 457 U.S. 147, 160-61, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Davis v. Hutchins,* 321 F.3d 641, 647 (7th Cir.2003). In conducting this rigorous analysis, the Court must "make whatever factual and legal inquiries are necessary under Rule 23."*Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 676 (7th Cir.2001).

*2 Plaintiffs' claims may proceed as a class action only if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."Fed.R.Civ.P. 23(a). Assuming Plaintiffs can meet this initial burden, they also must show that the requirements for one of the subsections of Rule 23(b) is met. Plaintiffs have moved to certify their class under Rule 23(b)(3), which permits class certification if: (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. This Court has "broad discretion" to determine whether class certification is appropriate. See *Mira v. Nuclear Measurements Corp.,* 107 F.3d 466, 474 (7th Cir.1997), citing *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). In this case, the Court finds that, with respect to the putative

class of Counter-Defendants the City has not even cleared the low hurdle of commonality. And even if there were common questions of law or fact applicable to the City's counterclaim against Plaintiffs, individual issues of fact and law would certainly predominate over the common issues.

**II.  The Requirements of Commonality and Predominance Are Not Satisfied in this Case.**

When deciding whether to certify a class, the Court must determine that there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2)."A common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)(2)."*Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). In the more traditional setting of a plaintiffs' class, such a common nucleus of operative facts can arise when each class member's claim will depend on the same conduct by the defendants. See *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998); *Allen v. City of Chicago,* 828 F.Supp. 543, 551 (N.D.Ill.1993) (commonality requirement met when there is "standardized conduct by defendants toward members of the putative class"). Once a common nucleus of facts is identified, commonality will not be upset by "factual variations among class members' grievances."*Id.,* citing *Patterson v. General Motors Corp.,* 631 F.2d 476, 481 (7th Cir.1980). But in this case, the City seeks to certify a class of defendants to its counterclaim. Accordingly, the Court's inquiry into whether there exists a nucleus of facts common to the putative class will necessarily reach the question whether the City's counterclaim depends upon standardized conduct *by-*as opposed to toward-the members of the putative class.

*3 As compared to commonality, "the predominance criterion is far more demanding."*Amchem Prods. v. Windsor,* 521 U.S. 591, 623-24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Predominance requires not only that common questions of law or fact exist, but that they "predominate over any questions affecting only individual members."Fed.R.Civ.P. 23(b)(3). This inquiry begins with an examination of the substantive elements of the class claims (or, in this case, the claims *against the class* ) and the defenses raised. See *Simer v. Rios,* 661 F.2d 655, 672 (7th Cir.1981). As to each claim or defense, the Court must examine rigorously the proof required to substantiate the allegations and the form the proof will take at trial.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3
Slip Copy, 2008 WL 687221 (N.D.Ill.)
**(Cite as: 2008 WL 687221 (N.D.Ill.))**

*Id.*

There is no precise test for predominance. On the one hand, the existence of individual issues does not necessarily defeat class certification. *Id.* Indeed, it is implicit in the predominance requirement as set forth in Rule 23(b)(3) that a certain number of individual issues may be present in a class action. On the other hand, a class action will not serve its intended purpose if it degenerates into separate trials on almost all elements of the claims against the class. *Id.* With that purpose in mind, the Court exercises its sound discretion to determine whether issues common to the class predominate over issues individual to each class member. *See Retired Chicago Police,* 7 F.3d at 596.

In this case, under the Ordinance, the City seeks to recover expenses for resources utilized as a result of Plaintiffs' violations of the law. The City's counterclaim alleges that Plaintiffs (both named class representatives and unnamed class members) committed violations of a number of state and local laws, including marching without a permit, disorderly conduct, obstruction of traffic, nuisance, reckless conduct and obstruction of roadways. (Mem. in Support of Mtn. for Class Cert. at p. 2). To certify a class of defendants to that counterclaim, the City must demonstrate, with respect to the elements of its claim under the Ordinance (violation, injury, and causation) that a common nucleus of facts will control the outcome.

The Court finds that the City cannot point to standardized unlawful conduct by the class members that would justify certification of a class in this case. Indeed, Plaintiffs/Counter-Defendants engaged in a wide variety of conduct: some organized the march; some participated in the march from its inception; some joined the march before marchers were turned around at Michigan Avenue; some joined after; and some were merely bystanders who were never a part of the march. Some individuals sat in the street and others stood on the sidewalk. Some were aware that the group did not have a permit to march and some were not.

Under these facts, the alleged violations of law are not attributable to the group as a class. Some plaintiffs may not have committed any of the violations alleged by the City.[FN1] For example, bystanders cannot be guilty of marching without a

permit. Persons who only walked on the sidewalk could not have obstructed the roadways. Marchers who may have joined the march after the City turned the crowd around at Michigan Avenue may have been unaware of any orders from police and thus could not have violated those orders. Thus, even though it is a low hurdle, the Court finds that the City has not satisfied the commonality requirement in this case.

> FN1. Accordingly, certification of a class would allow for the possibility that completely innocent bystanders might wind up liable for a portion of any judgment against the class on the City's counterclaim. That possibility alone weighs heavily against class certification here.

**\*4** And even if there were questions common to the entire class of defendants, individual issues would no doubt predominate. Members of the putative class engaged in different conduct and would have different defenses to the City's counterclaim. Resolution of that counterclaim would degenerate into separate trials to determine-at least as a threshold matter-whether each individual plaintiff committed any violations of law (or was ever even a part of the march). Accordingly, the Court also finds that the City has not satisfied the predominance requirement in this case.

### Conclusion and Order

Wherefore, the City's Motion for Class Certification of its Counterclaim Against Class Plaintiffs/Counter-Defendants is denied.

So ordered.

N.D.Ill.,2008.
Vodak v. City of Chicago
Slip Copy, 2008 WL 687221 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 U.S. Dist. LEXIS 3968, *

LEXSEE 2001 US DIST LEXIS 3968

**INDELFE ROMAN, Plaintiff, v. FIRST FRANKLIN FINANCIAL CORPORATION; OPTION ONE MORTGAGE CORPORATION; and EQUICREDIT CORPORATION OF ILLINOIS, Defendants.**

**No. 00 C 7228**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2001 U.S. Dist. LEXIS 3968*

**April 2, 2001, Decided
March 3, 2001, Docketed**

**DISPOSITION:**    [*1]  Indelfe Roman's motion for class certification [2-1] denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued defendant bank for failure to disclose an alleged personal property security interest taken by means of a mortgage, in violation of the Truth in Lending Act, *15 U.S.C.S. § 1601 et seq.*, and Regulation Z, *12 C.F.R. § 226.1.* Plaintiff moved for class certification pursuant to *Fed. R. Civ. P. 23.*

**OVERVIEW:** Plaintiff sought class certification, contending that an unknown number of class members shared common questions of law and fact. The court concluded that plaintiff failed to show the impracticality of joinder because he offered no evidence to substantiate his theory that defendant had issued many loans secured by real estate containing two dwellings other than defendant's status as a large institution. Even if he had established that joinder was impracticable, plaintiff failed to show that common questions of law and fact predominated because to determine whether each class member's loan was subject to the Truth in Lending Act, *15 U.S.C.S. § 1601 et seq.*, the court would have been required to undertake a fact intensive inquiry into whether each loan was used for business or consumer purposes. Since the liability determinations were both individual and fact-intensive, class certification was improper.

**OUTCOME:** Motion for class certification was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Class Actions > Judicial Discretion*
[HN1] Courts have broad discretion in determining whether class certification is appropriate. In assessing a certification motion, the court does not consider the merits of the case. However, the boundary between a class determination and the merits may not always be easily discernible.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
[HN2] The importance of class certification is heightened in cases under the Truth in Lending Act, *15 U.S.C.S. § 1601 et seq.*, where the small amounts of money involved and the difficult financial situations of many of the litigants may inhibit individualized litigation.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > General Overview*
*Civil Procedure > Class Actions > Prerequisites > Adequacy of Representation*
*Civil Procedure > Class Actions > Prerequisites > Numerosity*
[HN3] In order to establish that class certification is justified, a plaintiff must satisfy the four requirements of *Fed. R. Civ. P. 23(a)*. These requirements include: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Fed. R. Civ. P. 23(a)*. In addition, the plaintiff must meet one of the requirements of *Fed. R. Civ. P. 23(b)*.

*Civil Procedure > Class Actions > Prerequisites > General Overview*
[HN4] *Fed. R. Civ. P. 23(b)(3)* requires that common questions of law and fact predominate over questions involving individual members, and that a class action is superior to other forms of adjudication.

*Civil Procedure > Class Actions > Prerequisites > Numerosity*
[HN5] For purposes of class certification, the exact number of class members need not be pleaded or proved. However, the impracticability of joinder must be positively shown and not merely speculative.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Class Members > General Overview*
[HN6] Class certification cannot be granted when questions involving individual class members predominate over common questions of law and fact. *Fed. R. Civ. P. 23(b)(3)*.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
[HN7] The Truth in Lending Act, *15 U.S.C.S. § 1601 et seq.*, is applicable when a loan is primarily used for consumer purposes, but not when the loan is used for business purposes.

*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Banking Law > Regulatory Agencies > U.S. Federal Reserve Board of Governors*
[HN8] According to the Federal Reserve Board's official state commentary to Regulation Z, *12 C.F.R. § 226.1*, merely providing Truth in Lending Act, *15 U.S.C.S. § 1601 et seq.*, disclosures is not determinative of whether the loan was used for business or consumer purposes. Instead, the commentary sets out five factors that should be considered in making this determination. The factors include: (1) the relationship of the borrower's primary occupation to the acquisition; the more closely related, the more likely it is to be business purpose; (2) the degree to which the borrower will personally manage the acquisition; the more personal involvement there is, the

more likely it is to be business purpose; (3) the ratio of income from the acquisition to the total income of the borrower; the higher the ratio, the more likely it is to be business purpose; (4) the size of the transaction; the larger the transaction, the more likely it is to be business purpose; and (5) the borrower's statement of purpose for the loan.

*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Prerequisites > General Overview*
[HN9] Where liability determinations are both individual and fact-intensive, class certification under *Fed. R. Civ. P. 23(b)(3)* is improper.

COUNSEL: For INDELFE ROMAN, plaintiff: Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Keith James Keogh, Edelman, Combs & Latturner, Chicago, IL.

For FIRST FRANKLIN FINANCIAL CORPORATION, defendant: Jonathan N. Ledsky, Craig Allen Varga, Joshua D. Davidson, Varga, Berger, Ledsky, Hayes & Casey, Chicago, IL.

JUDGES: Suzanne B. Conlon, United States District Judge.

OPINION BY: Suzanne B. Conlon

OPINION

MEMORANDUM OPINION AND ORDER

Indelfe Roman ("Roman") sues First Franklin Financial Corporation ("First Franklin") for failure to disclose an alleged personal property security interest taken by means of a mortgage, in violation of the Truth in Lending Act, *15 U.S.C. § 1601 et seq.* (TILA), and its implementing Regulation Z, *12 C.F.R. 226.1.* [1] Roman moves for class certification, pursuant to *Fed.R.Civ.P. 23*.

> 1    Defendants Equicredit Corporation of Illinois ("Equicredit") and Option One Mortgage Corporation ("Option One") were dismissed from this action.

[*2] BACKGROUND

I. Allegations in the complaint

Roman resides in and owns a two-flat building in Chicago. First Franklin is a Delaware corporation with its principle place of business in San Jose, California. The corporation has several offices in Illinois. First

Franklin provides mortgage brokers with various products and services, but focuses on its "proprietary risk-based direct access loan programs." Cmplt. at P 8.

On November 24, 1999, Roman obtained a $ 70,000 mortgage loan from First Franklin for the purpose of refinancing his building. In connection with the loan, Roman signed a note, a mortgage, a 1-4 family rider and assignment of rents ("the rider"), a TILA statement, and a HUD-1 settlement statement. Roman alleges the TILA disclosure statement (1) misrepresented that the only security interest taken was in real property and (2) failed to disclose that the lender had taken a security interest in certain personal property by means of the rider.

## II. Class definition

Roman seeks to represent a class of all persons who satisfy the following requirements: (1) they obtained a residential mortgage secured by real estate that held two dwellings; (2) their [*3] family members or themselves resided in one or more of the dwellings; (3) their transaction was documented as being subject to the TILA; (4) their note and mortgage were originated by or assigned to First Franklin; (5) their mortgage included the rider, which created a security interest in personal property at the mortgaged premises; (6) their TILA statement does not disclose the security interest in personal property created by the rider; and (7) their mortgage is dated on or after one year prior to the filing of this action. [2]

> 2  Because Option One and Equicredit were dismissed from this action, Roman's motion is moot to the extent it requests certification of a B and C class.

## DISCUSSION

### I. Class certification standard

[HN1] Courts have broad discretion in determining whether class certification is appropriate. *Keele v. Wexler, 149 F.3d 589, 592 (7th Cir. 1998).* In assessing a certification motion, the court does not consider the merits of the case. *Dhamer v. Bristol-Myers Squibb Co., 183 F.R.D. 520, 525 (N.D. Ill. 1998).* [*4] However, "the boundary between a class determination and the merits may not always be easily discernible." *Retired Chicago Police Association v. City of Chicago, 7 F.3d 584, 599 (7th Cir. 1993)* (internal citations omitted). [HN2] The importance of class certification is heightened in TILA cases, "where the small amounts of money involved and the difficult financial situations of many of the litigants may not inhibit individualized litigation." *Williams v. Chartwell Financial Services, Ltd., 204 F.3d 748, 760 (7th Cir. 2000).*

[HN3] In order to establish that class certification is justified, a plaintiff must satisfy the four requirements of *Fed.R.Civ.P. 23(a).* These requirements include: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *Fed.R.Civ.P. 23(a).* In addition, the plaintiff must meet one of the requirements of *Fed.R.Civ.P. 23(b).* [HN4] As applied to this case, *Rule 23(b)* requires [*5] that common questions of law and fact predominate over questions involving individual members, and that a class action is superior to other forms of adjudication. *Fed.R.Civ.P. 23(b)(3).*

## II. Rule 23(a)

Roman contends the requirement of numerosity is satisfied for the following reasons: (1) he is claiming a common TILA violation; (2) First Franklin has a large number of loans, many of which are secured by real estate containing at least two dwellings; and (3) a mortgage company of First Franklin's size is going to have more than 20-40 loans with the violation Roman alleges. Roman does not purport to know the number of putative class members.

[HN5] The exact number of class members need not be pleaded or proved. *See Gomez v. Comerford, 833 F. Supp. 702, 706 (N.D. Ill. 1993).* However, the impracticability of joinder must be positively shown and not merely speculative. *Kohn v. Mucia, 776 F. Supp. 348, 352 (N.D. Ill. 1991).* Roman has relied solely on speculation in an attempt to establish numerosity. Essentially, Roman asserts that because First Franklin is so large, it must have issued many loans secured by real estate containing two dwellings. Roman [*6] offers no evidence to substantiate this theory. In fact, he does not even *estimate* how many loans of this type were issued by First Franklin. Moreover, Roman simply speculates that if many of these loans were issued then at least 20-40 must have been deficient in TILA disclosures. Roman has failed to establish that the class is so numerous that joinder is impracticable. [3]

> 3  The court need not reach *Rule 23(a)*'s requirements of typicality, commonality, and adequate representation.

## III. Rule 23(b)

Even if Roman met all *Rule 23(a)* requirements, class certification would not necessarily be appropriate. [HN6] Class certification cannot be granted when questions involving individual class members predominate

over common questions of law and fact. *See Fed.R.Civ.P. 23(b)(3)*. First Franklin contends individual questions of law predominate because it must be determined whether each class member's loan falls under TILA protection. [HN7] The TILA is applicable when a loan is primarily used for consumer purposes, [*7] but not when the loan is used for business purposes.

Roman's proposed class definition assumes it is easily discernible whether the class members' loans are subject to the TILA. [HN8] However, according to the Federal Reserve Board's official state commentary to regulation Z, merely providing TILA disclosures is not determinative of whether the loan was used for business or consumer purposes. Instead, the commentary sets out five factors that should be considered in making this determination. The factors include: (1) The relationship of the borrower's primary occupation to the acquisition; the more closely related, the more likely it is to be business purpose; (2) the degree to which the borrower will personally manage the acquisition; the more personal involvement there is, the more likely it is to be business purpose; (3) the ratio of income from the acquisition to the total income of the borrower; the higher the ratio, the more likely it is to be business purpose; (4) the size of the transaction; the larger the transaction, the more likely it is to be business purpose; and (5) the borrower's statement of purpose for the loan. *See* Commentary § 226.3(a)-4. First Franklin asserts that [*8] applying these five factors to each possible member of the putative

class requires highly fact intensive inquiries and that class certification would result in an undetermined number of mini-trials. [4] As this court has previously held, [HN9] "Where liability determinations are both individual and fact-intensive," class certification under *Rule 23(b)(3)* is improper." *McGarvey v. Citibank (South Dakota) N.A., 1995 U.S. Dist. LEXIS 9328*, No. 95 C 123, 1995 WL 404866, at *6 (N.D. Ill. July 5, 1995).

   4   Roman's contention that examining First Franklin's records will answer the question of whether the loans were for business or consumer purposes is questionable. He offers no basis for his assumptions that each loan file "will probably have a borrower's affidavit" and that the lender will have documents showing the purpose of each loan.

**CONCLUSION**

Indelfe Roman's motion for class certification [*9] is denied.

ENTER:

Suzanne B. Conlon

United States District Judge

April 2, 2001

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**(Cite as: Not Reported in F.Supp.2d)**

**H**Peoples v. Sebring Capital Corp.
N.D.Ill.,2002.

United States District Court, N.D. Illinois, Eastern
Division.
BENJAMIN PEOPLES, Plaintiff,
v.
SEBRING CAPITAL CORPORATION, Defendant.
**No. 01 C 5676.**

March 15, 2002.

MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District J.
**\*1** Plaintiff Benjamin Peoples alleges that defendant
Sebring Capital Corporation ("Sebring") violated
state and federal law in the course of two loan
transactions. Peoples has moved for class
certification as to the first of his four counts. For the
reasons set forth below, the motion for class
certification is granted with one modification.

I. Background

On September 1, 2000, Peoples obtained two loans
from Sebring in order to purchase his current
residence, 7653 South Langley Avenue in Chicago.
On July 23, 2001, Peoples filed this putative class
action alleging in Count I that Sebring violated
section 1638 of the Truth in Lending Act ("TILA"),
15 U.S.C. § 1601 et seq., and subpart 18 of
implementing Federal Reserve Board Regulation Z
("Regulation Z"), 12 C.F.R. pt. 226. In a secured
credit transaction, section 1638 of the TILA requires
the lender to provide "a statement that a security
interest has been taken in (A) the property which is
purchased as part of the credit transaction, or (B)
property not purchased as part of the credit
transaction identified by item or type."15 U.S.C. §
1638(a)(9); accord12 C.F.R. § 226.18(m) (requiring
disclosure by the lender of "[t]he fact that the creditor
has or will acquire a security interest in the property
purchased as part of the transaction, or in other
property identified by item or type").

In the first amended complaint,<sup>FN1</sup> Peoples explains

that the TILA disclosure statements provided by
Sebring in the September 1 transaction, "among other
things, ... failed to disclose that the loan documents
created an extensive security interest in certain
property, by means of the 1-4 Family
Rider."(Am.Compl.¶ 14.) The 1-4 Family Riders (a
standard form prepared by Fannie Mae) amended the
mortgages by adding a security interest in "building
materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used,
or intended to be used in connection with the
Property, ... now or hereafter attached to the Property,
all of which including replacements and additions
thereto."(Am.Compl.Ex. C, ¶ A, Ex. G, ¶ A.) The
only security interest disclosed in each TILA
statement is "in the property located at: 7653 South
Langley Avenue, Chicago, Illinois 60619."Peoples
argues that the disclosure statement is too narrow and
violates the TILA. For relief, Peoples seeks statutory
damages as specified in 15 U.S.C. § 1640, attorneys
fees and costs, and any other appropriate relief.

> FN1. The motion for class certification
> preceded the first amended complaint, but
> the amendments did not substantially affect
> Count I. Peoples has moved for leave to file
> a second amended complaint, a motion to
> which Sebring objects. Resolving this
> motion will not impact class certification
> because Count I remains unchanged in the
> proposed second amended complaint.

Peoples defines the putative class as "all natural
persons who satisfy the following criteria:"
a. They obtained a residential mortgage loan secured
by real estate containing 1-2 dwelling units;
b. In one of which they or a family member resided;
c. Their transaction was documented as one subject to
the Truth in Lending Act;
d. Their note and mortgage were originated by
Sebring;
e. Their mortgage included a 1-4 Family Rider and
Assignment of **Rents** creating a security interest in
personal property not limited to **rents**;
**\*2** f. Their Truth in Lending statement does not
disclose the security interest in personal property
created by the Rider; and
g. Their mortgage is dated on or after a date one year

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
(Cite as: Not Reported in F.Supp.2d)

prior to the fling [sic] of this action.

(Am.Compl.¶ 21.) So defined, the class consists of thirty-eight individuals, eleven of whom reside in Illinois (including Peoples). Peoples moves for class certification under Federal Rule of Civil Procedure 23(b)(3).

## II. Analysis

The burden is on the putative class representative to demonstrate that all the requirements for class certification are satisfied. _Retired Chicago Police Ass'n v. City of Chicago,_ 7 F.3d 584, 596 (7th Cir.1993).Rule 23(a) provides that an individual may sue on behalf of a class only if
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Where, as here, a Rule 23(b)(3) class is proposed, the court must also find:that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). The Federal Rules expressly permit classes, like the one proposed here, that are limited to only one count of a multi-count complaint. Fed.R.Civ.P. 23(c)(4).

In ruling on certification, the court has an independent duty to scrutinize the appropriateness of a class action and is not limited to arguments made by the parties. _In re General Motors Corp. Engine Interchange Litig.,_ 594 F.2d 1106, 1124 (7th Cir.1979). And while the court may not consider the ultimate merits of the claim, _Eisen v. Carlisle & Jacquelin,_ 417 U.S. 156, 178 (1974), "[t]he boundary between a class determination and the merits may not always be easily discernible." _Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,_ 657 F.2d 890, 895 (7th Cir.1981); _see also Coopers & Lybrand v. Livesay,_ 437 U.S. 463, 469 (1978) ("[T]he class determination generally involves considerations

that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal quotation marks omitted). For example, it is sometimes necessary to determine the contours of the applicable law in order to predict "the difficulties likely to be encountered in the management of a class action." _Szabo v. Bridgeport Machs., Inc.,_ 249 F.3d 672, 676 (7th Cir.2001). The court is not to assume the truth of factual allegations in the complaint that go to the issue of class certification, but rather, as would be true on a motion to dismiss for lack of jurisdiction, should resolve factual issues related to certification using any rational mode of inquiry. _See id._ at 675-77.

### A. Numerosity

*3 The prerequisite of numerosity is satisfied if "the class is so large that joinder of all members is impracticable."Fed.R.Civ.P.                23(a)(1). Impracticability, not impossibility, is the touchstone. "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."_Gen. Tel. Co. v. EEOC,_ 446 U.S. 318, 330 (1980)."As a general rule, classes of 20 are too small, classes of 20-40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough."_Ikonen v. Hartz Mountain Corp.,_ 122 F.R.D. 258, 262 (S.D.Cal.1988). Factors to be considered in addition to size include "the nature of the relief sought, the ability of the individuals to press their own claims, the practicality of forcing relitigation of a common core of issues, and administrative difficulties involved in interpretation and joinder."_Rosario v. Cook County,_ 101 F.R.D. 659, 661 (N.D.Ill.1983). The court may "make common sense assumptions in order to find support for numerosity."_NOW v. Scheidler,_ 172 F.R.D. 351, 359-60 (N.D.Ill.1997) (quoting _Evans v. United States Pipe & Foundry,_ 696 F.2d 925, 930 (11th Cir.1983)).

The parties dispute the relevant number of class members. Peoples would include all thirty-eight individuals who meet the specified criteria. Sebring argues the class must be limited to the eleven Illinois residents because state law controls the threshold question of whether a particular interest in property constitutes a "security interest" for TILA disclosure purposes. In response, Peoples contends that the definition of "security interest" does not vary from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**(Cite as: Not Reported in F.Supp.2d)**

state to state, pointing out that all 50 states have adopted the Uniform Commercial Code article governing the creation of security interests in personal property and that Fannie Mae issued only one 1-4 Family Rider for use in all jurisdictions. What is more, Peoples urges, "[a]s long as defendant's documents *purport* to take a security interest in personal property, the fact that some court might later hold that the security interest is not enforceable does not affect defendant's disclosure obligations."(Reply at 3.) Both sides' arguments blur potentially important distinctions, but Peoples reaches the right result.

Evaluating these competing contentions requires a nuanced appreciation of the role of state law in determining liability under the TILA. Regulation Z defines a security interest as "an interest in property that secures performance of a consumer credit obligation and that is recognized by State or Federal law."12 C.F.R. § 226.2(a)(25). The official commentary states:
The threshold test is whether a particular interest in property is recognized as a security interest under applicable law. The regulation does not determine whether a particular interest is a security interest under applicable law. If the creditor is unsure whether a particular interest is a security interest under applicable law (for example, if statutes and case law are either silent or inconclusive on the issue), the creditor may at its option consider such interests as security interests for Truth in Lending purposes.

**\*4** 12 C.F.R. pt. 226, supp. I, § 226.2(a)(25)-1.[FN2]The TILA generally demands accuracy, however, so the creditor's uncertainty must be bona fide and reasonable for disclosure to become optional. *Szumny v. Am. Gen. Fin., Inc.,* 246 F.3d 1065, 1071 (7th Cir.2001). It follows that if state law conclusively establishes that the purported security interest is wholly without value, then believing it is a security interest would be unreasonable and disclosing it would violate the TILA. *See Smith v. Cash Store Mgmt ., Inc.,* 195 F.3d 325, 328 (7th Cir.1999). Nondisclosure would be mandatory, not merely permissible.

> FN2. Federal Reserve Board regulations and commentary under the TILA are entitled to substantial deference. *Szumny v. Am. Gen.*

*Fin., Inc.,* 246 F.3d 1065, 1069 (7th Cir.2001).

In the 1-4 Family Rider, Sebring purported to take a security interest in "building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, ... now or hereafter attached to the Property, all of which including replacements and additions thereto."(Am.Compl.Ex. C, ¶ A, Ex. G, ¶ A.) The state law definition of "security interest" would affect Sebring's potential liability under the TILA only if it clearly excluded all property that is described by this language. That seems very unlikely. It is true that some states prohibit certain security interests in household goods, 12 C.F.R. pt. 226, supp. I, § 226.18(m)-2, but the court is aware of no state that prohibits a security interest in *all* goods "of every nature" attached to a house or the land on which the house sits. Variations in state law definitions of "security interest" are immaterial so long as a security interest in one good that falls into this category is potentially viable in every relevant state. Sebring's argument to limit the class to Illinois residents therefore fails.

An alternative argument not raised by the parties derives from specific exceptions to the TILA disclosure requirement. If everything described in the additional security interest provision falls into an exception, Sebring is off the hook. The TILA does not require disclosure of every interest that qualifies as a "security interest" under state law. Regulation Z specifies that "security interest" for TILA purposes "does not include incidental interests such as interests in proceeds, accessions, additions, fixtures, insurance proceeds (whether or not the creditor is a loss payee or beneficiary), premium rebates, or interests in after-acquired property."12 C.F.R. § 226.2(a)(25). Although neither the TILA nor Regulation Z defines these terms, Regulation Z provides that any term not defined by the regulation should be construed in accordance with state law or the contract. 12 C.F.R. § 226.2(b)(3). Peoples's mortgages do not define any of these terms but provide that the law of the jurisdiction in which the property is located governs. (Am.Compl.Ex. B, ¶ 13, Ex. F, ¶ 15.) Presumably, the other class members' transactions were documented with comparable standard-form mortgages. This court must therefore consider

Not Reported in F.Supp.2d                                                                                              Page 4
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
(Cite as: Not Reported in F.Supp.2d)

whether jurisdictional variations in the definitions of these terms might impact Sebring's potential liability on Count I.

**\*5** Only one of these terms has any chance of making a difference. Based on the "attached" language in the 1-4 Family Rider additional security interest provision, Sebring could argue that the provision includes only "fixtures." *See, e.g., Leon v. Washington Mut. Bank, F.A.,* 164 F.Supp.2d 1034, 1037-39 (N.D.Ill.2001).Article 9 of the Uniform Commercial Code, which has been adopted in all 50 states, defines fixtures as "goods that have become so related to particular real property that an interest in them arises under real property law."U.C.C. § 9-102(a)(41).FN3 The test for determining when a good becomes "so related" has changed over time and still varies across jurisdictions. For the differences to matter, however, it must be the case that in one relevant jurisdiction a good automatically becomes a fixture when it is "attached" to real property. As far as this court is aware, non-permanent attachment was never deemed sufficient to convert a good into a fixture. *Cf. Nat'l Bank of Republic v. Wells-Jackson Corp.,* 193 N.E. 215, 218 (Ill.1934) ("The early decisions in England, as well as in this country, were very firm in holding that when personal property became a fixture by annexation to the real estate *by some permanent method* the personal property lost its identity as such and became real estate.") (emphasis added). A calendar (or Post-it ® note) does not become part of your house when you put it on the wall. But even if the court is mistaken on this point or if the phrase "now or hereafter attached" implies the required element of permanence, "[t]here seems to be a general agreement today that annexation is no longer a matter of controlling importance."35 Am.Jur.2d, *Fixtures* § 4 (2000). If it later appears that attachment alone suffices in any relevant jurisdiction, the court will reevaluate the appropriateness of a nationwide class. Until then, the relevant number of putative class members will be thirty-eight.

> FN3. Revised Article 9 took effect in 46 states (including Illinois) on July 1, 2001. The definition of fixture was moved to section 9-313(1)(a) but was substantively unchanged.

And while thirty-eight is not an especially large number, courts have certified classes of this size and

smaller. *See, e.g., Swanson v. Am. Consumer Indus., Inc.,* 415 F.2d 1326, 1333 n. 9 (7th Cir.1969) (class of 40); *Jordan v. County of Los Angeles,* 669 F .2d 1311, 1319-20 (9th Cir.) (class of 39), *vacated on other grounds,*459 U.S. 810 (1982); *Afro Am. Patrolmens League v. Duck,* 503 F.2d 294, 298 (6th Cir.1974) (class of 35); *Riordan v.. Barney,* 113 F.R.D. 60, 62 (N.D.Ill.1986) (class of 29); *Basile v. Merrill Lynch, Pierce, Fenner & Smith,* 105 F.R.D. 506, 508 (S.D.Ohio 1985) (class of 23); *Arkansas Educ. Ass'n v. Bd. of Educ.,* 446 F.2d 763, 765 (8th Cir.1971) (class of 20); *Rosario,* 101 F.R.D. at 659 (class of 20); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n,* 375 F.2d 648, 653 (4th Cir.1967) (class of 18). Sebring objects to Peoples's reliance on securities fraud cases where there is a "strong policy favoring certification," *Riordan,* 113 F.R.D. at 62, but most of the cases cited above arise in other contexts.

**\*6** Two other factors also favor a finding of numerosity. The statutory damages sought here are too small to warrant undertaking individual actions.*Swanson,* 415 F.2d at 1333 n. 9. At least twenty-seven of the thirty-eight potential class members reside in other judicial districts, which increases the impracticability of joinder. *Allen v. Isaac,* 99 F.R.D. 45, 53,*amended in non-pertinent part,*100 F.R.D. 373 (N.D.Ill.1983). And it seems unlikely that the non-Illinois residents are concentrated in just one or two other locations. *Cf. Gaspar v. Linvatec Corp.,* 167 F.R.D. 51, 56 (N.D.Ill.1996) ( "[T]he more geographically separated the proposed members are, the more joinder becomes impracticable.").

The court finds that Peoples's proposed class is sufficiently "large that joinder of all members is impracticable."Fed.R.Civ.P. 23(a)(1).

*B. Commonality*

Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class."The threshold for commonality is not high. *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir.1990)."A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)."*Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). A common nucleus of operative fact exists when "defendants

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**(Cite as: Not Reported in F.Supp.2d)**

have engaged in standardized conduct towards members of the proposed class."*Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998)."[T]here need only be a single issue [of law or fact] common to all members of the class."*Gomez v. Illinois State Bd. of Educ.,* 117 F.R.D. 394, 399 (N.D.Ill.1987) (quoting *Edmondson v. Simon,* 86 F.R.D. 375, 380 (N.D.Ill.1980)).

Sebring has engaged in standardized conduct toward members of the proposed class. By definition, each class member's loan contract includes the same standard form 1-4 Family Rider and no TILA disclosure of a security interest in personal property. This common fact unites the class. Sebring offers several arguments for why its liability under the TILA might nonetheless turn on individual differences among class members. These arguments are considered below in the predominance section. To clear the commonality bar, however, it is sufficient to observe that each class member's transaction was documented using the same allegedly deficient instruments. *See Demitropoulos v. Bank One Milwaukee, N.A.,* 915 F.Supp. 1399, 1417 n. 19 (N.D.Ill.1996).

### C. Typicality

Sebring sensibly does not dispute the typicality of Peoples's claims and defenses. Typicality requires substantial similarity, not perfect identity.*Allen,* 99 F.R.D. at 54. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."*De La Fuente v.. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) (quoting H. Newberg, *Class Actions* § 1115(b), at 185 (1977)). Sebring's practice of using the 1-4 Family Rider in residential loan transactions without disclosing a security interest in personal property gives rise to the TILA claim of each class member, including Peoples. Peoples's claims and defenses are typical.

### D. Adequacy of Representation

*7Rule 23(a)(4) requires that the named plaintiff will fairly and adequately represent the interests of the class. "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not

have interests antagonistic to those of the class."*Susman v. Lincoln Am. Corp.,* 561 F.2d 86, 90 (7th Cir.1977) (quoting *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.1975)). Peoples's counsel has substantial class action experience and has co-authored a publication on residential mortgage litigation. This court has thus far perceived nothing which indicates that Peoples's attorney will not be "generally able" to conduct this litigation on behalf of the proposed class.<u>FN4</u> Neither does the court perceive any antagonistic interests between Peoples and the rest of the putative class. One might hope for a class representative with a larger monetary interest in the outcome, but given the nature of the alleged harm it seems improbable that any class member could seek more than statutory damages.

> <u>FN4.</u> Sebring alleges several instances of attorney neglect in its response to Peoples's motion for leave to file a second amended complaint. The court reserves the right to revisit the question of counsel's adequacy as this action progresses.

### E. Predominance

Rule 23(b)(3) requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members."Because no actual damages are sought or seem likely, individualized analysis of this fact-intensive issue will not be required. As noted in the commonality section, Sebring's standard loan documentation is clearly a fact common to each class member. This common fact would appear to give rise to a common question of law: whether the 1-4 Family Rider reasonably purported to create a security interest in personal property that was not disclosed as required by the TILA. Sebring has three arguments against commonality on this latter question. The first is that differences in state law governing the creation of security interests will require separate state-specific analyses. The court recognized this theoretical possibility above in the numerosity section, but found it exceedingly unlikely on the facts presented that state law variations would affect the sufficiency of Sebring's TILA disclosure.

Second, Sebring argues that, notwithstanding its usage of a common form, the question of what security interest was actually intended is unique to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 6
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**(Cite as: Not Reported in F.Supp.2d)**

each loan transaction. Specifically, Sebring suggests that a class member's real estate contract might address the question of whether a security interest in personal property was intended. Unless the real estate contract defines a term or terms used in the 1-4 Family Rider in such a way as to wholly exempt the purported security interest from the TILA's disclosure requirement-for example, by incorporating the state law definition of "fixture" into the word "attached"-the court does not perceive any way in which the contract could affect its analysis with respect to Count I. Based on the standard form mortgage used in Peoples's loan transactions, this seems quite unlikely. *Cf. Kleiner v. First Nat'l Bank,* 97 F.R.D. 683, 694-95 (N.D.Ga.1983) ("[A]t this point the fact that not all contracts are identical is not sufficient to overcome the apparent commonality of issues that they present.").

**\*8** The court also rejects the broader notion that it will generally have to examine the parties' intent on a transaction-by-transaction basis. By definition, each class member's contract includes the same 1-4 Family Rider with the same critical security interest provision. To the extent this language is unambiguous (and Sebring has not argued otherwise), extrinsic evidence of intent will not be relevant. As far as this court is aware, this basic principle of contract law applies in every jurisdiction. *See id.* at 694 & n. 13 (certifying class in part because state contract law on this precise point was the same in all five of the relevant jurisdictions). It is possible that the parties actually understood contractual terms in a way that would impact the court's analysis, if their intent was controlling. The problem for Sebring is that, as a general matter, the terms of the contract govern. A standardized agreement "is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." *Restatement (Second) of Contracts* § 211(2) (1981). Sebring may have had reason to know that the borrowers would not have signed the contract if they believed Sebring would obtain a security interest in any personal property attached to their land or home, *id.* § 211(3), but it seems highly unlikely that the reason would vary from class member to class member. The court suspects that the meaning of the 1-4 Family Rider was not discussed in any of these transactions.

Sebring's third argument against commonality is that, because commercial and business loans are exempt from the TILA, 15 U.S.C. § 1603(1), determining liability will require an individualized determination of whether the proceeds of each class member's loan were used for **business** or **commercial purposes**. The commentary to Regulation Z lists five factors to be considered in making this determination: (1) the relationship between the borrower's primary occupation and the acquisition; (2) the degree to which the borrower will personally manage the acquisition; (3) the ratio of income from the acquisition to the total income of the borrower; (4) the size of the transaction; and (5) the borrower's statement of purpose for the loan. 12 C.F.R. pt. 226, supp. I, § 226.3(a)-2. One judge in this district has held that "applying these five factors to each possible member of the putative class requires highly fact intensive inquiries and that class certification would result in an undetermined number of mini-trials."*Roman v. First Franklin Fin. Corp.,* No. 00 C 7228, 2001 U.S. Dist. LEXIS 3968, at \*7-8 (N.D.Ill. Apr. 2, 2001); *see also Parker v. George Thompson Ford, Inc.,* 83 F.R.D. 378, 381 (N.D.Ga.1979); *Berkman v. Sinclair Oil Corp.,* 59 F.R.D. 602, 609 (N.D.Ill.1973).

The weight of authority, however, tilts in the opposite direction. Six courts in this district have rejected the argument that having to determine whether a transaction is commercial precludes class certification. *See Lang v. Winston & Winston, P.C.,* No. 00 C 5516, 2001 U.S. Dist. LEXIS 7480, at \*6 (N.D. Ill. June 4, 2001); *Wilkerson v. Bowman,* 200 F.R.D. 605, 609-10 (N.D.Ill.2001); *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, L.L.C.,* 198 F.R.D. 503, 506 (N.D.Ill.2001); *Blair v. Equifax Check Servs.,* 97 C 8913, 1999 U.S. Dist. LEXIS 2536, at \*18-20 (N.D.Ill. Feb. 25, 1999); *Wilborn v. Dun & Bradstreet Corp.,* 180 F.R.D. 347, 357 (N.D.Ill.1998); *Beasley v. Blatt,* No. 93 C 4978, 1994 U.S. Dist. LEXIS 9383, at \*10, \*13-14 (N.D.Ill. July 11, 1994); *see also Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1165 n. 4 (7th Cir.1974) (observing that the possibility that some transactions were commercial rather than personal would probably not prevent certification in a Truth in Lending Act class action because commercial transactions are "frequently ... readily identified by the listing of the name of the business as the purchaser").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**(Cite as: Not Reported in F.Supp.2d)**

**\*9** This court agrees with the majority position. "The need to show that the transactions involved are consumer transactions is inherent in every [TILA] class action. If that need alone precluded certification, there would be no class actions under [the TILA]."*Wilborn, 180 F.R.D. at 357.* Such a result would be inconsistent with the TILA's express provision for class actions. Moreover, the court is convinced that the commercial determination will not require unduly burdensome individualized inquiry. It appears that the nature of the loan can be determined on the basis of Sebring's own business records. *See Haynes, 503 F.2d at 1165 n. 4.* The uniform residential loan application includes the amount of the loan, whether the property will be a primary or secondary residence or an investment, the applicant's occupation, the amount and sources of income, and a schedule of other real estate owned. In most cases, this document alone will decide the commercial purpose issue. *Cf.*12 C.F.R. pt. 226, supp. I, § 226.3(a)-2 (relevant factors include the size of the transaction and the borrower's income, occupation, and statement of purpose). Other times, the appraisal, as explained below, will resolve lingering uncertainty. Unlike the plaintiff in *Roman,* Peoples has provided support for the proposition "that the lender will have documents showing the purpose of each loan." 2001 U.S. Dist. LEXIS 3968, at \*8 n. 4. "Finally, if there is genuine confusion over this issue, class members can be asked a single question to determine whether they are entitled to relief."*Wilkerson, 200 F.R.D. at 610 (N.D.Ill.2001)* (citing *Wells v. McDonough, 188 F.R.D. 277, 279 (N.D.Ill.1999)*).

Although the commercial purpose issue does not defeat predominance, it does require the following additional provision in the class definition: The credit transaction involved an extension of credit not primarily for **business** or **commercial purposes**. *See*15 U.S.C. § 1603(1). Because the proposed class consists of only thirty-eight members, this new criterion raises a numerosity concern. If a substantial number of potential class members are excluded by this limitation, then the class may no longer be so large as to make joinder impracticable. Should this turn out to be the case, the court will not hesitate to decertify this class. At this stage, however, that possibility does not appear likely. The class is already limited to transactions involving real estate with one

or two dwelling units, in one of which the borrower or a family member resided. Because the value of the land plus one of the two dwelling units will almost always exceed the value of the other unit by itself, this limitation makes it exceedingly unlikely that more than half of the loan proceeds went to commercial purposes. The appraisal can rule out this possibility and identify the rare potential exception.

### F. Superiority

Finally, "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."Fed.R.Civ.P. 23(b)(3). It seems quite likely that the vast majority of class members is unaware of the alleged TILA violation. Even if they were so informed, they would probably lack sufficient incentive to bring individual actions. No actual damages are alleged, and the maximum potential recovery for statutory damages in individual actions is $2000 per person. *See Haynes, 503 F.2d at 1165* (in deciding superiority question, court should consider the "inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually"); *see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985)* ("Class actions ... may permit the plaintiffs to pool claims which would be uneconomical to litigate individually.") A class action is an efficient and appropriate method of resolving this controversy.

### III. Conclusion

**\*10** People's motion for class certification is granted with the addition of one criterion to the class definition: The credit transaction involved an extension of credit not primarily for **business** or **commercial purposes**.

N.D.Ill.,2002.
Peoples v. Sebring Capital Corp.
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 U.S. Dist. LEXIS 14048, *

LEXSEE 2001 US DIST LEXIS 14048

**ROSIE LEE POWELL, Plaintiff, v. ADVANTA NATIONAL BANK, and AD-VANTA MORTGAGE CORP., USA, Defendants. EDWARD SIMS, Plaintiff, v. ADVANTA NATIONAL BANK, and ADVANTA MORTGAGE CORP., USA, Defendants.**

**No. 00 C 7234, No. 00 C 5942**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2001 U.S. Dist. LEXIS 14048*

**September 4, 2001, Decided
September 10, 2001, Docketed**

**DISPOSITION:** [*1] Sims's and Powell's motions for class certification granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Two plaintiff borrowers moved for class certification of their separate actions against defendant lender, in which they alleged violations of the Truth in Lending Act (TILA), *15 U.S.C.S. § 1638*, and its accompanying Regulation Z, *12 C.F.R. § 226.18*. The court addressed the motions together.

**OVERVIEW:** The borrowers challenged the lender's practice of failing to disclose that the lender was taking a security interest in personal property through a mortgage rider. The lender argued that business transactions were excluded from the disclosure requirement, and therefore each putative class member needed to demonstrate their loan was a consumer transaction. The court disagreed, finding the problem raised by the lender could be solved simply by defining the class so as not to include those who were borrowing for a business purpose. To determine who should be excluded, a questionnaire would be sent to the potential class members, along with the class notification materials. The court found that simply joining all of the estimated 500-600 members would be impracticable. The claims of the borrowers were typical of the claims of the class and the borrowers demonstrated they would fairly and adequately represent the class. Common questions of law and fact predominated. The alleged violation was the same for each class member, it would be cost-prohibitive to initiate individual actions, and a class action offered the most judicially efficient method of litigation.

**OUTCOME:** The motions for class certification were granted, pending the court's approval of an elaborated definition of the class that limited the transactions at issue to consumer loans as defined by the Truth in Lending Act, *15 U.S.C.S. § 1602(h)*.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > General Overview*
*Civil Procedure > Class Actions > Prerequisites > Adequacy of Representation*
*Civil Procedure > Class Actions > Prerequisites > Numerosity*
[HN1] *Fed. R. of Civ. P. 23* permits a class action to be maintained if: (1) the class is so numerous that joinder of all class members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly or adequate protect the interests of the class. *Fed. R. Civ. P. 23(a)*.

*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Class Members > General Overview*
*Civil Procedure > Class Actions > Prerequisites > General Overview*
[HN2] In addition to the requirements of *Fed. R. Civ. P. 23(a)*, the court, in permitting a class action to be maintained, must also find: (1) that the prosecution of sepa-

Case 1:07-cv-06543    Document 44-18    Filed 06/11/2008    Page 21 of 40

Page 2
2001 U.S. Dist. LEXIS 14048, *

rate actions by the individual class members would create a risk of inconsistent adjudications or substantially impair the abilities of other class members to protect their interests; (2) that the party opposing the class has acted or failed to act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate for the class; or (3) that common questions of law or fact predominate over questions affecting only individual members and the class action is the best method for fairly and efficiently adjudicating the controversy. *Fed. R. Civ. P. 23(b)*.

*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Prerequisites > General Overview*
[HN3] The party seeking certification bears the burden of proving that its action is appropriate as a class action and that it satisfies all of the requirements of *Fed. R. Civ. P. 23*.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Civil Procedure > Class Actions > Certification*
[HN4] Business transactions are not subject to the Truth in Lending Act, *15 U.S.C.S. § 1603(1)*.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
[HN5] A consumer transaction is defined in the Truth in Lending Act as a transaction in which the party to whom credit is offered or extended is a natural person, and the property which is the subject of the transaction is primarily for personal, family, or household purpose. *15 U.S.C.S. § 1602(h)*.

*Banking Law > Consumer Protection > General Overview*
[HN6] The Uniform Residential Loan Application requires each borrower to state the purpose of the loan and whether the property will serve as the borrower's primary residence. By law, these documents are required to be preserved and should be contained in each loan file.

*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN7] The 1-4 Family Rider is a standard document used throughout the mortgage industry for refinancing of multi-unit properties.

*Civil Procedure > Class Actions > Prerequisites > Numerosity*
[HN8] Courts may make common sense assumptions in considering the numerosity requirement, in determining the issue of class action certification.

*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Civil Procedure > Class Actions > Prerequisites > General Overview*
[HN9] A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and the claims are based on the same legal theory.

**COUNSEL:** For ROSIE LEE POWELL, plaintiff (00-CV-7234): Jonathan Nachsin, Jonathan Nachsin P.C., Chicago, IL.

For ADVANTA NATIONAL BANK, ADVANTA MORTGAGE CORP., USA, defendants (00-CV-7234): Irving Bert Levinson, Michael David McCullough, Piper, Marbury, Rudnick & Wolfe, Chicago, IL.

For EDWARD SIMS, plaintiff (00-CV-5942): Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Edelman, Combs & Latturner, Chicago, IL.

PARKWAY MORTGAGE, INC., defendant (00-CV-5942): William Denby Heinz, Shelley Malinowski, Maaike Sari Hudson, Jenner & Block, Chicago, IL.

For ADVANTA NATIONAL BANK, defendant (00-CV-5942): Irving Bert Levinson, Piper, Marbury, Rudnick & Wolfe, Chicago, IL.

**JUDGES:** David H. Coar, United States District Judge.

**OPINION BY:** David H. Coar

**OPINION**

*MEMORANDUM OPINION AND ORDER*

   Rosie Lee Powell ("Powell") and Edward Sims ("Sims") (collectively, "Plaintiffs") bring class action suits against Advanta National Bank and Advanta Mortgage Corp., USA (collectively, "Advanta"). Although Powell and Sims bring separate suits, they are related, and both cases were assigned to this Court based on relatedness. Because [*2] both parties advance identical claims and the issues presented in their respective motions for class certification are also the same, this court addresses the two motions together.

Powell and Sims challenge Advanta's practice of failing to disclose that the lender is taking a security interest in personal property through a mortgage with a "1-4 Family Rider." Plaintiffs' complaint alleges that the Truth in Lending Disclosure Statements issued by Advanta violate the Truth in Lending Act ("TILA"), *15 U.S.C. § 1638*, and its accompanying Regulation Z, *12 C.F.R. § 226.18*. Plaintiffs seek statutory damages pursuant to *15 U.S.C. § 1640*.

[HN1] *Federal Rule of Civil Procedure 23* permits a class action to be maintained if (1) the class is so numerous that joinder of all class members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly or adequate protect the interests of the class. *Fed. R. Civ. P. 23(a)*; *Romaker v. Crossland, 1996 U.S. Dist. LEXIS 6490*, No. 94 C 3328, [*3] 1996 WL 254299 at *1 (N.D. Ill. May 10, 1996). [HN2] In addition, the court must also find: (1) that the prosecution of separate actions by the individual class members would create a risk of inconsistent adjudications or substantially impair the abilities of other class members to protect their interests; (2) that the party opposing the class has acted or failed to act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate for the class; or (3) that common questions of law or fact predominate over questions affecting only individual members and the class action is the best method for fairly and efficiently adjudicating the controversy. *Fed. R. Civ. P. 23(b)*; *Romaker, 1996 U.S. Dist. LEXIS 6490, 1996 WL 254299* at *1. [HN3] The party seeking certification bears the burden of proving that its action is appropriate as a class action and that it satisfies all of the requirements of *Rule 23. Trotter v. Klincar, 748 F.2d 1177, 1184 (7th Cri. 1984)*.

Advanta's sole objection is that individual issues preclude the certification of a class, thus defeating the requirements of commonality, typicality, and predominance. Advanta correctly [*4] points out that [HN4] business transactions are not subject to TILA. *See 15 U.S.C. § 1603(1)* (exempting "credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes"). Thus, Advanta's argument goes, each putative class member must demonstrate that her loan qualifies as [HN5] a consumer transaction, defined in TILA as a transaction:

> in which the party to whom credit is offered or extended is a natural person, and the . . . property . . . which [is] the subject of the transaction [is] primarily for personal, family, or household purpose.

*15 U.S.C. § 1602(h)*. Advanta insists that the putative class members must make individual showings that the primary purpose of the loan was personal and not commercial. This court disagrees. This court adopts the position taken by court in *Romaker*, which rejected an identical argument:

> Defendant argues that individual issues predominate because defendant was not required to make TILA disclosures to those who were borrowing to purchase multiple units for a business purpose. Since some class members whose loans contained the 1-4 Family [*5] Rider were borrowing for a business purpose, so the argument goes, defendant would be entitled to examine each class member on the question. However, this problem can be resolved simply by defining the class so as not to include those who were borrowing for a business purpose. To determine who should be excluded from the class on this basis, which would be shown by facts such as the number of days they intended to occupy the property per year, the parties can create a questionnaire to be sent to potential class members along with the class notification materials.

*1996 U.S. Dist. LEXIS 6490 1996 WL 254299* at *2.

Advanta's concern, although legitimate, does not preclude class certification. [1] As long as the class is fashioned narrowly so as to include only those members who borrowed for consumer purpose as defined by TILA, the class may be preserved. The loan application on file with Advanta will indicate the purpose of the loan. [2] As noted in *Romaker*, questionnaires may be appropriate to determine the purpose of the loan. In the alternative, borrowers could be required to submit documentation showing the purpose of their loan as a prerequisite to sharing in any recovery. These protections [*6] will ensure that the class is comprised of those whose loans are subject to TILA. Accordingly, Plaintiffs are directed to submit an elaborated definition of the class so as to limit it to only those putative members whose credit extensions are governed by TILA as consumer transactions. With those limitations in place, the court finds that such a proposed class [3] satisfies the criteria for class certification as set forth in *Fed. R. Civ. P. 23*.

1   Advanta also seeks to cross-examine each putative class member prior to certification to determine whether the loan is for consumer pur-

poses, but the court rejects such a proposition as too burdensome and intrusive upon absent class members.

2   For example, [HN6] the Uniform Residential Loan Application requires each borrower to state the purpose of the loan and whether the property will serve as the borrower's "primary residence." By law, these documents are required to be preserved and should be contained in each loan file.

3   Plaintiffs are directed to submit to the court an elaborated definition of the proposed class so as to limit it to those whose claims will be governed by TILA.

[*7]   First of all, joinder of all members of the class would be impracticable. Counsel for Powell estimates that the class contains 500-600 members. [4] Advanta is a national lender which makes hundreds of loans each year in the Chicago area. [HN7] The 1-4 Family Rider, the form that Plaintiffs take issue with, is a standard document used throughout the mortgage industry for refinancing of multi-unit properties. Given Advanta's large volume of business, it may be reasonably inferred that the proposed class is sufficiently numerous. *See In re VMS Securities Litigation, 136 F.R.D. 466, 473 (N.D. Ill. 1991)* (noting that [HN8] courts may make "common sense assumptions" in considering the numerosity requirement); *Cox v. Joe Rizza Ford, Inc., 1996 U.S. Dist. LEXIS 1581, *24, No. 94 C 5688, 1996 WL 65994, at *7 (N.D. Ill. Feb. 9, 1996)* (concluding from defendant's volume of business and use of standardized forms that numerosity requirement was satisfied).

4   In fact, in their Response In Opposition to Sims's Motion for Class Certification, Advanta concedes that the numerosity requirement has been met. *See* Def. Resp. at 4.

[*8]   Second, Plaintiffs' claims are typical of the claims of the class. [HN9] A claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [the] claims are based on the same legal theory." *Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992).* By definition, the class members obtained a residential mortgage loan with an attached 1-4 Family Rider from Advanta and received a TILA Disclosure Statement that failed to disclose the security interest in the personal property. In other words, the class members allege that they were subject to the same wrongful practice and advance the same legal theory.

Third, Plaintiffs have demonstrated that they will fairly and adequately represent the class. Powell's and Sims's interests, which are identical to those of the class, are not antagonistic to those of the class, and they appear to be ligating vigorously on behalf of the class. Plaintiffs have appointed experienced and qualified counselors whose resumes reflect extensive trial experience, especially in the area of class action and consumer litigation.

Lastly, class certification is appropriate under [*9] *Fed. R. Civ. P. 23(b)(3).* Common questions of law and fact predominate over any questions affecting only individual class members. The alleged TILA violation is the same for each class member, as they all allege that Advanta's standard practice of issuing 1-4 Family Riders and taking a security interest in property without proper disclosure violated TILA. Moreover, a class action is the best method for litigating this claim. The recovery available to each class member is not so significant, making it cost-prohibitive to initiate individual actions. In view of the hundreds of potential class members, too, a class action offers the most efficient method in terms of conserving the resources of the court.

**Conclusion**

For the foregoing reasons, Sims's and Powell's motions for class certification are granted pending this court's approval of an elaborated definition of the class that limits the transactions at issue to consumer loans as defined by TILA.

Enter:

David H. Coar

United States District Judge

Dated: SEP 4 2001

Not Reported in F.Supp.2d                                                    Page 16
Not Reported in F.Supp.2d, 2000 WL 1121778 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1121778 (S.D.Ala.))**


Not Reported in F.Supp.2d, 2000 WL 1121778 (S.D.Ala.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-06543    Document 44-18    Filed 06/11/2008    Page 25 of 40

Page 1
1996 U.S. Dist. LEXIS 6490, *

LEXSEE 1996 US DIST. LEXIS 6490

**CHARLES P. ROMAKER and ANA Z. CARRASQUILLO, Plaintiffs, v. CROSS-LAND MORTGAGE CORPORATION, Defendant.**

**No. 94 C 3328**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1996 U.S. Dist. LEXIS 6490*

**May 8, 1996, Decided**
**May 10, 1996, DOCKETED**

**DISPOSITION:** [*1] Plaintiffs' amended motion for class certification is granted with respect to Class I, and with respect to Class II for the purposes of determining statutory damages and the scope of injunctive relief.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff borrowers brought an action under the Truth-in-Lending Act (TILA), *15 U.S.C.S. § 1601 et seq.* The court granted summary judgment for the borrowers on the issue of TILA liability with respect to both the finance charge/amount financed disclosures and the security interest disclosure. The borrowers filed an amended motion for class certification seeking certification of two classes for the purpose of determining appropriate relief.

**OVERVIEW:** The borrowers claimed that defendant mortgage company did not make correct disclosures of the total finance charge and amount financed on their residential mortgage loan and failed to disclose adequately the security interest it was taking in the property. The court granted summary judgment for the borrowers on the issue of liability. The borrowers sought class certification. The court held that both classes satisfied the prerequisites to a class action contained in *Fed. R. Civ. P. 23(a)* of numerosity, commonality, typicality, and fair representation. The issue of whether individual issues predominated could be resolved by defining the class so as not to include those who were borrowing for a business purpose. Both classes could be certified pursuant to *Fed. R. Civ. P. 23(b)(3)*, so long as the purpose of the certification was limited to the determination of statutory damages. Individual issues did predominate on the question of actual damages. Any class member who wanted to pursue actual damages could both share in a class

award of statutory damages and file a separate individual action for actual damages.

**OUTCOME:** The court granted the borrowers' motion for class certification with respect to class I, and with respect to class II for the purposes of determining statutory damages and the scope of injunctive relief.

**LexisNexis(R) Headnotes**

*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Class Members > General Overview*
*Civil Procedure > Class Actions > Prerequisites > Numerosity*
[HN1] *Fed. R. Civ. P. 23* allows a member of a class to sue as a representative of the class only if (1) joinder of all members is impractical because the class is so numerous, (2) questions of law or fact are common to the class, (3) the representative's claims are typical of those of the class, and (4) the representative will fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*. Moreover, the court must also find: (1) that the prosecution of separate actions by the individual class members would create a risk of inconsistent adjudications or substantially impair the abilities of other class members to protect their interests; (2) that the party opposing the class has acted or failed to act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate for the class; or (3) that common questions of law or fact predominate over questions affecting only individual members and the class action is the best method for fairly and efficiently adjudicating the controversy. *Fed. R. Civ. P. 23(b)*. The party seeking certification bears the burden of proving

1996 U.S. Dist. LEXIS 6490, *

that its action is appropriate as a class action and that it satisfies all the requirements of *Rule 23*.

*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Civil Procedure > Class Actions > General Overview*
[HN2] In the context of a class action brought pursuant to the Truth-in-Lending Act, *15 U.S.C.S. § 1601 et seq.*, to prove actual damages, each class member has to prove that but for the violation, he would have obtained credit on more favorable terms elsewhere.

**COUNSEL:** For CHARLES P ROMAKER, ANA Z CARRASQUILLO, plaintiffs: Daniel A. Edelman, Cathleen M. Combs, Tara Leigh Goodwin, James Eric Vander Arend, Michelle Ann Weinberg, Edelman & Combs, O. Randolph Bragg, Attorney at Law, Chicago, IL. Charles M Baird, Attorney at Law, Atlanta, GA.

For CROSSLAND MORTGAGE CORPORATION, defendant: Robert J. Kriss, Alan Norris Salpeter, Mayer, Brown & Platt, Chicago, IL. James S Jardine, John A Adams, Ray, Quinney & Nebeker, Salt Lake City, UT. Tacie Yoon, Swidler & Berlin, Washington, DC.

**JUDGES:** John F. Grady, United States District Judge

**OPINION BY:** John F. Grady

**OPINION**

*MEMORANDUM OPINION*

Plaintiffs, who are husband and wife, brought this suit under the Truth-in-Lending Act ("TILA"), *15 U.S.C. § 1601 et seq.*, claiming that Crossland Mortgage Corporation ("Crossland") did not make correct disclosures of the total finance charge and amount financed on their residential mortgage loan and failed to disclose adequately the security interest it was taking in [*2] the property. In a memorandum opinion dated November 3, 1995, this court granted summary judgment for plaintiffs on the issue of TILA liability with respect to both the finance charge/amount financed disclosures and the security interest disclosure. Plaintiffs have now filed an amended motion for class certification seeking certification of two classes for the purpose of determining appropriate relief. Class I would consist of those whose TILA statements from defendant incorrectly stated the finance charge, and/or amount financed, in a manner similar to the incorrect disclosures in plaintiffs' TILA statement. Class II would consist of those borrowers, like plaintiffs, from whom defendant took a security interest in personal property and improperly disclosed that security interest. For the reasons stated in this opinion, the court will cer-

tify both classes, but only for the purposes of determining statutory damages and the scope of injunctive relief.

*DISCUSSION*

[HN1] *Federal Rule of Civil Procedure 23* allows a member of a class to sue as a representative of the class only if (1) joinder of all members is impractical because the class is so numerous, (2) questions of law or [*3] fact are common to the class, (3) the representative's claims are typical of those of the class, and (4) the representative will fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*. Moreover, the court must also find: (1) that the prosecution of separate actions by the individual class members would create a risk of inconsistent adjudications or substantially impair the abilities of other class members to protect their interests; (2) that the party opposing the class has acted or failed to act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate for the class; or (3) that common questions of law or fact predominate over questions affecting only individual members and the class action is the best method for fairly and efficiently adjudicating the controversy. *Fed. R. Civ. P. 23(b)*. The party seeking certification bears the burden of proving that its action is appropriate as a class action and that it satisfies all the requirements of *Rule 23*. *Trotter v. Klincar, 748 F.2d 1177, 1184 (7th Cir. 1984)*.

Defendant does not dispute that plaintiffs have met their burden of showing that both classes satisfy [*4] the prerequisites to a class action contained in *Rule 23(a)*. Joinder of all members of Class I would be impracticable because approximately 3,000 incorrect TILA disclosure statements were issued before defendant detected and corrected the computer program error responsible for the errors. Similarly, Class II is estimated to include approximately 1,000 borrowers whose mortgages included defendant's standard "1-4 Family Rider" which gave defendant a security interest in personal property that was not disclosed on the TILA statement. As to the commonality requirement, plaintiffs point out that the issues of law and fact in this case involve whether standard forms issued by defendant to numerous borrowers comply with TILA, and that, since the court has already held that the forms do not comply, statutory damages are available for all of the members of each class under *15 U.S.C. § 1640(a)(2)(B)*. Also, plaintiffs' claims are typical of those of the two classes because, by definition, each class member received the same improper TILA disclosures as plaintiffs, and each class member has a claim arising from the same practices of defendants of which plaintiffs complain. Plaintiffs meet the [*5] Seventh Circuit's requirements for fair and adequate class representation because it appears that plaintiffs' attorneys can adequately conduct this litigation -- due to their extensive qualifications and experience in the areas of class action

and consumer litigation -- and there is no possibility of plaintiffs having interests antagonistic to those of the classes, since plaintiffs' claims are identical to those of the classes. *See Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 598 (7th Cir. 1993).*

There is also no dispute that Class II satisfies at least one of the *Rule 23(b)* requirements for maintaining a class action. Plaintiffs and defendant agree that injunctive relief is a suitable remedy for the improperly disclosed security interest claim. Therefore, Class II may be certified pursuant to *Fed. R. Civ. P. 23(b)(2).*

As to whether Class II can be certified pursuant to *Fed. R. Civ. P. 23(b)(3),* the parties disagree. Defendant argues that individual issues predominate because defendant was not required to make TILA disclosures to those who were borrowing to purchase multiple unit properties for a business purpose. Since some class members whose loans contained [*6] the 1-4 Family Rider were borrowing for a business purpose, so the argument goes, defendant would be entitled to examine each class member on this question. However, this problem can be resolved simply by defining the class so as not to include those who were borrowing for a business purpose. To determine who should be excluded from the class on this basis, which would be shown by facts such as the number of days they intended to occupy the property per year, the parties can create a questionnaire to be sent to potential class members along with the class notification materials.

The court agrees with plaintiffs that both Class II and Class I can be certified pursuant to *Fed. R. Civ. p. 23(b)(3),* so long as the purpose of the certification is limited to the determination of statutory damages. Common issues of law and fact predominate over individual issues with respect to the question of statutory damages because once liability has been established, the class members are entitled to share equally in any award of statutory damages -- up to a maximum of $ 500,000.00 -- which the court allows after considering the aggravating and mitigating factors set forth in the statute. *15 U.S.C.* [*7] *§ 1640(a).* These factors pertain only to the behavior and characteristics of the defendant.

On the other hand, individual issues do predominate on the question of actual damages. [HN2] To prove actual damages, each class member would have to prove that but for the violation, he would have obtained credit on more favorable terms elsewhere. *Adiel v. Chase Fed. Sav. & Loan Ass'n, 630 F. Supp. 131, 133 (S.D. Fla. 1986), aff'd, 810 F.2d 1051 (11th Cir. 1987); McCoy v. Salem Mortgage Co., 74 F.R.D. 8, 12 (E.D. Mich. 1976).* This means each plaintiff would have to prove: (1) that he read the TILA disclosure statement; (2) that he understood the charges being disclosed; (3) that had the disclosure statement been accurate, he would have sought alternative financing; and (4) that he would have found, and been qualified to obtain, an alternative loan with better terms. Clearly, the ability to provide the necessary proof on all four of these issues would vary widely among all of the individual class members.

Furthermore, any class member who could prove actual damages would not be prejudiced by our certification of the class for the purpose of determining statutory damages. The statute [*8] allows recovery of both actual and statutory damages. *15 U.S.C. § 1640(a).* Therefore, any class member who wanted to pursue actual damages could both share in a class award of statutory damages and file a separate individual action for actual damages.

Defendant argues that a class action is not the superior method for achieving a fair and efficient adjudication of the statutory damages question. Crossland points out that, under *§ 1640(a)(2)(A),* in an individual action plaintiffs would be entitled to the maximum $ 1,000.00 in statutory damages and every class member who chose to bring an individual action would be entitled to at least $ 100.00, while, under *§ 1640(a)(2)(B),* in a class action there is no requirement that the class members recover anything. Nevertheless, as plaintiffs argue, it is unlikely that even those class members who knew they had a claim would choose to incur the expense of bringing an individual action where the maximum recovery was only $ 1,000.00. Since there is little chance that many class members would bring individual actions, and there is some chance that all class members will recover some statutory damages in a class action, a class action is the [*9] superior method for obtaining a fair adjudication of the statutory damages issue. Also, a class action is clearly the more efficient method for resolving the statutory damages issue since there are thousands of potential class members.

### CONCLUSION

Plaintiffs' amended motion for class certification is granted with respect to Class I for the purpose of determining statutory damages, and with respect to Class II for the purposes of determining statutory damages and the scope of injunctive relief. The parties should craft an order concerning class certification and notice to the class which contains appropriate class definitions and methods for identifying class members in accordance with this opinion. A status conference is set for May 29, 1996, at 9:30 a.m. for entry of the order.

DATED: May 8, 1996

ENTER: John F. Grady, United States District Judge

Westlaw.

--- S.W.3d ----                                                                                          Page 1
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

**C**Brown & Root Inc. v. Shelton
Tex.App.-Tyler,2003.
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

Court of Appeals of Texas,Tyler.
BROWN & ROOT INC. n/k/a Kellogg-Brown &
Root, Appellants,
v.
Shearon SHELTON, Appellee.
No. 12-01-00259-CV.

July 31, 2003.

Employee of tire plant, and his wife, filed personal
injury action against general contractor that
performed renovations on plant based on exposure to
asbestos used in construction. After husband died,
wife proceeded in her individual capacity only. After
jury trial, the 241st Judicial District Court, Smith
County, Diane V. Devasto, J., entered judgment
awarding $2,766,000 in actual damages and
$1,250,000 in punitive damages. General contractor
appealed. The Court of Appeals, James T. Worthen,
C.J., held that: (1) fireproofing, pipe installation, and
tire machines installed in factory were improvements;
(2) at least some exposure occurred prior to
annexation, and thus statute of repose did not bar
action; (3) evidence supported finding that contractor
was grossly negligent; and (4) husband and wife were
single claimant for purposes of determining
contractor's entitlement to settlement credit.

Affirmed as modified.

West Headnotes

**[1] Improvements 206 €━━1**

206 Improvements
    206k1 k. Nature and Effect of Making in General.
Most Cited Cases

Fireproofing applied to ceiling of tire plant, pipe
insulation and gaskets adapted to fit the layout of
plant, and expansion of cafeteria by general
contractor in accordance with plant owner's design
were annexed to realty, for purposes of determining
whether these items constituted improvements, where
contractor adapted these items to use and purpose of
tire plant. V.T.C.A., Civil Practice & Remedies Code
§ 16.009.

**[2] Limitation of Actions 241 €━━31**

241 Limitation of Actions
    241I Statutes of Limitation
        241I(B) Limitations Applicable to Particular
Actions
            241k31 k. Injuries to the Person. Most
Cited Cases
Asbestos-containing fireproofing materials installed
in tire plant constituted an improvement to real
property for purposes of application of contractor's
statute of repose to personal injury action. V.T.C.A.,
Civil Practice & Remedies Code § 16.009.

**[3] Limitation of Actions 241 €━━31**

241 Limitation of Actions
    241I Statutes of Limitation
        241I(B) Limitations Applicable to Particular
Actions
            241k31 k. Injuries to the Person. Most
Cited Cases
Contractor's statute of repose did not bar tire plant
worker's personal injury action against general
contractor that installed asbestos-containing
fireproofing and pipe insulation, where evidence
showed that worker's exposure occurred, at least
partially, prior to annexation of improvements to real
property; prior to annexation, contractor engaged in
pre-annexation activity, such as mixing asbestos-
containing fireproofing, in presence workers, which
created asbestos-laden dust, that workers were forced
to breathe. V.T.C.A., Civil Practice & Remedies
Code § 16.009.

**[4] Damages 115 €━━91(3)**

--- S.W.3d ----                                                                Page 2
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

115 Damages
    115V Exemplary Damages
       115k91 Grounds for Exemplary Damages
         115k91(3) k. Negligence. Most Cited Cases

**Negligence 272 ☜1205(7)**

272 Negligence
    272XVII Premises Liability
      272XVII(G) Liabilities Relating to Construction, Demolition and Repair
        272k1205 Liabilities of Particular Persons Other Than Owners
          272k1205(6) Contractors
            272k1205(7) k. In General. Most Cited Cases
Evidence supported finding that general contractor, involved in construction projects at tire plant in which asbestos-containing fireproofing materials were installewd and to which tire plant workers were exposed, was actually aware of risk of injury to workers and proceeded with conscious indifference to workers' safety, as required to establish gross negligence, where a pathologist, testified that, as early as 1955, link between asbestos exposure and cancer was essentially confirmed, and that information, studies, and reports detailing this fact were readily available to anybody who cared to look for them, evidence showed that general contractor had been member of National Safety Council, and that, as such, received articles in 1935, 1966, and 1967 detailing the dangers of exposure to asbestos dust, including its link to mesothelioma, defendant's industrial hygienist testified that contractor's own industrial hygiene library had materials concerning dangers of asbestos, and standard safety procedures while doing contract work for other manufacturer included requirement that non-contract workers who would be exposed to asbestos also wear respirators. V.T.C.A., Civil Practice & Remedies Code §§ 41.001(7)(B)(i), 41.003(a).

**[5] Corporations 101 ☜498**

101 Corporations
    101XI Corporate Powers and Liabilities
      101XI(E) Torts
        101k498 k. Exemplary Damages. Most Cited Cases
A corporation is liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if

it is grossly negligent in hiring an unfit agent.

**[6] Appeal and Error 30 ☜215(1)**

30 Appeal and Error
    30V Presentation and Reservation in Lower Court of Grounds of Review
      30V(B) Objections and Motions, and Rulings Thereon
        30k214 Instructions
          30k215 Objections in General
            30k215(1) k. Necessity of Objection in General. Most Cited Cases
Contractor's failure to object to jury charge on issue of exemplary damages for contractor's gross negligence in installing asbestos-containing material, did not waive challenge on appeal to sufficiency of evidence to show act or omission by contractor vice-principal, where element regarding vice-principal was only part of independent charge of gross negligence by contractor, and other issues necessarily referable to that ground were submitted and answered.

**[7] Damages 115 ☜63**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
      115III(B) Aggravation, Mitigation, and Reduction of Loss
        115k63 k. Reparation by Wrongdoer. Most Cited Cases
Husband, who was exposed to asbestos, and his wife, were single claimant for purposes of determining settlement credits, and thus nonsettling contractor, that installed asbestos-containing material in tire plant, was entitled to full credit for total amount of all settlements with other defendants. V.T.C.A., Civil Practice & Remedies Code §§ 33.011(1), 33.012(b).

**[8] Damages 115 ☜63**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
      115III(B) Aggravation, Mitigation, and Reduction of Loss
        115k63 k. Reparation by Wrongdoer. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----                                                                        Page 3
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

Because portion of settlements, in personal injury action by worker exposed to asbestos, were not specifically designated as punitive damages, nonsettling defendant was entitled to credit for total amount of settlements.

**[9] Damages 115 ⚷—63**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(B) Aggravation, Mitigation, and Reduction of Loss
            115k63 k. Reparation by Wrongdoer. Most Cited Cases
In determining entitlement to offset of joint and several damages paid by settling defendant, the only restriction as to punitive damages and credits is that a nonsettling defendant's settlement credit will be limited to that portion of a settlement not specifically designated as punitive damages.

David J. White, David L. Patterson, Steven T. Polino, Godwin Gruber, L.L.P., Dallas, for appellants.
Jeffrey B. Simon, Daryl L. Moore, Houston, for appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and RAMEY, Jr., Retired Chief Justice, Twelfth Court of Appeals, Tyler, sitting by assignment.

*OPINION*

JAMES T. WORTHEN, Chief Justice.
*1 Brown & Root, Inc., now known as Kellogg Brown & Root, Inc. ("Brown & Root"), appeals the trial court's judgment entered in favor of Shearon Shelton ("Mrs.Shelton"). Brown & Root raises four issues on appeal. We modify the judgment of the trial court and affirm as modified.

***BACKGROUND***

John Shelton ("Mr.Shelton") was a thirty-year employee of the Kelly-Springfield tire plant ("Kelly-Springfield") located in Tyler, Texas. From 1969 until 1971, Kelly-Springfield contracted with Brown & Root as a general contractor to construct certain renovations and additions at its plant. During this construction, asbestos-laden materials were used in various forms on multiple expansion projects, which included the construction of a new cafeteria addition, new pipelines in the plant, the application of fireproofing and the installation of insulation. In September of 1999, Mr. Shelton was diagnosed with mesothelioma and was forced to retire. In January of 2000, Mr. and Mrs. Shelton filed a personal injury action against Brown & Root and fourteen other defendants. Other than Brown & Root, all defendants settled prior to the conclusion of trial. Mr. Shelton died after settlement but before the close of trial, and Mrs. Shelton chose to proceed in her individual capacity only.

At trial, Mrs. Shelton introduced Mr. Shelton's deposition testimony concerning his exposure to asbestos from Brown & Root's activities at the Kelly-Springfield Plant such as installing asbestos-containing insulation, cutting gaskets, and cutting rope packing. Two of Mr. Shelton's co-workers also testified extensively about Brown & Root's activities as a general contractor during the period in question. Both stated that workers in Mr. Shelton's position were exposed to asbestos from such acts as the application of fireproofing, insulation, cement, and plaster, all of which contained asbestos. Additionally, the record reflects that at a date much earlier than 1971, Brown & Root became aware of the hazards posed by the use of asbestos and even took measures to alleviate this risk at some of their work sites.

Prior to the close of trial, Mr. and Mrs. Shelton entered into settlements totaling $3,951,900 with the other fourteen defendants. Brown & Root subsequently made a timely request for a dollar-for-dollar settlement credit for the sum total of those settlements. At the close of Mrs. Shelton's case, Brown & Root made a motion for a directed verdict based on the contractor's statute of repose.[FN1] Brown & Root's motion was denied by the trial court.

On January 22, 2001, the jury returned a verdict against Brown & Root in the amount of $2,766,000 in actual damages and $1,250,000 in punitive damages. Brown & Root was given a $70,000 settlement credit.[FN2] Again based on the statute of repose, Brown & Root made a motion for judgment notwithstanding the verdict. The trial court denied Brown & Root's motion and entered judgment in favor of Mrs. Shelton. Brown & Root subsequently filed a motion for a new trial which was denied on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----                                                                    Page 4
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

September 9, 2001. This appeal followed.

### CONTRACTOR'S STATUTE OF REPOSE

**\*2** In its first issue, Brown & Root contends that the trial court erred in failing to grant its motion for a directed verdict and motion for judgment notwithstanding the verdict because the statute of repose applies and protects Brown & Root from liability.

### Standard of Review

An appeal from the denial of a motion for directed verdict is in essence a challenge to the legal sufficiency of the evidence. _Haynes & Boone, L.L.P. v. Chason,_ 81 S.W.3d 307, 309 (Tex.App.-Tyler 2002, pet. denied); _Lochinvar Corp. v. Meyers,_ 930 S.W.2d 182, 187 (Tex.App.-Dallas 1996, no writ). Likewise, a motion for judgment notwithstanding the verdict should be granted when the evidence is conclusive and one party is entitled to judgment as a matter of law. _Mancorp, Inc. v. Culpepper,_ 802 S.W.2d 226, 227-28 (Tex.1990); _see also Brookshire Bros., Inc. v. Wagnon,_ 979 S.W.2d 343, 351 (Tex.App.-Tyler 1998, pet. denied) (a review of a judgment notwithstanding the verdict and a directed verdict are subject to the same standard). On review, this court will consider only the evidence and inferences tending to support the trial court's decision, and disregard evidence and inferences to the contrary. _Minyard Food Stores, Inc. v. Goodman,_ 80 S.W.3d 573, 577 (Tex.2002); _Bradford v. Vento,_ 48 S.W.3d 749, 754 (Tex.2001). A motion for a directed verdict should be granted when, viewing the evidence in the light most favorable to the non-movant, there is no more than a scintilla of evidence that would defeat the movant's entitlement to judgment as a matter of law. _See Trinity Indus., Inc. v. Ashland,_ 53 S.W.3d 852, 862 (Tex.App.Austin 2001, no pet.).

### Applicable Law

Section 16.009 of the Texas Civil Practice and Remedies Code provides as follows:

A claimant must bring suit for damages for a claim listed in Subsection (b) against a person who constructs or repairs an improvement to real property

not later than ten years after the substantial completion of the improvement in an action arising out of the defective or unsafe condition of the real property or a deficiency in the construction or repair of the improvement.

TEX. CIV. PRAC. & REM.CODE § 16.009(a). By enacting this statute of repose, the Legislature sought to protect contractors who install such improvements from a perpetual threat of liability. _See Petro Stopping Ctrs., Inc. v. Owens-Corning Fiberglas Corp.,_ 906 S.W.2d 618, 620 (Tex.App.El Paso 1995, no writ). If applicable, the statute of repose "provides a complete defense to a personal injury action based on strict liability or negligence."_Reames v. Hawthorne-Seving, Inc.,_ 949 S.W.2d 758, 761 (Tex.App.-Dallas 1997, writ denied).<sup>FN3</sup>

### Analysis

A defendant seeking to invoke the statute of repose must satisfy two underlying requirements. "First, the defendant must be one who constructs or repairs. Second, that which the defendant constructs or repairs must be an improvement to real property."_Williams v. U.S. Natural Resources,_ 865 S.W.2d 203, 206 (Tex.App.-Waco 1993, no writ). A defendant who satisfies only one of these requirements is not protected by section 16.009. _Id._ at 207.Both parties acknowledge that Brown & Root is "one who constructs or repairs." Therefore, the applicability of the statute of repose turns on whether the construction performed by Brown & Root constitutes an improvement to real property. Before personalty can be considered an improvement, it must be annexed to realty.<sup>FN4</sup>_Sonnier v. Chisholm-Ryder Co., Inc.,_ 909 S.W.2d 475, 479 (Tex.1995).

### Annexation

**\*3**[1] Three factors are relevant in determining whether personalty has been annexed to realty. _See Logan v. Mullis,_ 686 S.W.2d 605, 607 (Tex.1985); _Fenlon v. Jaffee,_ 553 S.W.2d 422, 428 (Tex.Civ.App.-Tyler 1977, writ ref'd n.r.e.). These factors include (1) the mode and sufficiency of annexation, either real or constructive, (2) the adaptation of the article to the use or purpose of the realty, and (3) the intention of the party who annexed the chattel to the realty. _Logan,_ 686 S.W.2d at 607;_see also O'Neal v. Quilter,_ 111 Tex. 345, 234

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----                                                                                Page 5
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

S.W. 528, 529 (Tex.1921). The third of these criteria "is preeminent, whereas the first and second criteria constitute evidence of intention."*Logan, 686 S.W.2d at 607;Fenlon, 553 S.W.2d at 428-29.*Though, as a general rule, the existence of such an intent to annex would be "a question of fact for the trier of fact, ... it becomes a question of law where reasonable minds could not differ on the issue of intent."*White v. CBS Corp., 996 S.W.2d 920, 924 (Tex.App.-Austin 1999, pet. denied); see also Sonnier, 909 S.W.2d at 487;Logan, 686 S.W.2d at 607.*

An intent to make improvements a fixture may be conclusively established by conduct at the time of the improvements including the adaptation of the personalty to the realty. *See Logan, 686 S.W.2d at 608.*Thus, such factors as the permanency of any attachment and the modification of personalty to fit a specific design may be considered to determine intent. *Id.;Fuentes v. Continental Conveyor & Equip., 63 S.W.3d 518, 521 (Tex.App.-Eastland 2001, pet. denied).* Such adaptation " 'of the personalty to the use or the purpose of the realty' [is] evidence of the owner's intent" to effect annexation. *Fuentes, 63 S.W.3d at 521* (quoting *Sonnier, 909 S.W.2d at 479).*

Here, Brown & Root applied fireproofing to the ceiling of the plant, installed pipe insulation and gaskets adapted to fit the layout of Kelly-Springfield's plant, built an expansion of the cafeteria in accordance with Kelly-Springfield's design, and installed new tire machines in the factory, each of which is an action analogous to those in *Fuentes* and *Logan.See Fuentes 63 S.W.3d at 521;Logan, 686 S.W.2d at 608.*Consequently, Brown & Root's actions, its adaptation of the items to the use and purpose of the Kelly-Springfield plant, and the "mode and sufficiency" of the construction's joiner to the realty similarly evidence an intent to effect annexation. *See White, 996 S.W.2d at 924;see also Logan, 686 S.W.2d at 608.*Thus, we conclude that the personalty at issue was annexed to realty.

**Improvements**

[2]"An improvement includes all additions to the freehold except trade fixtures that can be removed without injury to the property."*Reames, 949 S.W.2d at 761;see also Sonnier, 909 S.W.2d at 479.*Additionally, those things which are classified as improvements constitute a more expansive class than

does the class of fixtures, which are items of personalty that are "permanently attached to the realty." *Reames, 949 S.W.2d at 761.*"Therefore, although all improvements are not necessarily fixtures, any fixture, unless it is a trade fixture, is considered an improvement."[FN5]*Id.*

*\*4 In examining whether asbestos-containing materials are "improvements" under a similar Mississippi statute of repose, the Fifth Circuit noted that "the term improvement must be given its customary meaning ... generally ... a permanent addition that increases the value of the property and makes it more useful."*Trust Co. Bank v. U.S. Gypsum Co., 950 F.2d 1144, 1152 (5th Cir.1992).* Applying this standard, the court held that asbestos fireproofing materials, similar to those in the present case, constituted "an improvement to real property within the customary meaning of the term."*Id.* Stating the definition even more broadly, the court in *Fuentes* held that a contractor who was required merely to "supervise and assist" in the installation of an improvement had "constructed" an improvement within the meaning of section 16.009. *Fuentes, 63 S.W.3d at 521;see also Reames, 949 S.W.2d at 763.*

Within this broadly-defined context, we conclude that the construction done by Brown & Root, after annexation, constituted an improvement. However, given the evidence that at least some of Mr. Shelton's exposure to asbestos occurred prior to annexation, the fact that it can be established that there was annexation and an "intent to effect an improvement as a matter of law ... is not the end of the matter."*White, 996 S.W.2d at 924.*

**Pre-Annexation Exposure**

[3] In *White,* the plaintiff contracted mesothelioma after workplace exposure to asbestos. Though Mr. White's exposure came through "the course of his work on and around industrial turbines that [the defendant] designed, manufactured, and installed for Mr. White's employer," the court held that the contractor's statute of repose was not applicable. *Id. at 921.*

Although there was little doubt that the objects installed by the defendant in *White* were, after annexation, improvements to real property,[FN6] the court held that application of the statute of repose

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----                                                                    Page 6
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

was not proper given that the defendant had not conclusively established that Mr. White's "only exposure occurred after the asbestos had been incorporated into the turbines and annexed to the realty so as to constitute an improvement."*Id.* at 925 (emphasis omitted). The court thus drew a distinction between exposure to asbestos that occurred prior to annexation and that which occurred subsequent to annexation.*Id.* Based on the evidence that Mr. White worked around the turbines while they were being installed, the court stated as follows:

Nothing in the record suggests that the City intended that the turbines be "joined" or "annexed" to the realty, in a constructive sense, before being installed; and the record suggests affirmatively by the very fact that the turbines were not installed until after Mr. White came to work at the two plants, that they had not been actually annexed before his exposure.

*Id.*(emphasis omitted). Consequently, because there was evidence to suggest that Mr. White was exposed to asbestos prior to annexation, the protection of section 16.009 had not yet attached and White's action, therefore, was not barred by the statute of repose. *Id.*

*5 Similarly, the evidence presented here indicates that Mr. Shelton's exposure also occurred, at least partially, prior to annexation. Much of the construction in question did not commence until after Mr. Shelton began work at Kelly-Springfield. Additionally, Brown & Root engaged in pre-annexation activity such as mixing asbestos-containing fireproofing, mixing refractory mix, sawing pipecover, and removing old gaskets in the presence of Mr. Shelton and other workers. The uncontroverted testimony of Mr. Shelton and other workers establishes that such activity created asbestos-laden dust, that workers, including Mr. Shelton, were forced to breathe this dust, and that such occurrences took place during pre-installation and pre-construction phases. As such, these pre-annexation occurrences do not fall under the protection of the statute of repose. *See id.*

Brown & Root argues that in *White* the court simply "missed the mark." In support of its argument, Brown & Root cites *Abbott v. John E. Green Co.,* 233 Mich.App. 194, 592 N.W.2d 96 (1998), which addressed Michigan's version of a contractor's statute

of repose.[FN7]Rejecting the argument that the statute of repose applied only post-annexation and not to any activities prior, the court held that the Michigan statute was intended to be applied to the construction process as a whole, and not simply to acts resulting in annexation. *Abbott,* 592 N.W.2d at 101 n. 2 (citing *Pendzsu v. Beazer East, Inc.,* 219 Mich.App. 405, 557 N.W.2d 127 (1996)(holding that the Michigan statute protects defects in the process of workmanship)). Because the court held that the Michigan statute protected the entirety of the process, annexation of the construction was not a question that court found relevant.*Id.* at 101.

Annexation, however, has long been a critical inquiry under the Texas statute. See *Sonnier,* 909 S.W.2d at 479, 482 (legislative history of Texas statute indicates that section 16.009 was intended to protect only those who annex personalty to realty); see also *Logan,* 686 S.W.2d at 607;*White,* 996 S.W.2d at 924;*Fuentes,* 63 S.W.3d at 520-21;*Fenlon,* 553 S.W.2d at 428.Annexation becomes the critical inquiry because "an improvement requires annexation to realty, and ... until something is annexed to realty, it cannot be considered an improvement."*Fuentes,* 63 S.W.3d at 520;*Sonnier,* 909 S.W.2d at 479.If there is no improvement, then the statute of repose does not apply. *Fuentes,* 63 S.W.3d at 520;*Sonnier,* 909 S.W.2d at 479.Hence, given both the essential differences in language between the two statutes and their divergent history and objectives, *Abbott* is inapposite.

The evidence establishes that Mr. Shelton's exposure to asbestos occurred, at least in part, prior to the annexation of the asbestos-containing materials, and therefore prior to the point at which these materials became improvements. Consequently, because section 16.009 does not apply to any pre-annexation exposure, we hold that the trial court did not err in denying Brown & Root's motion for a directed verdict and its motion for judgment notwithstanding the verdict. Brown & Root's first issue is overruled.

### *GROSS NEGLECT*

*6 In its second issue, Brown & Root challenges the legal sufficiency of the evidence to support the jury's finding of gross neglect.

### *Standard of Review*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----                                                                                          Page 7
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

The evidence is sufficient to support a jury finding of gross negligence if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions."*General Motors Corp. v. Sanchez, 997 S.W.2d 584, 595 (Tex.1999); Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex.1994).*"Some evidence of simple negligence is not evidence of gross negligence; conversely, some evidence of care does not defeat a gross negligence finding."*Sanchez, 997 S.W.2d at 595.*However, circumstantial evidence alone is sufficient to prove gross negligence. *See Mobil Oil Corp. v. Ellender, 968 S.W.2d 917, 921 (Tex.1998); Moriel, 879 S.W.2d at 23.*Because Brown & Root challenges the legal sufficiency of the evidence on an issue for which it did not have the burden of proof at trial, Brown & Root must demonstrate that there is no evidence to support the adverse finding. *R & R Contractors v. Torres, 88 S.W.3d 685, 706 (Tex.App.-Corpus Christi 2002, no pet.).* We may only sustain a "no evidence" point when the record discloses one of the following: (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (4) the evidence establishes conclusively the opposite of a vital fact. *See Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997).*

*Analysis*

[4] Gross negligence consists of both an objective and subjective element.*Sanchez, 997 S.W.2d at 595.*First, a plaintiff must prove by clear and convincing evidence that, when viewed objectively, an act or omission on the part of the defendant "involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others."TEX. CIV. PRAC. & REM.CODE ANN. §§ 41.001(7)(B)(i), 41.003(a) (Vernon 1997). Second, by the same evidentiary standard, a plaintiff must show that the defendant "had an actual, subjective awareness of the risk involved, but nevertheless proceed [ed] with conscious indifference to the rights, safety, or welfare of others."TEX. CIV. PRAC. & REM.CODE ANN. §§ 41.001(7)(B)(ii), 41.003(a) (Vernon 1997). Here, Brown & Root challenges only the second of these elements.

**Actual Awareness**

Actual awareness has been defined as a defendant's acts or omissions which demonstrate that a defendant with knowledge of a danger nonetheless acted in a manner of careless disregard. *Ellender, 968 S.W.2d at 921;Moriel, 879 S.W.2d at 22.*"What lifts ordinary negligence into gross negligence is the mental attitude of the defendant."*Burk Royalty Co. v. Walls, 616 S.W.2d 911, 922 (Tex.1981).* It is this mental attitude of reckless indifference that permits a jury to find "that the defendant had 'decided to ignore the rights of others even in light of probable and threatened injury to them.'"*Williams v. Steves Indus., Inc., 699 S.W.2d 570, 573 (Tex.1985).*

*7 The evidence establishes that Brown & Root was aware of the health hazards related to its use of asbestos. Dr. Victor Roggli, a pathologist, testified that, as early as 1955, the link between asbestos exposure and cancer was "essentially confirmed," and that information, studies, and reports detailing this fact were readily available "to anybody who cared to look for them."Other evidence showed that Brown & Root had been a member of the National Safety Council ("NSC") and that, as a member, it received a publication entitled "National Safety News" which contained articles in 1935, 1966, and 1967 detailing the dangers of exposure to asbestos dust, including its link to mesothelioma. James Hammond ("Hammond"), a former industrial hygienist for Exxon Corporation ("Exxon"), gave testimony concerning the 1969 Bonsib Report, which outlined some of the hazards of asbestos and what precautionary measures companies should take to protect employees. Hammond stated that this report was made available to members of the NSC. Additionally, the jury heard testimony from Steven Sellers ("Sellers"), an industrial hygienist currently employed by Brown & Root's parent corporation. Sellers testified that in its own industrial hygiene library Brown & Root had materials concerning the dangers of asbestos. Specifically, he noted that one particular journal from Brown & Root's library stated that the link between asbestos and cancer has been known since 1935.

Finally, the jury heard evidence relating to Brown & Root's standard safety procedures while doing contract work for Exxon. These procedures included

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) ensuring that Brown & Root's supervisors were aware "of the hazards that would be associated with [asbestos] and what they needed to do about it," and (2) a requirement that non-contract workers who would be exposed to asbestos as a result of the contracted construction would "also wear the equivalent type of approved respirator wherever our people were wearing respirators."Therefore, we conclude that the evidence was sufficient to support a jury finding that Brown & Root had an actual awareness of the risks involved in their use of asbestos.

**Conscious Indifference**

In light of the aforementioned evidence, Brown & Root contends only that the evidence, other than that which relates to the Exxon safety mandates, "merits no discussion" because it was offered by witnesses who were not agents or employees of Brown & Root at the time of the Kelly-Springfield project. As to the Exxon safety standards, Brown & Root argues that these standards are limited only to work Brown & Root did on Exxon job sites and should not be construed as Brown & Root's company requirements, policies, or procedures generally. Brown & Root thus urges that _Sanchez_ controls the present case, and supports the argument that the evidence is legally insufficient to support a finding of gross neglect.

In _Sanchez,_ the plaintiff bled to death after being pinned to a gate by his General Motors ("G.M.") truck. Due to problems with the transmission, Sanchez had shifted "into what he thought was Park, but what was actually an intermediate, 'perched' position between Park and Reverse...."_Sanchez, 997 S.W.2d at 587._The gear subsequently slipped from that position into Reverse causing the truck to roll backwards into Sanchez. The jury found G.M. to be grossly negligent and assessed both actual and punitive damages. On appeal, the supreme court held that there was insufficient evidence to support a finding of gross negligence. _Id._ at 598.

**\*8** In its analysis, the supreme court noted that the evidence did not establish that G.M. acted out of "conscious indifference." _Id._ at 596.The only evidence the plaintiff presented regarding this issue was the testimony of two expert witnesses who stated that G.M.'s conduct was a "conscious decision," and that G.M. "knew that people were getting hurt and

they made the decision not to do anything about [the problem]."_Id._The court found, however, that these two statements carried little weight, especially in light of the contrary evidence offered by G.M. _Id._At trial, G.M. presented evidence that it was taking steps to eliminate the problem, including patent applications and examples of modified engineering to improve the design of its transmissions and increase their safety, along with evidence indicating the lack of a better alternative. The court concluded that "G.M. can[not] be consciously indifferent solely for failing to adopt a safer design it did not know existed."_Id._ at 597.The evidence, the court thus concluded, was insufficient to "support [ ] the inference that G.M. made a conscious choice to implement a more dangerous design in preference to a known safer one that would have substantially reduced the risk."_Id._

In contrast, the evidence before us indicates that Brown & Root made a conscious choice to implement more dangerous procedures in preference to known practices that would have substantially reduced the risk. For example, the jury heard from Hammond that Brown & Root was aware of the dangers of asbestos as early as 1947, that it took protective measures at some of its work sites, and yet over twenty years later, it was still not employing safety procedures such as monitoring asbestos levels or providing protective equipment and respirators to workers at the Kelly-Springfield site. Further, in 1958 the State of Texas passed legislation requiring contractors to monitor workers exposed to asbestos in order to prevent overexposure. Brown & Root, however, offered no evidence that it was acting in compliance with these requirements. Additionally, extensive evidence was introduced detailing the stringent safety measures mandated by Exxon on all jobs undertaken for them by Brown & Root. These measures outline both the risks involved in the use of materials such as asbestos, and also instruct as to mandatory precautions to be implemented to reduce such risks. No evidence was offered, however, to show that Brown & Root employed any similar measures at the Kelly-Springfield site. Thus, from this evidence alone the jury could reasonably infer that Brown & Root was aware of the dangers involved in its use of asbestos and chose to protect some, but not all, who were exposed to that risk. _See Ellender, 968 S.W.2d at 924_ ("Evidence that Mobil had a policy of monitoring and protecting its own employees but chose not to do the same for contract

--- S.W.3d ----                                                                                                      Page 9
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

workers provides additional facts and circumstances for the jury to infer that Mobil knew the risks ... yet proceeded with conscious indifference"). Though Brown & Root asserts that the Exxon policies applied only to Exxon-contracted jobs, in so doing it overlooks the fact that the crucial inquiry is what is known by the defendant, and not from whom the defendant obtained that knowledge. *See id.* at 921;*Moriel,* 879 S.W.2d at 23;*Wal-Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326 (Tex.1993).

**\*9** Further, while Brown & Root correctly notes that none of the witnesses who testified as to the policies of Brown & Root in 1971 were themselves employees of Brown & Root in 1971, the jury was free to consider that fact in reaching their conclusions, and could legitimately draw reasonable inferences from that testimony. *See Ellender,* 968 S.W.2d at 924-925;*Lee Lewis Const., Inc. v. Harrison,* 70 S.W.3d 778, 786 (Tex.2001). Thus, the evidence need not show, as Brown & Root contends, a particular example of Brown & Root making a recorded, contemporaneous decision to act with indifference as to this specific job. *Id.* Rather, the evidence need only be such that reasonable inferences of a conscious decision could be made. *Id.* As such, we hold that the evidence in this case is legally sufficient to support a finding that Brown & Root had actual awareness of a risk, proceeded to act with conscious indifference to that risk, and was, therefore, grossly negligent. *See Sanchez,* 997 S.W.2d at 595;*Ellender,* 968 S.W.2d at 923.Consequently, we overrule Brown & Root's second issue.

### *CORPORATE LIABILITY*

[5][6] In its third issue, Brown & Root asserts that, even if the evidence is legally sufficient to support the jury's finding of gross negligence, there is no evidence to show an act or omission by a Brown & Root vice-principal which would support an award of exemplary damages.[FN8]"A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence."*Ellender,* 968 S.W.2d at 921.However, a corporation can act only through "agents of some character." *Id.* (citation omitted). Thus, a corporation can be held to have committed acts of gross negligence by the actions of a vice-principal. *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387,

389 (Tex.1997). The term "vice-principal" encompasses

(a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom the master has confided the management of the whole or a department or a division of the business.

*Ellender,* 968 S.W.2d at 922.A corporation is also liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent. *Id.* at 921.As opposed to looking only to a single detail or group of factors, an appellate court, determining whether a corporation itself is grossly negligent, must look to the totality of "the surrounding conditions and circumstances at the time and place the act was committed."*Ellender,* 968 S.W.2d at 922;*McPhearson v. Sullivan,* 463 S.W.2d 174, 176 (Tex.1971)."Whether the corporation's acts can be attributed to the corporation itself ... is determined by reasonable inferences the factfinder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiff's alleged damages."*Ellender,* 968 S.W.2d at 922.If the totality of the evidence is sufficient to lead to the inference that agents of the corporation were aware of the risk to which workers were being exposed, such an inference is sufficient to support corporate liability. *Id.* at 924.

**\*10** During trial, Mrs. Shelton offered evidence of Brown & Root's subjective awareness of the hazards of asbestos, including medical reports, state regulations, and company policies, along with evidence which tended to show that Brown & Root failed to act in accordance with this information. Sellers also testified that any corporation who did not take the recommended and necessary measures to provide workers with protection, or at least take steps to mitigate exposure, would be acting in an "improper" manner with an "indifferent" attitude. Considering these facts in conjunction with evidence concerning Brown & Root's contract work for Exxon, who required Brown & Root to abide by its safety manual on each contracted job at the risk of losing that job, a jury could reasonably infer that Brown & Root possessed a subjective knowledge of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----                                                                    Page 10
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

dangers posed by asbestos but proceeded with conscious indifference to that danger. *See id.*

Brown & Root urges us to consider the holding in *Louisiana Pacific Corp. v. Andrade,* 19 S.W.3d 245 (Tex.1999). In *Andrade,* an employee who was told that the electricity had been turned off suffered an electrical shock, resulting in permanent injuries, when he touched a metal crane. The supreme court held that, although the defendant had no corporate policy related to turning off the electricity, the absence of such a policy alone did not support an inference of subjective awareness. *Id.* at 248.Here, in contrast, more than a mere lack of a policy has been raised. Rather, the totality of the evidence, in addition to the lack of any policy, is legally sufficient to support a jury's determination that Brown & Root, which was made aware of the hazards posed by asbestos and the remedies which could be used to lessen those risks, acted with gross negligence by choosing not to employ similar remedies in this instance. *See Ellender,* 968 S.W.2d at 924-25.Because we conclude that the evidence before the jury was legally sufficient to support a finding that Brown & Root was grossly negligent, we need not consider whether evidence existed showing action on the part of a Brown & Root vice-principal. *See Torres,* 88 S.W.3d at 711.Brown & Root's third issue is overruled.

### SETTLEMENT CREDITS

In its fourth issue, Brown & Root argues that it was improperly denied a full, dollar-for-dollar offsetting settlement credit. Proper application of settlement credits is a question of law reviewed by a de novo standard. *See Sugar Land Props., Inc. v. Becnel,* 26 S.W.3d 113, 119 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

The relevant statutory provisions are found in Chapter 33 of the Texas Civil Practice and Remedies Code. Section 33.012 provides as follows:

If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to ...

(1) the sum of the dollar amounts of all settlements;

**\*11** ....

TEX. CIV. PRAC. & REM.CODE ANN. § 33.012(b) (Vernon 1997).Section 33.011(1) defines "claimant" and provides, in part, as follows:
In an action in which a party seeks recovery of damages for injury to another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes both that other person and the party seeking recovery of damages pursuant to the provisions of Section 33.001.

TEX. CIV. PRAC. & REM.CODE § 33.011(1) (Vernon 1997).

The Texas Supreme Court has outlined a three-step process for the application of Chapter 33. *See Utts v. Short,* 81 S.W.3d 822, 829 (Tex.2002); *see also Ellender,* 968 S.W.2d at 927-28.First, a defendant seeking credit must file a written election to do so prior to the submission of the case to the jury. *Utts,* 81 S.W.3d at 829.Second, the defendant seeking credit must demonstrate to the trial court that the plaintiff against whom credit is sought benefitted from any settlement. *Id.* If such evidence is presented, "the trial court shall presume the settlement credit applies unless the nonsettling plaintiff presents evidence to overcome this presumption."*Id.; see also Ellender,* 968 S.W.2d at 927-28.Here, Brown & Root's timely filing of the necessary election is not contested. The issue thus turns on whether Mrs. Shelton benefitted from the fourteen settlements.

**Availability of Full Credit**

[7] In *Drilex Sys., Inc. v. Flores,* the court held that the term "claimant" in section 33.012(b)(1) includes all of the family members whose claim arises from an injury to only one member. *Drilex Sys., Inc. v. Flores,* 1 S.W.3d 112, 122 (Tex.1999). Thus, Brown & Root contends, Mrs. Shelton and her husband should be considered as one claimant regardless of any allocation between the two made in the settlement agreements. *See, e.g., id.* at 122;*but see Utts,* 81 S.W.3d at 830 (criticizing *Drilex* ). Mrs. Shelton, however, argues that *Drilex* is not controlling because she was pursuing only her individual claims against Brown & Root and Mr.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----                                                                    Page 11
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

Shelton, after his death, was no longer a party to the action.

*Drilex* involved a husband and father who had been injured and his wife and children who joined as plaintiffs suing two different defendants. All plaintiffs settled with one defendant and in the trial against the remaining defendant, each plaintiff was awarded some amount by the jury. In determining how to apply the settlement credit, the supreme court rejected the argument that settlements paid to one member of a family should not be deducted from the jury award given to another member of that family. *Drilex*, 1 S.W.3d at 122.

As a basis for its holding in *Drilex*, the supreme court cited with approval the case of *J.D. Abrams, Inc. v. McIver*, 966 S.W.2d 87 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). In *McIver*, the plaintiff, Lori Crane ("Crane"), suffered injury, and her mother joined suit both in her individual capacity and as the guardian of her daughter's estate. Before the commencement of trial, several of the defendants settled for a total of $2,497,175. At the close of trial, the jury awarded Crane $13,500,000 without any damage issue having been submitted to the jury as to her mother's individual claim. The trial court gave the defendant credit only for that aggregate amount of the settlements that had been given to Crane. On appeal, the court held that the nonsettling defendant was entitled to a full credit for the total amount of all settlements, including the settlement amounts that had been designated as compensation only to Crane's mother in her individual capacity. In so doing, the court of appeals, rejecting an argument similar to that made by Mrs. Shelton, stated as follows:

*12 Crane also contends that this result would make her give a credit for money she never received, money that by court order went to another person, [Crane's mother], for [Crane's mother's] own losses. While that is true, we believe the legislature intended this result in order to protect defendants from plaintiffs who would manipulate settlements among those "seek[ing] recovery of damages for injury to another person."

*Id.* at 97.

Based on this reasoning, the court determined that in *Drilex*, the defendant was entitled to total credit for a

settlement entered into by the familial co-plaintiffs against another defendant, even when by its terms the settlement allocated individual payments to the individual claimants. *Drilex*, 1 S.W.3d at 122.Therefore, the total settlement amount should have been deducted from the total jury award to the family. *Id.*

The same issue has recently been revisited by the supreme court in *Utts*, a medical malpractice case brought by a decedent's estate representative and the decedent's surviving spouse and children against a physician and a hospital. Prior to trial, the decedent's daughter settled with the hospital and distributed the money she received among other family members. She then nonsuited the doctor. The remaining family members settled with the hospital, in agreements totaling $200,000, and continued in a suit against the physician only. The jury rendered a verdict that assigned fault both to the physician and the hospital, and the doctor sought credit for the entirety of the $200,000 settlement into which each member of the family had individually entered with the hospital. The trial court denied the settlement credit, and the court of appeals affirmed. The supreme court reversed, holding that any benefit received by nonsettling plaintiffs from a co-plaintiff's settlement agreement would entitle the nonsettling defendant to a credit. *Utts*, 81 S.W.3d at 829.

Contrary to Mrs. Shelton's contentions, *Utts* did not explicitly overrule, nor substantially modify, *Drilex*.As noted by the court in *Utts*,"a majority of the Court concludes that *Drilex's*Chapter 33 settlement-credit analysis does not control the settlement-credit issue in this case."*Id.* at 830 (Baker, J., concurring). Further, while in their opinions four members of the supreme court assert that *Drilex* was wrongly decided, Justice Owen writes in dissent that "[t]here is at least a consensus of a majority of the Court on one point: *Drilex Systems, Inc. v. Flores* remains good law when family members settle but remain parties pursuing claims against a non-settling defendant."*Id.* at 838 (Owen, J., dissenting). Thus, though some members of the court disagree with *Drilex*, it has not been overruled. *Id.* Therefore, the resolution of Brown & Root's fourth issue turns on whether *Utts* or *Drilex* is controlling.

The facts of the present case are much more analogous to those of *Drilex* than *Utts*.Given the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----                                                                                    Page 12
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

judicially placed limitations on the holding in *Utts, Drilex* remains controlling where the issue is settlement credits allocated to the injured party against recovery by a single derivative family claimant. Further, in the case at bar, Mr. Shelton was the injured party and Mrs. Shelton sought to recover damages. These facts present the exact situation that section 33.011(1) was designed to address as indicated by the Legislature's chosen language that a "claimant" includes both "that other person and the party seeking recovery of damages." TEX. CIV. PRAC. & REM. CODE § 33.011(1); *see Drilex,* 1 S.W.3d at 122 (holding that the Legislature's language in this statute was chosen specifically to effect the treatment of "both that other person and the party seeking recovery of damages" as one claimant). We therefore conclude that *Drilex* is controlling and hold that Mr. and Mrs. Shelton constitute one claimant for the purposes of determining settlement credits. Thus, we sustain Brown & Root's fourth issue and hold that Brown & Root is entitled to a full, dollar-for-dollar credit in the amount of $3,951,900.

**\*13**[8][9] In calculating the resulting judgment, Mrs. Shelton argues that any punitive damages are exempt from crediting. In support of this proposition, she cites *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 391 (Tex.2000). We disagree with Mrs. Shelton's reading of the court's opinion in *Casteel.* In *Casteel,* the court held that

> the nonsettling defendant is entitled to offset any liability for joint and several damages by the amount of common damages paid by the settling defendant, but not for any amount of separate or punitive damages paid by the settling defendant.

*Id.* at 391-92. As such, the only restriction as to punitive damages and credits is that a nonsettling defendant's settlement credit will be limited to that portion of a settlement not specifically designated as punitive damages. *Id.* Consequently, because the settlements in question here were divided only as between Mr. and Mrs. Shelton, but not identified as either actual or punitive damages, there is no *Crown* limitation in this case. Thus, we hold that the judgment amount, both actual and punitive damages, should be reduced by the full credit amount.

**Constitutionality of Full Credit**

Mrs. Shelton also argues that the damages awarded by the jury were her separate property. Therefore, she contends that considering her and her husband to be one claimant under section 33.012 would unconstitutionally divest her of her separate property. In support of her contention, Mrs. Shelton argues that a trial court cannot divest a spouse of his or her separate property. *See Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 142 (Tex.1977). We disagree. *Eggemeyer* is not applicable to the present case because its holding is limited to the divisibility of separate property on divorce and the interpretation of certain statutes in the Texas Probate Code. *See id.* at 139-140. To the contrary, we are aware of no Texas law that prohibits a full settlement credit on the facts before us. Therefore, we hold that granting Brown & Root a full settlement credit does not violate Mrs. Shelton's constitutional rights.

### *CONCLUSION*

Having sustained Brown & Root's fourth issue, we *modify* the judgment of the trial court to reflect that Brown & Root receives a full settlement credit, in the amount of $3,951,900. The application of the credit to the judgment leaves Brown & Root liable for $64,100 in damages.[FN9] In all other respects, the judgment of the trial court is *affirmed.*

> FN1. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.009(a), (b) (Vernon 1997).

> FN2. In a ninety to ten percent split, the settlement amounts were divided between Mr. and Mrs. Shelton such that Mrs. Shelton received only $395,190 of the total amount. This amount was allocated as $325,000 for a claim of loss of inheritance and $70,000 for loss of consortium, mental anguish, and loss of household services. It was for this $70,000 amount that the trial court gave Brown & Root a settlement credit.

> FN3. Mrs. Shelton argues that Brown & Root is not entitled to use the statute of repose as a defense based on Brown & Root's argument at trial that it was not, in fact, the contractor who performed the work in question. As Brown & Root correctly points out, however, its denial does not then bar a subsequent invocation of the statute of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----                                                                                            Page 13
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)
**(Cite as: --- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler))**

repose as the "Texas Rules of Civil Procedure allow alternative pleading even of inconsistent theories."*Brown v. Goldstein, 685 S.W.2d 640, 642 (Tex.1985).* Hence, Brown & Root was entitled both to argue its role as contractor and to plead, in the alternative, that if it is found to be the contractor, it is protected by the contractor's statute of repose.

FN4. With the possible exception of the renovation of, and addition to, the cafeteria, the various acts of construction before us each involve personalty. As for the cafeteria, neither party explains to a sufficient degree, nor does the record clearly indicate, to what extent that portion of the project would not be considered personalty. Even if it did not constitute personalty, however, this issue would not be resolved because the other acts of construction all involve personalty and are, therefore, subject to the *Sonnier* analysis.

FN5. Neither party contends that the issue of trade fixtures is applicable to this case.

FN6. This determination was based on the fact that the turbines were designed for a specific function and place and that the installation was done in accordance with the owner's stipulations. *White, 996 S.W.2d at 924.*

FN7. The Michigan statute of repose provides as follows:

No person may maintain any action to recover damages ... for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained as a result of such injury, ... against any contractor making the improvement, more than 6 years after the time of occupancy of the completed improvement, use, or acceptance of the improvement, or 1 year after the defect is discovered or should have been discovered, provided that the defect

constitutes the proximate cause of the injury ... and is the result of gross negligence on the part of the contractor....

*Abbott, 592 N.W.2d at 98-99* (citing M.C.L. § 600.5839(1)).

FN8. Mrs. Shelton first contends that, by failing to object to the jury charge on the controlling issue, Brown & Root has waived a subsequent "no evidence" argument. However, when issues which constitute only a part of a complete and independent ground are not affirmatively raised, and other issues necessarily referable to that ground are submitted and answered, the omitted elements are deemed found in support of the judgment if no objection is made and they are supported by some evidence. *Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex.1990).* Consequently, because the element regarding a vice-principal was only a part of the independent charge of gross negligence by Brown & Root, such a finding is deemed to be inherently present, and hence reviewable on appeal, even in the absence of an objection by Brown & Root. *See id. at 668-69.*

FN9. The total amount of the settlement credit was applied first to actual damages. Because the credit exceeds the actual damages, prejudgment interest is not available. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.007 (West Supp.2003) ("[p]rejudgment interest may not be assessed or recovered on an award of exemplary damages").

Tex.App.-Tyler,2003.
Brown & Root Inc. v. Shelton
--- S.W.3d ----, 2003 WL 21771917 (Tex.App.-Tyler)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.