# Exhibit 5

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4

5    LONG BEACH MORTGAGE COMPANY            )

6    TRUTH IN LENDING ACT FAMILY RIDER      ) MDL CASE

7    LITIGATION                             ) NO. CV 06543

8

9

10    THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

11

12              The deposition of ALBERT STINSON,

13    called for examination, taken pursuant to the

14    Federal Rules of Civil Procedure of the United

15    States District Courts pertaining to the taking of

16    depositions, taken before NOREEN S. ERICKSON, CSR

17    No. 84-1527, a Notary Public within and for the

18    County of Cook, State of Illinois, and a Certified

19    Shorthand Reporter of said state, at Suite 3500,

20    321 North Clark Street, Chicago, Illinois, on the

21    21st day of April, A.D. 2008, at 10:13 a.m.

22

23

24

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 2

1  PRESENT:
2      EDELMAN, COMBS, LATTURNER & GOODWIN, LLC,
3      (120 South LaSalle Street, 18th Floor
4       Chicago, Illinois  60603
5       Telephone: 312-739-4200), by:
6      MS. CATHLEEN M. COMBS,
7      MR. MICHAEL J. ASCHENBRENER,
8          appeared on behalf of the Witness;
9
10  HOWERY LLP,
11      (321 North Clark Street, Suite 3400
12       Chicago, Illinois  60610
13       Telephone: 312-846-5645), by:
14      MR. GABRIEL A. CROWSON,
15      MR. SCOTT T. SCHUTTE,
16          appeared on behalf of Long Beach
17          Mortgage Company;
18
19  ALSO PRESENT:
20      MR. MARC BUHMANN, The Videographer,
21       Esquire Deposition Services.
22
23  REPORTED BY:  NOREEN S. ERICKSON, RPR, C.S.R.
24          CERTIFICATE NO. 84-01527

Page 3

1      THE VIDEOGRAPHER:  Good morning.  We're going
2  on the video record at 10:13 a.m.
3          My name is Marc Buhmann, and I'm a legal
4  videographer in association with Esquire
5  Deposition Services located at 311 West Monroe,
6  Chicago, Illinois.
7          The court reporter is Noreen Erickson,
8  also in association with Esquire Deposition
9  Services.
10          Here begins the videotape deposition of
11  Albert Stinson, taking place at Howery LLP, 321
12  North Clark Street, 34th floor, Chicago, Illinois.
13          Today's date is April 21st, 2008.
14          This deposition is being taken in the
15  matter of Long Beach Mortgage Company, Truth in
16  Lending Act, Family Rider litigation in the United
17  States District Court Northern District of
18  Illinois Eastern Division.  MDL case number 07 CV
19  06543.
20          This deposition is being taken on behalf
21  of the defendants, the party at whose instance
22  this deposition is being recorded on an
23  audio-video recording device.
24          Counsel, please identify yourselves for

Page 4

1  the record.
2      MS. COMBS:  Cathleen Combs on behalf of
3  Mr. Stinson.
4      MR. ASCHENBRENER:  Michael Aschenbrener on
5  behalf of Mr. Stinson.
6      MR. CROWSON:  Gabriel Crowson on behalf of
7  defendant, Long Beach Mortgage Company.
8      MR. SCHUTTE:  Scott Schutte for Long Beach
9  Mortgage Company.
10      THE VIDEOGRAPHER:  Will the court reporter
11  please swear in the witness.
12          (WHEREUPON, the witness was duly
13          sworn.)
14          ALBERT STINSON,
15  called as a witness herein, having been first duly
16  sworn, was examined and testified as follows:
17          EXAMINATION
18  BY MR. CROWSON:
19      Q.   Good morning, Mr. Stinson.
20      A.   Good morning.
21      Q.   My name is Gabe Crowson, I represent
22  Long Beach in the lawsuit that you filed.  We met
23  earlier this morning.
24          Would you please state and spell your

Page 5

1  full name for the record.
2      A.   Albert Stinson, A-l-b-e-r-t,
3  S-t-i-n-s-o-n.
4      Q.   Are you a junior or a senior?
5      A.   Junior.
6      Q.   Have you ever gone by any other names?
7      A.   No.
8      Q.   Have your given a deposition before?
9      A.   No.
10      Q.   I'll go over a few of the ground rules.
11  Your lawyer may have talked about this with you
12  already --
13      A.   Right.
14      Q.   -- but I have to make sure.
15          I'll be answering the questions, you'll
16  be giving the responses.  As you can see there's a
17  court reporter here who's taking everything down.
18  For that reason, it's important that you give an
19  audible response to all of my questions.  Even
20  though I may know what you mean when you kind of
21  nod or say huh-uh, she can't take it down, so you
22  need to give a verbal response, yes or no or
23  whatever to the actual question.
24          Also it's important, because she can

2 (Pages 2 to 5)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 6

1  only take down one person at a time, that you let
2  me finish my question before you begin
3  your response, and I'll do the same, I'll let you
4  finish your response before I begin my next
5  question.
6      Also, there's no judge here today. But
7  periodically your lawyer may make objections for
8  the record. Those are to preserve, you know, for
9  down the road. But unless they instruct you
10  otherwise, you're required to answer the questions
11  that are pending. If you need me to restate the
12  question, or rephrase it, please let me know.
13      A.  Okay.
14      Q.  Is there any reason that would impair
15  your ability to understand and answer truthfully
16  my questions today?
17      A.  No.
18      Q.  And you understand that you're being
19  deposed in connection with a lawsuit that you
20  filed against Long Beach Mortgage Company?
21      A.  Yes, I do.
22      Q.  And do you understand that the
23  deposition is being videotaped and taken down by a
24  court reporter as well?

Page 7

1      A.  Yes, I do.
2      Q.  Do you understand that the videotape
3  and/or your testimony could be shown to a judge or
4  jury in this lawsuit?
5      A.  Yes.
6      Q.  I'd like you to tell me in your own
7  words what you think Long Beach has done wrong.
8      A.  I think they violated -- they Truth in
9  Lending Act by not disclosing what they suppose to
10  disclose, as far as that 1-4 family rider.
11      Q.  And what was it that you claim that
12  they were supposed to disclose?
13      A.  The security interest on my personal
14  property.
15      Q.  And is that the only thing that you
16  claim Long Beach has done wrong?
17      A.  Yes, because I think that's most
18  important.
19      Q.  Other than -- other than your claim
20  that they didn't disclose a security interest in
21  personal property, is there anything -- any other
22  problems that you have with your loan with Long
23  Beach?
24      A.  I'd rather not say. I just -- I just

Page 8

1  think all of it is a fraud. It's just my personal
2  opinion of things.
3      Q.  Okay. What I'm trying to figure out is
4  what all those things were that constitute fraud.
5  I mean, you've identified the failure to disclose
6  security interest?
7      A.  Just the practice on loan -- on loan
8  companies, period.
9      Q.  But what other practices?
10      A.  Just the mess that the mortgage crisis
11  is in right now. You know, I don't want to go on
12  and on about that. I just want to just --
13      Q.  But do you allege that Long Beach did
14  anything to you similar to what's going on in
15  mortgage industry right now?
16      A.  Just on behalf of violating what they
17  didn't disclose. That's it.
18      Q.  Just the failure to disclose the
19  security interest?
20      A.  Right.
21      Q.  When did you first feel that they had
22  done something wrong?
23      A.  When they came into my attention when
24  Al Hofeld sent me what he sent me. And I was,

Page 9

1  like, wow. You know, I never could imagine that.
2      Q.  How do you know -- are you talking
3  about Al Hofeld?
4      A.  Yes.
5      Q.  How do you know Al?
6      A.  He sent me a package. And once I read
7  the package about what was going on, it just -- it
8  just had me appalled.
9      Q.  When -- had you ever spoken or met
10  Mr. Hofeld before that package?
11      A.  No.
12      Q.  So it was just a cold -- something sent
13  in the mail to you?
14      A.  Right.
15      Q.  When was that?
16      A.  Around January. I received it January
17  '07, something like that. I have the package in
18  my bag, as a matter of fact.
19      Q.  Did you ever give that package to your
20  attorneys?
21      A.  No.
22      Q.  But you brought it here with you today?
23      A.  Yes.
24      Q.  What was included in that package?

3 (Pages 6 to 9)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 10

1    A.    Just things pertaining to that 1-4
2  rider that should have been disclosed, and how it
3  was a violation upon the Truth in Lending Act for
4  not disclosing that.
5    Q.    Why did Mr. Hofeld send that to you?
6    A.    I guess they saw something that was
7  worth going after.
8    Q.    How did Mr. Hofeld know about you,
9  though?
10    A.    I guess they did their homework.
11  That's all I can tell you.
12    Q.    What else was in that package?
13    A.    I didn't really go through the whole
14  package.  That peaked my interest, that Long Beach
15  can have that, not disclose that they can have
16  something on my personal property.  And I really
17  took offense to that.
18    Q.    Was it was -- was there a letter in the
19  package?
20    A.    Yes.
21    Q.    And did it include some other
22  materials?
23    A.    No, just information on that 1-4.
24    Q.    Just a letter that had information

Page 11

1  about the family rider?
2    A.    Yes.
3    Q.    And what did you do after you received
4  this package?
5    A.    After I received the letter --
6    MS. COMBS:  Mr. Stinson, I want you to be
7  careful when you answer your questions not to say
8  what you told your attorney about or what your
9  attorney told you.  But if you can answer the
10  question without revealing it, go ahead and
11  answer.
12    THE WITNESS:  Okay.  Can you repeat the
13  question.
14  BY MR. CROWSON:
15    Q.    Yeah.  What did you do after you
16  received the package from Mr. Hofeld?
17    A.    I looked over it and I went home and I
18  looked through my loan papers, see if I have that
19  1-4 rider first.  And once I found out that I had
20  that 1-4 rider, then that's when I took
21  appropriate action.
22    Q.    So you looked at your loan papers at
23  home?
24    A.    Yes.

Page 12

1    Q.    And you saw the 1-4 family rider in
2  there?
3    A.    Yes.
4    Q.    And then what did you do after that?
5    A.    Is that --
6    MS. COMBS:  You can say what you did, but
7  not -- but not what was said.
8    THE WITNESS:  Okay.
9  BY THE WITNESS:
10    A.    What I did, I contacted who I need to
11  contact and tell them yes, I have this 1-4 rider.
12    MS. COMBS:  Again, do not say what you said
13  to your attorneys or what your attorney said to
14  you.  But you can answer the question if you can
15  answer the question without revealing that.  Go
16  ahead.
17    THE WITNESS:  Okay.
18  BY MR. CROWSON:
19    Q.    So you called someone at Mr. Hofeld's
20  firm?
21    MS. COMBS:  You can answer that question --
22  BY THE WITNESS:
23    A.    Yes.
24

Page 13

1  BY MR. CROWSON:
2    Q.    And I'm not looking for what you told
3  anyone at the law firm or what they told you, but
4  I'm entitled to a lot of details about the --
5  leading up to the relationship.  And that's what
6  I'm trying to get at.
7    And all I'm asking is, you know, roughly
8  how long after you received that package did you
9  call someone at the Edelman firm?
10    A.    Right away.
11    Q.    Like within a day --
12    A.    Within a day, probably within a day.
13    Q.    And did you speak with Mr. Hofeld, or a
14  paralegal, or some other attorney?
15    A.    I spoke -- I think I recall speaking to
16  Al Hofeld.
17    Q.    And did you at that time decide to
18  enter into an attorney-client relationship with
19  Mr. Hofeld?
20    A.    Yes.
21    Q.    Do you have a written agreement where
22  you retained Mr. Hofeld and his firm?
23    A.    No, I do not.
24    Q.    And you believe that was around January

4 (Pages 10 to 13)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 14

1   of 2007?
2       A.   Yes.
3       Q.   Now you said you were upset about
4   learning about the 1-4 family rider.  Have you --
5   do you feel that you've incurred any economic
6   damages because of the 1-4 family rider?
7       MS. COMBS:  Objection, calls for a legal
8   conclusion.  But he can answer.
9   BY THE WITNESS:
10      A.   I feel I would have.
11  BY MR. CROWSON:
12      Q.   If what?
13      A.   If I would have been able to stay at
14  that property and defaulted on the loan.
15      Q.   Have you ever defaulted on your loan
16  before?
17      A.   No, I have not.
18      Q.   Do you still have the loan?
19      A.   No, I do not.
20      Q.   When did you pay it off?
21      A.   Actually -- let me see, on my statement
22  and I don't really know -- it should be in there,
23  I gave the property --
24      Q.   You sold the property?

Page 15

1       A.   Yes.
2       Q.   When was that?
3       A.   Like I said, I don't get the date, but
4   like I said, I gave it to some investors because I
5   could no longer keep it.
6       Q.   You could no longer afford the mortgage
7   payments?
8       A.   Yes.
9       Q.   So you sold it to some investors?
10      A.   Yes.
11      Q.   And you're just not sure exactly when?
12      A.   No.  Like I said, all my papers got
13  destroyed in the fire at my home.  So I really
14  don't have any type of other paperwork in that.
15      Q.   Just so we're clear, the house that
16  we're talking about is the address at 127 --
17      A.   No.
18      Q.   I'm sorry, 5402 South Shields Avenue in
19  Chicago, Illinois?
20      A.   Yes.
21      Q.   That's the property that you purchased
22  with the Long Beach mortgage loan?
23      A.   Yes.
24      Q.   And you sold that property to some

Page 16

1   investors?
2       A.   Yes.
3       Q.   So you never defaulted on your mortgage
4   loan?
5       A.   They go my statement there.
6       Q.   I can look at it, but I'm just asking
7   you.
8       A.   Yeah -- no, I never defaulted.
9       Q.   So Long Beach never commenced any
10  foreclosure actions against you?
11      A.   No.
12      Q.   And they never took any of your
13  personal property --
14      A.   No.
15      Q.   -- by way of foreclosure?
16      A.   No.
17      Q.   What is it that your -- in your own
18  words -- that you're seeking in this lawsuit
19  against Long Beach?
20      A.   Statutory damages.
21      Q.   Anything else?
22      A.   No.
23      Q.   Are you aware that you're a proposed
24  class representative for a class of consumers?

Page 17

1       A.   Yes, I am.
2       Q.   Do you know what it means to be a class
3   representative?
4       A.   Yes, I am.
5       Q.   Can you tell me in your own words what
6   that means?
7       A.   When one person represents a group of
8   other people that has the same claim.
9       Q.   Do you know any other persons who had a
10  Long Beach loan who have a similar claim as you?
11      A.   No, I do not.
12      Q.   Do you know any of the other named
13  plaintiffs in this lawsuit?
14      A.   The first plaintiff.
15      Q.   Ms. Guadalupe Navara?
16      A.   Yes.
17      Q.   Did you know her before this lawsuit?
18      A.   No.
19      Q.   You just know her because of this
20  lawsuit?
21      A.   Yes.
22      Q.   What about Eric Shelton?
23      A.   No.
24      Q.   What about Mirlaine Jeune?

5 (Pages 14 to 17)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 18

1    A.    No.
2    Q.    Or Charlene Sullivan?
3    A.    No.
4    Q.    I just want to confirm a couple of
5  personal stats, I guess, before we go into some
6  more substantive stuff.
7          From your loan application I saw that
8  your date of birth is
9    A.    That's correct.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 19

1            (WHEREUPON, the following
2            proceedings were had designated
3            as confidential:)
4  BY MR. CROWSON:
5    Q.    And your Social Security number is.
6
7    A.    That's correct.
8    MS. COMBS:  I would like that that be kept
9  confidential, please.
10   MR. CROWSON:  That's fine.  That part of the
11 transcript can be confidential.
12           (WHEREUPON, certain proceedings
13           designated as confidential were
14           concluded.)
15
16
17
18
19
20
21
22
23
24

Page 20

1  BY MR. CROWSON:
2    Q.    And you said you haven't been known by
3  any other names other than Albert Stinson, Junior?
4    A.    That's right.
5    Q.    Are you presently married?
6    A.    Yes.
7    Q.    What is your's wife name?
8    A.    Aisha Harris, A-i-s-h-a, H-a-r-r-i-s.
9    Q.    And how long have you been married?
10   A.    Six years.
11   Q.    Were you ever married before you were
12 married to Ms. Harris?
13   A.    No.
14   Q.    What's the highest level of education
15 you've obtained?
16   A.    I have a two-year degree.
17   Q.    An associate's?
18   A.    Associate's in general studies, yes.
19   Q.    Where did you get that associate's
20 degree from?
21   A.    Harold Washington.
22   Q.    And does it have a specific major?
23   A.    Mental health.
24   Q.    Mental health?

Page 21

1    A.    (Nodding head).
2    Q.    What year did you get that associate's
3  degree?
4    A.    '98.
5    Q.    Did you go straight to that university
6  after high school?
7    A.    No, I did not.
8    Q.    What year did you finish high school?
9    A.    Oh, wow, I almost forgot.  '91.
10   Q.    And where?
11   MS. COMBS:  Not so long ago.
12   THE WITNESS:  Right.
13 BY MR. CROWSON:
14   Q.    If you're not sure of specific dates or
15 things like that, you can feel free to say you're
16 not sure.
17   A.    Yeah.
18   Q.    But of course throughout the day if
19 something jogs your memory, please let me know.
20         And where did you go to high school?
21   A.    John Marshal Metro.
22   Q.    That's here in Chicago?
23   A.    Yes.
24   Q.    And did you start working after you

6 (Pages 18 to 21)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 22

1  finished high school?
2      A.    Actually I went to trade school for a
3  while and the school -- Washburne shut down, so...
4      Q.    How long did you go to the trade
5  school?
6      A.    Maybe three months.
7      Q.    What was that to study?
8      A.    Home building maintenance.
9      Q.    And what did you do after those three
10  months?
11      A.    What did I do?  Pretty much nothing,
12  you know.  Live my life a while.
13      Q.    Did you have any jobs?
14      A.    No, not at the time.
15      Q.    And then when did you start going to
16  get your associate's degree?
17      A.    I'm not -- out the correct date.  I
18  mean, I'm not sure of the date.  Had to be around
19  201, 202, something like that.
20      Q.    2001?
21      A.    Yeah.
22      Q.    I thought you said you got the degree
23  in 1998?
24      A.    Oh, no, hold on -- let me be sure --

Page 23

1  yeah, '98.  I went in '93, but I kept going back
2  and forth.  I take a semester off, go back and
3  forth.  Because I do have an 18-year old child.
4  So I was raising my kids in the process.
5      Q.    So it wasn't one continuous two years?
6      A.    No, it was over a period of time.
7      Q.    But ultimately in 1998 you got an
8  associate's degree?
9      A.    Right.
10      Q.    And then what did you do after you got
11  your associate's degree?
12      A.    I went to work for Blue Cross, Blue
13  Shield.
14      Q.    What did you do there?
15      A.    What didn't I do there?  Quality
16  control check, people insurance cards.  Mail,
17  distribute packages for new benefit riders,
18  maintain stockroom.  I had various things I did
19  over there.  That was the main three.
20      Q.    Did you have an official title or
21  position?
22      A.    No.
23      Q.    Did you get promoted or move up into
24  any other position?

Page 24

1      A.    Actually I started as a temp there.  I
2  was working as a temp for two and-a-half years,
3  maybe two and-a-half years.
4      Q.    So you just worked as a temp at Blue
5  Cross for two and-a-half years?
6      A.    Right.
7      Q.    And then what did you do when you left
8  Blue Cross?
9      A.    Maybe like four, five months, I started
10  working for -- oh, no, I got my unemployment for a
11  while.  Then I went to work for Easter Seals.
12      Q.    And what is Easter Seals?
13      A.    It's a school that teaches autism --
14  kids with autism and other behavior disorders.
15      Q.    And what do you do at Easter Seals?
16      A.    I'm assistant teacher there.  And I was
17  a para per mentor (sic) there for the other aides
18  and assistants.
19      Q.    And is that your current job?
20      A.    Yes.
21      Q.    So you've been there since about 2001?
22      A.    Yes.
23      Q.    And is that the job that you had when
24  you got your Long Beach mortgage loan?

Page 25

1      A.    Yes.
2      Q.    When you got your associate's degree
3  and prior to that when you were getting your -- or
4  going to the trade school, did you ever take any
5  classes on law or legal affairs?
6      A.    No.
7      Q.    Have you ever -- you know, since you've
8  gotten your associate's degree, taken any
9  continuing education courses or any courses on the
10  law or legal relations?
11      A.    No. Very much interested so though.
12      Q.    And have you ever served in the
13  military?
14      A.    No.
15      Q.    Do you have any other jobs other than
16  working at Easter Seals?
17      A.    No.
18      Q.    And we can mark this part confidential,
19  too, if you want.  Can you tell me what your
20  salary or hourly wage is at Easter Seals?
21      A.    Right now my salary is
22  twenty-four-five.
23      Q.    24,500 a year?
24      A.    Yes.

7 (Pages 22 to 25)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 26

1    Q.    And do you remember what it was around
2  April of 2006 when you got your Long Beach
3  mortgage loan?
4    A.    Maybe 24, because they give us three
5  percent every year, 24.  Twenty-three-five, 24, in
6  that ballpark there.
7    Q.    And do you have any other sources of
8  income?
9    A.    No.
10    Q.    When you got your Long Beach mortgage
11  loan, did you have any other sources of income?
12    A.    No.
13    Q.    Can you tell me your current address.
14    A.    5937 West Iowa Street, Chicago,
15  Illinois 60651.
16    Q.    And do you own or rent that house?
17    A.    Me and my wife own that property.
18    Q.    Do you lease any part of it out to
19  anyone else?
20    A.    No.
21    Q.    Do you own any other properties other
22  than 5937 West Iowa Street?
23    A.    No.
24    Q.    Do you manage any other rental

Page 27

1  property?
2    A.    No.
3    Q.    When did you start living at the West
4  Iowa Street address?
5    A.    '06, August.
6    Q.    And before that, were you living at
7  5402 South Shields Avenue?
8    A.    That was the plan.  I sold my house in
9  Bellwood to go live at that property at 5402 South
10  Shields.
11    Q.    So did you ever live at 5402 South
12  Shields?
13    A.    No.
14    Q.    Can you tell me again what your plan
15  was?
16    A.    I purchased the property to go live in
17  the property.  But once my wife saw that it was on
18  the south side of the town in Englewood, she
19  say -- her exact words was, hell no.  And we had a
20  big fight about that seriously.
21    Q.    I know how that works.
22    MR. SCHUTTE:  Me too, for the record.
23  BY MR. CROWSON:
24    Q.    So at the time you purchased 5402 South

Page 28

1  Shields, you were living at 127 Bellwood Avenue in
2  Bellwood?
3    A.    Yes.  Yes.
4    Q.    Did you own or rent that house?
5    A.    I owned that.
6    Q.    Did you have a mortgage on it?
7    A.    Yes, I did.
8    Q.    Do you remember who the lender was?
9    A.    Man, they sold my mortgage about three,
10  four times.  I couldn't tell you who the last
11  mortgage on it -- Wells Fargo.
12    Q.    Sorry to interrupt you.  Wells Fargo
13  was the servicer or the original lender?
14    A.    I don't know who the original lender
15  was, but I know Wells Fargo was the last people I
16  was making payments to.
17    Q.    Was the house at 127 Bellwood, was it a
18  single family or --
19    A.    Single family.
20    Q.    And did anyone other than your wife
21  live there with you?
22    A.    My kids.
23    Q.    Did you -- you didn't lease or rent any
24  part of it out?

Page 29

1    A.    No.
2    Q.    And at the time you owed that house,
3  did you own any other rental property?
4    A.    No.
5    Q.    How long did you live at the Bellwood
6  address?
7    A.    Maybe like a year, little bit after a
8  year, year and a half.  Something like that.
9    Q.    Did you own a house before that?
10    A.    No.
11    Q.    Where did you life before then?
12    A.    I stayed in Oak Park.  I was renting
13  out in Oak Park.
14    Q.    Is that an address of 712 --
15    A.    712, yes, North Austin.
16    Q.    So prior to the 127 Bellwood, you had
17  never owned a house before?
18    A.    That's correct.
19    Q.    Now let's back and fast forward.  When
20  you went to buy the house at 5402, your plan was
21  to go and live there?
22    A.    Yes.
23    Q.    And did you plan on renting any part of
24  that house out?

8 (Pages 26 to 29)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 30

1    A.    Yes.
2    Q.    Was there an existing tenant at that
3 house?
4    A.    Yes.
5    Q.    Can you describe for me the layout of
6 that property.
7    A.    What you mean, like --
8    Q.    Like is it multiple units?
9    A.    Right.  It was a top floor, first
10 floor, and I was going to renovate the basement
11 for extra income.
12    Q.    You were going to live in one floor?
13    A.    I was going to live on the top floor.
14    Q.    And you were going to rent out --
15    A.    The second floor.
16    Q.    Did you have a lease to do that?
17    A.    No.
18    Q.    Did you have an expectation of a rental
19 amount?
20    A.    Yes.
21    Q.    What was that?
22    A.    What I wanted from the rental?
23    Q.    Right.
24    A.    750.  That's what the -- what the two

Page 31

1 bedrooms going at that time.
2    Q.    And I'm sorry, was there already a
3 tenant there?
4    A.    Yes.
5    Q.    Do you know how much they were renting?
6    A.    I think 750.
7    Q.    And were you going to sell your house
8 at 127 Bellwood?
9    A.    Yes, I put it on the market two months
10 after I purchased 5402, because I just knew I was
11 going to 5402.  Didn't work.
12    Q.    Did you have any plans of renting part
13 of 127 Bellwood out?
14    A.    No, it wasn't -- it's a single family.
15    Q.    I guess what I'm asking is after you
16 moved -- after you would have moved into 5402
17 South Shields, did you have any plans for
18 retaining 127 Bellwood and renting it out?
19    A.    No, I saw -- no.
20    Q.    Did you ever move into the South
21 Shields address?
22    A.    No.
23    Q.    So you just owned it for a few months?
24    A.    Yes.

Page 32

1    Q.    And then you sold it around August of
2 2006?
3    A.    I don't -- was it August -- like I say,
4 I can't give my dates, but was around up in there
5 somewhere.  Like I say, I gave it to some
6 investors and let them take it off my hands.
7    Q.    But you bought a house at West Iowa
8 Street in August of '06?
9    A.    Yes.  Yes.
10    Q.    Did you need to use the Long Beach
11 mortgage loan to fix up or improve any part of the
12 property at South Shields Avenue?
13    A.    No.
14    Q.    You were just going to use the loan
15 just to buy the house?
16    A.    Yes.
17    Q.    Did you ever had any problems with the
18 mortgage lender for your 127 Bellwood Avenue?
19    A.    No.
20    Q.    So I take it you haven't filed any
21 lawsuits against any other mortgage lenders?
22    A.    No.
23    Q.    Have you ever filed any lawsuit before
24 other than the one we're talking about today?

Page 33

1    A.    No.
2    Q.    Have you ever been sued?
3    A.    No.
4    Q.    And if you've never filed a lawsuit, I
5 take it you've never sought to be a class
6 representative?
7    A.    That's correct.
8    Q.    Have you ever been part of a class
9 action?
10    A.    No.
11    Q.    Have you ever filed for bankruptcy?
12    A.    No.
13    Q.    And I take it since you're still
14 married, you've never been involved in any
15 divorce proceedings --
16    A.    I'm going through that right now, and
17 this is the root of it.
18    Q.    I'm sorry.  Is that in Cook County?
19    A.    Yes.
20    Q.    So a divorce proceeding has already
21 started?
22    A.    It's in the making.  It's in the
23 making.
24    Q.    What do you mean that this was a root

9 (Pages 30 to 33)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 34

1  of the divorce?
2      A.    The big fight about me going into that
3  property over there, that this what really, really
4  started the trickle-down effect.  And it started
5  from moving from the suburbs, coming back to
6  certain part of the city.
7      Q.    So it was about buying the house?
8      A.    Yes.
9      Q.    Not about the claims you have about the
10  loan?
11      A.    No.
12      Q.    Have you ever been involved -- other
13  than Long Beach, have you ever been involved in
14  any foreclosure proceedings?
15      A.    No.
16      Q.    Have you ever been evicted?
17      A.    No.
18
19
20
21
22
23
24

Page 35

1              (WHEREUPON, the following
2              proceedings were had designated
3              as confidential:)
4  BY MR. CROWSON:
5      Q.    Have you ever been arrested or
6  convicted of any crimes?
7      A.    Is that relevant?
8      MS. COMBS:  Object to more than ten years
9  unless it's related to -- you know, the federal
10  rule, unless it's related to truth or falsity.
11      MR. CROWSON:  I think that only goes to
12  credibility issues.  But I think when we're
13  talking about a class representative, you know --
14      MS. COMBS:  Isn't that a credibility issue?
15      MR. CROWSON:  Well, no, I mean it's
16  credibility issues but there's also the adequacy
17  of serving as a class representative that's
18  separate and apart from credibility.
19      MS. COMBS:  How far do you want to go back?
20  I mean, are you talking about --
21      MR. CROWSON:  We'll go back ten years.  But I
22  don't want it limited to crimes related to truth
23  and --
24      MS. COMBS:  Fine.

Page 36

1          You can answer the question.
2  BY THE WITNESS:
3      A.    Well, I had two weapons charges in my
4  early 20s.  I'm 35 now, so that's been over ten
5  years ago.  And I had an obstruction charge a
6  couple of years back.
7  BY MR. CROWSON:
8      Q.    Obstruction charge --
9      A.    Police felt that I was violating them
10  because I felt they were violating my brother.  I
11  didn't like the way they was touching my brother.
12  I took up for my brother, and I went to jail for
13  that.
14      Q.    Did you get convicted?
15      A.    No, I did not, they throw it out, it
16  wasn't even credible.
17      Q.    When was that?
18      A.    Maybe '05, '04, something like that.
19      Q.    And the two weapons charges that were
20  more than ten years ago?
21      A.    Yes.
22      Q.    Were those arrests or convictions?
23      A.    They was arrests, and I wasn't
24  convicted.  They dropped the charges.

Page 37

1      Q.    So the two weapons charges and the
2  obstructions charges are the only times you've
3  been arrested?
4      A.    Yes.
5      MR. CROWSON:  And again, we can mark that
6  part confidential, too.
7      MS. COMBS:  Oh, please.
8              (WHEREUPON, certain proceedings
9              designated as confidential were
10              concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

10 (Pages 34 to 37)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 38

1 BY MR. CROWSON:
2    Q.   Mr. Stinson, do you -- what's your
3 understanding as to what a class action is?
4    A.   It's I -- do want me to repeat my
5 initial answer?  A class action -- like I said, I
6 represent a group of people that has the same
7 claim.
8    Q.   Do you have an understanding as to any
9 responsibilities or obligations you have?
10    A.   Yes.  I have to be considerate of the
11 rest of the claimants in my decision-making
12 process.
13    Q.   What about -- I'm sorry.
14    A.   When it comes down to settling.
15    Q.   What about time commitments?  Do you
16 understand that -- do you have an understanding
17 that you may be asked to dedicate some of your
18 time for this case?
19    A.   Yes.
20    Q.   Have you signed any affidavits or
21 verifications about your lawsuit?
22    A.   No.
23    Q.   How much time have you spent, you know,
24 working on this case or being involved in this

Page 39

1 case?
2    A.   Do you want a rough estimate or --
3    Q.   Yeah, rough estimate.
4    A.   What, like days or --
5    Q.   Or, you know, if you can ballpark it in
6 terms of hours.
7    A.   Maybe four or five.
8    Q.   Four or five?
9    A.   Yes.
10    Q.   And what has that been spent doing?
11 And you don't have to tell me what, you know,
12 you've talked about with your lawyers.
13    A.   Just going over the case, just going
14 over my claim.
15    Q.   Meeting with your lawyers?
16    A.   Yes.
17    Q.   About how many times have you met with
18 your lawyers?
19    A.   One, two, three -- maybe three.
20    Q.   Is that phone meetings or in person?
21    A.   In person.
22    Q.   Have you had any telephone meetings?
23    A.   Not outside -- twice with Hofeld, and I
24 spoke with Mike.

Page 40

1    Q.   When you had the roughly three
2 in-person meetings, who was present at those
3 meetings?
4    A.   Mike was present the first two times
5 and Ms. Combs was present the last time we met.
6    Q.   Any other lawyers?
7    A.   No.
8    Q.   Any other persons?
9    A.   No.
10    Q.   Do you know what the status of the
11 lawsuit is?
12    A.   As far as getting retributed (sic) --
13    Q.   As far as where it's progressed in the
14 litigation process?
15    A.   No.
16    Q.   Have you reviewed any of the papers
17 that have been filed in the lawsuit?
18    A.   Yes.
19    Q.   Have you reviewed a consolidated class
20 action complaint?
21    A.   Of the papers -- of the documents I
22 have?  Like I said, I looked through the documents
23 but I couldn't really understand half of them, you
24 know, that's for my counsel, so...

Page 41

1    Q.   All right.  It's like my wife says,
2 it's mostly lawyer mumbo-jumbo.
3    A.   Right.
4    Q.   Are you aware that a class action
5 lawsuit was filed on your behalf?
6    A.   No, I thought -- on the original
7 plaintiff, I was added on to this.
8    Q.   But -- fair enough.  Have you ever
9 reviewed any drafts of complaints to be filed in
10 federal court?
11    A.   No.
12    Q.   Have you ever reviewed any drafts of a
13 motion for a class certification?
14    A.   No.
15    Q.   And you haven't signed any declarations
16 or affidavits about class certification?
17    A.   No.
18    Q.   When you got the initial package from
19 Mr. Hofeld, did you go and gather any documents?
20    A.   Not initially until I made phone
21 contact, so I can know what to gather.
22    Q.   Did you give those documents to your
23 attorneys?
24    A.   Yes.

11 (Pages 38 to 41)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 42

1    Q.    And what documents was it that you have
2  at your house that you would have gathered?
3    A.    Statements, just my loan packets
4  showing the 1-4 rider and other things that's
5  beneficial to this claim.
6    Q.    What about any lease documents?
7    A.    No.
8    Q.    What about any tax returns?
9    A.    I submit it, but they -- you know, I
10  submit it.
11    Q.    You gave your tax returns to your
12  lawyers?
13    A.    Yes.
14    Q.    And there was a fire at your house
15  around February or March of 2007?
16    A.    Yes.
17    Q.    Was the house at South Shields?
18    A.    No, 5937, my residency now.
19    Q.    That was the house that you were
20  maintaining your personal files?
21    A.    Yes.
22    Q.    Was that destroyed, all your personal
23  documents?
24    A.    Yes.  Yes.

Page 43

1    Q.    Sorry to hear about that.
2        Do you have a personal computer?
3    A.    I don't use it.
4    Q.    You have one and you don't use it?
5    A.    I let my kids.  I don't believe in it.
6  Just I have a personal thing about computers right
7  now.
8    Q.    So you don't -- right now or --
9    A.    Just period.  I use it at work but not
10  at -- for home business.
11    Q.    So you don't maintain anything on a
12  personal computer?
13    A.    No, no.
14    Q.    Does the name Lloyd Brooks ring a bell
15  to you?
16    A.    Can you repeat that.
17    Q.    Sure.  Lloyd Brooks?
18    A.    No.
19    Q.    What about Christopher Lefebvre?
20    A.    Yes -- it's part of your firm, right?
21    MS. COMBS:  No, he isn't.
22    THE WITNESS:  I thought I heard of the name.
23  BY MR. CROWSON:
24    Q.    Is that a name that just sounds

Page 44

1  familiar?
2    A.    It just sounds familiar.
3    Q.    Have you ever met or spoken with
4  someone named Christopher Lefebvre?
5    A.    No.
6    Q.    And I think you answered this already,
7  but when you initially spoke with Mr. Hofeld, you
8  started a -- you retained Mr. Hofeld and the
9  Edelman firm at that time?
10    A.    Yes.
11    Q.    Did you have a meeting with your
12  lawyers to get ready for today's deposition?
13    A.    Yes.
14    Q.    When was that?
15    A.    Last -- last week.  When was that?
16  Wednesday.  Last Wednesday.
17    Q.    One day last week?
18    A.    Last Wednesday, yes.
19    Q.    About how long did that meeting last?
20    A.    Maybe upwards to two hours.
21    Q.    And who was there at that meeting?
22    A.    Mike and Mrs. Combs.
23    Q.    No one else?
24    A.    No.

Page 45

1    Q.    Did you review any documents at that
2  time?
3    A.    Yes.
4    Q.    What kind of categories or kinds of
5  documents did you look at?
6    A.    Just the documents that's basically in
7  front of you, you know.  Wasn't any other
8  documents there.
9    Q.    Your loan documents?
10    A.    Yes.
11    Q.    Other than your lawyers, have you ever
12  spoken with anyone about this case or about your
13  Long Beach mortgage loan?
14    A.    Yes.
15    Q.    Who would that be?
16    A.    Previous owner and the coworker of
17  mine.
18    Q.    The previous owner of the house at --
19    A.    5402 South Shields.
20    Q.    What is his or her name?
21    A.    Alonso Hicks.
22    Q.    And what's the coworker's name?
23    A.    Tekeisa, T-e-k-e-i-s-a. And Matthew
24  Henry too, as well.

12 (Pages 42 to 45)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 46

1    Q.    What's Tekeisa's last name?
2    A.    Cooley, C-o-o-l-e-y.
3    Q.    Did you know Mr. Hicks before you
4  bought the house at 5402?
5    A.    Yes.
6    Q.    How did you know him?
7    A.    He's -- my brother has a kid by his
8  sister.
9    MS. COMBS:  Extended family.
10    THE WITNESS:  Extended family, right.
11  BY MR. CROWSON:
12    Q.    Got it.  You've spoken with Mr. Hicks
13  after you bought the property specifically about
14  the lawsuit?
15    A.    Yes.
16    Q.    What have you talked about?
17    A.    That 1-4 rider.  That was it.
18    Q.    What did you tell him about it?
19    A.    Just I didn't know that they can have a
20  stake in my personal property.
21    Q.    What did he say about it?
22    A.    He was appalled.  He was, like, wow.
23    Q.    About how many times did you speak with
24  Mr. Hicks about it?

Page 47

1    A.    Twice.
2    Q.    Did he say anything else about that?
3    A.    He told me if I needed him for
4  anything, you know, he'd be more than willing to
5  step up for me.
6    Q.    What did he mean by that?
7    A.    If I needed him to come to a
8  disposition or anything like this here.
9    Q.    Anything else?
10    A.    That's it.
11    Q.    And you also spoke with a coworker,
12  Matthew Henry?
13    A.    Right.
14    Q.    What did you talk to him about?
15    A.    About the 1-4 rider, to make sure they
16  review all documents and understand them, that's
17  it, because they homeowners.
18    Q.    So you were sort of giving him advice?
19    A.    Right.
20    Q.    What did he say in response?
21    A.    Oh, wow.  That's all you can say,
22  because these things you're not aware of.
23    Q.    I'm sorry, say that again.
24    A.    I say these are things you're not aware

Page 48

1  of when you're buying property.
2    Q.    Did you say anything else?
3    A.    No.
4    Q.    Did you talk about anything else?
5    A.    No.
6    Q.    And what about -- is it Ms. Tekeisa
7  Cooley?
8    A.    Yes.
9    Q.    What did you talk to her about?
10    A.    Same thing, because they just bought
11  property.
12    Q.    Did you talk to them at the same time?
13    A.    Yes.
14    Q.    And what did she say?
15    A.    She said she'd have her mom look into
16  that, that's something else.  And that was the end
17  of the conversation.
18    Q.    So they already had homes with
19  mortgages?
20    A.    She just -- her mom just purchased a
21  mortgage two weeks ago.
22    Q.    And you said you're not -- you don't
23  know any of the other named plaintiffs other than
24  Ms. Navara?

Page 49

1    A.    No, I don't know him, just know the
2  name.
3    Q.    You just recognize the name?
4    A.    Yes.
5    Q.    And you don't know anybody who --
6  potentially in the punitive class who may have had
7  a mortgage loan with Long Beach?
8    A.    No.
9    MR. CROWSON:  You guys want to take a break
10  for five minutes.
11    MS. COMBS:  I would love to take a break.
12    THE VIDEOGRAPHER:  Going off the video record
13  at 10:56 a.m.
14      (WHEREUPON, a recess was had.)
15    THE VIDEOGRAPHER:  We're going back on video
16  record at 11:09 a.m.
17    MR. CROWSON:  Mr. Stinson, I'm going to hand
18  you several series of documents, and just ask you
19  a few questions about each one.
20      (WHEREUPON, a certain document
21      was marked Stinson Deposition
22      Exhibit No. 1, for
23      identification, as of 4/21/08.)
24

13 (Pages 46 to 49)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 50

BY MR. CROWSON:
1   BY MR. CROWSON:
2       Q.   Mr. Stinson, I'm going to hand you
3   what's been marked as Exhibit 1.  I have a copy
4   for you.
5       MS. COMBS:  Okay.  Great.  Thanks.
6       MR. ASCHENBRENER:  Thank you.
7       MR. CROWSON:  For the record, it's a copy of
8   the consolidated class action complaint without
9   exhibits.
10  BY MR. CROWSON:
11      Q.   Mr. Stinson have you -- I'm sorry, just
12  let me know when you've flipped through it enough.
13      A.   I read it.
14      Q.   Have you ever seen a copy of this
15  document before?
16      A.   Yes.
17      Q.   Do you know if -- have you ever seen a
18  draft of this document?
19      A.   No.
20      Q.   So the only version that you saw was a
21  final version after it was filed?
22      A.   I guess this --
23      MS. COMBS:  I just -- objection to the
24  question because I think a draft and a final

Page 51

1   document after filing -- you could have a final
2   document before filing.
3       MR. CROWSON:  Okay.
4   BY MR. CROWSON:
5       Q.   Have you ever seen a draft of the
6   consolidated class action complaint?
7       A.   No.
8       Q.   Do you know if you saw a final version
9   of the complaint before it was filed?
10      A.   This is what I saw.
11      Q.   What you saw was the final version --
12  is that a yes?
13      A.   Yes, I guess, you know, this is what I
14  saw.  I'm not going to say.  This the lawyer's
15  thing, so...
16      Q.   Do you remember when you saw it?
17      A.   Yes.
18      Q.   Was it -- do you know if it had already
19  been filed with the court?
20      A.   I couldn't tell you that.
21      Q.   Can you turn to page 3.  And the
22  paragraph that is number 13, it says, "Plaintiff,
23  Albert Stinson, obtained the loans for personal
24  family or household purposes, mainly the

Page 52

1   refinancing of prior debts incurred for such
2   purposes."
3           Do you see what I'm talking about?
4       A.   Yes.
5       Q.   Correct me if I'm wrong, but I think
6   your earlier testimony was that you got the Long
7   Beach mortgage to buy the house at 5402 South
8   Shields?
9       A.   Yes.
10      Q.   Did you use any part of that to pay for
11  other debts?
12      A.   No.
13      Q.   That's all I have.
14          (WHEREUPON, a certain document
15          was marked Stinson Deposition
16          Exhibit No. 2, for
17          identification, as of 4/21/08.)
18  BY MR. CROWSON:
19      Q.   Now I'm going to hand you what I'm
20  going to mark as Exhibit 2 -- I'm done with that
21  one -- for the record, Exhibit 2 is a copy of the
22  third amended complaint class action without
23  exhibits.
24          Let me know when you've had a chance to

Page 53

1   flip through it.
2       A.   I'm ready.
3       Q.   The only questions I have are do you
4   remember seeing a -- have you ever seen a copy of
5   this --
6       A.   Yes.
7       Q.   -- complaint before?
8       A.   Yes.
9       Q.   Do you remember seeing a draft or a
10  final version?
11      A.   Is this what I saw?  Like I said, I'm
12  going to leave that to my counsel.  I just
13  remember seeing this paper.
14      Q.   Do you know if it was before or after
15  it was filed with the court?
16      A.   No.
17      Q.   All right.  That's all I have.  You can
18  set it aside.
19          I'm going to mark this as Exhibit 3.
20          For the record I'm marking as Exhibit 3
21  plaintiff Albert Stinson's responses to Long
22  Beach's first set of discovery requests.
23          (WHEREUPON, a certain document
24          was marked Stinson Deposition

14 (Pages 50 to 53)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 54

1          Exhibit No. 3, for
2          identification, as of 4/21/08.)
3     THE WITNESS:  I'm ready.
4  BY MR. CROWSON:
5     Q.    Okay.  Have you ever seen a copy of
6  this document before?
7     A.    Yes.
8     Q.    Do you recall when --
9     A.    Yes.
10     Q.    About when that was?
11     A.    Last week.
12     Q.    Was it -- do you recall being sent a
13  version of this document that only had the
14  questions?
15     A.    I don't recall.
16     Q.    Was the version that you saw have
17  answers already filled in?
18     A.    Like I say, this -- I remember this top
19  sheet and I looking through it.  But I didn't get
20  through it thoroughly because I didn't understand
21  it.  So that's what --
22     Q.    Did you read the answers to the
23  questions?
24     A.    No.

Page 55

1     Q.    Did you read the questions?
2     A.    Say I didn't even get through the
3  middle of it.
4     Q.    So you just read like the cover page?
5     A.    Yes, I saw the MDL, and I flipped two
6  or three pages.  I saw the plaintiff, and I didn't
7  go into no more detail about it.
8     Q.    Turn to page 9 -- actually the question
9  starts on the page before, and it's asking you to
10  identify various people who may have knowledge of
11  this litigation.
12     A.    Okay.
13     Q.    And one of the answers on page 9 is
14  Brent Claire with Park West Mortgage.  Do you see
15  that?
16     A.    Yes.
17     Q.    Do you know who that is?
18     A.    He's my loan guy.
19     Q.    Did you know him before you got your
20  mortgage loan with Long Beach?
21     A.    Yes.
22     Q.    Professionally or just personally?
23     A.    Professionally.
24     Q.    Had he helped you out with other loans

Page 56

1  before?
2     A.    Yes.
3     Q.    Have you spoken with him about this
4  lawsuit?
5     A.    No.
6     Q.    Have you ever spoken with him after you
7  got your Long Beach mortgage loan?
8     A.    No.
9     Q.    Was he at the closing?
10     A.    Yes.
11     Q.    What was his role, so to speak, for the
12  closing?
13     A.    Doing his job.  I know he needed to be
14  there.
15     Q.    Did he explain any documents to you?
16     A.    Not really.
17     Q.    What did the have to do though, for his
18  job, to be there?
19     A.    See, I don't get into that.  I know he
20  just had to be present, you know.
21     Q.    But you didn't really understand what
22  he needed to do?
23     A.    No, no. Pick up a check.
24     Q.    I guess that's the most important

Page 57

1  thing.
2          If we can go to -- it's near the end,
3  after the actual cleaning -- there's a page that
4  says Exhibit A; it's really the last, like, five
5  pages.
6     A.    You said the last five pages?
7     Q.    Yeah.  It starts Exhibit A.
8     A.    Okay.
9     Q.    And then if you turn to the next
10  page -- I'm sorry, you were at it.  At the top
11  right-hand corner there's letters that say
12  Stinson 1?
13     A.    Yes.
14     Q.    Those are Bates stamps that lawyers put
15  on documents so we know where they're at.  If you
16  can turn to the one that's marked Stinson 2.  It
17  appears to be a settlement statement for the house
18  that you bought at 5937 West Iowa Street?
19     A.    Yes.
20     Q.    And it says "Settlement date,
21  August 2006"?
22     A.    Yes.
23     Q.    Is that when you bought the house at
24  West Iowa Street?

15 (Pages 54 to 57)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 58

1    A.    That's when I closed on it, yes.
2    Q.    At that time, where were you living?
3    A.    I was still staying in Bellwood.
4    Q.    At the 127 Bellwood?
5    A.    At the 127 Bellwood, right.
6    Q.    So you hadn't sold that house yet?
7    A.    No.
8    Q.    And had you sold the 5402 South Shields
9  house yet?
10    A.    No.
11    Q.    Had you ever moved into the 5402 South
12  Shields house?
13    A.    No.
14    Q.    And were you renting either part --
15    A.    Yes.
16    Q.    Let me finish.  Were you renting either
17  part of 127 Bellwood or 5402 South Shields?
18    A.    I was staying at 127 for personal.  I
19  was renting 5402 to help me with that mortgage
20  until I got something done with it.
21    Q.    How many leases did you have for 5402?
22    A.    One.
23    Q.    And who was that lease to?
24    A.    Jasper Tabb.

Page 59

1    Q.    I'm sorry, spell --
2    A.    Jasper, J-a-s-p-e-r, T-a-b-b.
3    Q.    Did you have a written lease with him?
4    A.    All my documents got destroyed.
5    Q.    But you had one before it got
6  destroyed?
7    A.    No, I never got a written because he's
8  a friend of mines, and I didn't get a written
9  lease up.
10    Q.    Was it a verbal agreement between you
11  two?
12    A.    Right.
13    Q.    How much was the rent?
14    A.    750.
15    Q.    Was that person the tenant that was
16  living there before you bought the house?
17    A.    No, actually I told the former owner to
18  tell the tenant, you know, to move, because he was
19  up in the air about getting a new owner and plus I
20  wanted the third floor.  He was staying on the
21  third floor and that's the one I wanted because it
22  had three bedrooms up there.  And that's the one I
23  was going into.
24    Q.    Oh --

Page 60

1    A.    The top floor had three bedrooms.
2  That's the one that the former tenant was living
3  in.  That's the one I wanted to go stay in.
4    Q.    And when you say third floor, you mean
5  there's a basement, first floor and second floor?
6    A.    Yeah.  Yeah.
7    Q.    How much -- do you know how much the
8  original tenant was paying in rent?
9    A.    I don't.  I know he was Section 8 up
10  there, so I couldn't really tell you.
11    Q.    Yeah, but do you know a ballpark?
12    A.    Maybe like 850.  That's what they run,
13  anywhere between 850, 750 for those units out
14  there.
15    Q.    So did you go to the lower end, around
16  750, because you were giving the lease to your
17  friend?
18    A.    No, but that's -- I was just being
19  fair.  That what they was asking for, you know.
20    Q.    If you look at the -- on the page
21  Stinson 2 in the box G, where it says "property
22  location," do you see where I'm talking about?
23  It's on the -- kind of in the middle on the left
24  side?

Page 61

1    A.    Yeah, I see.  Yeah.
2    Q.    It describes it as 5937 West Iowa
3  Street, Chicago, Illinois, Cook County, Illinois.
4  Then lots, looks like 7 and 8?
5    A.    Right.
6    Q.    Is it two pieces of property on that
7  address?
8    A.    No.
9    Q.    Do you know why it's referred to as
10  lots 7 and 8?
11    A.    I have no idea.
12    Q.    Is it a single-family or multi-unit?
13    A.    Single family.
14    MR. CROWSON:  We're going to take a quick
15  break to change the tape.
16    THE VIDEOGRAPHER:  We're going off the video
17  record at the end of tape one at 11:23 a.m.
18        (WHEREUPON, discussion was had
19        off the record.)
20    THE VIDEOGRAPHER:  We're going back on the
21  video record at the start of tape two at
22  11:25 a.m.
23  BY MR. CROWSON:
24    Q.    Why don't you hold on to the discovery

16 (Pages 58 to 61)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 62

1   answers, Exhibit 3. And I'm going to mark as
2   Exhibit 4 the verification for those discovery
3   requests.
4           I'll make one extra copy for this.
5                   (WHEREUPON, a certain document
6                   was marked Stinson Deposition
7                   Exhibit No. 4, for
8                   identification, as of 4/21/08.)
9   BY MR. CROWSON:
10      Q.   Is that your signature, Mr. Stinson?
11      A.   Yes, it is.
12      Q.   What's your understanding of why you
13  needed to sign this document?
14      A.   Just verify things that I went over,
15  you know.
16      Q.   Was it to verify the information in
17  Exhibit 3?
18      MS. COMBS: Want to look at the title of
19  Exhibit 3.
20  BY MR. CROWSON:
21      Q.   Or do you know?
22      A.   Yeah, I -- yes.
23      Q.   That's all I have. I'm done with that,
24  you can set that aside -- you can set both of

Page 63

1   those aside.
2           Earlier, Mr. Stinson, you explained a
3   package of materials that Mr. Hofeld had sent to
4   you in the mail. Did you retain everything that
5   Mr. Hofeld delivered to you?
6       A.   It's right there, it's what I have,
7   right there.
8       Q.   Was there a -- I thought you may have
9   said earlier --
10      A.   There was a first initial letter.
11      Q.   There was a cover letter?
12      A.   No, it was a letter before that.
13      Q.   Did you save that?
14      A.   No. I thought I did, I don't have it.
15      Q.   You just may have happened to throw it
16  away at some point?
17      A.   Right.
18      Q.   I just want to mark this for the
19  record.
20                  (WHEREUPON, a certain document
21                  was marked Stinson Deposition
22                  Exhibit No. 5, for
23                  identification, as of 4/21/08.)
24

Page 64

1   BY MR. CROWSON:
2       Q.   I'm handing you what I've marked as
3   Exhibit 5. Can you just confirm that that's the
4   packet of materials that you did retain --
5       A.   Yes.
6       Q.   -- from Mr. Hofeld?
7       A.   Yes.
8       Q.   Okay. You can set it aside.
9           Earlier you gave a very good and
10  accurate summary of your claim against Long Beach
11  when you said that it's the failure to disclose a
12  security interest via the 1-4 family rider.
13          Have you -- is that understanding based
14  solely on information that you got from your
15  attorneys?
16      A.   No.
17      MS. COMBS: Well -- okay.
18  BY THE WITNESS:
19      A.   No, because I feel like I'm highly
20  educated enough to understand that without a
21  lawyer, you know.
22  BY MR. CROWSON:
23      Q.   And when again was it that you first
24  started feeling that Long Beach had violated the

Page 65

1   Truth in Lending Act?
2       MS. COMBS: I'm going to object. I believe
3   that was asked and answered. But, he can answer.
4   BY THE WITNESS:
5       A.   When I received those documents stating
6   that they have a right to my personal property.
7   BY MR. CROWSON:
8       Q.   And that was around January of 2007?
9       A.   Yes. When I first made -- made aware
10  of what this thing -- this whole thing was about.
11      Q.   Did you have any understanding as to
12  how Mr. Hofeld had a copy of your mortgage or your
13  1-4 family rider?
14      MS. COMBS: Now I'm going to caution you not
15  to answer as to what Mr. Hofeld told you or what
16  you told Mr. Hofeld. But if you can answer
17  that --
18      MR. CROWSON: If you know.
19      MS. COMBS: -- based on your knowledge --
20  BY THE WITNESS:
21      A.   That's what lawyers do, they do they
22  own work.
23  BY MR. CROWSON:
24      Q.   I want to talk about the actual Long

17 (Pages 62 to 65)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 66

1  Beach mortgage loan that you got. Do you recall
2  that was around April 12th, 2006?
3      A.   Yes.
4      Q.   How did you go about starting the
5  process to get a loan?
6      A.   Like I said, I -- Brent Claire from
7  prior business. And like I say, I actually felt
8  that he was doing something fraudulent.
9      Q.   Why do you say that?
10     A.   He kept shopping my loan.
11     Q.   Shopping your loan to different
12 lenders?
13     A.   Yeah, he kept shopping me.
14     Q.   And offering different loan products
15 from different lenders?
16     A.   Yes.
17     Q.   And why did you feel that that was
18 wrong?
19     A.   Because when I really looked at my
20 interest rate, I could have got a better interest
21 rate at that time.
22     Q.   So you feel that Mr. Park --
23     A.   Brent Claire.
24     Q.   Brent Claire, I'm sorry -- Brent Claire

Page 67

1  didn't get you the best interest rate that you
2  could have gotten?
3      A.   Right.
4      Q.   It was -- what's the name of his
5  company?
6      A.   He's not with them anymore, but the
7  first company was Park West Mortgage.
8      Q.   That was where he was at when you got
9  your loan?
10     A.   Yes.
11     Q.   Had you already signed a purchase
12 contract for the house when you started applying
13 for a loan?
14     A.   No, I don't recall.
15     Q.   Were you just -- you were trying to
16 figure out what kind of loan you could get?
17     A.   Right.
18     Q.   And when did you become aware that Long
19 Beach would be the lender for your loan?
20     A.   The very last minute. I actually -- I
21 actually was through another lender. Then at the
22 last minute, he come with this -- saying that it
23 did fall through with the previous lender. Then
24 he say, Well, I have someone that can accept you,

Page 68

1  which was Long Beach. And I wanted to get the
2  property, and I went with it.
3      Q.   Do you have -- did you have any
4  communications with anyone at Long Beach before
5  then?
6      A.   No.
7      Q.   Have you had any communications since
8  you got your loan?
9      A.   Hadn't even heard of Long Beach.
10     Q.   At that time did you feel that the loan
11 that Mr. Claire got you was not the best loan you
12 could have gotten?
13     A.   Yes.
14     Q.   Did you raise that with him?
15     A.   Yes.
16     Q.   What did he say?
17     A.   We don't even talk right now, so...
18     Q.   Why do you say that?
19     A.   I say we don't talk because I was
20 pretty hot.
21     Q.   You mean you don't talk to him now?
22     A.   Right. Right.
23     Q.   But what I'm asking about is at the
24 time, around April of 2006, when he told you that

Page 69

1  he was going to get you a loan with Long Beach,
2  did you feel that it wasn't the best loan
3  possible?
4      A.   After I sat and thought about it. But
5  like I said, I was so gung ho into getting this
6  property that I didn't think of at the time. But
7  the minute I signed those papers, I looked over
8  the thing and I was like, wow, I got screwed on
9  this.
10     Q.   Like on the day of the closing you
11 looked over the papers?
12     A.   Yes.
13     Q.   And did you raise it with him then?
14     A.   Right. I felt -- I told him he should
15 have got me a better deal than that. But I know
16 it's money -- it's money.
17     Q.   What did he say in response?
18     A.   He really didn't say, kind of was
19 quiet. So I hit a nerve.
20     Q.   Did you call anybody up at Long Beach?
21     A.   I actually called and filed a complaint
22 with -- what's the people that police these type
23 of -- I can't think of the name, but you can call
24 a complaint and -- on lending companies if you

18 (Pages 66 to 69)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 70

1 think you wasn't treated fairly.
2     Q.   Was it like the Better Business Bureau
3 or like the FTC or some kind of consumer
4 organization?
5     A.   Yeah, some type.  And they never
6 followed back in on me, so...
7     Q.   Did you keep a copy of that?
8     A.   No.
9     Q.   Was that something that you did online?
10     A.   Over the phone.  I called and talked
11 with someone.  They said they was going to submit
12 it in, and they give me a response back.  I hadn't
13 had a response back from it.
14     Q.   You never got anything in the mail in
15 response?
16     A.   No.
17     Q.   And you don't remember the name of the
18 agency or the group that you called?
19     A.   No.  No.
20     Q.   Where did you get the number from?
21     A.   Where did I get that number from?  I
22 think it was on some of those CIA's them credit
23 reporting agencies where you can report stuff like
24 this here.

Page 71

1     Q.   So maybe one of the credit bureaus?
2     A.   Yeah.
3     Q.   Now do you have any -- other than the
4 1-4 family rider, are you claiming that Long Beach
5 got you a loan that was at too high of an interest
6 rate?
7     A.   Yes.
8     MS. COMBS:  I guess I would ask you to
9 clarify.  Are you talking about part of the
10 lawsuit, or is that his separate contention.
11 BY MR. CROWSON:
12     Q.   Right.  In this lawsuit that we're
13 talking about today, do you have a claim that Long
14 Beach in some way improperly got you a loan at too
15 high of an interest rate?
16     A.   No.  My claim is with that 1-4.  I have
17 no other claim with them except what's in that
18 1-4.
19     Q.   But you were upset at the time that you
20 got a loan that was too high?
21     A.   Right.
22     Q.   And you've since paid off the loan?
23     A.   Yes.  To my knowledge, the investor
24 paid it off.  Like I say, I gave it to them.  I

Page 72

1 don't know what they even done with the property.
2 But it's paid off according to my statements from
3 the bank.
4     Q.   Did you get it paid off as part of your
5 closing with the investor?
6     A.   Yes.
7     Q.   So you didn't transfer the loan or
8 assign it to the new investor?
9     A.   No.
10     Q.   About how many conversations did you
11 have with Mr. Claire before you went to your
12 closing?
13     A.   Maybe one or two, just talking about
14 the closing, the closing location, and that's it.
15     Q.   Did he, you know, get information from
16 you for a loan application?
17     A.   When, after wise?
18     Q.   Before the loan closing?
19     A.   No.
20     Q.   Did he prepare a loan application for
21 you to sign?
22     A.   Yeah, prior to me getting the loan.
23     Q.   I guess what I'm asking is did you talk
24 to him before you signed the application for him

Page 73

1 to get the information to put on there?
2     A.   Yes.
3     Q.   And you haven't had any written
4 communications or verbal communications with
5 anyone at Long Beach about your loan?
6     A.   No. Because right after that Long Beach
7 sold my loan, so...
8     Q.   You know who they sold it to?
9     A.   Washington Mutual.
10     Q.   Is that where you sent your payments,
11 to Washington Mutual?
12     A.   Yes.
13     Q.   Do you remember when you signed a loan
14 application?
15     A.   August -- April, I mean -- probably
16 March -- right before I -- maybe a month or so
17 before.
18     Q.   Before the closing?
19     A.   Yeah.
20     Q.   Or during?
21     A.   Before the closing.
22     Q.   Did you have to provide any information
23 to Mr. Claire in terms of financial data like tax
24 returns or W-2 forms?

19 (Pages 70 to 73)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 74

1    A.    Yes.  Yes.
2    Q.    Do you know if you had to give him any
3  leases on the property at that time?
4    A.    No.
5              (WHEREUPON, a certain document
6              was marked Stinson Deposition
7              Exhibit No. 6, for
8              identification, as of 4/21/08.)
9  BY MR. CROWSON:
10    Q.    Mr. Stinson, I've handed you what's
11  been marked as Exhibit 6, which is a copy of a
12  uniform residential loan application, which your
13  attorney has produced, has a Bates stamp at the
14  lower right-hand corner Stinson 44 to Stinson 47.
15    A.    Okay.
16    Q.    Just let me know when you've had a
17  chance to flip through it.  You're ready?
18    A.    Yeah.
19    Q.    Do you remember having to get two
20  mortgage loans in order to buy it?
21    A.    Yes.
22    Q.    Do you know why you had to do that?
23    A.    Because combination loan.  I didn't
24  apply for the FHA, so they say you could do a

Page 75

1  conventional for me.
2    Q.    Was that an 80 percent loan?
3    A.    80/20.  Yeah, 80/20.
4    Q.    So could you finance 100 percent of the
5  purchase price?
6    A.    Yes.
7    Q.    So if you look at the amount section
8  for this, what's been marked as Exhibit 6, it says
9  100 and -- I guess that's 48,000?
10    A.    Yes.
11    Q.    Would this be the loan application for
12  your first mortgage loan, the 80 percent loan?
13    A.    Yes.
14    Q.    If you look a few more lines down, it
15  says "Title will be held in what name."  And then
16  it says, "Albert Stinson and Lawrence Reddit."
17    A.    Right.
18    Q.    Who is Mr. Lawrence Reddit?
19    A.    Lawrence actually was going to come in
20  and stay in the other unit, but he didn't.  At the
21  last minute he backed down.
22    Q.    He was going to stay in as a tenant?
23    A.    Yes.  He was going to be my second
24  tenant, and I'd be the first tenant of my own

Page 76

1  property.  But he backed out at the end.
2    Q.    Was he going to be the owner of the
3  house, or just you?
4    A.    Just me.  I don't even know why he put
5  that there.
6    Q.    If you flip to page -- the third page
7  in, which is marked Stinson 46, near the bottom,
8  borrower's signature?
9    A.    Yes.
10    Q.    Is that your signature?
11    A.    Yes.
12    Q.    Is that your handwriting for the date?
13    A.    Yes.
14    Q.    And or the next page at the bottom, is
15  that your signature and handwritten date?
16    A.    Yes.
17    Q.    If you look at the third page at the
18  top, it says "Schedule of Real Estate," and then
19  it lists your house at 127 Bellwood in Bellwood?
20    A.    Yes.
21    Q.    Couple of rows over, it says "current
22  or gross rental income 1250."  Do you see where
23  I'm talking about?
24    A.    Yes.

Page 77

1    Q.    Do you know why there was a rental
2  income designated for that property?
3    A.    I have no idea.
4    Q.    You didn't rent it out at that time?
5    A.    No.
6    Q.    And were you going to rent it out
7  afterwards?
8    A.    Is you talking about 5402 South
9  Shields?
10    Q.    No, no, I'm talking about 127 Bellwood.
11    A.    No, that was my house.
12    Q.    I guess what I'm asking is after you
13  purchased 5402, did you intend to --
14    A.    Rent my former house?
15    Q.    Right.
16    A.    No.
17    Q.    And if you go to the second page, at
18  the top it lists employment income of borrower,
19  $4200.  On the second page, I think you were --
20    A.    Okay.
21    Q.    And then lower down on that column it
22  lists "other," $900.
23    A.    Yes, I see it.
24    Q.    Do you know what that is referring to?

20 (Pages 74 to 77)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 78

1    A.    No.
2    Q.    If you look in the next little section,
3  there's an entry that says "Subject property
4  rental income." Then it says $900?
5    A.    Yes, I see it.
6    Q.    Do you know why that was listed there?
7    A.    No.
8    Q.    Did you have any intention to rent it
9  out for $900 a month?
10   A.    No, I did not. I told you what my
11  intention was earlier.
12   Q.    That was to rent it to your friend for
13  750?
14   A.    To buy it for me and to rent -- to help
15  me pay that mortgage. That was my purpose.
16   Q.    To live in it?
17   A.    To live in it.
18   Q.    And rent part of it?
19   A.    Yes. Look like Brent did a number on
20  this.
21   Q.    I'm sorry?
22   A.    I was just talking to myself. Looking
23  like Brent -- wow.
24   Q.    You think he did something wrong with

Page 79

1  the application?
2    A.    Want to keep my personal opinions to
3  myself.
4    MS. COMBS: Well, I think you can answer that
5  question.
6    THE WITNESS: Yeah. Because I don't remember
7  seeing these -- these numbers.
8  BY MR. CROWSON:
9    Q.    Did you look over this before you
10  signed it?
11   A.    No. That was my fault.
12   Q.    And are you referring to the $900,
13  that's a mistake?
14   A.    Right. Right.
15   Q.    And what about the 4200?
16   A.    The 4200, right. I don't see where
17  them numbers coming from.
18   Q.    Because $4200 a month would be more
19  than $24,000?
20   A.    Right. That's why I don't understand
21  where they coming from.
22   Q.    Do you have any idea why Mr. -- why
23  Brent Claire would have put inaccurate figures in
24  the loan application?

Page 80

1    A.    You know, if you're in a loan business,
2  you do what you do to get the loan, you know. I
3  don't ask questions. I don't know how -- what he
4  did -- but he made it happen. Maybe he plugged
5  things in he shouldn't have plugged in. I don't
6  know. That's what I'm figuring.
7    Q.    Would you agree with me that a lender
8  like Long Beach relies on the information in the
9  application to determine whether to give a person
10  a loan?
11   A.    Do you want me it answer that
12  personally or --
13   Q.    Yeah. I'm just asking your personal --
14   A.    I just think they all crooks, man. And
15  they do --
16   MS. COMBS: Wait a minute. Listen to his
17  question.
18   THE WITNESS: Okay. I guess you say -- you
19  said --
20   MS. COMBS: Could you read the question back?
21   MR. CROWSON: I'll rephrase it.
22  BY MR. CROWSON:
23   Q.    Would you agree with me that a lender
24  like Long Beach relies on the accuracy of

Page 81

1  information in a loan application in order to
2  determine whether to give a borrower like you a
3  loan and whether to set a certain interest rate
4  for the loan?
5    A.    Part yes and part no.
6    Q.    Why part yes and part no?
7    A.    Because this wasn't accurate.
8    Q.    I guess what I'm asking -- I understand
9  that you say that this one is inaccurate. But do
10  you have any reason to suspect that Long Beach
11  would have known that these figures are
12  inaccurate?
13   A.    No.
14   Q.    And I guess what I'm asking is Long
15  Beach has to rely on --
16   A.    The information they -- given to them.
17   Q.    Would you agree with that?
18   A.    Yes.
19   Q.    And then why would you say part no,
20  just because some of the information on yours is
21  inaccurate?
22   A.    It's just personal things, man.
23  That -- I just have personal problem with lending
24  services, how they go about, you know, doing

21 (Pages 78 to 81)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 82

1 things with people.
2    Q.    Lenders and mortgage brokers?
3    A.    Yes.
4    Q.    And why do you think that they're
5 crooks?
6    A.    Look at the mess we're in now.
7    Q.    You're referring to the --
8    A.    The financial mess -- I mean the
9 mortgage.
10    Q.    Do you have any other, like, examples
11 or just kind of more details why you think they're
12 not doing the right thing?
13    A.    Just the mortgage crisis, you know.
14 They should be accountable for that because they
15 do give out the loans, you know.  That's just my
16 personal opinion.  Stay away from that though.
17    Q.    Did you know how much you were going
18 to -- how much were your monthly payment was going
19 to being under the Long Beach mortgage loan?
20    A.    Yes.
21    Q.    What was the monthly mortgage payment?
22    A.    I'm thinking it was -- okay, I know
23 probably like around 1500.  That's with taxes and
24 insurance included.  So in that ballpark.

Page 83

1    Q.    Were you uncomfortable with that amount
2 in terms of being able to pay it every month?
3    A.    Well, like I say, my plan was to go in
4 there and live in there myself and to have the
5 other 750.  So it wouldn't have been a problem.
6    Q.    So you were going to use part of the
7 lease money to pay the mortgage?
8    A.    Yes.  Yes.
9    Q.    I'm going to mark a second loan
10 application just to get you to verify your
11 signature.
12             (WHEREUPON, a certain document
13             was marked Stinson Deposition
14             Exhibit No. 7, for
15             identification, as of 4/21/08.)
16 BY MR. CROWSON:
17    Q.    I'm handing what what's been marked as
18 Exhibit 7.  It's a uniform residential loan
19 application produced by your attorneys bearing the
20 Bates range Stinson 35 through Stinson 38.
21             If you flip to the third page, which is
22 marked Stinson 37, in the section borrower's
23 signature, is that your signature?
24    A.    Yes.

Page 84

1    Q.    Is that your handwriting for the date?
2    A.    Yes.
3    Q.    And on the next page, page 4 at the
4 bottom, borrower's signature, is that your
5 signature?
6    A.    Yes.
7    Q.    And the handwriting is yours for the
8 date?
9    A.    Yes.
10    Q.    All right.  And if you look at the
11 first page in the amount section, I think it looks
12 like --
13    A.    37,000.
14    Q.    This would be for the second mortgage
15 loan, the 20 percent?
16    A.    Yes.
17    Q.    And again, we don't have to spend as
18 much time, but if you look at the second page, it
19 has the same information about your income?
20    A.    Right.
21    Q.    The 4200 per month and the 900 rental
22 income?
23    A.    Yes.
24    Q.    And it's your testimony that that's not

Page 85

1 accurate information?
2    A.    Yes.
3    Q.    And the same for on page 3, where it
4 lists your address at 127 Bellwood as gross rental
5 income 1,250?
6    A.    Yes.
7    Q.    That's not accurate?
8    A.    That's not accurate, right.
9    Q.    And you didn't provide that information
10 to Mr. Claire, the monthly income or the rental
11 income information?
12    A.    No, I didn't.
13    Q.    He put that on there?
14    A.    He had to because I wouldn't written
15 anything.
16    Q.    Just want to get to you verify
17 another of your signatures.
18             (WHEREUPON, a certain document
19             was marked Stinson Deposition
20             Exhibit No. 8, for
21             identification, as of 4/21/08.)
22 BY MR. CROWSON:
23    Q.    Mr. Stinson, I'm going to hand you
24 what's been marked as Exhibit 8, which a one-page

22 (Pages 82 to 85)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 86

1  document bearing the Bates stamp Long Beach
2  MDL 00612.
3      Are you ready?
4      A.  Yes.
5      Q.  Is that your signature at the bottom?
6      A.  Yes, it is.
7      Q.  Do you recall writing this note or
8  letter?
9      A.  Yes, I have some recollection of it.  I
10 actually forgot about it, but I have some
11 recollection of it.
12     Q.  Did you type this up and sign it?
13     A.  Yes.
14     Q.  Do you know why you had to -- did you
15 submit this to somebody?
16     A.  I think I submitted to Brent.  I think
17 he said I needed to submit this, if I'm not
18 mistaken.  Part of the loan processes or
19 something, he said I needed to have something like
20 this here.  I can't really tell you why, but I
21 recall me typing this up and being thorough like
22 this here.
23     Q.  All right.  That's all I wanted to know
24 about it.

Page 87

1      That's all I have with that one, you can
2  set it aside if you want.
3      MR. CROWSON:  I'm almost done.  But if you
4  guys want to take another like five-minute
5  break --
6      MS. COMBS:  Okay.  That would be great.
7      THE VIDEOGRAPHER:  We're going off the video
8  record at 11:55 a.m.
9          (WHEREUPON, a recess was had.)
10     THE VIDEOGRAPHER:  We're going back on the
11 video record at 12:07 p.m.
12 BY MR. CROWSON:
13     Q.  We're almost done, Mr. Stinson.
14         Was -- did you ever see a copy of the
15 appraisal that was done for the 5402 South Shields
16 Avenue house when you bought it?
17     A.  I actually asked Brent Claire to give
18 me a copy of that appraisal, he never sent it to
19 me.
20     Q.  So you never got one?
21     A.  Never got a copy, no.
22     Q.  But you wanted one?
23     A.  Yes, I'd like to have steps for
24 personal records.

Page 88

1      Q.  Well, we produced one to your lawyer so
2  if you really want one --
3      A.  Yes.
4      Q.  -- they should have it.
5          Was the name of the tenant that was
6  already at 5402 South Shields Darryl Castillo.
7  Does that ring a bell?
8      A.  I have no idea.
9      Q.  So you don't know who the tenant was
10 that lived there?
11     A.  No, I just know it was one there.
12     Q.  And you had never seen a lease by that
13 tenant?
14     A.  No.
15     Q.  Did you execute a real estate purchase
16 contract when you bought the house at 5402?
17     A.  Yes.
18     Q.  That was with Mr. Alonso Hicks?
19     A.  Yes.
20     Q.  Do you recall having to discuss or
21 negotiate any fixtures or personal property that
22 needed to stay on the property?
23     A.  No.
24     Q.  That wasn't discussed at all?

Page 89

1      A.  No.
2          (WHEREUPON, a certain document
3          was marked Stinson Deposition
4          Exhibit No. 9, for
5          identification, as of 4/21/08.)
6  BY MR. CROWSON:
7      Q.  Mr. Stinson, I'm going to hand you
8  what's been marked as Exhibit 9.  It's a copy of a
9  multi-board residential real estate contract,
10 bears the Bates stamp Long Beach MDL 00664 through
11 00671.
12         Are those initials yours in the lower
13 left-hand corner of each page?
14     A.  Yes.
15     Q.  And on the last page, is that your
16 signature near the top on the left where it says
17 "buyer signature"?
18     A.  You say the top on the left?
19     Q.  Yes, on the last page.
20     A.  Yes.
21     Q.  Okay.  That's all I wanted to do with
22 that document.
23         (WHEREUPON, a certain document
24         was marked Stinson Deposition

23 (Pages 86 to 89)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 90

1    Exhibit No. 10, for
2    identification, as of 4/21/08.)
3    BY MR. CROWSON:
4    Q.    Mr. Stinson, I've handed you what was
5    marked as Exhibit 10, which is a copy of a
6    mortgage for your first mortgage loan, bears the
7    Bates stamp Long Beach MDL 00495 through 00515.
8    Is that your initials near the bottom of the page?
9    A.    Yes.
10    Q.    On each page?
11    A.    Yes.
12    Q.    And if you look on page 2, the amount
13    that's secured by the note is $148,000?
14    A.    Yes.
15    Q.    So this would be the mortgage for your
16    first mortgage --
17    A.    First mortgage, yeah.
18    Q.    And let's flip to the page which is 14
19    of 15.
20    A.    You say page 14?
21    Q.    Right.  It has the 508 number at the
22    bottom.
23    A.    Okay.  Okay.
24    Q.    Is that your signature at the top right

Page 91

1    where it says "borrower"?
2    A.    Yes.
3    Q.    And then if we flip a few more pages to
4    514, starts the 1-4 family rider?
5    A.    Yes.
6    Q.    Are those your initials at the bottom
7    right?
8    A.    Yes.
9    Q.    And then the next page, is that your
10    signature?
11    A.    Yes.
12    Q.    Did you look over the 1-4 family rider
13    when you signed it?
14    A.    No.
15    Q.    Did you look over it -- was it included
16    in your package of materials after the loan
17    closing?
18    A.    You said was this included in --
19    Q.    Well, let me back up.  After the
20    closing, were you presented your personal copy of
21    the loan documents?
22    A.    Yes.
23    Q.    Did you take those home with you?
24    A.    Yes.

Page 92

1    Q.    Did you look at any of them when you
2    went home?
3    A.    No.
4    Q.    Do you know if the mortgage and the 1-4
5    family rider were included in that package?
6    A.    Well, they was there when I was
7    informed that I looked through there.  So they was
8    there on the original documentations.
9    Q.    So until you got the package from
10    Mr. Hofeld, had you ever went through and looked
11    at your mortgage documents?
12    A.    Not all the way through.
13    Q.    And you didn't read the 1-4 family
14    rider when you were at the closing?
15    A.    No.
16    Q.    Did you have an attorney there with
17    you?
18    A.    No, because Alonso Hicks, his attorney
19    actually was representing him.  So I felt safe.
20    And I should have had my own personal lawyer
21    there, too, like they advise you to, but I didn't.
22    But like I say, by him being a close friend and,
23    you know, part of the extended family, I just
24    didn't think, you know, to have my own personal

Page 93

1    attorney there.
2    Q.    Who was -- who was at the closing?
3    A.    Alonso Hicks attorney, Charisse Miller,
4    Brent Claire, and someone else.  Everybody that
5    picks up checks, basically.
6    Q.    I'm sorry to cut you off.
7    Who's Charisse Miller?
8    A.    Alonso Hicks' relative who happened --
9    was selling the property.
10    Q.    So it was Mr. Hicks, his agent?
11    A.    Right.
12    Q.    His lawyer?
13    A.    Right.
14    Q.    Mr. Claire?
15    A.    Yes.
16    Q.    And then you?
17    A.    Yes.
18    Q.    What about someone from the title
19    company?
20    A.    Yes, I can't recall the name.
21    Q.    Did anyone explain any of the documents
22    to you as you were signing them?
23    A.    No.
24    Q.    Did Mr. Hicks' attorney tell you

24 (Pages 90 to 93)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 94

1  anything about any of the documents?
2      A.   No.
3      Q.   Did you ask any questions about any of
4  them?
5      A.   I was just signing the documents.
6      Q.   You just signed where they told you to?
7      A.   Yes.
8      Q.   Did you want to ask any questions?
9      A.   No.  Like I said, I just felt -- I felt
10 kind of safe and secure, you know, and that was my
11 fault.  You're never safe and secure in these
12 contracts, so...
13     Q.   So you were okay until after you looked
14 over the documents and you saw the interest rate?
15     A.   Yeah.
16     Q.   And that was the first time that you
17 had any -- being upset about the loan?
18     A.   Right.
19     Q.   Before I ask you a little bit more --
20 more about the rider, let me go ahead and get you
21 to verify one more signature.
22              (WHEREUPON, a certain document
23              was marked Stinson Deposition
24              Exhibit No. 11, for

Page 95

1              identification, as of 4/21/08.)
2  BY MR. CROWSON:
3      Q.   I've handed you, Mr. Stinson, what
4  we've marked as Exhibit 11, a copy of a mortgage,
5  which I believe is for your second mortgage loan.
6  It bears the Bates stamp Long Beach MDL 00773
7  through 779.
8      A.   Yes.
9      Q.   And if you look on the first page, it
10 has the borrower is indebted to lender for
11 $37,000?
12     A.   Yes.
13     Q.   So this would be for your second --
14     A.   Second mortgage.  That's correct.
15     Q.   And is that -- are those your initials
16 at the bottom left corner --
17     A.   Yes.
18     Q.   -- of the page.
19              And then on the bottom right corner of
20 the subsequent pages?
21     A.   Yes.
22     Q.   And if we go to the fifth page, which
23 is marked 777, is that your signature near the top
24 on the left?

Page 96

1      A.   Yes.
2      Q.   And then the next page starts the 1-4
3  family rider.  And on page 779, is that your
4  signature where it says "borrower"?
5      A.   Yes.
6      Q.   So I think you said earlier that you
7  didn't have any agreement or negotiation with
8  Mr. Hicks about any of the fixtures or personal
9  property at the house?
10     A.   As I recall, I just -- I see where I
11 checked them things at, but it was just like I was
12 getting property off his hands.
13     Q.   I mean you're talking about the real
14 estate contract --
15     A.   Right.
16     Q.   -- where you checked a few things?
17     A.   Right.
18     Q.   Did the house have a central air
19 conditioner system?
20     A.   Did I get one installed -- I can't
21 recall.  When I -- no, I don't think so.
22     Q.   Did it have just a -- window AC units?
23     A.   Yeah, yes.
24     Q.   Were those there when you bought the

Page 97

1  house?
2      A.   Yes.
3      Q.   When you sold it to the investors, did
4  you take those out?
5      A.   I did electrical work and some other
6  minor little things that I just gave it to them,
7  because it was -- it wasn't complete.
8      Q.   What do you mean, it wasn't complete?
9      A.   It needed a lot of work did to it,
10 basically, let's put it like that.
11     Q.   A lot of renovations?
12     A.   Yes.
13     Q.   You said you did some electrical work?
14     A.   Yes.
15     Q.   Did you install certain things?
16     A.   Well, they had old -- they had to
17 regrade the wiring because it wasn't GFC
18 certified.  So we had to get it GFC certified.
19     Q.   Got you.  But there wasn't a central AC
20 system?
21     A.   I can't recall.
22     Q.   Do you know for sure if there were
23 window AC units?
24     A.   It was a window in -- I know the guy

25 (Pages 94 to 97)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 98

1  had an air conditioner on the second floor.
2      Q.  And I guess what I'm asking is when you
3  sold it to the investor, did you take that with
4  you?
5      A.  Oh, no, no, I didn't take -- no.
6      Q.  Did you take any part of the electrical
7  system?
8      A.  No.
9      Q.  What about the gas or water?
10     A.  No.
11     Q.  Were there any kind of fire prevention
12  devices in the house?
13     A.  Smoke detector.
14     Q.  Were those there when you bought it?
15     A.  Yes.
16     Q.  Did you take those away?
17     A.  No.
18     Q.  Was there a security system?
19     A.  Yes.
20     Q.  What kind?
21     A.  I think it was ADT, if I'm not
22  mistaken.
23     Q.  Like one that's monitored --
24     A.  Yes, monitored, yes.

Page 99

1      Q.  Did you have that --
2      A.  No.
3      Q.  -- unattached when you left?
4      A.  No.
5      Q.  Did you take any of the plumbing when
6  you left?
7      A.  No.
8      Q.  And I'm sorry, I don't mean to say when
9  you left, when you sold it to the investors?
10     A.  No.
11     Q.  Did you take out any of the bathtubs?
12     A.  No.
13     Q.  What about the water heaters?
14     A.  No.
15     Q.  Do you know what a water closet is?
16     A.  No.
17     Q.  So I guess you didn't take any?
18     A.  No.
19     Q.  What about any of the sinks?
20     A.  No.
21     Q.  Did you take any ovens, ranges, or
22  stoves?
23     A.  No.
24     Q.  What is there a refrigerator there when

Page 100

1  you moved in?
2      A.  Yes.
3      Q.  Did you take that when you left?
4      A.  No.
5      Q.  Was there a dishwasher?
6      A.  No.
7      Q.  What about a garbage disposal in the
8  sink?
9      A.  No.
10     Q.  There wasn't one?
11     A.  No.
12     Q.  Was there a washer and a dryer?
13     A.  No.
14     Q.  Were there any storm windows or patio
15  doors?
16     A.  No.
17     Q.  Did the windows have screens on them?
18     A.  Yes.
19     Q.  Did you take those with you?
20     A.  No.
21     Q.  Did any of the windows have blinds or
22  shades?
23     A.  Yes.
24     Q.  For both or --

Page 101

1      A.  For both, it was some on both floors.
2      Q.  Had blinds and shades?
3      A.  Right -- well, just blinds.
4      Q.  Just blinds.  Did you take any of the
5  blinds when you left?
6      A.  No.
7      Q.  Were there curtains or curtain rods?
8      A.  No.
9      Q.  So it didn't have any curtains at all
10  in the house?
11     A.  No.
12     Q.  Did it have mirrors in any of the
13  rooms?
14     A.  I think it was one -- yes, it was one.
15  Didn't take it.
16     Q.  So it sounded like a lot of work needed
17  to be done.
18         Did it have any cabinets anywhere?
19     A.  Basic, you know, kitchen cabinets.
20     Q.  Did you uninstall those and take them?
21     A.  No.
22     Q.  What kind of flooring did it have?
23     A.  Wood -- well, it was carpeted.
24     Q.  All throughout?

26 (Pages 98 to 101)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 102

1    A.   Yeah.
2    Q.   It was already carpeted?
3    A.   It -- it was messed up, I recarpeted
4    it.
5    Q.   Did you uninstall the carpet when you
6    left?
7    A.   No.
8    MR. CROWSON:  I think that's it.
9    THE VIDEOGRAPHER:  We're going off the video
10   record at 12:23 p.m.
11        (Short pause.)
12   THE VIDEOGRAPHER:  We're going back on the
13   video record at 12:25 p.m.
14   MR. CROWSON:  Mr. Stinson, that's all the
15   questions that I have for you today.  However, as
16   counsel and I just spoke off the record, there's
17   one outstanding discovery issue that may or may
18   not require a resumption of this deposition that
19   we will revisit that question once -- if and when
20   the documents are produced.
21   MS. COMBS:  Okay.  I have a few questions.
22             EXAMINATION
23   BY MS. COMBS:
24   Q.   Now, Mr. Stinson in your deposition

Page 103

1    testimony you testified that you had gone in to
2    meet with the mortgage broker, Mr. Claire -- was
3    that his name?
4    A.   Yes.  Yes.
5    Q.   And at that time you filled out an
6    application?
7    A.   Yes.
8    Q.   Okay.  I want you to look at
9    exhibits -- do you recall what date that
10   approximately was?  Was it in March?
11   A.   Yes, it had to be -- I can't give you
12   an exact date but, it had to be in March sometime.
13   Q.   Was it April 12th that you filled out
14   that written application, the first written
15   application?
16   A.   I can't recall.
17   Q.   Okay.  I'm going to ask you to look at
18   deposition Exhibits No. 6 and 7.  And if you look
19   on the page where your signature is, there are two
20   places where your signature is, 46 and 47 on
21   Exhibit 6.  Do you see the date that was
22   signed?
23   A.   Yeah, 4/12.
24   Q.   So is it your testimony that the

Page 104

1    Exhibits 6 -- was that the same document you
2    signed when you went to Mr. Claire's office back
3    in March?
4    A.   You know, we was faxing the
5    information.  So, yes.
6    Q.   My question is did you -- did you sign
7    an application?
8    A.   Yes.
9    Q.   And what where was the application
10   signed?
11   A.   Oh, the application was signed in his
12   office.
13   Q.   In his office?
14   A.   Yes.
15   Q.   Is this the same document --
16   A.   Yes.
17   Q.   -- the same exact document that you
18   signed in March?
19   A.   Yes -- it has.  Yes.
20   Q.   I mean, do you know for sure if it has
21   the same information that you signed in March?
22   Did you, for example, provide to him in March that
23   your income was $4200 a month?
24   A.   I didn't provide any -- none of that.

Page 105

1    I don't recall providing that, period.
2    Q.   And in the application that you signed
3    in March, did it have income of $4200?
4    A.   I can't recall seeing that because that
5    wouldn't have been accurate.  So...
6    Q.   Okay.  All right.  Then I'm going to
7    ask you to look at Exhibit 8.  Okay.
8        Now you've testified that was your
9    signature at the bottom of this document, correct?
10   A.   Yes.
11   Q.   And that, in fact, you provided the
12   information for --
13   A.   Right.
14   Q.   Okay.  You understand that your prior
15   testimony at this deposition was that you did not
16   plan on renting out your single-family dwelling
17   for $1250 a month, but that you planned on selling
18   it.  What is your explanation for the fact that
19   you put this in this letter?
20   A.   Because at the time I had a tax freeze.
21   I bought my first home from a senior citizen and
22   there was a tax freeze.  So I was saying I could
23   get some income if I would have kept it.  But when
24   the freeze was up, guess what, my taxes went from

27 (Pages 102 to 105)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 106

1  1200 to 3700, so that made my mortgage increase.
2  So bam, that had to get thrown out the window.
3  There was no income there.
4      Q.   So at any time was it your plan to rent
5  out the family dwelling -- the single-family
6  dwelling?
7      A.   Right.  Before they hit me with that
8  tax increase.  And when they hit me with that tax
9  increase, that just cancelled that completely.
10     MS. COMBS:  I have no further questions.
11          FURTHER EXAMINATION
12  BY MR. CROWSON:
13     Q.   As is the case with lawyers...
14          What do you mean -- what was the tax
15  freeze?
16     A.   Senior citizen.  He had a freeze on the
17  tax increase.  When I bought the property, the
18  taxes at the time, I was only paying 1250.  So as
19  I stayed out there for a year, his freeze is up.
20  I didn't qualify for the freeze because I'm not a
21  senior citizen.
22          So I had to pay the regular taxes, which
23  was 3500.  So that means it was a big increase in
24  my mortgage payment because was I was paying my

Page 107

1  insurance through escrow.  And that jacked my
2  mortgage up almost $300 from that increase.
3          And that was my purpose from getting out
4  of Bellwood to, you know, going into Shields as
5  well.
6      Q.   So when you bought the house at 127
7  Bellwood, you bought it from a senior --
8      A.   A senior citizen.
9      Q.   And he was able to benefit from a tax
10  freeze?
11     A.   Yes.
12     Q.   Where the taxes would only be $1200 a
13  month?
14     MS. COMBS:  $1200 a year.
15     THE WITNESS:  Well, actually, the senior
16  citizen had died.  His sons had the property.  The
17  property was in their name.
18     MS. COMBS:  We won't go there.
19  BY MR. CROWSON:
20     Q.   But nonetheless, some kind of way the
21  current owner --
22     A.   Right, was still paying.
23     Q.   -- was able to benefit from a tax
24  freeze?

Page 108

1      A.   Right.
2      Q.   When did the tax freeze end?
3      A.   Maybe after a year I was there.
4      Q.   And when did you start getting there?
5      A.   When I moved in there?
6      Q.   Yeah.
7      A.   I moved in August -- I think August
8  '04, I think -- '04 or '05 something.  And I got
9  it right away because I was still up under the
10  exemption.
11     Q.   I guess what I'm trying to figure out
12  is when did you first realize you were no longer
13  going to benefit from a tax freeze --
14     A.   After the next tax season came.  You
15  know, every year they send you your tax to fill
16  out the tax exemption, and they was on there.  I
17  no longer apply for that because I'm the new owner
18  and I'm not a senior citizen.
19     Q.   I guess what I'm asking --
20     A.   I can't tell you the exact date, you
21  know, whatever time they send out the second
22  installment.  It was the second installment, maybe
23  of '05 or something like that when I received
24  the -- it was the first or second installment,

Page 109

1  either '06, late '05, either one of them.
2      Q.   If you look at the top line of, I think
3  it's Exhibit 8, there's a fax line March 27th,
4  2006?
5      A.   Okay.  Okay.
6      Q.   Do you recall faxing this letter to
7  Mr. Claire on or around March 27, 2006?
8      A.   I had to, the date there.  I don't
9  recall, but...
10     MS. COMBS:  Well, wait a minute.  It's from
11  Park West Mortgage, so it was faxed but it was
12  from Park West Mortgage.
13  BY THE WITNESS:
14     A.   I don't think I faxed these letters to
15  Brent Claire.  I actually think I took this letter
16  in.
17  BY MR. CROWSON:
18     Q.   You hand delivered it to Mr. Claire?
19     A.   Yes.
20     Q.   But would it have been before March 27,
21  2006?
22     A.   I'm trying to see exactly when that tax
23  break came.  Because that's when I first was
24  aware -- like, man, I have to pay $300, I have to

28 (Pages 106 to 109)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 110

1  get up out of this property. So it had to be
2  before that time.
3      Q.   So you wrote this letter before you
4  knew about the change in your tax status?
5      A.   It was in between. I knew I was
6  getting hit with that increase, I just didn't know
7  I was going to get hit right way.
8          So my plan was to go and move in that
9  property at 5402 Shields, save me some money and
10  then maybe get three, $400 extra on my property
11  out in Bellwood.
12          But then like I say, once I saw that
13  that change was coming, I was like I can't keep it
14  because I lose. So I definitely had to sell the
15  property.
16          So I just -- I can't get those dates. I
17  can't recall those dates, man.
18      Q.   Okay. I mean, I hope I'm paraphrasing
19  correctly -- but you knew about a tax change but
20  you weren't sure exactly the extent of it
21  initially?
22      A.   Because I knew I wasn't a senior
23  citizen. So I knew it was coming --
24      Q.   But you just didn't --

Page 111

1      A.   I just didn't know exactly when, right.
2  I didn't know how much time they let you have
3  being a new homeowner to continue to have that
4  exemption.
5      Q.   And was it at that time that you wrote
6  this note marked as Exhibit 8?
7      A.   I can't -- I can't recall. I know I
8  wrote -- I produced a note. He told me to produce
9  a note. I can't recall.
10      Q.   But because of -- as reflected in
11  Exhibit 8, your intention was to move into the
12  house at 5402?
13      A.   Yes.
14      Q.   Rent one unit of it?
15      A.   Right.
16      Q.   And still maintain your house at
17  Bellwood to rent to someone else?
18      A.   Right.
19      Q.   And was the plan to get about $1250 per
20  month from the Bellwood address?
21      A.   If I -- it was feasible at that time
22  until the tax break, like I say.
23      Q.   And were you hoping to get $900 a month
24  in the 5402 South Shields Avenue?

Page 112

1      A.   That's what I was told I could get
2  through if I Section 8 it out. That's what
3  Section 8 was offering.
4      Q.   $900 a month?
5      A.   Yes.
6      Q.   And then when did you change your plan
7  to where you didn't want to rent out the Bellwood
8  address?
9      A.   When them taxes came, when that taxes
10  came, I wouldn't have made any money, period, from
11  that.
12      Q.   Was that after April 12th, 2006, after
13  your loan closing?
14      A.   It had to be. I can't recall, but it
15  had to be.
16      MR. CROWSON: Do we have a minute?
17      THE VIDEOGRAPHER: You've got three minutes
18  left.
19  BY MR. CROWSON:
20      Q.   Your counsel was asking about a loan
21  application that you may have filled out in
22  March 2006. Do you remember filling out a loan
23  application?
24      A.   Yes.

Page 113

1      Q.   Did it have the information filled out
2  already for you just to sign?
3      A.   I didn't -- like I say, I didn't -- I
4  don't want to say Brent, but those numbers wasn't
5  there, because those are not accurate numbers. I
6  mean, I know for sure those numbers wasn't there.
7      Q.   So in March of 2006 you signed an
8  application that had amount information, income
9  information different than what you signed on
10  April 12th, 2006?
11      A.   Like I say, I don't even recall the
12  numbers exactly. Brent Claire told me I could do
13  something that was called stated. I never heard
14  anything like that, where I didn't have to state
15  an income.
16      Q.   You could do it without stating your
17  income?
18      A.   Yes. So like I said, I don't know
19  where those numbers came in there.
20      Q.   Do you remember what was stated on the
21  March '06 application?
22      A.   Like I say, I just -- the guy told me
23  he can give me this loan. Alonso Hicks said he
24  would pay for my closing, so that was a go.

29 (Pages 110 to 113)

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 114

1    Q.    Okay.
2    A.    Once he said he can give me this loan,
3  I didn't ask no questions.  I gave my information
4  to -- all the information that you need to go get
5  about applying for a loan.  I didn't give him no
6  specific numbers because I don't make $4200 -- I
7  don't make nowhere near $4200 a month.
8    Q.    Did you give him -- we can go off.  I
9  just have like two more minutes.
10   THE VIDEOGRAPHER:  We're going off the video
11  record at the end of tape two at 12:36 p.m.
12       (Short pause.)
13   THE VIDEOGRAPHER:  We're going back on the
14  video record at the start of tape three at
15  12:38 p.m.
16  BY MR. CROWSON:
17   Q.    Mr. Stinson, we were talking about your
18  loan application before we went on a quick little
19  break.  Without trying to remember whether the
20  numbers were correct or not, when you filled out
21  or signed an application in March 2006, was there
22  information already filled out on the application?
23   A.    No.
24   Q.    It was completely blank?

Page 115

1    A.    Right.
2    Q.    And did you fill it out?
3    A.    I filled out what I had to fill out.  I
4  didn't fill out everything thoroughly, just the
5  basic information in the -- applying for a loan.
6  I sent them my documents, my financial statements,
7  my W-2 statements, my earnings -- my pay stubs and
8  things like that.
9    Q.    But you didn't write in the income
10  amount?
11   A.    Right, I didn't write the numbers in.
12   Q.    Now on April 12th, 2006, when you
13  signed the two applications that we've marked as
14  Exhibits 6 and 7, was the information already
15  filled out on those applications?
16   A.    I don't recall.  They couldn't have
17  been because, like I say, I wouldn't agree with
18  those numbers because them numbers weren't
19  accurate.
20   Q.    Was the form just blank?
21   A.    Yes.
22   Q.    And then you signed your name to it?
23   A.    Yes.
24   MR. CROWSON:  That's all I have.

Page 116

1       FURTHER EXAMINATION
2  BY MS. COMBS:
3    Q.    Just a little followup question.
4       At the closing on April 12th, 2006, did
5  you get -- did you take an opportunity to review
6  the residential loan application before you signed
7  it?
8    A.    Honestly I didn't.  And like I say, I
9  looked over it and I was just signing there.
10   Q.    So do you recall specifically whether
11  or not there was -- you reviewed the income
12  information on what is now Exhibit 6?
13   A.    I never did because, like I say, I was
14  just too busy.  It was --
15   Q.    And is it possible that the document
16  was typewritten filled out and you didn't actually
17  see that income information?
18   A.    It's very possible because, like I say
19  I wasn't --
20   Q.    There were a lot of documents?
21   A.    Yes.  Yes.
22   MS. COMBS:  Okay.  I have no further
23  questions.
24   MR. CROWSON:  I think you're done.

Page 117

1    MS. COMBS:  We'll reserve signature.
2    THE VIDEOGRAPHER:  We're going off the video
3  record at the end of tape three at 12:40 p.m.
4       This concludes the deposition of Albert
5  Stinson.
6       FURTHER DEPONENT SAITH NOT.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

30 (Pages 114 to 117)

ALBERT STINSON, APRIL 21, 2008
THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

Page 118

1       IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4   LONG BEACH MORTGAGE COMPANY          )
5   TRUTH IN LENDING ACT FAMILY RIDER    ) MDL CASE
6   LITIGATION                 ) NO. CV 06543
7
8
9       I hereby certify that I have read the
10  foregoing transcript of my deposition given at the
11  time and place aforesaid, consisting of Pages 1 to
12  117, inclusive, and I do again subscribe and make
13  oath that the same is a true, correct and complete
14  transcript of my deposition so given as aforesaid,
15  and includes changes, if any, so made by me.
16
17              ALBERT STINSON
18  SUBSCRIBED AND SWORN TO before me
19  this      day of              , A.D. 2008.
20
21      Notary Public
22
23
24

Page 119

1   STATE OF ILLINOIS )
2              ) SS:
3   COUNTY OF COOK   )
4       I, NOREEN S. ERICKSON, a Notary Public
5   within and for the County of Cook, State of
6   Illinois, and a Certified Shorthand Reporter of
7   said state, do hereby certify:
8       That previous to the commencement of
9   the examination of the witness, the witness was
10  duly sworn to testify the whole truth concerning
11  the matters herein;
12      That the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting under my
15  personal direction and constitutes a true record
16  of the testimony given and the proceedings had;
17      That the said deposition was taken
18  before me at the time and place specified;
19      That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24      IN WITNESS WHEREOF, I do hereunto set

Page 120

1   my hand and affix my seal of office at Chicago,
2   Illinois, this 26th day of April, 2008.
3
4
5          Notary Public, Cook
6          County, Illinois
7          My commission expires 6-28-11
8
9   C.S.R. Certificate No. 84-1527
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 121

1              I N D E X
2   WITNESS              EXAMINATION
3   ALBERT STINSON
4   By Mr. Crowson            4, 106
5   By Ms. Combs              102, 116
6
7
8           E X H I B I T S
9   NUMBER                  PAGE
10  1                        49
11  2                        52
12  3                        53
13  4                        62
14  5                        63
15  6                        74
16  7                        83
17  8                        85
18  9                        89
19  10                       89
20  11                       94
21  C O N F I D E N T I A L   P A G E S
22          Page 19
23          Pages 35 to  37
24

31 (Pages 118 to 121)