## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LONG BEACH MORTGAGE COMPANY | ) | |
| TRUTH IN LENDING ACT FAMILY RIDER | ) | |
| LITIGATION | ) | MDL 07-cv-06543 |
| | ) | |
| _____ | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Centralized before Judge |
| NAVARA & STINSON, JEUNE, | ) | Wayne R. Andersen |
| SULLIVAN, & SHELTON | ) | |
| | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Michael J. Aschenbrener
EDELMAN, COMBS, LATTURNER
& GOODWIN, LLC
120 S. LaSalle St., 18th Floor
Chicago, Illinois, 60603
(312) 739-4200
(312) 419-0379 (FAX)

Lloyd Brooks
THE BROOKS LAW FIRM
15008 Woodlawn Avenue
Dolton, Illinois 60419
(708) 841-8000
(708) 841-8080 (FAX)

CLAUDE LEFEBVRE
CHRISTOPHER LEFEBVRE, PC
P.O. Box 479
Pawtucket, RI 02862
(401) 728-6060
(401) 728-6534 (FAX)

## INTRODUCTION

Plaintiffs Navara, Stinson, and Shelton obtained their loans primarily for consumer use, thereby rendering the Truth In Lending Act ("TILA") and the Real Estate Settlement Procedures Act ("RESPA") applicable to their mortgage loans. Also, Ms. Sullivan has standing to pursue her claim. All of defendant's arguments to the contrary fail.

## FACTS

**A.     Plaintiff Navara**.

On April 29, 2004, Ms. Navara, a retired factory worker, obtained a $50,000 mortgage loan from Long Beach to refinance the real property located at 2715 S. Kostner, Chicago, Illinois. (*See* Plaintiffs' Response to Defendant's Local Rule 56.1 Statement of Material Facts ("SOF"), ¶ 43 and 8). As part of her mortgage, Ms. Navara executed a 1-4 Family Rider. (SOF ¶ 9). Ms. Navara stated that she obtained the loan to refinance her primary residence when she applied for the loan through Long Beach. (SOF ¶ 45).

The property at 2715 S. Kostner consists of one building with two apartments and a coach house. (SOF ¶ 10). Ms. Navara has lived at the property since 1970. (SOF ¶ 40). Ms. Navara's tax returns for the years 2003-2005 list her home address as 2715 S. Kostner. (SOF ¶ 41). Ms. Navara's returns were prepared by a paid tax preparer for the years 2003-2005. (SOF ¶ 42). Ms. Navara received $11,200 in rent in 2003, $11,200 in rent in 2004, and $12,300 rent in 2005 in connection with the property at 2715 S. Kostner. (SOF ¶ 44).

**B.     Plaintiff Stinson.**

On April 12, 2006, Mr. Stinson executed two 1-4 Family Rider forms in connection with two mortgage loans totaling $185,000 that he obtained from Long Beach secured by real property at 5402 S. Shields Avenue, Chicago, Illinois. (SOF ¶ 19 and 50). Mr. Stinson

1

stated that he obtained the loans to acquire his primary residence when he applied for the loans through Long Beach. (SOF ¶ 51). While Mr. Stinson never moved in to the property, he intended to do so when he obtained the loan and did not do only in an attempt to save his marriage. (SOF ¶ 46). Mr. Stinson's wife objected to moving to the Englewood neighborhood. Mr. Stinson's 2006 tax return indicates that he did not move in to the property at 5402 S. Shields. (*See* SOF ¶ 22). Mr. Stinson collected $3,000 in rents in 2006. (SOF ¶ 49).

Mr. Stinson works at Easter Seals Metropolitan Chicago where he is an assistant teacher at the organization's school for autistic children. (SOF ¶ 47). In 2006, Mr. Stinson earned $23,411 in wages from Easter Seals. (SOF ¶ 48).

**C.    Plaintiff Shelton.**

Mr. Shelton obtained a $205,000 mortgage loan from Long Beach in July 2005 to finance the purchase of a building at 6800 S. Artesian Avenue, Chicago, Illinois. (SOF ¶¶ 25 and 59). Mr. Shelton executed a 1-4 Family Rider in connection with his mortgage loan. (SOF ¶ 26). Mr. Shelton stated that he obtained the loan to acquire his primary residence when he applied for the loan through Long Beach. (SOF ¶ 56).

Mr. Shelton is confined to a wheelchair and uses a prosthetic eye. (SOF ¶ 54). Mr. Shelton requires assistance with physical tasks and financial matters because of his injuries. (SOF ¶ 55). Mr. Shelton purchased the property with the intent to live there with his close friend, Mr. Bibbs, who was to assist Mr. Shelton in his healthcare. (SOF ¶ 62). Mr. Shelton moved in to the property immediately after closing on it. (SOF ¶ 57).

Mr. Shelton is unemployed and collected $500 per month in social security benefits during the relevant time period. (SOF ¶ 32). Mr. Shelton collected rent at the property for only one or two months. (SOF ¶ 58).

2

**D.    Plaintiff Sullivan.**

In July 2005, Ms. Sullivan obtained a mortgage loan from Long Beach that was secured by real property located at 190 Littlefield Street, Pawtucket, Rhode Island.  (SOF ¶ 34).  As part of her mortgage loan, Ms. Sullivan executed a 1-4 Family Rider.  (SOF ¶ 35).

On May 16, 2007, Ms. Sullivan commenced a Chapter 7 bankruptcy proceeding with the U.S. Bankruptcy Court for the District of Rhode Island.  (SOF ¶ 37).  In schedule B to the bankruptcy petition, Ms. Sullivan disclosed her lawsuit against Long Beach as an asset of her estate.  (SOF ¶ 38).  Ms. Sullivan's bankruptcy was discharged in August 2007.  (SOF ¶ 39).

## STANDARD OF DECISION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c).  The moving party bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Cedillo v. Int'l Assoc. of Bridge & Structural Iron Workers, Local Union No. 1, 603 F.2d 7, 10 (7th Cir. 1979). The substantive law of the issues raised by the claims asserted in the complaint determines what is "material" for purposes of a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## ARGUMENT

Long Beach moves for summary judgment against plaintiffs Navara, Stinson, and Shelton asserting that their respective TILA and RESPA claims should be dismissed because the subject loans were not obtained primarily for personal purposes.  Long Beach's arguments are unsupported by the record.  Instead, the record makes it clear that Navara and Shelton both

3

intended to use and actually used the subject properties as their primary personal residences, while Stinson intended to use the subject property as his sole personal residence, making Long Beach's motion ill-conceived and without merit.

Long Beach also argues that plaintiff Sullivan has no standing to pursue her claim because the claim is still the property of her bankruptcy estate. This is incorrect. Ms. Sullivan regained the right to pursue her claim when the bankruptcy was discharged.

When the subject of a loan transaction is owner-occupied rental property containing two units or less for acquisitions or four units or less for refinancing, then the Court must consider the factors set forth in the Regulation Z Staff Commentary. 12 C.F.R. § 226.3, Supp. I, Comment 3(a)-4; *Romaker v. Crossland Mortgage Corp.*, No. 94 C 3328, 1995 U.S. Dist. LEXIS 22252, at *19 (N.D. Ill. Nov. 3, 1995). In fact, the Staff Commentary is dispositive in TILA matters, unless the Court finds them demonstrably irrational. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980).

The five factors are:

- The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.

- The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.

- The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.

- The size of the transaction. The larger the transaction, the more likely it is to be business purpose.

- The borrower's statement of purpose for the loan.

12 C.F.R. § 226.3, Supp. I, Comment 3(a)-2.

4

Not only do these factors serve as the means by which to evaluate whether loans were obtained for consumer or business use, but these factors also serve as a reminder that TILA applies not only to pure consumer transactions, i.e., to obtain single-family homes, but also to multi-unit residences. Borrowers who rent out units of their residences are allowed to collect rent payments and still rely on the protections of TILA. *See Romaker*, at *19-20.

Long Beach failed in its motion to analyze all five of these factors and failed to indicate to this Court that when considering those factors the Court should remain cognizant that TILA is to be liberally construed in favor of the consumer, and thus, err on the side of plaintiffs in determining whether a transaction is for business or consumer credit. *Westbank v. Maurer*, 658 N.E.2d 1381 (Ill. App. Ct. 1995).

Long Beach's burden is even higher here on a motion for summary judgment where it must show it is entitled to a judgment as a matter of law. As the non-movants, plaintiffs are entitled to every reasonable inference in their favor.

## I.    Navara, Stinson, and Shelton's loans were all obtained for consumer purposes.

### A.    Navara.

#### 1.    *Ms. Navara has lived at the subject property since 1970.*

Defendant claims "[t]he undisputed evidence demonstrates that Ms. Navara did not live at" the mortgaged property. Defendant's Memorandum In Support of Motion for Partial Summary Judgment ("Def. Memo"), p. 7. Actually, the undisputed evidence demonstrates that she not only lived at the property, but has lived there continuously since 1970. (SOF ¶ 40). The evidence leaves no doubt that Ms. Navara personally resided at all times relevant at the home for which she obtained refinancing through Long Beach.

5

Defendant also wrongly claims that "Ms. Navara cannot prove as a matter of law that her loan was subject to TILA" because of statements on her tax forms. Def. Memo, p. 7. Defendant cites no statute or case law to support its contention that statements made on tax returns have any bearing on whether a loan is made for consumer or business purposes. In fact, the factors outlined by the Staff Commentary to Regulation Z make no mention of tax forms as a method for determining the purpose of a loan. *See* 12 C.F.R. § 226.3, Supp. I, Comment 3(a)-2. In other words, all of defendant's references to Ms. Navara's tax forms are completely irrelevant to the issue of determining the purpose of her loan.

## 2.    *Ms. Navara has not committed tax fraud.*

Defendant further claims that Ms. Navara is susceptible to charges of tax fraud because of the statements on her tax returns. While Ms. Navara denies this unnecessary charge, Long Beach also misses the point. Defendant points out that her tax returns indicate that she did not use her home for personal purposes. (SOF ¶ 12). But defendant fails to recognize that those same tax returns also list her home address—the address at which she personally resides—as the very same 2715 S. Kostner address that defendant claims she does not live in or use for personal purposes. (SOF ¶ 41). Defendant has merely pointed out an inconsistency on her tax returns, but not fraud. To suggest that she was not forthright with the IRS about her place of residence because of select statements on her returns ignores other select statements and the whole of her returns, which clearly indicate her home as 2715 S. Kostner.

Furthermore, Ms. Navara did not personally prepare her tax returns. (SOF ¶ 42). Ms. Navara provided her correct residence address to the preparer, and if any error was committed, it was the preparer who committed it. As a result, any inconsistencies are the fault of her tax preparer, not her.

6

### 3.    *Ms. Navara obtained the loan for personal purposes.*

Ms. Navara obtained a loan through Long Beach to refinance the Chicago home in which she has lived since 1970, which contains a modest two-unit building and a coach house. (SOF ¶ 10).  She lives in the coach house and rents out the other two units.  (SOF ¶ 10).

But defendant attempts to paint her as a real estate magnate running an apartment-leasing empire at 2715 S. Kostner.  It does so by arguing that much of her income is derived from renting two units, that she manages the property, and that leasing properties is her primary occupation.

Ms. Navara is a retired factory worker.  (SOF ¶ 43).  So it is to be expected that the small amount of income she derives from the property constitutes the bulk of her earnings. And a small amount of income, it is.  In 2003, 2004, and 2005, Ms. Navara received rents from the property at 2715 S. Kostner in the amounts of $11,200, $11,200, and $12,300, respectively. (SOF ¶ 44).  And while these amounts did constitute all or most of her earnings in those years, no one will accuse Ms. Navara of running a real estate empire by collecting about $1,000 per month in rent.

And because she is retired, lives at the property, and generates such little income from the property, it only makes sense that she would not hire others to manage the property. Yet, illogically, defendant seems to argue that if she did not personally manage the property, i.e., hired someone else to manage it, then the loan would more likely be for personal use; but because she does it herself rather than run a business to do it, her loan is a business loan.  This argument *strains both logic and common sense.  See Romaker*, at *20 ("That the plaintiffs are personally managing the property does not show a business purpose where the property at issue is the home in which the plaintiffs live.").

7

When taking in all of the relevant facts, defendant cannot demonstrate that these factors prove she obtained the loan for business purposes. Rather, quite the opposite is true; these three factors show Ms. Navara obtained the loan for consumer purposes, not for business.

Furthermore, these are only three of the five factors the Staff Commentary sets forth for determining whether a loan is personal or business in nature. The other two factors are the size of the transaction and the borrower's statement of purpose. 12 C.F.R. § 226.3, Supp. I, Comment 3(a)-2.

The size of Ms. Navara's transaction was $50,000. (SOF ¶ 8). In the context of mortgages, this is not a large loan. In fact, it is a small loan.

Finally, Ms. Navara stated that her purpose for obtaining the loan was personal, not business. (SOF ¶ 45).

When considered in their entirety, the five factors outlined by § 3(a)-2 of the Regulation Z Staff Commentary weigh in favor of categorizing her loan as a personal loan. Accordingly, the Court should not dismiss any of Ms. Navara's claims.

**B.    Stinson**.

The Staff Commentary to Regulation Z defines non-owner-occupied rental property in the following manner: "[i]f the owner *expects* to occupy the property for more than 14 days during the coming year, the property cannot be considered non-owner-occupied." 12 C.F.R. § 226.3, Supp. I, Comment 3(a)-3 (emphasis added). When he purchased the property, Mr. Stinson expected it to be the permanent home for himself and his wife. But his wife objected to living in Englewood:

6    Q.    And before that, were you living at 5402 South Shields Avenue?

8    A.    That was the plan. I sold my house in Bellwood to go live at that property at 5402 South Shields.

8

| 11 | Q. | So did you ever live at 5402 South Shields? |
|----|----|--------------------------------------------|
| 13 | A. | No. |
| 14 | Q. | Can you tell me again what your plan was? |
| 16 | A. | I purchased the property to go live in the property. But once my wife saw that it was on the south side of the town in Englewood, she say -- her exact words was, hell no. And we had a big fight about that seriously. |

(SOF ¶ 46).

Thus, he honestly expected to move to the property at 5402 South Shields when he obtained financing from Long Beach, but, in an attempt to save his marriage, did not move in. (SOF ¶ 46). The result is that the loan should be considered a consumer loan if the five factors outlined in § 3(a)-2 of the Staff Commentary, as applied to Mr. Stinson's loan, so demonstrate, which they do.  12 C.F.R. § 226.3, Supp. I, Comment 3(a)-4 ("the determination of whether it is business or consumer credit should be made by considering the factors listed in Comment 3(a)-2").

The first factor is the relationship of Mr. Stinson's primary occupation to the acquisition.  12 C.F.R. § 226.3, Supp. I, Comment 3(a)-2.  He is employed by Easter Seals Metropolitan Chicago as an assistant teacher for autistic students.  (SOF ¶ 47).  This is not at all related to the acquisition of the property at 5402 South Shields.  Thus, this factor weighs in favor of the loan being considered a consumer loan.

The second factor is the degree to which the borrower will personally manage the acquisition.  12 C.F.R. § 226.3, Supp. I, Comment 3(a)-2.  Like Ms. Navara, Mr. Stinson does not run a leasing business or apartment management company, which means that he is left to manage the property himself.  But this does not mean that the property was acquired primarily for business purposes. *Romaker*, at *20.  Rather, it demonstrates the very opposite: that he managed

9

the property personally precisely because it was a personal acquisition, much the same as Ms. Navara. Again, Long Beach strains logic by arguing that Mr. Stinson's loan would more likely be a consumer loan if he operated a business to manage his property.

The third factor is the ratio of income from the acquisition to the total income of the borrower. 12 C.F.R. § 226.3, Supp. I, Comment 3(a)-2. Mr. Stinson made $23,411 in income in 2006 as an employee of Easter Seals. (SOF ¶ 48). He received $3,000 in rents from the property at the rate of $750 per month. (SOF ¶¶ 49, 52). This small rent-to-income ratio of nearly 1/8 demonstrates that he did not acquire the property for business purposes. Additionally, Mr. Stinson collected less in rent each month ($750) than the mortgage payment ($1,553), which further demonstrates the consumer purpose of the transaction. (SOF ¶¶ 52, 53); *see Romaker*, at * 19-20 ("The fact that the mortgage payment on the property exceeds the income from the rental unit indicates that the property as a whole is not producing any net income.").

The fourth factor is the size of the transaction. 12 C.F.R. § 226.3, Supp. I, Comment 3(a)-2. Mr. Stinson's combined loans used to acquire the property totaled $185,000. (SOF ¶ 50). This, too, is still a small transaction in the realm of real estate and does not indicate that Mr. Stinson obtained the property for a business purpose.

The fifth and final factor is the borrower's statement of purpose. 12 C.F.R. § 226.3, Supp. I, Comment 3(a)-2. Mr. Stinson stated that he intended to use the property for personal purposes. (SOF ¶ 51).

All five factors indicate that the acquisition was a personal acquisition, not a business acquisition. Accordingly, Mr. Stinson's loans should be construed as consumer loans subject to the provisions of TILA and Long Beach's motion for summary judgment related to Mr. Stinson should be denied.

10

Additionally, Mr. Stinson did not commit tax fraud. Every representation he's made—to Long Beach when he acquired the loans, to the IRS on his tax returns, and during discovery—has been honest and straight-forward. He purchased the property to move in to it, but did not because his wife objected. (SOF ¶ 46). He then filled out his tax forms to reflect that he never actually moved in. (SOF ¶ 23). Thus, there is no fraud or even inconsistency. Long Beach's claim that he committed tax fraud is patently false—the face of the relevant documents demonstrate his honesty.

**C.     Shelton.**

Long Beach contends that Mr. Shelton's loan is not subject to TILA even though Mr. Shelton actually lived in the home secured by the subject mortgage loan—a fact undisputed by Long Beach. Defendant attempts to distract the Court from this fact by claiming that even if Mr. Shelton actually lived there, he did not intend to live there, making TILA inapplicable. Long Beach also argues that TILA does not apply to Mr. Shelton's loan because much of his income was derived from the rent he collected.

Long Beach's first argument ignores the facts of the case, namely that Mr. Shelton used the property as his primary residence and testified that he intended to use the property as his primary residence. (SOF ¶ 62).

Long Beach's second argument fails to account for all five factors outlined by the Staff Commentary, which demonstrate that Mr. Shelton obtained the loan for consumer purposes.

**1.     *Mr. Shelton both intended to use and actually used the two-unit home as his primary residence.***

Long Beach contends that the subject loan made to Shelton is primarily for a

11

business purpose and therefore not subject to the provisions of TILA or RESPA.[1]  A proper

consideration of the record shows that the subject property was primarily for Mr. Shelton's

personal use and not for business purposes.

Mr. Shelton is confined to a wheelchair and uses a prosthetic eye.  (SOF ¶ 54).  As

a result of Mr. Shelton's injuries, he needs assistance performing physical chores and handling

financial matters. (SOF ¶ 55). Mr. Shelton's purpose in purchasing the property was to live in the

property with a close friend, Mr. Bibbs, who would assist in Mr. Shelton's healthcare.  (SOF

¶ 62).  Mr. Shelton and Mr. Bibbs moved into the property immediately after the closing.  (SOF

¶ 55).

These facts show the primary purpose of the loan was for personal use.  The

borrowing of funds for the purchase of residential property as the borrower's residence is clearly

a consumer purpose. *See Kamara v. Michael Funding, LLC*, 379 F. Supp. 2d 631 (D. Del. 2005).

Long Beach does not contest that Mr. Shelton used the funds to purchase the building and resided

therein.

Conversely, Long Beach fails to point out any evidence in the record that Mr.

Shelton purchased the property primarily as a business investment.  Furthermore, Long Beach

has not pointed to any evidence in the record showing Mr. Shelton indicated to Long Beach that

the loan had a business purpose.  Quite to the contrary, the only evidence in the record suggests

that Long Beach believed the loan had a personal, household, or family purpose.[2]  In avoidance

---

[1]     Long Beach does not make any argument for the dismissal of Count III of Shelton's First Amended Complaint asserting a cause of action for the violation of Illinois Consumer Fraud and Deceptive Practices Act against Long Beach for its payment of a kickback to the mortgage broker.

[2]     Long Beach received a Uniform Residential Loan Application in connection with the subject loan, clearly indicating the loan was for Eric's purchase of a personal residence. (SOF ¶ 56).  Although Eric did not complete the application and denies providing the information contained in the application, the application appears to be the only statement Long Beach

of the clear import of the record, Long Beach points to Mr. Shelton's testimony that his purchase of the property assisted Mr. Bibbs, who also needed a place to live.  But Long Beach fails to show how sharing living quarters with a friend or home healthcare aide is a business purpose.

### 2.    *The five factors outlined by the Regulation Z Staff Commentary demonstrates that Mr. Shelton obtained his loan for consumer use.*

Long Beach's reliance upon the amount of the rent Mr. Shelton was expecting fails to carry the day, as well, because the five factors indicate Mr. Shelton used the loan for consumer purposes, making the loan subject to TILA.

First, Mr. Shelton does not have an occupation, so the first factor in the Staff Commentary is either inapplicable or reveals that the loan was not related to Mr. Shelton's occupation.  (SOF ¶ 32).

Second, Mr. Shelton's disability renders him unable to manage many of his own personal affairs, let alone manage an apartment-leasing business.  (SOF ¶ 55).  Accordingly, Long Beach cannot demonstrate that this Staff Commentary factor weighs in its favor.

Third, Long Beach argues that Mr. Shelton's loan is not subject to TILA because he received rents and had no other occupation.  This argument ignores the facts that Mr. Shelton's lack of employment is due in no small part to his severe disability and that he received only $500 per month in social security benefits.  (SOF ¶ 32).  Furthermore, Mr. Shelton received only one or two months or rent payments from the tenants of the building.  This means that Mr. Shelton collected, at most, $2,400 in rent payments, and not the $1,200 per month every month implied by defendant's argument comparing his monthly social security benefits with his rents received.  (SOF ¶ 58).  As a result, the appropriate analysis is not a monthly analysis, but an annual analysis, which reveals that Mr. Shelton received $6,000 in social security benefits

received prior to making the loan about its purpose.

13

annually but a maximum of only $2,400 in rent payments for the entire relevant year. Plus, the $1,200 per month he collected in rent was less than the $1,850 per month mortgage payment, making the loan a consumer loan. *Romaker*, at *19-20. Thus, Long Beach's claim that TILA does not apply because the ratio of rents to overall income is too high falls flat.

Fourth, Mr. Shelton's loan was for $205,000. (SOF ¶ 59). Again, within the real estate world, this is not a large loan and does not, as a matter of law, lead to the conclusion that Mr. Shelton obtained the loan primarily for business purposes.

Finally, Mr. Shelton stated that his purpose for obtaining the loan was personal. (SOF ¶ 56).

Just as with Ms. Navara and Mr. Stinson, a complete look at the whole record and all five relevant factors reveal that Mr. Shelton undoubtedly obtained his loan for consumer use and Long Beach's motion for summary judgment should be denied.

## IV.    Ms. Sullivan regained ownership of her claim from the bankruptcy estate and may continue to prosecute her claim.

Defendant claims that Ms. Sullivan cannot maintain her claim because she lacks standing to do so. Defendant's argument rests on the mistaken notion that her claim is still the property of her bankruptcy estate.

Long Beach completely misstates the relevant bankruptcy law. Ms. Sullivan filed a Chapter 7 bankruptcy, listed this lawsuit as an asset of the estate on her bankruptcy petition, and had the bankruptcy discharged in August 2007. (SOF ¶ 39). Her bankruptcy trustee never administered the asset, meaning that the asset was deemed abandoned on discharge.

*Morlan v. Universal Guaranty Life Insurance Co.*, 298 F.3d 609, 618 (7th Cir. 2002), holds that "property that has been scheduled, § 521(1), but 'not otherwise administered at the time of the closing of a case'" "is deemed abandoned." This describes exactly what

happened in this matter—Ms. Sullivan scheduled this suit properly, but it was not administered as of the closing of the case. Defendant cites *Morlan* for the exact opposite of its actual holding. Defendant cites this case to support its argument that a motion to abandon is necessary, but the holding makes clear that a motion to abandon is not required when an asset is properly scheduled, as was Ms. Sullivan's TILA claim. Therefore, the estate abandoned this lawsuit, and she has standing to pursue her claim. Accordingly, Long Beach's challenge to her standing is without merit.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny defendant's motion for summary judgment.

Respectfully submitted,


<u>s/ Michael J. Aschenbrener</u>
Michael J. Aschenbrener

15

## <u>CERTIFICATE OF SERVICE</u>

I, Michael J. Aschenbrener, hereby certify that on July 18, 2008, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. Notice was sent *via* US mail to those without access to the Court's electronic filing system.

Rogelio A. Astudillo
Astudillo Consulting Services
2304 Frontera Road
McAllen, TX 78504

Law Department
New Millennium Mortgage
1700 Park Street Suite 203
Naperville, IL 60563

Gabriel A. Crowson
Matthew M. Neumeier
Scott T. Schutte
Howrey LLP
321 North Clark Street, Suite 3400
Chicago, IL 60610

s/Michael J. Aschenbrener
Michael J. Aschenbrener