# Appendix
# of
# Unreported
# Decisions



Page 1

12 C.F.R. Pt. 226, Supp. I

**Effective: January 14, 2008**

Code of Federal Regulations Currentness
   Title 12. Banks and Banking
      Chapter II. Federal Reserve System
         Subchapter A. Board of Governors of the Federal Reserve System
           Part 226. Truth in Lending (Regulation Z) (Refs & Annos)

➡**SUPPLEMENT I TO PART 226-- OFFICIAL STAFF INTERPRETATIONS**

<For compliance date(s) of amendment(s) to supplement, see 72 FR 63462.>

Introduction

1. Official status. This commentary is the vehicle by which the staff of the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Regulation Z, as revised effective April 1, 1981. Good faith compliance with this commentary affords protection from liability under 130(f) of the Truth in Lending Act. Section 130(f) (15 U.S.C. 1640) protects creditors from civil liability for any act done or omitted in good faith in conformity with any interpretation issued by a duly authorized official or employee of the Federal Reserve System.

2. Procedure for requesting interpretations. Under appendix C of the regulation, anyone may request an official staff interpretation. Interpretations that are adopted will be incorporated in this commentary following publication in the Federal Register. No official staff interpretations are expected to be issued other than by means of this commentary.

3. Status of previous interpretations. All statements and opinions issued by the Federal Reserve Board and its staff interpreting previous Regulation Z remain effective until October 1, 1982, only insofar as they interpret that regulation. When compliance with revised Regulation Z becomes mandatory on October 1, 1982, the Board and staff interpretations of the previous regulation will be entirely superseded by the revised regulation and this commentary except with regard to liability under the previous regulation.

4. Rules of construction. (a) Lists that appear in the commentary may be exhaustive or illustrative; the appropriate construction should be clear from the context. In most cases, illustrative lists are introduced by phrases such as "including, but not limited to," "among other things," "for example," or "such as."

(b) Throughout the commentary and regulation, reference to the regulation should be construed to refer to revised Regulation Z, unless the context indicates that a reference to previous Regulation Z is also intended.

(c) Throughout the commentary, reference to "this section" or "this paragraph" means the section or paragraph in the regulation that is the subject of the comment.

5. Comment designations. Each comment in the commentary is identified by a number and the regulatory section or paragraph which it interprets. The comments are designated with as much specificity as possible according to the particular regulatory provision addressed. For example, some of the comments to § 226.18(b) are further divided by paragraph, such as Comment 18(b)(1)-1 and Comment 18(b)(2)-1. In other cases, comments have more general application and are designated, for example, as Comment 18-1 or Comment 18(b)-1. This introduction may be cited as Comments I-1 through I-7. Comments to the appendices may be cited, for example, as Comment app. A-1.

6. Cross-references. The following cross-references to related material appear at the end of each section of the commentary:

(a) "Statute"--those sections of the Truth in Lending Act on which the regulatory provision is based (and any other relevant statutes);

(b) "Other sections"--other provisions in the regulation necessary to understand that section;

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06543    Document 66-2    Filed 08/01/2008    Page 3 of 33
Case 1:07-cv-06543    Document 42-16    Filed 06/11/2008    Page 3 of 20

Page 2

12 C.F.R. Pt. 226, Supp. I

(c) "Previous regulation"--parallel provisions in previous Regulation Z; and

(d) "1981 changes"--a brief description of the major changes made by the 1981 revisions to Regulation Z.

Where appropriate a fifth category ("Other regulations") provides cross-references to other regulations.

7. Transition rules. (a) Though compliance with the revised regulation is not mandatory until April 1, 1982, creditors may begin complying as of April 1, 1981. During the intervening year, a creditor may convert its entire operation to the new requirements at one time, or it may convert to the new requirements in stages. In general, however, a creditor may not mix the regulatory requirements when making disclosures for a particular closed-end transaction or open-end account; all the disclosures for a single closed-end transaction (or open-end account) must be made in accordance with the previous regulation, or all the disclosures must be made in accordance with the revised regulation. As an exception to the general rule, the revised rescission rules and the revised advertising rules may be followed even if the disclosures are based on the previous regulation. For purposes of this regulation, the creditor is not required to take any particular action beyond the requirements of the revised regulation to indicate its conversion to the revised regulation.

(b) The revised regulation may be relied on to determine if any disclosures are required for a particular transaction or to determine if a person is a creditor subject to Truth in Lending requirements, whether or not other operations have been converted to the revised regulation. For example, layaway plans are not subject to the revised regulation, nor are oral agreements to lend money if there is no finance charge. These provisions may be relied on even if the creditor is making other disclosures under the previous regulation. The new rules governing whether or not disclosures must be made for refinancings and assumptions are also available to a creditor that has not yet converted its operations to the revised regulation.

(c) In addition to the above rules, applicable to both open-end and closed-end credit, the following guidelines are relevant to open-end credit:

. The creditor need not remake initial disclosures that were made under the previous regulation, even if the revised periodic statements contain terminology that is inconsistent with those initial disclosures.

. A creditor may add inserts to its old open-end forms in order to convert them to the revised rules until such time as the old forms are used up.

. No change-in-terms notice is required for changes resulting from the conversion to the revised regulation.

. The previous billing rights statements are substantially similar to the revised billing rights statements and may continue to be used, except that, if the creditor has an automatic debit program, it must use the revised automatic debit provision.

. For those creditors wishing to use the annual billing rights statement, the creditor may count from the date on which it sent its last statement under the previous regulation in determining when to give the first statement under the new regulation. For example, if the creditor sent a semi-annual statement in June 1981, and converts to the new regulation in October 1981, the creditor must give the billing rights statement sometime in 1982, and it must not be fewer than 6 nor more than 18 months after the June statement.

. Section 226.11 of the revised regulation affects only credit balances that are created on or after the date the creditor converts the account to the revised regulation.

### Subpart A--General

### Section 226.1--Authority, Purpose, Coverage, Organization, Enforcement and Liability

1(c) Coverage.

1. Foreign applicability. Regulation Z applies to all persons (including branches of foreign banks and sellers located in the United States) that extend

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06543    Document 66-2    Filed 08/01/2008    Page 4 of 33
Case 1:07-cv-06543    Document 42-16    Filed 06/11/2008    Page 4 of 20

Page 16

12 C.F.R. Pt. 226, Supp. I

Consumer credit reflects the new statutory exemption for agricultural credit.

Consummation is a significant departure from longstanding interpretations of the previous definition. It now focuses only on the time the consumer becomes contractually obligated, rather than the time the consumer pays a nonrefundable fee or suffers an economic penalty for failing to go forward with the credit transaction.

Credit generally parallels the previous definition, but modifies the previous interpretations of the definition by excluding more transactions.

Creditor reflects the statutory amendments to the act that were intended to eliminate the problem of multiple creditors in a transaction. The regularly standard is still used, but it is now defined in terms of the frequency of the credit extensions. The new definition also requires that there be a written agreement to pay in more than 4 installments if no finance charge is imposed. Finally, the obligation must be initially payable to a person for that person to be the creditor.

Dwelling reflects the statutory amendment that expanded the scope of the definition to include any residential structure, whether or not it is real property under state law.

Open-end credit reflects the amended statutory definition requiring that the creditor reasonably contemplate repeated transactions. The new definition no longer requires the consumer to have the privilege of paying either in installments or in full.

Periodic rate combines the previous definitions of period and periodic rate with clarification in the commentary concerning transaction charges and 360-day-year factors.

Security interest is much narrower than the previous definition. Reflecting the legislative history of the simplification amendments, incidental interests are expressly excluded from the definition. Except for purposes of rescission, interests that arise solely by operation of law are also excluded.

## Section 226.3--Exempt Transactions

3(a)  Business, commercial, agricultural, or organizational credit.

1. Primary purposes. A creditor must determine in each case if the transaction is primarily for an exempt purpose. If some question exists as to the primary purpose for a credit extension, the creditor is, of course, free to make the disclosures, and the fact that disclosures are made under such circumstances is not controlling on the question of whether the transaction was exempt.

2. Factors. In determining whether credit to finance an acquisition--such as securities, antiques, or art--is primarily for business or commercial purposes (as opposed to a consumer purpose), the following factors should be considered:

.  The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.

. The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.

. The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.

.  The size of the transaction. The larger the transaction, the more likely it is to be business purpose.

. The borrower's statement of purpose for the loan.

Examples of business-purpose credit include:

. A loan to expand a business, even if it is secured by the borrower's residence or personal property.

. A loan to improve a principal residence by putting in a business office.

. A business account used occasionally for consumer

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06543    Document 66-2    Filed 08/01/2008    Page 5 of 33
Case 1:07-cv-06543    Document 42-16    Filed 06/11/2008    Page 5 of 20

Page 17

12 C.F.R. Pt. 226, Supp. I

purposes.

Examples of consumer-purpose credit include:

. Credit extensions by a company to its employees or agents if the loans are used for personal purposes.

. A loan secured by a mechanic's tools to pay a child's tuition.

. A personal account used occasionally for business purposes.

3. Non-owner-occupied rental property. Credit extended to acquire, improve, or maintain rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes. This includes, for example, the acquisition of a warehouse that will be leased or a single-family house that will be rented to another person to live in. If the owner expects to occupy the property for more than 14 days during the coming year, the property cannot be considered non-owner-occupied and this special rule will not apply. For example, a beach house that the owner will occupy for a month in the coming summer and rent out the rest of the year is owner occupied and is not governed by this special rule. See Comment 3(a)-4, however, for rules relating to owner-occupied rental property.

4. Owner-occupied rental property. If credit is extended to acquire, improve, or maintain rental property that is or will be owner-occupied within the coming year, different rules apply:

. Credit extended to acquire the rental property is deemed to be for business purposes if it contains more than 2 housing units.

. Credit extended to improve or maintain the rental property is deemed to be for business purposes if it contains more than 4 housing units. Since the amended statute defines dwelling to include 1 to 4 housing units, this rule preserves the right of rescission for credit extended for purposes other than acquisition.

Neither of these rules means that an extension of credit for property containing fewer than the requisite

number of units is necessarily consumer credit. In such cases, the determination of whether it is business or consumer credit should be made by considering the factors listed in Comment 3(a)-2.

5. Business credit later refinanced. Business-purpose credit that is exempt from the regulation may later be rewritten for consumer purposes. Such a transaction is consumer credit requiring disclosures only if the existing obligation is satisfied and replaced by a new obligation made for consumer purposes undertaken by the same obligor.

6. Agricultural purpose. An agricultural purpose includes the planting, propagating, nurturing, harvesting, catching, storing, exhibiting, marketing, transporting, processing, or manufacturing of food, beverages (including alcoholic beverages), flowers, trees, livestock, poultry, bees, wildlife, fish, or shellfish by a natural person engaged in farming, fishing, or growing crops, flowers, trees, livestock, poultry, bees, or wildlife. The exemption also applies to a transaction involving real property that includes a dwelling (for example, the purchase of a farm with a homestead) if the transaction is primarily for agricultural purposes.

7. Organizational credit. The exemption for transactions in which the borrower is not a natural person applies, for example, to loans to corporations, partnerships, associations, churches, unions, and fraternal organizations. The exemption applies regardless of the purpose of the credit extension and regardless of the fact that a natural person may guarantee or provide security for the credit.

8. Land trusts. Credit extended for consumer purposes to a land trust is considered to be credit extended to a natural person rather than credit extended to an organization. In some jurisdictions, a financial institution financing a residential real estate transaction for an individual uses a land trust mechanism. Title to the property is conveyed to the land trust for which the financial institution itself is trustee. The underlying installment note is executed by the financial institution in its capacity as trustee and payment is secured by a trust deed, reflecting title in the financial institution as trustee. In some instances, the consumer executes a personal guaranty of the indebtedness. The note provides that it is payable only out of the property specifically

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06543     Document 66-2     Filed 08/01/2008     Page 6 of 33
Case 1:07-cv-06543     Document 42-16     Filed 06/11/2008     Page 6 of 20

Page 18

12 C.F.R. Pt. 226, Supp. I

described in the trust deed and that the trustee has no personal liability on the note. Assuming the transactions are for personal, family, or household purposes, these transactions are subject to the regulation since in substance (if not form) consumer credit is being extended.

3(b) Credit over $25,000 not secured by real property or a dwelling.

1. Coverage. Since a mobile home can be a dwelling under § 226.2(a)(19), this exemption does not apply to a credit extension secured by a mobile home used or expected to be used as the principal dwelling of the consumer, even if the credit exceeds $25,000. A loan commitment for closed-end credit in excess of $25,000 is exempt even though the amounts actually drawn never actually reach $25,000.

2. Open-end credit. An open-end credit plan is exempt under § 226.3(b) (unless secured by real property or personal property used or expected to be used as the consumer's principal dwelling) if either of the following conditions is met:

. The creditor makes a firm commitment to lend over $25,000 with no requirement of additional credit information for any advances.

. The initial extension of credit on the line exceeds $25,000.

If a security interest is taken at a later time in any real property, or in personal property used or expected to be used as the consumer's principal dwelling, the plan would no longer be exempt. The creditor must comply with all of the requirements of the regulation including, for example, providing the consumer with an initial disclosure statement. If the security interest being added is in the consumer's principal dwelling, the creditor must also give the consumer the right to rescind the security interest. (See the commentary to § 226.15 concerning the right of rescission.)

3. Closed-end credit--subsequent changes. A closed-end loan for over $25,000 may later be rewritten for $25,000 or less, or a security interest in real property or in personal property used or expected to be used as the consumer's principal dwelling may be added to an extension of credit for over $25,000. Such a transaction is consumer credit requiring disclosures only if the existing obligation is satisfied and replaced by a new obligation made for consumer purposes undertaken by the same obligor. (See the commentary to § 226.23(a)(1) regarding the right of rescission when a security interest in a consumer's principal dwelling is added to a previously exempt transaction.)

3(c) Public utility credit.

1. Examples. Examples of public utility services include:

. Gas, water, or electrical services.

. Cable television services.

. Installation of new sewer lines, water lines, conduits, telephone poles, or metering equipment in an area not already serviced by the utility.

The exemption does not apply to extensions of credit, for example:

. To purchase appliances such as gas or electric ranges, grills, or telephones.

. To finance home improvements such as new heating or air conditioning systems.

3(d) Securities or commodities accounts.

1. Coverage. This exemption does not apply to a transaction with a broker registered solely with the state, or to a separate credit extension in which the proceeds are used to purchase securities.

3(e) Home fuel budget plans.

1. Definition. Under a typical home fuel budget plan, the fuel dealer estimates the total cost of fuel for the season, bills the customer for an average monthly payment, and makes an adjustment in the final payment for any difference between the estimated and the actual cost of the fuel. Fuel is delivered as needed, no finance charge is assessed, and the customer may withdraw from the plan at any time. Under these circumstances, the arrangement is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06543    Document 66-2    Filed 08/01/2008    Page 7 of 33
Case 1:07-cv-06543    Document 42-16    Filed 06/11/2008    Page 7 of 20

Page 19

12 C.F.R. Pt. 226, Supp. I

exempt from the regulation, even if a charge to cover the billing costs is imposed.

3(f) Student loan programs.

1. Coverage. This exemption applies to the Guaranteed Student Loan program (administered by the Federal government, State, and private non-profit agencies), the Auxiliary Loans to Assist Students (also known as PLUS) program, and the National Direct Student Loan program.

References

Statute: Sections 103(s) and (t) and 104.

Other sections: Section 226.12(a) and (b).

Previous regulation: Section 226.3 and Interpretations §§ 226.301 and 226.302.

1981 changes: The business credit exemption has been expanded to include credit for agricultural purposes. The rule of Interpretation § 226.302, concerning credit relating to structures containing more than 4 housing units, has been modified and somewhat expanded by providing more exclusions for transactions involving rental property.

The exemption for transactions above $25,000 secured by real estate has been narrowed; all transactions secured by the consumer's principal dwelling (even if not considered real property) are now subject to the regulation.

The public utility exemption now covers the financing of the extension of a utility into an area not earlier served by the utility, in addition to the financing of services.

The securities credit exemption has been extended to broker-dealers registered with the CFTC as well as the SEC.

A new exemption has been created for home fuel budget plans.

Section 226.4--Finance Charge

4(a) Definition.

1. Charges in comparable cash transactions. Charges imposed uniformly in cash and credit transactions are not finance charges. In determining whether an item is a finance charge, the creditor should compare the credit transaction in question with a similar cash transaction. A creditor financing the sale of property or services may compare charges with those payable in a similar cash transaction by the seller of the property or service.

i. For example, the following items are not finance charges:

A. Taxes, license fees, or registration fees paid by both cash and credit customers.

B. Discounts that are available to cash and credit customers, such as quantity discounts.

C. Discounts available to a particular group of consumers because they meet certain criteria, such as being members of an organization or having accounts at a particular financial institution. This is the case even if an individual must pay cash to obtain the discount, provided that credit customers who are members of the group and do not qualify for the discount pay no more than the nonmember cash customers.

D. Charges for a service policy, auto club membership, or policy of insurance against latent defects offered to or required of both cash and credit customers for the same price.

ii. In contrast, the following items are finance charges:

A. Inspection and handling fees for the staged disbursement of construction loan proceeds.

B. Fees for preparing a Truth in Lending disclosure statement, if permitted by law (for example, the Real Estate Settlement Procedures Act prohibits such charges in certain transactions secured by real property).

C. Charges for a required maintenance or service contract imposed only in a credit transaction.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 322563 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 322563 (N.D.Ill.))**

**C**Roman v. First Franklin Financial Corp.
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Indelfe ROMAN, Plaintiff,
v.
FIRST FRANKLIN FINANCIAL CORPORATION;
Option One Mortgage Corporation; and Equicredit
Corporation of Illinois, Defendants.
No. 00 C 7228.

March 3, 2001.

MEMORANDUM OPINION AND ORDER

CONLON, District J.
**\*1** Indelfe Roman ("Roman") sues First Franklin
Financial Corporation ("First Franklin") for failure to
disclose an alleged personal property security interest
taken by means of a mortgage, in violation of the
Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*
(TILA), and its implementing Regulation Z, 12C.F.R.
226.1.FN1 Roman moves for class certification,
pursuant to Fed.R.Civ.P. 23.

> FN1. Defendants Equicredit Corporation of
> Illinois ("Equicredit") and Option One
> Mortgage Corporation ("Option One") were
> dismissed from this action.

BACKGROUND

I. Allegations in the complaint

Roman resides in and owns a two-flat building in
Chicago. First Franklin is a Delaware corporation
with its principle place of business in San Jose,
California. The corporation has several offices in
Illinois. First Franklin provides mortgage brokers
with various products and services, but focuses on its
"proprietary risk-based direct access loan
programs."Cmplt. at ¶ 8.

On November 24, 1999, Roman obtained a $70,000
mortgage loan from First Franklin for the purpose of
refinancing his building. In connection with the loan,

Roman signed a note, a mortgage, a 1-4 family rider
and assignment of rents ("the rider"), a TILA
statement, and a HUD-1 settlement statement. Roman
alleges the TILA disclosure statement (1)
misrepresented that the only security interest taken
was in real property and (2) failed to disclose that the
lender had taken a security interest in certain personal
property by means of the rider.

II. Class definition

Roman seeks to represent a class of all persons who
satisfy the following requirements: (1) they obtained
a residential mortgage secured by real estate that held
two dwellings; (2) their family members or
themselves resided in one or more of the dwellings;
(3) their transaction was documented as being subject
to the TILA; (4) their note and mortgage were
originated by or assigned to First Franklin; (5) their
mortgage included the rider, which created a security
interest in personal property at the mortgaged
premises; (6) their TILA statement does not disclose
the security interest in personal property created by
the rider; and (7) their mortgage is dated on or after
one year prior to the filing of this action.FN2

> FN2. Because Option One and Equicredit
> were dismissed from this action, Roman's
> motion is moot to the extent it requests
> certification of a B and C class.

DISCUSSION

I. Class certification standard

Courts have broad discretion in determining whether
class certification is appropriate. *Keele v. Wexler,* 149
F.3d 589, 592 (7th Cir.1998). In assessing a
certification motion, the court does not consider the
merits of the case.*Dhamer v. Bristol-Myers Squibb
Co.,* 183 F.R.D. 520, 525 (N.D.Ill.1998). However,
"the boundary between a class determination and the
merits may not always be easily discernible."*Retired
Chicago Police Association v. City of Chicago,* 7
F.3d 584, 599 (7th Cir.1993) (internal citations
omitted). The importance of class certification is
heightened in TILA cases, "where the small amounts

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2001 WL 322563 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 322563 (N.D.Ill.))**

of money involved and the difficult financial situations of many of the litigants may inhibit individualized litigation."*Williams v. Chartwell Financial Services, Ltd.,* 204 F.3d 748, 760 (7th Cir.2000).

**\*2** In order to establish that class certification is justified, a plaintiff must satisfy the four requirements of Fed.R.Civ.P. 23(a). These requirements include: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). In addition, the plaintiff must meet one of the requirements of Fed.R.Civ.P. 23(b). As applied to this case, Rule 23(b) requires that common questions of law and fact predominate over questions involving individual members, and that a class action is superior to other forms of adjudication. Fed.R.Civ.P. 23(b)(3).

II. Rule 23(a)

Roman contends the requirement of numerosity is satisfied for the following reasons: (1) he is claiming a common TILA violation; (2) First Franklin has a large number of loans, many of which are secured by real estate containing at least two dwellings; and (3) a mortgage company of First Franklin's size is going to have more than 20-40 loans with the violation Roman alleges. Roman does not purport to know the number of putative class members.

The exact number of class members need not be pleaded or proved. *See Gomez v. Comerford,* 833 F.Supp. 702, 706 (N.D.Ill.1993). However, the impracticability of joinder must be positively shown and not merely speculative. *Kohn v. Mucia,* 776 F.Supp. 348, 352 (N.D.Ill.1991). Roman has relied solely on speculation in an attempt to establish numerosity. Essentially, Roman asserts that because First Franklin is so large, it must have issued many loans secured by real estate containing two dwellings. Roman offers no evidence to substantiate this theory. In fact, he does not even *estimate* how many loans of this type were issued by First Franklin. Moreover, Roman simply speculates that if many of these loans were issued then at least 20-40 must have been

deficient in TILA disclosures. Roman has failed to establish that the class is so numerous that joinder is impracticable.[FN3]

> FN3. The court need not reach Rule 23(a)'s requirements of typicality, commonality, and adequate representation.

III. Rule 23(b)

Even if Roman met all Rule 23(a) requirements, class certification would not necessarily be appropriate. Class certification cannot be granted when questions involving individual class members predominate over common questions of law and fact. *See* Fed.R.Civ.P. 23(b)(3). First Franklin contends individual questions of law predominate because it must be determined whether each class member's loan falls under TILA protection. The TILA is applicable when a loan is primarily used for consumer purposes, but not when the loan is used for business purposes.

Roman's proposed class definition assumes it is easily discernible whether the class members' loans are subject to the TILA. However, according to the Federal Reserve Board's official state commentary to regulation Z, merely providing TILA disclosures is not determinative of whether the loan was used for business or consumer purposes. Instead, the commentary sets out five factors that should be considered in making this determination. The factors include: (1) The relationship of the borrower's primary occupation to the acquisition; the more closely related, the more likely it is to be business purpose; (2) the degree to which the borrower will personally manage the acquisition; the more personal involvement there is, the more likely it is to be business purpose; (3) the ratio of income from the acquisition to the total income of the borrower; the higher the ratio, the more likely it is to be business purpose; (4) the size of the transaction; the larger the transaction, the more likely it is to be business purpose; and (5) the borrower's statement of purpose for the loan. *See* Commentary § 226.3(a)-4. First Franklin asserts that applying these five factors to each possible member of the putative class requires highly fact intensive inquiries and that class certification would result in an undetermined number of mini-trials.[FN4] As this court has previously held, "Where liability determinations are both individual and fact-intensive," class certification under Rule

Not Reported in F.Supp.2d, 2001 WL 322563 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 322563 (N.D.Ill.))**

23(b)(3) is improper." *McGarvey v. Citibank (South Dakota) N.A.,* No. 95 C 123, 1995 WL 404866, at *6 (N.D.Ill. July 5, 1995).

> FN4. Roman's contention that examining First Franklin's records will answer the question of whether the loans were for business or consumer purposes is questionable. He offers no basis for his assumptions that each loan file "will probably have a borrower's affidavit" and that the lender will have documents showing the purpose of each loan.

CONCLUSION

**\*3** Indelfe Roman's motion for class certification is denied.

N.D.Ill.,2001.
Roman v. First Franklin Financial Corp.
Not Reported in F.Supp.2d, 2001 WL 322563 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 404866 (N.D.Ill.)
**1995 WL 404866 (N.D.Ill.)**

Page 1

**C**McGarvey v. Citibank (South Dakota) N.A.
N.D.Ill.,1995.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Scott MCGARVEY, on behalf of himself and all
others similarly situated, Plaintiff,
v.
CITIBANK (SOUTH DAKOTA) N.A., Citicorp
Credit Services, Inc., and Resolution Services, Inc.,
Defendants.
No. 95 C 123.

July 05, 1995.

*MEMORANDUM OPINION AND ORDER*

CONLON, District Judge.
*1 Scott McGarvey filed this purported class action
against Citibank (South Dakota) N.A., Citicorp
Credit Services, Inc. (collectively "Citibank"), and
Resolution Services, Inc. ("Resolution") for
violations of the Fair Credit Billing Act, 15 U.S.C. §
1666*et seq.* ("FCBA"), which is Part D of the Truth
in Lending Act, 15U.S.C. § 1601*et seq.* ("TILA"),
and the Illinois Consumer Fraud Act, 815 ILCS 505/2
("ICFA"). McGarvey alleges that Citibank imposes
arbitrary and unauthorized "documentation
deadlines" on consumers who attempt to assert
claims arising under 15 U.S.C. § 1666i. Section
1666i subjects credit card issuers to certain claims or
defenses that cardholders may have against
merchants furnishing goods or services paid for by
the credit card. McGarvey moves to certify a class.
Fed.R.Civ.P. 23.

*BACKGROUND*

In ruling on a motion for class certification, the
allegations of the complaint are taken as true. *Allen v.
Isaac,* 99 F.R.D. 45, 49 (N.D.Ill.1983). Citibank
issued McGarvey a Visa credit card account.
McGarvey used the account primarily for personal
purposes. On December 2, 1993, McGarvey brought
his car to a MAACO Auto Painting and Bodyworks
("MAACO") shop for repairs. McGarvey charged the
$1,076 cost of the repairs to his Citibank Visa

account. McGarvey, however, was dissatisfied with
the repair job and asked MAACO to correct the
problems. MAACO agreed, and attempted to correct
the deficiencies identified by McGarvey.
Nevertheless, McGarvey remained dissatisfied and
asked MAACO for a refund of the price of the
repairs. MAACO refused to issue McGarvey a
refund.

The debit for the MAACO repair appeared on
McGarvey's December 22, 1993 Citibank Visa
statement. McGarvey gave Citibank's customer
service unit information that MAACO had failed to
perform the repairs in accordance with the parties'
agreement. At the time, the entire amount of the
credit for the transaction was outstanding. In a letter
dated December 24, 1993 responding to McGarvey's
complaint, Citibank issued McGarvey a conditional
credit for the price of the repairs, informed him that it
would try to help him resolve the dispute, and
requested that McGarvey provide Citibank with
additional information and documentation regarding
the problem within ten days (the "ten-day letter").
*See* Compl.Ex. B. McGarvey provided Citibank with
the requested information on January 14, 1994. In a
letter dated January 22, 1994, Citibank asked
McGarvey to provide more information, including an
estimate from another merchant indicating any
original work needed to be redone, within five days
(the "five-day letter"). *See* Compl.Ex. C. McGarvey
alleges that he telephoned Citibank several times
between January 22nd and March 7, 1994 to report
that the other merchant had not yet redone the work
and that he would send an invoice upon completion.
The merchant did not complete the work until March
2, 1994.[FN1]

On February 22, 1994, Citibank sent McGarvey a
letter stating that "[w]e previously wrote to you
requesting necessary information concerning this
dispute(s) and did not receive a reply." *See*
Compl.Ex. D. Citibank then notified McGarvey that
its investigation was complete and that Citibank
would rebill McGarvey's account for the $1,076 price
of the MAACO repairs (the "turn-down letter"). *See*
Compl.Ex. D. On March 7, 1994, McGarvey
responded with a letter enclosing the requested
information and noting that it was not possible for

Not Reported in F.Supp.                                                                                   Page 2
Not Reported in F.Supp., 1995 WL 404866 (N.D.Ill.)
**1995 WL 404866 (N.D.Ill.)**

him to send the information earlier. *See* Compl.Ex. E. On April 6, 1994, Citibank informed McGarvey that it was unable to assist him in the dispute "because we received your correspondence after the requested response date." *See* Compl.Ex. F. McGarvey continued to make minimum payments on his Visa account until June 1994, when he abruptly stopped. Heinemann Aff. ¶ 7. McGarvey does not explain why he ceased making payments on his account.

**\*2** McGarvey alleges that Citibank "deni[ed] his claim under § 1666i" for arbitrary and unauthorized reasons. McGarvey claims that but for this arbitrary action, "Citibank would have been required to pay or credit McGarvey with the full $1,076 claimed." Compl. ¶ 24. McGarvey also alleges that Citibank and Resolution have attempted to collect his MAACO debt and have threatened to report the debt to credit bureaus. McGarvey argues that it is illegal for Citibank to impose ten and five-day deadlines on a cardholder's "claims" under § 1666i. McGarvey further asserts that Citibank has a policy and practice of reporting delinquent debts to credit bureaus even though consumers have asserted claims or defenses. McGarvey requests certification of a class of all Illinois residents who satisfy the following criteria:
<sup>FN2</sup>

a. Citibank sent them a letter demanding that additional information be submitted within a period of time not provided for in the FCBA.

b. Citibank sent them a letter denying a claim within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12 because requested information had been received after a "requested response date."

c. After they had notified Citibank in writing of a dispute within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12, Citibank or its affiliates threatened to report or did report the debt to a credit bureau, without first obtaining a resolution of the dispute by settlement or judicial determination.

d. The class period for purposes of Count I begins one year prior to the filing of this action. The class period for purposes of Count II begins three years prior to the filing of this action.

Motion for Class Certification ¶ 10.

### *DISCUSSION*

In order to maintain a class action, McGarvey must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir.1993). Rule 23(a) requires that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). If these prerequisites are satisfied, the court must determine whether one of the standards of Rule 23(b) is met. *Patrykus v. Gomilla*, 121 F.R.D. 357, 360 (N.D.Ill.1988). Here, McGarvey looks to Rule 23(b)(3) and asserts that questions of law or fact common to the class predominate over questions affecting only individual members. In addition, McGarvey claims that a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Fed.R.Civ.P. 23(b)(3).

The certification decision is committed to the sound discretion of the court. *First Interstate Bank, N.A. v. Chapman & Cutler*, 837 F.2d 775, 781 (7th Cir.1988). In assessing the certification petition, the court does not examine the merits of the case, *Allen v. Isaac*, 99 F.R.D. 45, 49 (N.D.Ill.1983), although "[t]he boundary between a class determination and the merits may not always be easily discernible." *Eggleston v. Chicago Journeymen Plumbers' Local Union*, 657 F.2d 890, 895 (7th Cir.1981); *accord General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982). Failure to meet any one of the Rule 23 requirements precludes certification. *Patterson v. General Motors Corp.*, 631 F.2d 476, 480 (7th Cir.1980). McGarvey bears the burden of showing that certification is proper. *Trotter v. Klincar*, 748 F.2d 1177, 1184 (7th Cir.1984).

### I. *Numerosity*

**\*3** Citibank contends that McGarvey cannot show numerosity. Under Rule 23(a)(1), McGarvey must show that the class is so numerous that joinder of all members is impracticable. The exact number of class members need not be pleaded or proved. *See Gomez*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                          Page 3
Not Reported in F.Supp., 1995 WL 404866 (N.D.Ill.)
**1995 WL 404866 (N.D.Ill.)**

*v. Comerford,* 833 F.Supp. 702, 706 (N.D.Ill.1993). Nevertheless, the impracticability of joinder must be positively shown and not merely speculative. *Kohn v. Mucia,* 776 F.Supp. 348, 352 (N.D.Ill.1991). McGarvey cannot rely on conclusory allegations or speculation as to the size of the class in order to prove numerosity. *See Marcial v. Coronet Ins. Co.,* 880 F.2d 954, 957 (7th Cir.1989).

McGarvey attempts to show numerosity in two ways. First, McGarvey alleges (without attaching evidence) that Citibank has more than 12 million credit card accounts and that 1978 Federal Reserve Board statistics indicate that between .87 percent and 6 percent of credit card holders "question their billing statement during any given month." *See* Mot.Class Cert. ¶ 12. But the class is not defined in terms of how many people, nationwide, "question their billing statement." The class consists of all Illinois residents who received a letter from Citibank requesting information within a time not specified by the FCBA, received a letter denying a "claim within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12" because the requested information was received late, and who thereafter were threatened with notification of the disputed debt to a credit bureau. McGarvey's statistics are not helpful in estimating this class. Similarly, McGarvey's statistics only estimate the number of credit card customers who "question their billing statement." This term may include many customers who inquire about possible billing mistakes on their statements, *see* 15 U.S.C. § 1666 (procedure for correction of billing errors), as opposed to those who assert against the card issuer any claims and defenses they may have against a merchant for defective goods or services. *See Exercise of Consumer Rights Under the Equal Credit Opportunity and Fair Credit Billing Acts,* 64 Fed.Reserve Bull. No. 5 at 363 (May 1978).

McGarvey also notes that Citibank admitted in an interrogatory to sending the ten-day letter to over 100 cardholders and to sending letters that included "some of the language in Exhibits B, C, D, or F" to more than 100 persons. In his reply, McGarvey buttresses this showing with evidence that the ten-day letter was sent to approximately 9000 individuals, Heinemann Dep. 94, and that the turn-down letter was sent to 700 in 1994. Heinemann Dep. 90. McGarvey does not produce evidence showing the number of people who received the five-day letter.[FN3]

These facts do not establish numerosity under McGarvey's current class definition. McGarvey's motion urges certification of a class definition that is conjunctive. *See* Mot.Class Cert. ¶ 10. The class consists of all Illinois residents who received a letter requesting information within a time period not specified in FCBA, *and* who received a letter denying a claim within the scope of § 1666i or 12 C.F.R. § 226.12 because of a tardy response to the first letter, *and* who became the subject of threats to report delinquent accounts. McGarvey must show that joinder of individuals satisfying all three criteria would be impracticable. The ten-day letter is the initial letter that Citibank sent to McGarvey asking for more information about his claim. The fact that Citibank sent the ten-day letter to 9000 customers may establish numerosity as to the first part of the class definition.[FN4] McGarvey cannot establish that Citibank has a letter "denying a claim within the scope of § 1666i." *See infra* pp. 11-13. Moreover, McGarvey fails to present any evidence whatsoever that Citibank threatened to report delinquent customers who had asserted claims under § 1666i to a local credit bureau. McGarvey excuses himself from this showing "because all such persons would have previously received the ten-day, five-day, or turn-down letters." McGarvey Reply at 6. However, the fact that these persons would have received the other letters first says nothing about whether persons who receive the first three letters *also* receive the letter threatening to report them to a credit bureau. Thus, McGarvey has not established that the number of Illinois residents satisfying all three criteria are so numerous that joinder is impracticable.[FN5]

*4 Perhaps recognizing the problem with his class definition, McGarvey changes his tack considerably in his reply.[FN6] McGarvey now boldly asserts that he is really proffering a disjunctive definition that Citibank has "seriously mischaracterized." The court disagrees. The only reasonable reading of McGarvey's proposed class definition is that it is conjunctive. *See* Mot. for Class Cert. ¶ 10. Citibank (and the court) reasonably read it as such. McGarvey's attempt to change the definition in his reply is unacceptable, for it sidesteps Citibank's arguments in opposition to certification while affording Citibank no further opportunity to respond. Accordingly, the court reads the definition as conjunctive and finds that McGarvey cannot establish

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                         Page 4
Not Reported in F.Supp., 1995 WL 404866 (N.D.Ill.)
**1995 WL 404866 (N.D.Ill.)**

numerosity.

Nevertheless, McGarvey's certification motion would fail even if his disjunctive definition were used. Under this definition, the first part of the class would consist of all persons whom Citibank "sent a letter demanding that additional information be submitted within a period of time not provided for in the FCBA." This definition is fatally vague and overbroad. The definition would encompass anyone, customers of Citibank or otherwise, who were sent a letter by Citibank demanding information within a time not specified by the FCBA. Thus, it could include Citibank's suppliers, Citibank's counsel, charities to whom Citibank was considering making a donation, or Citibank's affiliates. The class definition could also include potential customers looking to open a Citibank credit account or customers seeking to resolve a billing error under § 1666.

Rule 23(a)(3) requires that the claims of the representative be typical of the claims of the class. The representative's claims must have the "same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983). "If proof of the representatives' claims not necessarily prove all the proposed class members' claims, the representatives' claims are not typical of the proposed members' claims." *Brooks v. Southern Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 58 (S.D.Fla.1990). The first element of McGarvey's class definition is overbroad. Determination of whether the demands Citibank made on McGarvey violates § 1666i would not resolve the "claims" of all other persons potentially included in the class. Courts faced with an overbroad class definition may deny certification for want of typicality. *See, e.g., Lundquist v. Security Pacific Automotive Financial Servs.,* 993 F.2d 11, 14 (2d Cir.1993) (involving McGarvey's counsel); *Hickey v. Great Western Mortgage Corp.,* 1995 U.S.Dist. Lexis 3357 (N.D.Ill.1995) (involving McGarvey's counsel); *Avila v. Van Ru Credit Corp.,* No. 94 C 3234, slip op. at 5 (N.D.Ill. Nov. 14, 1994) (involving McGarvey's counsel). The court holds that McGarvey's claims are not typical of the claims of all other class members under McGarvey's class definition.

**\*5** The second portion of McGarvey's disjunctive class consists of all Illinois residents to whom "Citibank sent a letter denying a claim within the

scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12 because requested information had been received after a 'requested response date.' " Citibank, however, argues that it does not have a letter "denying a claim" within the scope of § 1666i or regulation § 226.12; Citibank therefore contends that there exist no individuals, including McGarvey, who will be a member of the class.

McGarvey contends that Citibank denies a claim within the scope of § 1666i when it issues a turn-down letter, as it did to McGarvey. McGarvey has not carried his burden on this issue. Section 1666i provides that a card issuer shall be subject to all claims and defenses that the cardholder has against the merchant. Thus, a "claim within the scope of § 1666i" is a personal defense, such as breach of contract, that a cardholder asserts against the creditor to avoid payment.

McGarvey informed Citibank that he was dissatisfied with the MAACO repair work. Citibank issued a conditional credit to McGarvey and agreed to try to assist McGarvey in his dispute with MAACO. The FCBA does not require Citibank either to issue the conditional credit or to attempt to help McGarvey, although Citibank may choose to do so in the interest of goodwill. Citibank's turn-down letter informs McGarvey that Citibank's "investigation is complete" and that Citibank "is unable to help in this matter." *See* Am.Compl.Exs. D & F.

Thus, Citibank's turn-down letter simply informs McGarvey that Citibank is reversing its conditional credit and that Citibank will no longer assist McGarvey. The turn-down letter does not appear to "deny a claim" under § 1666i; it does not assert that McGarvey's breach of contract defense is unmeritorious or deny McGarvey's right to withhold payment by asserting a personal defense against Citibank. Nor does the turn-down letter state that McGarvey waives any personal defenses because of his failure to comply with Citibank's deadlines. *See In re Beneficial Corp.,* 96 F.T.C. 120 (1980). Indeed, Citibank does not have any power to "deny a claim" under § 1666i. The turn-down letter simply informs McGarvey that Citibank will not voluntarily assist him in his dispute because McGarvey failed to submit information in a timely fashion.

Thus, whether Citibank's letter "denies a claim within

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 404866 (N.D.Ill.)
**1995 WL 404866 (N.D.Ill.)**

the scope of § 1666i" conflates with the legal question that must ultimately be decided on the merits. McGarvey bears the certification burden. McGarvey has not established that the turn-down letter "den[ies] a claim within the scope of § 1666i and 12 C.F.R. § 226.12." Accordingly, McGarvey has not established that he is a member of the proposed class and he cannot establish that anyone exists who will satisfy this portion of the class definition.

The third part of McGarvey's class definition includes all Illinois residents who, "[a]fter they had notified Citibank in writing of a dispute within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12, Citibank or its affiliates threatened to report or did report the debt to a credit bureau, without first obtaining a resolution of the dispute be settlement or judicial determination." McGarvey presents no evidence reflecting the number of people who received this letter, much less how many received this response after notifying Citibank in writing of a dispute within the scope of § 1666i. There is no reasonable basis to estimate how many individuals satisfy this element of the class definition.[FN7] As a result, McGarvey also fails to establish numerosity as to this element of his definition.

*6 McGarvey bears the burden of demonstrating that the numerosity requirement of Rule 23(a)(1) is satisfied. The evidence offered by McGarvey on numerosity is fatally vague and only marginally relevant to his class definition. McGarvey's numerosity showing is complicated by an unworkable class definition, making it impossible to determine who, if anyone, is included in the class. Although a numerosity showing may be aided by common sense and appropriate inferences, the court finds that McGarvey's numerosity showing amounts only to pure speculation. *See, e.g., Kohn,* 776 F.Supp. at 353; *Faraci v. Regal Cruise Line, Ltd.,* 1994 WL 573305, *1-3, 1994 U.S.Dist. Lexis 14817, *4-7 (S.D.N.Y.1994)* (Martin, J.). Because numerosity cannot be based on speculation as to the size of the class, *see Marcial,* 880 F.2d at 957, the court concludes that McGarvey has not demonstrated that the class is so numerous as to make joinder impracticable. Accordingly, the motion for class certification is denied.

II. *Predominance of Common Questions*

McGarvey seeks class certification under Rule 23(b)(3). Rule 23(b)(3) requires that common issues of law or fact predominate over questions affecting only individual class members. Certification under Rule 23(b)(3) is improper where liability determinations are both individual and fact-intensive. *See, e.g., Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.,* 149 F.R.D. 65, 76 n. 21 (D.N.J.1993).

Citibank argues that common questions do not predominate because determining the applicability of § 1666i is a fact-intensive inquiry. Citibank contends that McGarvey's claim will require the court to decide the applicability of § 1666i to each class member. McGarvey responds that he is only challenging the "policy of setting arbitrary deadlines for consumers with claims within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12." Mot.Class.Cert. at 9. McGarvey argues that the court can determine the legality of Citibank's procedure without adjudicating any of the class members' underlying claims or defenses.

The court agrees that individual issues will predominate over issues common to the class. McGarvey alleges that Citibank's practice of imposing documentation deadlines as a condition to providing assistance in resolving billing disputes violates § 1666i and 12 C.F.R. § 226.12. Neither Congress nor the Federal Reserve Board ("the Board") imposed any explicit timing requirements for asserting claims or defenses under these sections. *Compare* 15 U.S.C. § 1666i and 12 C.F.R. § 226.12 *with* 15 U.S.C. § 1666 and 12 C.F.R. § 226.13 (explicit timing requirements for billing error resolution). McGarvey essentially claims that Citibank's documentation deadlines contravene procedural protections that are implied in the rights provided in § 1666i and 12 C.F.R. § 226.12.

McGarvey's claims depend on the applicability of § 1666i; a Citibank letter will only violate the implied procedural protections or rights of § 1666i if § 1666i applies to a particular plaintiff. However, the rights in § 1666i "apply only if" (1) the cardholder has made a good faith attempt to resolve the dispute with the person honoring the credit card; and (2) the amount of credit extended to obtain the property or services exceeds $50 and the disputed transaction occurred in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6
Not Reported in F.Supp., 1995 WL 404866 (N.D.Ill.)
**1995 WL 404866 (N.D.Ill.)**

the same state as the cardholder's designated address or within 100 miles from that address. *See* 15 U.S.C. § 1666i(a), 12 C.F.R. § 226.12(3). The first limitation is a highly individualized inquiry. The Board's commentary notes that determining whether a consumer tried in good faith to resolve a dispute with a merchant is "a matter for factual determination in each case." 12 C.F.R. pt. 226, Supp. I, ¶ 12(c)(3)(i). In order to determine whether an individual class member can obtain relief for a violation of § 1666i, the court would be required to conduct an evidentiary inquiry into every putative class member's attempt to resolve the dispute with the merchant. Such an individualized inquiry will be time-consuming and inimical to the policies served by class actions.

**\*7** Any question that McGarvey's claims necessarily require application of § 1666i is foreclosed by McGarvey's own class definition. Under the definition's second element, a consumer may only be a class member if the consumer received a letter from Citibank "denying a claim within the scope of § 1666i and 12 C.F.R. § 226.12." Thus, a prerequisite to class membership is that the consumer's claims are "within the scope of § 1666i." Claims are only within the scope of § 1666i if the consumer made a good faith attempt to resolve the dispute, the amount of credit extended exceeds $50, and the transaction at issue occurred within the geographic limitation.

Contrary to McGarvey's suggestion, this approach should not be equated with deciding the underlying merits of the class members' claims. The "underlying merits" consist of whether the personal defenses class members assert against a creditor are valid and allow them to avoid payment. In McGarvey's case, for example, the underlying merits of his claim are whether MAACO breached its contract with McGarvey. However, the three requirements listed in the statute are conditions or prerequisites that must be satisfied before any rights under § 1666i apply; § 1666i does not even come into play unless a plaintiff satisfies these requirements. In order to obtain relief for Citibank's alleged violation of § 1666i, each class member must establish that he is entitled to the right to assert his underlying claim against the creditor. *See also* Am.Compl. ¶ 11 (treating the three requirements of § 1666i as a prerequisite to relief). This inquiry is unacceptably individualized for class purposes.

McGarvey cites several cases for the proposition that a class action is a proper mechanism to challenge a defendant's procedures with respect to a denial of a benefit despite the fact that the merits of the class members' underlying claims would be different. *See, e.g., Andre H. v. Ambach,* 104 F.R.D. 606 (S.D.N.Y.1985); *Wilder v. Bernstein,* 499 F.Supp. 980 (S.D.N.Y.1980); *Morgan v. Laborers Pension Trust Fund,* 81 F.R.D. 669 (N.D.Cal.1979); *Fischer v. Weaver,* 55 F.R.D. 454 (N.D.Ill.1972). McGarvey's reliance on these cases is flawed in two respects. First, the cases are all inapposite because they involve certification under Rule 23(b)(2). Rule 23(b)(2) does not require a finding that common issues predominate over individual issues. As a result, McGarvey's cases do not consider whether certification would have been proper under Rule 23(b)(3). Here, McGarvey seeks certification under Rule 23(b)(3), which requires a finding that common issues predominate over individual issues.[FN8] Second, none of McGarvey's cases involve the issue of whether the source of the plaintiffs' alleged procedural rights actually apply to the plaintiffs.[FN9] Here, however, the rights and alleged implied procedural protections of § 1666i do not apply unless specific prerequisites are satisfied.[FN10]

*CONCLUSION*

**\*8** Plaintiff Scott McGarvey's motion for class certification is denied. McGarvey's motion to strike the affidavit of Catherine Heinemann is moot.

> FN1. It is unclear why McGarvey had the work "redone" when Citibank merely asked for a letter or estimate from another merchant indicating what work needed to be redone. *See* Compl.Ex. C.

> FN2. The motion for class certification does not contain a geographical limitation in the definition. McGarvey assured Citibank that he intends to limit his class to Illinois residents. *See* Citibank Br. at 4 n. 4. Accordingly, the court assumes McGarvey seeks certification of an Illinois-based class.

> FN3. McGarvey contends that he need not show this number because "all or almost all persons receiving it would also have received the ten-day letter." McGarvey

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 404866 (N.D.Ill.)
**1995 WL 404866 (N.D.Ill.)**

Reply at 3 n. 2.

FN4. However, this portion of the class definition is defective as overbroad. *See infra* pp. 10-11.

FN5. Citibank submits an affidavit from its compliance manager. The compliance manager avers that she has no knowledge of a cardholder dispute relating to the quality of goods or services with the same facts as those alleged by McGarvey. *See* Heinemann Aff. ¶ 12. Although this statement is self-serving and must be discounted as such, it nevertheless militates against a numerosity finding given the weak and speculative nature of the numerosity evidence McGarvey presents.

FN6. Indeed, McGarvey effectively concedes that he cannot satisfy numerosity if his definition is read as conjunctive. *See* McGarvey Reply at 2-3.

FN7. The relevant inquiry is not how many people received a letter attempting to collect a Citibank debt and threatening to report the consumer to a credit bureau. Instead, the relevant question is how many people received such a letter after first notifying Citibank of a dispute within the scope of § 1666i.

FN8. In his reply, McGarvey makes a conclusory assertion that he also moves for certification under Rule 23(b)(2). *See* McGarvey Reply at 2. McGarvey has never presented (even in his reply) *any* argument or analysis for certification under Rule 23(b)(2), and the court declines to make the argument for him. *See Hartmann v. Prudential Ins. Co.,* 9 F.3d 1207, 1212 (7th Cir.1993) (failure to press a point with proper argument forfeits it).

FN9. McGarvey's reliance on *Avila v. Van Ru Credit Corp.,* 1995 WL 41425, 1995 U.S.Dist. Lexis 461 (N.D.Ill.1995), is misplaced. In *Avila,* a determination that the form letter sent by the debt collector violated the relevant provisions of the Fair Debt Collect Practices Act would have established that the plaintiff class was entitled to relief; no issue was presented as to whether the relevant sections of the statute applied to the class, and relief could be granted without engaging in collateral, individualized issues for each class member. Here, in contrast, the members of McGarvey's class are not entitled to relief unless they show both that Citibank's letter violates the FCBA and that they have satisfied the other prerequisites for relief.

FN10. McGarvey moves to strike the affidavit of Catherine Heinemann, submitted by Citibank in opposition to class certification. Because the court does not rely on any of the challenged material in the affidavit, McGarvey's motion is moot.

N.D.Ill.,1995.
McGarvey v. Citibank (South Dakota) N.A.
Not Reported in F.Supp., 1995 WL 404866 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**2002 WL 406979 (N.D.Ill.)**

**H**Peoples v. Sebring Capital Corp.
N.D.Ill.,2002.

United States District Court, N.D. Illinois, Eastern
Division.
BENJAMIN PEOPLES, Plaintiff,
v.
SEBRING CAPITAL CORPORATION, Defendant.
**No. 01 C 5676.**

March 15, 2002.

MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District J.
*1 Plaintiff Benjamin Peoples alleges that defendant
Sebring Capital Corporation ("Sebring") violated
state and federal law in the course of two loan
transactions. Peoples has moved for class
certification as to the first of his four counts. For the
reasons set forth below, the motion for class
certification is granted with one modification.

I. Background

On September 1, 2000, Peoples obtained two loans
from Sebring in order to purchase his current
residence, 7653 South Langley Avenue in Chicago.
On July 23, 2001, Peoples filed this putative class
action alleging in Count I that Sebring violated
section 1638 of the Truth in Lending Act ("TILA"),
15 U.S.C. § 1601 et seq., and subpart 18 of
implementing Federal Reserve Board Regulation Z
("Regulation Z"), 12 C.F.R. pt. 226. In a secured
credit transaction, section 1638 of the TILA requires
the lender to provide "a statement that a security
interest has been taken in (A) the property which is
purchased as part of the credit transaction, or (B)
property not purchased as part of the credit
transaction identified by item or type."15 U.S.C. §
1638(a)(9); accord12 C.F.R. § 226.18(m) (requiring
disclosure by the lender of "[t]he fact that the creditor
has or will acquire a security interest in the property
purchased as part of the transaction, or in other
property identified by item or type").

In the first amended complaint,[FN1] Peoples explains

that the TILA disclosure statements provided by
Sebring in the September 1 transaction, "among other
things, ... failed to disclose that the loan documents
created an extensive security interest in certain
property, by means of the 1-4 Family
Rider."(Am.Compl.¶ 14.) The 1-4 Family Riders (a
standard form prepared by Fannie Mae) amended the
mortgages by adding a security interest in "building
materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used,
or intended to be used in connection with the
Property, ... now or hereafter attached to the Property,
all of which including replacements and additions
thereto."(Am.Compl.Ex. C, ¶ A, Ex. G, ¶ A.) The
only security interest disclosed in each TILA
statement is "in the property located at: 7653 South
Langley Avenue, Chicago, Illinois 60619."Peoples
argues that the disclosure statement is too narrow and
violates the TILA. For relief, Peoples seeks statutory
damages as specified in 15 U.S.C. § 1640, attorneys
fees and costs, and any other appropriate relief.

> FN1. The motion for class certification
> preceded the first amended complaint, but
> the amendments did not substantially affect
> Count I. Peoples has moved for leave to file
> a second amended complaint, a motion to
> which Sebring objects. Resolving this
> motion will not impact class certification
> because Count I remains unchanged in the
> proposed second amended complaint.

Peoples defines the putative class as "all natural
persons who satisfy the following criteria:"

a. They obtained a residential mortgage loan secured
by real estate containing 1-2 dwelling units;

b. In one of which they or a family member resided;

c. Their transaction was documented as one subject to
the Truth in Lending Act;

d. Their note and mortgage were originated by
Sebring;

e. Their mortgage included a 1-4 Family Rider and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**2002 WL 406979 (N.D.Ill.)**

Assignment of Rents creating a security interest in personal property not limited to rents;

**\*2** f. Their Truth in Lending statement does not disclose the security interest in personal property created by the Rider; and

g. Their mortgage is dated on or after a date one year prior to the fling [sic] of this action.

(Am.Compl.¶ 21.) So defined, the class consists of thirty-eight individuals, eleven of whom reside in Illinois (including Peoples). Peoples moves for class certification under Federal Rule of Civil Procedure 23(b)(3).

## II. Analysis

The burden is on the putative class representative to demonstrate that all the requirements for class certification are satisfied. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir.1993).Rule 23(a) provides that an individual may sue on behalf of a class only if

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Where, as here, a Rule 23(b)(3) class is proposed, the court must also find:
that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). The Federal Rules expressly permit classes, like the one proposed here, that are limited to only one count of a multi-count complaint. Fed.R.Civ.P. 23(c)(4).

In ruling on certification, the court has an independent duty to scrutinize the appropriateness of a class action and is not limited to arguments made by the parties. *In re General Motors Corp. Engine*

*Interchange Litig.*, 594 F.2d 1106, 1124 (7th Cir.1979). And while the court may not consider the ultimate merits of the claim, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974), "[t]he boundary between a class determination and the merits may not always be easily discernible."*Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 895 (7th Cir.1981); *see also Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal quotation marks omitted). For example, it is sometimes necessary to determine the contours of the applicable law in order to predict "the difficulties likely to be encountered in the management of a class action."*Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir.2001). The court is not to assume the truth of factual allegations in the complaint that go to the issue of class certification, but rather, as would be true on a motion to dismiss for lack of jurisdiction, should resolve factual issues related to certification using any rational mode of inquiry. *See id.* at 675-77.

### A. Numerosity

**\*3** The prerequisite of numerosity is satisfied if "the class is so large that joinder of all members is impracticable."Fed.R.Civ.P. 23(a)(1). Impracticability, not impossibility, is the touchstone. "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."*Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980)."As a general rule, classes of 20 are too small, classes of 20-40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough."*Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D.Cal.1988). Factors to be considered in addition to size include "the nature of the relief sought, the ability of the individuals to press their own claims, the practicality of forcing relitigation of a common core of issues, and administrative difficulties involved in interpretation and joinder."*Rosario v. Cook County*, 101 F.R.D. 659, 661 (N.D.Ill.1983). The court may "make common sense assumptions in order to find support for numerosity."*NOW v. Scheidler*, 172 F.R.D. 351, 359-60 (N.D.Ill.1997) (quoting *Evans v. United States Pipe & Foundry*, 696 F.2d 925, 930 (11th Cir.1983)).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**2002 WL 406979 (N.D.Ill.)**

The parties dispute the relevant number of class members. Peoples would include all thirty-eight individuals who meet the specified criteria. Sebring argues the class must be limited to the eleven Illinois residents because state law controls the threshold question of whether a particular interest in property constitutes a "security interest" for TILA disclosure purposes. In response, Peoples contends that the definition of "security interest" does not vary from state to state, pointing out that all 50 states have adopted the Uniform Commercial Code article governing the creation of security interests in personal property and that Fannie Mae issued only one 1-4 Family Rider for use in all jurisdictions. What is more, Peoples urges, "[a]s long as defendant's documents *purport* to take a security in personal property, the fact that some court might later hold that the security interest is not enforceable does not affect defendant's disclosure obligations."(Reply at 3.) Both sides' arguments blur potentially important distinctions, but Peoples reaches the right result.

Evaluating these competing contentions requires a nuanced appreciation of the role of state law in determining liability under the TILA. Regulation Z defines a security interest as "an interest in property that secures performance of a consumer credit obligation and that is recognized by State or Federal law."12 C.F.R. § 226.2(a)(25). The official commentary states:

The threshold test is whether a particular interest in property is recognized as a security interest under applicable law. The regulation does not determine whether a particular interest is a security interest under applicable law. If the creditor is unsure whether a particular interest is a security interest under applicable law (for example, if statutes and case law are either silent or inconclusive on the issue), the creditor may at its option consider such interests as security interests for Truth in Lending purposes.

**\*4** 12 C.F.R. pt. 226, supp. I, § 226.2(a)(25)-1.[FN2]The TILA generally demands accuracy, however, so the creditor's uncertainty must be bona fide and reasonable for disclosure to become optional. *Szumny v. Am. Gen. Fin., Inc.,* 246 F.3d 1065, 1071 (7th Cir.2001). It follows that if state law conclusively

establishes that the purported security interest is wholly without value, then believing it is a security interest would be unreasonable and disclosing it would violate the TILA. *See Smith v. Cash Store Mgmt ., Inc.,* 195 F.3d 325, 328 (7th Cir.1999). Nondisclosure would be mandatory, not merely permissible.

> FN2. Federal Reserve Board regulations and commentary under the TILA are entitled to substantial deference. *Szumny v. Am. Gen. Fin., Inc.,* 246 F.3d 1065, 1069 (7th Cir.2001).

In the 1-4 Family Rider, Sebring purported to take a security interest in "building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, ... now or hereafter attached to the Property, all of which including replacements and additions thereto."(Am.Compl.Ex. C, ¶ A, Ex. G, ¶ A.) The state law definition of "security interest" would affect Sebring's potential liability under the TILA only if it clearly excluded all property that is described by this language. That seems very unlikely. It is true that some states prohibit certain security interests in household goods, 12 C.F.R. pt. 226, supp. I, § 226.18(m)-2, but the court is aware of no state that prohibits a security interest in *all* goods "of every nature" attached to a house or the land on which the house sits. Variations in state law definitions of "security interest" are immaterial so long as a security interest in one good that falls into this category is potentially viable in every relevant state. Sebring's argument to limit the class to Illinois residents therefore fails.

An alternative argument not raised by the parties derives from specific exceptions to the TILA disclosure requirement. If everything described in the additional security interest provision falls into an exception, Sebring is off the hook. The TILA does not require disclosure of every interest that qualifies as a "security interest" under state law. Regulation Z specifies that "security interest" for TILA purposes "does not include incidental interests such as interests in proceeds, accessions, additions, fixtures, insurance proceeds (whether or not the creditor is a loss payee or beneficiary), premium rebates, or interests in after-acquired property."12 C.F.R. § 226.2(a)(25).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 4
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**2002 WL 406979 (N.D.Ill.)**

Although neither the TILA nor Regulation Z defines these terms, Regulation Z provides that any term not defined by the regulation should be construed in accordance with state law or the contract. 12 C.F.R. § 226.2(b)(3). Peoples's mortgages do not define any of these terms but provide that the law of the jurisdiction in which the property is located governs. (Am.Compl.Ex. B, ¶ 13, Ex. F, ¶ 15.) Presumably, the other class members' transactions were documented with comparable standard-form mortgages. This court must therefore consider whether jurisdictional variations in the definitions of these terms might impact Sebring's potential liability on Count I.

*5 Only one of these terms has any chance of making a difference. Based on the "attached" language in the 1-4 Family Rider additional security interest provision, Sebring could argue that the provision includes only "fixtures." *See, e.g., Leon v. Washington Mut. Bank, F.A.,* 164 F.Supp.2d 1034, 1037-39 (N.D.Ill.2001).Article 9 of the Uniform Commercial Code, which has been adopted in all 50 states, defines fixtures as "goods that have become so related to particular real property that an interest in them arises under real property law."U.C.C. § 9-102(a)(41).[FN3] The test for determining when a good becomes "so related" has changed over time and still varies across jurisdictions. For the differences to matter, however, it must be the case that the provision never deemed sufficient to convert a good into a fixture when it is "attached" to real property. As far as this court is aware, non-permanent attachment was never deemed sufficient to convert a good into a fixture. *Cf. Nat'l Bank of Republic v. Wells-Jackson Corp.,* 193 N.E. 215, 218 (Ill.1934) ("The early decisions in England, as well as in this country, were very firm in holding that when personal property became a fixture by annexation to the real estate *by some permanent method* the personal property lost its identity as such and became real estate.") (emphasis added). A calendar (or Post-it ® note) does not become part of your house when you put it on the wall. But even if the court is mistaken on this point or if the phrase "now or hereafter attached" implies the required element of permanence, "[t]here seems to be a general agreement today that annexation is no longer a matter of controlling importance."35 Am.Jur.2d, *Fixtures* § 4 (2000). If it later appears that attachment alone suffices in any relevant jurisdiction, the court will reevaluate the appropriateness of a nationwide class. Until then, the

relevant number of putative class members will be thirty-eight.

> FN3. Revised Article 9 took effect in 46 states (including Illinois) on July 1, 2001. The definition of fixture was moved to section 9-313(1)(a) but was substantively unchanged.

And while thirty-eight is not an especially large number, courts have certified classes of this size and smaller. *See, e.g., Swanson v. Am. Consumer Indus., Inc.,* 415 F.2d 1326, 1333 n. 9 (7th Cir.1969) (class of 40); *Jordan v. County of Los Angeles,* 669 F .2d 1311, 1319-20 (9th Cir.) (class of 39), *vacated on other grounds,*459 U.S. 810 (1982); *Afro Am. Patrolmens League v. Duck,* 503 F.2d 294, 298 (6th Cir.1974) (class of 35); *Riordan v. Barney,* 113 F.R.D. 60, 62 (N.D.Ill.1986) (class of 29); *Basile v. Merrill Lynch, Pierce, Fenner & Smith,* 105 F.R.D. 506, 508 (S.D.Ohio 1985) (class of 23); *Arkansas Educ. Ass'n v. Bd. of Educ.,* 446 F.2d 763, 765 (8th Cir.1971) (class of 20); *Rosario,* 101 F.R.D. at 659 (class of 20); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n,* 375 F.2d 648, 653 (4th Cir.1967) (class of 18). Sebring objects to Peoples's reliance on securities fraud cases where there is a "strong policy favoring certification," *Riordan,* 113 F.R.D. at 62, but most of the cases cited above arise in other contexts.

*6 Two other factors also favor a finding of numerosity. The statutory damages sought here are too small to warrant undertaking individual actions.*Swanson,* 415 F.2d at 1333 n. 9. At least twenty-seven of the thirty-eight potential class members reside in other judicial districts, which increases the impracticability of joinder. *Allen v. Isaac,* 99 F.R.D. 45, 53,amended in non-pertinent part,100 F.R.D. 373 (N.D.Ill.1983). And it seems unlikely that the non-Illinois residents are concentrated in just one or two other locations. *Cf. Gaspar v. Linvatec Corp.,* 167 F.R.D. 51, 56 (N.D.Ill.1996) ( "[T]he more geographically separated the proposed members are, the more joinder becomes impracticable.").

The court finds that Peoples's proposed class is sufficiently "large that joinder of all members is impracticable."Fed.R.Civ.P. 23(a)(1).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                 Page 5
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**2002 WL 406979 (N.D.Ill.)**

### B. Commonality

Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class."The threshold for commonality is not high. *Forbush v. J.C. Penney Co., 994 F.2d 1101, 1106 (5th Cir.1993).*"A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)."*Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir.1992).* A common nucleus of operative fact exists when "defendants have engaged in standardized conduct towards members of the proposed class."*Keele v. Wexler, 149 F.3d 589, 594 (7th Cir.1998).*"[T]here need only be a single issue [of law or fact] common to all members of the class."*Gomez v. Illinois State Bd. of Educ., 117 F.R.D. 394, 399 (N.D.Ill.1987)* (quoting *Edmondson v. Simon, 86 F.R.D. 375, 380 (N.D.Ill.1980)).*

Sebring has engaged in standardized conduct toward members of the proposed class. By definition, each class member's loan contract includes the same standard form 1-4 Family Rider and no TILA disclosure of a security interest in personal property. This common fact unites the class. Sebring offers several arguments for why its liability under the TILA might nonetheless turn on individual differences among class members. These arguments are considered below in the predominance section. To clear the commonality bar, however, it is sufficient to observe that each class member's transaction was documented using the same allegedly deficient instruments. *See Demitropoulos v. Bank One Milwaukee, N.A., 915 F.Supp. 1399, 1417 n. 19 (N.D.Ill.1996).*

### C. Typicality

Sebring sensibly does not dispute the typicality of Peoples's claims and defenses. Typicality requires substantial similarity, not perfect identity.*Allen, 99 F.R.D. at 54.* "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."*De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir.1983)* (quoting H. Newberg, *Class Actions* § 1115(b), at 185 (1977)). Sebring's practice of using the 1-4 Family Rider in residential loan transactions without disclosing a security interest in personal property gives rise to the

TILA claim of each class member, including Peoples. Peoples's claims and defenses are typical.

### D. Adequacy of Representation

*7 Rule 23(a)(4) requires that the named plaintiff will fairly and adequately represent the interests of the class. "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class."*Susman v. Lincoln Am. Corp., 561 F.2d 86, 90 (7th Cir.1977)* (quoting *Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir.1975)).* Peoples's counsel has substantial class action experience and has co-authored a publication on residential mortgage litigation. This court has thus far perceived nothing which indicates that Peoples's attorney will not be "generally able" to conduct this litigation on behalf of the proposed class.[FN4] Neither does the court perceive any antagonistic interests between Peoples and the rest of the putative class. One might hope for a class representative with a larger monetary interest in the outcome, but given the nature of the alleged harm it seems improbable that any class member could seek more than statutory damages.

> FN4. Sebring alleges several instances of attorney neglect in its response to Peoples's motion for leave to file a second amended complaint. The court reserves the right to revisit the question of counsel's adequacy as this action progresses.

### E. Predominance

Rule 23(b)(3) requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members."Because no actual damages are sought or seem likely, individualized analysis of this fact-intensive issue will not be required. As noted in the commonality section, Sebring's standard loan documentation is clearly a fact common to each class member. This common fact would appear to give rise to a common question of law: whether the 1-4 Family Rider reasonably purported to create a security interest in personal property that was not disclosed as required by the TILA. Sebring has three arguments against commonality on this latter question. The first

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 406979 (N.D.Ill.), 52 Fed.R.Serv.3d 197
**2002 WL 406979 (N.D.Ill.)**

is that differences in state law governing the creation of security interests will require separate state-specific analyses. The court recognized this theoretical possibility above in the numerosity section, but found it exceedingly unlikely on the facts presented that state law variations would affect the sufficiency of Sebring's TILA disclosure.

Second, Sebring argues that, notwithstanding its usage of a common form, the question of what security interest was actually intended is unique to each loan transaction. Specifically, Sebring suggests that a class member's real estate contract might address the question of whether a security interest in personal property was intended. Unless the real estate contract defines a term or terms used in the 1-4 Family Rider in such a way as to wholly exempt the purported security interest from the TILA's disclosure requirement-for example, by incorporating the state law definition of "fixture" into the word "attached"-the court does not perceive any way in which the contract could affect its analysis with respect to Count I. Based on the standard form mortgage used in Peoples's loan transactions, this seems quite unlikely. Cf. *Kleiner v. First Nat'l Bank,* 97 F.R.D. 683, 694-95 (N.D.Ga.1983) ("[A]t this point the fact that not all contracts are identical is not sufficient to overcome the apparent commonality of issues that they present.").

**\*8** The court also rejects the broader notion that it will generally have to examine the parties' intent on a transaction-by-transaction basis. By definition, each class member's contract includes the same 1-4 Family Rider with the same critical security interest provision. To the extent this language is unambiguous (and Sebring has not argued otherwise), extrinsic evidence of intent will not be relevant. As far as this court is aware, this basic principle of contract law applies in every jurisdiction. *See id.* at 694 & n. 13 (certifying class in part because state contract law on this precise point was the same in all five of the relevant jurisdictions). It is possible that the parties actually understood contractual terms in a way that would impact the court's analysis, if their intent was controlling. The problem for Sebring is that, as a general matter, the terms of the contract govern. A standardized agreement "is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the

writing."*Restatement (Second) of Contracts* § 211(2) (1981). Sebring may have had reason to know that the borrowers would not have signed the contract if they believed Sebring would obtain a security interest in any personal property attached to their land or home, *id.* § 211(3), but it seems highly unlikely that the reason would vary from class member to class member. The court suspects that the meaning of the 1-4 Family Rider was not discussed in any of these transactions.

Sebring's third argument against commonality is that, because commercial and business loans are exempt from the TILA, 15 U.S.C. § 1603(1), determining liability will require an individualized determination of whether the proceeds of each class member's loan were used for business or commercial purposes. The commentary to Regulation Z lists five factors to be considered in making this determination: (1) the relationship between the borrower's primary occupation and the acquisition; (2) the degree to which the borrower will personally manage the acquisition; (3) the ratio of income from the acquisition to the total income of the borrower; (4) the size of the transaction; and (5) the borrower's statement of purpose for the loan. 12 C.F.R. pt. 226, supp. I, § 226.3(a)-2. One judge in this district has held that "applying these five factors to each possible member of the putative class requires highly fact intensive inquiries and that class certification would result in an undetermined number of mini-trials."*Roman v. First Franklin Fin. Corp.,* No. 00 C 7228, 2001 U.S. Dist. LEXIS 3968, at \*7-8 (N.D.Ill. Apr. 2, 2001); *see also Parker v. George Thompson Ford, Inc.,* 83 F.R.D. 378, 381 (N.D.Ga.1979); *Berkman v. Sinclair Oil Corp.,* 59 F.R.D. 602, 609 (N.D.Ill.1973).

The weight of authority, however, tilts in the opposite direction. Six courts in this district have rejected the argument that having to determine whether a transaction is commercial precludes class certification. *See Lang v. Winston & Winston, P.C.,* No. 00 C 5516, 2001 U.S. Dist. LEXIS 7480, at \*6 (N.D. Ill. June 4, 2001); *Wilkerson v. Bowman,* 200 F.R.D. 605, 609-10 (N.D.Ill.2001); *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, L.L.C.,* 198 F.R.D. 503, 506 (N.D.Ill.2001); *Blair v. Equifax Check Servs.,* 97 C 8913, 1999 U.S. Dist. LEXIS 2536, at \*18-20 (N.D.Ill. Feb. 25, 1999); *Wilborn v. Dun & Bradstreet Corp.,* 180 F.R.D. 347,

357 (N.D.Ill.1998); *Beasley v. Blatt,* No. 93 C 4978, 1994 U.S. Dist. LEXIS 9383, at *10, *13-14 (N.D.Ill. July 11, 1994); *see also Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1165 n. 4 (7th Cir.1974) (observing that the possibility that some transactions were commercial rather than personal would probably not prevent certification in a Truth in Lending Act class action because commercial transactions are "frequently ... readily identified by the listing of the name of the business as the purchaser").

*9 This court agrees with the majority position. "The need to show that the transactions involved are consumer transactions is inherent in every [TILA] class action. If that need alone precluded certification, there would be no class actions under [the TILA]."*Wilborn,* 180 F.R.D. at 357. Such a result would be inconsistent with the TILA's express provision for class actions. Moreover, the court is convinced that the commercial determination will not require unduly burdensome individualized inquiry. It appears that the nature of the loan can be determined on the basis of Sebring's own business records. *See Haynes,* 503 F.2d at 1165 n. 4. The uniform residential loan application includes the amount of the loan, whether the property will be a primary or secondary residence or an investment, the applicant's occupation, the amount and sources of income, and a schedule of other real estate owned. In most cases, this document alone will decide the commercial purpose issue. *Cf.*12 C.F.R. pt. 226, supp. I, § 226.3(a)-2 (relevant factors include the size of the transaction and the borrower's income, occupation, and statement of purpose). Other times, the appraisal, as explained below, will resolve lingering uncertainty. Unlike the plaintiff in *Roman,* Peoples has provided support for the proposition "that the lender will have documents showing the purpose of each loan." 2001 U.S. Dist. LEXIS 3968, at *8 n. 4. "Finally, if there is genuine confusion over this issue, class members can be asked a single question to determine whether they are entitled to relief."*Wilkerson,* 200 F.R.D. at 610 (N.D.Ill.2001) (citing *Wells v. McDonough,* 188 F.R.D. 277, 279 (N.D.Ill.1999)).

Although the commercial purpose issue does not defeat predominance, it does require the following additional provision in the class definition: The credit transaction involved an extension of credit not primarily for business or commercial purposes. *See*15 U.S.C. § 1603(1). Because the proposed class consists of only thirty-eight members, this new criterion raises a numerosity concern. If a substantial number of potential class members are excluded by this limitation, then the class may no longer be so large as to make joinder impracticable. Should this turn out to be the case, the court will not hesitate to decertify this class. At this stage, however, that possibility does not appear likely. The class is already limited to transactions involving real estate with one or two dwelling units, in one of which the borrower or a family member resided. Because the value of the land plus one of the two dwelling units will almost always exceed the value of the other unit by itself, this limitation makes it exceedingly unlikely that more than half of the loan proceeds went to commercial purposes. The appraisal can rule out this possibility and identify the rare potential exception.

### F. Superiority

Finally, "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."Fed.R.Civ.P. 23(b)(3). It seems quite likely that the vast majority of class members is unaware of the alleged TILA violation. Even if they were so informed, they would probably lack sufficient incentive to bring individual actions. No actual damages are alleged, and the maximum potential recovery for statutory damages in individual actions is $2000 per person. *See Haynes,* 503 F.2d at 1165 (in deciding superiority question, court should consider the "inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually"); *see also Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985) ("Class actions ... may permit the plaintiffs to pool claims which would be uneconomical to litigate individually.") A class action is an efficient and appropriate method of resolving this controversy.

### III. Conclusion

*10 People's motion for class certification is granted with the addition of one criterion to the class definition: The credit transaction involved an extension of credit not primarily for business or commercial purposes.

LEXSEE 2001 US DIST LEXIS 14048



Cited
As of: Jul 30, 2008

ROSIE LEE POWELL, Plaintiff, v. ADVANTA NATIONAL BANK, and
ADVANTA MORTGAGE CORP., USA, Defendants. EDWARD SIMS, Plaintiff, v.
ADVANTA NATIONAL BANK, and ADVANTA MORTGAGE CORP., USA,
Defendants.

No. 00 C 7234, No. 00 C 5942

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

*2001 U.S. Dist. LEXIS 14048*

September 4, 2001, Decided
September 10, 2001, Docketed

**DISPOSITION:**     [*1]  Sims's and Powell's motions for
class certification granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Two plaintiff borrowers
moved for class certification of their separate actions
against defendant lender, in which they alleged violations
of the Truth in Lending Act (TILA), *15 U.S.C.S. § 1638*,
and its accompanying Regulation Z, *12 C.F.R. § 226.18*.
The court addressed the motions together.

**OVERVIEW:** The borrowers challenged the lender's
practice of failing to disclose that the lender was taking a
security interest in personal property through a mortgage
rider. The lender argued that business transactions were
excluded from the disclosure requirement, and therefore
each putative class member needed to demonstrate their
loan was a consumer transaction. The court disagreed,
finding the problem raised by the lender could be solved
simply by defining the class so as not to include those
who were borrowing for a business purpose. To
determine who should be excluded, a questionnaire
would be sent to the potential class members, along with
the class notification materials. The court found that

simply joining all of the estimated 500-600 members
would be impracticable. The claims of the borrowers
were typical of the claims of the class and the borrowers
demonstrated they would fairly and adequately represent
the class. Common questions of law and fact
predominated. The alleged violation was the same for
each class member, it would be cost-prohibitive to initiate
individual actions, and a class action offered the most
judicially efficient method of litigation.

**OUTCOME:** The motions for class certification were
granted, pending the court's approval of an elaborated
definition of the class that limited the transactions at issue
to consumer loans as defined by the Truth in Lending
Act, *15 U.S.C.S. § 1602(h)*.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > General Overview*
*Civil Procedure > Class Actions > Prerequisites >
Adequacy of Representation*
*Civil Procedure > Class Actions > Prerequisites >*

*Numerosity*

[HN1] *Fed. R. of Civ. P. 23* permits a class action to be maintained if: (1) the class is so numerous that joinder of all class members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly or adequate protect the interests of the class. *Fed. R. Civ. P. 23(a).*

*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Class Members > General Overview*
*Civil Procedure > Class Actions > Prerequisites > General Overview*
[HN2] In addition to the requirements of *Fed. R. Civ. P. 23(a)*, the court, in permitting a class action to be maintained, must also find: (1) that the prosecution of separate actions by the individual class members would create a risk of inconsistent adjudications or substantially impair the abilities of other class members to protect their interests; (2) that the party opposing the class has acted or failed to act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate for the class; or (3) that common questions of law or fact predominate over questions affecting only individual members and the class action is the best method for fairly and efficiently adjudicating the controversy. *Fed. R. Civ. P. 23(b).*

*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Prerequisites > General Overview*
[HN3] The party seeking certification bears the burden of proving that its action is appropriate as a class action and that it satisfies all of the requirements of *Fed. R. Civ. P. 23.*

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Civil Procedure > Class Actions > Certification*
[HN4] Business transactions are not subject to the Truth in Lending Act, *15 U.S.C.S. § 1603(1).*

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
[HN5] A consumer transaction is defined in the Truth in Lending Act as a transaction in which the party to whom credit is offered or extended is a natural person, and the property which is the subject of the transaction is primarily for personal, family, or household purpose. *15 U.S.C.S. § 1602(h).*

*Banking Law > Consumer Protection > General Overview*
[HN6] The Uniform Residential Loan Application requires each borrower to state the purpose of the loan and whether the property will serve as the borrower's primary residence. By law, these documents are required to be preserved and should be contained in each loan file.

*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN7] The 1-4 Family Rider is a standard document used throughout the mortgage industry for refinancing of multi-unit properties.

*Civil Procedure > Class Actions > Prerequisites > Numerosity*
[HN8] Courts may make common sense assumptions in considering the numerosity requirement, in determining the issue of class action certification.

*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Civil Procedure > Class Actions > Prerequisites > General Overview*
[HN9] A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and the claims are based on the same legal theory.

COUNSEL: For ROSIE LEE POWELL, plaintiff (00-CV-7234): Jonathan Nachsin, Jonathan Nachsin P.C., Chicago, IL.

For ADVANTA NATIONAL BANK, ADVANTA MORTGAGE CORP., USA, defendants (00-CV-7234): Irving Bert Levinson, Michael David McCullough, Piper, Marbury, Rudnick & Wolfe, Chicago, IL.

For EDWARD SIMS, plaintiff (00-CV-5942): Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Edelman, Combs & Latturner, Chicago, IL.

2001 U.S. Dist. LEXIS 14048, *1

PARKWAY MORTGAGE, INC., defendant (00-CV-5942): William Denby Heinz, Shelley Malinowski, Maaike Sari Hudson, Jenner & Block, Chicago, IL.

For ADVANTA NATIONAL BANK, defendant (00-CV-5942): Irving Bert Levinson, Piper, Marbury, Rudnick & Wolfe, Chicago, IL.

**JUDGES:** David H. Coar, United States District Judge.

**OPINION BY:** David H. Coar

**OPINION**

### *MEMORANDUM OPINION AND ORDER*

Rosie Lee Powell ("Powell") and Edward Sims ("Sims") (collectively, "Plaintiffs") bring class action suits against Advanta National Bank and Advanta Mortgage Corp., USA (collectively, "Advanta"). Although Powell and Sims bring separate suits, they are related, and both cases were assigned to this Court based on relatedness. Because [*2] both parties advance identical claims and the issues presented in their respective motions for class certification are also the same, this court addresses the two motions together.

Powell and Sims challenge Advanta's practice of failing to disclose that the lender is taking a security interest in personal property through a mortgage with a "1-4 Family Rider." Plaintiffs' complaint alleges that the Truth in Lending Disclosure Statements issued by Advanta violate the Truth in Lending Act ("TILA"), *15 U.S.C. § 1638*, and its accompanying Regulation Z, *12 C.F.R. § 226.18*. Plaintiffs seek statutory damages pursuant to *15 U.S.C. § 1640*.

[HN1] *Federal Rule of Civil Procedure 23* permits a class action to be maintained if (1) the class is so numerous that joinder of all class members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly or adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*; *Romaker v. Crossland, 1996 U.S. Dist. LEXIS 6490*, No. 94 C 3328, [*3] 1996 WL 254299 at *1 (N.D. Ill. May 10, 1996). [HN2] In addition, the court must also find: (1) that the prosecution of separate actions by the

individual class members would create a risk of inconsistent adjudications or substantially impair the abilities of other class members to protect their interests; (2) that the party opposing the class has acted or failed to act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate for the class; or (3) that common questions of law or fact predominate over questions affecting only individual members and the class action is the best method for fairly and efficiently adjudicating the controversy. *Fed. R. Civ. P. 23(b)*; *Romaker, 1996 U.S. Dist. LEXIS 6490, 1996 WL 254299* at *1. [HN3] The party seeking certification bears the burden of proving that its action is appropriate as a class action and that it satisfies all of the requirements of *Rule 23. Trotter v. Klincar, 748 F.2d 1177, 1184 (7th Cri. 1984).*

Advanta's sole objection is that individual issues preclude the certification of a class, thus defeating the requirements of commonality, typicality, and predominance. Advanta correctly [*4] points out that [HN4] business transactions are not subject to TILA. *See 15 U.S.C. § 1603(1)* (exempting "credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes"). Thus, Advanta's argument goes, each putative class member must demonstrate that her loan qualifies as [HN5] a consumer transaction, defined in TILA as a transaction:

> in which the party to whom credit is offered or extended is a natural person, and the . . . property . . . which [is] the subject of the transaction [is] primarily for personal, family, or household purpose.

*15 U.S.C. § 1602(h).* Advanta insists that the putative class members must make individual showings that the primary purpose of the loan was personal and not commercial. This court disagrees. This court adopts the position taken by court in *Romaker*, which rejected an identical argument:

> Defendant argues that individual issues predominate because defendant was not required to make TILA disclosures to those who were borrowing to purchase multiple units for a business purpose. Since some class members whose loans contained the 1-4 Family [*5] Rider were borrowing for a business purpose, so the argument goes, defendant would be

entitled to examine each class member on the question. However, this problem can be resolved simply by defining the class so as not to include those who were borrowing for a business purpose. To determine who should be excluded from the class on this basis, which would be shown by facts such as the number of days they intended to occupy the property per year, the parties can create a questionnaire to be sent to potential class members along with the class notification materials.

*1996 U.S. Dist. LEXIS 6490 1996 WL 254299* at *2.

Advanta's concern, although legitimate, does not preclude class certification. [1] As long as the class is fashioned narrowly so as to include only those members who borrowed for consumer purpose as defined by TILA, the class may be preserved. The loan application on file with Advanta will indicate the purpose of the loan. [2] As noted in *Romaker*, questionnaires may be appropriate to determine the purpose of the loan. In the alternative, borrowers could be required to submit documentation showing the purpose of their loan as a prerequisite to sharing in any recovery. These protections [*6] will ensure that the class is comprised of those whose loans are subject to TILA. Accordingly, Plaintiffs are directed to submit an elaborated definition of the class so as to limit it to only those putative members whose credit extensions are governed by TILA as consumer transactions. With those limitations in place, the court finds that such a proposed class [3] satisfies the criteria for class certification as set forth in *Fed. R. Civ. P. 23*.

1   Advanta also seeks to cross-examine each putative class member prior to certification to determine whether the loan is for consumer purposes, but the court rejects such a proposition as too burdensome and intrusive upon absent class members.

2   For example, [HN6] the Uniform Residential Loan Application requires each borrower to state the purpose of the loan and whether the property will serve as the borrower's "primary residence." By law, these documents are required to be preserved and should be contained in each loan file.

3   Plaintiffs are directed to submit to the court an elaborated definition of the proposed class so as to

limit it to those whose claims will be governed by TILA.

[*7]  First of all, joinder of all members of the class would be impracticable. Counsel for Powell estimates that the class contains 500-600 members. [4] Advanta is a national lender which makes hundreds of loans each year in the Chicago area. [HN7] The 1-4 Family Rider, the form that Plaintiffs take issue with, is a standard document used throughout the mortgage industry for refinancing of multi-unit properties. Given Advanta's large volume of business, it may be reasonably inferred that the proposed class is sufficiently numerous. *See In re VMS Securities Litigation, 136 F.R.D. 466, 473 (N.D. Ill. 1991)* (noting that [HN8] courts may make "common sense assumptions" in considering the numerosity requirement); *Cox v. Joe Rizza Ford, Inc., 1996 U.S. Dist. LEXIS 1581, *24, No. 94 C 5688, 1996 WL 65994, at *7 (N.D. Ill. Feb. 9, 1996)* (concluding from defendant's volume of business and use of standardized forms that numerosity requirement was satisfied).

4   In fact, in their Response In Opposition to Sims's Motion for Class Certification, Advanta concedes that the numerosity requirement has been met. *See* Def. Resp. at 4.

[*8]  Second, Plaintiffs' claims are typical of the claims of the class. [HN9] A claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [the] claims are based on the same legal theory." *Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992)*. By definition, the class members obtained a residential mortgage loan with an attached 1-4 Family Rider from Advanta and received a TILA Disclosure Statement that failed to disclose the security interest in the personal property. In other words, the class members allege that they were subject to the same wrongful practice and advance the same legal theory.

Third, Plaintiffs have demonstrated that they will fairly and adequately represent the class. Powell's and Sims's interests, which are identical to those of the class, are not antagonistic to those of the class, and they appear to be litigating vigorously on behalf of the class. Plaintiffs have appointed experienced and qualified counselors whose resumes reflect extensive trial experience, especially in the area of class action and consumer litigation.

2001 U.S. Dist. LEXIS 14048, *8

Lastly, class certification is appropriate under [*9] *Fed. R. Civ. P. 23(b)(3)*. Common questions of law and fact predominate over any questions affecting only individual class members. The alleged TILA violation is the same for each class member, as they all allege that Advanta's standard practice of issuing 1-4 Family Riders and taking a security interest in property without proper disclosure violated TILA. Moreover, a class action is the best method for litigating this claim. The recovery available to each class member is not so significant, making it cost-prohibitive to initiate individual actions. In view of the hundreds of potential class members, too, a class action offers the most efficient method in terms of conserving the resources of the court.

**Conclusion**

For the foregoing reasons, Sims's and Powell's motions for class certification are granted pending this court's approval of an elaborated definition of the class that limits the transactions at issue to consumer loans as defined by TILA.

Enter:

David H. Coar

United States District Judge

Dated: SEP 4 2001

LEXSEE 1996 US DIST LEXIS 6490



Positive
As of: Jul 30, 2008

CHARLES P. ROMAKER and ANA Z. CARRASQUILLO, Plaintiffs, v.
CROSSLAND MORTGAGE CORPORATION, Defendant.

No. 94 C 3328

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

*1996 U.S. Dist. LEXIS 6490*

May 8, 1996, Decided
May 10, 1996, DOCKETED

**DISPOSITION:** [*1] Plaintiffs' amended motion for class certification is granted with respect to Class I, and with respect to Class II for the purposes of determining statutory damages and the scope of injunctive relief.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff borrowers brought an action under the Truth-in-Lending Act (TILA), *15 U.S.C.S. § 1601 et seq.* The court granted summary judgment for the borrowers on the issue of TILA liability with respect to both the finance charge/amount financed disclosures and the security interest disclosure. The borrowers filed an amended motion for class certification seeking certification of two classes for the purpose of determining appropriate relief.

**OVERVIEW:** The borrowers claimed that defendant mortgage company did not make correct disclosures of the total finance charge and amount financed on their residential mortgage loan and failed to disclose adequately the security interest it was taking in the property. The court granted summary judgment for the borrowers on the issue of liability. The borrowers sought class certification. The court held that both classes satisfied the prerequisites to a class action contained in *Fed. R. Civ. P. 23(a)* of numerosity, commonality, typicality, and fair representation. The issue of whether individual issues predominated could be resolved by defining the class so as not to include those who were borrowing for a business purpose. Both classes could be certified pursuant to *Fed. R. Civ. P. 23(b)(3),* so long as the purpose of the certification was limited to the determination of statutory damages. Individual issues did predominate on the question of actual damages. Any class member who wanted to pursue actual damages could both share in a class award of statutory damages and file a separate individual action for actual damages.

**OUTCOME:** The court granted the borrowers' motion for class certification with respect to class I, and with respect to class II for the purposes of determining statutory damages and the scope of injunctive relief.

**LexisNexis(R) Headnotes**

*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Class Members > General Overview*
*Civil Procedure > Class Actions > Prerequisites > Numerosity*

1996 U.S. Dist. LEXIS 6490, *1

[HN1] *Fed. R. Civ. P. 23* allows a member of a class to sue as a representative of the class only if (1) joinder of all members is impractical because the class is so numerous, (2) questions of law or fact are common to the class, (3) the representative's claims are typical of those of the class, and (4) the representative will fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*. Moreover, the court must also find: (1) that the prosecution of separate actions by the individual class members would create a risk of inconsistent adjudications or substantially impair the abilities of other class members to protect their interests; (2) that the party opposing the class has acted or failed to act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate for the class; or (3) that common questions of law or fact predominate over questions affecting only individual members and the class action is the best method for fairly and efficiently adjudicating the controversy. *Fed. R. Civ. P. 23(b)*. The party seeking certification bears the burden of proving that its action is appropriate as a class action and that it satisfies all the requirements of *Rule 23*.

*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Civil Procedure > Class Actions > General Overview*
[HN2] In the context of a class action brought pursuant to the Truth-in-Lending Act, *15 U.S.C.S. § 1601 et seq.*, to prove actual damages, each class member has to prove that but for the violation, he would have obtained credit on more favorable terms elsewhere.

**COUNSEL:** For CHARLES P ROMAKER, ANA Z CARRASQUILLO, plaintiffs: Daniel A. Edelman, Cathleen M. Combs, Tara Leigh Goodwin, James Eric Vander Arend, Michelle Ann Weinberg, Edelman & Combs, O. Randolph Bragg, Attorney at Law, Chicago, IL. Charles M Baird, Attorney at Law, Atlanta, GA.

For CROSSLAND MORTGAGE CORPORATION, defendant: Robert J. Kriss, Alan Norris Salpeter, Mayer, Brown & Platt, Chicago, IL. James S Jardine, John A Adams, Ray, Quinney & Nebeker, Salt Lake City, UT. Tacie Yoon, Swidler & Berlin, Washington, DC.

**JUDGES:** John F. Grady, United States District Judge

**OPINION BY:** John F. Grady

**OPINION**

*MEMORANDUM OPINION*

Plaintiffs, who are husband and wife, brought this suit under the Truth-in-Lending Act ("TILA"), *15 U.S.C. § 1601 et seq.*, claiming that Crossland Mortgage Corporation ("Crossland") did not make correct disclosures of the total finance charge and amount financed on their residential mortgage loan and failed to disclose adequately the security interest it was taking in [*2] the property. In a memorandum opinion dated November 3, 1995, this court granted summary judgment for plaintiffs on the issue of TILA liability with respect to both the finance charge/amount financed disclosures and the security interest disclosure. Plaintiffs have now filed an amended motion for class certification seeking certification of two classes for the purpose of determining appropriate relief. Class I would consist of those whose TILA statements from defendant incorrectly stated the finance charge, and/or amount financed, in a manner similar to the incorrect disclosures in plaintiffs' TILA statement. Class II would consist of those borrowers, like plaintiffs, from whom defendant took a security interest in personal property and improperly disclosed that security interest. For the reasons stated in this opinion, the court will certify both classes, but only for the purposes of determining statutory damages and the scope of injunctive relief.

*DISCUSSION*

[HN1] *Federal Rule of Civil Procedure 23* allows a member of a class to sue as a representative of the class only if (1) joinder of all members is impractical because the class is so numerous, (2) questions of law or [*3] fact are common to the class, (3) the representative's claims are typical of those of the class, and (4) the representative will fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*. Moreover, the court must also find: (1) that the prosecution of separate actions by the individual class members would create a risk of inconsistent adjudications or substantially impair the abilities of other class members to protect their interests; (2) that the party opposing the class has acted or failed to act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate for the class; or (3) that common questions of law or fact predominate over questions affecting only individual members and the class action is the best method for fairly and efficiently adjudicating the controversy. *Fed. R. Civ.*

Case 1:07-cv-06543     Document 66-2     Filed 08/01/2008     Page 32 of 33

Page 3
1996 U.S. Dist. LEXIS 6490, *3

*P. 23(b)*. The party seeking certification bears the burden of proving that its action is appropriate as a class action and that it satisfies all the requirements of *Rule 23*. *Trotter v. Klincar, 748 F.2d 1177, 1184 (7th Cir. 1984)*.

Defendant does not dispute that plaintiffs have met their burden of showing that both classes satisfy [*4] the prerequisites to a class action contained in *Rule 23(a)*. Joinder of all members of Class I would be impracticable because approximately 3,000 incorrect TILA disclosure statements were issued before defendant detected and corrected the computer program error responsible for the errors. Similarly, Class II is estimated to include approximately 1,000 borrowers whose mortgages included defendant's standard "1-4 Family Rider" which gave defendant a security interest in personal property that was not disclosed on the TILA statement. As to the commonality requirement, plaintiffs point out that the issues of law and fact in this case involve whether standard forms issued by defendant to numerous borrowers comply with TILA, and that, since the court has already held that the forms do not comply, statutory damages are available for all of the members of each class under *15 U.S.C. § 1640(a)(2)(B)*. Also, plaintiffs' claims are typical of those of the two classes because, by definition, each class member received the same improper TILA disclosures as plaintiffs, and each class member has a claim arising from the same practices of defendants of which plaintiffs complain. Plaintiffs meet the [*5] Seventh Circuit's requirements for fair and adequate class representation because it appears that plaintiffs' attorneys can adequately conduct this litigation -- due to their extensive qualifications and experience in the areas of class action and consumer litigation -- and there is no possibility of plaintiffs having interests antagonistic to those of the classes, since plaintiffs' claims are identical to those of the classes. *See Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 598 (7th Cir. 1993)*.

There is also no dispute that Class II satisfies at least one of the *Rule 23(b)* requirements for maintaining a class action. Plaintiffs and defendant agree that injunctive relief is a suitable remedy for the improperly disclosed security interest claim. Therefore, Class II may be certified pursuant to *Fed. R. Civ. P. 23(b)(2)*.

As to whether Class II can be certified pursuant to *Fed. Civ. P. 23(b)(3)*, the parties disagree. Defendant argues that individual issues predominate because defendant was not required to make TILA disclosures to those who were borrowing to purchase multiple unit properties for a business purpose. Since some class members whose loans contained [*6] the 1-4 Family Rider were borrowing for a business purpose, so the argument goes, defendant would be entitled to examine each class member on this question. However, this problem can be resolved simply by defining the class so as not to include those who were borrowing for a business purpose. To determine who should be excluded from the class on this basis, which would be shown by facts such as the number of days they intended to occupy the property per year, the parties can create a questionnaire to be sent to potential class members along with the class notification materials.

The court agrees with plaintiffs that both Class II and Class I can be certified pursuant to *Fed. R. Civ. p. 23(b)(3)*, so long as the purpose of the certification is limited to the determination of statutory damages. Common issues of law and fact predominate over individual issues with respect to the question of statutory damages because once liability has been established, the class members are entitled to share equally in any award of statutory damages -- up to a maximum of $ 500,000.00 -- which the court allows after considering the aggravating and mitigating factors set forth in the statute. *15 U.S.C.* [*7] *§ 1640(a)*. These factors pertain only to the behavior and characteristics of the defendant.

On the other hand, individual issues do predominate on the question of actual damages. [HN2] To prove actual damages, each class member would have to prove that but for the violation, he would have obtained credit on more favorable terms elsewhere. *Adiel v. Chase Fed. Sav. & Loan Ass'n, 630 F. Supp. 131, 133 (S.D. Fla. 1986), aff'd, 810 F.2d 1051 (11th Cir. 1987); McCoy v. Salem Mortgage Co., 74 F.R.D. 8, 12 (E.D. Mich. 1976)*. This means each plaintiff would have to prove: (1) that he read the TILA disclosure statement; (2) that he understood the charges being disclosed; (3) that had the disclosure statement been accurate, he would have sought alternative financing; and (4) that he would have found, and been qualified to obtain, an alternative loan with better terms. Clearly, the ability to provide the necessary proof on all four of these issues would vary widely among all of the individual class members.

Furthermore, any class member who could prove actual damages would not be prejudiced by our

1996 U.S. Dist. LEXIS 6490, *7

certification of the class for the purpose of determining statutory damages. The statute [*8] allows recovery of both actual and statutory damages. *15 U.S.C. § 1640(a).* Therefore, any class member who wanted to pursue actual damages could both share in a class award of statutory damages and file a separate individual action for actual damages.

Defendant argues that a class action is not the superior method for achieving a fair and efficient adjudication of the statutory damages question. Crossland points out that, under *§ 1640(a)(2)(A),* in an individual action plaintiffs would be entitled to the maximum $ 1,000.00 in statutory damages and every class member who chose to bring an individual action would be entitled to at least $ 100.00, while, under *§ 1640(a)(2)(B),* in a class action there is no requirement that the class members recover anything. Nevertheless, as plaintiffs argue, it is unlikely that even those class members who knew they had a claim would choose to incur the expense of bringing an individual action where the maximum recovery was only $ 1,000.00. Since there is little chance that many class members would bring individual actions, and there is some chance that all class members will recover some statutory damages in a class action, a class action is the [*9] superior method for obtaining a fair adjudication of the statutory damages issue. Also, a class action is clearly the more efficient method for resolving the statutory damages issue since there are thousands of potential class members.

## CONCLUSION

Plaintiffs' amended motion for class certification is granted with respect to Class I for the purpose of determining statutory damages, and with respect to Class II for the purposes of determining statutory damages and the scope of injunctive relief. The parties should craft an order concerning class certification and notice to the class which contains appropriate class definitions and methods for identifying class members in accordance with this opinion. A status conference is set for May 29, 1996, at 9:30 a.m. for entry of the order.

DATED: May 8, 1996

ENTER: John F. Grady, United States District Judge