IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LONG BEACH MORTGAGE COMPANY TRUTH IN LENDING ACT FAMILY RIDER LITIGATION | * * * * * * * * * * * * * * * * * * * * * * | MDL CASE NO. 07 CV 06543 <br><br> Centralized before <br> Judge Wayne R. Andersen |
| THIS DOCUMENT RELATES TO | | |
| *Navara v. Long Beach Mortgage Co.* <br> U.S.D.C., N.D. Ill., Civil Action No. 05-0864 | | |
| *Carye v. Long Beach Mortgage Co.* <br> U.S.D.C., D. Mass., Civil Action No. 06-10887 <br> (N.D. Ill. Civil Action No. 07-06544) | | |
| *Shelton v. Long Beach Mortgage Co.* <br> U.S.D.C., N.D. Ill., Civil Action No. 06-2323 | | |

*********************************************

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF LONG BEACH'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

In its motion for partial summary judgment, defendant Long Beach Mortgage Company ("Long Beach") demonstrated that three of the named Plaintiffs – Guadalupe Navara, Albert Stinson, and Eric Shelton – could not maintain their Family Rider claim under the Truth in Lending Act ("TILA") because they did not obtain their loan primarily for a personal purpose. Long Beach also explained that the remaining plaintiff – Charlene Sullivan – lacked standing to maintain her TILA Family Rider claim because it became the property of her bankruptcy estate when she filed a Chapter 7 bankruptcy proceeding.

1

Plaintiffs' Response Brief does not raise any genuine issue of material fact to refute that Plaintiffs Navara, Stinson, and Shelton obtained their loan primarily for a personal purpose such that TILA would apply. Indeed, the undisputed evidence suggests otherwise. As for Ms. Sullivan, the law clearly requires a bankruptcy trustee to knowingly abandon a debtor's claim after full disclosure, before the claim can be returned to the debtor. Because Ms. Sullivan's claim against Long Beach remains part of her bankruptcy estate, she lacks standing to maintain this action. Accordingly, the Court should grant Long Beach's motion for partial summary judgment and dismiss, with prejudice, the Truth in Lending Family Rider Claim asserted by the named Plaintiffs in the Consolidated Class Action Complaint.[1]

## ARGUMENT

I. **Plaintiffs Navara, Stinson, and Shelton Cannot Maintain Any Claims Under TILA Because They Did Not Obtain Their Loans Primarily For A Personal Purpose.**

Plaintiffs readily acknowledge that their TILA Family Rider Claim requires them to demonstrate their loan was a "consumer credit" transaction, which is defined as a transaction extended "*primarily* for personal, family or household purposes." 15 U.S.C. § 1602(h) (emphasis added). Additionally, TILA exempts credit transactions that are obtained primarily for "business or commercial purposes." 15 U.S.C. § 1603(1); 12 C.F.R. § 226.3(a)(1). Thus, an essential element of Plaintiffs' Family Rider claim is whether the loan was obtained primarily for a personal purpose. If it was a business purpose loan, TILA is inapplicable. In this case, Long

---

[1] As explained in Long Beach's sur-reply on class certification, Plaintiffs' summary judgment response only serves to reinforce Long Beach's position that, irrespective of the Court's ruling on summary judgment, this case should not be certified as a class action. In particular, in attempting to create a jury issue as to whether their mortgage loans were obtained primarily for a personal purpose and thus purportedly subject to TILA, Plaintiffs offer detailed examinations of their loan transactions and apply the various legal factors required by TILA when determining a loan's purpose. That Plaintiffs undertook such a rigorous analysis of their own loan transactions proves Long Beach's point, as a similar analysis must be conducted for each member of the putative class, creating predominating individual fact issues.

Beach submits that there is no genuine issue of material fact on this issue, and Long Beach is therefore entitled to judgment as a matter of law.

### A.     Plaintiff Guadalupe Navara.

As explained in Long Beach's opening memorandum, Ms. Navara submitted at least three income tax returns to the IRS under penalty of perjury in which she represented that she did not use the property covered by her mortgage loan (2715 S. Kostner) for more than 14 days for personal purposes. In an effort to salvage her TILA claim, Ms. Navara now makes the exact opposite representation to this Court, namely that she did use 2175 S. Kostner for personal purposes. As discussed below, because Ms. Navara obtained tax benefits as a result of the statements on her tax returns that she did not use the property for personal purposes, she should be precluded from now suggesting otherwise.

### 1.     Navara Represented To The IRS That The Mortgaged Property Was Non-owner Occupied Rental Property To Obtain Material Tax Benefits.

The Federal Reserve Board's Staff Commentary to Regulation Z makes it crystal clear that "credit extended to acquire, improve, or maintain rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes." *See* Supplement I to Part 226, 12 C.F.R. § 226.3, at Commentary 3(a)(1); *see also Johnson v. Wells Fargo Home Mortgage, Inc.*, No. 05-CV-0321, 2007 WL 3226153, at *5-6 (D. Nev. Oct. 29, 2007). The Commentary further provides that "if the owner expects to occupy the property for more than 14 days during the coming year, the property cannot be considered non-owner-occupied and this special rule will not apply." *See* Commentary 3(a)(1).[2]

---

[2] Plaintiffs acknowledge that courts must follow the factors listed in the Staff Commentary to Regulation Z when determining a loan's purpose. *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 n.9 (1980) (finding that the Official Staff Interpretations "should be dispositive" unless "demonstrably

In this case, Ms. Navara admitted that she listed 2715 S. Kostner as "rental real estate property" in her income tax returns. (Pltfs.' Resp. to SOF, Dkt. 59, ¶ 11). Ms. Navara also conceded that when asked whether she used the rental properties listed on her return for more than 14 days for personal purposes, she checked the box marked "No." (*Id.* at ¶ 12). Tellingly, Ms. Navara made these representations on at least three occasions under penalty of perjury. (*See* Long Beach Mem., Dkt. 42, Exh. 5 at ECL&G 134; Exh. 6 at ECL&G 141; Exh. 7 at ECL&G 151).

Ms. Navara's statement that she did not live at the property for more than 14 days meant that she could deduct all the expenses associated with the property from her taxable income. The Internal Revenue Code provides that a taxpayer can deduct ordinary and expenses "for the management, conservation, or maintenance of property held for the production of income." *See* 26 U.S.C. § 212; *see also Grigg v. Comm'r of Internal Revenue*, 979 F.2d 383, 385 (5th Cir. 1992). The expenses incurred in connection with a taxpayer's personal residence cannot be excluded from the taxpayer's income. *See* 28 U.S.C. §280A(a). The tax Code does allow a taxpayer to deduct the expenses associated with a dwelling unit if it is used as rental property and not for personal purposes. 12 U.S.C. § 280A(c)(3); *Anderson v. Comm'r of Internal Revenue*, No. 13228-04, 2006 WL 469770 (U.S. Tax. Ct. Feb. 27, 2006) ("The purpose of section 280A is to prevent taxpayers from taking business deductions which in effect relate to personal living expenses."). A taxpayer uses a dwelling unit as a residence if he uses the unit for personal purposes for more than 14 days during the tax year. 12 U.S.C. § 280A(d)(1). Thus, if a taxpayer uses rental property for more than 14 days for personal use, then he cannot deduct the ordinary and necessary expenses associated with that property. *Grigg*, 979 F.2d at 385 (citing 26 U.S.C. §

---

irrational"); *see also* Pltfs.' Resp. Br., Dkt. 61, p. 4. The relevant excerpts of the Commentary are included in the attached Appendix of Unreported Decisions.

4

280A); *see also Holmes v. United States*, 85 F.3d 956, 959 (2d Cir. 1996) (providing overview of business deductions in connection with personal use of rental property).

To take advantage of these tax rules and deduct the ordinary expense associated with 2715 S. Kostner, Ms. Navara represented to the IRS that she did not use that property for more than 14 days during the calendar year. (Pltfs.' Resp. to SOF, Dkt. 59, ¶ 12). If she had checked yes, then she would not have been able to offset the expenses associated with property used for personal purposes. Notwithstanding the tax benefits that she obtained at least three years in a row, Ms. Navara claims that the representation on her tax returns was just some minor "inconsistency" that she and her tax preparer simply overlooked. Although this "inconsistency" allowed Navara to reap tax benefits by deducting personal expenses, there is no indication that she has taken any steps to correct the "inconsistency" such as filing an amended return. Indeed, in her deposition taken in June 2006, Navara readily acknowledged that she has not filed any amended returns and was not considering doing so. (*See* Navara Dep. 61:19-24, 62:1-6, attached as Exh. 1 to Long Beach Mem., Dkt. 42).

Ms. Navara also makes the curious argument that it is not her responsibility to inform the IRS of this "inconsistency" because she did not personally prepare her taxes. That effort to evade responsibility fails. Navara admitted that she signed the tax returns that were filed with the IRS. (Navara Dep. 61:14-18). The tax returns provide that "under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete." (Long Beach Mem., Dkt. 42, Exh. 5 at ECL&G 134; Exh. 6 at ECL&G 141; Exh. 7 at ECL&G 151). Further, even if Navara's hands-off approach were tolerated by the tax Code, her tax preparer explicitly asked her to "review the returns carefully to ensure that there are no omissions or misstatements of

5

materials facts." (Exh. 5 at ECL&G 130). The representation that Ms. Navara did not use her rental properties for personal uses was a material fact, as it allowed her to deduct ordinary personal expenses from her taxable income. Given that there is no indication that she has taken any steps to correct this supposed "inconsistency," Ms. Navara is estopped from suggesting to this Court that the property was used for personal purposes.

Truly grasping at straws, Ms. Navara claims that her tax returns cannot serve as evidence of her loan purpose because the TILA Commentary does not explicitly reference tax returns. (Pltfs.' Resp. Br., Dkt. 61, p. 6). This represents a fundamental misunderstanding of the TILA Commentary, which enumerates several factors that courts should consider in determining the purpose of a credit transaction. Income tax returns serve as evidence of the items referenced in the Commentary, such as whether the property is owner-occupied rental property and the amount of rental income generated by the property. It strains credulity for Plaintiffs to suggest that the Commentary must also list the various types of evidentiary materials that the fact-finder should consider when analyzing the factors. Under Plaintiffs' theory, the Commentary would also have to explicitly state that a borrower's loan application, mortgage documents, oral testimony, and other financial statements are the types of evidentiary materials that can be considered. Put simply, the Commentary does not need to list these materials before the Court can consider them as evidence, and Plaintiffs' arguments to the contrary should be given short shrift.

>    **2.    To The Extent That Navara's Property Was Owner Occupied, Her Loan Was Still A Business Purpose Loan According To The TILA Factors.**

Even if the Court determined that (contrary to her tax returns) there is a question of fact as to whether Ms. Navara's property was owner-occupied rental property, her TILA claim still must be dismissed. This is because a careful application of all TILA Staff Commentary factors indicates that her Long Beach mortgage loan was a business purpose loan. The Commentary

provides that courts should consider the following factors when determining the purpose of a loan obtained in connection with owner-occupied rental property: (1) the relationship of the borrower's primary occupation to the acquisition; (2) the degree to which the borrower will personally manage the property; (3) the ratio of income from the acquisition to the total income of the borrower; (4) the size of the transaction; and (5) the borrower's statement of purpose of the loan. *See* Supplement I to Part 226, 12 C.F.R. § 226.3, at Commentary 3(a)(2).

In this case, Ms. Navara admitted that her primary occupation involves managing and renting her apartments, which include both the 2715 S. Kostner property and separate rental property at 2843 Drake Avenue. (Pltfs.' Resp. to SOF, Dkt. 59, ¶¶ 11, 18). Likewise, Ms. Navara acknowledged that her only source of income comes from the rental income generated by her rental properties, as she only reported nominal interest on her tax returns. (*Id.* at ¶¶ 14-17).

Navara attempts to downplay the "ratio of income" factor by arguing that she does not operate a real estate leasing empire. This is a red herring, as the TILA case law makes it clear that business purpose loans can be found for persons who operate either a full-time or a part-time business. *See Puckett v. Georgia Homes, Inc.*, 369 F. Supp. 614, 619 (D.S.C. 1979) (noting that TILA's business loan exemption "does not distinguish between full-time and part-time businesses") (quoting *Sarpenter v. Dreyco, Inc.*, 326 F. Supp. 871, 873-74 (E.D. La.), *aff'd* 450 F.2d 941 (5th Cir. 1971)). Indeed, the Commentary does not focus on the amount of rental income that is generated by the rental properties, but instead speaks in terms of the "ratio of income." In this case, it is undisputed that Ms. Navara generated virtually all of her income from her rental properties, which include both 2175 S. Kostner and 2843 Drake Avenue. As a result, her loan was obtained primarily for a business purpose, namely to refinance debts associated with her rental property.

The final two factors – the size of the transaction and the borrower's statement of purpose of the loan – do not change the analysis. While the amount of Ms. Navara's loan was relatively small, it certainly does not change the fact that the entire amount was used in connection with rental properties that generated all of Navara's income. Further, Navara cannot rely on her loan application or occupancy agreement as evidence of her loan purpose, given that those documents are flatly inconsistent with statements she made to the IRS to obtain tax benefits.[3] Simply put, Navara's mortgage was obtained in connection with rental property that generated rental business income for Navara, and thus her loan was a business purpose loan exempt from TILA.

**B.    Plaintiff Albert Stinson.**

As explained above, TILA does not apply to credit transactions obtained in connection with non-owner occupied rental property because those loans are deemed to be business purpose loans. *See* Commentary 3(a)(1); *see also In re Fricker*, 113 B.R. 856, 867 (Bankr. E.D. Pa. 1990) ("This passage makes clear that the expenditure of funds toward the 900 Property, ***which has never been owner-occupied*** by the Debtors, must also be considered as an expenditure 'for business purposes.'") (emphasis added). Because credit obtained in connection with non-owner occupied rental property is automatically considered a business purpose loan, the Court does not have to consider the TILA Staff Commentary factors, as those come into play for loans on owner-occupied property.

In this case, it is uncontested that Mr. Stinson *never* lived at the 5402 S. Shields, the property that was used as collateral for his Long Beach mortgage loan. (Pltfs.' Resp. to SOF, Dkt. 59, ¶ 20). Mr. Stinson also conceded that he listed that property as rental real estate on his tax returns and that he represented to the IRS that he did not use the property for personal

---

[3] Indeed, Ms. Navara's mortgage broker and loan consultant (Roger Astudillo) confessed that he and Ms. Navara falsified several documents and made false representations in Ms. Navara's loan papers, including her loan applications. (*See* Opp. to Class Certification, Dkt. 44, pp. 14-15).

purposes. (*Id.* at ¶¶ 22-23). Instead, Mr. Stinson leased the property to make his monthly mortgage payment. (*Id.* at ¶ 21). Accordingly, he was able to receive material tax benefits by reporting a loss against his income for the expenses associated with 5402 S. Shields. (*Id.* at ¶ 24). Thus, because there is overwhelming evidence that the 5402 S. Shields property was non-owner occupied rental property, Mr. Stinson's loan to acquire that property was an exempt business purpose loan.

Nevertheless, Mr. Stinson believes that his loan was still subject to TILA because he initially *expected* to reside in the property as his personal residence but only changed his intentions when his wife objected to the location. (Pltfs.' Resp. Br., Dkt. 61, pp. 8-9). To support his story, Stinson cites his loan application and occupancy agreement, which indicated that he informed Long Beach that he was going to use 5402 S. Shields as his primary residence. (Exh. C to Pltfs.' Resp. to SOF, at Long Beach MDL 00494). Stinson fails to disclose, however, that the Occupancy Agreement clearly provides that if the "Borrower's intention changes prior to the loan closing, Borrower agrees to notify Lender immediately of that fact." (*Id.*). This is because Long Beach "relied upon the Borrower's representation of occupancy in securing said loan, the interest rate or funding said loan." (*Id.*). Thus, Mr. Stinson would have the Court believe that he negotiated and executed a real estate contract, obtained loan approval for a purchase money loan, and attended a loan closing, all without telling his wife the address of their new family home prior to the closing.

Moreover, even if Mr. Stinson's expectations did not change until after he closed on the Long Beach mortgage loan, then he materially breached the Occupancy Agreement by never using the house as his primary residence:

9

> **BORROWER(S) FAILURE TO OCCUPY THE PROPERTY AS THE PRIMARY RESIDENCE (i.e. OWNER-OCCUPED) DURING THE 12 MONTH PERIOD FOLLOWING THE LOAN CLOSING;**
>
> **SHALL CONSTITUTE A DEFAULT UNDER THE NOTE AND SECURITY INSTRUMENT EXECUTED IN CONNECTION WITH SAID LOAN AND, UPON THE OCCURRENCE OF SAID DEFAULT, THE WHOLE SUM OF PRINCIPAL AND INTEREST PAYABLE PURSUANT TO SAID NOTE PLUS COSTS AND FEES SHALL BECOME IMMEDIATELY DUE AT THE OPTION OF THE HOLDER THEREOF AND/OR LENDER MAY ADJUST THE INTEREST RATE TO BE EQUIVALENT TO THAT OF A NON-OWNER OCCUPIED LOAN.**

(*Id.*) (emphasis in original). Mr. Stinson has admitted that he never used the property as his primary residence, which means that he has breached the Occupancy Agreement and is liable to Long Beach for the attendant damages.

In sum, there is overwhelming evidence that Mr. Stinson never used 5402 S. Shields for personal purposes but instead leased the property to generate rental income and obtain material tax benefits as a result. Mr. Stinson's story that he intended to use the property as his primary residence, but then changed his intention because his wife objected, defies any sense of credibility because his wife must have known about the transaction prior to the loan closing. Even if Mr. Stinson's allegation is believable, he clearly committed a material breach of his Occupancy Agreement. Accordingly, this Court should find that Mr. Stinson obtained his mortgage loan to acquire non-owner occupied rental property and that the loan was a business purpose loan exempt from TILA's disclosure requirements.

### C. Plaintiff Eric Shelton.

Plaintiffs contend that Eric Shelton obtained his Long Beach loan primarily for a personal purpose because he ultimately lived in the mortgaged property with one of his friends. In doing so, Plaintiffs completely ignore the clear testimony that Mr. Shelton gave when asked about his

initial intentions. On at least three occasions, Mr. Shelton made it clear that he did not initially intend to move into the 6800 S. Artesian Avenue property when he first decided to make the purchase. (Shelton Dep. 144:14-23, 146:10-19; 148:7-11, attached as Exh. 3 to Long Beach Mem., Dkt. 42). Even though Mr. Shelton ultimately decided to move into the property with his friend, he initially expected to lease the property and not live there. Thus, because his initial expectation was for the property to be non-owner occupied rental property, Mr. Shelton's loan was a business purpose loan exempt from TILA.

Nevertheless, even if the Court were to determine that Shelton's loan was for owner-occupied rental property because he ultimately lived there for a few months, the TILA Staff Commentary factors indicated that the loan was still for a business purpose. Plaintiffs do not dispute that nearly all of Mr. Shelton's income was generated through rental income, as he does not have any other primary occupation. (Pltfs.' Resp. to SOF, Dkt. 59, ¶¶ 32-33). Plaintiffs overlook this fact and instead claim that the size of Mr. Shelton's transaction was relatively small and thus could not be considered a business loan. While a loan for $257,000 may be small in comparison to some commercial real estate loans, the size of the transaction would be highly significant for someone whose only income is $500 per month in social security benefits.

Plaintiffs also place significant reliance in the fact that Mr. Shelton's loan application suggested that his loan was obtained in connection with his primary residence. The Court should give little weight to the statements in that application, given that Mr. Shelton admitted that there were numerous misrepresentations in his loan application that he signed under penalty of perjury. (Shelton Dep. 96:12-4, 97:1-24, 98:1-24, 99:1-24, 100:1-10). Thus, given that Mr. Shelton had no primary occupation, obtained a $257,000 mortgage loan based on $500 per month in social security benefits, generated nearly all of his income from the rental receipts, and submitted a

loan application riddled with misstatements, the Court should find that Mr. Shelton obtained his loan for a business purpose that was exempt from TILA.

## II.  Ms. Sullivan Cannot Maintain Her Claim Because She Lacks Standing To Pursue That Claim Due To Her Chapter 7 Bankruptcy Case.

Plaintiffs do not dispute that plaintiff Charlene Sullivan filed a Chapter 7 bankruptcy proceeding in which she disclosed her claim against Long Beach as an asset of her estate. (Pltfs.' Resp. to SOF, Dkt. 59, ¶¶ 37-38). Plaintiffs further admit that the bankruptcy trustee failed to take any steps whatsoever to formally abandon Ms. Sullivan's claim. (*Id.* at ¶ 39). In the absence of a formal abandonment by the bankruptcy trustee, Ms. Sullivan's claim belongs to her bankruptcy estate and she lacks standing to pursue that claim.[4]

The Bankruptcy Code provides that when a debtor files for bankruptcy protection, "all legal or equitable interests of the debtor in property as of the commencement of the case" become property of the bankruptcy estate. 11 U.S.C. § 541(a)(1). Courts have held that the term "property" used in § 541(a)(1) includes causes of action held by the debtor. *Augustin v. Danvers Bank*, 486 F. Supp. 2d 99, 103 (D. Mass. 2007) (citing *In re Smith*, 640 F.2d 888, 890 (7th Cir. 1981)) (holding that the there is no question "that the estate includes causes of action such as the truth in lending claims"). The Bankruptcy Code further provides that property can be abandoned when it is scheduled by the debtor and not otherwise administered during the bankruptcy. 12 U.S.C. § 554(c).

Courts have made it clear that "if a cause of action is listed on a schedule so the trustee may ***knowingly*** abandon it, courts will consider it outside the bankruptcy estate once the

---

[4] Interestingly, while Ms. Sullivan is the only plaintiff who may be able to show that her loan was subject to TILA, she is also the only plaintiff whose factual circumstances would have allowed Long Beach to enforce the 1-4 Family Rider form that is at issue in this case. Even though Long Beach foreclosed upon Ms. Sullivan's home in August 2007, Long Beach did not enforce the Family Rider using the interpretation urged by Plaintiffs and seize any of Ms. Sullivan's personal effects. (Sullivan Dep. 10:9-17, attached as Exh. 4 to Long Beach Mem., Dkt. 42).

12

bankruptcy case is closed." *Mobility Systems & Equip. Co. v. United States*, 51 Fed. Cl. 233, 236 (Fed. Cl. 2001) (emphasis added) (citing *In re Enriquez*, 22 B.R. 934 (Bankr. D. Neb. 1982)). The key inquiry is "whether the trustee had **full disclosure** so that **knowing** abandonment of the property could be made." *Mobility Systems*, 51 Fed. Cl. at 236 (emphasis added). Accordingly, courts have held that claims were not abandoned even when they were listed on the debtor's bankruptcy schedules. *See Augustin*, 486 F. Supp. 2d at 104-05 (rejecting debtor's argument that claim was abandoned when he listed legal claims on schedules). Moreover, even when courts have found abandonment, there is clear evidence that the trustee chose not to administer the claim as part of the bankruptcy. *See Fedotov v. Peter T. Roach & Assocs.*, 354 F. Supp. 2d 471, 476 (S.D.N.Y. 2005).[5]

In this case, although Ms. Sullivan provided a perfunctory reference to her claim against Long Beach in her personal property schedules, she certainly did not provide enough information for the bankruptcy trustee to make a knowing abandonment of her claim. The schedule does not include a case name or civil action number, much less provide any explanation as to the nature of the claim that is being schedule. Further, there is no indication that the bankruptcy trustee took any steps to investigate the claim and then made a knowledgeable decision about abandoning the claim. The trustee certainly did not provide notice of his intent to abandon the claim nor did the trustee indicate that the claim had been administered as part of the bankruptcy proceeding. Accordingly, Ms. Sullivan's claim remains part of her bankruptcy estate and she lacks standing to maintain that claim.

---

[5] In arguing that the trustee abandoned Ms. Sullivan's TILA claim simply because it was listed on her schedules, Plaintiffs overstate the Seventh Circuit's holding in *Morlan v. Universal Guaranty Life Ins. Co.*, 298 F.3d 609 (7th Cir. 2002). Even though the *Morlan* court did ultimately conclude that the plaintiff maintained standing to pursue her claim, the Court emphasized that there was overwhelming evidence that the trustee was aware of the claim and clearly intended to abandon the claim. *Id.* at 617-18 (discussing various proceedings in bankruptcy suit and recognizing that there was "no doubt the trustee wanted and intended to abandon Morlan's claim").

13

**CONCLUSION**

For the foregoing reasons, Long Beach respectfully requests that this Court grant Long Beach's motion for partial summary judgment and dismiss, with prejudice, the following counts:

(1) Count I of the Consolidated Class Action Complaint asserted by Plaintiffs Guadalupe Navara, Albert Stinson, Eric Shelton, and Charlene Sullivan;

(2) Count I of the Third Amended Complaint (Dkt. No. 132) filed by plaintiff Guadalupe Navara, N.D. Ill. Civil Action No. 05-0864; and

(3) Count I of the First Amended Complaint (Dkt. No. 63) filed by plaintiff Eric Shelton, N.D. Ill. Civil Action No. 06-02323.

Dated: August 1, 2008

Respectfully submitted,

Washington Mutual Bank
f/k/a Long Beach Mortgage Company

By:  /s/ Gabriel A. Crowson
Matthew M. Neumeier
Scott T. Schutte
Gabriel A. Crowson
HOWREY LLP
321 N. Clark St. Suite 3400
Chicago, IL 60610
Telephone: (312) 595-1239
Fax: (312) 595-2250
Email: neumeierm@howrey.com
schuttes@howrey.com
crowsong@howrey.com

**CERTIFICATE OF SERVICE**

    I, Gabriel A. Crowson, hereby certify that a copy of the foregoing Reply Memorandum of Law in Further Support of Motion for Partial Summary Judgment has been served on all counsel of record with the Clerk of the Court using the CM/ECF system on the 1st day of August, 2008.

                                            /s/ Gabriel A. Crowson
                                            Gabriel A. Crowson