# Appendix
# of
# Unreported
# Decisions



12 C.F.R. Pt. 226, Supp. I

**Effective: January 14, 2008**

Code of Federal Regulations Currentness
  Title 12. Banks and Banking
    Chapter II. Federal Reserve System
      ▸▣ Subchapter A. Board of Governors of the Federal Reserve System
        ▸▣ Part 226. Truth in Lending (Regulation Z) (Refs & Annos)

**➡SUPPLEMENT 1 TO PART 226-- OFFICIAL STAFF INTERPRETATIONS**

<For compliance date(s) of amendment(s) to supplement, see 72 FR 63462.>

Introduction

1. Official status. This commentary is the vehicle by which the staff of the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Regulation Z, as revised effective April 1, 1981. Good faith compliance with this commentary affords protection from liability under 130(f) of the Truth in Lending Act. Section 130(f) (15 U.S.C. 1640) protects creditors from civil liability for any act done or omitted in good faith in conformity with any interpretation issued by a duly authorized official or employee of the Federal Reserve System.

2. Procedure for requesting interpretations. Under appendix C of the regulation, anyone may request an official staff interpretation. Interpretations that are adopted will be incorporated in this commentary following publication in the Federal Register. No official staff interpretations are expected to be issued other than by means of this commentary.

3. Status of previous interpretations. All statements and opinions issued by the Federal Reserve Board and its staff interpreting previous Regulation Z remain effective until October 1, 1982, only insofar as they interpret that regulation. When compliance with revised Regulation Z becomes mandatory on October 1, 1982, the Board and staff interpretations

of the previous regulation will be entirely superseded by the revised regulation and this commentary except with regard to liability under the previous regulation.

4. Rules of construction. (a) Lists that appear in the commentary may be exhaustive or illustrative; the appropriate construction should be clear from the context. In most cases, illustrative lists are introduced by phrases such as "including, but not limited to," "among other things," "for example," or "such as."

(b) Throughout the commentary and regulation, reference to the regulation should be construed to refer to revised Regulation Z, unless the context indicates that a reference to previous Regulation Z is also intended.

(c) Throughout the commentary, reference to "this section" or "this paragraph" means the section or paragraph in the regulation that is the subject of the comment.

5. Comment designations. Each comment in the commentary is identified by a number and the regulatory section or paragraph which it interprets. The comments are designated with as much specificity as possible according to the particular regulatory provision addressed. For example, some of the comments to § 226.18(b) are further divided by paragraph, such as Comment 18(b)(1)-1 and Comment 18(b)(2)-1. In other cases, comments have more general application and are designated, for example, as Comment 18-1 or Comment 18(b)-1. This introduction may be cited as Comments I-1 through I-7. Comments to the appendices may be cited, for example, as Comment app. A-1.

6. Cross-references. The following cross-references to related material appear at the end of each section of the commentary:

(a) "Statute"--those sections of the Truth in Lending Act on which the regulatory provision is based (and any other relevant statutes);

(b) "Other sections"--other provisions in the regulation necessary to understand that section;

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06543    Document 67-2    Filed 08/01/2008    Page 3 of 21
Case 1:07-cv-06543    Document 42-16    Filed 06/11/2008    Page 3 of 20

Page 2

12 C.F.R. Pt. 226, Supp. I

(c) "Previous regulation"--parallel provisions in previous Regulation Z; and

(d) "1981 changes"--a brief description of the major changes made by the 1981 revisions to Regulation Z.

Where appropriate a fifth category ("Other regulations") provides cross-references to other regulations.

7. Transition rules. (a) Though compliance with the revised regulation is not mandatory until April 1, 1982, creditors may begin complying as of April 1, 1981. During the intervening year, a creditor may convert its entire operation to the new requirements at one time, or it may convert to the new requirements in stages. In general, however, a creditor may not mix the regulatory requirements when making disclosures for a particular closed-end transaction or open-end account; all the disclosures for a single closed-end transaction (or open-end account) must be made in accordance with the previous regulation, or all the disclosures must be made in accordance with the revised regulation. As an exception to the general rule, the revised rescission rules and the revised advertising rules may be followed even if the disclosures are based on the previous regulation. For purposes of this regulation, the creditor is not required to take any particular action beyond the requirements of the revised regulation to indicate its conversion to the revised regulation.

(b) The revised regulation may be relied on to determine if any disclosures are required for a particular transaction or to determine if a person is a creditor subject to Truth in Lending requirements, whether or not other operations have been converted to the revised regulation. For example, layaway plans are not subject to the revised regulation, nor are oral agreements to lend money if there is no finance charge. These provisions may be relied on even if the creditor is making other disclosures under the previous regulation. The new rules governing whether or not disclosures must be made for refinancings and assumptions are also available to a creditor that has not yet converted its operations to the revised regulation.

(c) In addition to the above rules, applicable to both

open-end and closed-end credit, the following guidelines are relevant to open-end credit:

. The creditor need not remake initial disclosures that were made under the previous regulation, even if the revised periodic statements contain terminology that is inconsistent with those initial disclosures.

. A creditor may add inserts to its old open-end forms in order to convert them to the revised rules until such time as the old forms are used up.

. No change-in-terms notice is required for changes resulting from the conversion to the revised regulation.

. The previous billing rights statements are substantially similar to the revised billing rights statements and may continue to be used, except that, if the creditor has an automatic debit program, it must use the revised automatic debit provision.

. For those creditors wishing to use the annual billing rights statement, the creditor may count from the date on which it sent its last statement under the previous regulation in determining when to give the first statement under the new regulation. For example, if the creditor sent a semi-annual statement in June 1981, and converts to the new regulation in October 1981, the creditor must give the billing rights statement sometime in 1982, and it must not be fewer than 6 nor more than 18 months after the June statement.

. Section 226.11 of the revised regulation affects only credit balances that are created on or after the date the creditor converts the account to the revised regulation.

Subpart A--General

Section 226.1--Authority, Purpose, Coverage, Organization, Enforcement and Liability

1(c) Coverage.

1. Foreign applicability. Regulation Z applies to all persons (including branches of foreign banks and sellers located in the United States) that extend

Case 1:07-cv-06543    Document 67-2    Filed 08/01/2008    Page 4 of 21
Case 1:07-cv-06543    Document 42-16    Filed 06/11/2008    Page 4 of 20

Page 16

12 C.F.R. Pt. 226, Supp. I

Consumer credit reflects the new statutory exemption for agricultural credit.

Consummation is a significant departure from longstanding interpretations of the previous definition. It now focuses only on the time the consumer becomes contractually obligated, rather than the time the consumer pays a nonrefundable fee or suffers an economic penalty for failing to go forward with the credit transaction.

Credit generally parallels the previous definition, but modifies the previous interpretations of the definition by excluding more transactions.

Creditor reflects the statutory amendments to the act that were intended to eliminate the problem of multiple creditors in a transaction. The regularly standard is still used, but it is now defined in terms of the frequency of the credit extensions. The new definition also requires that there be a written agreement to pay in more than 4 installments if no finance charge is imposed. Finally, the obligation must be initially payable to a person for that person to be the creditor.

Dwelling reflects the statutory amendment that expanded the scope of the definition to include any residential structure, whether or not it is real property under state law.

Open-end credit reflects the amended statutory definition requiring that the creditor reasonably contemplate repeated transactions. The new definition no longer requires the consumer to have the privilege of paying either in installments or in full.

Periodic rate combines the previous definitions of period and periodic rate with clarification in the commentary concerning transaction charges and 360-day-year factors.

Security interest is much narrower than the previous definition. Reflecting the legislative history of the simplification amendments, incidental interests are expressly excluded from the definition. Except for purposes of rescission, interests that arise solely by operation of law are also excluded.

Section 226.3--Exempt Transactions

3(a)    Business,    commercial,    agricultural,    or organizational credit.

1. Primary purposes. A creditor must determine in each case if the transaction is primarily for an exempt purpose. If some question exists as to the primary purpose for a credit extension, the creditor is, of course, free to make the disclosures, and the fact that disclosures are made under such circumstances is not controlling on the question of whether the transaction was exempt.

2. Factors. In determining whether credit to finance an acquisition--such as securities, antiques, or art--is primarily for business or commercial purposes (as opposed to a consumer purpose), the following factors should be considered:

.  The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.

. The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.

. The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.

.  The size of the transaction. The larger the transaction, the more likely it is to be business purpose.

. The borrower's statement of purpose for the loan.

Examples of business-purpose credit include:

. A loan to expand a business, even if it is secured by the borrower's residence or personal property.

. A loan to improve a principal residence by putting in a business office.

. A business account used occasionally for consumer

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06543   Document 67-2   Filed 08/01/2008   Page 5 of 21
Case 1:07-cv-06543   Document 42-16   Filed 06/11/2008   Page 5 of 20

Page 17

12 C.F.R. Pt. 226, Supp. I

purposes.

Examples of consumer-purpose credit include:

. Credit extensions by a company to its employees or agents if the loans are used for personal purposes.

. A loan secured by a mechanic's tools to pay a child's tuition.

. A personal account used occasionally for business purposes.

3. Non-owner-occupied rental property. Credit extended to acquire, improve, or maintain rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes. This includes, for example, the acquisition of a warehouse that will be leased or a single-family house that will be rented to another person to live in. If the owner expects to occupy the property for more than 14 days during the coming year, the property cannot be considered non-owner-occupied and this special rule will not apply. For example, a beach house that the owner will occupy for a month in the coming summer and rent out the rest of the year is owner occupied and is not governed by this special rule. See Comment 3(a)-4, however, for rules relating to owner-occupied rental property.

4. Owner-occupied rental property. If credit is extended to acquire, improve, or maintain rental property that is or will be owner-occupied within the coming year, different rules apply:

. Credit extended to acquire the rental property is deemed to be for business purposes if it contains more than 2 housing units.

. Credit extended to improve or maintain the rental property is deemed to be for business purposes if it contains more than 4 housing units. Since the amended statute defines dwelling to include 1 to 4 housing units, this rule preserves the right of rescission for credit extended for purposes other than acquisition.

Neither of these rules means that an extension of credit for property containing fewer than the requisite

number of units is necessarily consumer credit. In such cases, the determination of whether it is business or consumer credit should be made by considering the factors listed in Comment 3(a)-2.

5. Business credit later refinanced. Business-purpose credit that is exempt from the regulation may later be rewritten for consumer purposes. Such a transaction is consumer credit requiring disclosures only if the existing obligation is satisfied and replaced by a new obligation made for consumer purposes undertaken by the same obligor.

6. Agricultural purpose. An agricultural purpose includes the planting, propagating, nurturing, harvesting, catching, storing, exhibiting, marketing, transporting, processing, or manufacturing of food, beverages (including alcoholic beverages), flowers, trees, livestock, poultry, bees, wildlife, fish, or shellfish by a natural person engaged in farming, fishing, or growing crops, flowers, trees, livestock, poultry, bees, or wildlife. The exemption also applies to a transaction involving real property that includes a dwelling (for example, the purchase of a farm with a homestead) if the transaction is primarily for agricultural purposes.

7. Organizational credit. The exemption for transactions in which the borrower is not a natural person applies, for example, to loans to corporations, partnerships, associations, churches, unions, and fraternal organizations. The exemption applies regardless of the purpose of the credit extension and regardless of the fact that a natural person may guarantee or provide security for the credit.

8. Land trusts. Credit extended for consumer purposes to a land trust is considered to be credit extended to a natural person rather than credit extended to an organization. In some jurisdictions, a financial institution financing a residential real estate transaction for an individual uses a land trust mechanism. Title to the property is conveyed to the land trust for which the financial institution itself is trustee. The underlying installment note is executed by the financial institution in its capacity as trustee and payment is secured by a trust deed, reflecting title in the financial institution as trustee. In some instances, the consumer executes a personal guaranty of the indebtedness. The note provides that it is payable only out of the property specifically

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06543    Document 67-2    Filed 08/01/2008    Page 6 of 21
Case 1:07-cv-06543    Document 42-16    Filed 06/11/2008    Page 6 of 20

Page 18

12 C.F.R. Pt. 226, Supp. I

described in the trust deed and that the trustee has no personal liability on the note. Assuming the transactions are for personal, family, or household purposes, these transactions are subject to the regulation since in substance (if not form) consumer credit is being extended.

3(b) Credit over $25,000 not secured by real property or a dwelling.

1. Coverage. Since a mobile home can be a dwelling under § 226.2(a)(19), this exemption does not apply to a credit extension secured by a mobile home used or expected to be used as the principal dwelling of the consumer, even if the credit exceeds $25,000. A loan commitment for closed-end credit in excess of $25,000 is exempt even though the amounts actually drawn never actually reach $25,000.

2. Open-end credit. An open-end credit plan is exempt under § 226.3(b) (unless secured by real property or personal property used or expected to be used as the consumer's principal dwelling) if either of the following conditions is met:

. The creditor makes a firm commitment to lend over $25,000 with no requirement of additional credit information for any advances.

. The initial extension of credit on the line exceeds $25,000.

If a security interest is taken at a later time in any real property, or in personal property used or expected to be used as the consumer's principal dwelling, the plan would no longer be exempt. The creditor must comply with all of the requirements of the regulation including, for example, providing the consumer with an initial disclosure statement. If the security interest being added is in the consumer's principal dwelling, the creditor must also give the consumer the right to rescind the security interest. (See the commentary to § 226.15 concerning the right of rescission.)

3. Closed-end credit--subsequent changes. A closed-end loan for over $25,000 may later be rewritten for $25,000 or less, or a security interest in real property or in personal property used or expected to be used as the consumer's principal dwelling may be added to an extension of credit for over $25,000. Such a

transaction is consumer credit requiring disclosures only if the existing obligation is satisfied and replaced by a new obligation made for consumer purposes undertaken by the same obligor. (See the commentary to § 226.23(a)(1) regarding the right of rescission when a security interest in a consumer's principal dwelling is added to a previously exempt transaction.)

3(c) Public utility credit.

1. Examples. Examples of public utility services include:

. Gas, water, or electrical services.

. Cable television services.

. Installation of new sewer lines, water lines, conduits, telephone poles, or metering equipment in an area not already serviced by the utility.

The exemption does not apply to extensions of credit, for example:

. To purchase appliances such as gas or electric ranges, grills, or telephones.

. To finance home improvements such as new heating or air conditioning systems.

3(d) Securities or commodities accounts.

1. Coverage. This exemption does not apply to a transaction with a broker registered solely with the state, or to a separate credit extension in which the proceeds are used to purchase securities.

3(e) Home fuel budget plans.

1. Definition. Under a typical home fuel budget plan, the fuel dealer estimates the total cost of fuel for the season, bills the customer for an average monthly payment, and makes an adjustment in the final payment for any difference between the estimated and the actual cost of the fuel. Fuel is delivered as needed, no finance charge is assessed, and the customer may withdraw from the plan at any time. Under these circumstances, the arrangement is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06543    Document 67-2    Filed 08/01/2008    Page 7 of 21
Case 1:07-cv-06543    Document 42-16    Filed 06/11/2008    Page 7 of 20

Page 19

12 C.F.R. Pt. 226, Supp. I

exempt from the regulation, even if a charge to cover the billing costs is imposed.

3(f) Student loan programs.

1. Coverage. This exemption applies to the Guaranteed Student Loan program (administered by the Federal government, State, and private non-profit agencies), the Auxiliary Loans to Assist Students (also known as PLUS) program, and the National Direct Student Loan program.

References

Statute: Sections 103(s) and (t) and 104.

Other sections: Section 226.12(a) and (b).

Previous regulation: Section 226.3 and Interpretations §§ 226.301 and 226.302.

1981 changes: The business credit exemption has been expanded to include credit for agricultural purposes. The rule of Interpretation § 226.302, concerning credit relating to structures containing more than 4 housing units, has been modified and somewhat expanded by providing more exclusions for transactions involving rental property.

The exemption for transactions above $25,000 secured by real estate has been narrowed; all transactions secured by the consumer's principal dwelling (even if not considered real property) are now subject to the regulation.

The public utility exemption now covers the financing of the extension of a utility into an area not earlier served by the utility, in addition to the financing of services.

The securities credit exemption has been extended to broker-dealers registered with the CFTC as well as the SEC.

A new exemption has been created for home fuel budget plans.

Section 226.4--Finance Charge

4(a) Definition.

1. Charges in comparable cash transactions. Charges imposed uniformly in cash and credit transactions are not finance charges. In determining whether an item is a finance charge, the creditor should compare the credit transaction in question with a similar cash transaction. A creditor financing the sale of property or services may compare charges with those payable in a similar cash transaction by the seller of the property or service.

i. For example, the following items are not finance charges:

A. Taxes, license fees, or registration fees paid by both cash and credit customers.

B. Discounts that are available to cash and credit customers, such as quantity discounts.

C. Discounts available to a particular group of consumers because they meet certain criteria, such as being members of an organization or having accounts at a particular financial institution. This is the case even if an individual must pay cash to obtain the discount, provided that credit customers who are members of the group and do not qualify for the discount pay no more than the nonmember cash customers.

D. Charges for a service policy, auto club membership, or policy of insurance against latent defects offered to or required of both cash and credit customers for the same price.

ii. In contrast, the following items are finance charges:

A. Inspection and handling fees for the staged disbursement of construction loan proceeds.

B. Fees for preparing a Truth in Lending disclosure statement, if permitted by law (for example, the Real Estate Settlement Procedures Act prohibits such charges in certain transactions secured by real property).

C. Charges for a required maintenance or service contract imposed only in a credit transaction.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                                                Page 1
Slip Copy, 2007 WL 3226153 (D.Nev.)
**2007 WL 3226153 (D.Nev.)**

**H**Johnson v. Wells Fargo Home Mortg., Inc.
D.Nev.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Nevada.
Wes JOHNSON, Plaintiff,
v.
WELLS FARGO HOME MORTGAGE, INC., a
California Corporation, dba America's Servicing
Company, et. al., al., Defendants.
No. 3:05-CV-0321-RAM.

Oct. 29, 2007.

Tory M. Pankopf, Reno, NV, for Plaintiff.
Bruce T. Beesley, Tricia M. Darby, Lewis and Roca
LLP, Reno, NV, for Defendant.

**MEMORANDUM DECISION AND ORDER**

ROBERT A. MCQUAID, JR., United States
Magistrate Judge.
*1 Before the court is Defendant Wells Fargo Bank,
N.A.'s Motion for Summary Judgment (Doc. # 70).
Plaintiff responded to the motion (Docs.# 73, 75) and
Defendant replied (Doc. # 76).

**I. BACKGROUND**

Plaintiff Wes Johnson alleges Defendant Wells Fargo
Home Mortgage, Inc. dba America's Servicing
Company (ASC) erroneously reported two of
Plaintiff's real property mortgage loans (Loans 55 and
56 purchased and serviced by Defendant) delinquent
to the credit reporting agencies (Doc. # 73 at 2, Doc.
# 66 at 3). Furthermore, Plaintiff alleges Defendant
foreclosed on Loan 56 and continued to erroneously
report both loans delinquent after Plaintiff spent nine
months making multiple phone calls and sending
correspondence, including cancelled checks and loan
documents, verifying the loans were current (Doc. #
73 at 2). Plaintiff asserts that, based on Defendant's
willful conduct, Plaintiff was precluded from
acquiring mortgage loans and refinancing existing
loans and was forced to pay higher interest rates on
mortgages and lines of credit (Doc. # 73 at 2).
Furthermore, Plaintiff asserts existing lines of credit
were reduced or cancelled (*Id.*).

Plaintiff's Amended Verified Complaint includes the
following causes of action: 1) violations of the Real
Estate Settlement Procedures Act (12 U.S.C. § 2605)
(RESPA); 2) violations of the Fair Credit Reporting
Act (15 U.S.C. § 1681s-2) (FCRA); 3) violations of
the Fair Debt Collection Practices Act (15 U.S.C. §
1692 et. seq.) (FDCPA); and, 4) negligence (Doc. #
66).

**II. STANDARD FOR SUMMARY JUDGMENT**

The purpose of summary judgment is to avoid
unnecessary trials when there is no dispute as to the
facts before the court. *Northwest Motorcycle Ass'n v.
U.S. Dep't of Agric.,* 18 F.3d 1468, 1471 (9th
Cir.1994). The moving party is entitled to summary
judgment where, viewing the evidence and the
inferences arising therefrom in favor of the
nonmovant, there are no genuine issues of material
fact in dispute and the moving party is entitled to
judgment as a matter of law. FED.R.CIV.P. 56(c);
*Bagdadi v.. Nazar,* 84 F.3d 1194, 1197 (9th
Cir.1996). Judgment as a matter of law is appropriate
where there is no legally sufficient evidentiary basis
for a reasonable jury to find for the nonmoving party.
FED.R.CIV.P. 50(a). Where reasonable minds could
differ on the material facts at issue, however,
summary judgment is not appropriate.*Warren v. City
of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert.
denied,*516 U.S. 1171 (1996).

The moving party bears the burden of informing the
court of the basis for its motion, together with
evidence demonstrating the absence of any genuine
issue of material fact. *Celotex Corp. v. Catrett,* 477
U.S. 317, 323 (1986). Once the moving party has met
its burden, the party opposing the motion may not
rest upon mere allegations or denials of the pleadings,
but must set forth specific facts showing there is a
genuine issue for trial. *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 248 (1986). Although the parties
may submit evidence in an inadmissible form, only
evidence which might be admissible at trial may be
considered by a trial court in ruling on a motion for
summary judgment.FED.R.CIV.P. 56(c); *Beyene v.
Coleman Sec. Serv., Inc.,* 854 F.2d 1179, 1181 (9th
Cir.1988).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**2007 WL 3226153 (D.Nev.)**

Page 2

**\*2** In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Anderson,* 477 U.S. at 248. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Id.*

### III. DISCUSSION

Defendant moves for judgment as a matter of law on all four of Plaintiff's causes of action (Doc. # 70). First, Defendant asserts Plaintiff's first cause of action for violations of RESPA must be dismissed because RESPA does not apply to loans obtained to buy rental properties for business purposes (*Id.* at 6-8). Next, Defendant asserts Plaintiff's second cause of action, for violations of the FCRA, must be dismissed because the FCRA does not apply to commercial transactions, no private right of action exists for alleged violations of the initial duties imposed on a furnisher of information by § 1681s-2(a), and no evidence exists that a Credit-Reporting Agency (CRA) notified Defendant that Plaintiff disputed information on Plaintiff's credit report (*Id.* at 8-12). Then, Defendant asserts Plaintiff's third cause of action for violations of the FDCPA must be dismissed because Plaintiff is not a "consumer" and Defendant is not a "debt collector" as defined by the FDCPA (*Id.* at 12-16). Finally, Defendant asserts Plaintiff's fourth cause of action for negligence must be dismissed because it is barred by the economic loss doctrine (Doc. # 70 at 17-20).

Plaintiff argues his mortgages are federally related mortgage loans subject to RESPA and Defendant is equitably estopped and has waived the argument that RESPA is not applicable (Doc. # 73 at 3-7).

Additionally, Plaintiff argues he is not contending the FCRA is applicable to his business transactions, but is alleging Defendant did not conduct a reasonable investigation into the accuracy of the information it reported to the CRAs (*Id.* at 7-8). Furthermore, Plaintiff argues that he is, in fact, a "consumer" and Defendant is a "debt collector" as defined by the FDCPA (*Id.* at 8-9). Finally, Plaintiff argues the economic loss doctrine is not applicable and Defendant's failure to raise its affirmative defenses in its answer constitutes a waiver (*Id.* at 9, Doc. # 75 at 2-3).

**\*3** Defendant replies that Plaintiff is not a consumer under any of the federal acts upon which he sues and Defendant did not waive any defenses (Doc. # 76).

### A. *Waiver of Defenses*

Plaintiff asserts each of Defendant's defenses are affirmative defenses; therefore, Defendant's failure to plead such defenses constitutes a waiver (Doc. # 75 at 2). Plaintiff further asserts that Defendant admitted in its Answer at paragraphs 23 and 24 and in its affirmative defenses numbers 2, 10, 11, 14 and 15 that it complied with RESPA; therefore, Defendant is estopped from taking two different positions in the same action and has, therefore, waived any contention that RESPA doesn't apply (Doc. # 73 at 3).

If Defendant did, in fact, waive its defenses, the remaining issues in the instant motion are moot; therefore, the court will address this issue first.

1. *Affirmative Defenses*

FED.R.CIV.P. 8(c) provides:

In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and *any other matter constituting an avoidance or affirmative defense.* When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**2007 WL 3226153 (D.Nev.)**

Page 3

justice so requires, shall treat the pleading as if there had been a proper designation.

FED.R.CIV.P. 8(c) (emphasis added). The question is whether Defendant's defenses fall within the language "any other matter constituting an avoidance or affirmative defense."*Id.*

The Ninth Circuit has held "[a] defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense."*Zivkovic v. Southern California Edison Co.,* 302 F.3d 1080, 1088 (9th Cir.2002) (*citing Flav-O-Rich v. Rawson Food Service, Inc. (In re Rawson Food Service, Inc.),* 846 F.2d 1343, 1349 (11th Cir.1988)). The Eleventh Circuit explained, in *Rawson Food Service, Inc.,* that a defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense. 846 F.2d at 546. "An affirmative defense raises matters extraneous to the plaintiff's *prima facie* case; as such, they are derived from the common law plea of 'confession and avoidance.' On the other hand, some defenses negate an element of the plaintiff's *prima facie* case; these defenses are excluded from the definition of affirmative defense in Fed.R.Civ.P. 8(c)."*846 F.2d at 1349* (*citing Ford Motor Co. v. Transport Indemnity Co.,* 795 F.2d 538, 546 (6th Cir.1986)) (internal citations omitted). Furthermore, "it is well established that '[t]he party asserting an affirmative defense usually has the burden of proving it.' " 846 F.2d at 1349 (*citing Drexel Burnham Lambert Group Inc. v. Galadari,* 777 F.2d 877, 880 (2d Cir.1985)).

a. *Applicability of Federal Statutes to Plaintiff's Claims*

*4 Plaintiff has the burden of proving his claims are properly asserted; therefore, whether or not Plaintiff's first, second and third causes of action properly fall under the federal statutes is not a matter (or question) "extraneous" FN1 to Plaintiff's *prima facie* case. To the contrary, Defendant's defenses, if true, negate an element of Plaintiff's *prima facie* case. *Rawson Food Service, Inc.,* 846 F.2d at 546. Furthermore, Defendant's defenses clearly point out defects in Plaintiff's *prima facie* case and, therefore, are not affirmative defenses. *Id.* Accordingly, Plaintiff did not waive these defenses.

FN1."An extraneous question is a question

that is beyond or beside the point to be decided."BLACK'S LAW DICTIONARY 606 (7th ed.1999).

b. *Economic Loss Doctrine*

Plaintiff asserts the economic loss doctrine is an affirmative defense and, therefore, has been waived. However, Plaintiff provides no authority or support for his conclusory statement that "Defendant did not plead as an affirmative defense: 1) the economic loss doctrine."(Doc. # 75 at 2).

It appears no court, in the Ninth Circuit or otherwise, has held the economic loss doctrine is an affirmative defense and at least one court has expressly held the economic loss doctrine is not an affirmative defense which can be waived under FED.R.CIV.P. 12(h)(1).*St. Paul Mercury Ins. Co. v. Viking Corp.,* 2007 WL 129063, 21 (E.D.Wis.2007) (official citation not available). The *Viking Corp.* court reasoned, and this court finds persuasive, that "courts regularly decide motions to dismiss under Rule 12(b)(6) based on the economic loss doctrine. Given that it is improper to grant a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense, it logically follows that the economic loss doctrine is not an affirmative defense which must be pled as such."*Id.* At 22. Accordingly, Defendant did not waive this defense.

2. *Inconsistent Positions*

Plaintiff argues that by admitting compliance with RESPA Defendant has waived any contention that RESPA does not apply to the two mortgages at issue (Doc. # 73 at 3). Plaintiff contends that by admitting compliance, Defendant has ultimately admitted it was *required* to comply with RESPA. However, Defendant does not assert that it was required to comply with RESPA; Defendant asserts that "standard loan servicing procedure requires compliance with RESPA, regardless of the purpose of the Loan."(Doc. # 76 at 2). In other words, although RESPA does not apply to these loans, Defendant has nevertheless complied with RESPA's requirements.

Defendant may properly plead alternate defenses under FED.R.CIV.P. 8(e)(2).Rule 8(e)(2) provides, in pertinent part:

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**2007 WL 3226153 (D.Nev.)**

A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds. All statements shall be made subject to the obligations set forth in Rule 11.

**\*5** FED.R.CIV.P. 8(e)(2).

Here, the issue is one of alternative pleading. The Ninth Circuit has held that "[i]n light of the liberal pleading policy embodied in Rule 8(e)(2)... a pleading should not be construed as an admission against another alternative or inconsistent pleading in the same case." _Molsbergen v. United States,_ 757 F.2d 1016, 1019 (9th Cir.), _cert. dismissed,_ 473 U.S. 934 (1985); _see also, McCalden v. California Library Ass'n,_ 955 F.2d 1214, 1219 (9th Cir.1990). Under Rule 8(e)(2), Defendant may properly assert that RESPA does not apply, and in the alternative if RESPA does apply, Defendant has complied. Therefore, Plaintiff has not waived this defense.

**B. _RESPA Claims_**

Defendant asserts Plaintiff's RESPA claims must be dismissed because RESPA does not apply to credit transactions "primarily for business, commercial or agricultural purposes" (Doc. # 70 at 6). Defendant contends Plaintiff's loans were used to acquire two four-plex rental properties for business purposes, which Plaintiff never intended to nor actually did occupy (Doc. # 70 at 7-8).

Plaintiff argues his two mortgage loans are "federally related mortgage loans" and are, therefore, subject to RESPA (Doc. # 73 at 4). Plaintiff further argues that RESPA applies because the loans were used to purchase real property and each loan was secured by real property (_Id._).

Defendant responds that Plaintiff's loans are not "federally related mortgage loans" under RESPA because Regulation Z plainly excludes commercial and business purpose loans from RESPA's definition (Doc. # 76 at 3). Defendant asserts RESPA directs the district court to apply the Truth in Lending Act's (TILA's) definition of commercial transactions, which is outlined in Regulation Z, and under Regulation Z credit obtained to acquire rental property that is not owner occupied is deemed to be for business purposes (_Id._ at 4).

1. _Definition of "Federally Related Mortgage Loan"_

The term "federally related mortgage loan" includes any loan which "is secured by a first or subordinate lien on residential property (including individual units of condominiums and cooperatives) designed principally for the occupancy of from one to four families, including any such secured loan, the proceeds of which are used to prepay or pay off an existing loan secured by the same property ..." 12 U.S.C. § 2602(1)(A). The loan must also meet one of four other requirements expressed in the statute. _Id._

The parties do not dispute that Plaintiff's loans may fall under the definition of "federally related mortgage loan" as it is defined in the statute. However, the parties do dispute whether RESPA applies to the loans.

2. _Applicability of RESPA to a "Federally Related Mortgage Loan"_

While RESPA does apply to federally related mortgage loans, RESPA explicitly exempts certain federally related mortgage loans from its coverage. 24 C.F.R. § 3500.5. Under paragraph (b) of Regulation X, "business purpose loans" (defined as "[a]n extension of credit primarily for a business, commercial, or agricultural purpose, as defined by Regulation Z, 12 C.F.R. 226.3(a)(1)") are excluded from RESPA's coverage. 24 C.F.R. § 3500.5(b)(2). In determining whether Plaintiff's loans fall under RESPA's definition of "business purpose loans", Regulation X directs this court to rely on Regulation Z. _Id._ Regulation Z expressly provides, in pertinent part, that "[c]redit extended to acquire ... rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes .... [furthermore, even] [i]f credit is extended to acquire rental property that is or will be

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**2007 WL 3226153 (D.Nev.)**

owner-occupied within the coming year ... [c]redit extended to acquire rental property is deemed to be for business purposes if it contains more than 2 housing units." 12 C.F.R. Pt. 226, Supp. 1., § 226.3 at Comment 3(a)-3, 3(a)-4.

*6 Here, it is undisputed that Plaintiff acquired two four-plex rental properties, neither of which are now or ever were owner-occupied. Therefore, based on RESPA's clear direction to rely on Regulation Z and Regulation Z's unambiguous definition of "business purpose loans", Plaintiff's loans obtained to acquire two four-plex rental properties constitute "business purpose loans" and are exempted from RESPA.

Accordingly, summary judgment on Plaintiff's RESPA claims is *GRANTED*.

## C. *FCRA Claims*

Defendant asserts Plaintiff's FCRA claims must be dismissed because the FCRA does not apply to Plaintiff's business transactions, there is no evidence a CRA notified Defendant that Plaintiff disputed information it provided and there is no private right of action for violations of § 1681s-2(a) (Doc. # 70 at 8-12).

Plaintiff argues he is not asserting a cause of action under § 1681s-2(a) and Defendant admitted being notified that Plaintiff disputed information it reported to the CRAs (Doc. # 73 at 7-8). Furthermore, Plaintiff alleges Defendant violated § 1681s-2(b) by failing to conduct a reasonable investigation into the accuracy of the information Defendant reported to the CRAs (Doc. # 73 at 7-8).

Defendant responds that the FCRA is inapplicable to reports used for commercial purposes and it has not admitted it was notified by a CRA about Plaintiff disputing any information it provided to a CRA (Doc. # 76 at 5-6).

Defendant basically argues that, as a furnisher of information, it cannot be held liable under the FCRA for inaccurately reporting information to a CRA and failing to investigate disputed information if the transactions at issue are commercial transactions. However, Defendant cites no Ninth Circuit case law to support this contention. Furthermore, the cases cited by Defendant deal with credit reports obtained and utilized for commercial purposes, not the liability of furnishers of information to a CRA regarding a commercial transaction. *See Mathews v. Worthen & Trust Co.*, 741 F.2d 217, 219 (8th Cir.1984) (finding a particular transaction exempt from the FCRA because the credit report was used solely for a commercial purpose); *Podell v. Citicorp Diners Club, Inc.*, 914 F.Supp. 1025, 1036 (S.D.N.Y.1996) (The loss of plaintiff's opportunity to participate in a real estate enterprise due to adverse information included in a furnished credit report is not the sort of loss cognizable under the FCRA); *Lucchesi v. Experian Information Solutions, Inc.*, 226 F.R.D. 172, 174 (S.D.N.Y.2005) (report issued in connection with a business operated by the consumer cannot form basis of liability under the FCRA).

The Ninth Circuit has applied the FCRA broadly, focusing on the purpose for which the information was obtained by the CRA in addition to the purpose for which the credit report was sought. *Hansen v. Morgan*, 582 F.2d 1214 (9th Cir.1978). In *Hansen*, although analyzing a different subsection under the FCRA, the Ninth Circuit explained:

*7 Section 1681a(d) of Title 15 defines "consumer report" to be:

"... Any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of this title. * * * "(Emphasis added.)

The credit report issued on the Hansens in this case falls directly within this definition. Since the Pocatello Credit Bureau knew nothing of the Morgans' real reason for requesting the report, it must have supplied this information with the expectation that the Morgans would use it for purposes consistent both with the FCRA and with the Bureau's form membership contract which closely correlated with the restrictions in the act. And unless the Bureau was

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

generally collecting such information for purposes not permitted by the FCRA, it must have collected the information in the report for use consistent with the purposes stated in the act. There has been no suggestion otherwise. Accordingly, the credit report is (1) a written communication of information (2) by a consumer reporting agency (3) bearing on the Hansens' credit worthiness, credit standing or credit capacity (4) *which was both expected to be used, and collected in whole or in part, for the purpose of establishing the Hansens' consumer eligibility for credit transactions.* As such it is a consumer report under the FCRA.

*Hansen,* 582 F.2d at 1218 (emphasis added).

Citing to *Hansen,* the Seventh Circuit held that "a consumer may establish that a particular credit report is a 'consumer report' falling within the coverage of the FCRA if: (1) the person who requests the report actually uses the report for one of the 'consumer purposes' set forth in the FCRA; (2) the consumer reporting agency which prepares the report 'expects' the report to be used for one of the 'consumer purposes' set forth in the FCRA; or (3) the consumer reporting agency which prepared the report originally collected the information contained in the report expecting it to be used for one of the 'consumer purposes' set forth in the FCRA." *Ippolito v. WNS, Inc.,* 864 F.2d 440, 449 (7th Cir.1988).

The district court in the Western District of Kentucky also provides a persuasive analysis on this very issue, in *Breed v. Nationwide Ins. Co.,* 2007 WL 1231558, 1-2 (W.D.Ky.2007) (official citation not available), finding the plaintiff was entitled to at least proceed to trial. In *Breed,* the issue before the court was whether the reports produced by Trans Union that allegedly resulted in denials of credit and increased interest rates were "consumer reports" under the FCRA. *Id.* at 1. The plaintiff was a real estate investor who bought properties, rehabilitated them and then resold them for profit.*Id.* CCS, the furnisher of information, allegedly erroneously reported a negative item to Trans Union, which negatively affected the plaintiff's ability to procure credit. *Breed,* 2007 WL 1231558 at 1. The plaintiff alleged damages incurred as a result of higher interest rates on five mortgages and being denied credit three times when trying to purchase a vehicle. *Id.* The district court initially held such damages were not recoverable under the FCRA

because they arose from commercial transactions. *Id.* However, after further reviewing the developing case law, the district court withdrew its previous opinion finding the plaintiff could pursue his FCRA theory at least through trial. *Id.* at 1-2.Noting the Circuits are split as to whether the consumer's purpose for obtaining credit necessarily determines whether the report is a consumer report under the FCRA, the district court concluded that the developing case law does not provide a definitive or reliable answer.*Id.* at 2. Furthermore, the district court determined that the majority of Circuits, including the Ninth Circuit, suggest the expectations of the CRA at the time it prepared the credit report and at the time it collected the information contained in the report should be considered; therefore, to avoid injustice, the district court declined to dismiss any claims solely because they involved commercial transactions. *Id.*

**\*8** Defendant's argument that Plaintiff may not recover under the FCRA for losses resulting from the use of a credit report obtained solely for a commercial transaction is an accurate statement; however, it does not follow that because Defendant is reporting information regarding a commercial transaction to the CRAs, it is somehow insulated from all liability under the FCRA with regards to that transaction. Subsequent credit reports issued for "consumer purposes" containing the inaccurate information arguably do fall under the coverage of the FCRA. *See Hansen,* F.2d at 1218.

Plaintiff asserts Defendant's erroneous reporting of inaccurate information and willful failure to reasonably investigate the disputed information caused "credit lines to be reduced; credit line cancelled; credit line denied; two commercial loans denied; and personal financing denied."(Doc. # 66 at 6). Under these facts, the credit reports obtained for Plaintiff's commercial loans do not fall under the FCRA; however, the credit reports obtained in connection with Plaintiff's credit lines (provided they are personal lines of credit and not business lines of credit) and personal financing are "consumer reports" falling within the coverage of the FCRA.

The Ninth Circuit expressly recognizes a consumer's cause of action against a furnisher of credit information under § 1681s-2(b), *see Nelson v. Chase Manhattan Mortgage Corp.,* 282 F.3d 1057, 1058 (9th Cir.2002), and there is a genuine issue of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**2007 WL 3226153 (D.Nev.)**

material fact as to whether Defendant was properly notified of the disputed information. Furthermore, there are genuine issues of material fact, as set forth above, precluding summary judgment on Plaintiff's FCRA claims.

Accordingly, summary judgment on Plaintiff's FCRA claims is *DENIED.*

### D. *FDCPA Claims*

Defendant asserts Plaintiff's FDCPA claims must be dismissed because Plaintiff is not a "consumer" and Defendant is not a "debt collector" as defined by the Act (Doc. # 70 at 12). Specifically, Defendant asserts the FDCPA does not apply to Plaintiff's loans because they are commercial in nature and the FDCPA does not apply to Defendant because Defendant did not act as a debt collector (*Id.* at 12-16).

Plaintiff argues the two loans are primarily for personal, family or household purposes and the real properties are part of Plaintiff's retirement planning; therefore, they are not commercial in nature (Doc. # 73 at 8-9). Plaintiff further argues Defendant is a debt collector because Defendant used ASC to collect the debt and Plaintiff did not discover ASC was actually Defendant until prior to filing his complaint (Doc. # 73 at 9). Finally, Plaintiff argues it is a question of fact as to whether Defendant is a debt collector (*Id.*).

Defendant responds that Plaintiff's theory of claiming the loans are part of his retirement planning, where he does not assert he ever actually lived in any of the rental properties, is untenable (Doc. # 76 at 7).

#### 1. *Consumer Debt v. Business Debt*

**\*9** "The FDCPA protects consumers from unlawful debt collection practices. Consequently, the Act applies to consumer debts and not business loans. The term 'debt' is defined as: [A]ny obligation or alleged obligation *of a consumer* to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are *primarily for personal, family, or household purposes*...15 U.S.C. § 1692a(5)."*Bloom v. I.C. System, Inc.,* 972 F.2d 1067, 1068 (9th Cir.1992) (emphasis in original)."When

classifying a loan, courts typically 'examine the transaction as a whole,' paying particular attention to 'the purpose for which the credit was extended in order to determine whether [the] transaction was primarily consumer or commercial in nature.' " 972 F.2d at 1068 (*citing Tower v. Moss,* 625 F.2d 1161, 1166 (5th Cir.1980)). "The Act does not define 'transaction' but the consensus judicial interpretation is reflected in the Seventh Circuit's ruling that the statute is limited in 'reach 'to those obligations to pay arising from consensual transactions, where parties negotiate or contract for *consumer-related goods or services.*' " *Turner v. Cook,* 362 F.3d 1219, 1227 (9th Cir.2004) (internal citations omitted) (emphasis added).

At least one other district court has expressly found the FDCPA does not apply to rental properties. *Piper v. Portnoff Law Associates,* 215 F.R.D. 495, 502, n. 10 (E.D.Pa.2003). In making this determination, the district court reasoned that obligations owed by individuals who owned their property for business purposes did not qualify as debts under the FDCPA because the services were not primarily for personal, family or household purposes. *Piper,* 215 F.R.D. at 501. This reasoning is persuasive and in line with "consensus judicial interpretation." *Turner,* 362 F.3d at 1227.

Plaintiff does not dispute he acquired the loans to purchase two four-plexes in Portland, Oregon, which are rental properties, and that he never resided in either of the rental properties. Plaintiff merely asserts that "[t]he mortgages are primarily for personal, family or household purposes ... [because] ... the real properties are part of, among other purposes, the Plaintiff's retirement planning ... [and] ... [p]lanning for one's retirement is not a business loan."(Doc. # 73 at 8). Plaintiff also asserts this question is a question of fact for the jury (*Id.*).

As stated above, the Ninth Circuit instructs the district court, not the fact finder, to examine the transaction as a whole in determining whether it was primarily consumer or commercial in nature. *Bloom,* 972 F.2d at 1068. Here, Plaintiff is a real estate investor and developer in multiple states and has purchased over one hundred residential and commercial investment properties (Doc. # 70 at 2). The two loans at issue were used to acquire two residential investment properties in order to collect

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**2007 WL 3226153 (D.Nev.)**

rental payments (*Id.* at 3-4). Plaintiff has not used either of these rental properties for his personal residence or for any other personal, family or household purpose. Furthermore, Plaintiff cites to no authority supporting the proposition that obtaining rental properties, which he does not occupy, but merely uses to collect rental payments, is still consumer in nature because he uses the properties for retirement planning. Under these facts, Plaintiff's debt is business in nature, not consumer in nature.

### 2. *Debt Collector*

**\*10** Plaintiff argues Defendant is a "debt collector" because the mortgages were originally obtained through Resource Concepts and were eventually assigned to Defendant, Plaintiff did not discover ASC was actually Defendant until prior to filing his complaint and not knowing this relationship would lead a person to believe the debts were being collected by a third party (Doc. # 73 at 9).

While the term "debt collector" includes "any creditor, who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts", 15 U.S.C. § 1692a(6), Plaintiff's Amended Verified Complaint fails to allege that Wells Fargo used a name which would indicate a third person was collecting or attempting to collect a debt. Plaintiff alleges violations of §§ 1692d, 1692e, 1692f, 1692g and 1692h asserting the following facts: Wells Fargo acquired the loans on July 1, 2004 (Doc. # 66 at 3); Plaintiff made timely payments on the loans throughout the assignment (*Id.* at 4); Wells Fargo made an error by not crediting two payments to Loan 56 (*Id.*);Wells Fargo misapplied check 1080 to another account(*Id.*);Wells Fargo would not correct its error and alleged Loan 55 and Loan 56 were delinquent (*Id.* at 6); and, Wells Fargo eventually commenced foreclosure on Loan 56 (*Id.* at 9). Plaintiff's allegations indicate Plaintiff was fully aware that Defendant acquired the loans and Defendant attempted to collect the debt owed on those loans. Under these facts, Defendant is a creditor, not a debt collector.

Accordingly, summary judgment on Plaintiff's FDCPA claims is ***GRANTED.***

### E. *Negligence Claim*

Defendant asserts Plaintiff's negligence claim should be dismissed because it is barred by Oregon's economic loss doctrine (Doc. # 70 at 17). Specifically, Defendant asserts that Plaintiff has not alleged a special relationship exists between Defendant and Plaintiff and, furthermore, Defendant did not owe Plaintiff a duty outside the realm of common law negligence standards (*Id.* at 18). Defendant further asserts the federal statutes do not create a duty beyond that of ordinary negligence, and even if a special relationship existed, Defendant's duty is limited by the foreseeability of the harm (*Id.* at 19-20).

Plaintiff argues the economic loss doctrine does not bar his claim because RESPA and the FCRA impose a statutory duty on Defendant owed to Plaintiff (Doc. # 73 at 9).

Defendant responds that none of the federal statutes relied upon by Plaintiff actually apply to him; therefore, Plaintiff's negligence claim is barred (Doc. # 76 at 9).

As previously discussed, the only federal statute applicable to Plaintiff's claims is the FCRA; therefore, the Court's analysis of the economic loss doctrine is limited to the FCRA.

The FCRA expressly precludes negligence actions against a furnisher of information, except under certain circumstances. Section 1681h(e) provides as follows:

**\*11**    *Except as provided in sections 1681n and 1681o of this title,* no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or *negligence* with respect to the reporting of information against any consumer reporting agency, Any user of information, *or any person who furnishes information to a consumer reporting agency,* based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, *Except as to false information furnished with malice or willful intent to injure such consumer.*

15 U.S.C. § 1681h(e) (emphasis added).

Plaintiff alleges Defendant willfully violated §

Slip Copy
Slip Copy, 2007 WL 3226153 (D.Nev.)
**2007 WL 3226153 (D.Nev.)**

1681s-2(b) by failing to conduct a reasonable investigation of the debt it reported to the CRAs after being notified the debt was in dispute (Doc. # 66 at 12). Plaintiff also alleges Defendant violated, among others, §§ 1681g and 1681h(*Id.* at 6). However, Plaintiff makes no allegations that Defendant furnished false information to the CRAs with malice or a willful intent to injure Plaintiff. Therefore, under these facts, the FCRA precludes Plaintiff's negligence claim.

Because the FCRA precludes Plaintiff's negligence claim, the district court need not decide whether Oregon's economic loss doctrine bars this claim.

Accordingly, summary judgment on Plaintiff's negligence claim is ***GRANTED.***

### IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (Doc. # 70) is ***GRANTED*** as to Plaintiff's First, Third and Fourth Causes of Action and ***DENIED*** as to Plaintiff's Second Cause of Action.

D.Nev.,2007.
Johnson v. Wells Fargo Home Mortg., Inc.
Slip Copy, 2007 WL 3226153 (D.Nev.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

T.C. Memo. 2006-33                    Page 1
T.C. Memo. 2006-33, 2006 WL 469770 (U.S.Tax Ct.), 91 T.C.M. (CCH) 791, T.C.M. (RIA) 2006-033, 2006 RIA
TC Memo 2006-033
**T.C. Memo. 2006-33, (U.S.Tax Ct.)2006 WL 469770**

**C**Anderson v. C.I.R.
U.S.Tax Ct.,2006.

United States Tax Court.
Charles E. and Sandra A. ANDERSON, Petitioners
v.
COMMISSIONER OF INTERNAL REVENUE,
Respondent
**No. 13228-04.**

Feb. 27, 2006.

**Background:** Taxpayers, operators of bed and breakfast inn who used part of inn as personal residence, petitioned for redetermination of deficiencies arising from disallowance, for purpose of calculating depreciation and interest deductions, of expenses associated with dual-use portions of inn.

**Holding:** The Tax Court, <u>Swift</u>, J., held that taxpayers could not include in their calculation of depreciation and interest deductions any portion of expenses associated with dual-use portions.
Decision for IRS.

West Headnotes

**Internal Revenue 220 ☜══3282**

<u>220</u> Internal Revenue
    <u>220V</u> Income Taxes
        <u>220V(I)</u> Deductions
            <u>220V(I)1</u> In General
                <u>220k3279</u> Interest Paid or Accrued
                      <u>220k3282</u> k. Particular Transactions.
<u>Most Cited Cases</u>

**Internal Revenue 220 ☜══3483**

<u>220</u> Internal Revenue
    <u>220V</u> Income Taxes
        <u>220V(I)</u> Deductions
            <u>220V(I)5</u> Depreciation, Depletion, Obsolescence, and Exhaustion
                <u>220k3483</u> k. Buildings and Other Structures. <u>Most Cited Cases</u>

Taxpayers, operators of bed and breakfast inn who used part of inn as personal residence, could not include in their calculation of depreciation and interest deductions any portion of expenses associated with dual-use portions of inn, i.e. portions used both by paying guests and by taxpayers for personal use; dual-use portions were outside "hotel exception" of Internal Revenue Code section generally disallowing business expense deductions connected with taxpayer's dwelling unit. <u>26 U.S.C.A. § 280A(a)</u> and <u>(f)(1)(B)</u>.

Mark S. Miller, for petitioners.
<u>Jeremy L. McPherson</u> and Daniel J. Parent, for respondent.

MEMORANDUM OPINION

<u>SWIFT</u>, J.
  **\*1** *Held:* Because petitioners use a portion of their bed and breakfast inn as their personal residence, the general disallowance rule of <u>sec. 280A(a), I.R.C.</u>, and the exclusive-use limitation of <u>sec. 280A(f)(1)(B)</u>, <u>I.R.C.</u>, are applicable, and expenses relating to the portion of the inn that is used for both business and personal purposes (i.e., dual-use portion) are not allowable.

Respondent determined a $1,434 deficiency in petitioners' 2000 joint Federal income tax.

The issue for decision is whether petitioners' bed and breakfast inn is to be treated as a dwelling unit subject to the general disallowance rule of <u>section 280A(a)</u> and to the exclusive-use limitation of <u>section 280A(f)(1)(B)</u>. If so, none of the expenses relating to the portion of petitioners' bed and breakfast inn that is used for both business and personal purposes are allowable.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

*Background*

The facts of this case have been fully stipulated by the parties under Rule 122 and are so found.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2006-33

T.C. Memo. 2006-33, 2006 WL 469770 (U.S.Tax Ct.), 91 T.C.M. (CCH) 791, T.C.M. (RIA) 2006-033, 2006 RIA TC Memo 2006-033

**T.C. Memo. 2006-33,   (U.S.Tax Ct.)2006 WL 469770**

At the time the petition was filed, petitioners resided in Sutter Creek, California.

In April of 2000, petitioners purchased a bed and breakfast inn located in Sutter Creek (the Inn). From the time of its purchase, petitioners and petitioner Sandra Anderson's parents have used a portion of the Inn as their personal residence, and, after making repairs and improvements, petitioners continued operating the Inn as a bed and breakfast under the name of "Eureka Street Inn".

From the appropriate government agencies, petitioners obtained the permits, licenses, and certifications required to operate the Inn as a bed and breakfast. Petitioners also obtained membership in a local bed and breakfast trade association and in the local chamber of commerce.

In 2000, petitioners' Inn had 289 separate room rentals from which petitioners received rental income of $26,476.

Petitioners' Inn has 5,664 square feet of useable floor space and consists of three floors-a main floor, an upstairs floor, and a basement.

*Main Floor*

The main floor of petitioners' Inn consists of a living room, a dining room, two bedrooms, two bathrooms, a sewing room, a lobby, a registration area, an office, a kitchen, a laundry room, and stairs leading to the upstairs floor.

Petitioners and petitioner Sandra Anderson's parents exclusively use the two bedrooms, the two bathrooms, and the sewing room for personal purposes.

The living room and the dining room are used exclusively by paying guests of the bed and breakfast, and the stairs are used exclusively in operating the bed and breakfast.

The balance of the main floor (lobby, registration area, office, kitchen, and laundry room) is used both for business in operating the bed and breakfast and by petitioners for personal purposes. Hereinafter, we refer to the portion of the Inn on the main floor that is used for both business and personal purposes as the "dual-use" portion.

**\*2** The parties have stipulated that during 2000 the dual-use portion of the Inn was used 75 percent of the time for business purposes and 25 percent of the time for personal purposes.

*Upstairs Floor*

The upstairs floor of the Inn consists of four guest suites with private bathrooms, each of which is used exclusively by paying guests of the bed and breakfast.

*Basement*

Except for a small space in the corner, the large basement room of the Inn is used exclusively for business purposes relating to the bed and breakfast.

*Tax Return*

As set forth below, the parties have stipulated that, of the Inn's total 5,664 square feet, 4,363 square feet were used exclusively in the business of operating the bed and breakfast, 695 square feet were used exclusively for petitioners' personal purposes, and 606 square feet were used for both business and personal purposes:

| | Total | Exclusively Business | | Exclusively Personal | | Dual-Use | |
|---|---|---|---|---|---|---|---|
| | *Square Feet* | *Square Feet* | *Percent of Total* | *Square Feet* | *Percent of Total* | *Square Feet* | *Percent of Total* |
| Main floor | 2,058 | 829 | 15 | 623 | 11 | 606 | 11 |
| Upstairs floor | 1,548 | 1,548 | 27 | 0 | 0 | 0 | 0 |
| Basement | *2,058* | *1,986* | *35* | *72* | *1* | *0* | *0* |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2006-33, 2006 WL 469770 (U.S.Tax Ct.), 91 T.C.M. (CCH) 791, T.C.M. (RIA) 2006-033, 2006 RIA
TC Memo 2006-033
**T.C. Memo. 2006-33,   (U.S.Tax Ct.)2006 WL 469770**

| Total | 5,664 | 4,363 77 | 695 | 12 | 606 | 11 |
|---|---|---|---|---|---|---|

In the preparation of petitioners' 2000 Federal income tax return and in calculating the depreciation and interest deductions relating to the business of the bed and breakfast, to the total 606 square feet dual-use portion of the Inn petitioners applied the 75 percentage of the time that such portion of the Inn was used for business purposes, resulting in 455 square feet. Petitioners added this 455 square feet to the 4,363 square feet of the Inn used exclusively for business, and petitioners calculated that a total of 4,818 square feet of the Inn was used in the business of the bed and breakfast.

Petitioners then calculated a business-use percentage for the entire Inn by dividing the total business square feet of 4,818 by the Inn's total square feet of 5,664. Under this calculation, the Inn was treated by petitioners as used 85 percent for business and 15 percent for personal use.

On Schedule C, Profit or Loss From Business, of their 2000 joint Federal income tax return, petitioners applied the above percentages (85 percent business, 15 percent personal) to the total depreciation and interest expenses relating to the Inn.

In the above calculations, petitioners treat the Inn as what they refer to as a "commercial structure," and petitioners do not apply the exclusive-use limitation of section 280A(f)(1)(B) to the dual-use portion of the Inn.

On audit, because petitioners used a portion of the Inn as their personal residence, respondent applied the exclusive-use limitation of section 280A(f)(1)(B) and disallowed all business deductions relating to the dual-use portion of the Inn. Respondent recalculated allowable depreciation and interest deductions relating to the bed and breakfast business based on an allocation factor of 77 percent (i.e., the portion of the Inn used exclusively in the business).

*Discussion*

**\*3**  Section 280A(a) provides a general disallowance rule for expenses relating to a "dwelling unit" that is used as a personal residence of the owner taxpayer. Section 280A(a) provides generally as follows: <sup>FN1</sup>

Except as otherwise provided in this section * * * no deduction * * * shall be allowed with respect to the use

of a dwelling unit which is used by the taxpayer during the taxable year as a residence.

For purposes of section 280A, a dwelling unit is treated as used as a taxpayer's residence if the taxpayer uses the dwelling unit (or a portion thereof) for personal purposes for the greater of 14 days or 10 percent of the number of days during the year that the unit is rented at a fair rental value.Sec. 280A(d)(1).

Section 280A(f)(1)(A) defines a "dwelling unit" for purposes of section 280A as:

a house, apartment, condominium, mobile home, boat, or similar property, and all structures or other property appurtenant to such dwelling unit.

Under section 280A(f)(1)(B), however, where portions of a dwelling unit are used exclusively as a hotel, motel, inn, or similar business, the portion thereof that is used exclusively in the business will not be considered part of the dwelling unit for purposes of the disallowance rule of section 280A(a) (the Hotel Exception).Section 280A(f)(1)(B) provides as follows:

The term "dwelling unit" does not include that portion of a unit which is used exclusively as a hotel, motel, inn, or similar establishment.

The word "exclusively", as used in section 280A(f)(1)(B), should be given its ordinary and common meaning. *Crane v. Commissioner,* 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947); *Old Colony R.R. Co. v. Commissioner,* 284 U.S. 552, 52 S.Ct. 211, 76 L.Ed. 484 (1932).

In *Byers v. Commissioner,* 82 T.C. 919, 925, 1984 WL 15582 (1984) (involving the rental of a condominium unit as part of a resort hotel and the personal use of the condominium by the taxpayer for 30 days of the year), we held that for purposes of the Hotel Exception "exclusively" means "solely" and that "any rent-free personal use of a unit during a taxable year precludes finding that such unit was used 'exclusively as a hotel.' "

Accordingly, once personal use exceeds the 14-day or 10-percent trigger of section 280A(d)(1), under the Hotel Exception the only portion of a hotel, motel, inn, or bed and breakfast that is excepted from the general disallowance rule of section 280A(a) is that portion that is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2006-33
T.C. Memo. 2006-33, 2006 WL 469770 (U.S.Tax Ct.), 91 T.C.M. (CCH) 791, T.C.M. (RIA) 2006-033, 2006 RIA
TC Memo 2006-033
**T.C. Memo. 2006-33,   (U.S.Tax Ct.)2006 WL 469770**

used exclusively in the business. Under the exclusive-use rule, the Hotel Exception does not apply to the dual-use portion of a hotel, inn, or bed and breakfast. See *Lofstrom v. Commissioner,* 125 T.C. ----, (2005) (slip op. at 11).

Petitioners, however, argue that a structure that otherwise would fall within the <u>section 280A(f)(1)(A)</u> definition of a dwelling unit, such as petitioners' Inn, at some point may become so commercial in operation and so different from a personal residence that the general disallowance rule of <u>section 280A(a)</u> should not apply to the dual-use portion, and business expenses relating to the dual-use portion of the property (e.g., in this case the lobby, registration area, office, kitchen, and laundry) should be allowed. Petitioners implicitly contend that their Inn has become so commercial that it should be treated the same as petitioners would treat a large hotel.<u>FN2</u>

*4 In *Grigg v. Commissioner,* 979 F.2d 383, 385-386 (5th Cir.1992),* affg. <u>T.C. Memo.1991-392</u>, in which the taxpayer, similar to the taxpayer in *Byers v. Commissioner,supra,* used a condominium for part of the year as a rental and for part of the year as a personal residence, the Court of Appeals, in dicta, stated that <u>section 280A</u> does apply to large hotels:

[A] taxpayer may * * * [take deductions] for the entire portion of the hotel which is used solely for commercial purposes. The portion of the hotel which is used for personal use obviously does not fit the exception and therefore *is* a dwelling unit, subject to the provisions in <u>section 280A</u>.

Thus, for example, if 98 units of a 100 unit hotel are used exclusively as a hotel and 2 units are used for personal reasons, the deductible expenses for the 98 units are excepted from <u>section 280A</u> and cannot be limited thereby since that portion of the hotel meets the requirements of the hotel exception. The other two units are dwelling units since the owner has not used them exclusively as a hotel. * * * [Fn. ref. omitted.]

The purpose of <u>section 280A</u> is to prevent taxpayers from taking business deductions which in effect relate to personal living expenses. By reading into the statutory language of <u>section 280A</u> an exception for establishments that reach a certain size or commercial level, petitioners would in effect grant to taxpayers owning large hotels deductions that would be prohibited to owners of small hotels simply by virtue of the disparity in the size or commercial nature of their respective hotels.

<u>Section 280A(f)(1)(B)</u> specifically refers to hotels and in so doing does not place any limitation on the size or nature of the hotel. The narrow reading by petitioners of <u>section 280A(f)(1)(A)</u> is not consistent with the statutory language.

Even if petitioners' legal argument had validity, which it does not, the facts herein are quite different from petitioners' extreme hypothetical situation. Nearly one quarter of petitioners' moderately sized bed and breakfast inn is used exclusively or partially for personal purposes.

If we find that <u>section 280A</u> is applicable to petitioners' Inn, in the alternative petitioners argue that their business use of the dual-use portion of the Inn should be treated as used exclusively in the business of operating a bed and breakfast and therefore as qualifying for business deductions under the Hotel Exception of <u>section 280A(f)(1)(B)</u>.

Petitioners misread the exclusive-use rule of the Hotel Exception. Thereunder, as explained, only the portion of petitioners' Inn used solely and exclusively in the business of operating the bed and breakfast is treated as business property. The dual-use portion of the Inn, because it was used partially for personal purposes, does not fall within the Hotel Exception, is not removed from the general definition of a dwelling unit, and related expenses are not excepted from the general disallowance rule of <u>section 280A(a)</u>.

*5 To reflect the foregoing,

*Decision will be entered under Rule 155.*

<u>FN1.</u> Certain exceptions to the general disallowance rule of <u>sec. 280A(a)</u> are not applicable to the issue before us.

<u>FN2.</u> Petitioners posit, for example, a situation in which a taxpayer-owner of a 500-room hotel uses one of the suites as his personal residence and chooses each morning to read the newspaper in the hotel lobby. Petitioners argue that the taxpayer's personal use of the lobby would be de minimis and should not result in the disallowance of business expenses relating to the hotel lobby. Respondent agrees that, "Arguably, merely reading a newspaper in a lobby does not

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 2006-33                                                          Page 5

T.C. Memo. 2006-33, 2006 WL 469770 (U.S.Tax Ct.), 91 T.C.M. (CCH) 791, T.C.M. (RIA) 2006-033, 2006 RIA TC Memo 2006-033

**T.C. Memo. 2006-33,   (U.S.Tax Ct.)2006 WL 469770**


rise to 'use for personal purposes" ' but cautions that "the owner might be wise to do his reading elsewhere". Herein, we do not decide whether there is a de minimis exception to the exclusive-use limitation of <u>sec. 280A(f)(1)(B)</u>.

U.S.Tax Ct.,2006.

Anderson v. C.I.R.

T.C. Memo. 2006-33, 2006 WL 469770 (U.S.Tax Ct.), 91 T.C.M. (CCH) 791, T.C.M. (RIA) 2006-033, 2006 RIA TC Memo 2006-033


END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.